# IN THE UNITED STATES
# COURT OF INTERNATIONAL TRADE

CAMEL GROUP CO., LTD.,

     *Plaintiff,*

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CUSTOMS AND BORDER
PROTECTION; FORCED LABOR
ENFORCEMENT TASK FORCE;
ALEJANDRO MAYORKAS, *in his
official capacity as the Secretary of the
Department of Homeland Security*;
TROY A. MILLER, *in his official
capacity as the Senior Official Performing
the Duties of the Commissioner for
U.S. Customs and Border Protection*;
ROBERT SILVERS, *in his official capacity
as Under Secretary for Office of Strategy,
Policy, and Plans and Chair of the Forced
Labor Enforcement Task Force*,

     *Defendants.*

Case No.: _25-00022_

Hon._____

---

# COMPLAINT

---

Plaintiff Camel Group Co., Ltd. ("Camel Group" or "Plaintiff") complains and alleges as follows against Defendants United States of America, U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), Forced Labor Enforcement Task Force ("FLETF"), Alejandro Mayorkas, in his official capacity as the Secretary of the Department of Homeland Security, Troy A. Miller, in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection, and Robert Silvers, in his official capacity as DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF (collectively, "Defendants").

## SUMMARY OF THE ACTION

1.    Camel Group challenges the arbitrary and capricious actions of the Defendants in first, adding Plaintiff to the UFLPA Entity List pursuant to the Uyghur Forced Labor Prevention Act (Pub. L. No. 117-78, 135 Stat. 1525) (2021) ("UFLPA") without ever disclosing its basis for doing so and, second, summarily denying Plaintiff's request to be removed from the UFLPA List without providing a reasoned explanation or justification.  The FLETF's failure to inform Plaintiff of the reasons for and evidence supporting the FLETF's actions has caused and continues to cause serious and irreparable economic, commercial, and reputational harm to Plaintiff, and is a clear violation of the requirements of the Administrative Procedures Act ("APA"), which requires a reasoned decision. Put simply, Plaintiff's due process rights were utterly disregarded, ignored and trampled in a flawed and poorly executed process administered by Defendants.

2.     Camel Group is a listed company on the Shanghai Stock Exchange (Stock No.: 601311), and employs more than 7,200 people around the world. It manufactures and sells more than 400 different products, including automobile batteries, traction batteries, and marine batteries. Camel Group manufactures and sells these products directly and indirectly to customers in the

United States, Europe, and Asia. Camel Group, through its subsidiaries and affiliates, are invested in the United States market and active in the import and sale of products through its subsidiaries and wholesale customers.

3.      In December 2021, Congress passed, and President Biden signed into law, the UFLPA. The UFLPA went into effect on June 21, 2022, and directs the FLETF to create and maintain a list of entities it has a reasonable basis to believe are manufacturing goods wholly or in part with forced labor from certain ethnic minorities in the People's Republic of China, particularly the Xinjiang Uyghur Autonomous Region ("XUAR") ("UFLPA Entity List" or "Entity List"). Entities may be added to one of five sub-lists described in UFLPA § 2(d)(2)(B)(i) – (v).

4.      The UFLPA also directs CBP to detain and exclude goods from importation into the U.S. if those goods are mined, produced, or manufactured wholly or in part in XUAR or by an entity on the "Entity List." *See* 19 U.S.C. § 1307. UFLPA § 3(a). To strengthen this enforcement, CBP is permitted to draw a rebuttable presumption that such goods were produced in violation of the UFLPA when an entity is on the UFLPA Entity List.

5.      DHS and its Under Secretary for Office of Strategy, Policy, and Plans chair the FLETF, and announce additions to the UFLPA Entity List through press releases and notices in the Federal Register. These announcements only identify which section and list a named entity is added to, and they do not provide any explanation of why that entity is listed.

6.      To Camel Group's knowledge, belief and experience, a listed entity is not provided with any formal notice prior to a public announcement of its addition, is not provided its Administrative Record, and the FLETF does not communicate to the listed entity the evidence it relied on or the grounds for its decision.

7.      An entity can request removal from the list, but it needs to "provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the [UFLPA]." *See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug. 2, 2023). As part of the removal process, a listed entity may request a meeting with the FLETF prior to the FLETF's vote on that entity's removal petition. The burden is completely on the listed entity to disprove the FLETF's allegations without ever knowing the specific reasons and evidence the FLETF relied on for its decisions.

8.      From February 2023 to September 2023, CBP issued 82 detention notices to Camel Group's U.S. subsidiary, Camel Energy, Inc. ("Camel Energy") for products imported from Camel's China-based subsidiaries. These notices were issued by 10 different ports of entry around the United States.

9.      After significant cooperation from Camel Energy, CBP found in all 82 cases that Camel Energy provided sufficient information to successfully establish by "clear and convincing" evidence under UFLPA § 3(b) that Camel Group's goods were not made using forced labor or sourced from XUAR and were not subject to the UFLPA, resulting in these goods being released for import into the United States.

10.      Despite this, on August 2, 2023, the FLETF placed Camel Group[1] on the UFLPA Entity List pursuant to UFLPA § 2(d)(2)(B)(ii). In doing so, FLETF alleged that Camel Group is "working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the [XUAR]." *See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug. 2, 2023) ("Listing Decision"). A copy

---

[1] No other subsidiary of Camel Group is listed on the Entity List.

of the Listing Decision is provided as **Exhibit 1**.  Camel Group learned of the Listing Decision through the public announcement, and it was not provided prior notice or an opportunity to refute the FLETF's allegations prior to the Listing Decision.  Outside of citing the statute of the UFLPA in the Listing Decision, the FLETF provided Camel Group with no explanation as to why or what underlying facts or evidence the FLETF was relying on in its decision to add Camel Group.

11.    Camel Group attempted to obtain its Administrative Record by making numerous requests and outreach to Defendants. A copy of Plaintiff and Defendants' communications from August 2023 to July 2024 is provided as **Exhibit 2**.  Camel Group, through its U.S. subsidiary Camel Energy, Inc., even served a Freedom of Information Act ("FOIA") request on DHS. As of the date of this Complaint, however, DHS and FLETF have refused to respond to any these requests.  As a result, Camel Group was forced to search the Internet and publicly available resources to learn why FLETF may have added Camel Group to the Entity List.

12.    Through its due diligence, Camel Group discovered allegations by a non-governmental organization that claimed Camel Group participated in a XUAR government-sponsored labor transfer program in Toksun County, XUAR in or around July 2017. These allegations were made in three publicly available reports published by Sheffield Hallam University Helena Kennedy Centre for International Justice ("SHU"). The reports are collectively referred to as the "SHU Reports" and are generally described as follows:

      a.    "Financing & Genocide Development Finance and the Crisis in the Uyghur Region," published in February 2022 ("SHU Feb. 2022 Report").  A copy of the SHU Feb. 2022 Report is provided as **Exhibit 3**.

b.  "Driving Force:  Automotive Supply Chains and the Forced Labor in the Uyghur Region," published in December 2022 ("SHU Dec. 2022 Report").  A copy of the SHU Dec. 2022 Report is provided as **Exhibit 4**.

c.  "Products Made with Forced Labor in the Uyghur Region," published in May 2023 ("SHU May 2023 Report").  A copy of the SHU May 2023 Report is provided as **Exhibit 5**.

13.    After a thorough internal review and through credible evidence obtained from the competent agency of the Toksun County, XUAR Government, Camel Group's investigation affirmed that Camel Group did not participate in the labor transfer program in 2017 as alleged in the SHU Reports. And, most importantly, Camel Group confirmed that it had not participated in a government-sponsored labor transfer program that forced ethnic minorities "out of XUAR."

14.    On November 7, 2023, Camel Group submitted its removal request petition to the FLETF and requested a meeting with the FLETF pursuant to the Listing Decision ("Removal Petition" or "Petition"). Because FLETF refused to provide Camel Group its Administrative Record and DHS did not respond to Camel Energy's FOIA request, Camel Group was forced to resort to its own investigation and assumptions in preparing its Petition. In other words, Camel Group's Petition could only respond to the publicly available SHU Reports because FLETF refused to provide any reason for its decision. A copy of Camel Group's Removal Petition is provided as **Exhibit 6.**[2]

15.    After filing its Removal Petition, Camel Group and the FLETF had limited engagement between November 2023 and July 2024.  At no time, however, did the FLETF provide Camel

---

[2] Camel Group provides the main body of its Removal Petition as Exhibit 6.  Exhibits of the Removal Petition have not been included but are in the possession of the FLETF.

Group its Administrative Record or communicate the evidence or grounds the FLETF relied on in its Listing Decision.

