# IN THE UNITED STATES
# COURT OF INTERNATIONAL TRADE

CAMEL GROUP CO., LTD.,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CUSTOMS AND BORDER
PROTECTION; FORCED LABOR
ENFORCEMENT TASK FORCE;
ALEJANDRO MAYORKAS, *in his*
*official capacity as the Secretary of the*
*Department of Homeland Security*;
TROY A. MILLER, *in his official*
*capacity as the Senior Official Performing*
*the Duties of the Commissioner for*
*U.S. Customs and Border Protection*;
ROBERT SILVERS, *in his official capacity*
*as Under Secretary for Office of Strategy,*
*Policy, and Plans and Chair of the Forced*
*Labor Enforcement Task Force*;

    *Defendants.*

Case No.:  25-00022

---

Mark V. Heusel
Jacob L. Clark (*admission pending*)
Dickinson Wright PLLC
350 S. Main Street, Ste. 300
Ann Arbor, MI 48104
(734) 623-1908
mheusel@dickinsonwright.com
jlclark@dickinsonwright.com
*Attorneys for Plaintiff*

---

## EXHIBIT 12 - AUGUST 30TH LETTER

**Jacob L. Clark**

| | |
|---|---|
| **From:** | Jacob L. Clark |
| **Sent:** | Wednesday, August 30, 2023 2:50 PM |
| **To:** | 'FLETF.UFLPA.EntityList@hq.dhs.gov' |
| **Cc:** | 'mheusel@dickinsonwright.com' |
| **Subject:** | Camel Group Co. Ltd. UFLPA Entity List Inquiry Letter |
| **Attachments:** | 4892-4473-3309 v4 Letter to DHS_SIGNED FULL PACKAGE 08302023.pdf |
| | |
| **Importance:** | High |

Dear Director Echeverria,

This is Jacob Clark from Dickinson Wright following up on my call from this morning. As mentioned in my message, attached, please find a letter from Mark Heusel on behalf of Camel Group Co. Ltd. I would emphasize that the attached letter is a formal communication on behalf of Camel Group and is not a request for removal at this point. Please review and let me know if you have any questions. If possible, we would appreciate if you could forward this letter to the Task Force, DHS Office of General Counsel, and any other agency or individual you feel would be in a position to best handle and respond to the inquiry.

If you have any questions, please do not hesitate to contact me. Thank you.

Sincerely,

Jake



350 S. Main Street, Suite 300
Ann Arbor, MI 48104-2131
Telephone: 734-623-7075
Facsimile: 844-670-6009
http://www.dickinsonwright.com

Mark V. Heusel
MHeusel@dickinsonwright.com
734-623-1908

August 30, 2023

**VIA E-MAIL**

Cynthia Echeverria
Director of Trade Policy, Trade and Economic Security
Department of Homeland Security, Office of Strategy, Policy, and Plans
Email:  FLETF.UFLPA.EntityList@hq.dhs.gov
Phone:  (202) 938-6365

     *Re:    Camel Group Co. Ltd.*

Dear Director Echeverria:

     We represent Camel Group Co. Ltd. ("Camel Group") in matters related to the Uyghur Forced Labor Prevention Act ("UFLPA").  On August 2, 2023, the Forced Labor Enforcement Task Force ("FLETF") added Camel Group to the UFLPA Entity List pursuant to UFLPA Section 2(d)(2)(B)(ii).  Besides identifying the specific section and sub-list of the UFLPA Camel Group was added to, the FLETF did not provide Camel Group with any other information, reasoning, or supporting evidence justifying its inclusion of Camel Group on the UFLPA Entity List.

     On August 3, 2023, my colleague Jacob Clark reached out to you via email.  On August 4, 2023, Jacob followed up with you via phone call and left a message regarding his August 3rd email.  On August 10, 2023, Jacob made another phone call to your office.  Then, on August 18, 2023 he received your callback.  We were very grateful for the time you took that day to speak with us and answer questions about the UFLPA removal process.  I understand he did not disclose Camel Group's name to you during his communications with you and your office.  Given our knowledge and the status of the case at that time, we were not in a position to make such disclosure.  We hope you can understand.  However, Jacob also called and left a message with you today regarding the communication of this letter.  Now that we have been able to learn more about this process and have made progress in our internal assessment regarding the allegations made against Camel Group, we are now in a position to make such a disclosure to you and begin engaging with you and the FLETF.

     On the August 18th call, Jacob expressed that Camel Group takes these allegations very seriously and fully intends to work with the FLETF to resolve the concerns it has identified.  I want to re-emphasize that point and express that Camel

Cynthia Echeverria
August 30, 2023
Page 2

Dickinson Wright PLLC

Group's position on that has not changed.  On that call, Jacob also discussed with you on the possibility of inquiring the Department of Homeland Security ("DHS") Office of the General Counsel ("OGC") on whether they may be willing to speak with us regarding the removal process and the possibility of sharing with us the reasons and evidence supporting the FLETF's decision to list Camel Group.  Understanding the FLETF's reasons and evidence will certainly help us facilitate a streamlined process designed to address the specific concerns of the FLETF on Camel Group's eventual removal request.

While we have not yet heard back on our inquiry to DHS OGC and in light of the recent case titled <u>Ninestar Corporation, et. al., v. United States of American, et. al</u>., Case No. 1:23-cv-00182 filed on August 22, 2023 in the Court of International Trade, we wanted to contact you now about the possibility of sharing the reasons and evidence for Camel Group's inclusion on the UFLPA Entity List, which is a key issue raised in Ninestar's complaint.  A copy of Ninestar's complaint has been attached for your reference as Attachment 1.  Camel Group does not take a position on the merits of Ninestar's claim.   However, since Camel Group intends to submit a removal request, Camel Group does believe that without knowing the reasons and evidence behind its addition to the UFLPA Entity List, it may not be able to adequately identify the concerns of the FLETF that led to Camel Group's listing and consequentially prevent Camel Group from meaningfully participating in the removal process.  *See* <u>Ninestar et. at., v. United States, et. al.</u>, Case No. 1:23-cv-00182, ECF No. 8, ¶¶ 45-46 (C.I.T). Furthermore, understanding the exact reasons for Camel Group's listing will allow us to better collaborate with the FLETF and other relevant stake holders to effectively address these concerns and ultimately facilitate a more efficient removal process that will conserve the valuable time and resources of the FLETF.

**Therefore, Camel Group would like to respectfully request DHS to work with its counterparts on the FLETF and provide Camel Group with reasons and evidentiary support for the FLETF's decision to add Camel Group to the UFLPA Entity List pursuant to UFLPA Section 2(d)(2)(B)(ii).**

Prior case precedent and U.S. government practice supports disclosure of the reasons and evidentiary support for the FLETF's decision to add Camel Group to the UFLPA Entity List pursuant to UFLPA Section 2(d)(2)(B)(ii).  In the case titled <u>Xiaomi Corporation et. al. v. U.S. Department of Defense, et. al.</u>, Xiaomi filed a complaint against the U.S. Department of Defense, Department of Treasury, Sec. Lloyd Austin, Sec. Janet Yellen, and Pres. Joseph Biden challenging Xiaomi's designation on the Chinese Communist Military Company (CCMC) List under Executive Order 13959 pursuant to the Administrative Procedures Act and due process and Constitutional grounds.  <u>Xiaomi Corp., et. al. v. U.S. Dept. of Defense, et. al.</u>, Case No. 1:21-cv-00280 (D.D.C.).  In the course of litigation, the Department of Defense produced as part of a

Cynthia Echeverria
August 30, 2023
Page 3

D I C K I N S O N   W R I G H T   P L L C

public filing the decision memo describing the reasons and supporting evidence for Xiaomi's inclusion on the CCMC List. Xiaomi Corp. et. al., *Declaration of Andrew J. Pahutski*, Ex. A, ECF No. 16-1, at pp. 5-6. A copy has been included as Attachment 2 to this letter.

