# IN THE UNITED STATES
# COURT OF INTERNATIONAL TRADE

CAMEL GROUP CO., LTD.,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*;

    *Defendants*.

Case No.: 25-00022

---

Mark V. Heusel
Jacob L. Clark (*admission pending*)
Dickinson Wright PLLC
350 S. Main Street, Ste. 300
Ann Arbor, MI 48104
(734) 623-1908
mheusel@dickinsonwright.com
jlclark@dickinsonwright.com
*Attorneys for Plaintiff*

---

**EXHIBIT 17 - CAMEL GROUP RESPONSES TO FLETF QUESTIONS**



350 S MAIN STREET, SUITE 300
ANN ARBOR, MI 48104-2131
TELEPHONE: 734-623-7075
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MARK V HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

March 1, 2024

**VIA E-MAIL**

United States Forced Labor Enforcement Task Force
Attn: Robert Silvers, Under Secretary for Strategy, Policy, and Plans
Chair, Forced Labor Enforcement Task Force
Office of the Secretary, Office of Strategy, Policy, and Plans
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0525

      Re:      ***Camel Group Co. Ltd. Responses to FLETF Questions***

Dear Secretary Silvers and Honorable Members of the Task Force:

      On December 14, 2023, the United States Forced Labor Enforcement Task Force ("Task Force") provided follow up questions to Camel Group Co. Ltd.'s ("Camel" or "Camel Group") in response to Camel's November 7, 2023 Removal Request Petition ("Petition"). We appreciate the Task Force's questions with respect to those areas that are directly related to Camel's Petition and which may be relevant to the issue whether sufficient evidence exists to place Camel on the Entity List for ***"working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang****.*" (UFLPA Sec. 2(d)(2)(B)(ii)) (emphasis added). To the extent that the Task Force's questions were relevant to the stated reason for Camel's inclusion on the Entity List, Camel provides its responses in this letter.

      **I.**      <u>**Scope of Camel's Responses**</u>

      As you know, Camel has made multiple requests to the Task Force to provide its Administrative Record that we assume exists and includes, *inter alia*, the Task Force's evidence and reasons supporting Camel's inclusion on the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii). On August 18, 2023, Mr. Zubo Zhang, on behalf of Camel Group and through counsel, submitted FOIA Request No. 2023-HQFO-02158 to the Department of Homeland Security requesting such information. Then, on August 30, 2023, Dickinson Wright sent a letter to the Task Force again requesting such information. Finally, on December 21, 2023, Dickinson Wright sent a second letter once again requesting the same information.

      In all instances, neither the Task Force nor anyone within the Department of Homeland Security has provided any substantive response to Camel. As of the date of this letter, the Task Force has still not provided Camel with its Administrative Record or informed Camel of the specific reasons or evidence supporting why Camel was placed on the UFLPA Entity List pursuant

United States Forced Labor Enforcement Task Force
March 1, 2024
Page 2

DICKINSON WRIGHT PLLC

to UFLPA Sec. 2(d)(2)(B)(ii).  This has limited Camel's ability to meaningfully participate in this removal process and its ability to respond to some of the Task Force's questions.

Therefore, in the absence of the Task Force providing Camel its Administrative Record or any specific evidence identifying and/or supporting its allegations against Camel, Camel has limited the scope of its replies to the allegations identified in its Petition, namely charges concerning alleged participation in the Labor Transfer Program made by the SHU Reports.  Camel reserves the right to supplement its answer based on the evidence and/or Administrative Record in possession of the Task Force that has not yet been disclosed to Camel despite multiple requests.

## II.     Definitions and Abbreviations

Below is a list of definitions and abbreviations used in Camel's responses below, and provided here for your reference.  These definitions and abbreviations are applicable to all responses unless otherwise specifically noted in a response:

1. Any "Exhibit" and Exhibit number referenced in Camel's response corresponds to an Exhibit provided as part of its Petition.

2. "Camel" or "Camel Group" refers to Camel Group Co. Ltd.

3. "Camel Energy" refers to Camel Energy, Inc., a U.S. company.

4. "Camel Renewable" refers to Camel Group Xinjiang Renewable Co. Ltd.

5. "Camel Battery Storage" refers to Camel Group Xinjiang Battery Storage Co. Ltd.

6. "Labor Transfer Program" refers to the "Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划 (2017-2019 年)》).

7. "Petition" refers to Camel Group's Removal Petition Request submitted on November 7, 2023 to the Task Force.

8. "SHU" refers to Sheffield Hallam University.

9. "SHU Reports" refers collectively to the SHU Feb. 2022 Report titled "Financing & Genocide:  Development Finance and the Crisis in the Uyghur Region" published in February 2022, the SHU Dec. 2022 Report titled "Driving Force:  Automotive Supply Chains and Forced Labor in the Uyghur Region" published in December 2022, and the SHU May 2023 Report titled "Products Made with Forced Labor in the Uyghur Region."