16.     On July 9, 2024, nearly ten months after Camel Group filed its Removal Petition, the FLETF finally issued its written decision denying Camel Group's request for removal on the grounds that: i) it did not find Camel Group's evidence "credible or sufficient;" and ii) it ha[d] "reasonable cause to believe" that "[b]ased on publicly available information from 2017, 2023, and 2024" Camel Group participated and was still participating in the single identified labor transfer program from July 2017 ("Removal Decision"). The FLETF did not provide *any* explanation as to what it did not find "credible," completely failed to address why Camel Group's evidence that clearly rebutted the public reporting in the SHU Reports was not "sufficient," and failed to identify what "publicly available information from 2017, 2023, and 2024" it relied on.

17.     Throughout this process, the FLETF has failed to provide Camel Group with its Administrative Record or communicate the grounds and/or evidence relied on for the FLETF's decision to list Camel Group or the FLETF's Removal Decision, failed to provide Camel Group any measure of due process or administrative review, and failed to meaningfully engage Camel Group in an open and transparent manner.   These missteps were a clear violation of the Administrative Procedures Act and Camel Group's due process rights.

18.     After having completely exhausted its administrative remedies,[3] Camel Group is now compelled to seek relief by this Court from the FLETF's improper actions and submits this Complaint.

---

[3] In the case <u>Ninestar Corp.,</u> this Court stated: ""[T]he (Forced Labor Enforcement Task Force ("FLETF")) would do well to offer a more developed explanation before future disputes reach the court.  Conversely, if future litigants fail to exhaust their remedies and then bring suit for lack of adequate explanation, this decision provides notice that exhaustion may be particularly appropriate for those future cases so that listed entities receive an explanation for their listing first. *See* 28 U.S.C. § 2637(d). Exhaustion of the FLETF's delisting procedure, rather than litigation, is the

# PARTIES

19.     Camel Group Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, and is headquartered in Xiangyang, Hubei, China with a registered address located at No. 16, Gushui Road, Gucheng County Economic Development Zone, Hubei Province, China, 441700 China (referred to herein as "Camel Group").  Camel Group specializes in the R&D, production, sales, recycling and service of advanced batteries.

20.     The Department of Homeland Security is a federal agency of the United States government and is located in the District of Columbia with its principal office at 245 Murray Lane S.W., Washington, D.C. 20528 (hereinafter referred to as "DHS"). Among its duties, DHS' Office of Strategy, Policy and Plans ("PLCY") leads the FLETF.

21.     U.S. Customs and Border Protection is a federal agency of the United States government and is located in the District of Columbia with its principal office at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229 (hereinafter referred to as "CBP"). CBP is an agency within DHS. Among its duties, CBP enforces federal laws regulating the importation of goods into the United States, including enforcing the rebuttable presumption under the UFLPA.

22.     The Forced Labor Enforcement Task Force ("FLETF") is a task force comprising representatives from seven federal agencies of the United States government. The FLETF was

---

preferable route through which a litigant should receive adequate notice; it better conserves judicial resources and it makes use of the FLETF's expertise." Ninestar Corp., et. al, v. United States, et., al., Case No. 1:23-cv-00182-GSK, (Feb. 27, 2024 Opinion) (Slip-Op. 24-24), at p. 33, fn. 15 (citation omitted). Here, unlike Ninestar, Camel Group has already gone through the delisting procedure and exhausted its administrative remedies with the FLETF.  Conversely, the FLETF has utterly failed to heed this Court's instruction to provide Camel Group with its Administrative Record or its evidence or an explanation for the FLETF's Listing Decision.  Instead, and contrary to the instruction by this Court, the FLETF is forcing Camel Group to litigate for this information, needlessly wasting judicial resources.  Even more troubling, at the time of the Court's decision in Ninestar, Camel Group's Removal Petition was still pending with the FLETF and it would be another three months before FLETF decided on Camel Group's Removal Petition. Given the Court's warning on February 27, 2024, the FLETF had multiple opportunities to correct its error and provide Camel Group with its Administrative Record prior to issuing its Removal Decision, yet still failed to do so.

established by Congress in the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). *See* 19 U.S.C. § 4681(a). On information and belief, the FLETF primarily holds meetings and conducts its business in secret in the District of Columbia. Among its duties, the FLETF monitors the enforcement of the federal prohibition on importation of goods made with forced labor, including voting on additions to and removal from the UFLPA Entity List.

23.     Secretary Alejandro Mayorkas is sued solely in his official capacity as Secretary of DHS. In that capacity, Secretary Mayorkas has the ultimate responsibility for the activities of DHS and CBP, including the actions complained of herein. Based on knowledge and belief, Secretary Mayorkas maintains an office and may be contacted at 245 Murray Lane S.W., Washington, D.C. 20373 and 2707 Martin Luther King Jr Ave SE, Washington, D.C. 20528.

24.     Troy A. Miller is sued solely in his official capacity as the Senior Official Performing the Duties of the Commissioner for CBP. In that capacity, Mr. Miller is responsible for the activities of CBP, including the actions complained of herein. Based on knowledge and belief, Mr. Miller maintains an office at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229.

25.     Robert Silvers is sued solely in his official capacity as DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF. In that capacity, Under Secretary Silvers is responsible for the activities of FLETF, including the actions complained of herein. Based on knowledge and belief, Under Secretary Silvers maintains an office and may be contacted at 2707 Martin Luther King Jr Ave SE, Washington, D.C. 20528.

26.     The United States of America may be served through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, U.S. Department of Justice. C.I.T. R. 4(h).

## JURISDICTION AND VENUE

27.     This action arises under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702-706, and the UFLPA, Pub. L. No. 117-78, 135 Stat. 1525 (2021).

28.     This Court has jurisdiction under 28 U.S.C. § 1581(i).

## LEGAL BACKGROUND

29.     The Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590, prohibits the importation of any goods or merchandise made in whole or in part by forced labor in a foreign country. 19 U.S.C. § 1307.

30.     As part of its commitment to enforcing and monitoring this prohibition, the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020), directed the President to establish the FLETF, which President Biden did through executive order on May 15, 2020. *See* 19 U.S.C. § 4681(a); Exec. Order No. 13,923, 85 Fed. Reg. 30, 587.

31.     The FLETF is an inter-agency task force led by DHS Office for Strategy, Policy and Plans ("PLCY"), and chaired by Under Secretary Robert Silvers.  The seven FLETF Member Agencies include:  DHS, Office of the United States Trade Representative, Department of Labor, Department of State, Department of the Treasury, Department of Justice, and Department of Commerce.

32.     In December 2021, Congress passed, and President Biden signed into law, the Uyghur Forced Labor Prevention Act (Pub. L. No. 117-78, 135 Stat. 1525) (2021) ("UFLPA"), which directs the FLETF to develop a strategy for supporting enforcement of the prohibition on the importation of goods into the United States manufactured wholly or in part with forced labor in the People's Republic of China, especially from the Xinjiang Uyghur Autonomous Region ("XUAR").

33.     The UFLPA was passed on December 23, 2021, with a June 21, 2022 effective date. The UFLPA allows CBP to exclude goods imported into the United States if the goods are mined, produced, or manufactured wholly or in part in Xinjiang or by an entity on the "UFLPA Entity List" 19 U.S.C. § 1307. UFLPA § 3(a). The UFLPA permits the CBP to exercise a rebuttable presumption in detaining and/or excluding such goods.

34.     For any listed entity or entity whose goods CBP suspects are within the scope of the UFLPA, CBP is obligated to apply the presumption and exclude the goods from entry into the United States under the UFLPA unless the CBP commissioner concludes that the importer of record has complied with "FLETF supply chain guidance," cooperated with all CBP inquiries, and proves by "clear and convincing evidence" that the goods were not produced in whole or in part using forced labor from XUAR and are not subject to the UFLPA. UFLPA § 3(b).

35.     As part of the implementation of the UFLPA, the FLETF maintains a list of entities (the "UFLPA Entity List" or "Entity List") that it alleges, *inter alia*, are "working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang." UFLPA § 2(d)(2)(B)(ii). Additions are made by a majority vote of the FLETF member agencies; however, entities placed on the Entity List are only notified through public announcement by DHS or through the Federal Register, and are not told or provided any information, evidence, or justification for such addition other than identifying the section of the UFLPA that the entity is allegedly violating. *See Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List*, 87 Fed. Reg. 47777, 47778 (Aug. 4, 2022).

36.     An entity can request removal from the UFLPA Entity List by showing that it "no longer meets or does not meet" the criteria for which an entity has been listed, but because the

FLETF refuses to communicate to the entity the grounds for listing, an entity is then left to speculate as to why it has been added to the Entity List. Id. Put another way, the FLETF summarily accuses an entity of involvement in forced labor, punishes that entity by adding it to the UFLPA Entity List, refuses to tell that entity why it is being punished, and then places the burden to disprove the allegations on the entity without sharing the evidence against that entity.

37.    Entities may request a meeting with the FLETF prior to its vote on the entity's removal request, which the FLETF may choose to accept. At an unspecific time that is not defined in the UFLPA or its rules, the FLETF is required to vote and advise an entity in writing of the FLETF's decision on removal. The FLETF's decision is not appealable, but a new removal request can be submitted with new evidence. Id.