In the case titled Luokang Technology Corporation, et. al., v. U.S. Department of Defense, et. al., Luokang filed a similar complaint against the same set of government and individual defendants requesting similar relief for Luokang's inclusion on the CCMC List under Executive Order 13959. Luokang Tech. Corp., et. al., v. U.S. Department of Defense, et. al., Case No. 1:21-cv-00583 (D.D.C.). Once again, in the course of litigation, the Department of Defense produced a decision memo describing the reasons and supporting evidence for Luokang's inclusion on the CCMC List to Luokang, and Luokang included it as part of a public filing without any known objection from the Department of Defense. Luokang Tech. Corp., et. al., *Amended Complaint for Declaratory and Injunctive Relief*, Exhibit G, ECF No. 22-7. A copy has been included as Attachment 3 to this letter. In both the Xiaomi and Luokang cases, the Court ultimately found that the reasoning in the decision memos were inadequate to support the decision and granted Xiaomi's and Luokang's requests for injunctions against enforcement of sanctions associated with entities on the CCMC List. **Based on these cases, there is a strong and recent precedent supporting the FLETF and/or DHS to provide Camel Group with the reasons and evidentiary support for its inclusion on the UFLPA Entity List.**

Should DHS or FLETF or its member agencies determine that it cannot release that information through this method of request, then alternatively, Camel Group would request that DHS or FLETF work with the DHS Privacy Office to ensure efficient processing of a connected FOIA Request to Camel Group, namely Request Number 2023-HQFO-02158 made by Zubo Zhang, a U.S.-based Camel employee, currently in "Initial Determination" status as of the date of this letter. A copy of the FOIA Request and FOIA Request Receipt has been included as Attachment 4. This FOIA Request seeks release of the reasons and evidentiary support for the FLETF's decision to add Camel Group to the UFLPA Entity List. As such, should DHS determine it cannot provide the reasons and evidentiary support directly to Camel Group through this informal request and pursuant to precedent and practice by the U.S. government seen in both the Xiaomi and Luokang cases, then we hope it can do so by granting our pending FOIA Request and providing the information sought through formal channels.

**Therefore, we would respectfully inquire whether it may be possible for DHS OGC provide us with a) the reasons and evidentiary support for the FLETF's decision to add Camel Group to the UFLPA Entity List pursuant to UFLPA Section 2(d)(2)(B)(ii); OR, alternatively, b) expediently process the FOIA Request (Request No. 2023-HQFO-02158) currently pending with the DHS Privacy Office.**

DICKINSON WRIGHT PLLC

Cynthia Echeverria
August 30, 2023
Page 4

Of course, should you have any questions or would like to discuss this letter or Camel Group in general, please do not hesitate to contact me. You may also reach out to Jacob Clark (email: jlclark@dicksinsonwright.com; phone: (734) 623-1624). Thank you and we look forward to hearing from you soon.

Sincerely,

Mark V. Heusel

# ATTACHMENT 1

PUBLIC VERSION

IN THE UNITED STATES
COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD.<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*,<br><br>*Defendants*. | Case No. ___23-182___ |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Ninestar Corporation, Zhuhai Ninestar Information Technology Co., Ltd., Zhuhai Pantum Electronics Co., Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd. (collectively, "Plaintiffs" or "Ninestar" unless otherwise indicated) complain and allege as follows against Defendant United States of America, Defendant U.S. Department of Homeland Security (DHS), Defendant U.S. Customs and Border Protection (CBP), Defendant Forced Labor Enforcement Task Force (FLETF), Defendant Alejandro Mayorkas, in his official capacity as the Secretary of the Department of Homeland Security, Defendant Troy A. Miller, in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection, and Defendant Robert Silvers, in his official capacity as DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF (collectively, "Defendants").

## SUMMARY OF THE ACTION

1. This action challenges the decision of the Forced Labor Enforcement Task Force (FLETF) to take adverse action against Plaintiffs, causing them serious and irreparable economic, contractual, market-based, reputational, and other harm, without offering any explanation or justification whatsoever for said action. Such arbitrary and capricious conduct violates the Administrative Procedures Act's reasoned decisionmaking requirement and must be set aside.

2. The Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021) ("UFLPA" or the "Act"), charges FLETF with compiling and maintaining lists of entities that either produce goods using forced labor by persecuted groups in the Xinjiang Uyghur Autonomous Region of China, or that work with the regional government to "recruit, transport, transfer, harbor or receive" such labor out of the Xinjiang Uyghur Autonomous Region. UFLPA

§ 2(d)(2)(B). The Act further directs CBP to presume that any goods produced by a listed entity violate 19 U.S.C. § 1307's prohibition on the importation of goods manufactured with forced labor, and must therefore be excluded from the United States. UFLPA § 3(a).

3. DHS, as the Chair of FLETF, announces additions to these lists through a press release and notice in the Federal Register. These announcements provide no explanation of why any particular entity was listed, nor do Defendants otherwise communicate such grounds to the listed entities. *See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 38,080, 38,082 (June 12, 2023) (the "Listing Decision"); *see also* UFLPA § 2(d)(2)(B)(ii).

4. FLETF has announced that it will entertain requests for removal from the list, but only if an entity can "provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the [Act]" for listing. 88 Fed. Reg. at 38,082. In other words, Defendants place on the listed entity the burden to prove the negative that its goods are not manufactured with forced labor and/or that it does not cooperate with Xinjiang regional officials to transport or harbor forced laborers, all without having been told the bases for the listing in the first instance.

5. In June 2023, FLETF added Plaintiffs to the UFLPA Entity List. This decision, announced without any details or explanation, has caused massive and irreparable harm to Plaintiffs' business and reputation.

6. Because FLETF failed to provide any reasoned explanation for its decision, and because Plaintiffs have no other recourse for learning the grounds on which they were listed or, therefore, to successfully question the listing, the Court should vacate the Listing Decision as arbitrary and capricious agency action.

## PARTIES

7.    Ninestar Corporation is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Area B, 7th Floor, Building 01, 3883 Zhuhai Avenue, Xiangzhou District, Zhuhai, Guangdong, China.  Ninestar Corporation is engaged in the business of manufacturing and selling printer cartridges.