United States Forced Labor Enforcement Task Force
March 1, 2024
Page 3

D I C K I N S O N  W R I G H T  PLLC

10. "Task Force" or "FLETF" refers to the United States Forced Labor Enforcement Task Force.

11. "Toksun County SSHR" refers to the Toksun County, XUAR Bureau of Social Security and Human Resources.

12. "UFLPA" refers to the Uyghur Forced Labor Prevention Act.

13. "XUAR" or "Xinjiang" refers to the Xinjiang Uyghur Autonomous Region.

### III.     Camel Group's Responses to FLETF Questions

Camel Group's responses to the FLETF questions that were submitted to Dickinson Wright on December 14, 2023 are provided below. Each response follows immediately after the question presented by FLETF. ***Camel Group reserves the right to supplement its answers based on the evidence and/or Administrative Record in possession of the Task Force that has not yet been disclosed to Camel***:

1. Please provide all correspondence between Camel Group subsidiaries and the Xinjiang Uygur Autonomous Region (XUAR) government, Xinjiang Production and Construction Corps (XPCC), or other regional, local, or county governments in the XUAR regarding labor recruitment of any kind from 2017 through 2023.

**CAMEL GROUP RESPONSE:  While this question appears to go beyond the charges against Camel under UFLPA Sec. 2(d)(2)(B)(ii) and the scope of the allegations concerning the Labor Transfer Program, Camel Group answers as follows: All correspondence regarding the Labor Transfer Program has been provided in Camel's Petition.  *See* Petition Exhibit 22, Petition Exhibit 23, and Petition Exhibit 25.  However, in furtherance of Camel's commitment to transparency and engagement, Camel has conducted a second internal inquiry with respect to aspects of this question relevant to the charges against Camel under UFLPA Sec. 2(d)(2)(B)(ii) and the content of Camel's Petition. After conducting additional due diligence, Camel has determined that it does not have any additional correspondence between Camel Group and the XUAR government, XPCC or other XUAR local government entities.**

2. Please provide evidence (e.g., press releases, corporate policies, official corporate reports, correspondence with government authorities) of Camel Group's public or private statements that it "commits to not participating in any similar [state labor transfer] program in the future" as stated on page 19 of the Entity List Removal Request Petition.

**CAMEL GROUP RESPONSE:  Camel first notes to the FLETF that the language regarding "state labor transfer" used in this question is the Task Force's own and was added to the original language from Camel's Petition. The full, original quote without the Task Force's**

**United States Forced Labor Enforcement Task Force**
**March 1, 2024**
**Page 4**

D ICKINSON  W RIGHT  PLLC

**addition appears to be on page 19 of Camel's Petition: "Camel Group states that it did not participate in the Labor Transfer Program and commits to not participating in any similar program in the future."**

**With respect to the Task Force's question, Camel further responds as follows: Camel has already produced its supplier policy that prohibits all Camel Group suppliers from using forced labor, including a prohibition on employing "involuntary or exploited prison workers, or enslaved or trafficked persons."** *See* **Petition Exhibit 31 – Camel Group Supplier Regulations, Art. 4.5.1.1. In order to demonstrate Camel Group's commitment to transparency and willingness to further engage the Task Force, Camel Group conducted an additional search of all relevant "evidence" regarding this commitment and Camel Group's statements addressing the UFLPA Entity List designation and allegations contained in the SHU Reports. On August 2, 2023, Camel Group, through its subsidiary Camel Group Battery Trading Co., Ltd., issued a sealed[1] Chinese language letter to customers addressing the UFLPA Entity List designation and reaffirming its commitment to complying with relevant labor laws and fair treatment for employees. A copy of this letter and a certified English translation is provided as Attachment 1.**

**In addition, Camel Group, as a company listed on the Shanghai Stock Exchange (Stock Code: 601311), issued a public announcement on August 5, 2023 regarding its inclusion on the UFLPA Entity List and reaffirmed Camel Group's commitment to international labor standards. A copy of that announcement and a certified English translation is provided for your reference as Attachment 2.**

**In addition, on August 7, 2023, Camel Group, through its subsidiary Camel Group Battery Trading Co., Ltd., issued an English language letter to customers addressing the UFLPA Entity List designation and reaffirmed its commitment to complying with relevant labor laws and fair treatment for employees. A copy of this letter is provided as Attachment 3.**

---

[1] Letters issued with the Camel Group seal affixed are similar to issuing a letter under penalty of perjury, and carries significant legal weight and force under Chinese law. Companies like Camel Group must have their seals engraved by entities designated by local police, and establish a system of examination and approval to affix a seal on any corporate document. *See* Provisions of the State Council on the Administration of Seals of State Administrative Organs, Enterprises, Public Institutions and Social Organizations ("Administration of Seals") (《国务院关于国家行政机关和企业事业单位社会团体印章管理的规定》), PRC State Council, Guo Fa (1999) No. 25, Issued Oct. 31, 1999. Once a corporate document is affixed with a company's seal, the document and its contents becomes legally binding on the company. *See, e.g.*, PRC Civil Code (《中华人民共和国民法典》), Art. 490, National People's Congress, Effective Jan. 1, 2021. Acts including affixing a seal improperly without the approval from relevant company leadership and forging and using forged company seals could result in investigation and even criminal liability. *See, e.g.*, Administration of Seals, Arts. 22-26; *see also, e.g.*, PRC Criminal Law (《中华人民共和国刑法》), Art. 280, para. 2, National People's Congress, Revised and Effective Mar. 1, 2021.