## STATEMENT OF FACTS

### Plaintiff Background

38.    Camel Group is a listed company on the Shanghai Stock Exchange (Stock No.: 601311) and together with its subsidiaries employs more than 7,200 people around the world, with manufacturing and R&D Centers also located around the world, including in the U.S.

39.    Camel Group offers over 400 different battery and battery-related products that can be used in various vehicle models, including internal combustion engine and pure electric models.

40.    Camel Group, through its subsidiaries and affiliates, are invested in the United States market and active in the import and sale of products through its subsidiaries and wholesale customers.

41.    In the years 2022 and 2023, prior to the Listing Decision, Camel Group, through its subsidiaries, imported millions of batteries and related components into the U.S.

42. In February 2022, Camel Group's wholly-owned U.S. subsidiary, Camel Energy, Inc. ("Camel Energy"), opened a manufacturing facility in Battle Creek, Michigan, creating several local jobs in the area.

43. Before Camel Energy opened its U.S. manufacturing facility, it had invested several millions of dollars in a sales and logistics center in Ann Arbor, Michigan, creating multiple local jobs in the area.

44. Camel Group, individually and through its US subsidiaries, conducted over USD $100 million in business in the US market, including over USD $75 million in gross sales in 2022.

45. Camel Group, through its US subsidiaries, has become a significant contributor to the U.S. economy and automotive industry, and remains an important asset in supporting the U.S. automotive OEMs as they continue to provide affordable vehicles to American consumers.

46. In September 2015, Camel Group established Camel Group Xinjiang Renewable Resources Co., Ltd. ("Camel Renewable")[4] in Toksun County, XUAR. Camel Renewable's business includes the recycling and sales of used batteries, lead slag, lead mud and lead-containing waste; recycling and sales of recycled crude lead, refined lead, alloy lead and lead oxide; the purchase and sale of scrap metal, waste plastics, sulfuric acid (industrial) operation with storage facilities; and the import and export trade of goods (except for goods and technologies prohibited from export by Chinese law).

---

[4] On August 30, 2024, Camel Group Xinjiang Renewable Resources Co., Ltd. (骆驼集团新疆再生资源有限公司) formally changed its name to "Turpan Metal Recycling Resources Co., Ltd. (吐鲁番金属再生资源有限公司)." The scope of business, shareholding structure, and operations did not change. Only the name was changed.

47.     Despite being founded in 2015, Camel Renewable did not begin operations or have a need for a manufacturing workforce until September 2019, after it received its final certification to begin production.

48.     In February 2017, Camel Group established Camel Group Xinjiang Storage Battery Co., Ltd. ("Camel Xinjiang Battery")[5] in Toksun County, XUAR.  Camel Xinjiang Battery's business includes the production and sales of batteries and their components as well as automobile parts; the sales of plastic products; battery technology development and services; and trade and import and export of technology (projects that require approval according to Chinese law can only be carried out after approval by relevant Chinese government departments).

49.     Like Camel Renewable, despite being founded in February 2017, Camel Xinjiang Battery did not begin operations or have a need for labor until the second quarter of 2018, after it received its final certification to begin production.

50.     Neither of Camel's Xinjiang facilities import products into the U.S.

51.     Prior to and even after the implementation of the UFLPA's rebuttable presumption by CBP under UFLPA § 3(a) on June 21, 2022, Camel Group did not experience any issues in importing its products into the United States.  It was not until shortly after the SHU Dec. 2022 Report was published that Camel Group began experiencing detentions under the UFLPA.

**The SHU Reports**

52.     The allegations against Camel Group of transferring ethnic minorities out of XUAR were first published in the SHU Feb. 2022 Report.  While SHU leveled other allegations against Camel Group, most relevant to this matter were the allegations of Camel Group's involvement

---

[5] On August 30, 2024, Camel Group Xinjiang Storage Battery Co., Ltd. (骆驼集团新疆蓄电池有限公司) formally changed its name to "Turpan Lead-Acid Storage Battery Co., Ltd (吐鲁番铅酸蓄电池有限公司)." The scope of business, shareholding structure, and operations did not change.  Only the name was changed.

with a 2017 government-sponsored labor transfer program in Toksun County, XUAR, known as the "Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划 (2017-2019 年)》) (herein after referred to as the "Labor Transfer Program").

53.    The SHU Feb. 2022 Report alleged that laborers were "dispatched to companies, including Camel Group" and that "workers were bussed to their assigned employers, which included Camel Group." Exhibit 3, at p. 30. In support of these allegations, SHU cited:

a.  Notice of the Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划 (2017-2019 年)》) ("Labor Transfer Program Regulations"). Per Section 4 of the Labor Transfer Program Regulations, an entity that received labor through the Labor Transfer Program would be paid subsidies and incentive payments from the local government for the employment of residents;

b.  A single WeChat article titled "Toksun County holds the handover ceremony for the urban and rural surplus labor enterprises in Kashgar and Hotan areas" (《托克逊县举行喀什、和田地区城乡富余劳动力企业上岗交接仪式》) ("WeChat Article"). A copy of the WeChat Article and certified English translation is provided as **Exhibit 7**. The article was published by the official WeChat account called "Toksun Employment Service," (《托克逊就业服务》), which is the official WeChat account for the Toksun County, XUAR Bureau of Social Security and Human Resources ("Toksun County SSHR"), a government agency in Toksun

County, XUAR.  The SHU Reports rely on the WeChat Article to allege that Camel

Group participated in a handover ceremony associated with the Labor Transfer

Program on or around July 10, 2017.

Exhibit 3, at p. 30, fns. 140 and 141.

54.     The SHU Feb. 2022 Report also contained photos of the Labor Transfer Program's

handover ceremony that SHU incorrectly and irresponsibly claimed, without evidence, depicted

Camel Group's participation.  Those same captions, however, are not contained in the WeChat

Article and, to the best of Camel Group's knowledge and belief, neither Camel Group's name nor

any known employee is shown in the photos.  *Compare* SHU Feb. 2022 Report Exhibit 3, at pp.

30-31 *with* WeChat Article, Exhibit 7.

55.     SHU made the same allegations against Camel Group in the SHU Dec. 2022 Report

and the SHU May 2023 Report, and cited the same two inaccurate and misleading facts, the

WeChat Article and Labor Transfer Program Regulations, in support of its allegations.  Exhibit 4,

at pp. 33-34, fns. 348 and 349; Exhibit 5, at p. 7.

56.     The SHU Reports do not cite any other evidence of Camel Group's participation in the

Labor Transfer Program except for the WeChat Article and Labor Transfer Program Regulations.

### CBP Detentions and Releases

57.     Nearly nine months after the implementation of the UFLPA and only two months after

the publication of the SHU Dec. 2022 Report, Camel Group's U.S. subsidiary Camel Energy, Inc.,

the "Importer of Record" for Camel Group's products, received its first detention notice from CBP

on February 16, 2023. The notice alleged that two entries containing Camel Group's products were

made in whole or in part with forced labor from Xinjiang.  In order to prevent an exclusion of the

goods under the UFLPA, Camel Energy was required to respond and provide, by "clear and

convincing evidence," that its goods were not made in whole or in part with forced labor from XUAR.

58.    On March 13, 2023, Camel Energy, through counsel, contacted CBP to inquire about the procedure for responding to detentions under the UFLPA. A copy of Camel Group's communications with CBP and CEE from February 2023 to September 2023 are provided as **Exhibit 8**.

59.    On March 21, 2023, Camel Energy's counsel followed up with CBP to inquire about the timing regarding the review of a response to a UFLPA-based detention. Exhibit 8, at p. 3.

60.    On May 5, 2023, CBP issued notices for exclusion of Camel Group's battery products in the two entries detained on February 16, meaning that CBP intended to exclude from entry into the U.S. Camel Group's products under the UFLPA, unless Camel Group could provide additional information to CBP and the Center of Excellence and Expertise ("CEE").

61.    On May 11, 2023, CBP began issuing detention notices to Camel Energy regarding multiple shipments of different Camel Group's battery products under the UFLPA.

62.    On May 12, 2023, Camel Energy's counsel contacted CBP about the submission process for petitions for release of goods detained under the UFLPA.  CBP responded on May 15 saying:  "As far as a process to obtain relief – I am not aware of any process by which an importer can obtain relief from the provisions of the UFLPA. As each shipment of like commodities may have different supply chains – all the way down to the raw materials for each component of the finished product- each shipment is subject to the UFLPA and at this time we would need documents rebutting the presumption for each entry."  Exhibit 8, pp. 8-9.

63.    On May 19, 2023, a CEE officer contacted Camel Energy to request additional information on the labor used for making Camel Group's products that are currently detained. Exhibit 8, at pp. 14-15.