8.    Zhuhai Ninestar Information Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 2nd Floor, Building 01; Area A, 1st Floor, Building 02; Building 03; Building 04; Building 05; 1st Floor, 2nd Floor, 4th Floor, Building 06, 3883 Zhuhai Avenue, Xiangzhou District, Zhuhai, Guangdong, China.  Zhuhai Ninestar Information Technology Co., Ltd. is engaged in the business of developing, manufacturing, and selling printer consumables and accessories.  It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

9.    Zhuhai Pantum Electronics Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Building 02, Building 06, Building 08, 888 Shengping Avenue, Pingsha Town, Jinwan District, Zhuhai, Guangdong, China.  Zhuhai Pantum Electronics Co., Ltd., is engaged in the business of designing, manufacturing, and selling laser printers, printer consumables, and accessories, and is a wholly owned subsidiary of Ninestar Corporation.

10.    Zhuhai Apex Microelectronics Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 1st Floor, 2nd Floor, Area A, 3rd Floor, 5th Floor, 6th Floor, 7th Floor, 8th Floor, 9th Floor, Building 01, 83 Guangwan Street, Xiangzhou District, Zhuhai, Guangdong, China.  Zhuhai Apex Microelectronics Co., Ltd. is engaged in the business of designing, manufacturing, and selling chips used in printer

4

consumables. Ninestar Corporation is a majority shareholder of Zhuhai Apex Microelectronics Co., Ltd.

11.     Geehy Semiconductor Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 2nd Floor, Building 1, Creative Valley, 1889 Huandao East Road, Hengqin New District, Zhuhai, Guangdong, China. Geehy Semiconductor Co., Ltd. is engaged in the business of designing, manufacturing, and selling microcontroller units. Geehy Semiconductor Co., Ltd. is a wholly owned subsidiary of Zhuhai Apex Microelectronics Co., Ltd.

12.     Zhuhai G&G Digital Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at East side of 3rd Floor, Building 1, 3883 Zhuhai Avenue, Zhuhai, Guangdong, China. Zhuhai G&G Digital Technology Co., Ltd. is engaged in the business of selling printer consumables. It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

13.     Zhuhai Seine Printing Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at No. 16007, 16th Floor, 169 Rongzhu Road, Hengqin New District, Zhuhai, Guangdong, China. Zhuhai Seine Printing Technology Co., Ltd. is engaged in the business of plant leasing operations. It is a parent company of Ninestar Corporation.

14.     Zhuhai Ninestar Management Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Office 920, Building 1, 833 Qinhai East Road, Hengqin New District, Zhuhai, Guangdong, China. Zhuhai Ninestar

Management Co., Ltd. is engaged in the business of corporate management consultation and intellectual property management, and is a wholly owned subsidiary of Ninestar Corporation.

15.     The Department of Homeland Security is a federal agency headquartered in the District of Columbia with its principal office located at 245 Murray Lane S.W., Washington, D.C. 20528.  Among its duties, DHS leads FLETF.

16.     U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia with its principal office located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229.  CBP is an agency within DHS.  Among its duties, CBP enforces federal laws regulating the importation of goods into the United States.

17.     The Forced Labor Enforcement Task Force is a task force comprising representatives from seven federal agencies.  FLETF was established by Congress in the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). *See* 19 U.S.C. § 4681(a).  On information and belief, FLETF primarily holds meetings and conducts its business in the District of Columbia.  Among its duties, FLETF monitors the enforcement of the federal prohibition on importation of goods made with forced labor.

18.     Secretary Alejandro Mayorkas is sued solely in his official capacity as Secretary of DHS.  In that capacity, Secretary Mayorkas has the ultimate responsibility for the activities of DHS and CBP, including the actions complained of herein.  Secretary Mayorkas maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

19.     Troy A. Miller is sued solely in his official capacity as the Senior Official Performing the Duties of the Commissioner for CBP.  In that capacity, Mr. Miller is responsible for the activities of CBP, including the actions complained of herein.  Mr. Miller maintains an office at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229.

20. Robert Silvers is sued solely in his official capacity as DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF. In that capacity, Under Secretary Silvers is responsible for the activities of FLETF, including the actions complained of herein. Under Secretary Silvers maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

21. The United States of America is amenable to service through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice. C.I.T. R. 4(h).

## JURISDICTION AND VENUE

22. This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the UFLPA, Pub. L. No. 117-78, 135 Stat. 1525 (2021).

23. This Court has jurisdiction under 28 U.S.C. § 1581(i).

## LEGAL BACKGROUND

24. Since the enactment of the Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590, federal law has prohibited importation of any goods or merchandise produced wholly or in part in any foreign country by forced labor. 19 U.S.C. § 1307.

25. As part of the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020), Congress directed the President to establish FLETF to monitor the Nation's enforcement of the prohibition on importation of goods made by forced labor set forth in 19 U.S.C. § 1307. *See* 19 U.S.C. § 4681(a). The President established FLETF by executive order on May 15, 2020. Exec. Order No. 13,923, 85 Fed. Reg. 30,587.

26. FLETF is chaired by the Secretary of DHS, and includes representatives from six other agencies: the Department of State, the Department of the Treasury, the Department of Justice, the Department of Labor, the Office of the United States Trade Representative, and the

Department of Commerce.  The Secretary of DHS later delegated his authority as chair of FLETF to the DHS Under Secretary for Office of Strategy, Policy, and Plans.

27.     In December 2021, Congress passed and the President signed into law the Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021).  The Act aims to strengthen § 1307 by curtailing the importation of goods linked to forced labor of Uyghurs, Kazakhs, Tibetans, and members of other persecuted groups in the People's Republic of China, and especially in the Xinjiang Uyghur Autonomous Region.  UFLPA §§ 1–2.  The Act announces the policy of the United States "to lead the international community in ending forced labor practices wherever such practices occur through all means available to the United States Government" and to combat human trafficking around the globe.  *Id.* § 1.

28.     The Act requires FLETF, after soliciting comments and holding a public hearing, to develop a strategy "to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China."  UFLPA § 2(a)–(c).

29.     As part of that strategy, FLETF must develop and regularly update:

    i.    a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

    ii.    a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

    iii.    a list of entities that exported any products mined, produced, or manufactured by any entity on the preceding two lists from the People's Republic of China into the United States; and

    iv.    a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production

and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor. UFLPA § 2(d)(2)(B)(i)–(v), (e)(2).

(Collectively, the "UFLPA Entity List").

30.　As to any entity on the UFLPA Entity List, the Act directs CBP to "apply a presumption" that importation of "any goods, wares, articles, and merchandise . . . produced by an entity on [the] list" is prohibited under § 1307 and that such items are not entitled to entry at any of the ports of the United States. UFLPA § 3(a).

31.　For a listed entity, CBP must apply this presumption unless the CBP Commissioner concludes that the importer of record has fully complied with FLETF supply chain "guidance," has cooperated fully with all CBP inquiries, and has proven—"by clear and convincing evidence"—that the goods were not produced in whole or in part by forced labor. UFLPA § 3(b).

32.　According to CBP, the UFLPA's presumption "exponentially increases the scope and volume of goods subject to examination and enforcement at ports of entry . . . under 19 U.S.C. § 1307." CBP, *UFLPA Fiscal Year 2022 Obligation and Implementation Plan* 2 (Oct. 12, 2022).[1]

## FACTUAL ALLEGATIONS

**Plaintiffs' Business**

33.　Ninestar Corporation, a listed company on the Shenzhen Stock Exchange, ranks among the 500 largest businesses in China by revenue, and is the world's fourth largest laser printer developer and manufacturer. Its products include laser printers, integrated circuit chips, and printer consumables such as toner and inkjet cartridges.