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 5

DICKINSON WRIGHT PLLC

**Lastly, on August 24, 2023, Camel Group, through its subsidiary Camel Group Battery Trading Co., Ltd., issued a sealed[2] "Declaration of Trade Compliance" ("Declaration") to customers reaffirming Camel Group's compliance with all relevant labor laws and regulations, commitment to supplier management and supply chain tracing, and affirming that products sold to or raw materials used with customers receiving the Declaration "do not involve" the XUAR. A copy of the Declaration is provided as Attachment 4.**

3. Camel Group states that it is "[c]ommitted to further internal risk prevention training and policy development to identify forced labor risks and prevent participation in any problematic labor program" on page 20 of the Entity List Removal Request Petition. Please provide Camel Group's definition of a "problematic labor program."

**CAMEL GROUP RESPONSE: Camel defines a "problematic labor program" as any labor recruitment program that has strong evidence that "forced labor" is involved in any form. Camel defines "forced labor" based on the International Labour Organisation ("ILO") Forced Labour Convention, to which China ratified on August 12, 2022 along with ILO Convention on the Abolition of Forced Labor, as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily," and exclusions identified in the same article.  *See* ILO Forced Labour Convention (No. 29), Art. 2, 39 U.N.T.S. 55 (*enter into force* May 1, 1932). Camel further understands this definition has been adopted by the United States in 19 U.S.C. § 1307 and cited by the Task Force itself as part of its UFLPA Strategy.  *See* DHS Office of Strategy, Policy and Plans, "Report to Congress - Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China," June 17, 2022, at p. 20. In evaluating whether clear evidence of "forced labor" that meets the aforementioned definition exists in a particular labor program, Camel refers to internationally accepted standards such as the 11 indicators of forced labor as published by the ILO, which includes: 1) Abuse of vulnerability; 2) Deception; 3) Restriction of movement; 4) Isolation; 5) Physical and sexual violence; 6) Intimidation and threats; 7) Retention of identity documents; 8) Withholding of wages; 9) Debt bondages; 10) Abusive working and living conditions; and 11) Excessive overtime. *See* International Labour Office Special Action Programme to Combat Forced Labour, "ILO Indicators of Forced Labour," International Labour Office, October 1, 2012.**

4. Please provide documentation memorializing the phone conversation Camel Group's manager had with Toksun County, XUAR Bureau of Social Security and Human Resources Social Security (Toksun County SSHR) inquiring as to whether Camel Group needed any labor, as noted in Exhibits 22 and 23.

---

[2] *See* fn. 1.

United States Forced Labor Enforcement Task Force
March 1, 2024
Page 6

Dickinson Wright PLLC

**CAMEL GROUP RESPONSE: Based on Camel's internal investigation, all communications between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. All documentation memorializing the phone conversation referenced by the Task Force with respect to the Toksun County SSHR's inquiry to Camel Group regarding labor needs is contained in Petition Exhibits 22 and 23.[3] To the best of Camel's knowledge and belief, no other documents or records exist memorializing the communications referenced by the Task Force. Despite this belief and in furtherance of Camel's commitment to transparency and engagement with the Task Force, Camel conducted another inquiry into whether there is any other documentation memorializing these communications between Camel Group and the Toksun County SSHR. Upon conclusion of this inquiry, no other documentation or records were discovered.**

5. Please provide all correspondence (such as emails, letters, notes) between Camel Group and Toksun County SSHR, as noted in Exhibits 22 and 25. Please provide all documentation in which Camel Group advises Toksun County that Camel Group did not need any laborers.

**CAMEL GROUP RESPONSE: Based on Camel's internal investigation, all communications between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. All documentation memorializing the phone conversation referenced by the Task Force with respect to Camel Group informing the Toksun County SSHR that Camel Group did not have a need for any labor is contained in Petition Exhibits 22, 23,[4] and 25. To the best of Camel's**