64.    On June 14, 2023, Camel Energy's counsel submitted the additional labor information to CEE.  Exhibit 8, at p. 16.

65.    On June 30, 2023, the CEE officer confirmed that the CEE director had authorized the release of Camel Group's detained goods.  Exhibit 8, at p. 21.

66.    On July 12, 2023, Camel Energy's counsel sent a letter to CEE regarding the release of shipments still detained, and the CEE officer responded the same day confirming the release. Exhibit 8, p. 28-29.

67.    On July 14, 2023, CBP issued a notice of release for Camel Group's goods detained under the UFLPA, stating that analysis of documentation submitted supports the importer's assertion that materials used in the manufacturing for these entries listed were not sourced from the XUAR, and ordered the release of Camel Group's products.  A copy of the July 14th Letter is provided as **Exhibit 9**.

68.    On September 13, 2023, CBP confirmed that the last entry of Camel Group's goods were released, stating that Camel Energy provided sufficient documentation that the shipment was not manufactured with forced labor.  A copy of this decision email is provided as **Exhibit 10**.

69.    Between February 2023 and September 2023, CBP issued a total of 82 detention and exclusion notices under the UFLPA for Camel Group's products

70.    In response to each of these notices, Camel Energy provided CBP with extensive commercial and company documents showing its supply chain, including who and how the goods

were manufactured.  Importantly, Camel Group clearly established that neither it nor its supply chain used forced laborers.

71.     In fact, Camel Group successfully established to the satisfaction of CBP in all 82 cases that Camel Group met the "clear and convincing" evidence standard under UFLPA § 3(b), thus proving that its products were not manufactured with forced labor and not subject to the UFLPA.

72.     CBP opined on two separate occasions as follows:

   a.  On July 14, 2023, CBP issued a decision letter stating "materials used in the manufacturing for these entries listed above were not sourced from the (XUAR)." Exhibit 9.

   b.  On September 13, 2023, CBP issued a decision stating that Camel Group (through Camel Energy) "has provided sufficient documentation to support their claim that shipment was not manufactured with forced labor." Exhibit 10.[6]

73.     Since August 2023, Camel Group has not experienced further detentions based on the UFLPA, despite being added to the UFLPA Entity List at that same time.

**Addition to the UFLPA Entity List and Camel Group's Removal Petition**

74.     Despite Camel Group's successful record in obtaining release of its products, on August 2, 2023, the FLETF announced that Camel Group was added to the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii), which allows FLETF to identify those entities "working with the government of Xinjiang to recruit transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang." *See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug.

---

[6] It is worth noting that this decision came over one month after Camel Group had been added to the UFLPA Entity List, further calling into question the basis and evidence the FLETF relied upon in its decision.

2, 2023) ("Listing Decision"; Exhibit 1); *see also* UFLPA Sec. 2(d)(2)(B)(ii), Pub. L. No. 117-78, 135 Stat. 1525 (2021).

75.    Except for providing the text of UFLPA Sec. 2(d)(2)(B)(ii) from the Listing Decision, the FLETF did not provide Camel Group with any reasoned explanation, justifications, evidence, Administrative Records, or any information that would have reasonably informed Camel Group of the evidence and charges against it that led to the FLETF's decision.

76.    Camel Group was suddenly, publicly, and without warning added to the UFLPA Entity List, was not told why, and instead was forced to guess as to the reasons for the FLETF's decision.

77.    After the FLETF's announcement, Camel Group's counsel immediately contacted the FLETF public contact DHS PLCY Director of Trade Policy, Trade and Economic Security, Cynthia Echeverria ("Director Echeverria") on August 3, 2023, seeking guidance on the removal process.  Exhibit 2, p. 29.

78.    At the same time, because the FLETF failed to provide Camel Group with any information regarding its listing decision, Camel Group immediately began an internal review and conducted wide-scale open source research to identify any possible reasons that could have led to the FLETF's decision.

79.    On August 4, 2023, Camel Group, through counsel, called Director Echeverria to follow up on its August 3rd email, but it was not answered.  Exhibit 12.

80.    In absence of any response or guidance from the FLETF, on August 8, 2023, Camel Group, through counsel, emailed a DHS CBP CEE Officer to inquire about removal from the UFLPA Entity List.  Exhibit 8, at p. 30-32.

81.     On August 9, 2023, the CEE Officer responded by directing Camel Group to the removal process outlined in the Federal Register and encouraging Camel Group to reach out to Director Echeverria.  Id.

82.     Because the Federal Register did not provide sufficient guidance on the process to seek removal and because no listed company had done so before, Camel Group's attorneys were left guessing on how to respond to the Listing Decision, especially since the FLETF did not provide any information regarding the reasons Camel Group was added to the UFLPA Entity List.

83.     After more than a week without receiving any information as to the reason for its listing or any response from Director Echeverria or the FLETF, on August 18, 2023, Camel Group submitted a Freedom of Information Act ("FOIA") Request (FOIA Request No. 2023-HQFO-02158) ("FOIA Request") to DHS Privacy Office requesting information about FLETF's decision to add Camel Group to the UFLPA Entity List and seeking Camel Group's Administrative Record. A copy of the FOIA Request is provided as **Exhibit 11**.[7]

84.     On August 18, 2023, the FLETF, through Director Echeverria, returned Camel Group's phone call and discussed the removal process generally with Camel Group's counsel, but did not disclose the reasons or provide Camel Group with any information about why the FLETF added it to the UFLPA Entity List.  Exhibit 12.

85.     On August 30, 2023, Camel Group, through counsel, sent a formal letter to the FLETF to, *inter alia*:

>       a.  Express Camel Group's intention to engage with the FLETF and submit a removal request pursuant to the administrative process identified in the Federal Register; and

---

[7] It is worth noting that this FOIA Request is still pending with DHS in violation of FOIA.  At this time, Camel Group intends to file a separate lawsuit regarding DHS' FOIA violation.

b.  Formally request the FLETF provide Camel Group with its Administrative Record and/or reasons supporting its addition to the UFLPA Entity List.

A copy of the August 30, 2023 Camel Group Letter to FLETF is provided as **Exhibit 12**.

86.    The FLETF never provided a response to Camel Group's August 30th Letter.

87.    On September 1, 2023, Director Echeverria and Camel Group's counsel had multiple calls wherein Director Echeverria:

a.  Confirmed that Camel Group's August 30th Letter has been received and forwarded to the FLETF and FLETF Chair Robert Silvers;

b.  Encouraged Camel Group to submit a removal request through the administrative process outlined in the Federal Register; and

c.  Provided general information about the removal process.

*See* Exhibit 2, at p. 23.

88.    At no point during that call did the FLETF respond to Camel Group's request for its Administrative Record and/or the reasons behind its inclusion on the UFLPA Entity List.

89.    On September 7, 2023, the FLETF, through Director Echeverria, emailed Camel Group to formally confirm receipt of the August 30th Letter, reiterate that entities seeking removal should do so through the administrative process in the Federal Register, and that a removal petition would be shared with the FLETF once it is submitted.  Id.

90.    Once again, the FLETF failed to provide Camel Group with a response to its request for its Administrative Record and/or the reasons behind its inclusion on the UFLPA Entity List.

91.     Despite the FLETF failing to inform Camel Group of the evidence and charges against it, Camel Group was determined to engage through the administrative process and took it upon itself to identify the reasons why the FLETF had targeted it.

92. Through its investigation, Camel Group identified the allegations made in the SHU Reports of Camel Group's alleged participation in a handover ceremony connected to the Labor Transfer Program, identified individuals with knowledge of the allegations, and conducted a full internal investigation into the matter.

93. Camel Group's investigation revealed that Camel Group had not participated in the Labor Transfer Program or the handover ceremony discussed in the WeChat Article and SHU Reports, finding, *inter alia*:

    a.   In early 2017, Camel Group was contacted by the Toksun County SSHR regarding the Labor Transfer Program handover ceremony, but Camel Group declined to participate. *See* Exhibit 6.

    b.   Despite this, on July 10, 2017, the Toksun County SSHR held the Labor Transfer Program handover ceremony, and published the WeChat Article that erroneously listed Camel Group as a participant. *See* Exhibit 6.

    c.   The very next day on July 11, 2017, Camel Group contacted the Toksun County SSHR to inform them of the error in the WeChat Article. *See* Exhibit 6.

    d.   The next day, on July 12, 2017, Toksun County SSHR verified that Camel Group had not participated in the Labor Transfer Program handover ceremony and published a follow up article in Yaxin News Network, syndicated through Sina News,[8] correcting the WeChat Article and removing Camel Group's name as a participant from the article ("Sina Article"). *See* Exhibit 6. A copy of the Sina Article and certified English translation is provided as **Exhibit 13**.

---

[8] "Sina News" is a major national Chinese state-run media outlet.

e.  Camel Group did not receive any subsidy or incentive payments from the Toksun SSHR or any other government agency related to the Labor Transfer Program. *See* Exhibit 6.

f.  Camel Group did not locate any human resources or employee records of any employee hired through the Labor Transfer Program. *See* Exhibit 6.