---

[1] https://www.dhs.gov/sites/default/files/2022-12/CBP%20-%20Uyghur%20Forced%20Labor%20Prevention%20Act%20-%20Fiscal%20Year%202022%20Obligation%20and%20Implementation%20Plan.pdf

34.     Ninestar Corporation and the other Plaintiffs manufacture and sell, or support the manufacture and sale of, products directly and indirectly to numerous United States-based customers. Those customers include wholesalers who resell Ninestar products to consumers and equipment manufacturers who integrate Ninestar components into their own products.

35.     Through its U.S.-based business partners and customers, Plaintiffs contribute to [      ] of products being imported into the United States each year. For example, from July 2022 to June 2023:

     i.    Plaintiff Ninestar Corporation caused approximately [      ] of printer cartridges to be imported into the United States. Ninestar Corporation also manufactures components used by other printer manufacturers that export directly to the United States.

    ii.    Plaintiff Zhuhai Ninestar Information Technology Co., Ltd. caused approximately [      ] of printer consumables and accessories to be imported into the United States.

    iii.    Plaintiff Zhuhai Pantum Electronics Co., Ltd. caused approximately [      ] of printers, printer consumables, and accessories to be imported into the United States.

    iv.    Plaintiff Zhuhai Apex Microelectronics Co., Ltd. caused approximately [      ] of chips used in printer consumables to be imported into the United States. Zhuhai Apex Microelectronics Co., Ltd. is also a manufacturer of spare parts used by other manufacturers that export directly to the United States.

    v.    Plaintiff Geehy Semiconductor Co., Ltd. caused approximately [      ] of microcontroller units to be imported into the United States. Geehy

Semiconductor Co., Ltd. is also a manufacturer of spare parts used by other manufacturers that export directly to the United States.

36.     The remaining three plaintiffs—Zhuhai G&G Digital Technology Co., Ltd.; Zhuhai Seine Printing Technology Co., Ltd.; and Zhuhai Ninestar Management Co., Ltd.—are not engaged in the business of mining, production, or manufacturing of goods, wares, articles, or merchandise, but provide support services to other Ninestar companies.

37.     Prior to June 2023, CBP has never suggested that any of Plaintiffs' products violated 19 U.S.C. § 1307, and Plaintiffs therefore have never had difficulties demonstrating to CBP that their products could lawfully be imported into the United States.

**The FLETF Listing**

38.     On June 9, 2023, FLETF announced that it would add "Ninestar Corporation and its eight Zhuhai-based subsidiaries" to the UFLPA Entity List "for working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or member of other persecuted groups out of Xinjiang."  The Listing Decision took effect three days later, when DHS, on behalf of FLETF, published an updated UFLPA Entity List in the Federal Register.  *See* Listing Decision*, supra*.

39.     The Listing Decision listed eight purported "Zhuhai-based subsidiaries": "Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd."  88 Fed. Reg. at 38,082.  One of these, Zhuhai Pu-Tech Industrial Co., Ltd., is not affiliated with Ninestar Corporation and is therefore not a party to this action.

40.     The Listing Decision was the only notice any Plaintiff received concerning this action.  The Listing Decision provides no explanation as to why any particular entity was added to the UFLPA Entity List.  And, FLETF provided no explanation to Plaintiffs, publicly or otherwise, for its decision to add Ninestar and its affiliates to the Entity List and by extension to exclude them and their goods entirely from the United States.

41.     Neither FLETF nor any other component of the United States government gave Plaintiffs notice that they would be added to the UFLPA Entity List.  Nor did DHS, CBP, FLETF, or any other federal agency conduct any public hearing, reported investigation, or adjudication regarding Plaintiffs and their labor practices prior to the listing, nor did FLETF make any inquiry directly of Plaintiffs prior to doing so.

42.     Rather, Ninestar first learned of the listing through public reporting after the listing was published in a DHS press release.

43.     The UFLPA Entity List does identify which of the statutorily-mandated lists each listed entity appears on.  Plaintiffs have been added to a list of entities purportedly "working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

44.     The inclusion of Plaintiffs on the UFLPA Entity List, automatically and without any intervening action or cause, requires CBP to presume that any good produced in whole or in part by any Plaintiff was made using forced labor and, therefore, is prohibited from entry into the United States.  The listing thus constitutes final agency action which adversely affects and aggrieves Plaintiffs.

45.     Plaintiffs are unaware of any facts relating to their respective businesses or otherwise supporting such an allegation.  Without learning the bases upon which Defendants added Plaintiffs to the UFLPA Entity List, Plaintiffs are unable meaningfully to seek removal from the list or otherwise challenge this final agency action.

46.     Nor are Plaintiffs able to seek relief under the APA challenging the action as contrary to the evidence in the administrative record, as Plaintiffs know neither the bases for the charge, nor the contents of the record.  After filing, Plaintiffs will seek the record and, when appropriate, seek additional relief.

**Injuries Caused by the FLETF Listing**

47.     Since FLETF's decision to add Plaintiffs to the UFLPA Entity List, Plaintiffs have suffered significant, irreparable harm to their businesses and reputation.

48.     By virtue of the listing, Plaintiffs' goods are automatically presumed to have been manufactured using forced labor (notwithstanding that the Listing Decision alleges transportation of protected persons, not the use of forced labor) and, therefore, cannot be imported into the United States directly or indirectly.  Any such goods will be—and are already being—detained by CBP at U.S. ports of entry, unable to be brought to market and sold.  Plaintiffs are aware of at least [     ] shipments that have been excluded by CBP on the basis of the Listing Decision.

49.     Plaintiffs are actively losing business relationships.  For example, one of the largest United States-based customers of Ninestar, Kentucky-based Lexmark, announced that it had "stopped shipments" from Ninestar and would "replace Ninestar as a supplier globally."  Lexmark International, Inc., *Lexmark Issues Statement on Supply Chain* (June 2023).[2]

---

[2] https://newsroom.lexmark.com/statement_June_2023.

50.     In total, Plaintiffs' U.S. customers have already cancelled approximately [      ] worth of purchase orders because of the Listing Decision.  Customers have also notified Plaintiffs that they have or are actively trying to transfer their orders for Plaintiffs' products to other suppliers.  Plaintiffs' anticipate that, if the ban on importing their products is not rescinded, they stand to lose [      ] in revenue from U.S. customers over the next year.

51.     [      ]

52.     The potential harm is not limited to the United States.  In light of the Listing Decision, the leader of a trade group for European businesses in the printing and printing consumables industry has called for European distributors to "quickly distance themselves from Ninestar to avoid being associated with forced labor."  ETIRA, *ETIRA Shocked that Ninestar is Found Engaged in Forced Labor, Asks EU Regulators to Act* (June 12, 2023).[3]  Customers in Europe and the People's Republic of China have cancelled about [      ] in orders as a direct result of the Listing Decision.  Customers in Canada and Japan have announced that they will no longer cooperate with Ninestar.