---

[3] With respect to Petition Exhibit 23 – Toksun County SSHR Letter, Camel Group reminds the Task Force that this document is an "official document" (公文) and is affixed with the official seal of the Toksun County Social Security and Human Resources Bureau. Under Chinese law, such documents are comparable to documents issued under penalty of perjury in the U.S. First, Chinese law regulates specific details of how government organs prepare and affix its seal. *See, e.g.* Administration of Seals. Second, "official documents" (公文) includes documents such as letters, like the one issued by the Toksun SSHR. Regulations on the Handling of Official Documents by Party and Government Organs (《党政机关公文处理工作条例》) ("Handling Regulations"), Art. 8(14), PRC State Council, Effective July 1, 2012. "Official documents" (公文) are required, generally, to have a seal affixed where that document also is signed by the government department or agency. Handling Regulations, Art. 9(13). There is also a strict procedure each government department must follow prior to affixing a seal and issuing an "official document" to verify, *inter alia*, the content of a document. *See* Handling Regulations, Art. 25(1). Regardless of whether the seal is physically affixed or an electronic seal, they both have the same legal effect. Several Provisions of the State Council on Online Government Services (《国务院关于在线政务服务的若干规定》), Art. 9, PRC State Council, Guo Ling No. 716, Issued Apr. 26, 2019. In Chinese courts, matters recorded in "official documents" (i.e. documents that bear a government seal) are deemed to be authentic and true. *See* PRC Supreme People's Court Interpretation on the Application of the PRC Civil Procedure Law (最高人民法院关于适用《中华人民共和国民事诉讼法》的解释), Art. 114, PRC Supreme People's Court, Fa Shi (2015) No. 5, Effective Feb. 4, 2015. Acts including affixing a seal improperly without the approval from the relevant government department or agency leadership as well as forging and using forged company seals could result in investigation and even criminal liability. *See, e.g.,* Administration of Seals, Arts. 22-26; *see also, e.g.*, PRC Criminal Law (《中华人民共和国刑法》), Art. 280, para. 1, National People's Congress, Revised and Effective Mar. 1, 2021.

[4] *See* fn. 3.

---

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 7

Dickinson Wright PLLC

knowledge and belief, no other documents or records exist memorializing the communications referenced by the Task Force. Despite this belief and in furtherance of Camel's commitment to transparency and engagement with the Task Force, Camel conducted another inquiry into whether there is any other documentation memorializing these communications between Camel Group and the Toksun County SSHR. Upon conclusion of this inquiry, no other documentation or records were discovered.

6. Please provide documentation that Toksun County SSHR was informed that it erroneously reported that Camel Group participated in the "Handover Ceremony for the Urban Rural Surplus Labor Enterprises in Kashgar and Hotan Areas" as part of the Labor Transfer Program.

**CAMEL GROUP RESPONSE: Based on Camel's internal investigation, all communications between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. All documentation memorializing the phone conversation referenced by the Task Force with respect to Camel Group informing the Toksun County SSHR that it erroneously reported Camel Group participated in the "Handover Ceremony for the Urban Rural Surplus Labor Enterprises in Kashgar and Hotan Areas" is contained in Petition Exhibits 22, 23,[5] and 24. To the best of Camel's knowledge and belief, no other documents or records exist memorializing the communications referenced by the Task Force. Despite this belief and in furtherance of Camel's commitment to transparency and engagement with the Task Force, Camel conducted another inquiry into whether there is any other documentation memorializing these communications between Camel Group and the Toksun County SSHR. Upon conclusion of this inquiry, no other documentation or records were discovered.**

7. Exhibit 23 states that the Public Employment Service Bureau received a request from Camel Group requesting that it correct the report stating that Camel Group participated in the "Handover Ceremony for the Urban Rural Surplus Labor Enterprises in Kashgar and Hotan Areas" as part of the Labor Transfer Program. Please provide any response Toksun County SSHR provided in 2017 confirming that Camel Group had not participated in the event.

**CAMEL GROUP RESPONSE: Based on Camel's internal investigation, all communications between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. All documentation memorializing the response from Toksun County SSHR to Camel Group's request to correct the report is contained in Petition Exhibits 22 – 25. With respect to Petition Exhibit 23 and the contents contained therein, Camel Group would remind the Task Force that this is an "official document" (公文) under Chinese law.[6] To the best of Camel's knowledge and belief, no other documents or records exist memorializing the**

---

[5] *See* fn. 3.  
[6] *See* fn. 3.

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 8

DICKINSON WRIGHT PLLC

communications referenced by the Task Force. Despite this belief and in furtherance of Camel's commitment to transparency and engagement with the Task Force, Camel conducted another inquiry into whether there is any other documentation memorializing these communications between Camel Group and the Toksun County SSHR. Upon conclusion of this inquiry, no other documentation or records were discovered.

8. Did the July 12, 2017, Sina Article (Exhibit 24) indicate that it was written as a correction and/or written to address a mistake in the July 10, 2017, article?

**CAMEL GROUP RESPONSE:** Upon learning of the erroneous inclusion of Camel Group in the July 10, 2017 WeChat Article (Petition Exhibit 19), the former Public Employment Service Bureau, which was under the Toksun County SSHR and controlled the WeChat account that published the WeChat Article, "immediately deleted and revised the error in the original report, and that same year on July 12 was posted on the Internet." *See* Toksun County SSHR Letter, Petition Exhibit 23 (link to Sina Article omitted). While the July 12, 2017 Sina Article does not contain any direct language that references the WeChat Article or directly states it is being published as a correction thereof, the official statement by the Toksun County SSHR contained in the Toksun County SSHR Letter (Petition Exhibit 23),[7] both in its original Chinese form and translated English, clearly demonstrates that the Sina Article was, at least in part, a correction of the WeChat Article. *See* Id.