94.  In support of its findings, Camel Group obtained the following documents and evidence:

a.  A declaration from the relevant Camel Group employee attesting to the interactions with the Toksun SSHR in 2017;

b.  A formal, signed and sealed[9] letter from the Toksun SSHR supporting Camel Group's finding that it did not participate in the Labor Transfer Program, and was

---

[9] This document is an "official document" (公文) and is affixed with the official seal of the Toksun County Social Security and Human Resources Bureau. Under Chinese law, such documents are comparable to documents issued under penalty of perjury in the U.S. First, Chinese law regulates specific details of how government organs prepare and affix its seal. *See, e.g.* Administration of Seals. Second, "official documents" (公文) includes documents such as letters, like the one issued by the Toksun SSHR. Regulations on the Handling of Official Documents by Party and Government Organs (《党政机关公文处理工作条例》) ("Handling Regulations"), Art. 8(14), PRC State Council, Effective July 1, 2012. "Official documents" (公文) are required, generally, to have a seal affixed where that document also is signed by the government department or agency. Handling Regulations, Art. 9(13). There is also a strict procedure each government department must follow prior to affixing a seal and issuing an "official document" to verify, *inter alia*, the content of a document. *See* Handling Regulations, Art. 25(1). Regardless of whether the seal is physically affixed or an electronic seal, they both have the same legal effect. Several Provisions of the State Council on Online Government Services (《国务院关于在线政务服务的若干规定》), Art. 9, PRC State Council, Guo Ling No. 716, Issued Apr. 26, 2019. In Chinese courts, matters recorded in "official documents" (*i.e.*, documents that bear a government seal) are deemed to be authentic and true. *See* PRC Supreme People's Court Interpretation on the Application of the PRC Civil Procedure Law (最高人民法院关于适用《中华人民共和国民事诉讼法》的解释), Art. 114, PRC Supreme People's Court, Fa Shi (2015) No. 5, Effective Feb. 4, 2015. Acts including affixing a seal improperly without the approval from the relevant government department or agency leadership as well as forging and using forged company seals could result in investigation and even criminal liability. *See, e.g.,* Administration of Seals, Arts. 22-26; *see also, e.g.*, PRC Criminal Law (《中华人民共和国刑法》), Art. 280, para. 1, National People's Congress, Revised and Effective Mar. 1, 2021.

approved by relevant Chinese government authorities to be provided to the FLETF as part of Camel Group's Removal Petition;[10]

c.  A copy of the Sina Article;

d.  A declaration from Camel Group's CFO and HR directors confirming that no subsidy, incentive or other payment was received in connection with the Labor Transfer Program, and that no employee was hired through the Labor Transfer Program; and

e.  Employee lists with detailed information of each employee for Camel Group and its two Xinjiang subsidiaries.

*See generally*, Exhibit 6.

95.     Based on these findings and evidence, Camel Group prepared its Removal Request Petition despite the FLETF still not providing Camel Group with the specific reasons for its inclusion on the UFLPA Entity List.

96.     At the suggestion of the FLETF in the September 1, 2023 calls with Director Echeverria, Camel Group included additional documents for the FLETF to demonstrate that Camel Group "does not or no longer" meets the criteria under the UFLPA Sec. 2(d)(2)(B)(ii), such as:

a.  Previous CBP decision letters finding, by clear and convincing evidence, that Camel Group's products were not subject to the UFLPA or made with forced labor; and

b.  Sample packages and documents submitted to CBP, including complete supply chain mapping and employee information and contracts

*See* Exhibit 6.

---

[10] In order to be able to submit this document to the FLETF, Camel Group required approval from relevant Chinese government authorities pursuant to multiple Chinese laws, most notably <u>PRC Data Security Law</u>, Art. 36.

97.    On October 17, 2023, Camel Group emailed the FLETF requesting information on submission instructions for its Removal Petition.  Exhibit 2, at p. 26.

98.    On October 25, 2023, the FLETF, through Director Echeverria, emailed Camel Group with instructions on how to submit its Removal Petition and an estimated timeline on what to expect next.  Exhibit 2, at p. 22-23.

99.    Camel Group had hoped to receive the Administrative Record, describing the evidence that FLETF relied on in adding Camel Group to the Entity List, prior to filing its Petition for Removal. This would have allowed Camel Group to more specifically address any concerns that the U.S. government had as to Camel Group's alleged involvement in forced labor activities.

100.    Knowing what allegations an accused must respond to is the hallmark of the U.S. judicial system; it is a fundamental right that is inscribed in our institutions and should never be abandoned as it was here.

101.    On November 7, 2023, despite the FLETF having still not provided Camel Group with its Administrative Record or any detailed information or evidence supporting its addition to the UFLPA Entity List, Camel Group submitted its Removal Petition and all supporting evidence and documentation to the FLETF requesting removal from the UFLPA Entity.  Exhibit 6; Exhibit 2, at pp. 15-21.

102.    As part of and at the time of its Removal Petition, Camel Group reiterated its efforts to obtain its Administrative Record and, in the least, an explanation as to why it was added to the UFLPA Entity List from the FLETF. In the absence of such information, Camel Group's Removal Petition was based only on allegations learned by Camel Group through publicly available resources that it discovered after it was added to the Entity List.  Exhibit 6, at p. 1-2, fn. 1.  In the

absence of receiving any information from FLETF, Camel Group had to guess as to what allegations it should be addressing in its Petition.

**FLETF's Conflict of Interest**

103.    On or around November 8, 2023, Camel Group discovered that the co-author of the SHU Reports, Dr. Laura Murphy, was appointed by the Biden Administration as a Policy Advisor to the Under Secretary for DHS PLCY and chair of the FLETF, Robert Silvers.

104.    Because Camel Group suspected that Dr. Murphy and SHU were the sole reasons for Camel Group's addition to the UFLPA Entity List and because Dr. Murphy could undoubtedly influence FLETF's consideration of Camel Group's Petition, Camel Group raised its concerns to FLETF in a letter dated December 21, 2023. A copy of this letter is provided as **Exhibit 14**.

105.    In its letter, Camel Group requested the FLETF clarify Dr. Murphy's role as a "Policy Advisor" and her involvement (if any) in the review of Camel Group's Removal Petition or the FLETF's decision on whether to remove Camel Group from the UFLPA Entity List. Id.

106.    On January 31, 2024, the FLETF responded to Camel Group's questions about Dr. Murphy's involvement by simply re-stating the public announcement that Dr. Murphy's role [was] as a "Policy Advisor" to DHS PLCY. Exhibit 2, at pp. 6-7.

107.    The FLETF failed to provide any meaningful information on Dr. Murphy's role and involvement with any decisions regarding Camel Group's Removal Petition, or otherwise address Camel Group's concern about this clear conflict of interest.

**FLETF'S Questions on Camel Group's Removal Petition and Camel Group's Responses**

108.    On December 14, 2023, the FLETF sent Camel Group follow-up questions regarding the Removal Petition ("FLETF Questions"). A copy of the FLETF Questions are provided as **Exhibit 15**.

109.    Camel Group assumed that FLETF's questions would be exacting and relate to the evidence that it was relying on in adding Camel Group to the UFLPA Entity List.

110.    While a few questions related tangentially to Camel Group's Removal Petition, most appeared completely unrelated to the Petition and the allegations identified therein, and even introduced new lines of inquiry outside of the scope of UFLPA Sec. 2(d)(2)(B)(ii), such as:

    a.   Inquiring about Camel Group's relationship with Xinjiang Production and Construction Corps (XPCC), which is covered under a separate section of the UFLPA (Sec. 2(d)(2)(B)(v)) and under which Camel Group is not charged (Exhibit 15, Question 1);

    b.   Inquiring about the construction of Camel Group's Camel Renewable facility in Xinjiang (Exhibit 15, Question 16);

    c.   Inquiring about Camel Group's "obligations" to collect and report "security information" for ethnic minority "citizens," such as "social credit score, security rankings or scores, criminal record, record of time in vocational education and training centers, family criminal record or record of time in vocational education and training centers, religious affiliation or practice" (Exhibit 15, Question 19);

    d.   Inquiring about Camel Group's security systems, such as the number of cameras and security guards it has in its facilities in and outside of XUAR, and where the security guards are recruited from (Exhibit 15, Question 20);

    e.   Requesting a full supply chain map for all of Camel Group's products being produced in whole or in part in the XUAR, regardless of whether they were imported into the U.S. or not (Exhibit 15, Question 21);

f.  Inquiring about business sensitive Camel Group information, including production capacity of all products in XUAR, how it produces and/or obtains battery products, and how Camel Group operates its supply chain (Exhibit 15, Questions 22-24).