53.     The Listing Decision has also tarnished and continues to tarnish Ninestar's reputation.  FLETF has effectively accused Plaintiffs of aiding and abetting human trafficking, which harms Plaintiffs in the eyes of their investors and business partners, and of the consuming public.  Even after Plaintiffs clear their name, this taint will persist.

54.     Despite the fact that the Listing Decision provided no basis whatsoever for the listing, customers and industry analysts have taken the announcement alone as proof positive of Ninestar's liability.  Indeed, Plaintiffs are deemed guilty until proven innocent.

---

[3] https://www.etira.org/posts/etira-shocked-that-ninestar-is-found-engaged-in-forced-labor-asks-eu-regulators-to-act/.

55. Ninestar's commercial competitors have every incentive to repeat and amplify the unadorned and unexplained allegation in the Listing Decision directly and through trade groups, to their own commercial benefit.

56. Because of the Listing Decision, several American printing-industry trade associations have cut off their relationships with Plaintiffs. *See, e.g.*, Business Tech. Ass'n, *Ninestar, Lexmark & the Business Technology Association* (July 25, 2023).[4] In addition, [      ]

## CLAIM FOR RELIEF

### COUNT I—5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

57. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 56 as if set forth fully herein.

58. Plaintiffs are adversely affected by the Listing Decision because it has terminated their ability to sell and ship goods directly or indirectly to United States-based customers. *See* 5 U.S.C. § 702.

59. The Listing Decision constitutes "final agency action," 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Indeed, without further action by Plaintiffs seeking to satisfy an onerous standing for discretionary relief from a different agency, Plaintiffs goods are today completely barred from the United States.

---

[4] https://businesstechnologyassociation.growthzoneapp.com/news/Details/ninestar-lexmark-the-business-technology-association-a-message-to-all-bta-members-176918.

60.     The APA requires courts to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

61.     "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that an agency acts unlawfully when it fails to "articulate a satisfactory explanation for its action").

62.     The Listing Decision is arbitrary and capricious because FLETF not only failed to provide an adequate explanation, it failed to provide *any* explanation, for adding Plaintiffs to the UFLPA Entity List.  *See Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[A]n agency must explain why it decides any question the way it does.  That obligation means that the agency must 'articulate a satisfactory explanation' of its reasoning; it may not simply provide a conclusion." (citations omitted)); *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) ("A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious agency action."); *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023) (holding agency action arbitrary and capricious "for the obvious reason that it gives no explanation whatsoever").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a Judgment:

(1)     Declaring that Defendants have acted in an arbitrary and capricious manner in violation of the APA by failing to provide a reasoned explanation for the Listing Decision;

(2)     Vacating FLETF's determination to add Plaintiffs to the UFLPA Entity List and remanding to FLETF for such further action as is lawful and appropriate consistent with the APA and other applicable laws;

(3)     Enjoining DHS and CBP from enforcing the UFLPA's adverse importation presumption against Plaintiffs;

(5)     Awarding Plaintiffs their attorneys' fees, expert witness fees, and all other reasonable expenses incurred in pursuit of this Action under 28 U.S.C. § 2412; and

(6)     Awarding such other relief as the Court deems just and proper.

Dated:  August 22, 2023

Respectfully submitted,

*/s/ Gordon D. Todd*

MICHAEL E. MURPHY
GORDON D. TODD
MICHAEL E. BORDEN
CODY M. AKINS
SIDLEY AUSTIN LLP

1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8760
gtodd@sidley.com

*Counsel for Plaintiffs*

# ATTACHMENT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| XIAOMI CORPORATION, *et al.*, |
| Plaintiffs, |
| v. |
| U.S. DEPARTMENT OF DEFENSE, *et al.*, |
| Defendants. |

Civil Docket No. 21-cv-00280 (RC)

## <u>DECLARATION OF ANDREW J. PAHUTSKI</u>

I, Andrew J. Pahutski, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1.  I am the Director of Foreign Investment Review for the Department of Defense (DoD). I report to the Deputy Assistant Secretary of Defense for Industrial Policy and the Under Secretary of Defense for Acquisition and Sustainment on matters pertaining to foreign investment review within the United States. In this capacity, among my duties is to represent DoD within the Committee on Foreign Investment in the United States (CFIUS). I submit this declaration in connection with the Defendants' opposition to the Plaintiffs' Motion for a Preliminary Injunction in this case.

2.  This declaration is based on my personal knowledge and information made available to me in the course of my official duties. Those duties include coordinating interagency packages for decisions by the Deputy Secretary of Defense in response to Section 1237(b) of the National Defense Authorization Act for Fiscal Year 1999 (P.L. 105-261, as amended by section 1233 of P.L. 106–398 and section 1222 of P.L 108–375).

3. DoD applies a three-factor test to determine whether an entity qualifies for inclusion under Section 1237(b), i.e., whether it is a Chinese Communist Military Company (CCMC). The entity must be: (i) owned, controlled, or affiliated with the People's Liberation Army (PLA), government ministries People's Republic of China (PRC), or affiliated with the PRC defense industrial base; (ii) engaged in providing commercial services, manufacturing, producing, or exporting; and (iii) be operating directly or indirectly within the United States.  After initial identification, an entity is subject to designation once all three criteria are satisfied.

4. In designating Xiaomi as a CCMC, the then-Deputy Secretary of Defense, the ultimate decision-maker, was provided the document attached to this declaration as Exhibit A.

5. The Xiaomi listing decision was based in part on the Military-Civil Fusion (MCF) doctrine, which, as described by the U.S. Department of State, "is an aggressive, national strategy of the Chinese Communist Party (CCP)."  *See* Exhibit B, Military-Civil Fusion and the People's Rep. of China, U.S. Dep't of State, https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-One-Pager.pdf.

As the described by the Department of State, "a key part of MCF is the elimination of barriers between China's civilian research and commercial sectors, and its military and defense industrial sectors."   Key technologies being targeted under MCF include quantum computing, big data, semiconductors, 5G, advanced nuclear technology, aerospace technology, and AI.  *Id.*  In Executive Order 13959, the President described how "[t]hrough the national strategy of Military-Civil Fusion, the PRC is increasing the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities.  Those companies, though

2

remaining ostensibly private and civilian, directly support the PRC's military,

intelligence, and security apparatuses and aid in their development and modernization."

Exec. Order No. 13959, 85 Fed. Reg. 73185, 73185 (2020).

I declare under penalty of perjury that the foregoing is true and correct to the best of my current

knowledge. Executed on February 26, 2021, in Arlington, Virginia.