9. Please attest under penalty of perjury that based on Camel Group's internal investigation, it concludes that neither Camel Group nor any of its subsidiaries (not only those in XUAR) have received any incentives to participate in a labor transfer program. Please explain the process Camel Group took to reach this determination.

**CAMEL GROUP RESPONSE:** Camel Group ███████████████ has provided a signed declaration under penalty of perjury and pursuant to 28 U.S.C. §1746 stating that Camel Group did not receive any incentives related to the Labor Transfer Program and explained the process Camel Group took to come to that conclusion. *See generally,* ███ Declaration, Petition Exhibit 26. Furthermore, ███████████████ has provided a signed declaration under penalty of perjury and pursuant to 28 U.S.C. §1746 stating that, to the best of ███ knowledge and belief, Camel Group, Camel Battery Storage, and Camel Renewable did not receive any financial benefit connected to the Labor Transfer Program. *See* ███ Declaration, Petition Exhibit 22, at ¶ 18. To the extent the Task Force seeks sworn statements regarding Camel Group subsidiaries not subject to the UFLPA Entity List determination or Camel Group's participation in any other labor transfer program, Camel Group is willing to engage with the Task Force to discuss the appropriate scope of this request in light of all evidence available to Camel Group at this time. Camel reserves the right to supplement its answer based on the evidence and/or

---

[7] *See* fn. 3.

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 9

**Dickinson Wright PLLC**

**Administrative Record in possession of the Task Force that has not yet been disclosed to Camel.**

10. In the May 19, 2023, email, enclosed as pages 410 to 411 of Exhibit 15, CBP requested the following information from Camel Group's ▮▮▮▮▮▮▮▮▮▮ "For a currently detained shipment, provide the timecards, or other proof of work (e.g., statement of earnings or wages), including employee identifiers and the names of the employees that worked during the time frame when the merchandise was produced."
    a. Please provide this information to the FLETF.

**CAMEL GROUP RESPONSE: The materials referenced on pages 410 and 411 were provided to CBP and can be found on page 417 to 418 of Petition Exhibit 15. For clarity, Camel has reproduced pages 417 to 418 of Petition Exhibit 15 a separate PDF and included it as Attachment 5.**

11. Please provide the "UFLPA Response Package for ▮▮▮▮▮▮▮▮▮▮▮▮▮ This is the documentation referenced in Exhibit 14 that was submitted to U.S. Customs and Border Protection's Machinery Center for an "applicability review."

**CAMEL GROUP RESPONSE: Camel has located "UFLPA Response Package for ▮▮▮▮▮▮▮▮▮▮▮ and provides it as Attachment 6.**

12. Please provide the following information for all Camel Group facilities located in the XUAR or Camel Group facilities employing anyone from Xinjiang from 2017 through 2023:
    a. All records of labor recruitment, accounting for all laborers during the period,
    b. Monthly total employee counts,
    c. The ethnic distribution of all employees.

**CAMEL GROUP RESPONSE: Camel has provided the Task Force an employee list for Camel Group that includes the employee's name, identification number, ethnicity, residential address and "household registration" information, first date of employment, method of recruitment, position/department, monthly salary, and benefits for all employees as of August 13, 2023, including those with a residential address or "household registration"/"hukou" (户口) in XUAR. *See* Camel Group Employee List, Petition Exhibit 29. Camel Group has further provided an employee list for both of its XUAR entities, Camel Battery Storage and Camel Renewable, that includes the employee's name, identification number, ethnicity, residential address and "household registration"/"hukou" (户口) information, first date of employment, and method of recruitment for all employees as of August 13, 2023. *See* Camel Xinjiang Employee Lists, Petition Exhibit 30. These lists include date of first employment, which should allow the Task Force to ascertain when and for how long an employee has been employed by Camel Group, Camel Renewable, and Camel**

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 10

DICKINSON WRIGHT PLLC

Battery Storage. Further, it is Camel Group's, Camel Renewable's and Camel Battery Storage's policy to only retain former employee records for two (2) years following their resignation or termination from Camel. *See* ▇▇▇▇▇▇ Declaration, Attachment 7 and ▇▇▇▇▇▇ Declaration, Attachment 8. Therefore, employee records of former employees prior to Jan. 2022 are no longer within the possession, custody or control of Camel Group. To the extent this request seeks information on Camel subsidiaries not subject to Camel Group's UFLPA Entity List designation, employees that have not been transferred "*out of Xinjiang*," employees that pre-date or post-date the Labor Transfer Program, or otherwise appear outside of the scope of the known allegations against Camel Group, Camel remains willing to engage with the Task Force to better understand an appropriate scope to this request.