111.    On December 20, 2023, Camel Group's counsel received an email from the DHS Privacy Office in response to Camel Energy's FOIA Request, which explained that the Request had been transferred to DHS PLCY who, allegedly, was conducting the search for records responsive to the FOIA Request, and would be "three to four months" before a final response.  A copy of this email is provided as **Exhibit 16**.

112.    On December 21, 2023, Camel Group's  counsel sent the FLETF a letter, *inter alia*:

a.  Acknowledging receipt of the FLETF's questions;

b.  Again requesting Camel Group's Administrative Record and/or reasons and evidence supporting the FLETF's decision to add Camel Group to the UFLPA Entity List;

c.  Requesting the FLETF and/or DHS PLCY provide an update on the search for records responsive to Camel Group's FOIA Request that is confirmed as being handled by DHS PLCY; and

d.  Requesting the FLETF to clarify the standard of proof for the removal process. Exhibit 14.

113.    On January 31, 2024, the FLETF responded to Camel Group's Dec. 21st Letter, stating it will work with Camel Group to set up a "virtual meeting" after reviewing Camel Group's responses to the FLETF Questions.  Exhibit 2, at pp. 6-7.

114.    In its response, the FLETF again ignored Camel Group's request for its Administrative Record and/or evidence supporting its addition to the UFLPA Entity List, and ignored Camel Group's request for clarification on the standard of proof for the removal process.  Id.

115.    Despite still not being provided its Administrative Record or any meaningful information about the removal process, on March 1, 2024, Camel Group provided its responses to the FLETF's Questions including its supporting documents ("Camel Group Responses").  Exhibit 2, at p. 6.  A copy of Camel Group's Responses are provided as **Exhibit 17**.[11]

116.    In Camel Group Responses, Camel Group reiterated its request for a meeting pursuant to Federal Register 88 FR 50902, 50904, No. 147, Aug. 2, 2023 and Federal Register 87 FR 47777, 47778, No. 149, Aug. 4, 2022.  Exhibit 17, at p. 16.

### FLETF's "Listening Session"

117.    On March 6, 2024, the FLETF confirmed receipt of the Camel Group Responses and exhibits.  Exhibit 2, at p. 5.

118.    On March 15, 2024, the FLETF emailed Camel Group and stated: i) FLETF accepted Camel Group's meeting request; ii) the meeting with FLETF was to take place on April 2, 2024 from 1-2pm; and iii) that Camel Group should provide the FLETF with a list of meeting participants from Camel Group.  Exhibit 2, at pp. 4-5.  Camel Group accepted the meeting request that same day. Id., at p. 4.

119.    On March 22, 2024, the FLETF confirmed the date and time for the meeting and provided a meeting agenda ("Meeting Agenda") and protocols governing the meeting ("Meeting Protocols").  Exhibit 2, at pp. 3-4 and 13-14.  Copies of the Meeting Agenda and Meeting Protocols have been attached as **Exhibit 18** and **Exhibit 19**, respectively.

---

[11] Like its Removal Petition, Camel Group provides the main body of its Responses as Exhibit 17.  Exhibits of the Camel Group Responses have not been included but are in the possession of the FLETF.

120.    Camel Group was surprised to learn that the "meeting" was not a meeting at all, but would be conducted virtually via Microsoft Teams and instead be structured as a "listening session to allow Camel Group to present or highlight information that it would like the FLETF to consider."  Exhibit 19.

121.    Further, the Meeting Protocols did not permit any audio or visual recording or press engagement, leaving Camel Group to question how a sufficient record for this seemingly significant step in the administrative process would be created, or if the FLETF had an interest in concealing from the public or this Court how it was conducting these meetings.

122.    On the same day, Camel Group provided its list of participants for the "listening session" to the FLETF.  Exhibit 2, at p. 3.

123.    On March 28, 2024, FLETF provided Camel Group and its representatives with the virtual meeting link as well as a list of attendees on behalf of the FLETF.  Exhibit 2, pp. 13-14.

124.    On April 2, 2024, FLETF and Camel Group held the "listening session" meeting regarding Camel Group's Removal Petition.

125.    During the listening session, Camel Group emphasized two points. First, it re-emphasized that in the absence of the FLETF providing Camel Group with its Administrative Record, Camel Group could only address the issues it identified through its own research, *i.e.*, the allegations in the SHU Reports.  Camel Group further emphasized the evidence it provided as part of its Removal Petition that clearly rebutted the allegations in the SHU Reports.  Camel Group stated that unless the FLETF had further questions or intended to provide Camel Group with its Administrative Record, Camel Group could not add to the arguments in its Removal Petition.

126.    Second, Camel Group re-issued its requests that the FLETF had, as of the date of the meeting, failed to respond to.  This included requests for: i) Camel Group's Administrative Record;

and ii) description of the voting process, including how the vote would be conducted, whether it needed to be unanimous, and the standard of proof used by the FLETF to evaluate Camel Group's Removal Petition.

127.    Camel Group did not receive a response to its questions.

128.    After Camel Group completed its statement, the FLETF was provided with the opportunity to ask Camel Group any question about its Removal Petition or the Camel Group Responses, but no representative from the FLETF asked a single question about Camel Group's submissions or any of the supporting evidence provided by Camel Group.

129.    Camel Group then used the remaining time to ask the FLETF the following questions, which were mostly answered by the DHS Deputy Assistant Secretary for Trade Policy and Economic Competition as well as another representative Camel Group understood to be from the DHS Office of General Counsel.  Questions are provided with the FLETF answer beneath:

    a.   Camel Group Question: Will the FLETF provide Camel Group with its Administrative Record?

        i.   FLETF Answer: FLETF stated that it understood Camel Group's concerns and that it was a priority, but did not provide a direct answer.

    b.   Camel Group Question: What is the standard of proof the FLETF will use when evaluating Camel Group's Removal Petition?

        i.   FLETF Answer: FLETF stated that it understood Camel Group's concerns, but did not provide a direct answer.

    c.   Camel Group Question: What are the next steps in the removal process?

      i.   FLETF Answer: FLETF quoted from the Federal Register in stating that it would vote on Camel Group's Removal Petition and provide Camel Group with a decision in writing.

   d.  Camel Group Question: When will the FLETF vote on Camel Group's Removal Petition?

      i.   FLETF Answer: FLETF stated it was a priority but did not commit to a timeline.

   e.  Camel Group Question: Will any transcript or other record of this meeting be provided?

      i.   FLETF Answer: FLETF stated it would not provide a transcript or any record of the meeting.

130.    FLETF concluded the meeting by telling Camel Group that it could submit any further new or additional information by April 15th for the FLETF's consideration before it voted on the Removal Petition.

131.    Camel Group concluded by stating that, in absence of the FLETF providing Camel Group with its Administrative Record and the FLETF not having any further questions for Camel Group, it had nothing further to add beyond what it has already submitted to the FLETF.

132.    Following the meeting, on April 5, 2024, Camel Group sent a follow up letter to FLETF: i) thanking FLETF members for their time; ii) confirming that, absent further questions from the FLETF or the FLETF providing Camel Group with its Administrative Record, Camel Group had nothing further to add to its submissions and evidence provided to the FLETF; iii) requesting an updated attendance list for the meeting; and iv) requesting a timeline for the FLETF's vote on Camel Group's Removal Petition.  A copy of this letter is provided as **Exhibit 20**.

**FLETF's "Removal Decision"**

133.    Over a month passed since the meeting and the FLETF had still not provided Camel Group any update on its Removal Petition or any response to any of the requests made by Camel Group during the meeting or in its April 5th letter.

134.    On May 3, 2024, Camel Group's counsel emailed the FLETF requesting an update on the FLETF's vote.

135.    The FLETF did not respond to Camel Group for two more weeks.  However, on May 16, 2024, the FLETF took action to add 26 entities to the UFLPA Entity List.[12]

136.    On May 16, 2024, taking notice of the FLETF's actions, Camel Group sent a letter to FLETF requesting an update on the status of Camel Group's Removal Petition in light of the FLETF's actions.  A copy of this letter has been provided as **Exhibit 21**.

137.    On May 17, 2024, FLETF responded by stating that Camel Group's Removal Petition is still under consideration and that FLETF would provide Camel Group with "additional information about the basis for its inclusion on the UFLPA Entity List" by the end of the day Friday, May 24, 2024.  Exhibit 2, pp. 1-2.

138.    On May 24, 2024, FLETF provided a written response to Camel Group that purportedly provided the "additional information about the basis for (Camel Group's) inclusion on the UFLPA Entity List.  In one short conclusory paragraph, the FLETF simply stated:

> "The FLETF determined, based on *publicly available information*, that there was reasonable cause to believe Camel Group participated in Toksun County's government labor transfer program and that Camel Group received workers from Uyghur-majority areas in southern Xinjiang through a handover ceremony coordinated by the Toksun County government in Turpan Prefecture in Xinjiang. Given the information indicating Camel Group's work with the Xinjiang government to receive Uyghurs and/or members of other persecuted groups from the XUAR, the FLETF determined that Camel Group

---

[12] DHS Press Release, "DHS Announces 26 Additional PRC Based Textile Companies to the UFLPA Entity List," May 16, 2024, available at https://www.dhs.gov/news/2024/05/16/dhs-announces-26-additional-prc-based-textile-companies-uflpa-entity-list.

satisfied the criteria for addition to the Section 2(d)(2)(B)(ii) list of the UFLPA, specifically that Camel Group is working with the government of the XUAR to receive Uyghurs and/or members of other persecuted groups from the XUAR." (emphasis added).