PAHUTSKI.ANDREW
.JOHN.1043405116

Digitally signed by
PAHUTSKI.ANDREW.JOHN.10434
05116
Date: 2021.02.26 11:51:05 -05'00'

Andrew J. Pahutski
Director, Foreign Investment Review
Department of Defense

**Exhibit A**

As Of: 9/18/20

**Xiaomi Corporation (Xiaomi)**
Beijing, China

**BUSINESS SUMMARY:**

Xiaomi Corporation is a China-based investment holding company principally engaged in the research, development and sales of smartphones, Internet of things (IoTs) and lifestyle products, the provision of Internet services, and investment business. The Company mainly conducts its businesses through four segments. The Smartphone segment is engaged in the sales of smartphones. The IoT and Lifestyle product segment is engaged in the sales of other in-house products, including smart televisions (TVs), laptops, artificial intelligence (AI) speakers and smart routers, ecosystem products, and other smart hardware and lifestyle products. The Internet service segment is engaged in the provision of advertising services and Internet value-added services. The Others segment is engaged in the provision of repair services for its hardware products. The Company distributes its products in domestic market and to overseas markets.[22]

**FACTOR 1: The entity must be owned, controlled, or affiliated with the People's Liberation Army (PLA), government ministries People's Republic of China (PRC), or affiliated with the PRC defense industrial base.**

- Lei Jun the founder and CEO of Xiaomi was awarded the title of "Outstanding Builders of Socialism with Chinese Characteristics" by the Ministry of Industry and Information Technology, which is an organization of the PRC that helps manage military-civil fusion for the state.[23]

- Xiaomi plans to invest ¥50 billion Renminbi over the next five years into combining 5th Generations telecommunications capabilities (5G), Artificial Intelligence (AI), and the Internet of Things (IoT). The strategy is named "5G+AIoT – the next generation super internet" and is designed to ensure Xiaomi's 'absolute dominance' over these emerging markets as well as first mover advantage in their combination.[24] 5G and AI, according to the 2019 DoD Industrial Capabilities Report, are both considered Critical Technologies essential to modern military operations.

Xiaomi meets the criteria for Factor 1.

**FACTOR 2: The entity must be engaged in commercial services, manufacturing, producing, or exporting.**

- Xiaomi is publicly traded on the Hong Kong stock exchange and owns 2 subsidiaries which are publicly traded on the NASDAQ Global Select stock exchange as of July 25, 2020. These companies are engaged in production and manufacturing for commercial use and profit.[25]

---

[22] Thomson Reuters Eikon, *Business Summary*
[23] Xiaomi, *2019 Annual Report*, https://company.mi.com/en-us/ir/indexContent/
[24] Xiaomi, *2019 Annual Report*, https://company.mi.com/en-us/ir/indexContent/
[25] Thomson Reuters Eikon, *Company Tree Structure*

Xiaomi meets the criteria for Factor 2.

**FACTOR 3: An entity must be operating directly or indirectly in the United States.**

- Xiaomi is a publicly traded company and has multiple U.S. based shareholders as of September 18, 2020.[26]
- Xiaomi owns 2 publicly traded companies which are listed on the NASDAQ Stock Exchange and have multiple U.S. based shareholders as of September 18, 2020.[27]
- Several current Xiaomi directors have experience working for U.S. based companies, as well as both attending and teaching at U.S. academic institutions.[28]

Xiaomi meets the criteria for Factor 3.


**DETERMINATION**

Xiaomi Corporation meets the criteria as defined by section 1237 of the FY99 National Defense Authorization Act, as amended and is determined to be a CCMC.

---

[26] Thomson Reuters Eikon, *Shareholders Report*

[27] Thomson Reuters Eikon, *Shareholders Report*

[28] Xiaomi, *2019 Annual Report*, https://company.mi.com/en-us/ir/indexContent/

# **Exhibit**

# Military-Civil Fusion
## and the People's Republic of China

**"Military-Civil Fusion," or MCF, is an aggressive, national strategy of the Chinese Communist Party (CCP). Its goal is to enable the PRC to develop the most technologically advanced military in the world. As the name suggests, a key part of MCF is the elimination of barriers between China's civilian research and commercial sectors, and its military and defense industrial sectors. The CCP is implementing this strategy, not just through its own research and development efforts, but also by acquiring and diverting the world's cutting-edge technologies – including through theft – in order to achieve military dominance.**

### What is MCF?

MCF is the CCP's strategy to develop the People's Liberation Army (PLA) into a "world class military" by 2049. Under MCF, the CCP is systematically reorganizing the Chinese science and technology enterprise to ensure that new innovations simultaneously advance economic and military development. PRC President and CCP General Secretary Xi Jinping personally oversees the strategy's implementation. He chairs the CCP's Central Military Commission and the Central Commission for Military-Civil Fusion Development.

### Why is MCF so important to the Chinese Communist Party?

The CCP sees MCF as critical to advancing its regional and global ambitions. It believes that artificial intelligence (AI) will drive the next revolution in military affairs, and that the first country to apply AI to next generation warfare will achieve military dominance. MCF aims to pave the way for the PRC to be the first country to transition to "intelligent warfare," and therefore develop the military capabilities it sees as critical to achieving these goals.

### What technologies are targeted under MCF?

Key technologies being targeted under MCF include quantum computing, big data, semiconductors, 5G, advanced nuclear technology, aerospace technology, and AI. The PRC specifically seeks to exploit the inherent 'dual-use' nature of many of these technologies, which have both military and civilian applications.

### How is the PRC targeting these technologies?

The CCP is developing and acquiring key technologies through licit and illicit means. These include investment in private industries, talent recruitment programs, directing academic and research collaboration to military gain, forced technology transfer, intelligence gathering, and outright theft. The CCP's MCF strategy allows a growing number of civilian enterprises and entities to undertake classified military R&D and weapons production. The CCP also exploits the open and transparent nature of the global research enterprise to bolster its own military capabilities through bodies like the China Scholarship Council, which requires academic scholarship recipients to report on their overseas research to PRC diplomats.

### Why should we be concerned about MCF?

MCF threatens the trust, transparency, reciprocity, and shared values that underpin international science and technology collaboration and fair global business practices. In a clandestine and non-transparent manner, the CCP is acquiring the intellectual property, key research, and technological advancements of the world's citizens, researchers, scholars, and private industry in order to advance military aims. Joint research institutions, academia, and private firms are all being exploited to build the PLA's future military systems—often without their knowledge or consent.

U.S. DEPARTMENT *of* STATE

# ATTACHMENT 3

# EXHIBIT G

CUI

As Of: 9/15/20

**Luokung Technology Corporation (LKCO)**
Beijing, China

**BUSINESS SUMMARY:**
Luokung Technology Corp., formerly Kingtone Wirelessinfo Solution Holding Ltd, is a holding company. The Company is a developer and provider of mobile enterprise solutions. The Company's mobile enterprise solutions allow company personnel whose work function requires mobility to be connected with enterprise information technology (IT) systems, including Enterprise Asset Management (EAM), Enterprise Resource Planning (ERP), Supply Chain Management (SCM), and Customer Relationship Management (CRM). Its software enables these systems to get extended to personnel in the field using wireless devices, such as smart phones, Personal Digital Assistant (PDA), cameras, barcode scanners, portable printers, global positioning system (GPS) devices, and tablet computers. Its mobile enterprise solutions also contain custom software applications for specific industries and businesses.[11]

**FACTOR 1: The entity must be owned, controlled, or affiliated with the People's Liberation Army (PLA), government ministries People's Republic of China (PRC), or affiliated with the PRC defense industrial base.**