13. According to Exhibit 30, there were only two people employed by Camel Renewable in all of 2017, both by the end of the year. No one named ▇▇▇▇ is listed as being employed in 2018, even though ▇▇▇▇▇▇ claimed in ▇ affidavit that they worked for Camel Renewable starting in April 2018. No ▇▇▇ appears in the records as being employed in 2017 or 2018 at Xinjiang Battery either, despite ▇▇▇▇▇▇ stating that they served as general manager for that facility from March 2017 to April 2018. Why is this individual not listed among the employees of these facilities? Are there any other employees not listed in these rosters?

**CAMEL GROUP RESPONSE:** Camel appreciates this question from the Task Force and would like to use it as an opportunity to clarify Exhibit 30, which was submitted as part of Camel's Petition. Similar to Exhibit 29 – Camel Group Employee List - the employee list for both Camel Renewable and Camel Battery Storage in Petition Exhibit 30 are current, complete and accurate employee lists as of August 13, 2023, and it is not a comprehensive historical list that includes all employees (current and former) from September 11, 2015 to August 13, 2023. *See* ▇▇▇▇▇▇ Declaration, Attachment 8. Because ▇▇▇▇▇▇ is presently employed by Camel Group, he is not included in the lists contained in Petition Exhibit 30. ▇▇▇▇ is, however, included in Petition Exhibit 29 ▇▇▇▇▇▇. *See* Petition Exhibit 29, at pp. 4 and 13. Both Petition Exhibits 29 and 30 are complete, and include current roster lists for Camel Group, Camel Renewable, and Camel Battery Storage. Camel Group, Camel Renewable and Camel Battery Storage only retain employee records for two (2) years after Camel terminates their employment or the employee resigns. *See* ▇▇▇▇▇▇ Declaration, Attachment 7 and ▇▇▇▇▇▇ Declaration, Attachment 8.

14. For each individual on the employee lists for Camel Group's XUAR facilities (Exhibits 29 and 30), please provide the job title and years of service.

**CAMEL GROUP RESPONSE:** The Camel Group Employee List provided as Petition Exhibit 29 already includes a section listing the "position/department" as well as a start date for each employee from which years of service can be determined, and would refer the Task

United States Forced Labor Enforcement Task Force
March 1, 2024
Page 11

DICKINSON WRIGHT PLLC

Force to that information. The Camel Xinjiang Employee Lists provided as Petition Exhibit 30 also includes each employee's start date from which years of service can be determined. Camel Group has supplemented its Petition Exhibit 30 to include a section listing the "position/department" for each employee, and it is included as Attachment 9.

15. Please clarify the part of the company that pertains to the employee list identified in Exhibit 29. Does Exhibit 29 consist of employees at Camel Group only?

**CAMEL GROUP RESPONSE: Petition Exhibit 29, Camel Group Employee List, consists of employees at Camel Group only and not any other Camel Group subsidiary.**

16. In regard to the construction of the Camel Renewable facility:
    a. Who or what organization built the facility?
    b. How was the labor to build that facility recruited? Did Camel recruit the laborers for the construction?
    c. What was the timeframe in which the facility was constructed?

**CAMEL GROUP RESPONSE: The Task Force's question is not relevant to the charges against Camel Group under UFLPA Sec. 2(d)(2)(B)(ii) or its alleged participation in the Labor Transfer Program. Camel Group remains willing to engage the Task Force to better understand the connection of this request to the allegations and charges against Camel regarding the Labor Transfer Program.**

17. Have any Camel Group employees been sent to so-called "vocational education and training centers" between 2017 and the present?
    a. If so, please name the facilities.
    b. If so, how many employees have been sent between 2017 and the present?
    c. What affect did their departures have on the company?
    d. How did the company respond to these departures?

**CAMEL GROUP RESPONSE: The Task Force's question is ambiguous and vague with respect to references to "so-called 'vocational education and training centers.'" Camel remains willing to engage with the Task Force to better understand this question and more efficiently address the Task Force's concerns. Notwithstanding, based on Camel's knowledge and belief, Camel has never sent its employees to any "so-called 'vocational education and training center,'" and is not aware of any Camel Group employee who has been sent to such a place or was sent during the course of their employment with Camel.**

18. Does Camel Group employ workers who have previously been sent to the "vocational education and training centers" in the XUAR?

ARIZONA   CALIFORNIA   COLORADO   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 12

DICKINSON WRIGHT PLLC

**CAMEL GROUP RESPONSE: The Task Force's question is ambiguous and vague with respect to references to "so-called 'vocational education and training centers.'" Camel remains willing to engage with the Task Force to better understand this question and more efficiently address the Task Force's concerns. In the meantime, based on Camel's knowledge and belief, Camel Group has never sent its employees to any "so-called 'vocational education and training center,'" and is not aware of any Camel Group employee who has been sent to such a place or was sent to one during the course of their employment with Camel.**

19. Regarding security information (e.g., social credit score, security rankings or scores, criminal record, record of time in vocational education and training centers, family criminal record or record of time in vocational education and training centers, religious affiliation or practice) for a citizen from an ethnic minority group, as identified in the Uyghur Forced Labor Prevention Act;
    a. What security information does Camel Group collect for its personnel records on employees at the facilities both in and outside the XUAR, including the Hubei facility?
    b. Are there any security requirements to work at a Camel Group facility in the XUAR or in any other Camel Group facility?
    c. What responsibility does Camel Group have to report security issues (related but not limited to the above list) with employees at all its (XUAR and non-XUAR) facilities to the government?