A copy of this letter is provided as **Exhibit 22**.

139.    While it presumably confirmed that Camel Group had guessed correctly regarding the allegation it addressed in its Removal Petition, the FLETF did not confirm or identify which publicly available information it was relying on to come to that conclusion (*i.e.,* if the FLETF was relying on the SHU Reports or some other source of public information).

140.    The FLETF also appeared to identify a standard of proof, stating that it "…determined reasonable cause to believe, based on specific and articulable information" that Camel Group engaged in actions referenced in UFLPA Sec. 2(d)(2)(B)(ii).  Exhibit 22.  However, this was not explicitly stated by the FLEFT.

141.    Lastly, FLETF stated it would issue a decision regarding Camel Group's Removal Petition within 30 business days of the letter, thus establishing a deadline of July 10, 2024.  Id.

142.    FLETF did not provide Camel Group with a copy of its Administrative Record, and this wholly inadequate explanation was the only information provided by FLETF about the substance of the allegations alleged against Camel Group prior to the FLETF's vote.

143.    Because the only public information that Camel Group could uncover was from the SHU Reports, it further validated that FLETF was simply relying on a non-governmental organization (*i.e.,* SHU) to make customs and border decisions of major import.

144.    On July 9, 2024, FLETF issued its decision on Camel Group's Removal Petition in a 3-page letter denying Camel Group's Removal Petition ("July 9th Removal Decision").  A copy of the FLETF's July 9th Removal Decision is attached as **Exhibit 23**.

145.    The first two and a half pages of the FLETF's letter goes through the procedural history and background of Camel Group's removal process and communications between Camel Group and the FLETF, and provides a summary of Camel Group's arguments and evidence in the Removal Petition.  Exhibit 23, at pp. 1-2.

146.    In the final three paragraphs, the FLETF provides only the following on its decision:

> "After reviewing all of the information provided by Camel Group to the FLETF, the FLETF has determined that Camel Group's removal from Section 2(d)(2)(B)(ii) list of the UFLPA is not warranted. The FLETF determined the information provided by Camel Group as part of its removal request did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA.

> In reaching its conclusion, the FLETF has carefully considered all of the arguments made on behalf of your clients. The FLETF determined that Camel Group did not provide sufficient, credible information to demonstrate it did not and does not participate in Toksun County government's labor transfer programs to recruit, transfer, or receive workers from Uyghur-majority areas in southern Xinjiang.

> Based on publicly available information from 2017, 2023, and 2024 illustrating continued Toksun County implementation of labor transfer schemes and Camel Group participation in Toksun County-sponsored labor recruitment events, the FLETF has reasonable cause to believe that Camel Group is working with the Toksun County government to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz. These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Labor Transfer Program."

> Exhibit 23, at p. 3.

147.    The FLETF did not provide any reasons, analysis or actual evidence as to why it found that Camel Group's Removal Petition and supporting evidence "did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA."

148.    The FLETF did not provide any reasons, analysis or actual evidence as to why it found Camel Group's Removal Petition and supporting evidence "did not provide sufficient, credible information to demonstrate it did not and does not participate in Toksun County government's

labor transfer programs to recruit, transfer, or receive workers from Uyghur-majority areas in southern Xinjiang." Exhibit 23, at p. 3.

149.    The FLETF did not identify which "publicly available information from 2017, 2023 and 2024" it believes "casts doubt" on Camel Group's Removal Petition and supporting evidence, nor did the FLETF provide any evidence to the contrary.

150.    The FLETF also implies that it "provided Camel Group with a summary of information the FLETF relied upon when considering whether to add Camel Group to the UFLPA Entity List" in the FLETF May 24th Letter, which simply stated that the FLETF relied upon unnamed and unidentified "publicly available information." Exhibit 22; *see also* Exhibit 23.

151.    In short, FLETF summarily denied Camel Group's Removal Petition, did not provide any analysis or reasoning as to why it did not find Camel Group's arguments or evidence credible or sufficient, and still did not provide Camel Group with its Administrative Record or identify any of the evidence it relied on except to say that it is "publicly available" from "2017, 2023, and 2024."

152.    This wholly inadequate ruling is devoid of any legal or other reasoning, analysis, facts or evidence, and was made arbitrarily and capriciously, based on unnamed public sources that the FLETF refuses to identify.

153.    Moreover, the FLETF does not even address why it believes Camel Group has met the standards under UFLPA Sec. 2(d)(2)(B)(ii), which contemplates recruiting and transferring minorities "*out of Xinjiang*." *See* UFLPA Sec. 2(d)(2)(B)(ii) (emphasis added). Indeed, the FLETF only concludes it has "reasonable cause to believe that Camel Group is working with the Toksun County government to recruit individuals form Uyghur-majority areas who are likely Uyghurs,

Kazakhs, and/or Kyrgyz." *See* Exhibit 23, p. 3. It does not ever address whether these individuals were transferred out of Xinjiang or whether they were done so against their will.

154. Lastly, in its July 9th Removal Decision, FLETF stated that Camel Group could not appeal the FLETF's decision, and could only submit a new petition if it could provide new information to support a request, Exhibit 23, at p. 3: an action that would be futile since FLETF never disclosed the so-called public sources it relied on.

**Injuries Caused by FLETF's "Listing Decision" and "Removal Decision"**

155. As a result of the August 2nd Listing Decision and now the July 9th Removal Decision, Camel Group has suffered significant commercial and reputational damage, including the loss of opportunities with Tier I OEMs and other major customers totaling over USD $100 million.

156. When an entity is listed on the Entity List, it is essentially a "scarlet letter" to be worn even though the CBP has on countless occasions concluded by "clear and convincing evidence" that goods imported into the U.S. by Camel Group's subsidiaries were not manufactured with forced labor from XUAR.

157. Notwithstanding the fact that CBP has come to its own conclusions (*i.e.*, that Camel Group's products were not subject to the UFLPA), as long as Camel Group remains on the UFLPA Entity List, its customers are unwilling to do business with the company and its subsidiaries, and several customers have terminated contracts and supply relationships with Camel Group and its subsidiaries in the United States and Europe.

158. Furthermore, Camel Group continues to accumulate commercial damages and reputational harm each day it unfairly remains on the UFLPA Entity List without any explanation from the FLETF.

159.    While Camel Group's customers have expressed sympathy for Camel Group and concern at the behavior and motives of the FLETF, the mere allegation of any connection between Camel Group and forced labor via the UFLPA Entity List is enough for Camel Group's customers to reconsider business with Camel Group.

## CLAIMS FOR RELIEF

### COUNT I – 5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

160.    Plaintiff restates and incorporates by reference all previous allegations contained therein as if set forth fully herein.

161.    Camel Group has been directly harmed by the Listing Decision and Removal Decision because it has severely impacted its ability to sell and ship goods directly and indirectly to its United States-based customers (*see* 5 U.S.C. § 702) and it has lost customers and business opportunities as a direct result of the FLETF's actions.

162.    The FLETF's July 9th Removal Decision constitutes "final agency action," 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decision-making process" and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).

163.    In its Removal Decision, the FLETF stated, "[t]he FLETF's decision to deny Camel Group's request for removal is not appealable; however, Camel Group may submit a new request for removal if it can provide new information to support such a request."  Exhibit 23, p. 3.

164.    The Federal Register also provides that the FLETF's decisions on removal requests are not appealable, and it will only consider a new petition based on new information. *See Notice on*

*the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List*, 87 Fed. Reg. 47777, 47778 (Aug. 4, 2022).

165.    Therefore, Camel Group is not able to appeal this decision and seek relief except through litigation.

166.    The July 9th Removal Decision is arbitrary and capricious because the FLETF not only failed to provide an adequate explanation, it failed to provide *any* explanation for its decision to deny Camel Group's Removal Request petition. *See* Aqua Prods., Inc. v. Matal, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[A]n agency must explain why it decides any question the way it does. That obligation means that the agency must 'articulate a satisfactory explanation' of its reasoning; it may not simply provide a conclusion." (citations omitted)); Tourus Recs., Inc. v. Drug Enf't Admin., 259 F.3d 731, 737 (D.C. Cir. 2001) ("A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious agency action."); Clarke v. CFTC, 74 F.4th 627, 641 (5th Cir. 2023) (holding agency action arbitrary and capricious "for the obvious reason that it gives no explanation whatsoever").