- Luokung and its strategic partner LandSpace Technology Corporation Ltd. work together on commercial space cooperation, focusing on satellite remote sensing data applications. They jointly develop products and services for domestic and foreign markets including spatial-temporal big-data applications, aerospace application systems, and measurement and control systems for rockets, satellites and earth stations with global coverage.[12] Space systems according to the 2019 DoD Industrial Capabilities Report are considered a Traditional Sector of the Defense Industrial Base and a Critical Technology for modern military operations.
- Luokung, through several of its subsidiaries, designs and employs Artificial Intelligence and Autonomous Systems which according to the 2019 DoD Industrial Capabilities Report are considered Critical Technologies used for modern military purposes.[13]
- In July 2020, Luokung entered into a strategic cooperation agreement with China National Geospatial Information Center which is an institution under the National Development and Reform Commission. Together they are undertaking the construction and operation of the national natural resources and geospatial basic information database, engaging in the formulation of policies and standards for the integration and sharing of geospatial information, providing geospatial information products and related services to the state and relevant departments and organizations, and guiding local governments to conduct the construction and application of natural resources and geospatial basic

---

[11] Thomson Reuters Eikon, *Business Summary*
[12] Bloomberg, *Press Release*, https://www.bloomberg.com/press-releases/2019-05-30/luokung-technology-corp-announces-strateg ic-cooperation-with-land-space-on-establishing-the-measurement-and-control-system-for
[13] Company Website, *Our Company*

CUI

CUI

information databases. The agreement is intended to promote the wide application of geospatial information data and technical services in spatial planning, e-government, smart city, smart ecology, and smart agriculture.[14] This agreement constitutes close affiliation with the main body of PRC economic regulation and planning and potential affiliation with the surveillance capabilities of the PRC National Police.

- In July 2020, Luokung established an in-depth partnership with the State-Owned Enterprise (SOE) Yangtze River Yuntong Group Co., Ltd. to provide cooperation on digital city construction, smart city data operation, transportation, and municipal administration multi-level cooperation in technologies, products, and markets in areas such as smart service solutions for public industries.[15] This agreement constitutes close affiliation with the PRC and potential affiliation with the surveillance capabilities of the PRC National Police.

- In 2019, Luokung's wholly owned subsidiary eMapgo Technologies (Beijing) Co., Ltd.[16] established comprehensive cooperation with Huawei Investment & Holding Co., Ltd a company determined to be a CCMC meeting the criteria as defined in section 1237 of the FY99 National Defense Authorization Act, as amended.[17]

Luokung meets the criteria for Factor 1.

**FACTOR 2: The entity must be engaged in commercial services, manufacturing, producing, or exporting.**

- Luokung is publicly traded on the NASDAQ Capital Market Consolidated Stock Exchange. The company manufactures and supplies products and services within the PRC and abroad for commercial use and profit.[18]

Luokung meets the criteria for Factor 2.

**FACTOR 3: An entity must be operating directly or indirectly in the United States.**

- Luokung's wholly owned subsidiary Yitutong Technology (Beijing) Co., Ltd. was selected by U.S. based Ford Motor Company to be Ford's China based operations designated supplier of HD maps for autonomous driving.[19]
- Luokung's wholly owned subsidiary eMapgo provides geographic information services to several U.S. based companies including, McDonald's, KFC, Starbucks, and UPS.[20]
- Luokung is a publicly traded company on the NASDAQ Capital Market Consolidated Stock Exchange and has multiple U.S. based shareholders as of September 4, 2020.[21]

Luokung meets the criteria for Factor 3.

---

[14] Bloomberg, *Press Release*, https://www.bloomberg.com/press-releases/2020-07-09/national-geospatial-information-center-boos ts-luokung-s-all-aspects-of-development-in-application-for-geospatial-information-in
[15] Company Website, *Press Release*, https://www.luokung.com/cn/press/90.html
[16] Company Website, *Our Company*
[17] eMapgo Website, *Company History*, http://www.emapgo.com.cn/index.php?id=149
[18] Thomson Reuters Eikon, *Overview*
[19] Company Website, *Press Release*, https://www.luokung.com/cn/press/82.html
[20] eMapgo Website, *Company Overview*, http://www.emapgo.com.cn/index.php?id=148
[21] Thomson Reuters Eikon, *Shareholder Report*

CUI

**DETERMINATION**

Luokung Technology Corp. meets the criteria as defined by section 1237 of the FY99 National Defense Authorization Act, as amended and is determined to be a CCMC.

# ATTACHMENT 4



350 S. Main Street, Suite 300
Ann Arbor, MI 48104-2131
Telephone: 734-623-7075
Facsimile: 844-670-6009
http://www.dickinsonwright.com

Jacob L. Clark
jlclark@dickinsonwright.com
734-623-1624

August 18, 2023

**VIA U.S. MAIL, SECURERELEASE PORTAL, AND EMAIL**

Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. AVE SE
Washington, D.C. 20528-065
Phone: 202-343-1743
Email: foia@hq.dhs.gov

  *Re: Camel Group Co. Ltd. Freedom of Information Act Request*

Dear FOIA Officer:

   On behalf of Zubo Zhang ("Requester"), we hereby submit the following Freedom of Information Act ("FOIA") request for records regarding the decision by the Forced Labor Enforcement Task Force ("FLETF") regarding Camel Group Company Limited's ("Camel Group") recent inclusion on the Uyghur Forced Labor Prevention Act ("UFLPA") Entity List. This FOIA request to the Department of Homeland Security ("DHS") Privacy Office is appropriate because (i) DHS is the Chair and member agency of the UFLPA, with DHS Under Secretary for Strategy, Policy and Plans Robert Silvers currently acting as Chair; (ii) DHS Office of Strategy, Policy, and Plans ("PLCY") is the office properly involved with FLETF activities and is the relevant office that would most likely have records responsive to our FOIA requests; and (iii) DHS Privacy Office is the office of DHS with jurisdiction of FOIA requests to DHS PLCY. In accordance with 5 U.S.C. § 552(a)(6)(A)(i), we respectfully request a response to this FOIA request within 20 working days, unless otherwise permitted by statute.

## I. REQUEST FOR INFORMATION

   1. For the period between December 1, 2022 to the present, we request any and all Records[1] relating to the following:

---

[1] The term "Records" in this request includes, but is not limited to: internal and/or interagency communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications and/or videotapes, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

DHS Privacy Office
August 18, 2023
Page 2

DICKINSON WRIGHT PLLC

   a.   Allegations against Camel Group concerning alleged forced labor and participation in labor transfer programs

   b.   Evidence, or other supporting substantiation, that has been submitted to FLETF, its member agencies, and/or the DHS PLCY about Camel Group, including but not limited to Records concerning forced labor and labor transfer programs and alleged participation therein.

   c.   Consideration of and the decision to identify and include Camel Group in the UFLPA Entity List

   d.   FLETF meeting records that identify, mention, discuss, or otherwise describe consideration of adding Camel Group to the UFLPA Entity List.

   e.   DHS PLCY meeting records that identify, mention, discuss, or otherwise describe consideration of adding Camel Group to the UFLPA Entity List.

   f.   Internal memorandums, due diligence, or notes thereof that relate to investigation of Camel Group.

   g.   Communications with any entities or persons not within DHS regarding Camel Group.

   h.   FLETF's procedure, guidelines, protocols and/or policies for adding entities to the UFLPA Entity List, including but not limited to the process of identifying entities, collection and evaluation of evidence, deliberative processes, and the final decision to include an entity.

   i.   FLETF's procedure, guidelines, protocols and/or policies for removing entities from the UFLPA Entity List, including but not limited to the guidelines on the submission and evaluation of removal requests, practice manuals and guidance, deliberative process, and the final decision to remove the entity or deny the request.

   j.   FLETF interagency communications and information sharing procedures and mechanisms.

   k.   Any procedure, guidelines, protocols and/or policies Implementation and enforcement of the UFLPA.