**CAMEL GROUP RESPONSE: The Task Force's question is vague and unclear with respect to its definition of "security information," "security requirements" with respect to employment at Camel Group, and Camel Group's "responsibility [to report] security issues…to the government." Camel Group does not understand the connection between this request and the core inquiry of whether Camel Group participated in the Labor Transfer Program alleged in the SHU Reports. Further, it appears the Task Force is requesting information about Camel Group's subsidiaries and facilities that are not subject to the UFLPA Entity List designation and outside the scope of Camel Group's Removal Petition Request. Moreover, the Task Force's request under 19(c) is vague and unclear as to what "responsibilities" it is referring to (i.e. legal obligations under Chinese law or the law of any other jurisdiction in which Camel Group operates versus some other "responsibility" the Task Force may be referring to). Camel Group remains willing to engage the Task Force to better understand the question and its connection to the allegations and charges against Camel regarding the Labor Transfer Program.**

20. Please describe the security apparatus in Camel Group's facilities. For each facility both in and outside the XUAR, including the Hubei facility, please provide:
    a. How many security guards are employed?
    b. How many cameras are in the facility?

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 13

DICKINSON WRIGHT PLLC

    c. How does this compare against other facilities with similar numbers of employees in or outside the XUAR? Please provide details of comparable facilities for comparison.
    d. How are the security guards for all (XUAR and non-XUAR) facilities recruited? Are any provided through government programs?
    e. Are there specific security requirements for employees considered as ethnic minorities?

**CAMEL GROUP RESPONSE:** The Task Force's question is vague and unclear with respect to requesting information on Camel's supposed "security apparatus" in its facilities as well as what is meant by "specific security requirements for employees considered as ethnic minorities." Camel further does not understand the connection of this request to allegations against Camel under UFLPA Sec. 2(d)(2)(B)(ii) and whether it participated in the Labor Transfer Program. Further, it appears the Task Force is requesting information about Camel Group's subsidiaries and facilities that are not subject to the UFLPA Entity List designation and outside the scope of Camel Group's Removal Petition Request. Camel Group remains willing to engage the Task Force to better understand the question and its connection to the allegations against Camel regarding the Labor Transfer Program.

21. Please provide a map of the entire supply chain(s) of all Camel Group products being produced in whole or in part in the XUAR, including movement of those products within Camel Group's own supply chain as well as movement of those products to Camel Groups' customers that receive those products. Please provide documentation, to include graphs or other visual depictions, demonstrating and explaining how Camel Group produces and/or obtains these products.

**CAMEL GROUP RESPONSE:** The Task Force's question is not relevant to the charges against Camel Group under UFLPA Sec. 2(d)(2)(B)(ii) or its alleged participation in the Labor Transfer Program. Camel Group remains willing to engage the Task Force to better understand the connection of this question to the allegations and charges against Camel regarding the Labor Transfer Program. In the meantime, Camel Group refers the Task Force to the Camel Energy Sample CBP Package, Exhibit 15, which was provided to the Task Force. This document includes detailed supply chain mapping regarding ▆▆▆▆▆▆▆▆▆▆ Additionally, Camel refers the Task Force to the "UFLPA Response Package for ▆▆▆▆▆▆▆▆▆▆ referenced in Exhibit 14 of Camel's Removal Request Petition and provided in response to the Task Force's question 11 above. *See* Attachment 6. This document contains detailed supply chain mapping for Camel's battery equipment. We also remind the Task Force that, with respect to battery products and battery equipment being imported into the United States, Camel has, on multiple occasions, successfully demonstrated to CBP by "clear and convincing" evidence per UFLPA Sec. 3(b)(2) that its products and equipment are not being manufactured or produced in whole or in part by forced labor. *See* Petition, at pp. 4-5; Petition Exhibits 14-16; Attachment 6.

United States Forced Labor Enforcement Task Force
March 1, 2024
Page 14

D i c k i n s o n   W r i g h t  PLLC

22. Please provide documentation demonstrating and explaining how Camel Group produces and/or obtains battery products 

**CAMEL GROUP RESPONSE: The Task Force's question is not relevant to the charges against Camel Group under UFLPA Sec. 2(d)(2)(B)(ii) or its alleged participation in the Labor Transfer Program. To the extent such request is asking for Camel's supply chain mapping of products it imports into the United States, this information has previously been provided.** *See* **Petition Exhibit 15 and Attachment 6.**

23. How does Camel Group ensure that none of the materials ▓▓▓▓ processed by the Camel Group facilities in the XUAR make it into the Camel battery supply chain for international export?  Please provide any evidence within Camel Group's control that those facilities in the XUAR produce nothing for Camel Group's export supply chain.