167.    In its July 9th Removal Decision, after more than two pages of regurgitating the procedural history of Camel Group's listing and removal request, the FLETF used *three conclusory sentences* to summarily dismiss all of Camel Group's arguments and evidence:

   a.   "The FLETF determined that Camel Group did not provide sufficient, credible information to demonstrate it did not and does not participate in Toksun County government's labor transfer programs to recruit, transfer, or receive workers from Uyghur-majority areas in southern Xinjiang."

b. "Based on publicly available information from 2017, 2023, and 2024 illustrating continued Toksun County implementation of labor transfer schemes and Camel Group participation in Toksun County-sponsored labor recruitment events, the FLETF has reasonable cause to believe that Camel Group is working with the Toksun County government to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz."

c. "These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Labor Transfer Program."

Exhibit 23, p. 3.

168.    The FLETF did not provide any explanation as to why it found Camel Group's evidence insufficient and not credible.

169.    The FLETF did not provide any explanation as to why it believed that "publicly available information from 2017, 2023 and 2024" cast doubt on Camel Group's evidence or even what was the source or substance of this publicly available information.

170.    Strikingly, by the FLETF's lack of transparency in this process and its utter refusal to disclose the substance and source of the publicly available information it considered, a reasonable person could conclude that the U.S. government relied solely on the academic rigor of Dr. Murphy and SHU.

171.    To the extent it did, Camel Group presented irrefutable evidence that the SHU Reports are inaccurate and should not be relied on.

172.    In fact, the FLETF did not identify, summarize or provide Camel Group with the "publicly available information from 2017, 2023 and 2024" it was relying on or how such information "cast[] doubt" on Camel Group's arguments and evidence.  To this day, the FLETF

has not identified, summarized, or provided Camel Group with such "publicly available information" and has not provided any explanation or reasoning for this action.

173.    The FLETF also failed to provide any explanation as to why it believed Camel Group was allegedly transferring employees *out of XUAR*.

174.    Indeed, the FLETF has only made vague and indirect references to "publicly available information from 2017, 2023, and 2024" as the basis for its decision, which can hardly be sufficient to cure this failure or be considered as providing any explanation (let alone an adequate one) to Camel Group of its Removal Decision.

175.    Moreover, Camel Group cannot speak to whether the Administrative Record would cure this failure because the FLETF, as of the date of this action, has still failed to provide Camel Group with its Administrative Record.

176.     This incredible lack of transparency, which was devoid of any explanation, has shown that the FLETF's July 9th Removal Decision, and the entire administrative process as administered by the FLETF was arbitrary and capricious, and in violation of the APA.

### COUNT II – 5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRCIOUS AGENCY ACTION)

177.    Plaintiff incorporates by reference all previous allegations contained therein as if set forth fully herein.

178.    Agency action is arbitrary and capricious when it is not supported by substantial evidence. Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys., 745 F.2d 677, 683–84 (D.C. Cir. 1984) (Scalia, J.). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 C.I.T. 1150, 1152 (2001) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

179.    The FLETF's Removal Decision is arbitrary and capricious because it is not supported by substantial evidence.

180.    The FLETF has never identified what information it is relying upon except to say it is based on "publicly available information from 2017, 2023 and 2024" without ever identifying which information it relied on.

181.    Assuming the FLETF is relying on the SHU Reports, the FLETF provided no evidence to rebut the supporting evidence and explanations provided by Camel Group in its Removal Petition and Responses.  This makes the evidentiary basis in which the FLETF purports to base its Removal Decision flawed in multiple ways:

  a.  The FLETF failed to provide Camel Group with any evidence that it relied upon in either its Listing Decision or Removal Decision, only revealing its decision to be based on "publicly available information" from multiple years.  This can hardly be considered "substantial evidence";

  b.  Assuming the FLETF relied upon the SHU Reports as the basis for its decisions, then the FLETF failed to address the corrected Sina Article omitted in the SHU Reports and contradicting the WeChat Article on which the SHU Reports solely rely upon to make its accusations against Camel Group;

  c.  The FLETF failed to provide evidence rebutting the sealed statement by the Toksun SSHR explaining the correction of the WeChat Article (which Toksun SSHR authored) and directly contradicting the allegations in the SHU Reports;

  d.  The FLETF failed to provide any evidence or analysis demonstrating why it found Camel Group's supporting evidence insufficient and not credible;

e.  The FLETF failed to provide any substantial evidence of Camel Group's participation in "Toksun County-sponsored labor recruitment events";

f.  The FLETF failed to provide any substantial evidence to support its claim that Camel Group is "working with the Toksun County government to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz" and *transfer them out of XUAR*.

182.    Furthermore, even if the FLETF believes that Camel Group did participate in the Labor Transfer Program in 2017, the UFLPA also provides relief if Camel Group "does not meet or no longer" meets the criteria in UFLPA Sec. 2(d)(2)(B)(ii).

183.    The FLETF failed to independently decide that issue and it says nothing about whether this argument was even considered despite being raised in Camel Group's Removal Petition.

184.    These facts add up to the conclusion that the FLETF's July 9th Removal Decision (as well as its original Listing Decision) was not based on substantial evidence, and was in violation of the APA.

## COUNT III – 5 U.S.C. § 706(2)(C)
## (AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY)

185.    Plaintiff incorporates by reference all previous allegations contained therein as if set forth fully herein.

186.    "'Retroactivity is not favored in the law,' Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988), and courts 'will construe a statute to avoid retroactivity unless there is clear evidence that Congress intended otherwise,' Hicks v. Merit Sys. Prot. Bd., 819 F.3d 1318, 1321 (Fed. Cir. 2016)." Ninestar Corp., et al., v. United States, et al., Case No. 1:23-cv-00182 (Slip-Op 24-24) (Feb. 27, 2024 Opinion) (ECF 121), at pp. 40-41.  The FLETF has previously agreed that "because the UFLPA requires the listed entity to be 'working' with the XUAR government to

recruit, transport, transfer, harbor or receive forced laborers or ethnic minorities," the FLETF must "reasonably conclude" that a listed entity's alleged conduct occurred after the UFLPA's enactment.  Id., at p. 41 (citations omitted); *see also* UFLPA § 2(d)(2)(B)(ii), 135 Stat. at 1527.

187.    Here, the FLETF cited "publicly available evidence from 2017, 2023, and 2024" all of which only include allegations of a single event that occurred in July 2017, nearly 5 years prior to the enactment of the UFLPA.  Exhibit 23, at p. 3. In other words, the publicly available evidence was published in 2023 and 2024 but it is speaking of an alleged event that actually occurred in 2017 – 8 years ago.

188.    The FLETF has based its Listing Decision and Removal Decision completely on evidence and events that occurred before the enactment of the UFLPA in June 2022, and it has not provided any evidence regarding allegations involving Camel Group that occurred after June 2022. As such, the FLETF has exceeded its statutory authority.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter a Judgment:

(1)    Pursuant to 28 U.S.C. § 2635(d),[13] ordering Defendants to file a copy of Plaintiff's Administrative Record within forty (40) days of service of the summons and this Complaint on Defendants;

(2)    Declaring that Defendants have acted in an arbitrary and capricious manner in violation of the APA by failing to provide a reasoned explanation for its July 9th  Removal Decision;

---

[13] *See also* Ninestar Corp., et. al. v. U.S., et. al, 1:23-cv-00182, (C.I.T.) (Sept. 11, 2023 Order, ECF No. 23), at pp. 2-3 ("…where judicial review involves an agency record, the agency must file the record within forty days after the date of service of the summons and complaint upon the agency, regardless of whether a motion for preliminary injunction was filed.").

(3)     Declaring that Defendants have acted in an arbitrary and capricious manner in violation of the APA by issuing its July 9th Removal Decision without substantial evidence to support either action;

(4)     Declaring that Defendants have acted in excess of their statutory authority by applying the UFLPA retroactively to Plaintiff;

(5)     Declaring that Defendants have violated Plaintiff's due process rights;

(6)     Vacating FLETF's determination to add Plaintiff to the UFLPA Entity List and deny Plaintiff's Removal Petition and remanding to FLETF for further action as is appropriate and consistent with the APA and other applicable laws to take action to remove Plaintiff from the Entity List;

(7)     Preliminarily and permanently enjoining DHS and CBP from enforcing the UFLPA's rebuttable presumption against Plaintiff;

(8)     Awarding Plaintiff its attorneys' fees and all other reasonable expenses and costs incurred as a result of this action under 28 U.S.C. § 2412; and

(9)     Awarding any other relief this Court deems just and proper.

Respectfully submitted,

**DICKINSON WRIGHT PLLC**

*/s/ Mark V. Heusel*
Mark V. Heusel
Jacob L. Clark (*admission pending*)
DICKINSON WRIGHT PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 623-1908
*Attorneys for Plaintiff*

**DATE:**  January 17, 2025
4922-5429-4032 v1 [71891-115]