DHS Privacy Office
August 18, 2023
Page 3

D I C K I N S O N   W R I G H T   PLLC

## II.    FORMAT OF PRODUCTION

Requester seeks responsive electronic records in a machine-readable, native file format, with all metadata and load files intact.  If a responsive record is not available in the above described electronic format, Requester would accept it in physical hard-copy format or any other format that would permit the production of all responsive records. With respect to electronic records, all data associated with such records should be provided in a workable format, such as Microsoft Excel or comma-separated values (CSV) files.  If terms or codes are not in the form template and/or publicly defined, please provide a glossary or other descriptive records containing definitions of acronyms, numerical codes, or terms contained in data and records responsive to this FOIA request. Requester further requests that you produce responsive records in their entirety, including all attachments, appendices, enclosures, and/or exhibits.

Requester also ask that electronic records be provided in a text-searchable, static-image format, such as PDF, in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

Thank you for your time and attention to this FOIA request.  If you have any questions or require further information, please do not hesitate to contact me using the contact information below my signature.

Sincerely,

Jacob L. Clark
Dickinson Wright PLLC
350 S. Main St., Ste. #300
Ann Arbor, MI 48103
Phone:  (734) 623-1624
Email:  jlclark@dickinsonwright.com





☰    **SecureRelease™ Portal**

| DETAILS | CONTACT INFORMATION | DOCUM... |
|---|---|---|

Request Number:
2023-HQFO-02158

**Details of Request**
(Read only details of request)                              **CANCEL**

**Request Description:**

Dear FOIA Officer: On behalf of Zubo Zhang ("Requester"), we hereby submit the following Freedom of Information Act ("FOIA") request for records regarding the decision by the Forced Labor Enforcement Task Force ("FLETF") regarding Camel Group Company Limited's ("Camel Group") recent inclusion on the Uyghur Forced Labor Prevention Act ("UFLPA") Entity List. This FOIA request to the Department of Homeland Security ("DHS") Privacy Office is appropriate because (i) DHS is the Chair and member agency of the UFLPA, with DHS Under Secretary for Strategy, Policy and Plans Robert Silvers currently acting as Chair; (ii) DHS Office of Strategy, Policy, and Plans ("PLCY") is the office properly involved with FLETF activities and is the relevant office that would most likely have records

**Fee Waiver Requested? :**   Not Requested






responsive to our FOIA requests; and (iii) DHS Privacy Office is the office of DHS with jurisdiction of FOIA requests to DHS PLCY. In accordance with 5 U.S.C. § 552(a)(6)(A)(i), we respectfully request a response to this FOIA request within 20 working days, unless otherwise permitted by statute. I. REQUEST FOR INFOMATION For purposes of this FOIA Request, the term "Records" refers to and includes, but is not limited to: Internal and/or interagency communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications and/or videotapes, as well as any reproductions thereof that differ in any

**Reason for Fee Waiver:** -






way from any other reproduction, such as copies containing marginal notations. Below are the specific requests made by the Requester: 1. For the period between December 1, 2022 to the present, we request any and all Records relating to the following: a. Allegations against Camel Group concerning alleged forced labor and participation in labor transfer programs b. Evidence, or other supporting substantiation, that has been submitted to FLETF, its member agencies, and/or the DHS PLCY about Camel Group, including but not limited to Records concerning forced labor and labor transfer programs and alleged participation therein. c. Consideration of and the decision to identify and include Camel Group in the UFLPA Entity List d. FLETF meeting records that identify, mention, discuss, or otherwise describe consideration of adding Camel Group to the UFLPA Entity List. e. DHS PLCY meeting records that identify, mention, discuss, or otherwise describe consideration of adding Camel Group to the UFLPA Entity List. f. Internal






memorandums, due diligence, or notes thereof that relate to investigation of Camel Group. g. Communications with any entities or persons not within DHS regarding Camel Group. h. FLETF's procedure, guidelines, protocols and/or policies for adding entities to the UFLPA Entity List, including but not limited to the process of identifying entities, collection and evaluation of evidence, deliberative processes, and the final decision to include an entity. i. FLETF's procedure, guidelines, protocols and/or policies for removing entities from the UFLPA Entity List, including but not limited to the guidelines on the submission and evaluation of removal requests, practice manuals and guidance, deliberative process, and the final decision to remove the entity or deny the request. j. FLETF interagency communications and information sharing procedures and mechanisms. k. Any procedure, guidelines, protocols and/or policies Implementation and enforcement of the UFLPA. II. FORMAT OF

**Expedited Processing?:**   Not Requested






PRODUCTION Requester seeks responsive electronic records in a machine-readable, native file format, with all metadata and load files intact. If a responsive record is not available in the above described electronic format, Requester would accept it in physical hard-copy format or any other format that would permit the production of all responsive records. With respect to electronic records, all data associated with such records should be provided in a workable format, such as Microsoft Excel or comma-separated values (CSV) files. If terms or codes are not in the form template and/or publicly defined, please provide a glossary or other descriptive records containing definitions of acronyms, numerical codes, or terms contained in data and records responsive to this FOIA request. Requester further requests that you produce responsive records in their entirety, including all attachments, appendices, enclosures, and/or exhibits. Requester also ask that electronic records be provided in a text-

**Reason for Expedited Processing:**     -









searchable, static-image format, such as PDF, in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files. Thank you for your time and attention to this FOIA request. If you have any questions or require further information, please do not hesitate to contact me using the contact information below my signature. Sincerely, Jacob L. Clark Dickinson Wright PLLC 350 S. Main St., Ste. #300 Ann Arbor, MI 48103 Phone: (734) 623-1624 Email: jlclark@dickinsonwright.com

**Agency:** Department of Homeland Security

**Component:** DHS Privacy Office

**Processing Track:** Simple

**Request Type:** FOIA Request

**Submitted Date:** 08/18/2023

**Request Status:** Initial Determination

**Identity Verification Status:** Not Requested by Agency



# SecureRelease™ Portal

## My Requests

| Actions | Request Number | Request Description | Agency | Component | Fee Waiver Requested? | Expedited Processing? | Request Status | Processing Track | ID Verification | Submitted Date |
|---------|---------------|---------------------|--------|-----------|----------------------|----------------------|----------------|-----------------|-----------------|----------------|
| ✕ 📎 | 2023-HQFO-02158 | Dear FOIA Officer:... | Department of Homeland Security | DHS Privacy Office | Not Requested | Not Requested | Initial Determination | Simple | Not Requested by Agency | 08/18/2023 |

Search

10 rows ▼    |<    <    1-1 of 1    >    >|



Jacob Clark
J.Clark@dickinson-wright.com