**CAMEL GROUP RESPONSE: The Task Force's question is not relevant to the charges against Camel Group under UFLPA Sec. 2(d)(2)(B)(ii) or its alleged participation in the Labor Transfer Program. Without waiving the foregoing, Camel states that it does not source raw materials or components from XUAR for any imports into the United States.**

24. Please state the production capacity of all products made, refined, or processed in each of Camel Group's XUAR facilities for the years 2017 to 2023.
    a. Please provide a customer list for all of these goods.

**CAMEL GROUP RESPONSE: The Task Force's question is not relevant to the charges against Camel Group under UFLPA Sec. 2(d)(2)(B)(ii) or its alleged participation in the Labor Transfer Program. Camel Group remains willing to engage the Task Force to better understand the question and its connection to the allegations and charges against Camel regarding the Labor Transfer Program.**

25. On page 797 of Exhibit 15, a table titled "Production Category of Key Positions" includes the key manufacturing positions of workers employed at several of Camel Group's production facilities, however it does not include the same information for Camel Group's XUAR production facilities.  Please provide a similar chart for production at Camel Group's XUAR facilities.

**CAMEL GROUP RESPONSE: Camel Group has prepared a similar chart of "Production Category of Key Positions" for its Camel Battery Storage and Camel Renewable facilities in XUAR, and included it as Attachment 10.**

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 15

D i c k i n s o n   W r i g h t   PLLC

## IV. <u>Additional Considerations</u>

Since being wrongfully named to the UFLPA Entity List on August 2, 2023, Camel Group has diligently investigated any of its alleged connections with forced labor in the XUAR. Unfortunately, it has been limited to relying on NGO reports like the SHU Reports for the record to which its Petition for Removal is based. This is because neither the FLETF, CBP nor any U.S. government agency has identified the reasons Camel Group was named on the UFLPA Entity List. Immediately following the FLETF's designation of Camel Group, the company has attempted to engage with the FLETF in a transparent and fulsome manner to better understand what evidence resulted in this decision; however, Camel Group has not been afforded any level of cooperation in this regard or any information as to the process, timing and requirements to obtain removal from the UFLPA Entity List. To this day, and six months after being named on the UFLPA Entity List, Camel Group still has no understanding how this investigation proceeded and what the review process involves. As the weeks pass, Camel Group has been placed under considerable scrutiny from its customers, demanding answers that cannot be given in light of the opaque manner in which this process is being conducted.

Consequently, Camel Group again reiterates two essential requests that were previously made to the Task Force on multiple communications:

1. Camel Group has requested the Administrative Record in multiple prior communications, which we assume exists and includes, *inter alia*, the Task Force's evidence and reasons supporting Camel's inclusion on the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii). Camel Group has made multiple requests to the Task Force directly and the Department of Homeland Security for this Administrative Record, and the Task Force has never provided any response to those requests. As the Task Force now well knows, the United States Court of International Trade recently found that Ninestar Corporation, another Chinese company recently added to the Entity List, was not required to exhaust administrative remedies (*i.e.* the FLETF's removal request process outlined in the Federal Register) prior to filing its lawsuit because "Ninestar did not receive 'timely access to the confidential record' or even an explanation of why it was listed" at the time of its action. *Ninestar Corp., et. al. v. United States, et. al.*, Case No. 1:23-cv-00182 (C.I.T. Feb. 27, 2024) (Slip Op. 24-24), at p. 24 (citation omitted). The Court went on to say that "exhaustion would be 'necessarily speculative, illogical, and useless' when the facts or argumentation supporting an agency's conclusion either did not exist at the time of the opportunity to exhaust, or *were not yet made available to a party challenging agency action*." Id. (citations omitted) (emphasis added). Camel reminds the Task Force that, like Ninestar, it still has not received its Administrative Record or in fact any explanation for its inclusion on the Entity List, despite multiple direct requests to the Task Force and a separate FOIA Request. While the Court of International Trade appears to have provided a clear path for Camel to challenge the FLETF's decision in litigation, Camel prefers to continue engaging with the Task Force through the administrative removal process outlined in the Federal Register to resolve this matter. Once

United States Forced Labor Enforcement Task Force  
March 1, 2024  
Page 16  

DICKINSON WRIGHT PLLC

again, Camel reiterates its request for its Administrative Record from the Task Force and re-emphasizes the importance of obtaining the record to the transparency and due process for this administrative remedy.

    2.    Camel Group also reiterates its meeting request to the Task Force made in its Nov. 7, 2023 Petition on page 20 and pursuant to Federal Register 88 FR 50902, 50904, No. 147, Aug. 2, 2023 and Federal Register 87 FR 47777, 47778, No. 149, Aug. 4, 2022.

Should the Task Force have any further questions or concerns, please do not hesitate to contact me. Thank you.

Sincerely,

*Mark V. Heusel*

Mark V. Heusel