UNITED STATES COURT OF INTERNATIONAL TRADE
HONORABLE LISA W. WANG, JUDGE

---

| | | |
|---|---|---|
| CAMEL GROUP CO., LTD., | : | |
| | : | |
| Plaintiff, | : | Court No.  25-00022 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES ET AL., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**ADMINISTRATIVE RECORD**

PUBLIC VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |  |
|---|---|---|
| CAMEL GROUP CO., LTD., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 25-00022 |
| v. | : | |
| | : | |
| UNITED STATES ET AL., | : | |
| | : | |
| Defendant. | : | |

**CERTIFICATION OF ADMINISTRATIVE RECORD**

My name is Robert Paschall. I am the Deputy Under Secretary for Strategy, Policy, and Plans for the U.S. Department of Homeland Security (DHS) and have held this position since October 27, 2024, and served as Acting Deputy Under Secretary for Strategy, Policy, and Plans since June 2024. Prior to this role, I served as the Principal Deputy Assistant Secretary for International Affairs, Office of Strategy, Policy, and Plans, from May 2021 to May 2024. I also previously served as DHS's Regional Attaché to Europe from August 2016 to April 2019, and as Associate General Counsel in the DHS Office of the General Counsel from March 2011 to January 2013.

I certify, to the best of my knowledge, information, and belief, that the documents listed in the attached index comprise the non-privileged documents that were submitted by DHS to the voting Member Agencies of the Forced Labor Enforced Task Force (FLETF) in consideration of Camel Group's request for removal from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List and which reflect the FLETF Member Agencies final vote and decision to deny Camel Group's request for removal from the UFLPA Entity List.

Therefore, I certify, to the best of my knowledge, information, and belief, that the documents listed in the attached index comprise all of the documents constituting the administrative record for the above-captioned case.

I also include the standard operating procedures adopted by the FLETF. Although this document was not submitted by DHS to the FLETF as part of the decision-making process for Camel Group, it reflects the procedures the FLETF followed in its decisions to add Camel Group to the UFLPA Entity List and deny Camel Group's request for removal from the UFLPA Entity List.

Executed this 24th day of March, 2025 in Washington, DC.

Robert Paschall

Digitally signed by Robert Paschall
Date: 2025.03.24 12:57:15 -04'00'

_____
Robert Paschall
Deputy Under Secretary
Office of Strategy, Policy, and Plans
Department of Homeland Security

**Camel Group v. U.S. – Administrative Record Index**

| | Document | Bates Number |
|---|---|---|
| 1. | U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, *Forced Labor Enforcement Task Force Standard Operating Procedures, Uyghur Forced Labor Prevention Act Entity List* (July 2022). | AR000001 - AR000009 |
| 2. | Memorandum from Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans, *Forced Labor Enforcement Task Force Denial of Camel Group Co., Ltd. Request for Removal the Uyghur Forced Labor Prevention Act Entity List*  (September 4, 2024). | AR000010 - AR000016 |
| | **Attachment 1:** Forced Labor Enforcement Task Force, Member Agency Votes on Removal of Camel Group Co., Ltd. From the UFLPA Entity List. | AR000017 - AR000023 |
| | **Attachment 2:** Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (November 7, 2023): *Camel Group Co. Ltd. UFLPA Entity List Removal Request Petition* (with attachments). | AR000024 - AR000044 |
| | • *Exhibit 1* – Email from Jacob L. Clark, Dickinson Wright PLLC, to Cynthia Echeverria, U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, Director of Trade Policy, Office of Trade and Economic Security via FLETF's public contact address (August 3, 2023). | AR000045 - AR000046 |
| | • *Exhibit 2* – Email from Mark V. Heusel to ██████████████████████, U.S. Customs & Border Prot. ██████████████████████ (August 8-9, 2023). | AR000047 - AR000050 |
| | • *Exhibit 3* – Letter from Mark V. Heusel, Dickinson Wright PLLC, to U.S. Dep't of Homeland Sec., Privacy Off. (August 18, 2023): *Camel Group Co. Ltd. Freedom of Information Act Request* (with attachments). | AR000051 - AR000062 |
| | • *Exhibit 4* – Email from Jacob L. Clark, Dickinson Wright PLLC, to Cynthia Echeverria, U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, Director of Trade Policy, Office of Trade and Economic Security via FLETF's public contact address (with attachments) (August 30, 2023). | AR000063 - AR000113 |
| | • Exhibit 5 – Email from Cynthia Echeverria, U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, Director of Trade Policy, Office of Trade and Economic Security via FLETF's public contact address to Jacob Clark, Dickinson Wright PLLC (September 7, 2023). | AR000114 - AR000117 |
| | • *Exhibit 6* – Camel Xinjiang Renewable Co. Ltd. Qichacha Corporate Record. | AR000118 - AR000121 |
| | • *Exhibit 7* – Camel Xinjiang Renewable Co. Ltd. Business License. | AR000122 - AR000125 |
| | • *Exhibit 8* – PRC Fire Prevention Law. | AR000126 - AR000137 |

| | | |
|---|---|---|
| | • *Exhibit 9* – Camel Xinjiang Renewable Co. Ltd. Fire Inspection Certificate. | AR000138 - AR000142 |
| | • *Exhibit 10* – Camel Xinjiang Battery Co. Ltd. Qichacha Corporate Record. | AR000143 - AR000146 |
| | • *Exhibit 11* – Camel Xinjiang Battery Co. Ltd. Business License. | AR000147 - AR000150 |
| | • *Exhibit 12* – Camel Xinjiang Battery Co. Ltd. Fire Inspection Certificate. | AR000151 - AR000154 |
| | • *Exhibit 13* – Letter from U.S. Customs & Border Prot. to Camel Energy, Inc. (July 14, 2023). | AR000155 - AR000156 |
| | • *Exhibit 14* – Email from U.S. Customs & Border Prot. to Mark V. Heusel, Dickinson Wright PLLC (September 13, 2023): *UFLPA Response Package* ████████. | AR000157 - AR000160 |
| | • *Exhibit 15* – Letter from Mark V. Heusel, Dickinson Wright PLLC, to U.S. Customs & Border Prot. (with attachments) (May 4, 2023). | AR000161 - AR001004 |
| | • *Exhibit 16* – Timeline of Interactions Between Camel Group, Camel Energy and CBP With Respect to UFLPA-Related Detentions. | AR001005 - AR001006 |
| | • *Exhibit 17* – Laura T. Murphy, Kendyl Salcito, & Nyrola Elimä, "Financing & Genocide: Development Finance and the Crisis in the Uyghur Region," Sheffield Hallam University Helena Kennedy Centre for International Justice, Atlantic Council, DFRLab, and NomoGaia February 2022, https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/financing-and-genocide. | AR001007 - AR001076 |
| | • *Exhibit 18* – Regulations Associated with the Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019) (《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划(2017-2019年)》) | AR001077 - AR001084 |
| | • *Exhibit 19* – Toksun Public Employment Service Center (托克逊就业服务中心) (formerly Public Employment Bureau of Toksun County), "Toksun County holds the handover ceremony for the urban and rural surplus labor enterprises in Kashgar and Hotan areas" (托克逊县举行喀什、和田地区城乡富余劳动力企业上岗交接仪式), Toksun Public Employment Service Center Official Account, WeChat (Tencent) (July 10, 2017), https://archive.ph/nC4Xt; and | AR001085 - AR001090 |

| | | |
|---|---|---|
| | https://mp.weixin.qq.com/s?src=11&timestamp=1626799213&ver=3202&signature=UdXHio*A4s-X8WUB4*k5KWO4TT-d2*ZwQoR4TlkWSmWPLsrYT8sexrkYontyqNU*rmZoZmpE1Oukuy3Dsw*8RwS2-YJfLWl7dKK-kx5sVFDBrPoeruSl7PyNAcI3qvic&new=1. | |
| | • *Exhibit 20* – Laura Murphy, et al., "Driving Force: Automotive Supply Chains and Forced Labor in the Uyghur Region," Sheffield Hallam University Helena Kennedy Centre for International Justice, NomoGia, December 2022, available at https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/driving-force. | AR001091 - AR001169 |
| | • *Exhibit 21* – Sheffield Hallam University Helena Kennedy Centre for International Justice, "Products Made with Forced Labor in the Uyghur Region," Evidence Briefs, Issue Brief No. 3, (May 2023), https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/evidence-briefs | AR001170 - AR001179 |
| | • *Exhibit 22* – Declaration of ███████████. | AR001180 - AR001188 |
| | • *Exhibit 23* – August 29, 2023 Letter from Toksun County Bureau of Social Security and Human Resources. | AR001189 - AR001193 |
| | • *Exhibit 24* – Yaxin Net (亚心网), "Toksun County, Xinjiang holds a handover ceremony for surplus labor entities" (新疆托克逊县举行富余劳动力企业上岗交接仪式), Sina News Network (新浪新闻), July 12, 2017, available at https://news.sina.com.cn/o/2017-07-12/doc-ifyhwehx572486.shtml. | AR001194 - AR001199 |
| | • *Exhibit 25* – Declaration of ██████. | AR001200 - AR001209 |
| | • *Exhibit 26* – Declaration of █████. | AR001210 - AR001213 |
| | • *Exhibit 27* – Declaration of ██████. | AR001214 - AR001220 |
| | • *Exhibit 28* – Declaration of ██████. | AR001221 - AR001227 |
| | • *Exhibit 29* – Camel Group Co. Ltd. Employee List. | AR001228 - AR001245 |

| | | |
|---|---|---|
| | • *Exhibit 30* – Camel Xinjiang Renewable Co. Ltd. and Camel Xinjiang Battery Co. Ltd. Employee Lists. | AR001246 - AR001262 |
| | • *Exhibit 31* – Camel Group Co. Ltd. Management Regulations on Supplier Social Responsibility and Sustainable Development. | AR001263 - AR001279 |
| | • Exhibit List. | AR001280 - AR001283 |
| | **Attachment 3:** Forced Labor Enforcement Task Force, Questions to Camel Group Co. Ltd. (December 14, 2023). | AR001284 - AR001287 |
| | **Attachment 4:** Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (December 21, 2023): *Camel Group Co. Ltd. Removal Request Petition Reply*. | AR001288 - AR001291 |
| | **Attachment 5:** Email from Cynthia Echeverria, U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, Director of Trade Policy, Office of Trade and Economic Security to Mark V. Heusel and Jacob L. Clark, Dickinson Wright PLLC (January 31, 2024). | AR001292 |
| | **Attachment 6:** Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (March 1, 2024): *Camel Group Co. Ltd. Responses to FLETF Questions* (with attachments). | AR001293 - AR001308 |
| | • *Attachment 1* – August 2, 2023 Camel Group Battery Trading Co. Ltd. Explanatory Statement Regarding Camel Group Co. Ltd. Being Listed by the U.S. Department of Homeland Security | AR001309 - AR001313 |
| | • *Attachment 2* – August 5, 2023 Camel Group Co. Ltd. Notice Regarding Company Being Listed by the U.S. Department of Homeland Security" | AR001314 - AR001317 |
| | • *Attachment 3* – August 7, 2023 Camel Group Battery Trading Co., Ltd. Customer Letter | AR001318 - AR001321 |
| | • *Attachment 4* – August 24, 2023 Camel Group Battery Trading Co., Ltd. Declaration of Trade Compliance | AR001322 - AR001324 |
| | • *Attachment 5* – Camel Group Co. Ltd. UFLPA List Removal Request Petition Exhibit 15 Sample UFLPA Response Package submitted by Camel Energy, Inc. to CBP Excerpt of Pages 417-418 | AR001325 - AR001327 |
| | • *Attachment 6* – Camel UFLPA Response Package ███████████ | AR001328 - AR001610 |
| | • *Attachment 7* – Camel Group ████████ Second Declaration | AR001611 - AR001613 |

| | |
|---|---|
| • *Attachment 8* – Camel Group ██████████ Second Declaration | AR001614 - AR001617 |
| • *Attachment 9* – Supplement to Exhibit 30 – Supplement to Employee Lists for Camel Xinjiang Renewable Co. Ltd. and Camel Xinjiang Battery Co. Ltd. | AR001618 - AR001631 |
| • *Attachment 10* – Production Category of Key Positions for Camel Xinjiang Renewable Co. Ltd. and Camel Xinjiang Battery Co. Ltd. | AR001632 - AR001636 |
| • Attachment List. | AR001637 |
| **Attachment 7:** Forced Labor Enforcement Task Force, Meeting on Camel Group Co. Ltd. Request to be Removed from the Uyghur Forced Labor Prevention Act Entity List: Protocols. | AR001638 |
| **Attachment 8:** Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (April 5, 2024): *Camel Group Co. Ltd. – FLETF April 2, 2024 Removal Petition Request Meeting Follow Up.* | AR001639 - AR001640 |
| **Attachment 9:** Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (May 16, 2024): *Concerns Regarding Camel Group Co. Ltd.'s UFLPA Entity List Removal Request Petition Process.* | AR001641 - AR001642 |
| **Attachment 10:** Forced Labor Enforcement Task Force Response to Camel Group (May 24, 2024) | AR001643 |
| **Attachment 11:** Uyghur Forced Labor Prevention Act (UFLPA) Entity List Package 23-004 from U.S. Dep't of Homeland Sec. to Forced Labor Enforcement Task Force. | AR001644 - AR001650 |
| • Memorandum from Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans, *Forced Labor Enforcement Task Force Addition of Camel Group Co., Ltd. to the Uyghur Forced Labor Prevention Act Entity List* (July 26, 2023) | AR001651 - AR001652 |
| • Forced Labor Enforcement Task Force, Member Agency Votes on Addition of Camel Group Co., Ltd. to the UFLPA Entity List. | AR001653 - AR001659 |
| • Camel Energy U.S. website, https://www.camelenergyus.com (April 4, 2023). | AR001660 - AR001673 |
| • Attachment A (original): Camel Group., Ltd. website, https://www.chinacamel.com/ (last visited April 4, 2023). | AR001674 - AR001675 |
| • Attachment A (English translation): Camel Group., Ltd. website, https://www.chinacamel.com/ (last visited April 4, 2023). | AR001676 - AR001677 |
| • Attachment B: Laura T. Murphy et. al., Financing & Genocide, Development Finance and the Crisis in the Uyghur Region, The Atlantic Council (February 2022), https://www.atlanticcouncil.org/wp-content/uploads/2022/02/Financing__Genocide.pdf. | AR001678 - AR001746 |

| | | |
|---|---|---|
| | • Attachment C: "Camel Group" (Sponsor/Cost/Location tab), IFC Project Information & Data Portal, Online; and "Camel Group" (IFC-41128)," https://disclosures.ifc.org/project-detail/SII/41128/camelgroup. (last visited March 23, 2023.) | AR001747 - AR001750 |
| | • Attachment D (original): █████████████████████████████████████████████████████████████ (last visited April 4, 2023) | AR001751 - AR001761 |
| | • Attachment D (English translation): ████████████████████████████████████████████████████ (last visited April 4, 2023). | AR001762 - AR001776 |
| | • Attachment E: Stanley Toops, *Spatial Results of the 2010 Census in Xinjiang, Asia Dialogue*, University of Nottingham's Asia Research Institute (March 7, 2016), https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang (last visited May 4, 2023). | AR001777 - AR001784 |
| | • Attachment F: ████████████████████████████ | AR001785 - AR002764 |
| | • Attachments G (original): Li Neng, "Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan, Weixin," July 10, 2017, https://archive.ph/nC4Xt. | AR002765 - AR002773 |
| | • Attachment G (English translation) Li Neng, "Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan, Weixin," July 10, 2017, https://archive.ph/nC4Xt. | AR002774 - AR002783 |
| | • Attachment H: ███████████████████ | AR002784 - AR002791 |
| | • Attachment I: International Finance Corporation, World Bank Group, "Performance Standard 7," https://www.ifc.org/wps/wcm/connect/topics_ext_content/ifc_external_corporate_site/sustainability-at-ifc/policiesstandards/performance-standards/ps7 (last visited May 5, 2023). | AR002792 - AR002865 |

| | | | |
|---|---|---|---|
| | • Attachment J: U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans, *Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China* (June 17, 2022), https://www.dhs.gov/uflpa-strategy. | | AR002866 - AR002933 |
| | **Attachment 12:** Memorandum from U.S. Customs & Border Prot., Note to File on Camel Energy Entry (May 3, 2024). | | AR002934 |
| | **Attachment 13:** ███████████████████████████████ (October 23, 2017). | | AR002935 - AR002941 |
| | **Attachment 14:** ███████████████████████████████ (March 4, 2023). | | AR002942 - AR002949 |
| | **Attachment 15:** Murphy, L. (2023). Chinese Transliteration of Uyghur (And Other Ethnic Minority) Names [Unpublished resource guide]. Professor of Human Rights and Contemporary Slavery, Helena Kennedy Centre for International Justice, Sheffield Hallam University. | | AR002950 - AR002951 |
| | **Attachment 16:** ███████████████████████████████ (June 9, 2024). | | AR002952 - AR002967 |
| | **Attachment 17:** ███████████████████████████████ ████ | | AR002968 - AR002976 |
| | **Attachment 18:** Letter from U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans to Mark V. Heusel, Dickinson Wright PLLC (July 9, 2024): *The Forced Labor Enforcement Task Force's Decision Regarding Camel Group Co., Ltd's Request for Removal from the Uyghur Forced Labor Prevention Act Entity List*. | | AR002977 - AR002979 |
| 3. | Memorandum from U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans (July 26, 2024): *Memorandum for Forced Labor Enforcement Task Force Paper Vote on Removal Request RR23-003*. | | AR002980 - AR002987 |

FOR OFFICIAL USE ONLY

**<u>Forced Labor Enforcement Task Force Standard Operating Procedures</u>**
**<u>Uyghur Forced Labor Prevention Act Entity List</u>**
*(July 2022)*

I.  GENERAL

    A.  Purpose

        1.  This Forced Labor Enforcement Task Force (FLETF) Standard Operating Procedure (SOP) outlines the FLETF's process for adding entities to and removing entities from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List, as required under Section 2(d)(2)(B) of the UFLPA (P.L. No. 117-78).

    B.  Definitions

        1.  UFLPA Entity List: A consolidated register of the four lists required by clauses (i), (ii), (iv), and (v) of Section 2(d)(2)(B) of the UFLPA.

        2.  FLETF: The FLETF is the Forced Labor Enforcement Task Force, which is chaired by the Secretary of the Department of Homeland Security (DHS) or designee, and is made up of member agencies and observer agencies.

        3.  FLETF Member Agencies: The Department of Homeland Security, the Office of the U.S. Trade Representative, the Department of Labor, the Department of State, the Department of Treasury, the Department of Justice, and the Department of Commerce (invited by the Chair of the Task Force).

        4.  FLETF Observer Agencies: Non-FLETF member agencies, invited by the FLETF Chair to participate.  Observer agencies do not have voting rights.

        5.  FLETF Chair: The Department of Homeland Security official responsible for carrying out the duties necessary to manage the work of the FLETF, including but not limited to distributing UFLPA Entity List recommendations to FLETF member agencies, convening meetings of the FLETF, setting agendas for FLETF meetings, and drafting FLETF decision memoranda and other related documentation to implement FLETF decisions.

        6.  Technical Correction: A change to an UFLPA Entity List entry that does not alter the scope or impact of the entry, i.e., a non-substantive change such as correction of a misspelling or citation.

    C.  Scope

        1.  The FLETF is composed of representatives from seven voting member agencies (Department of Homeland Security, Department of State, Department of

FOR OFFICIAL USE ONLY

AR000001

FOR OFFICIAL USE ONLY

Commerce, Department of Treasury, Department of Justice, Department of Labor, and the U.S. Trade Representative) and six observer agencies (Department of Energy, Department of Agriculture, and U.S. Agency for International Development, the National Security Council, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement).

2. Criteria for Adding Entities to, Removing Entities from, or Making a Technical Correction to the UFLPA Entity List:

   a. When there is reasonable cause to believe, based on specific and articulable information, that entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA, outlined below, those entities shall be added to the UFLPA Entity List pursuant to the procedures defined in section II of this SOP.

      • Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.
      • Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.
      • Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.
      • Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the poverty alleviation program or the pairing-assistance program or any other government labor scheme that uses forced labor.

   b. Entities may be **removed** from the UFLPA Entity List, if there is no longer reasonable cause to believe that they meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA, pursuant to the procedures provided in Section II of this SOP.

   c. UFLPA Entity List entities may be subject to **technical correction**, pursuant to the procedures defined in section II of this SOP.

II. PROCESS AND PROCEDURES

FOR OFFICIAL USE ONLY

AR000002

FOR OFFICIAL USE ONLY

A.  Submission of Recommendations to the FLETF Chair and Initial Processing

1.  Any FLETF member agency may submit a recommendation to the FLETF Chair to add, remove, or make technical corrections to an entry on the UFLPA Entity List. Such recommendations will be submitted to the FLETF Chair at FLETF.UFLPA.EntityList@hq.dhs.gov using the recommendation questionnaire provided in Annex 1.

2.  Whenever possible, the recommending FLETF member agency will include publicly available information to serve as the basis for the recommendation. If an agency is unable to provide publicly available information, the recommending agency will submit to the FLETF Chair the classified or otherwise non-releasable information that serves as the basis for the recommendation. The FLETF Chair will include this supporting information when forwarding the recommendation to the FLETF member and observer agencies.

    a.  Regardless of whether the supporting information is releasable, recommending FLETF member agencies will include in the recommendation an unclassified, general description of the basis for its recommendation that is suitable for public release to explain the addition, removal or technical correction to the UFLPA Entity List.

B.  FLETF Review

1.  The FLETF Chair will circulate recommendations and the underlying information to the FLETF member agencies for formal consideration at least 30 calendar days in advance of a vote on the recommendation. Prior to circulating the recommendation and supporting information to the FLETF member and observer agencies, the FLETF Chair will review the supporting information (addressed in II.A.1 above), and if the supporting information is not provided or is incomplete, the FLETF Chair may request the recommending agency provide additional supporting information, which the recommending agency may provide to the FLETF Chair prior to circulation. Recommendations are not under formal consideration until circulated to the FLETF member agency representatives by the FLETF Chair.

2.  The FLETF Chair will provide the following materials to the FLETF member and observer agency representatives for review:

    a.  A copy of the recommendation received from the recommending agency; and

    b.  Associated supporting information for the recommendation (publicly available and/or classified or sensitive), on the appropriate electronic platform.

3.  Within 30 calendar days of receiving a recommendation from the FLETF Chair, unless the FLETF member agencies unanimously agree to postpone

3
FOR OFFICIAL USE ONLY

AR000003

FOR OFFICIAL USE ONLY

action, the FLETF member agencies will:

    a.   Review the recommendation;

    b.   Submit questions to the recommending FLETF member agency, as necessary;

    c.   Provide any relevant information in their control regarding the recommendation; and

    d.   Prepare to vote on disposition of the recommendation at the next FLETF meeting.

4.   The FLETF observer agencies may provide any relevant information regarding the recommendation to the FLETF member agencies during the review period.

C.  FLETF Meeting and Voting Procedures for UFLPA Entity List Determinations

1.   The FLETF Chair may convene the FLETF on a quarterly basis - in-person, virtually, or through a paper process - or the FLETF Chair may convene meetings other than a quarterly meeting for the purpose of considering the disposition of recommendations circulated pursuant to Part II, Sections A and B of this SOP.

    a.   When convening the FLETF for an in-person or virtual meeting, the FLETF Chair will circulate a FLETF Meeting Agenda to member and observer agencies at least 24 hours in advance of each FLETF meeting. The agenda will include outstanding UFLPA Entity List recommendations under consideration by the FLETF.

    b.   When convening the FLETF for a paper meeting, the FLETF Chair will circulate a paper identifying the issues up for a vote before the FLETF and requesting a written response from each FLETF member agency reflecting its vote on those issues.

    c.   Following an in-person, virtual, or paper meeting, the FLETF Chair will draft and circulate to each FLETF member agency a summary of the meeting, including: decisions reached, follow up actions required of FLETF member agencies, requests for additional information, agency positions articulated at the meeting, and the status of each discussed recommendation.

    d.   The FLETF member agencies may contact the FLETF Chair to request amendments or changes to the summary. The FLETF Chair will take these requests under consideration and provide amended summaries to all the FLETF member and observer agencies, as appropriate.

2.   Voting will take place at FLETF meetings, unless the FLETF member agencies unanimously agree to vote at a different time. The FLETF member agencies will

FOR OFFICIAL USE ONLY

AR000004

FOR OFFICIAL USE ONLY

submit their agency's vote to the FLETF Chair, via voice vote, at an in-person or virtual FLETF meeting or via a written response to a paper meeting.

    a.  Decisions to add, remove, or make a technical correction to an entry on the UFLPA Entity List will be made by majority vote of the FLETF member agencies.

    b.  In the event of a tie vote, the FLETF Chair will break the tie vote.

D.  Post-Determination Procedures

1.  Within seven days of a FLETF vote to add or remove an entity from the UFLPA Entity List, the FLETF Chair will circulate to the FLETF member agencies an UFLPA Entity List Decision Memorandum reflecting the FLETF member agency votes and the FLETF's final decision on the recommendation. This memorandum will specify the applicable section(s) of the UFLPA that provide(s) the basis for the FLETF's determination and a summary of the reasons supporting the determination.

2.  The FLETF will publish updates, as applicable, to the UFLPA Entity List following FLETF meetings through a Federal Register Notice.

## III. POST-ADDITION REVIEWS

A.  Requests for Removal from an Entity

1.  An entity listed on the UFLPA Entity List may submit a request for removal from the UFLPA Entity List to the FLETF Chair. The FLETF Chair will refer all such requests and supporting information to the FLETF member agencies. The FLETF member agencies will review and vote on all such requests. The review and voting procedures that govern the FLETF member agency proposals, set forth in Part II, Sections B through D of this SOP, will apply to removal requests. The decision of the FLETF on requests for removal will not be appealable, and any new removal request will require additional information to be provided.

2.  Once a request for removal has been submitted to the FLETF Chair, only the FLETF Chair, or the Chair's representative, may contact the entity on behalf of the FLETF regarding questions on the submission, including requests for additional information.

3.  If, after being added to the UFLPA Entity List, an entity (or its designated representative) contacts the FLETF Chair or an individual FLETF member agency to request a meeting regarding the UFLPA Entity List, the FLETF Chair or member agency will respond as follows:

    a.  The FLETF will consider a meeting request only after the entity has

FOR OFFICIAL USE ONLY

AR000005

FOR OFFICIAL USE ONLY

submitted a request for removal from or technical correction to the UFLPA Entity List to the FLETF Chair.

b. Any such meeting will not occur before FLETF member agencies have reviewed a request for removal. The FLETF will determine, at the conclusion of the review period but before voting on the request for removal, if it will accept the meeting request. The FLETF Chair, or the Chair's representative, will advise the entity in writing whether the FLETF will accept the meeting request. An accepted meeting will be held prior to the FLETF's vote on the request for removal.

4. The FLETF Chair will advise the entity in writing of the FLETF's decision.

B. Annual Reviews

1. The FLETF Chair will coordinate annual updates of the UFLPA Entity List as part of statutorily-prescribed updates to the appropriate congressional committees. The update will include a review of the current UFLPA Entity List, highlighting any additions and removals since the prior year.

IV. Records Management

A. All records concerning the FLETF's review of the UFLPA Entity List, including recommendations and requests for removal, associated supporting documentation, documentation of the FLETF's decisions, and any supplementary information shared with the FLETF, will be withheld from public disclosure unless disclosure is required by law or the information or records are publicly released via the processes identified in this SOP. The FLETF member and observer agencies will apprise DHS, as the FLETF Chair, of any requests for disclosure of records, and DHS will coordinate review of such requests.

B. All Government and/or contract employees assigned to, or working in conjunction with, the FLETF for the purpose of reviewing the UFLPA Entity List are responsible for ensuring the proper handling, storage, and distribution of both electronic and hard copy documents produced and/or maintained for use during the UFLPA Entity List review process. Classified documents must be handled pursuant to U.S. Government requirements.

C. Records concerning the FLETF's review of the UFLPA Entity List that constitute records of the individual member and observer agencies, will be handled in accordance with each agency's existing document retention and disclosure policies.

V. NO PRIVATE RIGHT CREATED. The guidelines set forth in this SOP do not create any right or benefit, substantive or procedural, enforceable by law or party against the United States, its agencies, its officers, or any person.

VI. AMENDMENT. This SOP may be modified on the written mutual consent of the FLETF member agencies.

FOR OFFICIAL USE ONLY

AR000006

FOR OFFICIAL USE ONLY

**Annex 1:**

**UYGHUR FORCED LABOR PREVENTION ACT (UFLPA) ENTITY LIST**

**RECOMMENDATION FOR ACTION**

1. **Name of Submitting FLETF Agency**:

*Provide the name of the FLETF agency submitting the recommendation.*

2. **FLETF Agency Point of Contact**:

*Provide the name, email address, and phone number of the agency POC for this recommendation.*

3. **Recommended Action (select one):**

☐ *Addition to List*          ☐ *Removal from List*          ☐ *Technical Correction*

4. **Entity Identifying Information**:

*Provide identifying information of the entities that are the subject of this recommendation, including names, aliases, and addresses. Also include additional information to assist in identifying the entities, if available (e.g., telephone numbers, websites, e-mail addresses, etc.).*

5. **UFLPA Entity List for Addition, Removal, or Correction (select one or more applicable list):**

☐ *Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.*

☐ *Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.*

☐ *Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.*

☐ *Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and*

FOR OFFICIAL USE ONLY

AR000007

FOR OFFICIAL USE ONLY

*Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.*

6. **Scope:**

   *For **additions**, provide a short description of any forced labor violations committed or alleged to have been committed by the entity or entities that support their inclusion on one or more of the four entity lists noted above. Additionally, include a description of the product(s) mined, produced, or manufactured wholly or in part by the entity or entities.*

7. **Basis for Recommendation**:

   *For **additions** to the UFLPA Entity List, include a narrative explaining in detail why there is reasonable cause to believe that the entity or entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section (d)(2)(B) of the UFLPA. Include a description of applicable forced labor indicators.[1]*

   *For **removal** from the UFLPA Entity List, include an explanation detailing why there is no longer reasonable cause to believe that the entity or entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA.*

   *For **technical corrections**, include full details and justification for the request. Technical corrections are changes to a UFLPA Entity List entry that do not alter the scope of the entry, i.e., a non-substantive change, such as correction of a misspelling or a citation.*

   *Please keep the narrative summary to 2-3 pages maximum. Inclusion of report excerpts, figures, pictures, etc. within that page limit is encouraged. Additional supporting documents (such as full reports) that are referenced or cited in the narrative should be submitted as addenda to the recommendation. References from web sources should be provided in a standardized format indicating the website, date accessed, and description of the source.[2] Digital copies (PDFs, HTML, or other standard file format) of such web sources should be*

---

[1] *ILO Indicators of Forced Labour, International Labour Organization, 3 (Oct. 1, 2012), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.* The ILO has developed 11 forced labor indicators to identify the most common signs that point to the possible existence of forced labor. With respect to PRC's forced-labor schemes (including transfer of workers from Xinjiang), the most common ILO indicators of forced labor are: intimidation and threats; exploitation of a position of dependency and vulnerability; restriction on freedom of movement; isolation; abusive working and living conditions; and excessive hours.

[2] TITLE OF WEBSITE | www.website.com/fullURLinOriginalCapitalization.html | DATE ACCESSED | SOURCEDESCRIPTOR (STATE WHETHER SOURCE IS PUBLIC).

FOR OFFICIAL USE ONLY

AR000008

FOR OFFICIAL USE ONLY

*included as addenda. Classified sources must be referenced in accordance with Intelligence Community Directive Number 206 (ICD 206),[3] as updated on January 22, 2015.*

8.  **Supporting Information**:

*Provide any supporting information not covered in the sections above that would bolster the case for the recommendation. If the agency will be submitting classified information to support the recommendation, please note that here as well.*

---

[3] Office of the Director of National Intelligence, *Sourcing Requirements for Disseminated Analytic Products,* ICD 206 (Jan. 2015), https://www.dni.gov/index.php/what-we-do/ic-related-menus/ic-related-links/intelligence-community-directives.

FOR OFFICIAL USE ONLY

AR000009



U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

September 4, 2024

## DECISION

MEMORANDUM FOR THE FORCED LABOR ENFORCEMENT TASK FORCE
MEMBER AGENCIES

FROM:             Robert Silvers
                  Under Secretary for Strategy, Policy, and Plans
                  Forced Labor Enforcement Task Force Chair

SUBJECT:          **Forced Labor Enforcement Task Force Denial of Camel Group Co.,
                  Ltd. Request for Removal from the Uyghur Forced Labor
                  Prevention Act Entity List**

---

(U//FOUO) On August 2, 2023, the U.S. Department of Homeland Security (DHS) published a
Federal Register Notice announcing the addition of Camel Group Co., Ltd. (Camel Group) to the
Uyghur Forced Labor Prevention Act (UFLPA) Entity List described in Section 2(d)(2)(B)(ii) of
the UFLPA (Public Law 117-78). The list described in Section 2(d)(2)(B)(ii) of the UFLPA is
"entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit,
transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of
other persecuted groups out of the Xinjiang Uyghur Autonomous Region." On November 7,
2023, Camel Group submitted a removal request (RR23-003) to the Forced Labor Enforcement
Task Force (FLETF).

1.      Addition of Camel Group to the UFLPA Entity List

(U//FOUO) UFLPA Entity List Package 23-004 added Camel Group to the list described in
Section 2(d)(2)(B)(ii) of the UFLPA (Attachment 11). Package 23-004 identifies a February 2022
Sheffield Hallam University report, *Financing & Genocide: Development Finance and the Crisis
in the Uyghur Region* and a July 10, 2017, announcement from Toksun County's official WeChat
page (which is also cited in the *Financing & Genocide* report). The Toksun County WeChat
announcement identifies Camel Group as one of several companies that participated in a
"handover ceremony" coordinated by the Toksun County government in Turpan Prefecture in
Xinjiang that received workers in 2017 from Kashgar and Hotan, which are Uyghur-majority areas
in southern Xinjiang. The handover ceremony was conducted under the Toksun County labor
transfer program known as the "Three-year Plan for the Autonomous Prefecture to Promote the
Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan
Region (2017-2019)" (herein after referred to as the "Labor Transfer Program").

(U//FOUO) Given the information indicating that Camel Group received workers through the
Toksun County Labor Transfer Program, the FLETF determined that Camel Group satisfied the

UNCLASSIFIED // FOR OFFICIAL USE ONLY

criteria for addition to the Section 2(d)(2)(B)(ii) list of the UFLPA, specifically that Camel Group works with the government of the XUAR to receive Uyghurs and/or members of other persecuted groups from the XUAR.

### 2.    Camel Group Removal Request

(U//FOUO) In RR23-003, Camel Group asserts that it did not participate in the Toksun County Labor Transfer Program in 2017 and that the information that the FLETF relied on to add Camel Group to the Section 2(d)(2)(B)(ii) list of the UFLPA is inaccurate.  Camel Group provided a number of certifications/affidavits, signed subject to penalty of perjury, that contend that the information relied upon by the FLETF was subject to a factual correction following initial publication that undermines the FLETF's reasoning for placing Camel Group on the UFLPA Entity List.  Camel Group also submitted several documents, including employee lists, its corporate record and business license, and its supplier regulations, to support its assertion that Camel Group did not participate in or benefit from any labor transfer programs.[1]  Camel Group further suggested that, although it never participated in any labor transfer programs, the Labor Transfer Program identified on the Toksun County WeChat page ended in 2019, and so it is not possible for them to be on the UFLPA Entity List under Section 2(d)(2)(B)(ii) on the basis of this reporting.  The FLETF weighed the persuasiveness and credibility of these arguments and information, as outlined in Camel's removal request and answers to the FLETF's follow-up questions, against the record originally presented in UFLPA Entity List Package 23-004 supporting Camel Group's designation and recent information indicating Camel Group is working with the government of Xinjiang Uyghur Autonomous Region to recruit members of persecuted groups out of Xinjiang.

### A.    Toksun County 2017 WeChat Announcement

(U//FOUO) In Removal Request 23-003 (RR23-003), Camel Group claimed that Toksun County's July 10, 2017, announcement on its official WeChat page identifying Camel Group as one of several companies that participated in a "handover ceremony" receiving workers through a Toksun County Labor Transfer Program, was inaccurate.  Camel Group claimed that a "corrected" article from Sina News, dated July 12, 2017, that replicates the content of the Toksun County WeChat article but omits Camel Group from the list of participating companies, demonstrates that Camel Group was not one of the participating entities.

---

[1] Although not the focus of its removal request, Camel Group also highlights in its removal request that a subsidiary, Camel Energy, has had shipments detained by U.S. Customs and Border Protection and ultimately released.  In particular, it highlights an email received from CBP on September 13, 2023, stating that it had reviewed Camel Energy Inc.'s "applicability documentation" related to ▮▮▮▮▮▮▮▮▮ and that Camel Energy Inc. "has provided sufficient documentation to support their claim that shipment was not manufactured with forced labor." (RR23-003, Exh.14).  CBP prepared a note to file that clarifies that during the review of ▮▮▮▮▮▮▮▮, it did not consider whether forced labor was present in the supply chain, despite that statement being included in the e-mail. (Attachment 12).  Camel includes this discussion in its removal request to show that despite a "stellar record of successfully seeking (and obtaining) CBP UFLPA-detention releases" it was still added to the UFLPA Entity List and that this successful record should be taken into account by the FLETF when reviewing RR23-003.  (RR23-003, pg. 5-6, 19).  However, the CBP assessments of individual entries by a Camel Group subsidiary do not preclude or restrict the FLETF from making an assessment that Camel Group meets the statutory criteria for placement on the UFLPA Entity List.

UNCLASSIFIED // FOR OFFICIAL USE ONLY    AR000011

(U//FOUO) Camel Group claimed that Toksun County mistakenly identified Camel Group as a participant in the labor transfer program and handover ceremony described in the announcement. Camel Group noted that "[u]pon seeing the erroneous WeChat Article, Camel Group immediately contacted the Toksun County SSHR on July 11, 2017 (the very next day), and informed it of the error in the report." (RR23-003, pg. 9). Camel Group also claimed that "the photos included in the WeChat Article do not show any Camel Group representatives or other evidence of its participation." (RR23-003, pg. 9).

(U//FOUO) Camel Group submitted a certification letter signed and dated October 25, 2023, from the Toksun County Human Resources and Social Security Bureau (Toksun County SSHR) confirming Camel Group's claims. (RR23-003, Exhibit 23). It stated that Camel Group immediately informed the Toksun County SSHR that the report published on the Toksun County WeChat account was incorrect. The 2023 Toksun County SSHR certification letter attested that Camel Group did not participate in the ceremony. (RR-23-003, Exhibit 23).

(U//FOUO) In response to follow-up questions from the FLETF, Camel Group stated that all communications with the Toksun County SSHR about the alleged misidentification, via the Toksun County WeChat account, of Camel Group as participating in a Toksun County Labor Transfer Program handover ceremony occurred via telephone. (Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 7-8).

(U//FOUO) Camel Group stated that the Toksun County SSHR "immediately corrected the article by removing all mention of Camel Group's name." (RR23-003, pg. 9). Camel Group explained that "[t]he corrected article was published that same day through Yaxin Network News, a subsidiary of national Chinese State media outlet Sina (新浪), entitled 'Toksun County, Xinjiang holds a handover ceremony for surplus labor entities.'" (RR23-003, pg. 9). Camel Group claimed that this "corrected" article from Sina News, dated July 12, 2017, demonstrates that Camel Group did not participate in the handover ceremony and Labor Transfer Program.

(U//FOUO) The July 10, 2017, WeChat article is posted on Toksun County's official WeChat page. Sina News is a global media company that was reproducing the announcement issued by the Toksun County government. The official WeChat page does not include a correction to the text or a notice indicating a correction. The July 12, 2017, Sina News article with the purported "correction" was not an official retraction by Toksun County, as it did not come from the Toksun County government.

(U//FOUO) The FLETF confirmed Camel Group's claims that photos included in the WeChat Article do not appear to show any Camel Group representatives or other evidence of its participation in the handover ceremony. However, the FLETF considered that their absence from the photos is not dispositive of whether they participated in the handover ceremony and labor transfer program.

(U//FOUO) The FLETF also questioned the credibility of the Toksun County SSHR certification document. Labor transfers in the XUAR, a key component of XUAR government policies (i.e. 14th Five – Year Plan), are the "coercive work policy that underpins most forced labor linked to

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Xinjiang."[2] Toksun County SSHR helped to facilitate labors transfers in the XUAR, and, it would behoove Camel Group and Toksun County SSHR to draft a document intended for the U.S. Government that says Camel Group did not participate in a handover ceremony implemented under a government labor transfer program.

  B.  Camel Group Correspondence with Toksun County Government Regarding Labor

(U//FOUO) In RR23-003, Camel Group claimed it corresponded with the Toksun County government regarding labor and/or labor transfers once in early 2017 when Camel Group's labor recruitment officer, ███████████ received a phone call from an official from the Toksun County SSHR asking if Camel Renewable and Camel Xinjiang Battery had any need for labor, which Camel Group declined, noting that it had not obtained all proper approvals for its XUAR facilities and therefore had no need to begin hiring. (RR23-003, pg. 8, ██ Declaration - Ex. 22; Toksun County SSHR Letter - Ex. 23.; ███████████ Declaration - Ex. 25).

(U//FOUO) The FLETF requested that Camel Group provide documentation memorializing that phone call between ██ and the Toksun County SSHR and all correspondence/documentation (such as e-mails, letters, notes) between Camel Group and Toksun County SSHR. (FLETF Questions for Camel Group Co. Ltd, pg. 1). According to Camel Group, all communication between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. (Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 5-7). Camel Group stated that this 2017 phone call is the only known communication or record related to Camel Group's participation in or involvement with the Toksun County Labor Transfer Program. (See RR23-003, pgs. 14-15; Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 5-7).

(U//FOUO) Notably, all correspondence, including documentation memorializing the phone conversation between ██ Camel Group's labor recruitment officer, and Toksun County, as well as information attesting to the phone conversations, occurred in 2023, after Camel Group was named to the UFLPA Entity List. (See RR23-003, Exhibits 22- 25). There is no contemporaneous documentation, including internal notes or a memorandum memorializing Camel Group's 2017 call with the Toksun County official in 2017 when the call purportedly occurred.

(U/FOUO) Moreover, while Camel Group asserted that it could not have participated in the Toksun County Labor Transfer Program because its XUAR facilities were not operational until mid-2018, (Removal Request RR23-003, Exhibit 22), Camel Group's XUAR employee lists demonstrate that they did in fact recruit employees for its Xinjiang facilities in 2017 and early 2018. (Removal Request RR23-003, Exhibit 30).

  C.  Camel Group Labor Recruitment

(U//FOUO) Camel Group asserted that it does not employ and has not employed anyone who was recruited through the Labor Transfer Program. (RR23-003, pgs. 16-17). Camel Group stated that its current employees were hired through Camel Group's typical "social recruitment/social hiring." (RR23-003, Exhibit 27 (██ Declaration), Exhibit 28 (██ Declaration), Exhibit 29 (Camel Group Employee List), Exhibit 30 (Camel Xinjiang Employee List)).

---

[2] Forced Labor in the Xinjiang Uyghur Autonomous Region: Assessing the Continuation of Coercive Labor Transfers in 2023 and Early 2024 - Jamestown

UNCLASSIFIED // FOR OFFICIAL USE ONLY  **AR000013**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

(U//FOUO) Additional FLETF research identified two additional instances in which Camel Group is working with Toksun County to recruit members of persecuted minority groups.

(U//FOUO) ██████████████████████████ Camel Group participated in a state-sponsored labor recruitment event for surplus laborers hosted by Toksun County. A member of the Toksun County government ███████████████████████████
████████████████ (Attachment 13).

(U//FOUO) ██████████████████████████ Camel Group had recruited and received ████████ through a state-sponsored job fair for surplus laborers operated by the Toksun County government. (Attachment 14). Uyghur, Kazakh, or Kyrgyz villagers appear to have attended the fair, as evidenced by ████████ ██████████████ who is likely a member of the Uyghur, Kazakh, or Kyrgyz communities, based on naming conventions.[4]

(U//FOUO) Information from these two additional sources indicates that Camel Group is working with Toksun County to recruit individuals from persecuted groups.[5] These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Toksun County Labor Transfer Program.

        D.       Continued Use of Labor Transfer Programs in Toksun County

(U//FOUO) In RR23-003, Camel Group further submitted that the Toksun County SSHR confirmed that the Toksun County Labor Transfer Program began in 2017 and ended in 2019. (RR23-003, pg. 18). Camel Group asserts that "even if the Task Force is not convinced that Camel Group did not participate in the Labor Transfer Program (which it did not), the Labor Transfer Program concluded more than 4 years ago, and Camel's Xinjiang entities were not in need of any labor at that time." (RR23-003, pg. 18).

(U//FOUO) Although the "Three-year Plan" to promote labor transfers identified in Package 24-004 has conceivably ended, additional FLETF research indicates that the Toksun County labor transfer programs remain active and ongoing. ████████████████████████
████████ indicates that Toksun County continued to participate in labor transfers, having transferred ██████████████████████████. (Attachment 16).

(U//FOUO) Additionally, although the Three-year Plan may have ended, there is evidence that Camel Group works with Toksun County to recruit members of persecuted groups, by

---

[3] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[4] Full names for Han individuals (the majority ethnic group in China) regularly consist of two or three Chinese characters. Names for ethnic minorities in China, especially Uyghurs, Kazakhs, Kyrgyz, Tajiks, and Uzbeks, regularly consist of more than two syllables and often include an interpunct (·) or other separator (i.e. -), to separate the first and last name in writing. *See* Attachment 15.

████████████████████████████████████████████
████████████████████████████████████████████

AR000014

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

participating in a state-sponsored job fair for surplus laborers operated by the Toksun County government.  (Attachments 13, 14).

3.      FLETF Decision

(U//FOUO) After DHS circulated RR23-003 to the FLETF on November 8, 2023, FLETF Member Agencies had the opportunity to review the information, submit questions to Camel Group, provide any relevant information in their control regarding RR23-003, meet with Camel Group on April 2, 2024, and prepare to vote on the disposition of RR23-003.

(U//FOUO) The FLETF considered information from the following documents when evaluating RR23-003 (included with this memorandum as Attachments 2 to 17).

- Camel Group Request for Removal from the UFLPA Entity List - RR23-003 (with attachments) (Attachment 2)
- FLETF Questions to Camel Group (December 14, 2023) (Attachment 3)
- Camel Group Letter to the FLETF (December 21, 2023) (Attachment 4)
- FLETF Response to Camel Group (January 31, 2024) (Attachment 5)
- Camel Group Response to FLETF Questions (March 1, 2024) (Attachment 6)
- Removal Request Meeting Protocols (Attachment 7)
- Camel Group Letter to the FLETF (April 5, 2024) (Attachment 8)
- Camel Group Letter to the FLETF (May 16, 2024) (Attachment 9)
- FLETF Response to Camel Group (May 24, 2024) (Attachment 10)
- UFLPA Entity List Package 23-004 (Attachment 11)
- CBP Note to File addressing applicability review (May 3, 2024) (Attachment 12)
-  (Attachment 13)
- (Attachment 14)
- Murphy, L. (2023). Chinese Transliteration of Uyghur (And Other Ethnic Minority) Names [Unpublished resource guide]. Professor of Human Rights and Contemporary Slavery, Helena Kennedy Centre for International Justice, Sheffield Hallam University. (Attachment 15)
-  (Attachment 16)
- (Attachment 17)

(U//FOUO) Following review and consideration of the information provided in RR23-003, by unanimous vote, FLETF Member Agencies determined that the information provided by Camel Group as part of its removal request did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2(B)(ii) of the UFLPA.

(U//FOUO) Accordingly, on June 28, 2024, FLETF Member Agencies voted unanimously to deny Camel Group's removal request and keep Camel Group on the UFLPA Entity List.

UNCLASSIFIED // FOR OFFICIAL USE ONLY                    **AR000015**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

<span style="color:red">**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**</span>

1. U.S. Department of Homeland Security (Chair) - **No** (REMAIN on UFLPA Entity List)
2. The Office of the United States Trade Representative - **No** (REMAIN on UFLPA Entity List)
3. U.S. Department of Labor - **No** (REMAIN on UFLPA Entity List)
4. U.S. Department of Commerce - **No** (REMAIN on UFLPA Entity List)
5. U.S. Department of the Treasury - **No** (REMAIN on UFLPA Entity List)
6. U.S. Department of State - **No** (REMAIN on UFLPA Entity List)
7. U.S. Department of Justice - **No** (REMAIN on UFLPA Entity List)

The FLETF advised Camel Group in writing of its decision on July 9, 2024 (Attachment 18).

Attachment:
1. (U//FOUO) UFLPA Entity List Package RR23-003 Collated FLETF Votes
2. Camel Group Request for Removal from the UFLPA Entity List - RR23-003 (with attachments)
3. FLETF Questions to Camel Group (December 14, 2023)
4. Camel Group Letter to the FLETF (December 21, 2023)
5. FLETF Response to Camel Group (January 31, 2024)
6. Camel Group Response to FLETF Questions (March 1, 2024)
7. Removal Request Meeting Protocols
8. Camel Group Letter to the FLETF (April 5, 2024)
9. Camel Group Letter to the FLETF (May 16, 2024)
10. FLETF Response to Camel Group (May 24, 2024)
11. UFLPA Entity List Package 23-004
12. CBP Note to File addressing applicability review (May 3, 2024)
13.
14.
15. Murphy, L. (2023). Chinese Transliteration of Uyghur (And Other Ethnic Minority) Names [Unpublished resource guide]. Professor of Human Rights and Contemporary Slavery, Helena Kennedy Centre for International Justice, Sheffield Hallam University.
16.
17.
18. FLETF Letter to Camel (July 9, 2024)

UNCLASSIFIED // FOR OFFICIAL USE ONLY    <span style="color:red">**AR000016**</span>

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☒

_____
Agency Official's Signature

## Robert Silvers
_____
Agency Official's Name

Under Secretary for Strategy, Policy, and Plans
_____
Agency Official's Title

## DHS
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**AR000017**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

BRENNA
DOUGAN

Digitally signed by BRENNA
DOUGAN
Date: 2024.06.28 13:11:39 -04'00'

Agency Official's Signature

# Brenna Dougan

Agency Official's Name

Deputy Assistant U.S. Trade Representative for Labor Affairs

Agency Official's Title

Office of the U.S. Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000018

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

Thea Lee
Digitally signed by Thea Lee
Date: 2024.06.26 17:37:15
-04'00'
_____
Agency Official's Signature

Thea Lee
_____
Agency Official's Name

Deputy Undersecretary
_____
Agency Official's Title

Department of Labor
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000019

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

Jennifer Knight  Digitally signed by Jennifer Knight
Date: 2024.06.26 15:52:07 -04'00'
_____
Agency Official's Signature

_____
Agency Official's Name

_____
Agency Official's Title

_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000020

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

*Scott Rembrandt  06/28/2024*
Agency Official's Signature

## Scott Rembrandt
Agency Official's Name

## Deputy Assistant Secretary
Agency Official's Title

## U.S. Department of the Treasury
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000021

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):    ☐

**No** (REMAIN on UFLPA Entity List):    ☑

*Cynthia Dyer*
Agency Official's Signature

## Cindy Dyer
Agency Official's Name

Ambassador, Office to Monitor and Combat Trafficking in Persons

Agency Official's Title

## Department of State
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000022

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Camel Group Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☑

HARRY HULINGS   Digitally signed by HARRY HULINGS
Date: 2024.06.27 14:49:44 -04'00'
_____
Agency Official's Signature

Jay Hulings on behalf of Hilary Axam, National Human Trafficking Coordinator
_____
Agency Official's Name

## Senior Counsel
_____
Agency Official's Title

## U.S. Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**AR000023**

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000024 - AR000044

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000045 - AR000046

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000047 - AR000050

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000051 - AR000062

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000062 - AR000113

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000114 - AR000117

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000118 - AR000121

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000122 - AR000125

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000126 - AR000137

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000138 - AR000142

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000143 - AR000146

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000147 - AR000150

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000151 - AR000154

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000155 - AR000156

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000157 - AR000160

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR000161 - AR001004

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001005 - AR001006

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001007 - AR001076

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001077 - AR001084

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001085 - AR001090

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001091 - AR001169

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001170 - AR001179

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001180 - AR001188

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001189 - AR001193

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001194 - AR001199

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001200 - AR001209

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001210 - AR001213

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001214 - AR001220

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001221 - AR001227

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001228 - AR001245

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001246 - AR001262

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001263 - AR001279

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001280 - AR001283

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001284 - AR001287



350 S. Main Street, Suite 300
Ann Arbor, MI 48104-2131
Telephone:  734-623-7075
Facsimile:  844-670-6009
http://www.dickinsonwright.com

Mark V. Heusel
MHeusel@dickinsonwright.com
734-623-1908

December 21, 2023

**VIA E-MAIL**

United States Forced Labor Enforcement Task Force
Attn: Robert Silvers, Under Secretary for Strategy, Policy, and Plans
Chair, Forced Labor Enforcement Task Force
Office of the Secretary, Office of Strategy, Policy, and Plans
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0525

> ### Re:   *Camel Group Co. Ltd. Removal Request Petition Reply*

Dear Secretary Silvers and Honorable Members of the Task Force:

I acknowledge receipt of the questions presented by the United States Forced Labor Enforcement Task Force ("Task Force") on December 14, 2023, in response to Camel Group Co. Ltd.'s ("Camel") Removal Request Petition ("Petition"), which was submitted on November 7, 2023.  We appreciate the Task Force's questions with respect to those areas that are directly related to Camel's Petition and which may be relevant to the issue whether sufficient evidence exists to place Camel on the Entity List for ***"working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups <u>out of Xinjiang</u>***." (UFLPA Sec. 2(d)(2)(B)(ii)).   In the twenty-five (25) questions presented by the Task Force, our initial assessment is that 13 of the initial 15 questions are relevant follow-up questions to Camel's Petition and what we believe the scope of inquiry should be (*i.e.,* whether Camel recruited and transferred ethnic minorities <u>out of Xinjiang</u>). The remaining questions, however, appear to be overly broad and even introduce new areas of inquiry that could not have been the basis for adding Camel to the UFLPA Entity List.  For example, questions pertaining to Camel's facilities in Xinjiang, such as how those facilities were constructed and how many security cameras exist on site today seem to have nothing to do with whether the presumed allegations that Camel recruited and transferred ethnic minorities out of Xinjiang six (6) years ago is, in fact, true.

As we continue to evaluate your questions in preparation for a formal response, we would like to take this opportunity to reiterate our previous requests to better understand the reasons that Camel was added to the UFLPA Entity List under UFLPA Sec. 2(d)(2)(B)(ii), the process in which any evidence was considered, and the standard in which that evidence and Camel's Petition will be reviewed.  As you know, Camel has been provided no information as to why the Task Forced

AR001288

United States Forced Labor Enforcement Task Force
December 21, 2023
Page 2

placed Camel on the Entity List (other than identifying the sub-list to which Camel was under), what evidence was considered and what evidence proved decisive. In order for Camel to properly respond to those allegations and be afforded a fair and transparent process, we believe the Task Force should disclose the following information:

## I.    Camel's Administrative Record

We would like to <u>again</u> request the Task Force's Administrative Record regarding Camel that we understand likely exists and includes, *inter alia*, the Task Force's evidence and reasons supporting Camel's inclusion on the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii).

On August 18, 2023, Mr. Zubo Zhang, on behalf of Camel Group and through counsel, submitted FOIA Request No. 2023-HQFO-02158 ("FOIA Request") that included requests to identify and produce, among other documents, Camel's Administrative Record as well as a description of the Task Force's process and procedures.  Per the Freedom of Information Act ("FOIA"), an agency has 20 days (excluding weekends and Federal holidays) from the day it receives a FOIA request to determine if it will comply with the request.  *See* 5 U.S.C. § 552(a)(6)(A).  DHS's statutory deadline to respond was September 18, 2023. Mr. Zhang did not receive a response to the FOIA Request until November 24, 2023, more than one month after the 20-day statutory deadline.  Moreover, in that response, DHS still did not provide a determination in response to the FOIA Request.  Instead, Jimmy Wolfrey, Senior Director, FOIA Operations and Management, Department of Homeland Security, issued a response letter notifying counsel that DHS has invoked a 10-day extension to respond to the request and stated that the appropriate components of DHS have been queried for responsive records.  Assuming the 10-day extension began from the Nov. 24th date that Camel received DHS's letter, DHS's extended deadline to respond to Camel's FOIA Request was December 8, 2023.  Unfortunately, despite its own extension, DHS did not respond by that date and has still failed to comply with its obligations under FOIA.  On December 20, 2023, the DHS Privacy Office informed counsel that the FOIA Request is currently with DHS Office of Strategy, Policy, and Plans, and estimated an additional 3-4 months until Mr. Zhang can expect a determination.  As you are undoubtedly aware, this lack of responsiveness is in violation of law, and Camel reserves all rights in law and equity to pursue DHS for its non-compliance with FOIA. Notwithstanding DHS's failure to adhere to the statutory deadlines and Mr. Zhang's rights to bring an action based on this failure, we would prefer DHS simply abide by its statutory obligations and produce the records that are readily at its disposal.

In addition to Mr. Zhang's FOIA request, on August 30, 2023, counsel sent the Task Force another letter requesting Camel's Administrative Record, citing legal precedent in <u>Xiaomi Corp., et. al. v. U.S. Dept. of Defense, et. al.</u>, Case No. 1:21-cv-00280 (D.D.C.) and <u>Luokang Tech. Corp., et. al., v. U.S. Department of Defense, et. al.</u>, Case No. 1:21-cv-00583 (D.D.C.).  On September 7, 2023, the Task Force sent us an email confirming receipt of our August 30th letter and encouraging Camel to submit a removal petition, but did not provide a formal response to the August 30th letter itself.  Camel proceeded to submit its Petition on November 7, 2023.  To date, the Task Force has

D I C K I N S O N   W R I G H T   P L L C

failed to provide Camel with its Administrative Record or indeed any formal response to the requests contained in our August 30th Letter.

Despite Camel making the above described multiple requests for the Administrative Record, the basis for Camel's addition to the UFLPA Entity List, and a more definitive understanding of the review process, the Task Force has still yet to provide any meaningful response.  Even more troubling, the Task Force has provided at least one other entity on the UFLPA Entity List with their Administrative Record while at the same time failing to provide Camel with the same.   In Ninestar Corp., et. al. v. U.S. Dep't of Homeland Security, et. al., Case No. 1:23-cv-00182 (C.I.T.), on October 3, 2023, the Task Force (through counsel) voluntarily and publicly produced a redacted version of Ninestar's Administrative Record, while also filing a confidential version with the court.  See Ninestar Corp., et. al., ECF Nos. 24-1 and 25-1.  Not only does this show disparate treatment by the Task Force of different entities seeking removal, but also sets a dangerous precedent that the only way for an entity to obtain its Administrative Record is through litigation rather than through the administrative process.  See  Invenergy Renewables LLC v. United States, 476 F. Supp. 3d 1323, 1347 (C.I.T. 2020) ("Requiring that the parties litigate a final agency decision in order to gain knowledge of and access to the agency's rationale wastes judicial resources and delays corrective agency action that would otherwise be addressed by the agency in the first instance.").

Thus, we once again request this Task Force to provide Camel with its Administrative Record and reasons supporting its inclusion on the UFLPA Entity List.  Upon receiving the Administrative Record, we will consider the questions as appropriate; however, we do not intend to engage in a process that lacks basic due process and transparency.  At the very least, that would require the Task Force to provide the Administrative Record to inform Camel of the charges and evidence that supported the decision to add Camel to the UFLPA Entity List.  This is especially so since the Task Force's questions to Camel do not appear to reveal any other information relevant as to why Camel was added to the UFLPA Entity List in the first place.  Without knowing the Task Force's charges, evidence, process and procedures, any entity, let alone Camel, will have a difficult time meaningfully engaging in this process without suffering a violation of fairness.

## II.      Dr. Laura Murphy's Role with the Task Force

On or around November 10, 2023, Dr. Laura Murphy was appointed as "Policy Advisor" to the Under Secretary for Strategy, Policy, and Plans, Office of the Secretary, Office of Strategy, Policy, and Plans, Department of Homeland Security and Chair of the Task Force.  Dr. Murphy is best known as the Director of the Sheffield Hallam University Helena Kennedy Centre for International Justice and the author of the reports that appear to form the basis of Camel's addition to the UFLPA Entity List.   Moreover, Dr. Murphy, in her written testimony to the U.S. Congressional-Executive Commission on China on April 18, 2023 stated: "*Congress should make clear to FLETF that it must presume that all state-sponsored labor transfers in the Uyghur Region constitute forced labor and thus add any company engaged in those coerced transfers of laborers onto the lists*."   While we do not question Dr. Murphy's expertise on forced labor issues in

AR001290

D I C K I N S O N   W R I G H T   P L L C

United States Forced Labor Enforcement Task Force
December 21, 2023
Page 4

Xinjiang, we do believe her past work and recent statements are a cause for concern given her new "Policy Advisor" role with DHS.  Therefore, we request the Task Force provide an explanation of Dr. Murphy's role as a "Policy Advisor," and particularly her involvement on any decision making regarding Camel.

### III.    UFLPA Entity List Additions and Removals Standard of Proof

Lastly, as we move forward in this removal process, to better ensure a fair and equitable process for Camel, we wish to confirm with you the standard of proof with which the Task Force and Camel will be held to.  Noticeably, the UFLPA enumerates a clear standard of proof, "*clear and convincing evidence*," with respect to obtaining release of UFLPA-based detentions from CBP.  *See* UFLPA Sec. 3(b)(2).  However, with respect to decisions on additions and removals to the UFLPA Entity List, the UFLPA is conspicuously silent on the standard of proof.  It is our understanding, per the common law, that absent specific statutory enumeration of a standard of proof, the default standard to which the administrative entity and process will be held will be a "preponderance of evidence" standard.  *See* Trinka v. McDonough, No. CV 21-2904 (RC), 2023 WL 6160053, at *13-15 (D.D.C. Sept. 21, 2023); *see also* Rodriguez v. Dep't of Veterans Affairs, 8 F.4th 1290, 1301 (Fed Cir. 2021); *accord* Hassoun v. Searls, 968 F.3d 190, 202 (2d Cir. 2020) ("The 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings." (quoting Sea Island Broad. Corp. of S.C. v. FCC, 627 F.2d 240, 243 (D.C. Cir. 1980)); Jones ex rel. Jones v. Chater, 101 F.3d 509, 512 (7th Cir. 1996); Bender v. Clark, 744 F.2d 1424, 1429 (10th Cir. 1984).

Please confirm that the standard of proof applied to UFLPA Entity List addition and removal proceedings is a "preponderance of evidence," or whether the Task Force intends to implement a different standard of proof for these administrative proceedings.  As we stated above, while we have been and will continue to be sincere and transparent in our engagement with the Task Force, Camel is unable to do so unless it is afforded basic due process and transparency regarding the standards to which itself and the Task Force will be held.

Thank you for your time and attention to Camel's Removal Request Petition and our requests, comments, and concerns expressed in this letter.  We look forward to your timely response.

Sincerely,

Mark V. Heusel

**AR001291**

| From: | FLETF UFLPA Entity List |
|---|---|
| To: | Mark V. Heusel; Jacob L. Clark |
| Cc: | Hezi Wang; FLETF UFLPA Entity List |
| Subject: | RE: Camel Group Co. Ltd. - UFLPA Entity List Removal Request Petition (5/5) |
| Date: | Wednesday, January 31, 2024 9:43:51 AM |

Good morning,

Thank you for your letter in response to the FLETF's questions regarding Camel Group Co. Ltd.'s (Camel Group's) request for removal from the UFLPA Entity List. The FLETF welcomes Camel Group's responses to the questions it chooses to answer. The FLETF will consider any and all information Camel Group provides to assess Camel Group's UFLPA Entity List removal request. Consistent with the parameters set forth in the Federal Register Notice, upon completing review of Camel Group's responses to the FLETF's questions, the FLETF will work with Camel Group to set up a virtual meeting.

Regarding your question on Laura Murphy's position with the U.S. Department of Homeland Security (DHS), she is serving as Policy Advisor for the DHS Office of Strategy, Policy, and Plans.

With respect to your FOIA request, we recommend that you continue to engage directly with the DHS Privacy Office on this matter.

We look forward to receiving your response to the FLETF's questions.

Thank you,

FLETF.UFLPA.ENTITYLIST@hq.dhs.gov
Trade Policy, Trade and Economic Security
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

---

**From:** Mark V. Heusel <MHeusel@dickinson-wright.com>
**Sent:** Thursday, December 21, 2023 4:58 PM
**To:** FLETF UFLPA Entity List <FLETF.UFLPA.EntityList@hq.dhs.gov>; Jacob L. Clark <JLClark@dickinson-wright.com>
**Cc:** Hezi Wang <HWang@dickinson-wright.com>
**Subject:** Camel Group Co. Ltd. - UFLPA Entity List Removal Request Petition (5/5)

Good afternoon, attached is a letter addressed to the Task Force.

Thank you.

**Mark V. Heusel** Practice Group Chair - Intl & Regional Practices

**AR001292**

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001293 - AR001308

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001309 - AR001313

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001314 - AR001317

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001318 - AR001321

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001322 - AR001324

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001325 - AR001327

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001328 - AR001610

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001611 - AR001613

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001614 - AR001617

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001618 - AR001631

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001632 - AR001636

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001637

UNCLASSIFIED

**Meeting on Camel Group Co. Ltd. Request to be Removed from the Uyghur Forced Labor Prevention Act Entity List**

**Protocols**

Camel Group Co. Ltd. (Camel) submitted a request for removal from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List, consistent with the procedures identified in the Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List (87 Fed. Reg. 47777).[1]  The Forced Labor Enforcement Task Force (FLETF) has agreed to accept Camel's meeting request prior to voting on the removal request.

**Meeting Protocols:**

1.  Camel (or its designated representative) will send a list of individuals to be invited to the meeting to FLETF.UFLPA.EntityList@hq.dhs.gov by close of business on Tuesday, March 26, 2024.  This list should include participant names, titles, and emails.

2.  The meeting will be held virtually on MS Teams.

3.  DHS will send a meeting invitation to all participants.  Participants should not forward the meeting invitation but can request that DHS add or remove participants from the calendar invitation as necessary.

4.  The meeting will be conducted in English.

5.  FLETF participation will include FLETF member agency representatives as well as subject matter experts, as appropriate.

6.  Camel will continue to coordinate with DHS, on behalf of the FLETF, for matters related to the removal request.

7.  The meeting will be structured as a listening session to allow Camel to present or highlight information that it would like the FLETF to consider.

8.  There will be no audio or visual recordings of the meeting.  No press engagement is permitted or invited into the meeting.

9.  Camel will provide the FLETF a written record of any new information presented at the meeting by close of business on Monday, April 15, 2024 (Camel can request an extension if necessary, however an extension may delay the FLETF review process).  Camel will identify information it believes should be treated as business confidential information.

10. Any follow up questions from the FLETF and answers from Camel will be provided in writing.

---

[1] Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List, 87 Fed. Reg. 47777 (August 4, 2022).

UNCLASSIFIED

<span style="color:red">**AR001638**</span>



350 S. MAIN STREET, SUITE 300
ANN ARBOR, MI 48104-2131
TELEPHONE: 734-623-7075
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MARK V. HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

April 5, 2024

**VIA EMAIL**

United States Forced Labor Enforcement Task Force ("FLETF" or "Task Force")
Attn: Robert Silvers, Under Secretary for Strategy, Policy, and Plans
Chair, Forced Labor Enforcement Task Force
Office of the Secretary, Office of Strategy, Policy, and Plans
Department of Homeland Security
FLETF.UFLPA.EntityList@hq.dhs.gov

> ***Re:   Camel Group Co. Ltd. – FLETF April 2, 2024 Removal Petition Request Meeting Follow Up***

Dear Secretary Silvers and Honorable Members of the Task Force:

Thank you to the FLETF, Dr. Tasha Hippolyte and all the attendees on behalf of the FLETF for your time and attention during the April 2nd meeting to discuss Camel's November 7th Removal Request Petition ("Petition"), Camel's March 1st Responses to the FLETF Questions on Camel's Petition ("Responses"), and the UFLPA Entity List removal process. We are grateful to have had the opportunity to meet with the FLETF and discuss these important topics.

As we mentioned during the meeting, absent further questions from FLETF and/or Camel being provided its administrative record underlying the allegations, Camel is only able to address those concerns it identified on its own in the public record and as described in its Petition. Camel's Petition and Responses to the FLETF's questions fully address those allegations and FLETF has presented no evidence contradicting Camel's evidence as of the date of this letter. Additionally, we understand that FLETF does not have any further questions for Camel regarding its Petition or Responses, and that the record regarding Camel's Petition is now closed. Furthermore, Camel indicated that it had no further documents or materials to provide the FLETF other than what has already been submitted. As such, Camel does not have anything further it intends to add or submit to the FLETF on or before the April 15, 2024 deadline set by the FLETF in its Protocols for the Meeting between Camel and the FLETF ("Protocols"), No. 9. Therefore, the FLETF does not need to wait until after that April 15th deadline to begin considering or taking action on Camel's removal from the UFLPA Entity List. In fact, as we understand from our meeting, FLETF's formal consideration of Camel's Petition will be the next administrative step in this process.

During the meeting, we noticed additional participants from the FLETF that we did not see included on the FLETF attendee list circulated by the FLETF on March 28, 2024. We request that the FLETF please provide Camel a supplemental list that includes the list of participants from the FLETF in attendance at the April 2nd meeting.

**AR001639**

United States Forced Labor Enforcement Task Force
April 5, 2024
Page 2

Furthermore, per the Protocols, No. 9, Camel requests that its Petition and Exhibits as well as its Responses to the FLETF Questions and Attachments be treated as "Business Confidential," as they contain sensitive employee information and Camel supplier and customer information that Camel considers "Confidential."

Lastly, we were encouraged by Dr. Hippolyte when she stated that the FLETF's decision with respect to Camel's Petition seeking removal from the UFLPA Entity List was a "priority" for the Task Force. While Dr. Hippolyte did not provide a specific timeframe, we understand this to mean that the FLETF will act quickly on Camel's removal request. If, however, the FLETF does not anticipate bringing Camel's request for removal to a vote within 30 days, then Camel reiterates its previous requests for additional information regarding the removal process and the administrative record. This information will allow Camel to evaluate its next steps in this process should a decision not be forthcoming.

Thank you again for your time to meet with us and we look forward to receiving the FLETF's decision soon.

Sincerely,

Mark V. Heusel

**AR001640**



DICKINSON WRIGHT PLLC

350 S. MAIN STREET, SUITE 300
ANN ARBOR, MI 48104-2131
TELEPHONE: 734-623-7075
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MARK V. HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

May 16, 2024

**VIA EMAIL**

United States Forced Labor Enforcement Task Force
Attn: Robert Silvers, Under Secretary for Strategy, Policy, and Plans
Chair, Forced Labor Enforcement Task Force
Office of the Secretary, Office of Strategy, Policy, and Plans
Department of Homeland Security
FLETF.UFLPA.EntityList@hq.dhs.gov

> **Re:    *Concerns Regarding Camel Group Co. Ltd.'s UFLPA Entity List Removal Request Petition Process***

Dear Secretary Silvers and Honorable Members of the Task Force:

It has come to our attention that in a recently released unpublished Federal Register (2024-10544), dated today (May 16, 2024) and that is set to be published tomorrow (May 17, 2024), the Task Force has taken several actions including adding 26 additional entities to the UFLPA Entity List. Most notable is that "Camel Group Co. Ltd." still appears on the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii), *leaving Camel Group unclear if the Task Force has taken action on its Removal Request Petition.*

The Task Force's actions today and throughout this process have been very concerning. On August 2, 2023, Camel Group was added to the UFLPA Entity List pursuant to UFLPA Sec. 2(d)(2)(B)(ii). On August 3, 2023, *the next day*, Camel Group, through counsel, contacted the Task Force regarding the listing. Camel Group made multiple requests for its Administrative Record including i) on August 18, 2023, Camel Group submitted a FOIA request to the DHS Privacy Office for the Administrative Record, and ii) on August 30, 2023, Camel Group, through counsel, sent a formal letter to the Task Force directly requesting the Administrative Record. Counsel for Camel Group continued to make requests for Camel's Administrative Record, but to no avail. Despite not receiving any response to our repeated request, Camel Group pressed ahead and submitted its formal Petition for removal on November 7, 2023, which also included a formal meeting request pursuant to the Federal Register.

On December 14, 2023, the Task Force provided Camel Group with questions regarding Camel's Petition. Before providing its answers, Camel Group made another formal written request to the Task Force for its Administrative Record in a letter on December 21, 2023. The Task Force provided a written response on January 31, 2024, but did not address Camel Group's request for its Administrative Record. On March 1, 2024, Camel Group provided its responses to the Task Force's questions, including providing hundreds of pages of new materials. In its responses, Camel again requested its Administrative Record and a formal meeting request pursuant to the Federal Register. On March 15, 2023, the Task Force agreed to Camel's meeting request, and set it for April 2, 2024.

**AR001641**

United States Forced Labor Enforcement Task Force
May 16, 2024
Page 2

On April 2, 2024, Camel Group and the Task Force held a meeting structured as a "listening session" to discuss Camel Group's Petition. At no point during that meeting did the Task Force inform Camel Group of the reasons for inclusion on the UFLPA Entity List. The Task Force did not address why it had not provided Camel Group with its Administrative Record or ignored its multiple requests for the same. The Task Force did not ask any questions to Camel about its Petition or supporting evidence during that meeting. The Task Force did not allow any video or audio recordings of the meeting, and stated that it would not provide a transcript of the meeting. The Task Force did state, however, that it "understood" our concerns and that it did not require any additional information from Camel. The Task Force further stated that Camel's Petition was a "priority," and a decision would be forthcoming. In addition, the Task Force invited Camel to make any additional submissions in support of its Petition. On April 5, 2024, Camel Group, through counsel, sent a letter to the Task Force indicating it had nothing further to add and effectively closed the record. In that letter, we asked the Task Force to act quickly and inform us if the Task Force anticipated not holding a vote on Camel's Petition within 30 days and requested a full list of attendees. Both requests went ignored by the Task Force.

It was our understanding that the Task Force would act on Camel Group's Petition shortly after the meeting. The Task Force has not provided any indication of whether it has in fact acted on Camel Group's Petition and has provided no indication that it has further questions or requires further information regarding Camel Group's Petition. Unfortunately, this lack of transparency continues to call into question the fairness of this process. In fact, as of the date of this letter, the Task Force has still not responded to Camel Group's *multiple requests* for its Administrative Record, Camel Group's FOIA request remains pending with the exact DHS office that chairs the Task Force (DHS PLCY), and Camel Group is still completely in the dark about why it was placed on the UFLPA Entity List, the rules regarding the removal process itself (including the standards of proof to which the Task Force would be held), and the status of Camel Group's Petition.

Today's actions combined with the Task Force's lack of transparency and communication throughout this process has caused Camel Group significant concern regarding what evidence the Task Force is relying on, particularly when the only evidence we are aware of indisputably demonstrates Camel Group "no longer meets or does not meet the criteria described" in UFLPA Sec. 2(d)(B)(ii) and should not be named on the UFLPA Entity List. Therefore, we request that you provide us with an update on the status of Camel Group's Petition immediately but no later than Friday, May 17 at 5:00pm EST.

Thank you and we look forward to receiving the Task Force's decision soon.

Sincerely,

Mark V. Heusel

AR001642

UNCLASSIFIED

This message is in response to your letter submitted to the FLETF on May 16, 2024, regarding Camel Group Co. Ltd.'s (Camel Group's) request for removal from the UFLPA Entity List and requesting additional information on the reasons for Camel Group's listing on the UFLPA Entity List.  Provided below is a summary of the information the FLETF relied upon when considering whether to add Camel Group to the UFLPA Entity List.

The FLETF intends to issue a decision on your removal request within 30 business days.  The FLETF Chair will advise you in writing of the FLETF's decision.

You also asked about the status of your FOIA request, and we recommend that you continue to engage directly with the DHS Privacy Office on this matter.

### Update on Removal Request: Camel Group

Effective August 2, 2023, goods produced in whole or in part by Camel Group Co., Ltd. ("Camel Group") are presumed prohibited from importation into the United States, subject to the rebuttable presumption identified in Section 3 of the UFLPA, following the FLETF's determination that Camel Group's actions satisfy the criteria for addition to the UFLPA Entity List under Section 2(d)(2)(B)(ii) of the UFLPA.  Camel Group, headquartered in Xiangyang City, Hubei Province, is a company that specializes in battery recycling and the manufacture and sale of lead-acid batteries, lithium-ion batteries, and energy storage systems for automobiles.

The FLETF determined that there was reasonable cause to believe, based on specific and articulable information, that Camel Group is working with the government of the Xinjiang Uyghur Autonomous Region (XUAR) to receive Uyghurs and/or members of other persecuted groups from the XUAR.

The FLETF determined, based on publicly available information, that there was reasonable cause to believe Camel Group participated in Toksun County's government labor transfer program and that Camel Group received workers from Uyghur-majority areas in southern Xinjiang through a handover ceremony coordinated by the Toksun County government in Turpan Prefecture in Xinjiang.  Given the information indicating Camel Group's work with the Xinjiang government to receive Uyghurs and/or members of other persecuted groups from the XUAR, the FLETF determined that Camel Group satisfied the criteria for addition to the Section 2(d)(2)(B)(ii) list of the UFLPA, specifically that Camel Group is working with the government of the XUAR to receive Uyghurs and/or members of other persecuted groups from the XUAR.

The FLETF intends to issue a decision on your removal request within 30 business days, unless Camel Group informs the FLETF within 5 business days that it would like to submit additional information in response to the factual summary provided above.

AR001643

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

## UYGHUR FORCED LABOR PREVENTION ACT (UFLPA) ENTITY LIST ACTION

1.  **Name of Submitting Agency**:

    Bureau of International Labor Affairs, U.S. Department of Labor

2.  **FLETF Agency Point of Contact**:

    Thea Lee
    Deputy Undersecretary for International Affairs
    International Labor Affairs Bureau
    U.S. Department of Labor

3.  **Action (select one)**:

    ☒ *Addition to List*        ☐ *Removal from List*        ☐ *Correction*

4.  **Entity Identifying Information**:

    Camel Group Co., Ltd. (骆驼集团股份有限公司) [1]
    No. 125, Keji 2nd Rd.
    East Lake High-Tech Development Zone
    Wuhan, Hubei 430040, China

---

[1] Camel Group, Ltd. is engaged in the production, distribution, sales, and recycling of lead-acid storage batteries, pure lead thin plate batteries, and power lithium-ion batteries. Website, https://www.camelbatt.com/; https://www.chinacamel.com/. (Attachment A)

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001644

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

5.  **UFLPA Entity List for Addition or Removal (select one or more applicable list):**

☐ *Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.*

☒ *Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.*

☐ *Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.*

☐ *Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the poverty alleviation program or the pairing-assistance program or any other government labor scheme that uses forced labor.*

6.  **Scope:**

Camel Group Co., Ltd. ("Camel Group"), headquartered in Xiangyang City, Hubei Province, is a battery recycling and manufacturing company and is among China's largest battery manufacturers. Camel Group is reported to have worked with the Toksun County government (within Turpan Prefecture in Xinjiang) to recruit, transport, transfer, harbor, or receive Uyghurs and/or members of other persecuted groups from Hotan and Kashgar in southern Xinjiang for its recently built manufacturing facility located in Turpan. The Toksun County government-sponsored labor transfer program transported 165 Uyghurs and/or members of other persecuted groups from southern Xinjiang to Turpan, for a ten-day state-run "closed pre-job training." After completion of the "training," there was a "handover ceremony" where government officials dispatched workers to several companies, including Camel Group. Furthermore, the workers Camel Group received through the XUAR government-sponsored labor transfer programs are considered to be in forced labor.

Based on the above, there is reasonable cause to believe that Camel Group should be added to the UFLPA Entity List under section 2(d)(2)(B)(ii).

AR001645

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

7.  **Basis**:

The Bureau of International Labor Affairs, on behalf of the Department of Labor (DOL) submits Camel Group Co., Ltd. ("Camel Group") for consideration to be added to the UFLPA Entity List under section 2(d)(2)(B)(ii) [2] based on reasonable cause to believe that this entity works with the government of the Xinjiang Uyghur Autonomous Region to recruit, harbor, or receive Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups from the Xinjiang Uyghur Autonomous Region or works with the government of the Xinjiang Uyghur Autonomous Region to recruit, harbor, or receive persons from the Xinjiang Uyghur Autonomous Region for the purposes of forced labor. [3]

The evidence provided, based on the reporting included in *Financing & Genocide: Development Finance and the Crisis in the Uyghur Region,*[4] establishes a reasonable cause to believe that the nominated entity satisfies the criteria outlined in section 2(d)(2)(B)(ii) of the UFLPA Entity List.

The *Financing & Genocide* report was the result of a joint investigation by the Helena Kennedy Centre for International Justice at Sheffield Hallam University and NomoGaia. DOL has verified the sources cited in this report against criteria DOL uses in developing and maintaining its Congressionally mandated reports, and has determined the credibility, level of expertise, and reputation of Dr. Murphy, Sheffield Hallam University's Helena Kennedy Centre for International Justice and NomoGaia are reliable and credible.

**Camel Group Co., Ltd. (骆驼集团股份有限公司)**

There is reasonable cause to believe that Camel Group Co., Ltd. ("Camel Group") should be a listed entity under Section 2(d)(2)(B)(ii). Camel Group's Xinjiang recycling and manufacturing facility worked with Xinjiang government to recruit, transport, transfer, harbor, or receive Uyghurs and other ethnic groups from Xinjiang which also constitutes working with the Xinjiang government to recruit, transport, transfer, harbor, or receive forced labor from XUAR.

---

[2] Department of Labor's view is that Camel Group could also be added to the UFLPA Entity List under section 2(d)(2)(B)(i), as its use of workers from persecuted groups involuntarily transferred to it under threat or menace of penalty constitutes direct use of forced labor.

[3] The language of the Section 2(d)(2)(B)(ii) provides "a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region." The FLETF interprets this provision as applying to recruitment, transport, transfer, harboring, or receipt of members of persecuted groups from the XUAR within the XUAR.

[4] Laura T. Murphy et. al., F*inancing & Genocide, Development Finance and the Crisis in the Uyghur Region*, The Atlantic Council (February 2022), https://www.atlanticcouncil.org/wp-content/uploads/2022/02/Financing__Genocide.pdf. (Attachment B)

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001646

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

### *Camel Group worked with the Government of XUAR and Toksun County to Receive Uyghurs and Members of Persecuted Groups from Xinjiang*

- In 2019, Camel Group received an International Finance Corporation ("IFC") loan to expand its recycling operations into Toksun County, Xinjiang, on the property of its recently built manufacturing facility.[5]

  - Enterprises in Toksun County were subject to the "Three-Year Plan for Promoting the Organized Transfer of Urban and Rural Surplus Labor Forces in Kashgar and Hotan Region to Employment in the Autonomous Prefecture (2017-2019)."[6]

- Camel Group received workers from Kashgar and Hotan, in southern Xinjiang, through the Toksun County, Xinjiang sponsored labor transfer program.

  - In 2017, the Toksun County government-sponsored labor transfer program transported 165 Uyghurs and/or members of other persecuted groups from Kashgar and Hotan, in southern Xinjiang, to Turpan (more than 1,300 km away) for a ten-day state-run "closed pre-job training" (封闭式岗前培训工作), where they were not allowed to leave freely.[7]

  - Those who were required to attend the "pre-job training" received military and ideological teaching and were required to sing patriotic songs and learn the Chinese language.[8]

  - At the completion of the training, the participants were required to take an oath celebrating how the labor program would promote "national unity and unity of the motherland," perform a flag-raising ceremony, and declare their commitment to fight the three evils of terrorism, extremism, and separatism and "profoundly expose and criticize the crimes of violent and terrorist activities and resolutely fight against nationalist separatists."[9]

  - These components of training indicate that the participants were members of persecuted ethnic groups because they were from southern Xinjiang, a majority

---

[5] Murphy et al., at 28. (*citing* International Finance Corporation (IFC). "Camel Group" (Sponsor/Cost/Location tab), IFC Project Information    Data Portal, Online; and "Camel Group" (IFC-41128)," https://disclosures.ifc.org/project-detail/SII/41128/camel-group.) (Attachment C)

[7] Murphy et al. at 30.  (Attachment B)

[8] *Id.* (Attachment B)

[9] *Id.* (Attachment B)

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001647

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

Uyghur population,[10] and were forced to endure treatment encountered by Uyghurs or other persecuted groups in XUAR.[11]

- o After completion of the "training," there was a "handover ceremony" where government officials had the workers dispatched to companies, including Camel Group.[12]
- o "Camel Group maintains that [it is] engaging in poverty-alleviation programs that benefit indigenous people of the region."[13] The term "indigenous people" is used in the IFC's Environmental and Social Performance Standards.[14] In this context, indigenous people should be understood to include Uyghurs, Kazakhs, Kyrgyz, and members of other persecuted groups.

The information above constitutes reasonable cause to believe that Camel Group worked with the government to receive persecuted ethnic workers (including Uyghurs and/or members of other persecuted groups) from Xinjiang.

### Camel Group Worked with the Government of XUAR and Toksun County to Receive Forced Labor from Xinjiang

Forced labor is "all work     extracted from any person under the menace of any penalty and for which the said person has not offered     [them]self voluntarily." As described in the FLETF UFLPA Strategy,[15] ethnic residents of Xinjiang are subject to the threat of detention. That the government moved people long distances to place them in "training" and could not leave freely indicates the workers were in the training and subsequent job placements involuntarily. Thus, the workers Camel Group received through this labor transfer were engaged in forced labor.

While the specific evidence relates to a 2017 transfer of workers to Camel Group under the 2017-2019 government labor transfer program, in February 2022 the Financing     Genocide

---

[10] Stanley Toops, *Spatial Results of the 2010 Census in Xinjiang*, Asia Dialogue, University of Nottingham's Asia Research Institute (March 7, 2016), https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang/ (stating "[t]he Uyghur[s] are located in the south (which is the poorest area) Kashgar, Hotan, Kizilsu, Aksu, Turpan, and north, Ili."). (Attachment E)

[11] ███████████████████████████████████████████████████████████████████████████████ ███████ (Attachment F)

[12] Li Neng, "托克逊县举行喀什、和田地区城乡富余劳动力企业上岗交接仪式" *Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan*,"), Weixin, July 10, 2017, https://archive.ph/nC4Xt. (Attachment G) (noting that on the morning of July 10th a handover ceremony was held at the county technical school for surplus labor enterprises in Kashgar and Hotan areas. The deputy magistrate of Toksun County Government, Shalapati Tursun, the County Human Resources and Social Security Bureau, the Development and Reform Commission, the Business and Economics Commission, and the main leaders of the Forestry Bureau of the Housing and Urban - 300 people attended the handover ceremony     [including] representatives of 11 receiving companies, including Huatian Porcelain Industry, Camel Group, Lvxiang Pipe Industry, Vatti Garment, Zhenkun Logistics, Yinehengda, Xinchuangyuan, and Shengtai Textile. ). *See also* ██████████████████████████████████████████████████████████ (Attachment H)

[13] Murphy et al. at 30. (Attachment B)

[14] https://www.ifc.org/wps/wcm/connect/topics_ext_content/ifc_external_corporate_site/sustainability-at-ifc/policies-standards/performance-standards/ps7 (Attachment I)

[15] Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China, June 17, 2022, https://www.dhs.gov/uflpa-strategy. (Attachment J)

5
FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001648

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

report indicated that that " initiative    is highly incentivized by the Turpan government and prominent enterprises, such as Camel Group, are expected to engage."[16]  For the aforementioned reasons, there is reasonable cause to believe Camel Group worked with the XUAR government to receive Uyghurs and members of other ethnic groups from Xinjiang, which also constitutes working with the Xinjiang government to receive forced labor from XUAR.

---

[16] Murphy et al. at 31. (Attachment B)

6

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001649

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

**ADDITIONAL INFORMATION**

*Hazardous Working Conditions*

- There is also evidence that these labor transfers were highly hazardous to the workers.[17]

- "Large scale lead-acid battery recycling plants include processes of waste acid neutralization/recycling and lead smelting /molding . . . [these] can generate significant lead fumes and dusts    and without proper controls, these processes may cause potentially significant adverse environmental or social risks and/or impacts that are diverse, or irreversible."[18]

- Workers in lead smelting and battery recycling plants often experience high and prolonged exposures to lead,[19] and the air, water, soil, and vegetation in the vicinity of lead smelters are often contaminated with the heavy metal, threatening the health of anyone who lives and works nearby.

- Even with this known hazard, Camel has worker dormitories directly on the property, which is described in Camel Group's manufacturing facility Environmental Impact Report (EIR) sections 3.1.5 and 13.3.3. Consequently, these workers are exposed to hazardous contaminants during their eight-hour shifts and their sixteen-hour rest periods, as well as on their weekly day off (assuming working hours described in the EIR are adhered to in practice).[20]

---

[17] *Id*. (Attachment B)
[18] IFC Camel Group Project Information    Data Portal, https://disclosures.ifc.org/project-detail/ESRS/41128/camel-group. (Attachment C)
[19] Murphy et al. at 31. (Attachment B)
[20] *Id*. at 32 (citing Camel Group's EIR 3.1.7). (Attachment B)

FOR OFFICIAL USE ONLY // PRE-DECISIONAL

AR001650

UNCLASSIFIED // FOR OFFICIAL USE ONLY



U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

July 26, 2023

## DECISION

MEMORANDUM FOR THE FORCED LABOR ENFORCEMENT TASK FORCE
MEMBER AGENCIES

FROM:        Robert Silvers
             Under Secretary for Strategy, Policy, and Plans
             Forced Labor Enforcement Task Force Chair

SUBJECT:     **Forced Labor Enforcement Task Force Addition of Camel Group
             Co., Ltd. to the Uyghur Forced Labor Prevention Act Entity List**

---

(U//FOUO) On May 22, 2023, the U.S. Department of Homeland Security (DHS) submitted Uyghur Forced Labor Prevention Act (UFLPA) Entity List Package 23-004 (Package 23-004) to the Forced Labor Enforcement Task Force (FLETF). Package 23-004, prepared by the U.S. Department of Labor (DOL), proposed adding Camel Group Co., Ltd. (Camel Group), to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA; i.e., "a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

(U//FOUO) Package 23-004 explains that Camel Group, headquartered in Xiangyang City, Hubei Province, is a battery recycling and manufacturing company and is among China's largest battery manufacturers.

(U//FOUO) The information in Package 23-004 demonstrates that Camel Group worked with the government of the XUAR to recruit, transport, transfer, harbor, or receive Uyghurs and other persecuted groups at one of its recycling and manufacturing facilities. Package 23-004 further demonstrates that Camel Group assimilated workers into its facility following state-run training associated with a Xinjiang-government sponsored labor transfer of Uyghurs and other members of persecuted groups from southern Xinjiang. Package 23-004 references reporting from civil society, news reporting, and corporate filings which corroborate that Camel Group has been involved in a Xinjiang government-sponsored labor transfer program.

(U//FOUO) After DHS submitted Package 23-004 to the FLETF on May 22, 2023, FLETF Member Agencies had the opportunity to review the information, submit questions to DOL, provide any relevant information regarding Package 23-004, and prepare to vote on the disposition of Package 23-004. Following review and consideration of the information provided by DOL in Package 23-004, a majority of FLETF Member Agencies found that there was reasonable cause to believe, based on specific and articulable information, that Camel Group works with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor, or

UNCLASSIFIED // FOR OFFICIAL USE ONLY            **AR001651**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

receive Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.

(U//FOUO) Accordingly, on July 14, 2023, a majority of FLETF Member Agencies voted to add Camel Group to the UFLPA Entity List, consistent with FLETF standard operating procedures.

1. U.S. Department of Homeland Security (Chair) - **Yes**
2. The Office of the United States Trade Representative - **Yes**
3. U.S. Department of Labor - **Yes**
4. U.S. Department of Commerce - **Yes**
5. U.S. Department of the Treasury - **No**
6. U.S. Department of State - **Yes**
7. U.S. Department of Justice - **No**

Attachment:
1. (U//FOUO) UFLPA Entity List Package 23-004 Collated FLETF Votes
2. (U//FOUO) UFLPA Entity List Package 23-004 (Camel Group Co., Ltd.)

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes:  ☒

No:  ☐

_____  7/14/23

Agency Official's Signature

**Robert Silvers**

Agency Official's Name

Under Secretary for Strategy, Policy, and Plans, DHS

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001653

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes:  ☑

No:  ☐

Joshua Kagan  Digitally signed by Joshua Kagan
Date: 2023.06.29 13:25:55 -04'00'
_____
Agency Official's Signature

## Joshua Kagan
_____
Agency Official's Name

Assistant U.S. Trade Representative for Labor Affairs, USTR
_____
Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

<span style="color:red">**AR001654**</span>

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes: ☑

No: ☐

Thea Mei Lee
Digitally signed by Thea Mei Lee
Date: 2023.06.23 16:32:44 -04'00'

Agency Official's Signature

## Thea Mei Lee

Agency Official's Name

## Deputy Undersecretary, Department of Labor

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001655

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes: ✓

No: ☐

Jennifer Knight
Digitally signed by Jennifer Knight
Date: 2023.07.12 14:47:49 -04'00'

Agency Official's Signature

# Jennifer Knight

Agency Official's Name

DAS for Textiles, Consumer Goods, Materials, Critical Minerals & Metals at Department of Commerce

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**AR001656**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes:     ☐

No:      ☑

Scott Rembrandt

Digitally signed by Scott
Rembrandt
Date: 2023.07.14 06:18:03
-04'00'

Agency Official's Signature

## Scott Rembrandt

Agency Official's Name

Deputy Assistant Secretary, Department of the Treasury

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**AR001657**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes: ✓

No: ☐

*Cynthia Dyer*
Agency Official's Signature

## Cynthia Dyer
Agency Official's Name

Ambassador-at-Large, Office to Monitor & Combat Trafficking in Persons, U.S. Department of State

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001658

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the addition of Camel Group Co., Ltd. to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes: ☐

No: ☑

HILARY AXAM
Digitally signed by HILARY AXAM
Date: 2023.07.13 17:33:25 -04'00'

Agency Official's Signature

## Hilary Axam

Agency Official's Name

National Human Trafficking Coordinator*, U.S. Dept. of Justice *Appointed by the AG under 34 U.S.C. 20711(d)

Agency Official's Title and Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**AR001659**

中国站



Home    Our Products +    About    Career    Contacts    🔍    |    4355 Varsity D
Ann Arbo

Based on **GB, DIN, JIS, BCI** standards and requirements of OEM customers

View Products

—————— **What We Offer**

# Innovate **Battery Solutions**

We could design and produce batteries for over 400 types, including batteries for cars, trucks, forklift, golf carts, vessels,
agricultural vehicles, industrial battery and batteries for some other special applications.

Camel Energy Inc - Camel Energy, Inc

**Heavy Duty & Commercial Vehicle**

**Automotive & Light Truck**

**AR001662**

Lawn & Garden

Renewable Energy Storage

AR001663

**Marine & RV**

**Golf & Utility**

**Forklift & Pallet Trucks**

**Portable Power Station**

AR001665

Camel Energy Inc - Camel Energy Inc

—————— WHAT WE OFFER

# About **Camel Group**



## Expertise + Experience

Camel Group Co., Ltd., founded in 1980, is an Integrated high-tech enterprise specialized in the R&D, production, sales and recycling of advanced batteries.



## Constantly Outperform

For over 40 years, Camel group is always customer-oriented and has gradually grown as the largest SLI battery manufacturer in Asia.



**7,000+**

Employees



**40+**

Branchs



**0+**

OEM

**0+**

Years of Experience

▶

WHAT WE DO

**AR001667**

## Activities In **Michigan U.S.A**

Advanced battery technology and information integration, R&D of advanced battery and key material, battery recycling technology, technical cooperation with universities and research institutes.

R&D Platform

Manufacturing

AR001668

Manufacturing

Our Market

— BRANDS LISTED IN RANDOM ORDER

# Beloved **Customer**

  

**AR001669**




AR001670

AR001671

## Our Products

Lead Acid Battery

Lithium-ion Battery

## Social

Linkedin

## Quick Links

Home

About

Career

Contacts

## US Head Office

4355 Varsity Dr Ann Arbor

Michigan 48108 USA

Phone: 734 929 4396

Camel@camelenergyus.com

## Get Directions



关于骆驼
ABOUT CAMEL

产品展示
PRODUCTS

新闻中心
NEWS

销售系统
SALE SYSTEM

投资者关系
INVESTOR RELATIONS

人才招聘
HUMAN RESOURCE

骆驼北美
CAMEL NORTH AMERICA

EN    CN

您现在所在位置：  首页 > 关于骆驼

# 关于骆驼

我们专注于提升品质、提高效益、改善环境，进一步加强我们在市场上的主导地位。

## 集团介绍



股票简称：骆驼股份
股票代码：601311

### 骆驼集团股份有限公司

是一家专业从事先进电池研究、开发、生产、销售的综合性高新技术企业，先进电池涵盖范围如下：铅酸蓄电池，纯铅薄极板电池，动力锂离子电池等。公司产品广泛应用于汽车、农用车、船舶、叉车、高尔夫球车、电动汽车、电动摩托车、电动自行车及工业和各种特殊用途，共...

发展历程            集团组成            质量认证

**企业文化**



致力于电池制造及循环利用，开启人类低碳生活。

**核心优势**



执著于提高产品性价比，持续提升产品竞争力。

**资质荣誉**



已通过ISO9001、ISO/TS16949等质量管理体系认证

**联系我们**



您有疑问吗？赶快拿起电话或在线留言，我们将竭诚为您服务！

回到
顶部

https://www.chinacamel.com/about.aspx?node=about

AR001674

| + 查看详情 | + 查看详情 | + 查看详情 | + 查看详情 |

## 网站总览

关于骆驼                    产品展示

新闻中心                    销售系统

投资者关系                  人才招聘

产品展示                    经销商天地

集团子公司

## 联系我们

**400-189-9507**

中国·集团总部：
湖北省襄阳市高新区汉江北路65号

网址：http://www.autocamel.com

国内销售热线：18872588562

国际销售热线：+86 710 3344062

信息安全热线：0710-3342880

## 快捷通道

企业门户          企业邮箱

经销商天地        骆驼养车网

招投标            采购系统

## 关注官方微信

COPYRIGHT © 2016 骆驼集团股份有限公司 ALL RIGHTS RESERVED

技术支持：八零后网络    备案号：鄂ICP备15000576号-3
鄂公网安备 42060602000269号

关于骆驼 | 网站地图 | 法律声明

分享到 / SHARE

回到
顶部

**AR001675**



## 骆驼股份
### CAMEL GROUP

**about camel**  product display  News Center  Sales System  Investor Relations  Recruitment  camel north america

ABOUT CAMEL  PRODUCTS  NEWS  SALE SYSTEM  INVESTOR RELATIONS  HUMAN RESOURCES  CAMEL NORTH AMERICA

Where you are now: Home> About Camel

EN _ CN _

# 关于骆驼

我们专注于提升品质、提高效益、改善环境，进一步加强我们在市场上的主导地位。

## Group introduction



股票简称：骆驼股份
股票代码：601311

## Camel Group Co., Ltd.

It is a comprehensive high-tech enterprise specializing in the research, development, production and sales of advanced batteries. The scope of advanced batteries is as follows: lead-acid batteries, pure lead thin plate batteries, power lithium-ion batteries, etc. The company's products are widely used in automobiles, agricultural vehicles, ships, forklifts, golf carts, electric vehicles, electric motorcycles, electric bicycles and industrial and various special purposes.

| company culture | core advantages | Honor | contact us |
|---|---|---|---|
|  |  |  |  |
| Committed to battery manufacturing and recycling, and start a low-carbon life for human beings. | Committed to improving product cost performance and continuously improving product competitiveness. | Has passed ISO9001, ISO/TS16949 and other quality management system certification | Do you have questions? Quickly pick up the phone or leave a message to the |

**AR001676**

天丰猎彪·骆驼集团股份有限公司·储蓄电池领航者

online, we will serve you wholeheartedly!

+ view details

+ view details

+ view details

+ view details

top

## Site overview

about camel

News Center

Investor Relations

product display

Group subsidiary

product display

Sales System

Recruitment

Dealer world

## contact us

**400-189-9507**

China Group Headquarters: No. 65, Hanjiang North Road, High-tech Zone, Xiangyang City, Hubei Province

URL: http://www.autocamel.com

Domestic sales hotline: 18872588562

International Sales Hotline: +86 710 3344062

Information Security Hotline: 0710-3342880

## Fast passage

Enterprise Portal

Enterprise mailbox

Dealer world

Camel car network

Bidding

Purchasing system

## Follow the official WeChat

About Camel | Site Map | Legal Statement

Share to / SHARE

COPYRIGHT © 2016 Camel Group Co., Ltd. ALL RIGHTS RESERVED

Technical support: post-80s network     record number: Hubei ICP No. 15000576-3

Hubei Public Network Security No. 42060602000269

back to the

**AR001677**

   

# FINANCING & GENOCIDE

## Development Finance and the Crisis in the Uyghur Region

**Laura T. Murphy, Kendyl Salcito, and Nyrola Elimä**

AR001678



 Atlantic Council

The mission of the Digital Forensic Research Lab (DFRLab) is to identify, expose, and explain disinformation where and when it occurs using open-source research; to promote objective truth as a foundation of government for and by people; to protect democratic institutions and norms from those who would seek to undermine them in the digital engagement space; to create a new model of expertise adapted for impact and real-world results; and to forge digital resilience at a time when humans are more interconnected than at any point in history, by building the world's leading hub of digital forensic analysts tracking events in governance, technology, and security.

**The Helena Kennedy Centre for International Justice at Sheffield Hallam University** is a leading center for social justice and human rights research, practice, and pedagogy. It provides a vibrant environment at the cutting edge of legal and criminal justice practice which prepares students for excellence in their chosen professional careers. The center is home to a range of social justice and human rights activities that include research, global engagement, impact on policy, professional training, and advocacy. Its central values are those of widening access to justice and education, the promotion of human rights, ethics in legal practice, equality, and a respect for human dignity in overcoming social injustice. The center works on high-profile projects in a variety of human rights and social justice areas. Research and projects concern modern slavery, gender-based violence, hate crime, and many more.

**NomoGaia** is a nonprofit research organization dedicated to identifying and reversing the human **rights risks and impacts associated with global** business. NomoGaia generates field-based processes of "human rights due diligence" to ensure that companies' human rights policies, practices, performance, and project designs respect human rights. Its analytical work identifies structural gaps in the operations of non-state actors to recenter policies and processes around the welfare of people.

**Acknowledgements** The authors are grateful to the experts who contributed to our rapid review process as well as all of those who gave feedback on this report or provided research support, including our team of student researchers. The authors wish to thank Jim Vallette and Material Research, Sophie Richardson, Rian Thum, Darren Byler, Isaac Stone Fish, and the Digital Forensic Research Lab team at the Atlantic Council for their insights into the report. Thanks to Andy Carvin, Graham Brookie, Susan Cavan, Ashish Kumar Sen, and Donald Partyka for their support in publishing this report. We appreciate the input of our Chinese-language factchecker, Liz Carter, and our colleagues in the fields of Uyghur Region studies, industrial environmental hazards, supply chain analysis, development finance, and labor rights who provided input at various stages of this process. We wish to thank all of the scholars and survivors whose work bolsters ours throughout this report.

ISBN-13: 978-1-61977-214-4

Cover: Still from Chenguang Biotech Promotional Video

This report is written and published in accordance with the Atlantic Council's policy on intellectual independence. The authors are solely responsible for its analysis and recommendations. The Atlantic Council and its donors do not determine, nor do they necessarily endorse or advocate for, any of this report's conclusions.

February 2022

AR001679



# Financing & Genocide

## Development Finance and the Crisis in the Uyghur Region

**Laura T. Murphy**

**Kendyl Salcito**

**Nyrola Elimä**

February 2022

AR001680

AR001681

# TABLE OF CONTENTS

**1  EXECUTIVE SUMMARY** — 2

    Findings — 3

    Conclusions and Recommendations — 4

**2  INTRODUCTION** — 5

    The PRC's Campaign of Repression in the Uyghur Region — 5

    Corporate Participation in Repression in the Uyghur Region — 6

    Framing Oppression As Development — 7

    The 'Circular Economy' and Environmental Degradation — 9

**3  FINANCING OPPRESSION** — 11

    DFI Investments in the Uyghur Region — 11

    The Responsibility of Development Banks in Times of Crisis — 11

    IFC's Performance Standards — 14

    Why IFC's Performance Standards Matter
for the Crisis in the Uyghur Region — 17

**4  IFC'S INVESTMENTS IN THE UYGHUR REGION** — 19

    **Chenguang Biotech Group Co., Ltd.**（晨光生物科技集团股份有限公司）— 21

        Risk of Performance Standards Violations — 22

        IFC's Response to Concerns — 27

        Summary of Performance Standards Risk — 28

    **Camel Group Co., Ltd.**（骆驼集团股份有限公司）— 28

        Risk of Performance Standards Violations — 29

        IFC's Response to Concerns — 36

        Summary of Performance Standards Risk — 36

    **Century Sunshine Group Holdings, Ltd.**（世紀陽光集團控股有限公司）— 37

        Risk of Performance Standards Violations — 38

        Summary of Performance Standards Risk — 43

    **Jointown Pharmaceutical Group Co., Ltd.**（九州通医药集团股份有限公司）— 44

        Risk of Performance Standards Violations — 44

        IFC's Response to Concerns — 47

        Summary of Performance Standards Risk — 47

**5  IMPLICATIONS AND RECOMMENDATIONS** — 48

AR001682

# EXECUTIVE SUMMARY

**T**HE WORLD BANK'S PRIVATE lending arm, the International Finance Corporation (IFC), has committed to upholding the human rights of populations affected by its investment projects since at least 2012, with the launch of its updated Performance Standards. These eight standards mandate adequate assessment of project risks and management planning, as well as rigorous oversight of labor conditions, waste management, pollution prevention and biodiversity protection, community safety and security, indigenous and cultural rights, and protections against economic or physical displacement. The IFC is the private-sector part of the World Bank Group. While the other components of the World Bank Group (IBRD and IDA) can only lend directly to governments, the IFC is set-up differently, and can lend directly to companies.

As the research in this report reveals, IFC has several significant investments in the Xinjiang Uyghur Autonomous Region (XUAR or the Uyghur Region) of the People's Republic of China (PRC), where indigenous peoples have been subjected to what international legislators, legal scholars, and advocates have determined to be a genocide.

**Significant evidence suggests that several of IFC's clients are active participants in the implementation of the PRC's campaign of repression against the Uyghurs, including through forced labor, forced displacement, cultural erasure, and environmental destruction. IFC's failure to adequately safeguard communities and the environment affected by its financing in the Uyghur Region makes the institution complicit in the repression of Uyghur, Kazakh, and other minoritized citizens.**



AR001683

## FINDINGS

IFC currently has approximately US$486 million in direct loans and equity investment in four companies operating in the Uyghur Region:[1]

### Chenguang Biotech Group Co., Ltd.
（晨光生物科技集团股份有限公司）

### Camel Group Co., Ltd.
（骆驼集团股份有限公司）

### Century Sunshine Group Holdings, Ltd.
（世纪阳光集团有限公司）

### Jointown Pharmaceutical Group Co., Ltd.
（九州通医药集团股份有限公司）

Evidence drawn from corporate disclosures and publicity campaigns, government directives and state media, and other publicly accessible information reveals that these four companies have

- directly participated in and benefited from state-sponsored **forced labor programs**,

- directly participated in and benefited from state-sponsored **compulsory land expropriation**,

- participated in programs that require minoritized citizens to take oaths to the Chinese Communist Party (CCP) and be subjected to **indoctrination**,

- recruited workers through **overtly racist/discriminatory hiring practices**,

- assigned minoritized citizens to do **hazardous work without safety equipment**,

- contributed to the environmental **destruction of affected and indigenous communities**,

- contributed to the **destruction of cultural heritage**, and

- **failed to fully implement IFC's required monitoring and assessment of its Performance Standards**.

Although IFC carried out a monitoring trip to the region in 2019, two years into the PRC's by then widely publicized system of mass atrocities, **it continued to issue new financing to projects in the Uyghur Region in 2020. The continued willingness to maintain financing in the Uyghur Region, without any direct oversight, effectively supports the oppression in the region.**

This report lays out these findings and proposes recommendations for IFC and other Development Finance Institutions (DFIs). **Using Chinese state media and propaganda, satellite imagery of IFC's client operations, IFC project documentation, public reports, and corporate disclosures, this report presents credible evidence that IFC financing is contributing to companies committing gross human rights abuses against Uyghur peoples in the XUAR and makes evidence-based recommendations to IFC and other parties.** This report also emphasizes the way desk-based due diligence can expose the disinformation campaigns that the PRC uses to justify its campaign of repression and to reveal the companies that are intertwined with the oppression in the region. This may be of use to both companies investigating their suppliers and to investors for which environmental, social, and governance standards matter.

IFC's Performance Standards are relevant beyond

**3**

**AR001684**

its own investments. The Performance Standards are foundational to the environmental and social standards adopted by private and public banks issuing development project finance worldwide (though some banks have created additional internal standards that strengthen the safeguards).

## CONCLUSIONS AND RECOMMENDATIONS

IFC and other development and infrastructure investment banks cannot conduct the on-the-ground due diligence necessary in the Uyghur Region to ensure that their clients are adhering to the Performance Standards. The United Nations has been denied access to the region. In the private sector, audit firms have ceased to certify products manufactured there, and the Fair Labor Association has banned all its members from sourcing from the region. Travel to the region is unsafe for researchers, journalists, corporate consultants, and others who might investigate state-sponsored atrocities, and asking minoritized citizens to report grievances about their working conditions is unacceptably dangerous so long as the PRC's campaign of repression remains in effect. For this reason, there is no feasible way for IFC to ensure its standards are met with regard to its investments in the XUAR.

As of March 2021, IFC closed its investments in three Chinese companies engaged in or sourcing from the Uyghur Region.[2] **However, if IFC is to uphold its own Performance Standards and serve as a model for responsible development finance, it must divest from any companies that have proven to be complicit in the PRC's program of repression in the Uyghur Region.**

These findings are specific to IFC's portfolio, but they are applicable to development and infrastructure finance organizations worldwide. **Other DFIs have significant investments in the Uyghur Region that are potentially similarly engaged in state-sponsored repression**. Financial institutions with commitments to environmental and social performance standards are heavily exposed in their current portfolios; application of IFC's Performance Standards is needed for investments in the Uyghur Region across the financial sector.

More broadly, this report reveals the challenges in applying the Performance Standards in situations of state-sponsored violence against ethnic minorities.

For these reasons, our **recommendations** include the following:

**1** IFC and other DFIs should divest from all corporate investments in the Uyghur Region.

**2** IFC and other DFIs should presume that all companies operating in the Uyghur Region are engaged in forced labor and carry risk of complicity in the ongoing genocide.

**3** IFC and other DFIs should review and adjust their direct and indirect investment portfolios to move sub-investments, sub-contracts, and supply chains out of the Uyghur Region. IFC should conduct a full review of its portfolio, including financial intermediary investments, using the methods employed in this report.

**4** IFC should create protocols for both responsible entry into fragile and conflict-affected regions, as well as protocols and triggers for responsible exit.

**5** All tenders put out for bidding by IFC and other DFIs should include a restriction on the purchase of forced-labor-made goods and require full supply chain transparency from all contractors and their suppliers.

**6** IFC should extend its zero-tolerance policy for reprisals against human rights defenders to the initial project appraisal phase and explicitly prohibit investments in any location where dissent is punishable by extrajudicial internment or incarceration.

**7** IFC should reinstate its policy of publishing the names of the loan officer and lead environmental and social specialist tasked with projects. This will enable human rights defenders, activists, and advocates to more directly engage with the decision makers who interact with project proponents.

**Governments should take note of the complicity of DFI investments in the PRC's repression of minoritized citizens. Individual government DFIs may be complicit, just as their investments in IFC may be. The United States in particular—with its 21 percent share—has an opportunity to take a leadership role in enhancing oversight of IFC's investments.**

AR001685

# INTRODUCTION

## THE PRC'S CAMPAIGN OF REPRESSION IN THE UYGHUR REGION

**N LATE 2017, NEWS BEGAN** to emerge that minoritized citizens[3] of the Xinjiang Uyghur Autonomous Region (XUAR or Uyghur Region) were disappearing without notice and were being detained in an expansive system of newly built or repurposed internment camps.[4] The government of the People's Republic of China (PRC) denied these allegations, but government documents and speeches clearly revealed that the XUAR government, under instruction from the central government, had indeed built a massive system of vocational training and ideological reeducation facilities that were designed to provide security and stability in the Uyghur Region.[5] These extrajudicial, nonvoluntary "de-extremification"（去极端化）internment programs were intended "to fundamentally eliminate the environment and soil that breeds terrorism and religious extremism and eliminate violent terrorist activities *before* they occur."[6] The reasoning provided by the Chinese Communist Party (CCP) for the internment camps was that Uyghur citizens were either guilty of committing terrorism or prone to being influenced by terrorists and, therefore, needed to be assimilated into Han-dominated society.[7] Estimates suggest that this internment camp system held at least one million Uyghur, Kazakh, and other minoritized people at its height, the vast majority of whom were held without criminal charge.[8]

International legislators, legal scholars, rights groups, and researchers have indicated that the PRC's program of oppression in the Uyghur Region meets the definition of genocide.[9] In addition to the system of mass internment, authorities have systematically erased cultural heritage, both through physical destruction of cultural heritage and through the institutionalization and indoctrination of children and adults.[10] Simultaneously, evidence suggests that the government is working to eliminate or at least reduce Uyghur population density through the labor transfer programs, and further research has documented that the government is forcing sterilizations and birth control on Uyghur women resulting in plummeting birth rates.[11]

In the spring of 2017, the PRC central government and XUAR regional government unveiled another critical mechanism of their program of state-sponsored repression in the region: a vast project of systematic forced labor that would reach every household in the region under the banner of "poverty alleviation."[12] Government directives instructed labor agents to go door-to-door to identify people who could be considered "surplus labor" by dint of their being un- or underemployed in the judgment of the state.[13] Under this program, farmers are particularly targeted to be "transform[ed] into modern industrial workers,"[14] forced to leave behind their land to join the industrial workforce.[15] In some areas, government officials assign a point value to each Uyghur person, indicating their supposed security risk and thus how far from home they should be assigned for work.[16] The XUAR government directs labor agencies to employ at least one person in every household through these programs and sometimes designates quotas for the number of people to be transferred.[17]

By early 2018, reports emerged that as many as 10,000 minoritized citizens from southern XUAR had already been "transferred" and "resettled" in Urumqi.[18] One government directive indicated that 100,000 workers should be transferred from Kashgar region alone.[19] In 2020, the PRC government estimated that it had "relocated" more than 2.6 million "surplus rural workers" in the Uyghur Region that year,[20] and in 2021, the XUAR government's work report celebrated that in the previous five years "14.33 million surplus rural laborers were transferred to employment."[21] Though this documents how many times people were transferred, and thus could include people transferred multiple times, the government's reports reveal a program of widespread and systematic state-sponsored transfer of people from the Uyghur Region to industrial work.

Government policy indicates that a person who refuses to participate in a government program or in poverty alleviation should be considered potentially infected

**5**

by the three evils—terrorism, separatism, and religious extremism—a status that would make them prime targets for internment.[22] In 2014, resistance to government assistance programs was included on a list of "religious extremist activities" disseminated by local governments across the Uyghur Region.[23] This means that no minoritized citizen in the region is at liberty to refuse to be transferred for work.

For this final reason alone, as well as the many others enumerated above, it is clear that the PRC's programs in the Uyghur Region are part of a program of systematic state-sponsored forced labor and meet the standards for forcible migration of people relevant to legal thresholds for genocide.

## CORPORATE PARTICIPATION IN REPRESSION IN THE UYGHUR REGION

The XUAR government has made public-private partnerships a centerpiece of its system of forced labor. Scholar Darren Byler has aptly described this expansive, intertwined system of state violence, forced labor, and incentivized corporate expansion in the Uyghur Region as "terror capitalism." Terror capitalism is "a form of capitalist frontier-making that exploits ethno-racial difference in order to generate forms of capital accumulation and state power."[24] The PRC government's program of forced labor in the Uyghur Region serves overlapping ambitions—to enhance state control over the people of the region and to discipline the population into contributors to capital expansion. These programs serve both the state's security goals and corporate interest in financial growth.

Corporations and "development" projects both within the Uyghur Region and across China are complicit in the implementation of these programs. Previous research has shown that companies play an active role in the expansion of terror capitalism by employing those people coerced by the state into labor assignments. Companies might

- **build or operate a factory within the walls of a camp or prison and benefit from the labor of those interned there;**

- **"absorb" forcibly "transferred laborers" into an already existing factory in the Uyghur Region;**

- **build a "satellite factory" in a village in the Uyghur Region so that people can be assigned to work "on their doorstep" if they are deemed too high of a security risk;**

- **build a factory in an industrial park that "absorbs" transferred laborers and distributes them to companies located in the park;**

- **"pair" with a company or factory in the Uyghur Region to either train transferred laborers in other parts of China or send trainers from those parts to factories operating in the Uyghur Region that are dependent on forced labor; or**

- **accept "batches" of Uyghur workers, in groups as large as 100, at a factory in other parts of China.[25]**

The PRC government implemented an extensive system of incentives to entice companies to move out to the XUAR since 2010, and especially in the years since the advent of the "Strike Hard Campaign Against Violent Terrorism"（严厉打击暴力恐怖活动专项行动）in 2014.[26] These incentives include reduced rents in industrial parks, subsidized electricity and water, elimination or significant reduction in taxes for several years, and provision of office space, desks, chairs, and computers. Since as early as 2010, the government has also included subsidies for training Uyghur workers in Chinese language, worker discipline, and ideological education, and those programs have expanded in reach and intensity since 2017.[27] In addition, the government has called on companies to engage in coercive "poverty alleviation" and "surplus labor transfer" programs as part of their corporate social responsibility programs.[28]

For generations, many Chinese companies have eschewed operating in the Uyghur Region as it is remote and often considered unstable. Furthermore, research by Peking University's Department of Sociology in 2015 has shown that racist views about the indigenous Uyghur people have led Han business owners to consider Uyghur people to be "lazy," "unstable," and unwilling "to use their brains." Managers who participated in the study suggested that Uyghur "traditional culture" encourages them to be "indifferent to material enjoyment" such that they do not have a sense of urgency about earning a living. Uyghurs were also perceived as being universally

AR001687

undisciplined, unproductive, and ill-equipped to work in anything but the lowest skilled work.[29] Job advertisements in the region provide further evidence of this widespread discrimination; many public-facing jobs, as well as many administrative and technical positions, explicitly exclude applicants from minoritized groups (though hiring discrimination is officially illegal in China).[30] In some ads, people with "political problems" or "criminal records" or even those "within three generations of immediate family members who have participated in illegal religions, have been taken into custody, are serving a sentence, or have been held criminally responsible" are ineligible to apply for certain jobs.[31]

Recognizing the discrimination against Uyghur workers, government programs have been developed with the explicit intent of encouraging companies to take on Uyghur workers nonetheless.[32] Policies regarding labor transfers suggest that government officials have responded to corporate disinterest in hiring Uyghur workers by creating a labor regime grounded in "militarized discipline," constant surveillance, and compulsory indoctrination toward "increase[d] national consciousness."[33] Reports have suggested that Uyghur workers are segregated from their Han peers, sometimes in dorms surrounded by barbed wire; are not allowed to leave for holidays; and are monitored at all times. "Batches" of Uyghur workers transferred to factories in other parts of China are accompanied by special security that monitor them at all times.[34] First-person testimony from people who have been given labor assignments (who have left the region or who have contacted a family member outside of China) describe working conditions that meet the International Labour Organization's (ILO's) threshold for forced labor, entailing isolation, abuse of vulnerability (including their poverty and the threat of internment), restriction of movement, deception (regarding the terms of their contract, their pay, their ability to leave the job), retention of identification, withholding of wages, debt bondage, and abusive working conditions.[35] A recent Reuters article revealed that companies that take on labor transfers may not pay their Uyghur workers directly, relying instead on the government agency that placed the workers to pay them, leaving it unclear as to whether or how the workers get paid at all. The company exposed in the report acknowledged that the Uyghur workers were under constant security surveillance and were living in segregated facilities.[36] These state-sponsored programs of labor transfer, both within the Uyghur

Region and to the rest of China, are designed in part to alleviate corporate management's reticence to hire the legions of Uyghur workers that the XUAR government is seeking to transfer. The result is a system of state-sponsored forced labor that businesses in the Uyghur Region and across China participate in knowingly.

## FRAMING OPPRESSION AS DEVELOPMENT

In 2020, the PRC government announced it had reached the goal of zero percent poverty in all of China, including in the Uyghur Region.[37] International observers suggest that this apparent achievement was only possible because China has set its poverty line inappropriately low.[38] The PRC has set its poverty line at the equivalent of $2.30 per day, while the World Bank sets the poverty line at nearly double that—$5.50—for mid-upper-income countries like China. By the World Bank's benchmark, 24 percent of the population remains impoverished, and the figure is almost certainly higher in the XUAR.[39]

The government has emphasized the importance of labor transfers as a primary mechanism of its "poverty alleviation" efforts across China, though it is only in the Uyghur Region that these programs are supported by a system of mass internment and laws that make refusing government programs illegal. Despite the regime of terror inflicted upon minoritized populations in the Uyghur Region, companies have celebrated their participation in "industrial poverty alleviation" as a sign of their commitment to the CCP. Because of the government's significant financial and political investment in these programs, it is unclear to what extent companies have a choice as to whether they accept transferred laborers or engage in other poverty alleviation programs in the region. Based on corporate publicity campaigns, it appears that most do so enthusiastically or at least find it beneficial to publicly report on their participation. Regardless, it is clear that these programs require the participation of vast numbers of companies to succeed. State-sponsored labor transfers in the region are ubiquitous and far-reaching, "affecting 90 percent of residents in some Uyghur regions and involving the displacement of whole villages." The central government has identified several sectors for strategic investment and expansion in the Uyghur Region—agriculture, new energy and new materials, electronics, and textile/apparel manufacturing, among them—and has touted the expansion of labor

**7**



**FIGURE 1: Uyghur man transferring land with thumbprint, unable to write a signature.**
Credit: Gao Sheng via Weixin

transfers as part of that strategy.[40]

Labor transfers are often facilitated through or significantly expedited by coercive land transfer and cooperativization programs. XUAR government programs called "enterprise + cooperative + order farming" (企业+合作社+订单农业) and "land transfer + x new countryside development strategy" (土地流转+X新农村发展方略) explicitly connect the expropriation of Uyghur lands with "development," and companies directly benefit. These programs are designed to "establish cooperatives and combine land transfers, livestock care, contract farming, characteristic planting, and surplus labor transfers."[41] This entails an agreement by which companies determine what crops will be planted in an area to meet their manufacturing needs. The company then sets the price for the harvest of those crops. The state in turn organizes small-scale farmers to transfer their land to a larger cooperative, run by a small group of the most prominent farmers in the area, or sometimes a Han Chinese person. Often one shareholder holds as much as 90 percent of the stake in the cooperative, as can be ascertained from

a review of Xinjiang-located farming cooperatives' shareholders in SAIC filings.[42]

The programs are clearly not welcomed by many Uyghur and Kazakh agriculturalists who have worked the land in the Uyghur Region for generations. In April 2020, a Xinjiang State Rural Cooperative Economic Development Center report revealed signs of the indigenous people's reluctance to transfer their land when they indicated that "[i]n order to make the grassroots cadres and the broad masses of farmers truly realize that land transfer and the development of rural land management at scale are the only way to realize agricultural modernization, [government agencies] have jointly organized many training courses in land contract management law, regulation, and policy for rural cadres, actively guiding farmers to carry out land transfer, speeding up the exchange of land, and organically combine rural land transfer with the exchange and merging of land plots, making the policy well-known, and arousing farmers' enthusiasm for land transfer." The farmers are encouraged to change their mindset from passive to active, from "I am wanted to transfer [my

**AR001689**

land]" to "I want to transfer."[43]

These coercive state-sponsored land appropriation programs directly benefit corporations. Village "work teams" made up of CCP cadres visit the homes of area farmers promising a dividend for their land. Sometimes whole villages are coerced into transferring land. In some cases, the government demolishes an entire village's homes and forces the residents to move into new cookie-cutter "modern" housing developments, sometimes intentionally located next to a factory. Some of the now landless farmers are then expected to work the land that has just been expropriated from them and are paid wages below the state-determined minimum. Others are "liberated" from the land and "transferred" for work in factories, often far from their homes.[44] Reports from the last ten years of Uyghur dispossession suggest that the government threatens Uyghurs that if they do not transfer their lands for the use of private companies owned by Han people they could be arrested. Government reports describe the transfers as short-term leases, justifying compensation rates at below market value. However, often farmers understand the expropriation to be permanent, particularly as it involves demolition (without adequate compensation) of their family homes and sustained coercion by authorities.[45] Contracts are sometimes written in Mandarin, which many Uyghur farmers cannot read, and "signed" by thumbprint (see Figure 1).[46]

Thus, in addition to the manufacturing routes by which private corporate enterprises actively participate in state-sponsored forced labor, they are also complicit through

- **participating in cooperative agreements with the government that depend on coerced state expropriation of indigenous people's land rights**

- **sourcing raw materials from expropriated land**

- **sourcing raw materials from farmers who are coerced by the state into farming products for the company's express benefit**

Programs that systematically dispossess Uyghurs of their land are touted as get-rich-quick schemes that will lift Uyghurs out of poverty. Instead, these programs leave Uyghurs landless and unemployed, making them vulnerable to forced labor transfers. Farmers sign contracts to transfer their land to state-organized cooperatives

because government officials treat resistance as a sign of cultural backwardness and potential terrorist mentality.[47] Again, because the supposed poverty alleviation programs operate on a backdrop of mass internment, state violence, and concomitant all-pervasive terror, refusing to participate in a land transfer is not possible for minoritized people of the Uyghur Region.[48]

The foundational protections for indigenous peoples in the international human rights regime derives from this precise situation. The ILO was the first institution to codify protections for indigenous peoples because the dispossession of indigenous peoples of their ancestral lands and their conversion into low-wage laborers so obviously violated both their labor rights and their rights to self-determination. The ILO first passed protections against these conditions in 1957 (ILO Convention 107) and strengthened them in 1989 (ILO Convention 169). The situation where indigenous peoples are expropriated and then hired back onto their ancestral lands has been recognized as a human rights violation for generations.

## THE 'CIRCULAR ECONOMY' AND ENVIRONMENTAL DEGRADATION

The PRC's program of "development" in the Uyghur Region has also led to investments in expanded access to electricity and other basic utilities, and the PRC has focused these on renewable energy projects as part of its efforts to decrease greenhouse gas emissions and reduce other pollutants.[49] Central, regional, and local government agencies have subsidized the development of critical solar and wind energy projects, expanding the grid to previously unconnected remote areas of the vast XUAR. While these programs are on the whole positive for indigenous communities, there are negative aspects to the growth of renewable energy investments in the Uyghur Region. This enhanced access to renewable energy has accompanied the expansion of an industrial base for the production of precursors necessary for the production of solar modules, which are installed within the Uyghur Region and across the rest of China, as well as distributed globally. Our previous research has provided evidence that many of the same companies that benefit from government incentives to install renewable energy plants in the Uyghur Region are also benefiting either directly or indirectly from forced labor in the region.[50] Media reports suggest that the wind energy industry in the region may be similarly tainted by forced labor transfers.[51]

**9**

In concert with these efforts, the government has also promoted as part of the Uyghur Region "development" program extractive projects that they have largely mislabeled as "circular economy" projects. Internationally, a circular economy is defined in contrast to a linear economy. Rather than extracting raw materials to produce goods that are consumed or otherwise disposed of, the circular economy "involves sharing, leasing, reusing, repairing, refurbishing and recycling existing materials and products as long as possible."[52] It aims to tackle global challenges like climate change, biodiversity loss, waste, and pollution "while addressing important social needs."[53] It is "an industrial system that is restorative or regenerative by intention and design. It replaces the end-of-life concept with restoration."[54]

The Uyghur Region has been identified as a high priority for the expansion of the "circular economy" in China. However, the PRC government appears to define the circular economy differently in the XUAR. Much of the emphasis is on production efficiencies in extraction and processing of resources, by situating mines, refineries, smelters, and power sources in close proximity to one another. This is generally considered good economic practice in heavy industry, rather than environmental circularity, as the model still relies on the extraction of raw materials. Often, the PRC touts the use of coal as central to the region's circular economy, in stark contrast to the spirit of low carbon emissions and recycling that is at the heart of the concept. In the XUAR's 13th Five-Year Plan for 2016–20, for instance, the government announced its intention to "build a circular economy industrial chain centered on coal deep processing, and focus on the construction of Zhundong and Zhunbei National-level Demonstration Zone of Coal Deep Processing Industry."[55] The Uyghur Region's coal accounts for 40 percent of the PRC's reserves and is one of the largest reserves in the world.[56] Circular economy references in industrial development plans make no mention of decommissioning coal mines but rather identify proximity to coal mines as advantageous for industry.[57] Industrial cost-reducing efficiencies have been rebranded as circular economy and heavy industry zones are renamed Circular Economy Industrial Parks.[58] Heavy industry projects have significant negative repercussions for the development benefits promised to the indigenous people of the region. Programs that are described as engaging in a circular economy in the Uyghur Region are often engaged in highly polluting manufacturing processes.

Two examples that emerged in this research shed light on the environmental risks of projects touted as contributing to a circular economy. In one case, a magnesium smelter and coal-tar coke manufacturing facility is described as an "integrated circular economy project, relying on the rich dolomite mine, coal, and power resources in Hami City,"[59] revealing the disconnect between international standards for the circular economy and those described by this Chinese corporation. In another case, recycling itself presents a significant danger to local communities. A lead-acid battery recycling project described in this report, while reducing the need for additional mining, nonetheless produces significant air, soil, and water pollutants that exceed international standards and may be affecting surrounding communities. Lead-acid battery recycling requires lead smelting, which creates air, water, and soil emissions that can have catastrophic effects on child brain development and, in some cases, adult health. As this report shows, the PRC government's extraordinarily high thresholds for environmental pollution allow companies to conduct dangerous business with no accountability to neighboring Uyghur communities and to power industry with coal. The corporate incentives programs for moving into the Uyghur Region (and at times the concomitant shuttering of similar facilities in other areas of the country) renders the region the country's dumping ground for waste and pollution, leading to long-term environmental degradation.

In effect, a wide range of corporations have actively participated in the central government's regime of repression in the Uyghur Region, through participation in a combination of forced labor, forcible migration, dispossession, and environmental destruction, all packaged in the guise of "development." The purpose of this report is to identify the ways international Development Finance Institutions (DFIs) are playing a role in financing this oppression, more than five years into the crisis in the Uyghur Region.

# FINANCING OPPRESSION

**WHILE THE GOVERNMENT** of the People's Republic of China (PRC) has expended vast resources in developing its program of interlinked corporate expansion and systematic oppression, private Chinese corporations have benefited from billions of dollars of financing provided by international Development Finance Institutions (DFIs) in their expansion, relocation, or establishment in the Xinjiang Uyghur Autonomous Region (XUAR or the Uyghur Region). DFIs finance projects and companies in low-income and developing countries. DFIs are typically majority-owned by governments and have as their mandate the provision of investments in public and private sector sustainable development projects. DFIs fund projects spanning from critical infrastructure to nanotechnology.

## DFI INVESTMENTS IN THE UYGHUR REGION

It is no surprise that international DFIs have supported PRC-initiated and -supported development programs in the Uyghur Region. As one of the most impoverished regions in China, the Uyghur Region is certainly home to a deserving population with great need, and it thus represents a significant opportunity for development investment. However, development "recipients" in the region are corporate actors with strong ties to government authorities, rather than ethnically indigenous actors whose supposed "development" is in question.

A review of six of the world's most significant DFIs identified at least twenty-three projects financed since 2013 that have footprints, supply chains, or other connections in the Uyghur Region. None of them are Uyghur-owned (see Table 1). This is likely a vast under-representation of the development finance moving into businesses operating in the region, as many DFI-financed projects in China are managed through central governments and state-run banks that obscure the final destinations of the funding.

Despite the documented needs of the people of the region, it is critical to consider the context in which these investments are occurring and to understand the role the financed corporations may play in the crisis in the Uyghur Region. Funding for projects in the Uyghur Region has continued, even as the crisis in the region has emerged and been well documented. Despite revelations in the United Nations (UN) that the PRC government operates a system of extrajudicial internment camps, legislative hearings around the world on the oppression of the Uyghurs, tribunals considering the crisis as a genocide, and a growing body of evidence of a systematic forced labor program dating back at least three years, DFIs do not seem to have considered these human rights violations in their determination of finance allocations.

Since its founding in 1956, the World Bank's private finance arm, the International Finance Corporation (IFC), has provided more than $285 billion in financing for businesses in developing countries.[60] IFC has made 125 investments in China since 2012, with current exposure valued at $4.75 billion.[61] While IFC began investing in the XUAR in 2010,[62] investments have increased in parallel with Beijing's deliberate industrial expansion into the region. IFC's current investments in the Uyghur Region amount to at least $486 million. Because of the significant role IFC plays in the development and implementation of standards around environmental and social risk, this report will examine IFC's investments in the Uyghur Region as a case study of the risks to DFIs when they invest in the region and the role IFC's Performance Standards can play in identifying that risk.

## THE RESPONSIBILITY OF DEVELOPMENT BANKS IN TIMES OF CRISIS

IFC and other development banks consider investments in regions they refer to as "fragile and conflict-affected situations" (FCS) to be largely positive.[63] In 2020, more than a fifth (21 percent) of IFC's lending was in FCS countries, on the premise that the private sector can and

11

AR001692

TABLE 1

# Development Finance Institutions with Known or Potential Links to the Uyghur Region

| INVESTMENTS | PROJECT NO. | AMOUNT | YEAR | PURPOSE, XUAR LINK, AND RECENT STATUS CHANGES |
|---|---|---|---|---|
| **INTERNATIONAL FINANCE CORPORATION** | | | | |
| **Chenguang Biotech Group Co., Ltd.** | 40616 | $40 million | 2019 | Support company's permanent working capital needs to increase production, including in the XUAR |
| **Camel Group Co., Ltd.** | 41128 | $80 million | 2019 | Build new recycling plants, technical upgrades and maintenance on existing plants, including in the XUAR |
| **Century Sunshine Group Holdings Ltd.** | 33903 <br> 36836 | $40 million <br> $125 million | 2014 <br> 2016 | Expansion of the company's organic fertilizer and other manufacturing, including in the XUAR |
| **Jointown Pharmaceutical Group Co., Ltd.** | 41947 <br> 43968 | <$150 million <br> $50 million | 2019 <br> 2020 | Construction and upgrade of facilities in the XUAR <br> Long-term working capital to meet COVID-19 pandemic demand |
| **Xiang Nian Food Co., Ltd.** | 42401 | $30 million | 2020 | Working capital needs for existing factory in Henan; <br> potential PS risk through associated facility in the XUAR |
| **Kingenta Ecological Engineering Group Co., Ltd.** | 39459 | $145 million | 2017 | Extensive conversion of Kingenta's existing distributors into crop production service centers; the company has holdings in the XUAR that are likely part of the project |
| **Best Logistics Technologies, Ltd.** | 37837 | $30 million | 2016 | Operational expansion of light truck and supply chain management services across China, potential PS risk through associated facilities in the XUAR |
| **Hosen Investment Fund III, L.P.** | 38599 | $30 million | 2017 | Private equity fund for agriculture-related investments, some of which may be located in the XUAR (note: Hosen has built "over 150 poverty-relieving factories," including in the XUAR) |
| **EUROPEAN INVESTMENT BANK (EIB)** | | | | |
| **China Climate Change Framework Loan (I and II)** | 20090490 <br> 20140060 | $40 million | 2014 | Included building improvements in Urumqi, including in high-tech zones <br> Urumqi sub-project CANCELLED in September 2021 (See Online Appendix A) |
| **ASIAN DEVELOPMENT BANK (ADB)** | | | | |
| **Xinjiang Integrated Urban Development Projects** | 45508-002 <br> 46049-002 <br> 49029-002 | $200 million <br> $150 million <br> $150 million | 2013 <br> 2015 <br> 2018 | Infrastructure development projects in several regions of the XUAR (1. Qaramay, Kuitun, 2. Aksu, and 3. Changji) <br><br> Qaramay and Kuitun CLOSED in June 2021, before planned repayment date; Aksu CLOSED in April 2021 (see Online Appendix A) |
| **Xinjiang Tacheng Border Cities and Counties Development Project** | 46063-002 | $150 million | 2015 | Urban infrastructure development in Tacheng City and the XUAR counties of Emin, Tuoli, and Yumin |
| **Solar Energy Finance Project** | 53310-001 | $70 million | 2020 | CITIC Financial Leasing Co., Ltd.'s solar power projects, including in XUAR |
| **Natural Gas for Land and River Transportation Project** | 48281-001 | $150 million | 2014 | China Gas refueling stations along long-distance transportation corridors; potential PS risk through associated facility/gas field and pipeline in Khorgos |
| **Jointown COVID-19 Pharmaceutical Distribution Expansion Project** | 54077-002 | €300 million | 2020 | Affordable pharmaceutical drugs for "under-served populations," potential PS risk through Jointown's extensive facilities in the XUAR |

AR001693

| INVESTMENTS | PROJECT NO. | AMOUNT | YEAR | PURPOSE, XUAR LINK, AND RECENT STATUS CHANGES |
|---|---|---|---|---|
| **EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT (EBRD)** | | | | |
| **Osh Solid Waste Project** | 42471 | €2 million | 2015 | Solid waste transport vehicles, potential PS risk through sub-contracts to XUAR companies |
| **Ulaanbaatar Darkhan Road Project** | 50766 | $175 million | 2019 | Road construction, potential PS risk through sub-contracts to XUAR companies, including Xinjiang Production and Construction Corps (XPCC) |
| **Tokmok Water Sub-Project** | 44828 | €588,800 | 2014 | Vehicles and machinery, potential PS risk through sub-contracts to XUAR companies |
| **Khujand Solid Waste Sub-project** | 47477 | €164,349 | 2016 | Waste transportation project, potential PS risk through sub-contracts to XUAR companies |
| **GERMAN INVESTMENT CORPORATION (KFW/DEG)** | | | | |
| **Jointown Pharmaceuticals Group Co., Ltd.** | Not specified | €30 million | 2020 | Increase delivery capacity and finance working capital; potential PS risk through Jointown's extensive facilities in the XUAR |
| **Hosen Private Equity III, L.P.** | Not specified | $27 million | 2019 | Private equity fund for agriculture-related investments, some of which may be located in the XUAR (note: Hosen has built "over 150 poverty-relieving factories," including in the XUAR) |
| **NETHERLANDS DEVELOPMENT FINANCE CO. (FMO)** | | | | |
| **Beijing Enterprises Water Group Ltd.** | 45024 | $15 million | 2015 | Construction of 8 wastewater treatment plants and 4 water distribution facilities, locations undisclosed, potential PS risk through BEWG's projects in the XUAR |

\* Development finance institutions were provided the opportunity to disclose any investments or sub-contracts in the XUAR, as well as the status of those investments. Responses received by the date of publication are included in Online Appendix A, available on the _report's website._

13

AR001694

should fill gaps left by the public sector in crisis situations, to "help break the cycle of conflict, fragility and poverty."[64]

This strategy has been controversial, both within IFC and among external observers.[65] A 2019 review of IFC's engagement in conflict-affected situations by the World Bank's Independent Evaluation Group did not actually evaluate whether IFC financing positively or negatively affected conflict conditions, focusing instead on whether loans were successfully repaid. Notably, it concluded that IFC should and could increase financing to fragile and conflict-affected states despite also finding that "in several cases, risks [of financial loss] were not mitigated, such as in the tourism industry, where projects failed to meet their financial benchmarks in part due to factors related to fragility including the occurrence of violence, or political instability."[66] Oxfam has pointed out that the World Bank Group's unwillingness to analyze the political economy of FCS prevents it from understanding "which groups are already winning and losing, and which groups will win and lose" from external investments. Oxfam America's President and CEO Abby Maxman concluded in 2020 that the World Bank Group "has not yet addressed how it will manage for the inevitable unintended harms that will result from investing in places where power-holders are often bad actors and institutions are weak."[67] The Organization for Economic Cooperation and Development (OECD) has proposed that a fragility analysis could enhance development finance project appraisal to the benefit of conflict-affected populations.[68] DFIs do not seem to have heeded these recommendations.

The consequences of such inaction can be discerned from the example of the crisis in the Uyghur Region. This report demonstrates that foreign dollars flowing into industrial and agricultural projects in the Uyghur Region finance widespread, state-sponsored, systematic oppression of indigenous populations amounting to genocide. Many DFI investments provide funding to private corporations that are actively participating in some of the PRC government's most repressive policies toward minoritized citizens in the Uyghur Region. Companies "absorb" the labor of people deemed to be "surplus" by the government. They surveil their minoritized workers and require their allegiance to the Chinese Communist Party (CCP). Companies in the agricultural sector (or that source raw agricultural inputs) benefit from state-sponsored land transfers. Those in the so-called circular economy and other manufacturing sectors are supported by the PRC's lax environmental standards that lead to environmental degradation for Affected Communities. All of these programs contribute to the destruction of indigenous culture, traditions, economies, families, and communities. The Uyghur Region is culturally, politically, and ecologically vulnerable.

**Through their investments, DFIs' support for the PRC's political strategy in the Uyghur Region is a green light to environmental, social, and cultural destruction.**

## IFC'S PERFORMANCE STANDARDS

IFC already has in place a system of standards that could be effectively applied to identify the heightened risk that DFIs are taking when investing in a conflict region such as the XUAR. As this report shows, application of those standards to IFC's investments clearly suggest that IFC (and likely other DFIs) is deploying funds that are at very high risk of violating its own stated standards.

IFC's Performance Standards are a well-defined and robust set of guidelines that detail sustainable practice for business. IFC developed its first set of Performance Standards on Environmental and Social Sustainability (typically referred to as the Performance Standards or PS) in 2006. In 2012, under the mandate of the World Bank Group Board, IFC revised its Performance Standards, strengthening its commitments to climate resilience, human rights, corporate governance, indigenous protection, and risk management.[69] The standards provide a model for Environmental, Social, and Governance (ESG) standards that some see as a gold standard for ensuring corporate and investor responsibility. IFC's Performance Standards shape the core of all the environmental and social standards adopted by private and public banks carrying out project finance worldwide (though some banks have issued individual updates since 2012 that strengthen the standards).

The eight Performance Standards that now govern IFC's investments were devised to establish the baseline standards that all IFC clients are required to meet throughout the period of the investment. Those standards are listed in Table 2 below.

The Performance Standards apply to all activities specifically funded by IFC, but IFC-funded companies are encouraged to comply with these standards in all of their activities and projects, regardless of whether they are directly funded by IFC. Where domestic governmental

regulations are relevant to the Performance Standards, IFC clients are expected to maintain the standard that is more stringent.[70]

IFC Performance Standards govern the behavior of clients and largely outsource due diligence to the projects' own administrators. However, IFC retains an oversight role for itself in its Policy on Environmental and Social Sustainability.[71] This policy notes that, "While managing environmental and social risks and impacts in a manner consistent with the Performance Standards is the responsibility of the client, *IFC seeks to ensure, through its due diligence, monitoring, and supervision efforts, that the business activities it finances are implemented in accordance with the requirements of the Performance Standards*" (paragraph 7, emphasis added). IFC lays out specific expectations of its loan officers and personnel for oversight, including reporting environmental and social risks (paragraph 21), only financing operations that adhere to the Performance Standards (paragraph 22), and independently determining whether project "risks are manageable, and if so under what conditions, so as to create outcomes consistent with the Performance Standards" (paragraph 23). IFC policy commits the institution to appropriately scope its oversight of the client, typically including document review, site inspection, stakeholder interviews, and a Performance Standards

gap analysis.

Critics of the Performance Standards have indicated that, because they are not normative or quality-assured, they serve more as guidelines with flexible implementation. Furthermore, according to a June 2020 review of IFC environmental and social accountability, Performance Standards are not demonstrably enforceable. Clients sometimes refuse to remediate harms or reverse violations of the Standards.[72] Given that IFC faces a long-term shortage of social specialists on staff, scholars have suggested that social considerations are inconsistently written into these contracts.[73] As a practical matter, because environmental and social due diligence is subsumed under economic due diligence, which is benchmarked by the bankers who staff IFC, the human rights dimensions that contradict economic drivers are often bypassed according to scholarly reports.[74] Andrew Hopkins and Deanna Kemp identified this issue when examining the causes of a catastrophic mine dam break in Brazil that killed more than 250 people in 2019. They note that though IFC guidelines state that mine closure costs should be fully funded during implementation, operators have leeway to bypass this expectation in practice if they conclude it would make the project "less competitive."[75]

There are also political determinations that override



**FIGURE 2:** International Finance Corporations Performance Standards.

AR001696

**TABLE 2**

# IFC Performance Standards on Environmental and Social Sustainability

| Performance Standard 1 | Assessment and Management of Environmental and Social Risks and Impacts | "underscores the importance of managing environmental and social performance throughout the life of a project" and "involves engagement between the client, its workers, local communities directly affected by the project (Affected Communities) and, where appropriate, other stakeholders" |
|---|---|---|
| Performance Standard 2 | Labor and Working Conditions | "recognizes that the pursuit of economic growth through employment creation and income generation should be accompanied by protection of the fundamental rights of workers," including workers in the client's supply chain; requires clients to "avoid the use of forced labor" |
| Performance Standard 3 | Resource Efficiency and Pollution Prevention | "recognizes that increased economic activity and urbanization often generate increased levels of pollution to air, water, and land, and consume finite resources in a manner that may threaten people and the environment" |
| Performance Standard 4 | Community Health, Safety, and Security | "recognizes that project activities, equipment, and infrastructure can increase community exposure to risks" and accelerate or intensify the effects of climate change |
| Performance Standard 5 | Land Acquisition and Involuntary Resettlement | "recognizes that project-related land acquisition and restrictions on land use can have adverse impacts on communities" and that involuntary resettlement — both physical and economic displacement — can result from that acquisition or restriction |
| Performance Standard 6 | Biodiversity Conservation and Sustainable Management of Living Natural Resources | "recognizes that protecting and conserving biodiversity, maintaining ecosystem services, and sustainably managing living natural resources are fundamental to sustainable development" |
| Performance Standard 7 | Indigenous Peoples | "recognizes that Indigenous Peoples. . .are often among the most marginalized and vulnerable segments of the population," and that "their economic, social, and legal status limits their capacity to defend their rights to, and interests in, lands and natural and cultural resources, and may restrict their ability to participate in and benefit from development" |
| Performance Standard 8 | Cultural Heritage | "recognizes the importance of cultural heritage for current and future generations" |

AR001697

Performance Standards. Specifically, scholars have argued that the World Bank Group avoids references to human rights in contexts where rights language is disfavored by the client country. In her detailed examination of World Bank investing and human rights, Galit Sarfaty singles out China as a country where bank employees "avoid using the term or taking a rights-based approach." She notes that China "could easily seek funding from the private sector" but is an important borrower and source of revenue for the World Bank Group. "Because the Bank cannot afford to lose their business, employees working on projects in these countries are often pressured to avoid explicit references to human rights for fear of angering government officials."[76]

IFC states that early engagement with clients to manage potential environmental and social risks "is critical in fragile and conflict-affected situations that require a heightened focus on country and sector-specific risks along multiple decision points." It professes that "[t]hrough its Sustainability Framework, IFC is well-positioned to support clients in these dynamic environments."[77] However, clients may not seek out such "support" and may prefer to exacerbate the power imbalances inherent to the conflict that defines the fragile context.

The IFC is the private-sector part of the World Bank Group. While the other components of the World Bank Group (IBRD and IDA) can only lend directly to governments, the IFC is set up differently and can lend directly to companies. While many IFIs do have private sector units, the IFC is somewhat unusual in being a separate organization. The Inter-American Development Bank also has a private-sector lender (the IIC), and the European Bank for Reconstruction and Development engages in private company lending.

## WHY IFC'S PERFORMANCE STANDARDS MATTER FOR THE CRISIS IN THE UYGHUR REGION

The Performance Standards are intentionally designed to prevent IFC and its partner banks from investing in projects that cause or contribute to atrocities. They have their roots in a set of World Bank Operational Policies (OPs) made binding after internal reports identified weak adherence to environmental and social standards as a driver for failures in highly criticized projects.[78] IFC adapted the OPs in the early 2000s to make them fit-for-purpose for collaboration with private banks, creating the Equator Principles for private bank clients in 2003, the Performance Standards for IFC clients in 2006, and a strengthened version of both in 2012.[79] Their entire function is to prevent IFC from financing projects that will have adverse environmental and social impacts that jeopardize its development aims. While IFC's preamble to the Performance Standards notes that "IFC requires its clients to apply the Performance Standards to manage environmental and social risks and impacts so that development opportunities are enhanced [and] uses the Sustainability Framework…in order to achieve its overall development objectives," the private sector instrument, the Equator Principles, is more direct. The Equator Principles' preamble states: "We will not provide loans to projects where the borrower will not or is unable to comply with our respective social and environmental policies and procedures that implement the Equator Principles."[80]

IFC's Performance Standards provide a clear framework for assessing ESG risk in any location. Although IFC (and other DFIs) may not be inclined to prioritize the Performance Standards over politics in China, the Uyghur crisis actually necessitates a heightened attention to environmental and social risks standards and thus make clear the inherent value of such a set of standards. As a 2019 IFC study on its investments in FCS countries observes, "substantial social and natural resource issues are often associated with conflicts."[81] The crisis in the Uyghur Region is not an armed conflict but a state-sponsored regime of terror that is enacting what many have called a genocide upon the indigenous people. Both the local governments and private corporations tasked with providing for the security and livelihoods of the people of the region are agents of that terror, which compromises the development value of DFI investments.

**This report deploys IFC's own Performance Standards as an internationally accepted set of norms of corporate behavior.** The Performance Standards serve as a useful tool by which to scrutinize the wide range of injustices being inflicted upon indigenous communities under terror capitalism in the Uyghur Region. International standards involving labor rights, community health, pollution, land acquisition, and indigenous rights and voices relevant to the crisis are explicitly enumerated in the Performance Standards. Application of those standards reveals an extraordinary array of violations and risks.

**It is incumbent upon DFIs to conduct the monitoring required of them in their own sustainability**

17

AR001698

**frameworks.** IFC largely relies on companies to self-report adherence to Performance Standards. IFC-funded clients operating in the XUAR are not only unprepared to engage the Performance Standards, they are active proponents of and agents in the government strategies that undermine those standards. Corporate administrators conceptualize coercion differently from how human rights advocates and Uyghurs themselves do. PRC government authorities characterize cultural erasure as patriotic. To ensure compliance with its standards, IFC needs granular, ground-level knowledge to provide assurance that forced labor, forced eviction, and other forms of coercion, discrimination, dispossession, and environmental harm are absent from its project's footprints, associated facilities, and supply chains. IFC cannot trust the corporations that benefit from these injustices to self-report.

Any attempt to conduct external monitoring of ESG in the Uyghur Region, however, is futile. In the Uyghur Region, the crisis has created substantial barriers to meaningful engagement in consultations with Affected Communities, which is prescribed by the Performance Standards. Government-approved community "representatives" cannot be trusted to represent the voices of those who are disenfranchised in the region, and discussing grievances is punishable by internment and long prison sentences. Due diligence is complicated in the region by the direct suppression and censorship of information by Beijing. Auditors have left the region in protest of these conditions, and IFC stated that, as recently as November 2020, it does not have alternative approaches to engagement in the region.[82] As a result, IFC has not conducted meaningful on-the-ground monitoring of its projects in the Uyghur Region and could not safely do so if it tried. All meaningful dialogue with stakeholders would be undermined by the crisis there.

State-sponsored forced labor, land expropriation, cultural destruction, and family separations directed at minoritized populations represent an extraordinary and complex set of risks for corporations engaged in state programs in the Uyghur Region. **While corporations reap the benefits of the oppression of minoritized indigenous citizens in the Uyghur Region and DFIs collect their interest, the communities of the region suffer.**

AR001699

# INVESTMENTS IN THE UYGHUR REGION

**A**S A RESULT OF ITS SIGNIFICANCE in the Development Finance Institution (DFI) landscape and because it is the originator of the Performance Standards, this report takes as its case study the International Finance Corporation's (IFC's) investments in the Xinjiang Uyghur Autonomous Region (XUAR or the Uyghur Region). This report identifies the risk of violating Performance Standards that DFI-invested projects might present when operating within the context of the crisis in the Uyghur Region.

IFC currently has approximately $486 million in loans and equity investment in four companies operating in the Uyghur Region:[83]

- **Chenguang Biotech Group Co., Ltd.** （晨光生物科技集团股份有限公司）

- **Camel Group Co., Ltd.** （骆驼集团股份有限公司）

- **Century Sunshine Group Holdings, Ltd.** （世纪阳光集团有限公司）

- **Jointown Pharmaceutical Group Co., Ltd.** （九州通医药集团股份有限公司）

IFC's investments in the XUAR include clients in the agriculture, technology, manufacturing, and, until very recently, energy production sectors. IFC has additional investments in the region through a large portfolio of "financial intermediaries," which are not considered in this report. IFC also finances companies that source from suppliers located in the Uyghur Region.

Using IFC project documentation, supplemented with corporate reports, PRC government directives, state media reporting, corporate publicity campaigns, and satellite imagery of IFC's client operations, this report presents credible evidence that IFC financing is contributing to repression in the Uyghur Region. Evidence drawn from corporate disclosures and publicity campaigns, government directives and state media, and other publicly accessible information reveals that

the four companies mentioned above have

- **directly participated in and benefited from state-sponsored forced labor programs,**

- **directly participated in and benefited from state-sponsored compulsory land expropriation,**

- **participated in programs that require minoritized citizens to take oaths to the Chinese Communist Party (CCP) and be subjected to indoctrination,**

- **recruited workers through overtly racist/ discriminatory hiring practices,**

- **assigned minoritized citizens to do hazardous work without safety equipment,**

- **contributed to the environmental destruction of affected and indigenous communities,**

- **contributed to the destruction of cultural heritage, and**

- **failed to fully implement IFC's required monitoring and assessment of its Performance Standards.**

Through an assessment of publicly available evidence, we determined that IFC's clients in the Uyghur Region are at very high risk of violating many Performance Standards (see Table 3).

Over the course of 2020, nonprofit advocacy group NomoGaia engaged in dialogues with IFC to determine to what extent the institution had investigated its investments and its relationship to the Uyghur crisis. In March 2021, NomoGaia published a report identifying the questions IFC should investigate to better understand its clients' adherence to the Performance Standards in regard to the Free, Prior, and Informed Consent (FPIC) of Affected Communities.[84] IFC provided some feedback, but as this report documents, for most investments, IFC

**19**

**AR001700**

TABLE 3

# IFC Performance Standards Risk of Violation

| | CHENGUANG BIOTECH | CAMEL GROUP | CENTURY SUNSHINE | JOINTOWN PHARMACEUTICAL |
|---|---|---|---|---|
| 1. Assessment and Management of Environmental and Social Risks and Impacts | HIGH | HIGH | HIGH | HIGH |
| 2. Labor and Working Conditions | HIGH | HIGH | HIGH | HIGH |
| 3. Resource Efficiency and Pollution Prevention | unknown | HIGH | MODERATE | unknown |
| 4. Community Health, Safety, and Security | unknown | HIGH | unknown | unknown |
| 5. Land Acquisition and Involuntary Resettlement | HIGH | unknown | LOW | LOW |
| 6. Biodiversity Conservation and Sustainable Management of Living Natural Resources | unknown | unknown | unknown | unknown |
| 7. Indigenous Peoples | HIGH | HIGH | HIGH | HIGH |
| 8. Cultural Heritage | Included by IFC under "Indigenous Peoples" where that category is applicable | | | |

20

has not produced documentation to demonstrate that risks of forced labor, ethnic erasure, and other marginalization are managed. When asked for detailed documentation to demonstrate oversight, IFC only provided partial responses. This report serves as a follow-up to the earlier report, in which we utilized publicly available records to answer some of the questions initially posed to IFC.

In response to a review of this report, IFC reported the following: "Sensitive to those [environmental and social] risks as well as difficulties around travel, we have not made any investments in the Xinjiang region in the last two years. In fact, we recently exited one of our investments because the client planned to acquire a company with operations in Xinjiang and we could not undertake thorough due diligence. We have also turned down a number of new investment proposals because we were not able to verify whether the project met our standards" (See *Online Annex A*). While IFC has not initiated new funding since 2020, several significant clients remain, and those

companies continue to engage in repressive programs against minoritized citizens.

The following sections present studies of each of IFC's remaining clients in the Uyghur Region, identifying specific ways in which those companies are violating or are at risk of violating IFC's own Performance Standards. Some of the research presented below reveals egregious violations of human rights and explicit participation in repressive government programs. Other aspects of the research indicate high likelihood of violation, in particular in the realm of environmental degradation, which cannot be adequately studied using desk-based research methods and would require on-the-ground investigation to ensure that the companies are not in breach of the Performance Standards.

In the conclusion of this report, we provide recommendations for how IFC should act in response to this evidence. These findings should also be seen as an indicator of how other DFIs might be exposed and should respond.

AR001701

## CHENGUANG BIOTECH GROUP CO., LTD.
### （晨光生物科技集团股份有限公司）

Chenguang Biotech Group Co., Ltd. (Chenguang Bio or CCGB) produces plant-based extracts, food additives, natural dyes, pigments, and supplements from agricultural products, such as marigolds, peppers, tomato skins, cotton seeds, cumin, walnuts, and grape seeds. Chenguang is headquartered in Handan, Hebei Province. The company sources and processes its raw materials from the XUAR and Andhra Pradesh, India. The company received IFC financing to expand raw materials sourcing in the XUAR as well as to expand into Zambia.[85] The company's expansion in the XUAR has been supported by significant tax reduction incentives.[86]

The company's extensive Uyghur Region holdings include at least twelve subsidiaries and processing facilities in Kashgar, Qaramay, Yarkand, Qarasheher, and Korla. The Uyghur Region has a hospitable climate for

### AT A GLANCE: CHENGUANG BIOTECH GROUP CO., LTD.

| Business Description | Manufacturer of plant-based extracts and additives for global export; a leading global producer of lutein supplements, capsanthin, and other ingredients in cosmetics |
| --- | --- |
| Investment Start Date | September 3, 2019 |
| Investment Amount | $40 million 6-year loan |
| Investment Purpose | Support the company's permanent working capital needs to increase production |

Zhu Ping, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation: Chenguang Biological order-based planting helps 100,000 farmers in Yarkand County to get rid of poverty"), 21st Century Business Herald, August 1, 2019, Online; Chenguang Information, "晨光生物把万寿菊种成南疆 '脱贫致富花'" ("Chenguang Biological plants marigolds as 'flowers for alleviating poverty and getting rich' in southern Xinjiang"), Guba.com, April 1, 2020, Online; Note: The second article indicates that CCGB may be falsely promoting its lutein capsules to middle school students as good for ocular health, though lutein's only likely effective medical use is for old-age-related macular degeneration. "'焉支山'下，'三红'调制'小康味.'" ["Under 'Yanzhi Mountain,' 'Three Reds' are used to make 'well-off taste'"], Xinhua News Agency, September 17, 2020, Online.

and a long history of producing many of the raw materials Chenguang requires. The Uyghur Region grows 85 percent of China's cotton,[87] more than 70 percent of China's tomatoes (and as much as 90 percent of its export tomato paste),[88] 50 percent of China's walnuts,[89] and 28 percent of China's grapes.[90] IFC's disclosure summary for Chenguang indicated that "~90% of [the company's] cottonseed, nearly 83% of paprika, and all marigold flowers are sourced from Xinjiang."[91] Marigolds are the key ingredient in the company's lutein supplements, and CCGB claims to be the supplier of more than a quarter of the world's lutein.[92]

**Export Customers:** The company claims to generate more than 30 percent of its revenue through exports.[93] Customs records indicate that the following customers have recently imported goods from CCGB: Pure & Green Life (United States), Mb Supplements (United States), OmniActive Health Technologies (India), AVT Natural Products (India), Hudson Trading Group (United States), Panacea Phytoextracts (India), Spicin Foods (United States), Kancor Ingredients (India), Shan Foods (Pakistan), Bio-Gen Extracts (India), Synthite Industries (India), Essence Indonesia (Indonesia), Roha Lautan Pewarna (Indonesia), Roha USA (United States), Yihai (US) Food (United States), Global Inovasi Cemerlang (Indonesia), Pt Foodex Inti (Indonesia), Bangja Inti Ingridien (Indonesia), Indesso Aroma (Indonesia), Kalsec (United States), Industrias Vepinsa S.A. de C.V. (Mexico), and Industrial Organica S.A. de C.V. (Mexico).[94]

Two Chenguang customers—Hudson Traders and Kalsec—have indicated that Chenguang has conducted third-party SEDEX-SMETA social audits that identified no forced labor at its facilities or in its supply chains. Kalsec indicated that its team has visited Chenguang's farms to conduct a sustainability assessment and has "personally trained Chenguang BioTech representatives to conduct their own further sustainability assessments to ensure adherence with our supplier requirements." Hudson Traders wrote that "the supplier has repeatedly denied any involvement in alleged forced labor or human rights violations in the XUAR to us." (See *Online Annex A* for the letters and more details.) In a phone conversation, Hudson Traders informed the authors that the company has suspended all future orders from Chenguang.

21

AR001702

## IFC PERFORMANCE STANDARDS VIOLATION RISK

| | |
|---|---|
| **1. Assessment and Management of Environmental and Social Risks and Impacts** | **HIGH** |
| **2. Labor and Working Conditions** | **HIGH** |
| **3. Resource Efficiency and Pollution Prevention** | unknown |
| **4. Community Health, Safety, and Security** | unknown |
| **5. Land Acquisition and Involuntary Resettlement** | **HIGH** |
| **6. Biodiversity Conservation and Sustainable Management of Living Natural Resources** | unknown |
| **7. Indigenous Peoples** | **HIGH** |

## RISK OF PERFORMANCE STANDARDS VIOLATIONS

PS2 (Labor and Working Conditions) and PS5 (Land Acquisition and Involuntary Resettlement) In the Uyghur Region, CCGB's direct workforce of roughly 370 (as of 2019, per IFC), including highly skilled labor in high-tech processing facilities, carries out agricultural processing activities while the company sources its raw materials from thousands of small-scale farmers and farming cooperatives. The majority of the direct workforce (76 percent) is Han, which suggests discriminatory hiring practices since the company operates in majority Uyghur areas.[95] A job advertisement for workers for Chenguang's wholly-owned subsidiary, Xinjiang Chenxi Pepper Industry Co., indicated that, indeed, administrative jobs (including office clerk and accountant), operations management, and warehouse workers were required to be of "Han ethnicity," whereas "seasonal workers in the workshop" positions were open to people of any ethnicity.[96] A Chenguang promotional video published on Weixin in 2020 about its operations in the XUAR seems to confirm that discrimination continues; Uyghur farmers appear in the film, but all of Chenguang's direct employees appear to be Han.[97]

Various Chinese state media reports have announced that Chenguang has created more than three hundred and fifty job opportunities *each year* since it arrived in the XUAR and lifted between forty thousand and seventy thousand households out of poverty, increasing farmers' income by between 2,000 yuan and 10,000 yuan per household.[98] CCGB also reported that the company actively "solve[d] the problem of employment" of more than one hundred thousand people who work as seasonal flower pickers.[99] None of these claims can be verified,

but, as reported below, the transition to Chenguang jobs and crops was facilitated through coercive state-sponsored labor and land transfers, in direct cooperation with the IFC client company.

State media has reported that CCGB built facilities in Yarkand with the specific intent to "recruit poor laborers first" through state-sponsored poverty alleviation and labor transfer schemes.[100] As discussed in the introduction, these labor recruitment programs are typically state-sponsored and coercive assignments of impoverished people in low-skill/low-wage jobs, often against their will. CCGB's participation in these programs indicates a high risk of violation of PS2's protections of laborers' rights to freely choose employment.

CCGB reportedly sources raw agricultural materials from approximately eight thousand small-scale agricultural producers in the Yarkand area alone,[101] but many of them are subject to coercive land/labor transfer programs. CCBG participates in and benefits from the XUAR government programs called "enterprise + cooperative + order farming" (企业+合作社+订单农业) and "land transfer + x new countryside development strategy" (土地流转+X新农村发展方略). Chenguang determines the types and quantities of agricultural produce it needs for its processing facility. The company partners with local governments to establish a purchase price agreement for the crops, typically with no input from the farmers. [102] The company establishes acquisition points and "closely integrates the development of enterprises with helping farmers to alleviate poverty."[103] The state organizes small-scale farmers to transfer their land to a larger cooperative, run by a very small group of the most prominent farmers in the area, or sometimes a Han Chinese person, who often retains the majority of revenues. SAIC filings

**AR001703**



**FIGURE 3:** Two men rake harvested marigolds destined for Chenguang.
Source: Still from Chenguang Biotech Promotional Video

**FIGURE 4:** Five members of a labor task force work to "educate" a single female farmer to plant marigolds.
Source: Xinjiang University Innovation China.

have identified "cooperatives" that are 90 percent controlled by a single shareholder.[104] According to an article published by Chenguang Bio promoting its poverty alleviation efforts, in one small town in Yarkand, cadres from the Department of Natural Resources and Xinjiang University arrived in the village, observed the situation, and declared unilaterally that all of the land (with few exceptions) would be dedicated to marigold planting.[105]

In another instance of CCGB's participation in these programs, Yarkand County (莎车/ Shache) agencies, in partnership with the Xinjiang branch of the Agricultural Development Bank, encouraged Chenguang to build a factory in the county with a 226 million yuan loan (~$34 million—about the same amount that IFC loaned the company in the same year, 2019). This was part of the state-run bank's "matchmaking" program, whereby the bank pairs companies with towns the government is seeking to "develop."[106] CCGB provides agricultural inputs (of seeds and fertilizer, for instance) to farmers that are coerced to commit their harvests to the company and promotes marigolds as the "flower for poverty alleviation and prosperity," while the local Yarkand government "guides" farmers to grow the flowers the company uses to make its lucrative lutein capsules. Farmers sign contracts directly with Chenguang to sell the marigolds at a set price.[107] This program is touted as a rural development scheme. IFC's disclosure page on Chenguang states: "Interviews with sample marigold

**23**

**AR001704**

growers suggested a positive relationship between Chenguang and growers."[108] These interviews were conducted during a surge of mass internment in the region and, IFC confirmed, under company surveillance.[109] The sample was likely not representative, given the state's control over such matters.

Chenguang and the regional government claim that Chenguang crop prices are higher than what farmers can earn planting wheat or cotton.[110] However, research suggests that Uyghur and other minoritized people are coerced into working toward Chenguang's goals. In Yarkand, for instance, state media reported in 2020 that "not just a few" Uyghur farmers were "doubtful about planting marigolds" for industries in the region, citing their reluctance to leave traditional farming and their concerns about being able to make enough money. (CCGB appears to be the only company growing marigolds in that area). County labor task force members conducted "household visits and evening schools for farmers and herdsmen" to convince them of the benefits of growing marigolds. Government agents visited farmers' households until the farmers relented and expressed their "determination" to pursue the "poverty alleviation" agenda. According to media reports, farmers who argue that they know nothing about marigolds are told that it is not difficult to learn and are pressured to do so, while farmers who request a loan to raise cattle are refused because they do not have the requisite knowledge.[111]

In the year after IFC's investment, Chenguang built a new marigold processing factory in Kargilik that would be capable of processing 250 tons of marigolds per day.[112] A 2020 media report described a corporate-state cooperative program that led to the *entire village* of Bostan in Kargilik County (叶城/Yecheng)—242 farmers—being directed to transfer their land to the Kargilik County Beautiful Natural Planting Farmers Professional Cooperative for the benefit of Chenguang.[113] In 2020, the cooperative was expected to plant "1280 mu of marigolds, 122 mu of roses, 86 mu of sorghum, and 5 mu of mint; [and] plant 1324.7 mu of high-yield corn, 474 mu of wheat, and 262 mu of vegetables and fruits," (roughly 585 acres in total) making the cooperative an anticipated 9 million yuan through an order agreement with Chenguang. The cooperative is managed by "fifteen large planting households" out of the 242 farmers that have had their land cooperativized. State media celebrated that this resulted in an income of 1.87 million yuan being distributed to the farmers who participated





**FIGURE 5: 2015, 2019, 2021 land conversions in Bostan (eliminating forests and family gardens; instituting monocropping, detail of 8 acres.**
Source: Google Earth

in the scheme—less than a quarter of the cooperative's expected income, and a mere 7,723 yuan per year per farmer (or 643 yuan a month) if the dividends were divided equally.

The dividends are not distributed equally—one farmer reported that he was given 1,680 yuan per year (or 140 yuan per month, or $21) for transferring 3.3 mu (roughly a half acre). That rate falls below the meager 1,500 yuan per mu annual rate indicated in other local government documents and leaves the farmers without livelihoods, ancestral lands, or self-determination.[114] Villagers are not given

AR001705



**FIGURE 6:** Chenguang Bio Marigold Planting Base.
Source: People's Daily Online - Xinjiang Channel.



**FIGURE 7: Uyghur farmers harvest marigolds for Chenguang.**
Photo Credit: Shi Jiaming for People's Daily

the opportunity to reject these terms or retain their lands. See Figure 5 for Google Earth time-lapsed imagery of the transformation of Bostan village from small farm households surrounded by shade trees to cooperativized land and monoculture farming in the service of Chenguang.

In Chenguang's state-facilitated mass land transfer scheme in Bostan, 103 farmers who previously farmed the land themselves were then contracted to work the land by the cooperative, and the media reports that they were paid a total of 1.491 million yuan for that work—only 1,206 yuan (~$185) per farmer per month. If their land dividends were paid out equally, their monthly income would still only come to 1,850 yuan, which is just slightly above the 1,820 yuan XUAR minimum wage for 2020.[115] In reality, at the low per mu rate described by the farmer cited above, their resulting income is likely reduced to below the XUAR's minimum wage (for working on land coercively expropriated from them). Indeed, if the farmer cited above is representative of other farmers, then that amount would be 1,346 yuan ($208) per month and is potentially far less.

The program also "allows farmers to extract themselves from the land and move out for employment," according to media reports. In Bostan, hundreds of farmers who had "extracted themselves from the land" were then "transferred" for work, likely to factories within the XUAR. Reports indicated that the transferred laborers' "average monthly salary per capita reached 1900 yuan," but that figure excluded "the epidemic period."[116] However, the same report stated that after this significant transformation of the entire village to suit the needs of CCGB, the per capita annual income of Bostan village amounted to 13,658 yuan (or 1,138 yuan—$176—per month) in 2020, far below the regional minimum wage (and only on average; some earned less). These farmers no longer have rights to their small subsistence farms to supplement their meager incomes, and many of them are then left few, if any, viable options other than state-sponsored labor transfers, even when they expressly prefer to remain in farming or in their own community.

Chenguang's wholly-owned subsidiary, Xinjiang Tianjiao Hongan Agricultural Technology Co. (新疆天椒红安农业科技有限责任公司), initiated a similar program of dispossession and land collectivization in concert with the Xinjiang Production and Construction Corps' (XPCC's) 1st Division, which has been sanctioned by the U.S. government.[117] In 2018, in the name of "sustainable development," the XPCC transferred the land management of Alar Farm to Xinjiang Tianjiao for pepper planting. The private company then cooperativized the land, giving farmers only 700 yuan per mu, "and then hires them back to manage the planting of peppers" at the rate of 260 yuan per mu, a program described as "land transfer and reemployment." There is no indication that farmers are allowed to refuse participation.[118] In 2020, this program was reportedly replicated in the XPCC's 3rd Division, when Xinjiang Tianjiao signed planting agreements with farmers whose land had recently been cooperativized under the guidance of the local Party Committee.[119]

These farmers are not direct employees of CCGB and are thus not directly covered by CCGB's corporate labor protections, though they should be covered under IFC's safeguards for workers in "associated facilities."[120] The farmers are explicitly engaged by CCGB to plant crops for them, under terms set in advance by (unelected) village work team leaders. CCGB sets the price for the products and sends a representative to collect them. Without having to own any land or contract any farmers, CCGB participates directly in a program that expropriates whole villages' land from farmers through state-organized cooperatives, without land-based compensation or adequate financial compensation. Ironically, this program is touted as a development program. This suggests a very high risk that CCGB is in violation of PS2 and PS5 as well as of the monitoring required by PS1 (Assessment and Management of Environmental and Social Risks and Impacts).

Some farmers who have not been affected by this cooperativization effort continue to plant their own small farms with marigolds, under pressure from the county and Chenguang. One state media report indicated that the XPCC, having learned of the successful planting for Chenguang in Yarkand, decided to pursue a similar program in one of its regiments in cooperation with the company. Again, reports indicate that the XPCC had to resort to "ideological work" to convince farmers to plant marigolds, because, as the commander of the 4th Company of the 51st Regiment told reporters, "The masses were unwilling to accept the cultivation of marigolds in the early stage. After the inspection in Yarkand County, we returned to the public and widely publicized [the plan] and did ideological work. Everyone slowly changed the traditional planting method."[121] Such "ideological work" is a common method of coercing minoritized citizens to do the bidding of the state, and in this case, of an IFC- and state-financed corporation. The harvesting season for marigolds lasts from June until first frost—about five to six months—and would earn a farmer about 3,000 yuan per mu. Many small-share farmers have less than 5 mu of land on which to plant, leaving the majority of farmers earning far less than the minimum wage in those months. Given the current compulsory labor regime in effect in the XUAR, those farmers are highly likely to be identified as seasonal surplus labor and thus required to transfer for work at a factory in the months when they are not picking marigolds for Chenguang.

These coercive programs assist CCGB in rapidly expanding its production. In 2019, CCGB reported expanding the area of its marigold fields in the XUAR by 30 percent, reaching 138,000 mu.[122] In 2020, Chenguang Chairman Lu Qingguo indicated that the company expected to have planted almost 200,000 mu of marigolds by the end of the year (another 45 percent increase in a single year),[123] and as of October 2020, the marigold planting area in Yarkand County alone was reported to have expanded to 130,000 mu.[124] The cultivation of marigolds under Chenguang's encouragement is intended to "drive farmers' large-scale contiguous planting"[125] in areas where farmers were previously engaged in transgenerational small-scale family farming. While some of those farms were merely subsistence farms and some farmers were indeed impoverished and in need of assistance, the programs that transfer their lands away from them are not demonstrably voluntary.

According to the company's own publicity, after only ten years in the XUAR, Chenguang has emerged as a leader in the production of not only marigolds, but also chili peppers. In order to achieve rapid growth, the company has reported that it has cultivated 400,000 mu of red peppers and 600,000 mu of bell peppers, at least in part through significant land transfers from small-share farmers to large cooperatives in Karashaher (焉耆/Yanqi) County. A Xinhua article reported that by 2020, Karashaher County had successfully transferred 151,000 mu (25,000 acres) of land to cooperatives serving CCGB

**AR001707**

and other corporations in the region. These transfers amounted to one-third of all arable land in the county. Lu, CCGB's chairman, claimed that the land CCGB cultivated for peppers (by proxy through the cooperatives) had increased from 50,000 mu to 600,000 mu—a twelvefold increase. The county claimed that these transfers of land "helped the labor liberated from the land achieve stable employment, forming a virtuous circle." The companies operating in the Karashaher region are collaborating with the county government to shift farming toward high-precision, high-tech agricultural development, likely displacing even more farmers.[126]

**PS7**
**Indigenous Peoples**
As indicated in the sections above, reports of Uyghur farmers being unwilling to plant at the direction of the state sometimes cite the farmers' concerns about shifting from the crops they have grown for generations.[127] Furthermore, large-scale corporate and cooperative farming in the region has been accompanied by an "Old Orchard Reconstruction" project, which cleared the old-growth poplar and elm trees to make way for expansions of farmland, which research suggests likely also triggers indigenous concerns of ancestral traditions being uprooted in the process.[128] These indigenous commitments to tradition are understood by the state as impeding the people's progress, and "ideological work" is undertaken by government agencies to "encourage" the people to relinquish their land, change their crops, alter their farming methods, work for cooperatives or large-scale farms that have expropriated their lands, or move to factory labor. These practices are at high risk of violating PS7, as government "encouragement," especially when backed by a vast system of mass internment, is a coercive tactic. IFC determined there was no need to seek the Free, Prior, and Informed Consent (FPIC) of indigenous peoples affected by Chenguang, because the factories were situated on government-held land. Technically all land is "state held" in China, so this designation is not sufficient to determine what rights indigenous people nonetheless have on the land. IFC does not appear to have evaluated whether state-held land had indigenous significance or even whether Uyghurs held actual leases prior to appropriation, let alone whether Uyghur farmers freely consented to land expropriations, crop conversions, and, in many cases, permanent personal physical displacement to supply Chenguang with their raw materials. This

is both because IFC has only had cursory and surveilled communications with the agricultural producers associated with Chenguang, and because for Uyghurs to express resistance to "development" initiatives is considered an indicator of extremism, as noted above.

## IFC'S RESPONSE TO CONCERNS
IFC determined that the environmental and social risks associated with financing Chenguang were "limited" and "can be readily addressed through good international industry practice and mediation measures." IFC determined this project to be a lower-risk Category B project, while indicating that treatment of workers and labor rights were both key issues to be considered by the company.[129]

In NomoGaia's spring 2021 interactions with IFC, IFC asked how it might demonstrate that its operations were not connected to the forced labor campaigns associated with internment camps and prisons. NomoGaia provided a list of questions and document requests. IFC supplied no documents and answered a small number of these questions. IFC responses explicitly relied on documents provided by Chenguang, such as supplier contracts and written statements from suppliers, rather than on-the-ground audits or inspections by IFC. Requests that IFC articulate the percentage of seasonal laborers who have been through "reeducation" in "vocational education and training centers" were unanswered. Likewise, IFC did not respond to requests for clarifying data demonstrating that all workers labor in the vicinity of their homes, or that wages met the XUAR's legal minimums. IFC declined to provide GPS coordinates of the Chenguang Bio facilities or its suppliers to facilitate analysis. However, the evidence of forced labor and land transfers presented in this report was available in publicly accessible websites at that time. It is not clear whether IFC conducted independent due diligence to identify these risks or evaluate the claims of its client company.

IFC reported conducting five spot interviews with Uyghur truck drivers delivering crops to one of Chenguang Bio's facilities in 2019.[130] Spot interviews with workers at job sites are unlikely to elicit candid criticisms.[131] IFC did not provide the authors any requested wage data that might demonstrate that economic "development outcomes" were being benchmarked or met.

27

AR001708

## SUMMARY OF PERFORMANCE STANDARDS RISK

Chenguang is at risk of violating the following IFC Performance Standards[132]:

- hiring is nondiscriminatory (PS2-15)

- workers have a non-retaliatory grievance process (PS2-20)

- recruitment practices are free of forced labor through labor transfers (PS2-22)

- land appropriation is voluntary (PS5-1)

- land appropriation happened in adequate and unco-erced consultation with and monitoring by Affected Communities (PS5-2 and 10) fair compensation or replacement of living standard was secured for expropriated land (PS5-9)

- submission of documentation of compliance with IFC standards where government programs have expropriated lands of benefit to the company (PS5-30)

- Free, Prior, and Informed Consent (FPIC) of the Affected Communities was attained for land and labor transfers in indigenous territories (PS7-10, 11, 13, and 14)

- tangible and intangible cultural heritage is protected (PS7-16 and 17)

## CAMEL GROUP CO., LTD.
（骆驼集团股份有限公司）

Camel Group Co., Ltd. is among China's largest battery manufacturers. Its primary focus is the production, dis-tribution, and recycling of lead-acid storage batteries for automobile starters. The company has major distribu-tion worldwide, counting many US, European, Japanese, and South Korean car manufacturers among its custom-ers. Camel Group operates facilities in Hebei, Jiangxi, Guangzhou, Hubei, Jiangsu, and Guangxi Provinces in China, as well as in Malaysia and South Korea. Camel Group received an IFC loan to expand its recycling oper-ations into Toksun County in the XUAR, on the property of its recently built manufacturing facility. Lead-acid bat-tery recycling requires lead smelting, making the project one of IFC's highest risk, Category A investments. This categorization necessitates heightened due diligence to align with IFC's Environmental and Social Framework. Such due diligence, required to be public, has not been disclosed by IFC.

### AT A GLANCE: CAMEL GROUP CO., LTD.

| | |
|---|---|
| **Business Description** | One of China's top battery manufacturers |
| **Investment Start Date** | July 30, 2019 |
| **Investment Amount** | $36 million plus an additional $45 million MCPP (IFC-managed co-lending portfolio loan) |
| **Investment Purpose** | Building new recycling plants, and technical upgrades to and maintenance of existing plants |

International Finance Corporation (IFC), "Camel Group" (Sponsor/Cost/Location tab), IFC Project Information & Data Portal, Online; and "Camel Group (IFC-41128)," Early Warning System, updated January 10, 2020, disclosed by Bank, January 30, 2019, Online.

**Export Customers:** According to Camel Group: Volkswagen, Ford, Audi, General Motors, Honda, Nissan, Jeep, Hyundai, Kia, Peugeot, Citroën, and Volvo;[133] according to shipping records: Canadian Energy and Power Corp., Canadian Energy Calgary, Prairie Battery, and several companies in Indonesia, as well as Camel's own US subsidiary.[134] Representatives of Audi, Volkswagen, and Volvo have indicated that they do not

AR001709

## IFC PERFORMANCE STANDARDS VIOLATION RISK

| | |
|---|---|
| 1. Assessment and Management of Environmental and Social Risks and Impacts | HIGH |
| 2. Labor and Working Conditions | HIGH |
| 3. Resource Efficiency and Pollution Prevention | HIGH |
| 4. Community Health, Safety, and Security | HIGH |
| 5. Land Acquisition and Involuntary Resettlement | unknown |
| 6. Biodiversity Conservation and Sustainable Management of Living Natural Resources | unknown |
| 7. Indigenous Peoples | HIGH |

source from Camel, though they are listed as customers on the company's website. After learning that Camel lists Volkswagen on its website, Volkswagen reported that the VW purchasing department is analyzing its business relationship with Camel.

## RISK OF PERFORMANCE STANDARDS VIOLATIONS

### PS1
### Assessment and Management of Environmental and Social Risks and Impacts

Camel did not carry out a PS1-compliant Environmental and Social Impact Assessment (ESIA) for the IFC-financed battery recycling facility. It produced only an Environmental Impact Report (EIR) for its manufacturing facility, which was conducted by a third party consultant and had an "evaluation focus" (Section 1.1.3.2 评价重点) on the feasibility of creating interdependence with the recycling facility and of the facility's environmental protection measures, and an environmental risk assessment, without any of the Social Impact Assessment (SIA) required.[135] The assessment included no actual focus on the risks specific to battery breaking or secondary smelting. This is a major gap in reporting for IFC PS1, as the risks specific to recycling are distinct from risks associated with manufacturing. Specifically, IFC indicated in its own disclosures that the "lead-acid battery recycling processes include old battery breaking, sulfuric acid neutralization or acid recycling/utilization, plastic melting/recycling, lead smelting, and ingot molding, etc." Battery breaking itself often merits detailed environmental risk assessment, both because old batteries can leak acid and

must be shipped, stored, and handled with careful attention, and because the secondary smelting of lead from batteries contains an array of heavy metals not generally present in the smelting of ingots used in manufacture.[136] The IFC-funded Camel Group project was designed to avoid the dangerous, unregulated, and unlicensed recycling of these batteries that was allegedly occurring in the XUAR before the plant was built, though even regulated lead-acid battery recycling poses extreme environmental and human impacts.[137]

As a result of this scoping, the EIR excluded major considerations of environmental and social impact pertinent to these battery recycling processes. For example, the wastewater parameters focused only on pollutant emission standards for "Production Wastewater," measuring lead, cadmium, pH, chemical oxygen demand, suspended solids, phosphorus, ammonia, and nitrogen (Section 1.8.2.2). These are important parameters, but secondary smelters also result in emissions of additional heavy metals (silver, arsenic, barium, chromium, mercury, selenium), which are important to monitor in wastewater.[138]

Perhaps more importantly, the EIR does not include a social impact assessment that would make it compliant with IFC PS1 (paragraphs 8, 11, and 12) for any part of the facility. Affected Communities downgradient of the lead smelter, which historically sourced water from directly beneath the facility for traditional crops, do not appear to have been engaged at any point during project appraisal and assessment. An impact assessment that meets PS1 standards would include clear descriptions of the effects of industrialization on local livelihoods. These major nonconformances with PS1 limit IFC's ability to interpret the applicability of other Performance

29

**AR001710**



**FIGURE 8:** Migrant workers from southern Xinjiang swear an oath before being taken to work at Camel Group and other Turpan companies.
Source: Weixin

Standards, as exhibited in the facility's nonadherence to numerous key principles of the Performance Standards detailed below.

The IFC Environmental and Social Mitigation Measures indicate that Camel Group would "conduct a land acquisition review. . .in case previous farmer's lands were acquired by local government, and propose mitigation methods in case the lands are not compensated sufficiently according to IFC Performance Standard 5, Land Acquisition and Involuntary Resettlement."[139] IFC also indicates that it is assessing "broad community support" for the project. In more than two years since IFC invested in the project, no updates have been provided on either of these action items.

### PS2
### Labor and Working Conditions

Like other companies operating in the Uyghur Region, Camel Group maintains that they are engaging in poverty-alleviation programs that benefit indigenous people of the region. As part of those programs, Camel Group is one of many companies that benefit from the labor transfer scheme facilitated by the Toksun County government, where Camel's facilities operate. Toksun County enterprises were subject to the "Three-Year Plan for Promoting the Organized Transfer of Urban and Rural Surplus Labor

Forces in Kashgar and Hotan Region to Employment in the Autonomous Prefecture (2017-2019)," issued by regional and municipal governments.[140] In 2017, this government-sponsored labor transfer program transported 165 people from southern Xinjiang (as much as 1,300 km away) to Turpan for a ten-day "closed pre-job training" (封闭式岗前培训工作), which indicates that the participants were not allowed to come and go freely from the training. At the training, they received military and ideological training, and they were required to sing patriotic songs and learn the Chinese language. There was then a "handover ceremony" in which they were dispatched to companies, including Camel Group. One of the migrant workers gave a speech celebrating how the labor program would promote "national unity and unity of the motherland," after which all of the workers performed a flag-raising ceremony and declared their commitment to "maintain the unity of the motherland, be loyal to the party, resolutely fight the 'three evils,' [terrorism, extremism, and separatism] and make due contributions to national security, national unity, social stability, and harmony." The workers also pledged to fight religious extremism and ethnic division, as well as to "profoundly expose and criticize the crimes of violent and terrorist activities and resolutely fight against nationalist separatists." Then officials had the workers bussed to their assigned employers, which included Camel Group.[141]

**AR001711**



**FIGURE 9:** Migrant workers from southern Xinjiang in "handover ceremony" to Camel Group and other Turpan companies.
Source: Weixin

There is no indication that Han migrant workers are subject to the same "closed training" or political/ideological oath taking to work at Camel Group. It is likely that Camel Group continues to participate in labor transfer programs because it is an initiative that is highly incentivized by the Turpan government and prominent enterprises, such as Camel Group, are expected to engage.

Between its Xinjiang Renewable Resources Co. and its other XUAR subsidiary, Xinjiang Storage Battery Co., Ltd, Camel employs 268 people in its Turpan facility.[142] According to the IFC disclosure, 10 percent of the staff at Camel Group's battery assembly plant in the XUAR are "minority employees."[143] By contrast, Turpan, where the facility is located, is 77 percent Uyghur and 6 percent Hui.[144] This suggests discriminatory hiring practices on the part of Camel Group.

These labor transfers may also be highly hazardous to the workers. Workers in lead smelting and battery recycling plants often experience high and prolonged exposures to lead. The air, water, soil, and vegetation in the vicinity of lead smelters are often contaminated with the heavy metal, threatening the health of anyone who lives and works nearby. Camel's own EIR indicates that no residential areas should be within 1 km of the facility, and that workers should labor with a 10 m to 150 m buffer from several components of the facility. However, Camel has worker dormitories directly on the property (described in the EIR sections 3.1.5 and 13.3.3). These workers are thus exposed to hazardous contaminants during their eight-hour shifts and their sixteen-hour rest periods, as well as on their weekly day off (assuming working hours described in the EIR are adhered to in practice).[145] PS2 compliance would be expected to include evaluation of heavy metals exposure risk within dormitories (air, dust, and water samples, as well as blood lead level samples).

## PS3
## Resource Efficiency and Pollution Prevention and PS4
## Community Health, Safety, and Security

Recycling has stalled the expansion of lead mining worldwide, but regulations around recycling facilities are weak and inconsistently enforced. Used lead-acid batteries are a listed hazardous waste in China. Lead pollution affects air, soil, and water. When ingested, either directly (through respiration or ingestion), or indirectly (e.g., through breast milk or tainted crops), lead is a potent neurotoxin, restricting intellectual development and increasing risk of behavioral disorders.[146] The World Health Organization (WHO) has indicated that there is "no safe threshold of lead exposure."[147]

The challenge is global; as recently as December 2020, California communities filed suit against a battery recycling plant for contaminating thousands of nearby properties, including schools, parks, and childcare centers.[148] A study of soil contamination from lead battery recycling in seven African countries found that surrounding communities saw mean lead levels of 2,600 mg/kg, sixty-five times higher than naturally occurring levels of lead.[149] A study of a lead battery recycling facility in Jiangsu Province proved that blood lead levels (BLLs) in 43 percent of the children sampled exceeded the Chinese Ministry of Health's diagnosis standard for child lead poisoning, and the closer a child lived to the plant the higher the risk of lead poisoning.[150] Lead battery recycling

31

**AR001712**

facilities have been associated with lead poisoning world-wide, including in several Chinese cities, causing the government to shut down hundreds of plants across China[151] and draft new legislation to reduce the environmental harms of the industry.[152] In 2011, three Camel companies were identified by the Hubei Environmental Protection Department as causing "frequent blood lead incidents" and the company was ordered to rectify the situation.[153] Unlike many of its competitors, Camel survived the mass shutdowns and soon became the first company to conduct recycling and processing of lead batteries in the XUAR.[154]

One of the key parameters for evaluating lead poisoning in humans is BLL. The US Centers for Disease Control and Prevention (CDC) and the American Public Health Association (APHA) have determined that BLLs above 50 µg/L (0.24 µmol/L) can result in adverse health effects in children and adults.[155] US regulations define 50 µg/L as an elevated BLL.[156] The WHO has concluded there is no safe intake level of lead in children or adults.[157] Nevertheless, the US government (the Occupational Safety and Health Administration, OSHA, unrevised since 1978) and the Chinese government (law GBZ37-2015) have both set occupational limits for BLL at 400 µg/L (or 1.9 µmol/L).[158]

Camel's EIR states that, before the manufacturing plant was built in 2007, baseline BLLs in local workers and residents were in a "normal" range of between 5.2–91.6 µg/L, the high end of the range being almost twice the amount determined to cause adverse health effects. After years of operation, for the 2017 EIR, Camel's consultants sampled blood from sixty patients at the Toksun People's Hospital. The study presents BLLs in mol/L rather than µg/L or µmol/L.[159] It states the results were between 9.5 mol/L and 27.3 mol/L. The unit (mol), it must be assumed, is written in error because a mole is one million times larger than a micromole (µmol). Assuming that the authors' intention was to report these figures in µmol, the results still are far higher—five to fourteen times higher—than allowed under Chinese law. Even if the EIR intended to report in µmol, these values would still far exceed safe levels for public health, whether using the 50 µg/L (0.24 µmol/L) definition of elevated BLL or even the 400 µg/L (or 1.9 µmol/L) occupational limit standard. Either the baseline conditions have become catastrophically hazardous, or Camel has no reliable baseline data on lead exposure levels. Exposure to lead released by this facility extends far beyond the fence line, through air and water emissions.

After Camel's 2017 EIR was approved, it published an Environmental Monitoring Report (EMR) in 2019. It projects the plant will release more than 8.2 tons of lead in smoke and dust per year. The 2019 report also provides wastewater quality data from two days of sampling in 2018.[160] This EMR indicates that lead emissions from the manufacturing plant were problematic even before the recycling facility was completed in 2021. In particular, it reported on lead levels in "domestic wastewater," referring to the water used for employee laundry and showers, canteen dishes, sewage, and other non-industrial water usage. Because there are dormitories on site, water uses are varied. The EIR and EMR do not indicate how wastewater is treated and used in Toksun, but as the plant is located in an arid region, it is possible that wastewater is used for agriculture. Because municipal water treatment facilities are rarely equipped with technology to remove lead from water, it is important to restrict lead emissions into municipal wastewater. The United States Environmental Protection Agency (EPA) sets an action limit at 15 µg/L for public water systems and 65 µg/L for acute criterion for maximum concentration.[161] IFC's Environmental, Health, and Safety Guidelines (EHS Guidelines) set a limit at 100 µg/L for effluent from non-ferrous metals facilities.[162] The Food and Agriculture Organization of the United Nations (FAO) sets the maximum limit at 500 µg/L for wastewater in agricultural uses.[163] As noted above, the WHO estimates that there is no safe limit for lead intake, through food, water, or air. The PRC's effluent limits for non-ferrous metals facilities is 500 µg/L (PRC regulation GB 300484-2013 for Battery Industry Pollutant Emission Standards), but it has set a weaker standard for domestic wastewater of 1,000 µg/L (PRC Regulation GB 8978-96 Integrated Wastewater Discharge Standard). In Camel's 2019 EMR, wastewater lead levels ranged from 13 µg/L to 150 µg/L, exceeding all but the Chinese and FAO standards. Sampling was restricted to only one day during the month of December, raising questions about whether there are other seasons when water quality is even worse. Notably, this data predates the establishment of the battery recycling facility, which would almost certainly involve increased fugitive emissions. Wastewater treatment assessment data reported by Camel are represented in Figure 10.

Furthermore, Camel Group has not conducted a deliberate evaluation of environmental risks associated with the battery plant's placement atop a historic irrigation

AR001713

**FIGURE 10: Camel Group wastewater monitoring report**

表 9-2-3　　　生活废水治理设施监测数据一览表
Table 9-2-3 Summary table of monitoring data from domestic wastewater management factilities

| 序号 | 检测项目 Parameter | 单位 Unit | 2018.12.6 Date of Water Sampling | | | | 2018.12.6 | | | | 标准值 Legal Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | pH 值 pH | 无量纲 | 6.81 | 6.67 | 7.03 | 6.98 | 7.01 | 6.62 | 8.00 | 7.65 | 6-9 |
| 2 | TSS 悬浮物 Suspended Solids | mg/L | 85 | 92 | 102 | 113 | 86 | 72 | 96 | 79 | 400 |
| 3 | 化学需氧量 COD | mg/L | 32 | 90 | 103 | 116 | 93 | 82 | 69 | 57 | 500 |
| 4 | 氨氮 Ammonia | mg/L | 1.31 | 2.04 | 2.54 | 1.17 | 1.76 | 2.31 | 2.34 | 1.99 | – |
| 5 | 五日生化需氧 量 5-day Biochemical aerobic quantity | mg/L | 17.7 | 42.0 | 47.9 | 52.5 | 47.1 | 36.6 | 34.4 | 28.7 | 300 |
| 6 | 动植物油类 Oils/Grease | mg/L | 1.00 | 1.07 | 0.95 | 0.94 | 0.96 | 1.03 | 1.25 | 1.14 | 100 |
| 7 | 石油类 Petro | mg/L | 0.13 | 0.13 | 0.13 | 0.19 | <0.04 | <0.04 | <0.04 | <0.04 | 20 |
| 8 | 铅 Lead | μg/L | 21.0 | 37.5 | 13.0 | 47.2 | 150 | 82.2 | 51.5 | 35.3 | 1000 |

Annotations:
- TSS Suspended Solids: 100 in US
- COD: 250 in US
- Oils/Grease: 10 in US
- Lead (Legal Limit 1000): USEPA Action Limit 15 µ/L*; WHO Standard 0-10µ/L; IFC EHS Guidance 100µ/L; China, Peru, FAO 500µ/L

2019 Camel Xinjiang Environmental Protection Acceptance Monitoring Report

system called karez (坎儿井). The karez system is a network of gravity-fed underground channels that transport water from the Tianshan Mountains into the Turpan Basin. The oldest of the karez channels have been carbon dated to the early fifteenth century. Karezes serve as an integral part of an ecosystem, providing water for domestic use, farm irrigation, native plants, and wildlife habitats. While the number of karezes in the region has decreased rapidly in the last twenty years due to industrial development, oil exploration, and large-scale farming, more than six hundred of these channels are still flowing. The United Nations and Chinese central and local governments have all recognized the historical and ecological importance of this system and have taken steps toward its preservation by designating some of the channels as protected as well as controlling development and exploitation around the system.[164] In 2010, the World Bank loaned the Xinjiang government $100 million, $500,000 of which was dedicated for restoration of the karez system.[165] Karez channels are common in the area where Camel Group established its recycling, smelting, and manufacturing facilities.

Satellite imagery of the industrial zone locates the Camel facility atop at least two karez canal systems. Camel Group's third-party 2017 EIR includes evaluations of hydrogeology that make no clear mention of whether or to what extent the presence of numerous vertical canal shafts downwind and downstream from the plant could accelerate the transmission of dust, air, and water contaminants into the farmlands that (previously or currently) sourced irrigation water from that system.[166]

The EIR indicates groundwater pollution via leaching is a concern that Camel Group should monitor [Section 6.3.4.1(1)] and the report also noted that the karez system is still active and that farmers generally use karez systems for crop irrigation (Section 6.3.1.5), but no evaluation of the water or farmland downgradient of Camel's operations or community consultations were conducted. Karez systems are not pictured anywhere in the EIR, including on the mapping of the whole industrial zone. Karez canals and shafts were not defined as sensitive. IFC has no documentation of how or whether the Uyghur families that may have relied on these karez canals have been consulted or affected. In correspondence with one of the authors of this report, IFC observed that "the Camel plant is more than a kilometer from the nearest karez well."[167] To the contrary, satellite imagery reveals that the nearest vertical shaft (mistakenly described by the IFC as a "well") is actually 580 meters from the fence line, within the 1 km perimeter described in the EIR as a "health protection distance" from "the surrounding population and sensitive areas" (Section 6.2.3.4) (see Figure 11).

33

**AR001714**

**FIGURE 11:** 2010 imagery shows three Karez systems north of the future Camel facility. 2019 imagery shows their remnants, only 540 meters from Camel's fence line.
Source: Google Earth





**AR001715**



**FIGURE 12:** **Soil monitoring points in the community (red pins). Nearest communities named in blue text boxes with blue markers. The sewage treatment plant for Camel and the whole industrial park outlined in black, directly south (and up-gradient) from Ying Karez ("Yingkan'er zi"). Camel has produced no water, air or soil monitoring data from Ying Karez to address potential risks of proximity to sewage treatment. Karez remnants are visible in both villages.**
Source: Google Earth

Camel's 2017 EIR notes no concerns related to neighboring communities; however, the 2019 EMR lists two of the ten neighboring communities as "sensitive." Notably, these two communities, Nanhu Village (南湖村, a newly erected tourism demonstration village built in place of the traditional village demolished by the government)[168] and Good Seed Farm (良种场), are not the closest residential communities to the facilities (see Section 7.6 Monitoring Point Coordinates). Several communities named for the karez systems are not considered as impacted "sensitive" areas. For example, the town of Supi Haji Karez (苏皮阿吉坎儿孜买里) is 1 km closer to the facility than Nanhu and in the same general direction. Camel Group has not set up water monitoring at the Uyghur communities directly associated with the karez systems downgradient from its operations (see Figure 12). Neither does the EIR articulate whether the existing canals could transport lead-affected dust or waterborne contaminants in stormwater via the vertical shafts near the facility.

The EIR did not include a community consultation, even with neighboring businesses. According to Camel Group's 2019 EMR, the company did hold a consultation, in the form of a survey given to approximately thirty-five business managers and government officials and "farmers" to respond to noise, dust, water, and air pollution related to the construction and trial operation of the site.[169] There is no specification as to what percentage of those consulted were farmers or local community members. All of the respondents were "satisfied" or "relatively satisfied" with all aspects surveyed. Given the questions focused on construction and trial operation, it is unlikely that the respondents would have discussed longer-term effects on the karez system or water, or even had a chance to identify problems.

### PS7
### Indigenous Peoples
Karez systems are not solely a source of livelihoods for local populations. Karezes carry cultural import as well. Shalamu Abudu, a Uyghur hydrologist and water resources expert, contends that "a karez system is not only a structure to extract groundwater, but is also an integration of the history, culture, and unique knowledge

35

AR001716

of its builders. Karezes have created strong cohesion in their communities owing to the traditions and beliefs attached to them. Religious beliefs and cultural traditions also helped the karez system to be handed down as a legacy. In the past, the social arrangements in karez-based communities were directly related to the karez system. Essentially, people's importance and value were judged according to their water rights in the system. A household's proximity to the system was a good indicator of the social or economic status of its residents."[170] The implications of every destroyed karez is direct for Uyghurs, whose livelihoods and ancestral ties to land are eliminated when the water source dries up. Locals report that as their traditional farms are expropriated or polluted, they turn to herding and other activities that do not rely on kinship ties and often the lack of access to water foments disputes.[171] IFC's project appraisal for the Camel investment did not include consideration of these structures' cultural significance, let alone how the project's substantial water demands in the middle of a desert could affect local tensions around water.

A PS7 evaluation, which is scoped to cover "cumulative impacts that result from the incremental impact, on areas or resources used or directly impacted by the project, from other existing, planned or reasonably defined developments," would, of necessity, include the water sourcing for the industrial zone, which has involved establishing a large reservoir whose impacts on subsurface karez systems is not disclosed. Likewise, it would include the impacts of sewage treatment within 100 meters of two such systems.

## IFC'S RESPONSE TO CONCERNS

In response to NomoGaia's inquiries about the karez system, IFC observed: "our analysis shows that the plant's operations will not impact the well. This analysis is backed up by the ESIA (Section 1.9.2), which was produced by a third-party, private-sector expert. Among other things, it states clearly: 'There is no special protected area or ecologically sensitive/vulnerable area.'" Here, IFC (and the EIR, to which they refer as an environmental and social impact assessment or ESIA, which it is not) evokes zoning regulation for the area, not evaluation of on-the-ground sensitivities. Under the Xinjiang government's 2012–20 eight-year plan, the whole area was zoned industrial, but that zoning decision never considered the indigenous people's uses of the land and

resources or of the cultural heritage associated with the karez system. Furthermore, the conclusions of the EIR were not upheld in the 2019 EMR, which found two communities to be "sensitive" even as it continued to make no assessment of cultural safeguards or hazards.[172]

Although the project is rated high-risk Category A, IFC has not made the 2017 EIR or other documentation publicly available. In March 2021, NomoGaia received a PDF of the 2017 EIR, after repeated requests. IFC noted that it required the client's "permission" to release it, which is at odds with IFC's sustainability and transparency policy commitments. The EIR makes no mention of any public consultation, required in the Performance Standards, and focuses almost uniquely on the environmental impacts of battery manufacturing instead of the IFC-invested recycling project.

## SUMMARY OF PERFORMANCE STANDARDS RISK

Camel Group is at risk of violating the following IFC Performance Standards:

- **adequate engagement with Affected Communities throughout the project cycle on issues that could potentially affect them and to ensure that relevant environmental and social information is disclosed and disseminated (PS1-3)**

- **Environmental and Social Management System (ESMS) that includes stakeholder engagement and detailed monitoring of community water sources (PS1-5)**

- **air emissions monitoring parameters that include heavy metals, dioxins, and furans associated with secondary smelting (PS1-5)**

- **completion of a "comprehensive Environmental and Social Impact Assessment, including an examination of alternatives" (PS1-7)**

- **consideration of indirect project impacts on biodiversity or on ecosystems services (e.g., water) (PS1-8)**

- **prioritization of "disadvantaged or vulnerable" populations for risk management (PS1-12)**

AR001717

- **migrant workers receive the same or equivalent terms as non-migrant workers (PS2-11)**

- **accommodations are nondiscriminatory and do not restrict workers' freedom of movement or association (PS2-12)**

- **hiring is nondiscriminatory (PS2-15)**

- **workers have a non-retaliatory grievance process (PS2-20)**

- **recruitment practices are free of forced labor through labor transfers (PS2-22)**

- **worker dormitory air, water, and soil monitoring for particulate, lead, and other heavy metals (PS2-23)**

- **wastewater monitoring parameters that include heavy metals associated with secondary smelting for lead-acid battery recycling (PS3-10)**

- **assessment of potential irreversible consequences of site pollution (PS3-11)**

- **current BLLs for populations downgradient and downwind of the facility (PS4-5)**

- **clearly articulated worker and community BLL monitoring plans using scientifically sound sampling strategies (PS2-23, PS3-4)**

- **any loss of cultural identity, culture, religion, or institutions due to corporate participation in government schemes (PS7-1)**

- **existence of engagement processes, consultations, and FPIC for indigenous communities (PS7-10, 11, 13, and 14)**

- **protections of cultural heritage (PS7-16, 17 and PS8)**

- **any mitigation or compensation for destruction of cultural heritage (PS7-18, 19, and 20)**

## CENTURY SUNSHINE GROUP HOLDINGS, LTD.
### （世紀陽光集團控股有限公司）

Century Sunshine Group Holdings, Ltd. is a vertically integrated magnesium fertilizer manufacturer and, more recently, magnesium alloy manufacturer. Magnesium ingots and alloys have been utilized by the China National Space Administration and have application in automobile, railway, and electronics manufacturing as well as global steel and aluminum alloying.[173]

Century Sunshine's headquarters are in Fuzhou, Fujian Province. Its two magnesium production sites are in Baishan, Jilin Province, and Hami, XUAR. The company sources magnesium raw materials from its own privately owned dolomite mines in Jilin and the Uyghur Region.[174]

Century Sunshine is a longstanding IFC client, with loans dating back to 2006. IFC granted Century Sunshine a $20 million loan in 2006, which the company repaid on a seven-year timeline.[175] IFC renewed its financing of Century Sunshine in 2014 with a loan of $25 million alongside a $15 million equity investment.[176] The company also received a $125 million loan the following year. Originally, that loan did not apply to any holdings in the XUAR. However, Century Sunshine offered equity in the parent company as collateral for the loan and then defaulted on repayments in 2020. As a result, IFC now owns at least 17 percent equity in all Century Sunshine

37

### AT A GLANCE: CENTURY SUNSHINE GROUP HOLDINGS, LTD.

| Business Description | Manufacturer of fertilizers and magnesium ingots and alloys |
|---|---|
| Investment Start Date | January and May 2014, and February 2016 |
| Investment Amount | 2014: $25 million loan; $15 million equity 2015: $125 million loan converted to 17 percent equity in the parent group |
| Investment Purpose | Take advantage of growing market demand and favorable government policies, seemingly for expansion of the company's organic fertilizer manufacturing |

**AR001718**

operations across Jilin and Hami, according to Century Sunshine's 2020 annual report and IFC's direct communications with an author of this report.[177]

**Export Customers:** Century Sunshine's corporate disclosures indicate that in 2016, it expanded magnesium exports to Europe and the United States.[178]

## RISK OF PERFORMANCE STANDARDS VIOLATIONS

### PS1
### Assessment and Management of Environmental and Social Risks Impacts

IFC's equity ownership in a mining, refining, and smelting operation in the XUAR is, like its investment in Camel, high-risk. Yet, inexplicably, this investment has been categorized as low-risk, Category C, which all but eliminates IFC's required due diligence and disclosure about the project's footprint. This categorization is particularly notable because IFC approved, signed, and invested in Century Sunshine between November 2015 and February 2016, months after the company began acquiring heavy industry assets.

Because this investment was miscategorized as low-risk, and because IFC's equity ownership in metals smelting in the Uyghur Region resulted from financial defaults after funds were dispersed, IFC has no public data on the environmental or social impacts of Century Sunshine's XUAR operations. The Performance Standards were designed to prevent such a scenario; even investments in financial intermediaries are ring-fenced to avoid investments in coal-powered metals smelting activities. As a result, IFC cannot demonstrate Camel's compliance with PS1 and has no clear means for evaluating which other Performance Standards are applicable. Under its $125 million loan (now 17 percent equity), IFC has not even produced a public Environmental and Social Review Summary.

### PS2
### Labor and Working Conditions

In August 2015, Century Sunshine Group acquired Xinjiang Tengxiang Magnesium Products Co., Ltd.（新疆腾翔镁制品有限公司）through its subsidiary Group Sense. (Xinjiang Tengxiang is treated as a subsidiary in Century Sunshine Group's financial statements; Group Sense is now called REMT.)[179] Xinjiang Tengxiang is a magnesium producer located in Hami, XUAR. According to state media, Xinjiang Tengxiang employs 370 people, of which "minority employees" account for about 35 percent.[180]

As is the case with CCGB and Camel Group, Century Sunshine participates in the local and regional government's labor transfer programs, which are pursued in the name of "poverty alleviation." In 2017, Yizhou District, where Xinjiang Tengxiang is located, "vigorously implemented" the state-sponsored transfer of rural labor program. According to the local official media report on the program, workers from Hami were being "transferred" to work in a variety of different industries, including restaurants, domestic service, and industrial manual labor. The report indicated that ten rural laborers had been transferred to Xinjiang Tengxiang from the same small village. There is no information about the situation

## IFC PERFORMANCE STANDARDS VIOLATION RISK

| | |
|---|---|
| 1. Assessment and Management of Environmental and Social Risks and Impacts | HIGH |
| 2. Labor and Working Conditions | HIGH |
| 3. Resource Efficiency and Pollution Prevention | MODERATE |
| 4. Community Health, Safety, and Security | unknown |
| 5. Land Acquisition and Involuntary Resettlement | LOW |
| 6. Biodiversity Conservation and Sustainable Management of Living Natural Resources | unknown |
| 7. Indigenous Peoples | HIGH |

AR001719



**FIGURE 13:** **Young "surplus laborers" arrive at Hami train station for assignment in Yizhou enterprises.**
Source: Yizhou Netcom

of these men's families.[181]

As recently as 2019, Xinjiang Tengxiang was continuing its participation in regional labor transfers. Its 2019 Environmental Impact Review (EIR) indicated: "The production of magnesium and magnesium alloy is a labor-intensive industry, which is conducive to solving the employment problem of local surplus labor. The commissioning of this project will provide about 1,446 jobs for the society."[182] In that same year, Xinjiang Tengxiang was one of nine companies that participated in a labor recruitment exercise that promised to provide Hami's "surplus laborers" with employment. Representatives of the Yizhou District Human Resources and Social Security Bureau attended the meeting, and the Hami Longteng Vocational Skills Training School presented at the meeting. The farmers who attended the meeting were encouraged to use the supposedly "slack" season to increase their income by working for one of the industrial manufacturing facilities in the area, including Xinjiang Tengxiang. In that particular event, eighty-two farmers were assigned to factories for off-season labor.[183] State media reported that the transferred workers at Xinjiang Tengxiang could make as much as 5,000 yuan per month depending on their job performance, which is indeed a high salary for manual labor in the region if anyone achieves that performance pay, but because of the coercive practices endemic to labor transfers and significant evidence that many people are not paid as promised, these transfers are at high risk of violating PS2.[184]

There is good reason to believe that Xinjiang Tengxiang continues to engage in labor transfers, as it is

an important initiative of the local government. In 2017, Yizhou District reported transferring more than 2,226 indigenous people in only ten months. [185] In 2020, Yizhou District welcomed a train with a "batch of migrant workers" from Kashgar and Hotan, including many recent graduates of a vocational high school, all bound for placement in area enterprises.[186] The district reported that all of the relevant agencies had "established mechanisms and acted proactively to ensure that the work of southern Xinjiang surplus labor coming to Hami for employment proceeds in an orderly fashion," which included providing the transferred laborers with education on "laws and regulations, patriotic education, gratitude education, and basic knowledge of job skills."[187] Yizhou District "formulated a series of assistance policies," which included "encourag[ing] enterprises to absorb a batch" of transferred laborers.[188] In 2021, the city of Hami announced that it had "achieved" 2,055 labor transfers by August, reaching 90 percent of its annual "target."[189] These government targets and directives suggest that the transfer of labor to this region is a high priority and that prominent, state-funding-backed companies in the area, such as Xinjiang Tengxiang, would be likely to be expected to participate.

IFC considered PS2 applicable to the Century Sunshine loan. Century Sunshine anticipated hiring significantly more employees as business expanded, and the company indicated to IFC that its policies reflect local labor law.[190] Chinese labor law not only permits but incentivizes, subsidizes, and actively engages in labor transfer programs that have been identified by international scholars, governments, legal experts, and advocacy groups to

39









**FIGURE 14: Xinjiang Tengxiang workers on the facility floor, wearing tennis shoes and little protective equipment. Note fire on factory floor in top photo; potentially flammable dust in the air in the third photo.**
Source: Tengxiang Promotional Video

be forced labor. For this reason, Century Sunshine should be held not to local labor law standards but to IFC's more stringent standards regarding workers' rights.

Century Sunshine also indicated to IFC that the company provides its workers with personal protective equipment relevant to the work they conduct. The company reported no occupational safety accidents at the time of its application for funding.[191] A 2017 local state media video that features Century Sunshine's Xinjiang Tengxiang facility depicts workers manually removing extremely hot slag (which can reach temperatures in excess of 650ºC) from reduction furnaces and, apparently, agitating it on the facility floor.[192] (See Figure 14.) The dust particles are potentially highly flammable and/or toxic. Magnesium slag often contains concentrations of arsenic, chromium, cadmium, mercury, copper, nickel, fluorine, and chlorine at levels hazardous to human and environmental welfare.[193] At one point, the video shows open flames on the factory floor while a motorized vehicle (forklift) passes nearby. The Uyghur workers are wearing hard hats and some wear gloves, but they do not have masks, safety boots, flame-resistant clothing, respirators, or protective eyewear (all of which are required in similar facilities in the United States and by IFC Performance Standards).[194]

It appears from the same video that all of the men working in the office are Han and the men working in the furnaces are Uyghur, likely indicating discriminatory hiring practices. Indeed, Xinjiang Tengxiang job descriptions listed on a XUAR human resources website confirm discriminatory hiring practices. Posts for forklift drivers, boiler workers, and maintenance workers have no ethnicity requirements; however, the company's advertisement for a logistics administrator includes under qualifications the following requirement: "Male, Han nationality, college degree or above, more than two years of logistics administrative management work."[195]

In July 2021, a third-party occupational hazard evaluation was conducted on Xinjiang Tengxiang that confirmed that the company's facilities present serious hazards to workers. The operation was found to be in violation of PRC standards for coal dust in the coal storage room

**40**

**AR001721**

and other dust in the ball mill facility, exposing workers to potentially unsafe air quality conditions. Workers were also exposed to excessive noise and high heat. The findings mention that while many of the worker protections examined met the Chinese governmental standards, several other protections, including personal protective equipment, emergency rescue facilities, and occupational health monitoring, only "basically meet the requirements," which, given the gap between the rigor of international standards and PRC standards, could indicate a risk of violating international norms for those standards. The third-party evaluator concluded that Xinjiang Tengxiang should "improve occupational disease protection facilities, auxiliary rooms, and emergency rescue facilities; strengthen occupational health management, occupational health monitoring, and personal protection."[196]

## PS3
## Resource Efficiency and Pollution Prevention

Xinjiang Tengxiang produces fifteen thousand tons of magnesium alloy per year, alongside 1.2 million tons of semi-coke.[197] The company notes that Hami is "famous for its abundant resources including quality and low-cost coal and dolomite mineral," which "facilitate the development of the magnesium business of the Group"[198] and give it "an inherent advantage in terms of production costs over manufacturers located in many other parts of China" (which alone produces half of the world's magnesium).[199] The magnesium is then shipped to the company's production sites located in Jiangsu, Shandong, and Jiangxi Provinces, or it is shipped out through Central Asia. As the company reported in a corporate disclosure: "Xinjiang is a core intermediate point to deepen the communication and cooperation with European countries and Central, South and Western Asian countries under the 'One Belt One Road' initiatives put forward by the PRC government, and Xinjiang Tengxiang is positioned to take advantage of its strategic geographical position in exploring its distribution network overseas."[200] Due to the acquisition of the XUAR site in 2015, Century Sunshine's magnesium sales volume increased by more than 50 percent in the following year.[201]

There are no environmental risk assessments for Century Sunshine that would allow for an assessment of the company's potential polluting effects on nearby communities. To assess potential risk, we identified a comparable site with the assistance of Material Research, an environmental research consulting group. Magnesium alloy production is extremely polluting and energy intensive. US Magnesium is the leading source of toxic air pollution in the United States. This plant on the Great Salt Lake in Utah has the same magnesium alloy production capacity as Century Sunshine's Hami site.[202]

The United States Environmental Protection Agency (EPA) designated US Magnesium as a priority Superfund site in 2009. The company has been in constant violation of hazardous waste and air pollution laws for years.[203] In 2003, the U.S. Public Interest Research Group named US Magnesium as the most polluting plant in the United States.[204]

**In 2020, US Magnesium reported releasing:**

- **310,631 metric tons of carbon dioxide-equivalent greenhouse gases[205]**

- **3,054,684 pounds of chlorine**

- **131,225 pounds of hydrochloric acid**

- **1,880 pounds of hexachlorobenzene (HCB)**

- **279 pounds of octachlorostyrene**

- **170 pounds of polychlorobiphenyls (PCBs)**

- **73 pounds of mercury**

- **19 pounds of lead**

- **24 grams of dioxins and dioxin-like compounds[206]**

In 2014, inspectors from the National Institute for Occupational Safety and Health (NIOSH) found dioxins, PCBs, and HCB in US Magnesium workers' blood, and excessive levels of chlorine and HCB in the air.[207]

Toxic chlorinated pollution, such as what occurs at US Magnesium, is common to magnesium alloy production[208] and can be expected to occur at the Hami site. However, there is no discussion of these concerns in IFC's Environmental and Social Review Summary for Century

41

AR001722

Sunshine.[209]

Furthermore, Xinjiang Tengxiang has continued to use coal as its energy source and has been fined by the Chinese government for environmental management violations, including expanding facilities without permits and approvals, stacking dolomite and reduced slag in open-air and untreated ground, allowing for wind dispersal and ground seepage, and violating environmental limits for nitrogen oxide emissions.[210] The company had previously secured government approval to switch to a gas-fired power source. By 2018, however, that project was stalled. As described in a 2019 EIR for a separate expansion, "The Hami City Environmental Protection Bureau imposed administrative penalties on Xinjiang Tengxiang Magnesium Products Co., Ltd. on the basis of Harbin Huanpu [2018] No. 17 ('哈市环罚[2018]17 号'), ordering the company to immediately stop construction and imposing a fine." [211] The company stopped the construction of that project but, while still appealing that decision, in 2019, began seeking permits for a coal-powered expansion of its facility. The 2019 EIR proposed increasing magnesium alloy and ingot production fivefold from fifteen thousand tons per annum to seventy-five thousand tons per annum, developing a ferrosilicon production facility to produce fifty-six thousand tons per annum, and maintaining its production of 1.2 million tons per annum of coke, used in production of both magnesium and ferrosilicon.

Because Xinjiang Tengxiang was purchased by a Century Sunshine subsidiary after the IFC loan date, it is unclear what environmental and social risk assessments have been conducted and submitted to IFC regarding the Hami location. However, IFC is now a substantial equity owner in the company, meaning that it holds direct ownership in the magnesium ingot and alloy facility, the proposed ferrosilicon production facility, and the alloy coke manufacturing facility. These heavy industries require implementation of PS1 for the operator to identify other Performance Standards applicable to its project footprints. Because magnesium is a source material for both the fertilizer and alloy businesses, magnesium production should have been scoped into project appraisal. Given the environmental hazards associated with magnesium slag disposal, the project should have been categorized as a high-risk Category A project. The Hami operation is in an industrial park south of the city and proximate to the decade-old Dananhu coalfields, where the US-sanctioned Xinjiang Production and Construction Corps (XPCC) and other state-owned enterprises operate coal mines and coal-fired power plants. Coal sourcing would be a significant concern for Performance Standards compliance, both because of the risk that coal is sourced from XPCC and carries labor risks, and because environmental risks associated with coal mining and coke production carried out by Xinjiang Tengxiang require scrutiny. The industrial park is upslope and roughly 1 km from a riparian zone and several Uyghur communities (see Figure 15).

As the Performance Standards have been static since 2012, IFC has issued additional guidance notes and commitments. In 2019, IFC committed to "green" its equity investments, working to eliminate its exposure to coal-related investments. Under this commitment, Century Sunshine would be expected to reduce its coal exposure to less than 5 percent of its total portfolio by 2025 and eliminate it completely by 2030.[212] Century Sunshine is not phasing out coal, however. Its coke manufacturing (coke being a coal-based product) is, by weight, its largest product, and its power source is entirely coal.

AR001723



**FIGURE 15:** **Xinjiang Tenxiang Magnesium operations (yellow outline).**
Source: Google Earth

## SUMMARY OF PERFORMANCE STANDARDS RISK

Century Sunshine is at risk of violating the following IFC Performance Standards:

- **assessment of environmental and social risks (PS1)**

- **migrant workers receive the same or equivalent terms as non-migrant workers (PS2-11)**

- **accommodations are nondiscriminatory and do not restrict workers' freedom of movement or association (PS2-12)**

- **hiring is nondiscriminatory (PS2-15)**

- **workers have a non-retaliatory grievance process (PS2-20)**

- **recruitment practices are free of forced labor through labor transfers (PS2-22)**

- **workers are provided a safe and healthy work environment, including personal protective equipment, site safety controls, occupational health, and safety monitoring (PS2-23)**

- **efficient consumption of energy and avoidance of coal (PS3-6)**

- **environmental pollutants release kept to appropriate standards (PS3-10)**

- **cumulative and future environmental impacts (PS3-11)**

43

AR001724

# JOINTOWN PHARMACEUTICAL GROUP CO., LTD.
## （九州通医药集团股份有限公司）

Jointown Pharmaceutical Group Co., Ltd. (also known as Jiuzhoutong Pharmaceutical) is a pharmaceutical distribution company headquartered in Wuhan, Hubei Province. At the time of its application for a loan from IFC, it operated 105 product distribution and logistics centers across China. The company's primary business buys pharmaceuticals and other medical products, warehouses them, and then sells them on to hospitals, clinics, and pharmacies throughout China. Jointown also has two pharmaceutical manufacturing facilities that focus on traditional Chinese medicines and on medications for diabetes and cardiovascular disease.

Jointown received up to one billion yuan in debt financing from IFC in 2019 to support the construction of five new distribution centers and the upgrading of four existing warehouses.[213] The company was awarded a nearly $50 million loan the following year to assist it in expanding its capacity to meet the demand for COVID-19 pandemic-related medical products. One of the new facilities financed by IFC through the 2019 application is located in an industrial zone in Urumqi. Xinjiang Jointown has at least six direct subsidiaries in the Uyghur Region.[214]

**Export Customers:** Jointown largely supplies domestic Chinese companies, but it has a distributing subsidiary in California. In the US, Jointown is registered as US Health Express Corp. The company sells medical equipment and PPE online, including on Amazon.com.

**Other DFI Financing:** Jointown has also received funds from the Asian Development Bank (ADB) and the German Investment Corporation (KfW/DEG).

## AT A GLANCE: JOINTOWN PHARMACEUTICAL GROUP CO., LTD.

| | |
|---|---|
| **Business Description** | Pharmaceutical manufacturing and distribution |
| **Investment Start Date** | March 21, 2019, and October 30, 2020 |
| **Investment Amount** | 2019: debt financing of up to 1 billion yuan (~$150 million) 2020: $49.66 million |
| **Investment Purpose** | 2019: expansion through construction and upgrade of facilities 2020: long-term working capital to meet surge in demand from health institutions |

"Jointown Pharma (IFC-41957)," Early Warning System, January 10, 2020, updated January 10, 2020, disclosed by Bank March 21, 2019, Online. International Finance Corporation (IFC), "RSE COVID Jointown," IFC Project Information & Data Portal, Online; and "RES COVID Jointown (IFC-43968)," Early Warning System, updated August 24, 2020, disclosed by Bank July 10, 2020, Online.

## RISK OF PERFORMANCE STANDARDS VIOLATIONS

### PS1
### Assessment and Management of Environmental and Social Risks and Impacts

PS1 is designed both to identify environmental and social risks and to determine what other Performance Standards are applicable. IFC notes that Jointown

 

**Yili Jointown's Muslim employees receiving wine for religious holiday.**
Source: Yili Jointown Pharmaceutical Co.

**AR001725**

## IFC PERFORMANCE STANDARDS VIOLATION RISK

| | |
|---|---|
| 1. Assessment and Management of Environmental and Social Risks and Impacts | HIGH |
| 2. Labor and Working Conditions | HIGH |
| 3. Resource Efficiency and Pollution Prevention | unknown |
| 4. Community Health, Safety, and Security | unknown |
| 5. Land Acquisition and Involuntary Resettlement | LOW |
| 6. Biodiversity Conservation and Sustainable Management of Living Natural Resources | unknown |
| 7. Indigenous Peoples | HIGH |

produced Environmental Impact Assessments in line with Chinese law, but these assessments do not include social components which would be pertinent for a logistics and manufacturing firm that engages in state-sponsored labor transfers. Although IFC states that "all Performance Standards are applicable to this investment," the project documentation contains no mention of indigenous peoples (PS7) or cultural heritage (PS8), among others.[215] The risk assessment summary also excluded mention of legal, ethical, and financial risks associated with the investment. In particular, in 2013, the XUAR government banned a subsidiary of Jointown Pharmaceutical Group Co., Ltd. from distributing essential drugs in the region for failing to distribute drugs at a rate set by government requirements. The company's president claimed in the media that he was unaware of the failure and while the company would like to meet the standards, it was unable to do so because of external factors.[216] In May 2020, the company's sub-subsidiary was also cited for noncompliance with medical production regulations.[217]

### PS2
### Labor and Working Conditions

Xinjiang Jointown reported a workforce of 1,474 to IFC.[218] Jointown's disclosures to IFC indicated that all employees have signed contracts and that the company's hiring practices are nondiscriminatory. Sixty percent of the company's workers at the time of application were classified as from rural areas. According to Jointown, those rural workers were afforded the same pay and work conditions as any other employee. Jointown's disclosure indicates that "a small percentage" of the rural workers are recruited through intermediaries instead of through direct company recruitment.[219] Those rural residents may not be people from minoritized communities,

as Jointown has claimed to IFC that members of those communities constitute only 6 percent of the company's workforce, holding low-level positions (sales, general administration, warehousing, delivery),[220] potentially suggesting discriminatory hiring practices in the Uyghur Region, where many of its facilities are located in predominantly Uyghur areas. Job recruitment advertisements posted between 2018 and 2020 confirm discriminatory hiring practices. When Jointown's subsidiaries in the Uyghur Region hired staff, the company indicated that only Han people need apply for administrative management, marketing, budgeting, logistics, accounting, cashier, business support, business development, invoice clerk, and even drug sorting positions.[221] One corporate publicity post that celebrated Muslim holidays indicated that the company's Yili subsidiary had only seven Muslim employees, to whom the company gifted bottles of wine for the holiday (alcoholic beverages are commonly forbidden in Islam). None of the Muslim employees appear to be Uyghur or Kazakh.[222] Corporate publicity videos about Jointown's operations in the Uyghur Region depict few, if any, Uyghur or Kazakh employees.[223]

Jointown's 2020 application to IFC for financing rested on the premise that while many companies would be laying off workers during the pandemic-induced economic downturn, Jointown would be in a position to hire more staff due to increased demand for the essential supplies the company sells to hospitals and clinics. Jointown indicated that its factories are "mainly located in frontier regions," which seems to suggest that hiring would benefit people in underserved communities, in line with IFC's development goals.[224]

IFC has accepted written statements from Jointown that "there is no forced labor involved in its operations in Xinjiang."[225] IFC's visits to Jointown's worker dormitories

45



**FIGURE 17:** **Jointown Urumqi facility and carceral growth 2002, 2007, 2013, 2018, 2020 and 2021 (left to right). Yellow polygons are present-day footprints for detention facilities. Green pin at top of image is current Urumqi facility. Smaller detention sites, farmland and other industry have all been converted to facilities with double-walls and surveillance watchtowers.**
Source: Google Earth

46

found that they were appropriate, but there is no evidence that IFC agents visited the company's XUAR locations. [226] The 2019 and 2020 investments followed significant evidence of the system of forced labor in operation in the region, but there appears to be no mention of concerns about forced labor in the IFC's environmental and social risk assessment criteria imposed on the company at the time of either loan.

Jointown began building its 120,000-square-meter industrial park in Urumqi in 2018, with a total investment of 500 million yuan. The company reports that much of the labor is automated, using robotic arms, AGV intelligent handling, and "intelligent picking." Nonetheless, Jointown requires a significant workforce across its twelve branch companies and twenty-three offices in the XUAR, which together employed one thousand three hundred people even before the new XUAR distribution center was opened. In December 2020, when the industrial park entered into trial operation, Jointown held a public relations event during which company representatives explained to media that the company has received "more than 200" workers "transferred" from southern XUAR "and other remote and underdeveloped prefectures" through the state-sponsored labor transfer program.[227] It is likely that Jointown would receive more

state-sponsored transferred laborers with its new distribution center in Urumqi.

Jointown's traditional Chinese medicine production is dependent on raw materials that are unidentified and undisclosed in its reporting to IFC and in its corporate publicity. The company's supply chains are entirely opaque, rendering external assessment of the labor conditions for supplier farmers and associated facilities impossible.

Furthermore, many of Jointown's XUAR facilities are located adjacent to internment camps identified by the Australian Strategic Policy Institute. While this is not certain evidence of forced labor, it does constitute a reasonable concern that should be investigated by IFC, if on-the-ground investigations were indeed possible, but they are not. The Urumqi facility, partially financed with IFC's 2019 loan, is in one of Urumqi's largest prison districts. In the past twenty years, the region has transformed from an agricultural district to more than 150 hectares of prisons, detention facilities, and internment camps (see Figure 17).

AR001727





## IFC'S RESPONSE TO CONCERNS

IFC continues to assert that Jointown "does not employ agricultural workers" for its traditional Chinese medicine production, which leaves questions unanswered about where and how agricultural inputs are sourced, which is critically important to monitoring adherence to the Performance Standards given the regime of state-sponsored forced labor in the region.[228]

## SUMMARY OF PERFORMANCE STANDARDS RISK

Jointown is at risk of violating the following IFC Performance Standards:

- **migrant workers receive the same or equivalent terms as non-migrant workers (PS2-11)**

- **accommodations are nondiscriminatory and do not restrict workers' freedom of movement or association (PS2-12)**

- **hiring is nondiscriminatory (PS2-15)**

- **workers have a non-retaliatory grievance process (PS2-20)**

- **recruitment practices are free of forced labor through labor transfers (PS2-22)**

47

**AR001728**

# IMPLICATIONS AND RECOMMENDATIONS

**T**HE WORLD BANK'S PRIVATE lending arm, the International Finance Corporation (IFC), has committed to upholding the rights of communities affected by its investment projects since at least 2012, with the launch of its updated Performance Standards. These eight standards mandate adequate assessment of project risks and management planning, as well as rigorous oversight of labor conditions, waste management, pollution prevention and biodiversity protection, community safety and security, indigenous and cultural rights, and protections against economic or physical displacement.

Today, evidence suggests that failure to adequately safeguard communities and the environment affected by IFC's investments in the Xinjiang Uyghur Autonomous Region (XUAR or the Uyghur Region) is contributing to the repression of Uyghur, Kazakh, and other minoritized citizens in the People's Republic of China (PRC). As the research in this report reveals, IFC has several significant investments in the Uyghur Region, where indigenous peoples have been subjected to what international legislators, legal scholars, and advocates have determined to be a genocide. Several of IFC's clients are active participants in the implementation of the government's campaign of repression against the Uyghurs, including forced labor, forced eviction, cultural erasure, and environmental destruction. The IFC-funded companies profiled in this report include multimillion-dollar corporations that serve the international market. Their role in state-sponsored repression suggests that the problem extends far beyond a handful of "bad apples." Research suggests that most (if not all) companies operating in the Uyghur Region are complicit in the PRC's campaign of repression against the indigenous populations there.

As a bank expressly focused on advancing human welfare, IFC's commitment to a multifaceted definition of "development" that is inclusive of inequality reductions and nondiscrimination is the key distinguishing feature between it and private commercial banks. Nonetheless, IFC did not adequately manage the risks particular to investments in the Uyghur Region during this time of crisis. A magnesium mine and smelter was inappropriately rated low-risk Category C. A Category A lead smelter was financed without publication of any environmental or social due diligence. A biotech firm whose production relies on agricultural inputs was not required to disclose its suppliers. None of these investments were revoked once documentation of a state-sponsored forced labor regime became public knowledge.

NomoGaia alerted IFC to concerns related to its XUAR portfolio in November 2020 and engaged with bank personnel to seek evidence demonstrating that identified risks were managed. Some of IFC's inquiries into client operations in the region have documented a degree of risk mitigation. However, the application and monitoring of Performance Standards remains opaque at best. Censorship and surveillance are ubiquitous in the Uyghur Region, and IFC states that it has no special access or privileges in the region that would allow the corporation exceptional access to Affected Communities or workers through which IFC could monitor its clients' compliance with the Performance Standards. According to IFC's own disclosure to NomoGaia, its team was stopped three times by police on a twenty-four-hour 2019 monitoring visit to the Uyghur Region and has not conducted follow-up fieldwork in the region since then. To date, IFC has not documented any systematic assessment of its clients' social impacts on Uyghur communities hosting IFC clients or Uyghur employees either directly contracted by the clients or within their supply chains. IFC has not published any Environmental Impact Assessments for these projects, and Chinese-mandated Environmental Impact Reports (EIRs) produced for permitting processes sometimes cannot be read without the creation of a Chinese government-monitored WeChat account and issuance of a payment. Still, those EIRs are not adequate to determine compliance with the Performance Standards, as this report has revealed.

As of March 2021, IFC has closed its investments in three Chinese companies engaged in or sourcing from the Uyghur Region. **If IFC is to uphold its own Performance Standards and serve as a model for**

48

AR001729

**responsible development finance, it must divest from any companies that have proven to be complicit in the PRC's program of repression in the Uyghur Region.**

IFC and other Development Finance Institutions (DFIs) cannot conduct the due diligence necessary in the Uyghur Region to ensure that their clients are implementing the Performance Standards. The United Nations has been denied access to the region. In the private sector, audit firms have ceased to certify products in the region, and the Fair Labor Association has banned all members from sourcing from the region. Travel to the region is unsafe for researchers, journalists, corporate consultants, and others who might investigate state-sponsored human rights violations in the region. For this reason, there is no way for IFC to maintain its standards with regard to investments in the region.

The corporate case studies presented in this report are specific to IFC's portfolio, but they are applicable to development and infrastructure finance organizations worldwide. Other DFIs have significant investments in companies and PRC government projects that are similarly engaged in state-sponsored repression in the Uyghur Region. Many financial institutions with commitments to environmental and social performance standards are heavily exposed in their current portfolios.

Adequate application of IFC's Performance Standards will also require that DFIs implement their responsibility to evaluate "associated facilities" as defined in PS1, to ensure that XUAR-based companies or suppliers are excluded from tenders, sub-investments, and investments in financial intermediaries. This is guidance that IFC's independent Office of the Compliance Advisor Ombudsman (CAO) issued through detailed case reviews in 2018.[229] IFC currently has additional sub-investments in the XUAR not analyzed in this report, through its financial intermediaries' portfolios. Sub-investments by these clients include surveillance tech companies operating in the Uyghur Region and, until recently, at least one Bitcoin miner profiting from the XUAR's cheap coal reserves.

IFC teams that engage with civil society are increasingly aware of the ways that projects generate risks for vulnerable and marginalized stakeholders. The Environmental and Social Risk Management Department actively develops tools to screen for conflict and repression risks, promote pathways for affected people to bring complaints to the bank, and prevent threats and reprisals at project sites. In 2018, this department issued "IFC Position Statement on Retaliation Against Civil Society and Project Stakeholders," establishing zero tolerance for "any action by an IFC client that amounts to retaliation...against those who voice their opinion regarding the activities of IFC or our clients." These mechanisms have not served their purpose during the Uyghur crisis.

In the Uyghur Region, there are no safe opportunities for Affected Communities or IFC client employees to express grievances.

This is not the first time IFC has found itself deeply embedded in a region when low-level violence escalates to gross atrocities.[230] If major changes are not made to IFC's protocols regarding what it refers to as "fragile and conflict-affected situations," it will not be the last. The Uyghur crisis provides strong evidence that IFC's Performance Standards and monitoring protocols are currently inadequate to determine what would constitute both responsible entry into fragile and conflict-affected regions, as well as protocols and triggers for responsible exit. **Without clear guidance, DFIs continue to infuse authoritarian governments and the companies that support them with capital that finances oppression.** Stable peace and expanding civic space should be benchmarked alongside the financial health of the project as a key development outcome. A successful project in a conflict-affected, high-risk area is not simply a profitable one. The World Bank Group's mission is to "promote shared prosperity." That goal will remain out of reach until its investments personnel are tasked to look beyond the economic bottom line.

In order to address the clear and critical gaps in current environmental and social safeguards, we recommend IFC and other DFIs do the following:

49

**1** IFC and other DFIs should divest from all corporate investments in the Uyghur Region.

**2** IFC and other DFIs should presume that all companies operating in the Uyghur Region are engaged in forced labor and carry risk of complicity in the ongoing genocide.

**3** IFC and other DFIs should review and adjust their direct and indirect investment portfolios to move sub-investments, sub-contracts, and supply chains out of the Uyghur Region. IFC should conduct a full review of its portfolio, including financial intermediary investments, using the methods employed in this report.

**4** IFC should create protocols for both responsible entry into fragile and conflict-affected regions, as well as protocols and triggers for responsible exit.

**5** All tenders put out for bidding by IFC and DFIs should include a restriction on the purchase of forced-labor-made goods and require full supply chain transparency from all contractors and their suppliers.

**6** IFC should extend its zero-tolerance policy for reprisals against human rights defenders to the initial project appraisal phase and explicitly prohibit investments in any location where dissent is punishable by extrajudicial internment or incarceration.

**7** IFC should reinstate its policy of publishing the names of the loan officer and lead environmental and social specialist tasked with projects. This will enable human rights defenders, activists, and advocates to more directly engage with the decision makers who interact with project proponents.

**Governments should take note of the complicity of DFI investments in the PRC's repression of minoritized citizens. Individual government DFIs may be complicit, just as their investments in IFC may be. The United States in particular—with its 21 percent share—has an opportunity to take a leadership role in enhancing oversight of IFC's investments.**

AR001731

51

AR001732

# ENDNOTES

*Most URLs refer to the archived version of the website, in an effort to increase link stability. Videos and PDFs are not archived in full, so any such media referenced in the notes have been uploaded to the [report's website](#) at Sheffield Hallam University. Correspondence between IFC and the authors can also be found on the website. DFI and corporate responses to requests for comments are included on the website in [Online Annex A](#).*

1    Kharon, "International Development Loans Fund Chinese Firms with Xinjiang Operations," November 4, 2021, https://brief.kharon.com/updates/international-development-loans-fund-chinese-firms-with-xinjiang-operations/.

2    International Finance Corporation (IFC), "Goldwind," IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/29998/goldwind; International Finance Corporation (IFC), "COFCO Noble II," IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/37939/cofco-noble-ii; and email correspondence between IFC and Kendyl Salcito, March 5, 2021.

3    The CCP describes Uyghurs as "ethnic minorities." However, prior to Chinese occupation of their ancestral lands, Uyghurs were the ethnic majority of the regions in which they live, and in many places they remain so today. As such, the term "minoritized citizens" is used to denote that Uyghurs have been "minoritized" by the Chinese state.

4    See, for example, Darren Byler, *In the Camps: China's High-Tech Penal Colony* (New York: Columbia Global Reports, 2021);  Sean R. Roberts, *The War on the Uyghurs: China's Campaign against Xinjiang's Muslims* (Princeton, New Jersey: Princeton University Press, 2020); Nathan Ruser, "Exploring Xinjiang's detention system," Xinjiang Data Project, Australia Strategic Policy Institute, September 2020, https://xjdp.aspi.org.au/explainers/exploring-xinjiangs-detention-facilities/; and Adrian Zenz, "'Wash Brains, Cleanse Hearts': Evidence from Chinese Government Documents about the Nature and Extent of Xinjiang's Extrajudicial Internment Campaign," Journal of Political Risk 7 (11) (November 2019), https://www.jpolrisk.com/wash-brains-cleanse-hearts/#caption-attachment-2460:-:text=Adding%20177%2C000%20to%20the%20current%20internment,-million%2C%20or%20approximately%201.8%20million.%20This.

5    Standing Committee of the People's Congress of Xinjiang Uygur Autonomous Region, "新疆维吾尔自治区人民代表大会常务委员会公报" ("Communiqué of the Standing Committee of the People's Congress of the Xinjiang Uygur Autonomous Region"), September 2018, https://archive.vn/otmiB; and "新疆维吾尔自治区主席就新疆反恐维稳情况及开展职业技能教育培训工作答记者问" ("The Chairman of Xinjiang Uyghur Autonomous Region answers reporters' questions on Xinjiang's anti-terrorism and stability maintenance situation and the development of vocational skills education and training"), Xinhua, October 16, 2018, https://archive.ph/ynyd6.

6    "新疆维吾尔自治区主席就新疆反恐维稳情况及开展职业技能教育培训工作答记者问" ("The Chairman of Xinjiang Uyghur Autonomous Region answers"); see also Enshen Li, "Fighting the 'Three Evils': A Structural Analysis of Counter-Terrorism Legal Architecture in China," *Emory International Law Review* 33 (3) (2019): 5–6, https://scholarlycommons.law.emory.edu/eilr/vol33/iss3/1/; Lily Kuo, "China 'legalises' internment camps for million Uighurs," *Guardian*, October 11, 2018, https://www.theguardian.com/world/2018/oct/11/china-legalises-internment-camps-for-million-uighurs; Lily Kuo, "'My soul, where are you?': families of Muslims missing in China meet wall of silence," *Guardian*, September 13, 2018, https://www.

theguardian.com/world/2018/sep/13/uighur-xinjiang-family-missing-china-kazakhstan; and "新疆大地  一场思想解放运动正在上演" ("An ideological liberation movement is taking place in Xinjiang"), *Tianshan News*, October 9, 2018, https://archive.ph/MxRT2.

7    See Greg Caskey and Ilia Murtazashvili, "The Predatory State and Coercive Assimilation: The Case of the Uyghurs in Xinjiang," July 8, 2021, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3878514; Roberts, *The War on the Uyghur*s; James Waller and Mariana Salazar Albornoz, "Crime and No Punishment? China's Abuses Against the Uyghurs," *Georgetown Journal of International Affairs* 22 (1) (Spring 2021): 100–111, https://muse.jhu.edu/article/789548; and "新疆维吾尔自治区主席就新疆反恐维稳情况及开展职业技能教育培训工作答记者问" ("The Chairman of Xinjiang Uyghur Autonomous Region answers").

8    Zenz, "'Wash Brains, Cleanse Hearts.'"

9    Uyghur Tribunal, "Uyghur Tribunal Judgment," December 9, 2021, https://uyghurtribunal.com/wp-content/uploads/2021/12/Uyghur-Tribunal-Summary-Judgment-9th-Dec-21.pdf; Edward Wong and Chris Buckley, "U.S. Says China's Repression of Uighurs Is 'Genocide,'" *New York Times*, January 19, 2021 (updated July 27, 2021), https://www.nytimes.com/2021/01/19/us/politics/trump-china-xinjiang.html; Michael R. Pompeo, "Determination of the Secretary of State on Atrocities in Xinjiang," U.S. Department of State, January 19, 2021, https://2017-2021.state.gov/determination-of-the-secretary-of-state-on-atrocities-in-xinjiang/index.html; "UK parliament declares genocide in China's Xinjiang; Beijing condemns move," Reuters, April 22, 2021, https://www.reuters.com/world/uk/uk-parliament-declares-genocide-chinas-xinjiang-raises-pressure-johnson-2021-04-22/; Peter Mattis, "Yes, the Atrocities in Xinjiang Constitute a Genocide," Foreign Policy, April 15, 2021, https://foreignpolicy.com/2021/04/15/xinjiang-uyghurs-intentional-genocide-china/ ; *The Uyghur Genocide: An Examination of China's Breaches of the 1948 Genocide Convention, Newlines Institute for Strategy and Policy*, March 8, 2021, https://newlinesinstitute.org/uyghurs/the-uyghur-genocide-an-examination-of-chinas-breaches-of-the-1948-genocide-convention/;
"Xinjiang genocide conference aims to up pressure on China," Associated Press, September 1, 2021, https://apnews.com/article/europe-religion-china-0155e9d8a3df71602329ca2420680567; Adrian Zenz, *Sterilizations, IUDs, and Mandatory Birth Control: The CCP's Campaign to Suppress Uyghur Birth rates in Xinjiang, Jamestown Foundation*, June 2020, https://jamestown.org/product/sterilizations-iuds-and-mandatory-birth-control-the-ccps-campaign-to-suppress-uyghur-birthrates-in-xinjiang/; Ondřej Klimeš and Joanne Smith Finley, "China's Neo-Totalitarian Turn and Genocide in Xinjiang," Society and Space, December 7, 2020, https://www.societyandspace.org/articles/chinas-neo-totalitarian-turn-and-genocide-in-xinjiang; and David Tobin et al., "State Violence in Xinjiang: A Comprehensive Assessment. A submission of evidence to the Uyghur Tribunal," London, United Kingdom, June 4–7, 2021, https://uyghurtribunal.com/wp-content/uploads/2022/01/UT-220118-David-Tobin-et.al_.pdf.

AR001733

10  Tobin et al., "State Violence in Xinjiang"; Yasmeen Serhan, "Saving Uighur Culture from Genocide," *Atlantic*, October 4, 2020, https://www.theatlantic.com/international/archive/2020/10/chinas-war-on-uighur-culture/616513/; Rachel Harris, "Uyghur Heritage and the Charge of Cultural Genocide in Xinjiang," Newlines Institute for Strategy and Policy, September 24, 2020, https://newlinesinstitute.org/uyghurs/uyghur-heritage-and-the-charge-of-cultural-geno-cide-in-xinjiang/; Nathan Ruser et al., *Cultural erasure: tracing the destruction of Uyghur and Islamic spaces in Xinjiang, Australian Strategic Policy Institute*, September 24, 2020, https://www.aspi.org.au/report/cultural-erasure; Magnus Fiskesjö, "Bulldozing Culture: China's Systematic Destruction of Uyghur Heritage Reveals Genocidal Intent," *Cultural Property News*, June 23, 2021, https://culturalpropertynews.org/bulldozing-culture-chinas-systemat-ic-destruction-of-uyghur-heritage-reveals-genocidal-intent/; Helen Davidson, "Thousands of Xinjiang mosques destroyed or damaged, report finds," *Guardian*, September 25, 2020, https://www.theguardian.com/world/2020/sep/25/thousands-of-xin-jiang-mosques-destroyed-damaged-china-report-finds; Sean R. Roberts, "The Roots of Cultural Genocide in Xinjiang: China's Imperial Past Hangs Over the Uyghurs," *Foreign Affairs*, February 10, 2021, https://www.foreignaffairs.com/articles/china/2021-02-10/roots-cultural-genocide-xinjiang; "Cultural Destruction," University of British Columbia's Xinjiang Documentation Project, *https://xinjiang.sppga.ubc.ca/timelines/cultural-destruction-timeline/*; Joanne Smith Finley, "'Now We Don't Talk Anymore': Inside the 'Cleansing' of Xinjiang,'" *ChinaFile*, December 28, 2018, https://www.chinafile.com/reporting-opinion/viewpoint/now-we-dont-talk-anymore; Rian Thum, "The Spatial Cleansing of Xinjiang: Mazar Desecration in Context," *Made in China Journal*, August 24, 2020, https://madeinchinajournal.com/2020/08/24/the-spa-tial-cleansing-of-xinjiang-mazar-desecration-in-context/; and Michael Clarke, *Settler Colonialism and the Path toward Cultural Genocide in Xinjiang, Global Responsibility to Project*, February 16, 2021, https://brill.com/view/journals/gr2p/13/1/article-p9_9.xml.

11  Sigal Samuel, "China's genocide against the Uyghurs, in 4 disturb-ing charts," Vox, March 10, 2021, https://www.vox.com/future-per-fect/22311356/china-uyghur-birthrate-sterilization-genocide; Zenz, *Sterilizations, IUDs, and Mandatory Birth Control*; Tobin et al., "State Violence in Xinjiang"; and 新疆和田地区维族劳动力转移就业扶贫工作报告 *(Report on poverty alleviation work for Xinjiang Hotan Region Uyghur labour force transfer and employment)*, China Institute of Wealth and Economics, Nankai University, December 23, 2019, https://web.archive.org/web/20200507161938/https://ciwe.nankai.edu.cn/2019/1223/c18571a259225/page.htm#d-con-tainer:-:text=.%20Fifth%2C%20in%20order%20to%20create,of%20migrant%20workers%20and%20various%20restrictions.

12  "新疆乌鲁木齐安置南疆富余劳动力转移就业近万人" ("Urumqi, Xinjiang, resettled the surplus labor force in southern Xinjiang, transferred nearly 10,000 people to employment"), China National Radio, March 7, 2018, https://archive.md/JBbKm. For analysis of these pro-grams see, for example, Amy Lehr and Mariefaye Bechrakis, *Con-necting the Dots in Xinjiang: Forced Labor, Forced Assimilation, and Western Supply Chains, Center for Strategic and International Stud-ies*, 2019, 4-8, https://www.csis.org/analysis/connecting-dots-xinji-ang-forced-labor-forced-assimilation-and-western-supply-chains; Amy Lehr, *Addressing Forced Labor in the Xinjiang Uyghur Autonomous Region: Toward a Shared Agenda, Center for Strategic and International Studies*, July 2020, https://csis-website-prod.s3.amazonaws.com/s3fs-public/publication/200730_Lehr_Xinjian-gUyghurForcedLabor_brief_FINAL_v2.pdf; Vicky Xiuzhong Xu et al., *Uyghurs for sale: 'Re-education', forced labour, and surveillance beyond Xinjiang, Australian Strategic Policy Institut*e, 2020, https://www.aspi.org.au/report/uyghurs-sale; Adrian Zenz, *Coercive Labor and Forced Displacement in Xinjiang's Cross-Regional Labor Transfer Program: A Process-Oriented Evaluation, Jamestown Foundation*, 2021, 19–21 and  24–25, https://jamestown.org/prod-uct/coercive-labor-and-forced-displacement-in-xinjiangs-cross-re-

gional-labor-transfer-program/; Adrian Zenz, "Beyond the Camps: Beijing's Long-Term Scheme of Coercive Labor, Poverty Alleviation and Social Control in Xinjiang," *Journal of Political Risk* 7 (12) (De-cember 2019), https://www.jpolrisk.com/beyond-the-camps-bei-jings-long-term-scheme-of-coercive-labor-poverty-alleviation-and-social-control-in-xinjiang/; Alison Killing and Megha Rajagopalan, "The Factories in the Camps," BuzzFeed News, December 28, 2020 (updated January 4, 2021), https://www.buzzfeednews.com/article/alison_killing/xinjiang-camps-china-factories-forced-labor; Laura T. Murphy and Nyrola Elimä, *In Broad Daylight: Uyghur Forced Labour in Global Solar Supply Chains*, Helena Kennedy Centre, Sheffield Hallam University, May 2021, https://www.shu.ac.uk/helena-kenne-dy-centre-international-justice/research-and-projects/all-projects/in-broad-daylight; and Laura T. Murphy, et al., *Laundering Cotton: How Xinjiang Cotton Is Obscured in International Supply Chains*, Helena Kennedy Centre, Sheffield Hallam University, November 2021, https://www.shu.ac.uk/helena-kennedy-centre-internation-al-justice/research-and-projects/all-projects/laundered-cotton.

13  Furthest Family, "致富路上的'夫妻档'" ("'Husband and wife coworkers' on the road to get rich"), Weixin, September 14, 2018, https://archive.vn/poU5S; "【扶贫故事绘】'扶贫羊'的带动效应" ("Stories of poverty alleviation through pictures: The driving effect of 'poverty alleviation sheep'"), *China Daily*, September 12, 2020, https://web.archive.org/web/20210219185543/https:/cn.chinadaily.com.cn/a/202009/12/WS5f5c4138a31009ff9fddfcff.html; and John Sudworth, "'If the others go I'll go': Inside Chi-na's scheme to transfer Uighurs into work," BBC News, March 2, 2021, https://www.bbc.com/news/world-asia-china-56250915.

14 "自治区党委自治区人民政府关于贯彻《中共中央、国务院关于全面推进乡村振兴加快农业农村现代化的意见》的实施意见" ("Opinions of the Autonomous Region Party Committee and the People's Government of the Autonomous Region on the implementa-tion of the 'Opinions of the Central Committee of the Commu-nist Party of China and the State Council on Comprehensively Promoting Rural Revitalization and Accelerating Agricultural and Rural Modernization'"), April 7, 2021, https://archive.ph/3u5xn.

15  Xinjiang State Rural Cooperative Economic Development Center, "推动农村土地流转促进新型农村经营主体发展" ("Promote the transfer of rural land and promote the development of new rural management entities"), April 20, 2020, https://archive.vn/0yzib; Happiness Third Division, "师市聚焦深度贫困团场 精准扶贫力拔穷根" ("The division city focuses on the deep-poverty group field, precision poverty alleviation, pulls out the roots of the poor"), Weixin, April 25, 2018, https://archive.vn/jtiP9; Li Shuo and Azigul Aisha, "真情结亲 真心帮扶" ("Really affectionate and support sincerely"), Xinhua News, December 14, 2019, https://archive.vn/9eJcR; Committee on the Elimination of Racial Discrimination, "Concluding observations on the combined fourteenth to seventeenth periodic reports of China (including Hong Kong, China and Macao, China)," United Nations Office of the High Commissioner of Human Rights, August 30, 2018, https://tbinternet.ohchr.org/Treaties/CERD/Shared%20Docu-ments/CHN/CERD_C_CHN_CO_14-17_32237_E.pdf; Uyghur Human Rights Project, "'They Can't Send Me Back': Uyghur Asylum Seekers in Europe," September 2020, 18, https://docs.uhrp.org/UHRP-re-port-Uyghur-asylum-seekers-in-Europe.pdf; Zenz, Coercive Labor, 24–25; Darren Byler, "Smart Workhouses, Negative Eugenics, and Uyghur Futures in Northwest China," presented at the Xinjiang Cri-sis: Genocide, Crimes against Humanity, Justice conference, New-castle University, September 1, 2021, https://www.youtube.com/watch?v=1BAxag6caTg; and Murphy et al., *Laundered Cotton*, 11–12

16  Qapqal County Human Resources and Social Security Board, "关于做好服务察布查尔县城乡富余劳动力转移就业工作实施方案" ("Im-plementation plan for serving the transfer and employment work for the urban and rural surplus labour force in Qapqal County"), March 22, 2018, https://web.archive.org/web/20191127080847/http://www.xjcbcr.gov.cn/info/1200/57613.htm.

17  Xinjiang Communist Youth League, "自治区团委面向南疆劳动力

**53**

转移就业人员开展国家通用语言培训" ("The Youth League Committee of the Autonomous Region conducts national language training for workers transferred from southern Xinjiang"), Weixin, May 11, 2020, https://archive.ph/xdLAd; Cyberspace Administration of China, "国新办：新疆连续三年未发生暴力恐怖案件" ("Information Office of the State Council: There have been no violent terrorist cases in Xinjiang for three consecutive years"), Weixin, December 9, 2019, https://archive.ph/9DZI9; and Shohret Zakir, 2021年新疆政府工作报告 (2021 Xinjiang government work report), Research Office of the People's Government of Hubei Province, March 8, 2021, https://archive.ph/GLXXb.

18  "新疆乌鲁木齐安置南疆富余劳动力转移就业近万人" ("Urumqi, Xinjiang, resettled the surplus labor force in southern Xinjiang").

19  Government Information Public Platform of Kashgar, "关于印发《喀什地区困难群体就业培训工作实施方案》的通知" ("Notice on issuing the 'Implementation Plan for Employment Training for the Difficult Groups in Kashgar'"), August 7, 2018, https://web.archive.org/web/20181204024839/http://kashi.gov.cn/Government/PublicInfoShow.aspx?ID=2963; "新疆聚焦22个深度贫困县（市）计划3年转移就业10万人" ["Xinjiang focuses on 22 deeply impoverished counties (cities) and plans to transfer and employ 100,000 people in three years"], Xinhua, January 10, 2018, https://archive.ph/qBXmu; Zenz, "'Wash Brains, Cleanse Hearts'"; and Shohret Zakir, 新疆维吾尔自治区政府工作报告 (2020 Xinjiang Uyghur Autonomous Region Government Work Report), Xinjiang Daily, January 6, 2020, https://archive.ph/os15M#selection-247.103-250.0.

20  The State Council Information Office of the People's Republic of China, "Employment and labor rights in Xinjiang," Xinhuanet, September 17, 2020, https://archive.ph/iWiLy.

21  Zakir, 2021年新疆政府工作报告 (2021 Xinjiang government).

22  The State Council Information Office of the People's Republic of China, "Employment and labor rights"; and Li, "Fighting the 'Three Evils.'"

23  Observer Network, "新疆局地组织民众识别75种宗教极端活动" ("Local people in Xinjiang organize people to identify 75 religious extremist activities"), December 24, 2014, https://web.archive.org/web/20141229192351/http://news.sina.com.cn/c/2014-12-24/093231321497.shtml.

24  Darren Byler, Terror Capitalism: Uyghur Dispossession and Masculinity in a Chinese City (Durham, North Carolina: Duke University Press, 2021); and Darren Byler, "From Xinjiang to Mississippi: Terror Capitalism, Labour and Surveillance," TNI Longreads, May, 2021, https://longreads.tni.org/stateofpower/from-xinjiang-to-mississippi-terror-capitalism-labour-and-surveillance.

25  See, for example, "新疆新源县农牧民实现家门口就业" ("Farmers and herdsmen in Kunas County, Xinjiang achieve employment at their doorsteps"), Xinhua, October 12, 2017, https://archive.ph/jWESF; Kunas County Human Resources and Social Security Bureau, "关于新源县2020年新疆晶科能源有限公司一次性吸纳就业补贴的公示" ("Announcement on Kunas County's 2020 Xinjiang Jinko Energy Co., Ltd. one-time subsidy for absorption of employees"), People's Government of Kunas County, Xinjiang, April 30, 2020, https://archive.vn/xVLlk; Qapqal County Human Resources and Social Security Board, "关于做好服务察布查尔县城乡富余劳动力转移就业工作实施方案" ("Implementation plan for serving the transfer"); and China Institute of Wealth and Economics, "新疆和田地区维族劳动力转移就业扶贫工作报告" ("Report on poverty alleviation work for Xinjiang Hotan Region Uighur labour force transfer and employment"), Nankai University, December 23, 2019, https://web.archive.org/web/20200507161938/https://ciwe.nankai.edu.cn/2019/1223/c18571a259225/page.htm#d-container:-:text=.%20Fifth%2C%20in%20order%20to%20create,of%20migrant%20workers%20and%20various%20restrictions. Academic reports have identified these different avenues of corporate participation in forced labor: Zenz, Coercive Labor and Forced Displacement; Zenz, "Beyond the Camps"; Xu et al., Uyghurs for sale; and Lehr and Bechrakis, Connecting the Dots in Xinjiang.

26  People's Court News, "新疆高院部署严厉打击暴力恐怖专项行动" ("The Xinjiang High People's Court deployed a special operation to crack down on violence and terrorism"), May 27, 2014, https://archive.ph/S6cAo; and "公安部开展严厉打击暴力恐怖活动专项行动" ("The Ministry of Public Security launched a special campaign to crack down on violent and terrorist activities"), Xinhua, May 25, 2014, https://archive.ph/x3jay.

27  See, for example, Ministry of Finance State Tax Administration, "关于新疆困难地区新办企业所得税优惠政策的通知" ("Notice regarding preferential income tax policies for newly established enterprises in difficult areas in Xinjiang"), No. 53, June 24, 2011, https://archive.ph/nBCK0; People's Government of Xinjiang Uyghur Autonomous Region, "新疆维吾尔自治区人民政府关于促进我区出口生产企业发展的税收政策的通知" ("Notice of the People's Government of Xinjiang Uyghur Autonomous Region on the tax policy for promoting the development of export production enterprises in our region"), No. 117, November 10, 2010, https://archive.ph/fMPWJ; "兵团石河子国家高新区技术产业开发区  关于鼓励创新创业发展的若干规定" ("Several provisions on encouraging innovation and entrepreneurship development in the Technology Industry Development Zone of the Shihezi National High-tech Zone of the Corps"), EmTown, June 19, 2018, https://archive.vn/UItaR; Turpan Municipal Bureau of Human Resources and Social Security, "吐鲁番市职业技能提升行动实施方案（2019-2021年）" ["Turpan city vocational skills upgrading action implementation plan (2019-2021)"], Turpan Executive Office (2019) No. 53, September 17, 2020, https://archive.vn/nUnSg; "减税降费助力新疆脱贫攻坚" ("Tax cuts and fee reductions to help Xinjiang fight poverty"), Xinjiang Autonomous Region Tax Service, State Taxation Administration, 2020, https://archive.ph/83yPa; "新疆：让扶贫举措更细  让脱贫效果更实" ("Xinjiang: Making poverty alleviation measures more detailed, making poverty alleviation more effective"), 2019, https://archive.ph/I2cWa; "和田纺织服装产业投资政策" ("Hetian Textile and Apparel Industry Investment Policy"), Hotan District Investment Promotion Bureau, May 23, 2017, https://web.archive.org/web/20191223102739/https://www.xjht.gov.cn/article/show.php?itemid=103053; "新疆：重点支持南疆纺织服装产业发展" ("Xinjiang: Focus on supporting the development of textile and garment industry in southern Xinjiang"), China Business News Network, April 17, 2018, https://archive.ph/XjJDe; and Xinjiang Uyghur Autonomous Region Government Network, "自治区发展纺织服装产业带动就业2018年行动方案" ("2018 Action Plan for the Development of the Textile and Apparel Industry in the Autonomous Region to Promote Employment"), April 24, 2018, https://archive.vn/X2fSE.

28  Wang Yuzhao, "新疆"千企帮千村"惠及26万余名贫困农牧民" ("Xinjiang's 'Thousands of Enterprises Helping Thousands of Villages' benefited more than 260,000 poor farmers and herdsmen"), Ministry of Agriculture and Rural Affairs of the People's Republic of China, August, 19, 2020, https://archive.ph/n1yTp.

29  Li Xiaoxia, "新疆少数民族产业工人队伍发展及现状分析" ("An analysis of the development and status of Xinjiang minority industrial workers"), Journal of Beifang University of Nationalities 4 (2015): 36, http://www.shehui.pku.edu.cn/upload/editor/file/20180829/20180829105607_8254.pdf.

30  For Chinese labor law, see Central People's Government of the People's Republic of China, "中华人民共和国劳动法" ("People's Republic of China Labor Law"), January 1, 1995, https://archive.ph/QOwdv#selection-739.7-739.35; for examples of job discrimination see, for example, IFC-funded Chenguang's advertisements: Yanqi Zero Distance, "焉耆县 '春风行动', 大量招聘信息免费送！" ("'Spring Breeze Action' in Yanqi County, a large number of recruitment information is sent for free!"), Weixin, March 13, 2015, https://archive.vn/9wDvn; or IFC-funded Tianxiang's advertisements on Xinjiang's human resources site xjhr.com for forklift drivers, atmospheric boiler workers, forklift workers, household boiler workers, and maintenance workers, and compare to listing for logistics administration.

31  "月薪：5827元！！喀什，克州，和田，面向社会公开招聘36名工作人员公告！" ("Monthly salary: 5827 yuan！！Kashgar, Kezhou, Hotan, the public recruitment announcement of 36 staff members!"), Weix-

54

AR001735

in, March 18, 2021, https://archive.ph/0hfBG#selection-471.0-515.49; Organization Department of the Luopu County Party Committee of the Communist Party of China and Luopu County Human Resources and Social Security Bureau,"2017年洛浦县面向全国公开招聘公安协警(事业单位 工作人员待遇) 公告" ["In 2017, Luopu County publicly recruited the public security association police (employee staff treatment) announcement for the whole country"], Luopu County Human Resources and Social Security Bureau, July 27, 2017, https://archive.ph/lil6h#selection-355.3-355.61; Keriya County Public Security Bureau, "2019年于田县面向社会公开招录100名警务辅助工作人员简章" ("The guideline for the public recruitment of 100 police auxiliary staff in Yutian County in 2019"), Weixin, April 1, 2019, https://archive.ph/TZRCh#selection-367.2-367.38; and Dongcheng Zhonghua Human Resources, "新疆西部合盛硅业招聘" ("Western Xinjiang Hoshine Silicon Industry recruitment"), November 17, 2020, https://archive.vn/SO1e3#selection-645.0-645.28.

32 "新疆维吾尔自治区主席就新疆反恐维稳情况及开展职业技能教育培训工作答记者问" ("The Chairman of Xinjiang Uyghur Autonomous Region answers reporters' questions"); see endnote 23 for several government programs meant to incentivize companies to take on minoritized workers in the Uyghur Region.

33 "新疆维吾尔自治区主席就新疆反恐维稳情况及开展职业技能教育培训工作答记者问" ("The Chairman of Xinjiang Uyghur Autonomous Region answers"); and Sun Yijie, "不忘初心创业 产业援疆报国" ("Don't forget the original intention to start a business, industry aid Xinjiang, and serve the country"), Ministry of Poverty Alleviation, October 24, 2018, https://archive.ph/QGiXC.

34 Chris Buckley and Austin Ramzy, "China's Detention Camps for Muslims Turn to Forced Labor," *New York Times*, December 16, 2018, https://www.nytimes.com/2018/12/16/world/asia/xinjiang-china-forced-labor-camps-uighurs.html; Shawn Zhang, "Satellite imagery of Xinjiang 'Re-education Camp' No 63 新疆再教育集中营卫星图 63," *Medium.com,* October 18, 2018, https://medium.com/@shawnwzhang/satellite-imagery-of-xinjiang-re-education-camp-63-%E6%96%B0%E7%96%86%E5%86%8D%E6%95%99%E8%82%B2%E9%9B%86%E4%B8%AD%E8%90%A5%E5%8D%AB%E6%98%9F%E5%9B%BE-63-5b324fa241d1; Rebecca Wright et al., "'Black gold': How global demand for hair products is linked to forced labor in Xinjiang," *CNN.com*, October 2020, https://edition.cnn.com/interactive/2020/10/asia/black-gold-hair-products-forced-labor-xinjiang/; Adrian Zenz, "The Karakax List: Dissecting the Anatomy of Beijing's Internment Drive in Xinjiang," *Journal of Political Risk* 8 (2) (February 2020), https://www.jpolrisk.com/karakax/; Darren Byler, "How companies profit from forced labor in Xinjiang," *SupChina*, September 4, 2019, https://supchina.com/2019/09/04/how-companies-profit-from-forced-labor-in-xinjiang/; Killing and Rajagopalan, "The Factories in the Camps"; and Qapqal County Human Resources and Social Security Board, "Implementation plan for serving the transfer."

35 See Murphy et al., *Laundering Cotton,* 19–20.

36 Cate Cadell, "US electronics firm struck deal to transport and hire Uyghur workers," Reuters, October 7, 2021, https://finance.yahoo.com/news/exclusive-u-electronics-firm-struck-140718580.html?guccounter=2.

37 "China's Xinjiang shakes off absolute poverty," *Global Times*, November 15, 2020, https://archive.ph/LILUx; Alice Su, "China fulfills a dream to end poverty. Not all poor people are feeling better off," *Los Angeles Times,* November 27, 2020, https://www.latimes.com/world-nation/story/2020-11-27/china-2020-poverty-eradication-dream; so-called poverty alleviation programs continued apace into 2021 despite this achievement. The government rationalizes this as an approach to prevent people from "poverty relapse." See Matteo Marchisio, "Rural revitalization can prevent poverty relapse," *China Daily,* March 11, 2021, https://archive.ph/GG4tF.

38 Indermit Gil, "Deep-sixing poverty in China," *Future Development* (blog), Brookings Institution, January 25, 2021, https://www.brookings.edu/blog/future-development/2021/01/25/deep-sixing-poverty-in-china/.

39 John Ruwitch, "What China's 'Total Victory' Over Extreme Poverty Looks Like In Actuality," *All Things Considered*, NPR, March 5, 2021, https://www.npr.org/2021/03/05/974173482/what-chinas-total-victory-over-extreme-poverty-looks-like-in-actuality; and Jack Goodman, "Has China lifted 100 million people out of poverty?" BBC News, February 28, 2021, https://www.bbc.com/news/56213271.

40 The State Council Information Office of the People's Republic of China, "Employment and labor rights."

41 Gao Sheng, "一线党旗红 ｜ 三载驻村路 一生驻村情" ("The first-line party flag is red | Three years of living in the village"), Weixin, May 27, 2020, https://archive.vn/NTYVi; and Gao Sheng, "土地流转见实效，合作社发钱咯！" ("The land transfer sees practical results, and the cooperative pays money!"), Weixin, December 10, 2020, https://archive.vn/aWVG3.

42 Accessed via Sayari Graph.

43 Xinjiang State Rural Cooperative Economic Development Center, "推动农村土地流转促进新型农村经营主体发展" ("Promote the transfer of rural land").

44 Xinjiang State Rural Cooperative Economic Development Center, "推动农村土地流转促进新型农村经营主体发展" ("Promote the transfer of rural land"); and Happiness Third Division, "师市聚焦深度贫困团场 精准扶贫力拔穷根" ("The division city focuses"); Gulchehre Hoja, Khitay Zărăpshan wadisidiki Uyghurlarni "küchüsh" wă "ishlăsh" birlăshkăn yengi shăhărgă köchürgăn a new city of 'migration' and 'work'"), RFA, June 10, 2020, https://www.rfa.org/uyghur/xewerler/zerepshan-wadisi-06102020141723.html; Li Shuo and Azigul Aisha, "真情结亲 真心帮扶" ("Really affectionate and support sincerely"), Xinhua News, December 14, 2019, https://archive.vn/9eJcR; CCTV News Network, "【"十三五"，我们这五年】新疆叶城：搬出大山天地宽" ["('Thirteenth Five-Year Plan': our five years) Yecheng, Xinjiang: Move out of the mountains and the world is wide"], Weixin, January 10, 2021, https://archive.ph/bIMvv; Committee on the Elimination of Racial Discrimination, "Concluding observations on the combined fourteenth to seventeenth periodic reports of China (including Hong Kong, China and Macao, China)," United Nations Office of the High Commissioner of Human Rights, August 30, 2018, https://tbinternet.ohchr.org/Treaties/CERD/Shared%20Documents/CHN/CERD_C_CHN_CO_14-17_32237_E.pdf; Uyghur Human Rights Project, "'They Can't Send'"; Zenz, "Coercive labor," 24-25; Byler, "Smart Workhouses"; and Murphy, et al., Laundered Cotton, 11–12.

45 Gulshen Abdukadir, "Ghulja shăhiridă ahalilăr wă dihqanlarning yăr mülüklirini măjburiy tartiwelish köpăymăktă" ("Number of farmers and residents of Yining, whose lands and properties are forcibly confiscated, is rising"), RFA, October 27, 2010, https://www.rfa.org/uyghur/programmilar/insan_heqliri/ghuljida-oy-cheqish-10272010202353.html; *The Bingtuan: China's Paramilitary Colonizing Force in East Turkestan, Uyghur Human Rights Project,* April, 2018, https://docs.uhrp.org/pdf/bingtuan.pdf; and Eziz, "Khitay hökümitining Uyghurlarni öy makanliridin köchürüsh hărikiti tekhimu kengăymăktă," ("The Chinese government is widening its move to relocate Uighurs from their homes"), RFA, May 5, 2020, https://www.rfa.org/uyghur/qisqa_xewer/uyghur-weziyiti-05052020160841.html.

46 Gao, "土地流转见实效，合作社发钱咯！" ("The land transfer sees practical results").

47 Darren Byler, "The Reeducation Labor Regime in Northwest China," *Georgetown Journal of Asian Affairs* 7 (2021), https://repository.library.georgetown.edu/bitstream/handle/10822/1061299/GJAA_Byler.pdf?sequence=1.

48 Coercive state-sponsored land transfer and cooperativization programs operate in other regions of China as well, but without the ultimate threat of internment or imprisonment that is ever-present for minoritized farmers in the Uyghur Region. See Qiangqiang Luo and Joel Andreas, "Mobilizing compliance: how the state com-

55

AR001736

pels village households to transfer land to large farm operators in China," *Journal of Peasant Studies* 47 (6) (2020): 1189–1210, https://www.tandfonline.com/doi/full/10.1080/03066150.2020.1822340.

49 "新疆维吾尔自治区国民经济和社会发展：第十三个五年规划" ("National economic and social development of the Xinjiang Uygur Autonomous Region: Outline of the thirteenth five-year plan"), May 2016, 49, https://www.ndrc.gov.cn/fggz/fzzlgh/dffzgh/201606/P020191104643495152910.pdf.

50 Murphy and Elimä, *In Broad Daylight.*

51 "Apple's Uyghur Dilemma Grows," Tech Transparency Project, June 8, 2021, https://www.techtransparency-project.org/articles/apples-uyghur-dilemma-grows.

52 European Parliament, "Circular economy: definition, importance and benefits," *European Parliament News*, December 2, 2015, https://www.europarl.europa.eu/news/en/headlines/economy/20151201STO05603/circular-economy-definition-importance-and-benefits.

53 "Circular economy introduction: What is a circular economy?" Ellen MacArthur Foundation, https://ellenmacarthurfoundation.org/topics/circular-economy-introduction/overview.

54 World Economic Forum, *Towards the Circular Economy: Accelerating the scale-up across global supply chains*, 2014, https://www3.weforum.org/docs/WEF_ENV_TowardsCircularEconomy_Report_2014.pdf.

55 "新疆维吾尔自治区国民经济和社会发展：第十三个五年规划纲要" ("National economic and social development of the Xinjiang Uygur Autonomous Region"); compare a case in South Africa where developers convert mine properties to new land uses while repurposing coal waste streams into biochar, activated carbon, hydrogen storage sinks, and other secondary and tertiary products and uses. Martin Creamer, "Profitable circular economy concepts making future potentially bright for coal miners," *Mining Weekly,* October 29, 2020, https://archive.ph/btqqW.

56 Qian Zhou and Zoey Zhang, "Investing in Xinjiang: Economy, Industry, Trade, and Investment Profile," China Briefing, April 9, 2021, https://www.china-briefing.com/news/investing-in-xinjiang-economy-industry-trade-and-investment-profile/#relatedservicesHeader:-:text=40%20percent%20of%20the%20country%E2%80%99s%20total%2C.

57 See, for example, Xinjiang Chemical Design and Research Institute Co., Ltd., "骆驼集团新疆蓄电池有限公司年产400 万kVAh蓄电池项目环境影响报告" ("Camel Group Xinjiang Storage Battery Co., Ltd. Annual Production of 4 million kVAh Battery Project Environmental Impact Report"), February 2017, Section 1.7.1.2. (Submitted by IFC to Kendyl Salcito in response to document request; available on report website.) All future references to this EIR will be cited parenthetically by paragraph within the text); see also Xinjiang Tengxiang Magnesium Products Co., "Environmental Impact Assessment" Section 9.2, Xinjiang Environment and Ecological Department, Urumqi, http://124.117.235.205:8099/eportal/fileDir/xjepb/resource/cms/article/1940/undefined/%E6%8A%A5%E5%91%8A%E4%B9%A620190906-2.pdf.

58 Beijing Xinguohuan Environmental Technology Development Co., Ltd., "新疆腾翔镁制品有限公司煤电冶一体化循环经济项目环境影响报告书（送审版）" ["Xinjiang Tengxiang Magnesium Products Co., Ltd. Coal-electricity-smelting integrated circular economy project Environmental Impact Report (Submission version)"], Department of Ecological Environment of Xinjiang Uyghur Autonomous Region, September 2019, Section 3.8.6, https://archive.ph/93Vds.

59 Ibid., Section 1(3).

60 "Homepage," International Finance Corporation, accessed November 17, 2021, https://www.ifc.org/wps/wcm/connect/corp_ext_content/ifc_external_corporate_site/home.

61 As of June 30, 2021, 7.4 percent of IFC's global portfolio was invested in China, second only to India (10.4 percent) in expo-

sure. See International Finance Corporation (IFC), *Meeting the Moment: 2021 Annual Report*, World Bank Group, 2021, https://www.ifc.org/wps/wcm/connect/5360200e-056f-4f99-9957-5f756c50a9ae/IFC_AR21.pdf?MOD=AJPERES&CVID=nNgZ.la.

62 IFC's 2010 $75 million equity investment in Xinjiang Goldwind was retained until 2019. A second 2010 investment, in a microcredit scheme, ended with the sanctioning of the project proponent, who was found to be acting fraudulently (Project Number 30345).

63 International Finance Corporation (IFC), *Our Purpose: IFC Annual Report 2020*, World Bank Group, 2020, https://www.ifc.org/wps/wcm/connect/c42df08e-b3f2-4655-b718-9afe6beaf969/IFC-AR20-Our-Purpose.pdf?MOD=AJPERES&CVID=nlnjbOt. See also, Asian Development Bank (ADB), *Working Differently in Fragile and Conflict-Affected Situations: The ADB Experience,* Staff Handbook, 2012, https://www.adb.org/sites/default/files/institutional-document/33774/files/working-differently-conflict-affected-situations.pdf; and African Development Bank (AfDB), "The Fragile States Facility (FSF): Guidelines on Administration of the Technical Assistance and Capacity Building (TCB) Program of Pillar III Operations," 2010, https://www.afdb.org/sites/default/files/documents/policy-documents/fsf_guidelines_administration_tcb_program_of_pillar_iiix1.pdf.

64 International Finance Corporation (IFC), *Generating Private Investment in Fragile and Conflict-Affected Areas,* 2019, https://www.ifc.org/wps/wcm/connect/publications_ext_content/ifc_external_publication_site/publications_listing_page/201902-fcs-study; and Weiyi Wang, Ozan Cakmak, and Kurt Hagemann, "Private Sector Initiatives in Forced Displacement Contexts: Constraints and Opportunities for Market-based Approaches," International Finance Corporation, Note 103, May 2021, https://www.ifc.org/wps/wcm/connect/925fb620-bb43-48d9-9112-c183856ca8d2/EMCompass_Note+103_Private+Sector+Initiatives+in+Forced+Displacement+Contexts_web.pdf?MOD=AJPERES&CVID=nB.X4yB.

65 In addition to the references cited in the rest of this paragraph, see Bretton Woods Project, "Conflict-affected states, IFC's final frontier," September 29, 2014, https://www.brettonwoodsproject.org/2014/09/conflict-affected-states-ifcs-final-frontier/.

66 Independent Evaluation Group (IEG) of the World Bank, "The International Finance Corporation's Engagement in Fragile and Conflict-Affected Situations: Results and Lessons," Synthesis Report, World Bank Group, 2019, https://ieg.worldbankgroup.org/sites/default/files/Data/reports/Synthesis_IFC_in_FCV.pdf. IEG "found that '54 percent of projects in FCS countries are rated mostly successful or above for their development outcome' but 'development outcome' referred to repayment of funds, rather than broad benefits to affected populations."

67 Abby Maxman, "The World Bank steps up on fragility and conflict: Is it asking the right questions?" *Future Development* (blog), Brookings Institution, March 16, 2020, https://www.brookings.edu/blog/future-development/2020/03/16/the-world-bank-steps-up-on-fragility-and-conflict-is-it-asking-the-right-questions/.

68 "Investment Policy in Fragile Contexts," Middle East and North Africa Investment Policy Perspectives, OECD Library, March 2021, https://www.oecd-ilibrary.org/sites/9a8381f0-en/index.html?itemId=/content/component/9a8381f0-en.

69 International Finance Corporation (IFC), IFC's *Sustainability Framework: From Policy Update to Implementation,* World Bank Group, December 2012, https://www.cbd.int/financial/mainstream/ifc-sustainability2012.pdf.

70 International Finance Corporation (IFC), "Performance Standards on Environmental and Social Sustainability," January 1, 2012, ii, https://www.ifc.org/wps/wcm/connect/24e6b-fc3-5de3-444d-be9b-226188c95454/PS_English_2012_Full-Document.pdf?MOD=AJPERES&CVID=jkV-X6h.

71 International Finance Corporation (IFC), "International Finance Corporation's Policy on Environmental and Social

AR001737

Sustainability," January 1, 2012, https://www.ifc.org/wps/wcm/connect/7141585d-c6fa-490b-a812-2ba87245115b/SP_English_2012.pdf?MOD=AJPERES&CVID=kiIrw0g.

72 Peter Woike, David Fairman, Arntraud Hartmann, Peter Larose, Tasneem Salam, and Edward Waitzer, *External Review of IFC/MIGA E&S Accountability, including CAO's Role and Effectiveness Report and Recommendations*. World Bank Group, June 9, 2020, https://thedocs.worldbank.org/en/doc/578881597160949764-0330022020/original/ExternalReviewofIFCMIGAESAccountabilitydisclosure.pdf.

73 Kinnari Bhatt, *Concessionaires, Financiers and Communities: Implementing Indigenous Peoples' Rights to Land in Transnational Development Projects* (Cambridge, United Kingdom: Cambridge University Press, 2020), 194.

74 Galit A. Sarfaty, *Values in Translation: Human Rights and the Culture of the World Bank* (Redwood City, California: Stanford University Press, 2012). One banker told Sarfaty, "the economics and human rights literature empirically is not super strong. It's pretty weak. So it's pretty irresponsible to be lending money if you haven't done the rigorous economic analysis" (p. 49). *In Concessionaires, Financiers and Communities,* Bhatt makes a similar point about the decision not to acknowledge the indigeneity of Mongolian herders affected by the Oyu Tolgoi mine (p. 132).

75 Andrew Hopkins and Deanna Kemp, *Credibility Crisis: Brumadinho and the Politics of Mining Industry Reform* (Alphen aan den Rijn, Netherlands: Wolters Kluwer, 2021), 55.

76 Sarfaty, *Values in Translation*, 111.

77 International Finance Corporation (IFC), "Fragile and Conflict-Affected Countries: Unlocking the Potential of the Private Sector – for Peace, Stability and Prosperity," World Bank Group, October 2014, https://www.ifc.org/wps/wcm/connect/dcd9f4c0-d34a-4556-9e5a-0dcb3a9b0ac0/IFC+FCS+Brochure.pdf?MOD=AJPERES&CVID=lglUzLj.

78 The catastrophic decimation of indigenous peoples in the implementation of the Sardar Sarovar Dam in India was the focus of the 1992 Morse and Berger report [see Bradford Morse and Thomas R. Berger, *Sardar Sarovar: The Report of the Independent Review* (Resource Futures International, 1992)]. In 1993, to enforce adherence to its Operational Policies (OPs), the World Bank established the Inspection Panel to evaluate allegations of noncompliance with the OPs. In 2000, IFC established a parallel oversight board for its Performance Standards, known as the Office of the Compliance Advisor and Ombudsman (CAO).

79 The Performance Standards were developed in direct reflection of the Equator Principles for private banks. Sarfaty, *Values in Translation*, 27.

80 Equator Principles Association, *The Equator Principles: EP4,* July 2020, https://equator-principles.com/app/uploads/The-Equator-Principles_EP4_July2020.pdf.

81 IFC, *Generating Private Investment.*

82 Personal communication between Kendyl Sacito and IFC, November 11, 2020.

83 IFC has additional indirect investments in the region through its financial intermediaries' portfolios. These are outside the scope of this research but require similar due diligence.

84 Kendyl Salcito, *IFC's FPIC and the Cultural Genocide of Uyghurs,* NomoGaia, March 2021, http://nomogaia.org/wp-content/uploads/2021/03/IFC-Xinjiang-Investments-the-tragic-cost-of-bypassing-PS7.pdf.

85 "Chenguang Bio (IFC-40616)," Early Warning System, June 22, 2018, https://ewsdata.rightsindevelopment.org/projects/IFC-40616/; and Reuters Staff, "BRIEF-Chenguang Biotech Group to inject capital of $24 million into unit CHENGUANG BIOTECH (ZAMBIA) AGRI-DEV," Reuters, April 24, 2018, https://www.reuters.com/article/brief-chenguang-biotech-group-to-inject/brief-chenguang-biotech-group-to-inject-capital-of-24-mln-into-unit-chenguang-biotech-agri-dev-idUSL3N1S14VU.

86 "新疆：减税降费"照亮"脱贫攻坚路" ("Xinjiang: Tax cuts and fee reductions 'light up' the road to poverty alleviation"), *Tianshan News*, March 12, 2020, https://archive.ph/2GzVy.

87 China Cotton Net, "新疆纺织服装业发展空间i有多大" ("How big is the development space of Xinjiang textile and garment industry"), Sina Finance, July 30, 2019, https://archive.ph/OoIUV; "新疆棉花产量占全国84.9% 比重创新高" ("Xinjiang's cotton production accounts for 84.9% of the country's total, a new high"), Xinhua News Agency, January 2, 2020, https://archive.is/Ktpph; and Lehr and Bechrakis, *Connecting the Dots in Xinjiang.*

88 Julia Fanzeres, "China Criticizes U.S. Ban on Xinjiang Goods Over Forced Labor," Bloomberg Law, January 13, 2021, https://news.bloomberglaw.com/international-trade/u-s-bans-xinjiang-cotton-products-tomatoes-on-forced-labor-2; and Wang Jingjing, Zhang Dan, and Xiong Wei, "中国新疆对哈萨克斯坦番茄酱出口潜力分析" ("Potential Analysis of Tomato Paste Export from China's Xinjiang to Kazakhstan"), *Journal of Theory and Practice of Social Science* 1 (2) (2019): 1–8, http://ssci.cc/wp-content/uploads/2020/05/20190201.pdf.

89 Phil K., "Analysis and forecast for China's tree nut sector in 2019/2020," Produce Report, October 22, 2019, https://www.producereport.com/article/analysis-forecast-chinas-tree-nut-sector-201920.

90 C. Textor, "Grape Production in China in 2019, by region," Statista, December 7, 2020, https://www.statista.com/statistics/242950/grape-production-in-china-by-region/.

91 International Finance Corporation (IFC), "Chenguang Bio" (Environmental and Social Mitigation Measures > PS 7: Indigenous People tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/40616/chenguang-bio.

92 Zhu Ping, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation: Chenguang Biological order-based planting helps 100,000 farmers in Yarkand County to get rid of poverty"), *21st Century Business Herald*, August 1, 2019, https://archive.ph/aPjTE.

93 International Finance Corporation (IFC), "Chenguang Bio" (Development and Impact tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/SII/40616/chenguang-bio.

94 Bills of lading accessed via Panjiva Market Intelligence.

95 Email correspondence from IFC to Kendyl Salcito, March 5, 2021. All IFC correspondence are available on the report website.

96 It is important to note that Uyghurs can be certified as accountants and thus would have the same credentials as any other person who would apply for this job. Yanqi Zero Distance, "焉耆县 '春风行动'，大量招聘信息免费送！" ("'Spring Breeze Action' in Yanqi County)

97 Micro Curve, *"绿色科技编织五彩世界–晨光科技集团新疆公司掠影"* ("Green technology weaves colorful colors - A Glimpse of Chenguang Technology Group Xinjiang Branch"), Weixin, May 20, 2020, https://archive.vn/Mxu32#selection-501.0-501.17.

98 Estimate discrepancies are endemic to media reports of "poverty alleviation" programs, and it is beyond the scope of this report to validate or refute these public numbers. "Peak harvest season for marigolds arrives in Shache county, NW China's Xinjiang," *People's Daily Online* (English edition), September 27, 2020, https://archive.ph/wi385; and Fei Wangyong, "产业扶贫 精准滴灌" ("Industrial poverty alleviation precision drip irrigation"), *Xinjiang Daily,* October 13, 2020, https://archive.is/119Sm.

99 Zhu, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation").

100 Kashgar Zero Distance, "莎车县脱贫攻坚工作综述" ("A

57

**AR001738**

Summary of Poverty Alleviation Work in Yarkant County"), Weixin, March 19, 2020, https://archive.vn/TMg3F.

101 International Finance Corporation (IFC), "Chenguang Bio" (Environmental and Social Mitigation tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/SII/40616/chenguang-bio.

102 Chenguang Bio, "新疆于田县：万寿菊开出"致富花"助力脱贫攻坚" ("Yutian County, Xinjiang: Marigold blooms 'getting rich flowers' to help fight poverty"), *People's Daily Online - Xinjiang Channel* via Weixin, July 2, 2020, https://archive.ph/6oSnS.

103 "新疆：减税降费"照亮"脱贫攻坚路" ("Xinjiang: Tax cuts and fee reductions 'light up' the road to poverty alleviation"), *Tianshan News,* March 12, 2020, https://archive.ph/2GzVy.

104 Accessed via Sayari Graph.

105 "沙海边的花海" ("The sea of flowers on the sandy beach"), Weixin, August 12, 2019, https://archive.vn/itf6m.

106 Wang Yongfei, "产业扶贫 精准滴灌" ("Industrial poverty alleviation precision drip irrigation"), Ministry of Agriculture and Rural Affairs of the People's Republic of China, October 13, 2020, https://archive.is/119Sm.

107 Chenguang Information, "晨光生物把万寿菊种成南疆 '脱贫致富花'" ("Chenguang Biological plants marigolds as 'flowers for alleviating poverty and getting rich' in southern Xinjiang"), Guba.com, April 1, 2020, https://archive.ph/GjaYh; Zhu, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation").

108 IFC, "Chenguang Bio" (Environmental and Social Mitigation tab).

109 According to communication with IFC, five truck drivers were chosen for interviews because they happened to be on Chenguang property when an IFC team was on site, accompanied by project management. There were no one-on-one or private interviews conducted away from project management and government authorities. Workers are generally not expected to speak freely under such circumstances. Personal communication between Kendyl Salcito and IFC, November 11, 2020.

110 Chenguang Information, "晨光生物把万寿菊种成南疆 '脱贫致富花'" ("Chenguang Biological plants marigolds as 'flowers for alleviating poverty and getting rich' in southern Xinjiang"), Guba, April 1, 2020, https://archive.ph/GjaYh; Zhu, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation"); and IFC, "Chenguang Bio" (Environmental and Social Mitigation tab).

111 Yang Mingfang, Li Yanan, and Han Liqun, "Shache county in Xinjiang implements targeted poverty alleviation measures," *People's Daily,* reprinted in *Los Angeles Post,* June 11, 2020, https://lapost.us/?p=25891; and Yang Donghua, "［媒体看新大］叶城零距离：万寿菊花开，一起来邂逅最美五月天！" ["(Media Watch at Xinda) Yecheng Zero Distance: Marigold flowers bloom, come and meet the most beautiful Mayday!"], May 13, 2020, https://archive.ph/leDSa.

112 Food Industry Offers, "晨光生物在新疆叶城投建万寿菊加工新工厂！加速抢占叶黄素市场份额！" ("Chenguang Bio will build a new marigold processing factory in Kargilik Xinjiang! Accelerating to seize the market share of lutein!"), Weixin, April 14, 2020, https://archive.vn/Xbcib.

113 Gao Sheng, "土地流转见实效，合作社发钱咯！" ("The land transfer sees practical results, and the cooperative pays money!"), Weixin, December 10, 2020, https://archive.vn/aWVG3; and Gao, "一线党旗红 ｜ 三载驻村路 一生驻村情" ("The first-line party flag is red").

114 People's Government of Kargilik County, "叶城县征收农用地区片综合地价成果公示" ("Announcement of the results of comprehensive land prices expropriated for agricultural areas in Yecheng County"), December 31, 2020, https://archive.ph/yVdlv.

115 CEIC, "Standard of Monthly Minimum Wage: Xinjiang," https://www.ceicdata.com/en/china/standard-of-monthly-mini-

mum-wage/standard-of-monthly-minimum-wage-xinjiang.

116 Gao, "一线党旗红 ｜ 三载驻村路 一生驻村情" ("The first-line party flag is red"); and regarding 553 surplus laborers and an average salary, see Gao, "土地流转见实效，合作社发钱咯！" ("The land transfer sees practical results").

117 US Department of the Treasury, Treasury Sanctions Chinese Entity and Officials Pursuant to Global Magnitsky Human Rights Executive Order, press release, July 31, 2020, https://home.treasury.gov/news/press-releases/sm1073.

118 In this case, farmers required to give up their land may also be Han employees of the XPCC. First Division Alar Farm Micro-Platform, "师市农业产业结构调整现场会在阿拉尔农场召开" ("On-site meeting of division city agricultural industrial structure adjustment was held in Alar Farm"), Weixin, April 20, 2018, https://archive.vn/VrSCW.

119 Happiness Third Division, "本地资讯丨第三师图木舒克市通讯员稿件" ("Local information｜Tumshuk correspondent's manuscript of the Third Division"), Weixin, November 18, 2020, https://archive.vn/BNyGu.

120 The application of Performance Standards is articulated in Paragraph 8 of PS1, defining the project's "area of influence" to encompass "affected" areas, "associated facilities," and "cumulative impacts." IFC assessments of protections for associated facilities have long been inadequate. Its independent ombudsman wrote an extensive report identifying this problem. See Compliance Advisory Ombudsman (CAO), *Supply Chain Business Opportunities and Risks*, Advisory Series, 2018, https://www.cao-ombudsman.org/resources/cao-advisory-memos-supply-chain-business-opportunities-and-risks.

121 Zhou Fangping, "五十一团3500亩万寿菊开始采摘" ("Fifty-first regiment begins harvest of 3,500 mu of marigolds"), Xinjiang Production and Construction Corps, June 24, 2020, https://archive.vn/kiii5.

122 Zhu, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation").

123 "晨光生物向河北高考生捐赠约290万元叶黄素软胶囊" ("Chenguang Bio donated about 2.9 million yuan of lutein soft capsules to Hebei college entrance examination candidates"), *Beijing News,* March 29, 2020, https://archive.ph/2F2xV.

124 Wang, "产业扶贫 精准滴灌" ("Industrial poverty alleviation"). Note: Media reports often contain discrepancies in figures, and we are unable to verify them.

125 Zhu, "产业扶贫样本调查：晨光生物订单式种植 助力莎车县10万农民脱贫" ("Sample survey of industrial poverty alleviation").

126 "'焉支山' 下，'三红' 调制 '小康味'" ["Under 'Yanzhi Mountain,' 'Three Reds' are used to make 'well-off taste'"], Xinhua News Agency, September 17, 2020, https://archive.ph/xGzJC; and China Food News, "两会聚焦——脱贫攻坚" ("Focus of the two sessions – poverty alleviation"), Weixin, May 27, 2020, https://archive.vn/P0KBK.

127 Gao, "一线党旗红 ｜ 三载驻村路 一生驻村情" ("The first-line party flag is red").

128 Gao Sheng, "老果园改造+土地平整，低产田摇身变良田" ("Reconstruction of old orchards + land leveling, low-yield fields turned into good fields"), People's Government of Kargilik County, March 9, 2020, https://archive.ph/lrmdb; and Darren Byler, "Spirit Breaking: Uyghur Dispossession, Culture Work and Terror Capitalism in a Chinese Global City." PhD diss., University of Washington, 2018, 47–49, 173, 255, https://digital.lib.washington.edu/researchworks/bitstream/handle/1773/42946/Byler_washington_0250E_19242.pdf. On the commodification of "3 generations of trees," one of Byler's informants noted: "'What those people who are buying and selling trees are forgetting is that the trees hold the spirits of our ancestors within them. We have always used wood to build the thresholds of our houses, but we did so out of respect for the trees and a way of guarding our home from evil spirits. Now that respect is lost.' He was saying that, when people begin to treat sacred

**AR001739**

landscapes like natural sources of capital, they are dispossessed of their relationship with the deep history of the land." (127-128).

129 International Finance Corporation (IFC), "Chenguang Bio," IFC Project Information & Data Portal, ESRS, Project No. 40616, https://disclosures.ifc.org/project-detail/ESRS/40616/chenguang-bio.

130 Teleconference between IFC and Kendyl Salcito, corroborating project notes for IFC Disclosure 40616, November 11, 2020.

131 Ibid.

132 Note: Performance Standards are cited in parentheses using the PS number and the relevant paragraph number as enumerated in IFC's Performance Standards Guidance. International Finance Corporation (IFC), "International Finance Corporation's Policy on Environmental and Social Sustainability," January 1, 2012, https://www.ifc.org/wps/wcm/connect/7141585d-c6fa-490b-a812-2ba87245115b/SP_English_2012.pdf?MOD=AJPERES&CVID=kiIrw0g.

133 "About Us — Cooperative Partners," Camel Group, https://archive.ph/zmLb2.

134 According to customs records accessed via Panjiva Market Intelligence platform.

135 Xinjiang Chemical Design and Research Institute Co., Ltd., "骆驼集团新疆蓄电池有限公司年产400万kVAh蓄电池项目环境影响报告书" ("Camel Group Xinjiang Storage Battery Co., Ltd. Annual Production of 4 million kVAh Battery Project Environmental Impact Report"), 2017..

136 See, for example, Commission for Environmental Cooperation, *Environmentally Sound Management of Spent Lead-Acid Batteries in North America: Technical Guidelines,* January 2016, http://www.cec.org/files/documents/publications/11665-environmentally-sound-management-spent-lead-acid-batteries-in-north-america-en.pdf.

137 "为废旧铅酸蓄电池污染治理与回收利用"把脉开方"——自治区政协视察废旧铅酸蓄电池污染治理与回收工作座谈会现场小记" ("'Check the pulse for write a prescription' for the pollution control and recycling of used lead-acid batteries — A small note on the site of the Autonomous Region CPPCC inspecting the pollution control and recycling of used lead-acid batteries"), Xinjiang Uyghur Autonomous Region Committee of the Chinese People's Political Consultative Conference, December 21, 2018, https://web.archive.org/web/20211006185130/http://www.xjzx.gov.cn/2018/12/21/zxzxyw/1749.html; and Northwest Inspection Bureau, Ministry of Ecology and Environment, "新疆八部门联合专项整治废铅酸电池收集转运处置" ("Eight departments in Xinjiang jointly conducted a special rectification of waste lead-acid battery collection, trans-shipment and disposal"), August 4, 2020, https://web.archive.org/web/20211006185358/https://xbdc.mee.gov.cn/xbfc/xjzzgzdt/202008/t20200804_792672.shtml.

138 Commission for Environmental Cooperation, *Environmentally Sound Management of Spent Lead-Acid Batteries*.

139 International Finance Corporation (IFC), "Camel Group" (Environmental and Social Mitigation Measures tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/41128/camel-group.

140 People's Government Office of Bayingoleng Mongolian Autonomous Prefecture, "关于印发《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划（2017—2019年）》的通知" ["Notice on Printing and Distributing the 'Three-Year Plan for Promoting the Organized Transfer of Urban and Rural Surplus Labor Forces in Kashgar and Hotan Region to Employment in the Autonomous Prefecture (2017-2019)'"], June 15, 2017, https://archive.vn/F3iHz. Note: This is a copy of the plan that was issued by the Bayingoleng Mongolian Autonomous Prefecture government. The following citation indicates that this plan was also issued in Turpan.

141 Li Neng, "托克逊县举行喀什、和田地区城乡富余劳动力企业上岗

交接仪式" ("Toksun County holds the handover ceremony for the urban and rural surplus labor enterprises in Kashgar and Hotan areas"), Weixin, July 10, 2017, https://archive.ph/nC4Xt.

142 Turpan Zero Distance, "骆驼集团股份有限公司新疆公司实施16万吨废旧铅酸蓄电池项目" ("Xinjiang Branch of Camel Group Co., Ltd. implements a 160,000-ton waste lead-acid battery project"), Weixin, July 19, 2021, https://archive.ph/wZgAC; and Xinjiang Supply and Marketing Investment Holding Group Co., Ltd., "新疆再生资源集团有限公司简介" ("Introduction to Xinjiang Renewable Resources Group Co., Ltd."), accessed January 22, 2022, https://archive.ph/wcWjS.

143 IFC, "Camel Group."

144 Turpan City Statistical Bulletin on National Economic and Social Development in 2018, cited in "吐鲁番市人口数据" ("Turpan population data"), *Red-Black Population Database 2021*, June 14, 2021, https://archive.ph/hFePe.

145 EIR Section 3.1.7

146 World Health Organization (WHO), "Lead poisoning," fact sheet, October 11, 2021, https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health; and Charles Xintaras, US Department of Health and Human Services, Public Health Service, Centers for Disease Control, Agency for Toxic Substances and Disease Registry, "Impact of Lead-Contaminated Soil on Public Health," CDC Prevention Guidelines Database, May 1, 1992, https://wonder.cdc.gov/wonder/prevguid/p0000015/p0000015.asp.

147 World Health Organization (WHO), *Recycling used lead-acid batteries: health considerations,* 2017, https://apps.who.int/iris/bitstream/handle/10665/259447/9789241512855-eng.pdf.

148 California Department of Public Health, "An Analysis of Children's Blood Lead Levels in the Area Around the Exide Site," accessed January 22, 2022, https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/An-Analysis-of-Children-s-Blood-Lead-Levels-in-the-Area-Around-the-Exide-Site.pdf; Jill E. Johnston and Andrea Hricko, "Industrial Lead Poisoning in Los Angeles: Anatomy of a Public Health Failure," *Environmental Justice* 10 (5) (2017): 162–167, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5783279/; Tony Barboza, "California sues to recover costs for Exide lead cleanup," *Los Angeles Times*, December 19, 2020, https://www.latimes.com/california/story/2020-12-19/state-lawsuit-to-recover-exide-cleanup-cost-targets-past-operators; Jeff Montgomery, "COVID-19 Drives Battery Maker Exide Back Into Bankruptcy," Law360.com, May 19, 2020, https://www.law360.com/articles/1274987/covid-19-drives-battery-maker-exide-back-into-bankruptcy; and Tony Barboza, "Auditor slams California for Exide cleanup delays, says cost could reach $650 million," *Los Angeles Times*, October 27, 2020, https://www.latimes.com/california/story/2020-10-27/auditor-slams-states-management-exide-cleanup-says-it-may-cost-650-million.

149 Perry Gottesfeld et al., "Soil contamination from lead battery manufacturing and recycling in seven African countries," *Environmental Research* 161 (February 2018): 609–614, https://pubmed.ncbi.nlm.nih.gov/29248873/.

150 Feng Zhang et al., "Investigation and Evaluation of Children's Blood Lead Levels around a Lead Battery Factory and Influencing Factors," *International Journal of Environmental Research and Public Health* 13 (6) (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4923998/.

151 See, for example, "China Shuts Most Lead-Acid Battery Producers to Curb Pollution," *Bloomberg News*, May 30, 2011, https://www.bloomberg.com/news/articles/2011-05-30/china-shuts-most-lead-acid-battery-producers-to-curb-pollution-poisoning; "淘汰落后产能'重伤'骆驼股份风帆股份" ("Eliminating outdated production capacity 'severely hurts' Camel Fengfan Co., Ltd."), International Finance News, July 12, 2012, https://archive.ph/1WLOT.

152 Specifically, the 2013 Act "Battery Industry Pollut-

**AR001740**

ant Emission Standard" GB30484.

153 Lei Chuang, "血铅事件频繁爆发 骆驼集团因污染被责令整改" ("Frequent blood lead incidents broke out, Camel Group was ordered to rectify due to environmental pollution"), *Yangtze River Commercial Daily*, June 23, 2011, https://archive.ph/sUdKc.

154 China Nonferrous Metals Industry Network, "新疆最大废旧铅酸蓄电池加工项目开建" ("Construction starts on Xinjiang's largest lead-acid battery waste processing project"), September 14, 2016, https://archive.ph/vmh20. The article references the consolidation of Xinjiang's lead-acid battery operations under two firms now owned by Camel, representing a shift away from small-scale battery recyclers and a new business stream for Xinjiang Renewable Resources Group (新疆再生资源集团).

155 Note: We are converting dL to L for comparison to measures used by Chinese corporate and government documents cited here. Agency for Toxic Substances and Disease Registry, "What are U.S. Standards for Lead Levels?" June 12, 2017, https://www.atsdr.cdc.gov/csem/leadtoxicity/safety_standards.html.

156 Centers for Disease Control and Prevention (CDC), "Adult Blood Lead Epidemiology and Surveillance (ABLES): Understanding Blood Lead Levels," National Institute for Occupational Safety and Health (NIOSH), February 23, 2021, https://www.cdc.gov/niosh/topics/ables/ReferenceBloodLevelsforAdults.html.

157 World Health Organization (WHO) Chemical Safety and Health Unit, "Exposure to lead: a major public health concern, 2nd edition: Preventing disease through healthy environments," October 21, 2021, https://www.who.int/publications/i/item/9789240037656.

158 American Public Health Association, "Strengthening the Occupational Health and Safety Administration Standards for Inorganic Lead to Protect Workers' Health," November 7, 2017, https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2018/01/18/strengthening-standards-for-inorganic-lead; "Occupational Safety and Health Administration," United States Department of Labor, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1025; and National Health and Family Planning Commission of the People's Republic of China, "职业性慢性铅中毒的诊断" ("Diagnosis of occupational chronic lead poisoning"), December 15, 2015, http://www.nhc.gov.cn/ewebeditor/uploadfile/2015/12/20151229111530852.pdf.

159 For explanations of conversion and standards using μmol/L, see Andy Menke et al., "Blood Lead Below 0.48 μmol/L (10 μg/dL) and Mortality Among US Adults," *Circulation* 114 (13) (September 18, 2006): 1388–1394, https://www.ahajournals.org/doi/10.1161/CIRCULATIONAHA.106.628321.

160 Urumqi Jinzheng Heyuan Environmental Technology Co., Ltd., "骆驼集团新疆蓄电池有限公司年产400万kVAh（已建200kVAh）蓄电池项目竣工环境保护验收监测报告" ["Camel Group Xinjiang Storage Battery Co., Ltd. Annual output of 4 million kVAh (2 million kVAh has been built) battery project completed environmental protection acceptance monitoring report"], Camel Group, March 2019, https://archive.ph/AeHNK.

161 United States Environmental Protection Agency (EPA), "Drinking Water Requirements for States and Public Water Systems," 40 CFR Part 141 Subpart I, https://www.epa.gov/dwreginfo/lead-and-copper-rule; and Agency for Toxic Substances and Disease Registry (ATSDR), "What Are U.S. Standards for Lead Levels?" accessed January 22, 2022, https://www.atsdr.cdc.gov/csem/leadtoxicity/safety_standards.html. Industrial effluent limits are based on technological specifications rather than risks to environment or health, but local limits set under the EPA's National Pretreatment Program require all facilities to treat water and remove lead before discharging into publicly owned treatment works (POTWs) [See United States Environmental Protection Agency (EPA), "National Pretreatment Program," National Pollutant Discharge Elimination System (NPDES), https://www.epa.gov/npdes/national-pretreatment-program]. Effluent discharged into the environment is held to emissions limits of 65 μg/L (acute criterion

maximum concentration) and 2.5 μg/L (chronic criterion maximum concentration). See United States Environmental Protection Agency (EPA), "National Recommended Water Quality Criteria – Aquatic Life Criteria Table," https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table.

162 International Finance Corporation (IFC), "Environmental, Health, and Safety Guidelines: Base Metal Smelting and Refining," April 30, 2007, https://www.ifc.org/wps/wcm/connect/2ac170b9-1591-48e2-a2cb-365619c3d777/Final%2B-%2BSmelting%2Band%2BRefining.pdf?MOD=AJPERES&CVID=jqeD5gW&id=1323152449229.

163 This resource has not been updated since 1994 and was conducted to evaluate the impact of heavy metals on plant growth, rather than the uptake of heavy metals into plants as a risk factor for human health. R.S. Ayers and D.W. Westcot, "Water quality for agriculture," FAO Irrigation and Drainage Paper, Rev. 1, Food and Agriculture Organization of the United Nations (FAO), 1976, https://www.fao.org/3/t0234e/t0234e00.htm.

164 Shalamu Abudu et al., "The Karez System in China's Xinjiang Region," in *Harvesting Water and Harnessing Cooperation:Qanat Systems in the Middle East and Asia*, Ed. John Calabrese, Middle East-Asia Project (MAP), January 2014, https://www.researchgate.net/publication/269693135_The_karez_system_in_China's_Xinjiang_Region; Mertil Mächtle et al., "The Age and Origin of Karez Systems of Silk Road Oases around Turpan, Xinjiang, P.R. of China" in *Socio-Environmental Dynamics along the Historical Silk Road,* eds. Liang Emlyn Yang et al. (Springer, Cham, 2019), https://link.springer.com/chapter/10.1007%2F978-3-030-00728-7_17; and Eset Sulaiman, "Exploitation Puts Ancient Well System at Risk in Uyghur Region," Radio Free Asia, April 27, 2017, https://www.rfa.org/english/news/uyghur/wells-04272017165849.html.

165 World Bank, "Xinjiang Turfan Water Conservation Project," June 17, 2010, https://projects.worldbank.org/en/projects-operations/project-detail/P111163.

166 Camel EIR 2017 Section 6.3.4.1.(1). This section mentions a "natural or man-made skylight" as a geological feature that could cause groundwater pollution.

167 Email correspondence between Kendyl Salcito and IFC, March 10, 2021.

168 "【乡村新貌】托克逊县夏镇南湖村：乡村旅游火 村民收入增" ["(New face of Countryside) Nanhu Village, Xia Town, Toksun County: Rural tourism popular and villagers' income increases"], *Tianshan News,* April 14, 2021, https://archive.ph/bVFsU; and "托克逊：南湖村美丽蜕变叙新章" ("Toksun: A New Chapter in the Beautiful Transformation of Nanhu Village"), *Xinjiang Chinanews,* December 18, 2018, https://archive.ph/PMJ9g. Note: Nanhu's transformation involved the full demolition of the traditional Uyghur village and the construction of a tourist village. A "tourism demonstration village" is an artificial village created by the state to represent a fictive version of Uyghur culture as part of the government's effort to increase tourism to the region.

169 Urumqi Jinzheng Heyuan Environmental Technology Co., Ltd., "骆驼集团新疆蓄电池有限公司年产400万kVAh（已建200万kVAh）蓄电池项目竣工环境保护验收监测报告" ["Camel Group Xinjiang Storage Battery Co., Ltd. Annual output of 4 million kVAh (2 million kVAh has been built) battery project completed environmental protection acceptance monitoring report"], *Environmental Monitoring Report 2019*, March 2019, Table 10-2, Section 10.4.

170 Abudu et al., "The Karez System in China's Xinjiang Region."

171 Sulaiman, "Exploitation Puts Ancient Well System at Risk."

172 Environmental Monitoring Report 2019, Section 7.5 identifies Nanhu Village as a "sensitive area" for groundwater. Section 9.2.5.1 identifies Nanhu Village and Good Seed Farm as sensitive areas for soil monitoring. Section 9.2.5.2 provides groundwater monitoring data from Nanhu Village but comments that "there is no significant change compared with the original environmental assessment report in monitoring at the Good Seed Farm."

**AR001741**

173 "Business — Magnesium Alloy," Century Sunshine Group, accessed July 28, 2021, https://archive.ph/MnCqU.

174 "About Us — Company Overview," Century Sunshine Group, accessed July 28, 2021, https://archive.ph/0Hsou. The Uyghur Region site may be owned by another private company. IFC correspondence states: "Magnesium ore is sourced from a private company which has its own dolomite mine in Hami." Information from email to Kendyl Salcito from IFC personnel, March 5, 2021.

175 International Finance Corporation (IFC), "Century Sunshine," Project # 25397, IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/25397/century-sunshine.

176 International Finance Corporation (IFC), "CenturySunshine2," Project # 33903, IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/SII/33903/centurysunshine2.

177 Century Sunshine Group Holdings Ltd., *Century Sunshine Annual Report 2020*, March 26, 2021,169–170, http://www.centurysunshine.com.hk/en/investor_relations/business_announcement.php; and email communication between Kendyl Salcito and IFC Corporate Relations, October 29, 2021.

178 "Century Sunshine Information Memorandum and Bond Document," May 2017, 112, https://secure.fundsupermart.com/fsm/bond/relatedBondDocument/754/Information%20Memorandum%20dated%209%20May%202017.PDF; see also Century Sunshine Group Holdings Ltd., *Century Sunshine Annual Report 2020*, 167.

179 Century Sunshine Group Holdings Ltd., *Century Sunshine Annual Report 2020*, 169–170, http://www.centurysunshine.com.hk/en/investor_relations/business_announcement.php; and OCBC Bank, "Information Memorandum of Century Sunshine Group Holdings Limited," Fund Supermart, 125-127, F-151-F-155, https://archive.ph/2gLnz.

180 "卯足了劲！哈密高新区南部循环经济产业园区企业防疫生产两手抓" ("Full of energy! Enterprises in the circular economy industrial park in the southern part of Hami High-tech Zone are hard at work at both epidemic prevention and production"), Weixin, February 23, 2020, https://archive.vn/Wo3ag.

181 Hami Zero Distance, "19656人，70137.67万元！这项政策的福利看得见" ("19656 people, 70137.67 yuan! The benefits of this policy are visible"), Weixin, December 21,2017, https://archive.vn/Eb2RA.

182 "新疆生态环境厅环境影响评价与排放管理处关于2019年9月6日建设项目环境影响评价文件受理情况的公示" (Ecological Environment Department of Xinjiang Uyghur Autonomous Region, "Announcement of the Environmental Impact Assessment and Emission Management Office of Xinjiang Ecological Environment Department on the acceptance of environmental impact assessment documents for construction projects on September 6, 2019"), September 6, 2019, https://archive.vn/93Vds.

183 Yizhou Zero Distance, "大学习、大培训、大宣传 | 回城乡将有82人找到新工作" ("Big study, big training, big publicity | 82 people will find new jobs when they return to urban and rural areas"), Weixin, December 24, 2019, https://archive.ph/KDZVK.

184 See video at Hami Zero Distance, "19656人，70137.67万元！这项政策的福利看得见" ("19656 people, 70137.67 yuan!").

185 Ibid.

186 While some people who have been released from internment camps have been euphemistically dubbed "graduates" by the XUAR government, these appear to be young people who attended a legitimate vocational school, though it is difficult to be certain.

187 Yizhou Netcom, "[决战决胜脱贫攻坚] 2020年首批南疆务工人员来伊州区就业" ["(Decisive battle and decisive victory over poverty alleviation) The first batch of southern Xinjiang migrant workers come to work in Yizhou District in 2020"], Weixin, March 23, 2020, https://archive.vn/igND3.

188 Yizhou Zero Distance, "[决战脱贫攻坚]伊州区：抓好就业就是抓住民生" ["(A decisive battle against poverty) Yizhou District: Grasping employment is to seize people's livelihood"], Weixin, September 7, 2020, https://archive.vn/Qfp8X.

189 "完成年度任务的90%! 今年上半年，哈密市转移就业2055人" ("90% of the annual mission completed! In the first half of this year, Hami City transferred and employed 2,055 people"), *Hami Daily,* August 8, 2021, https://archive.vn/6tDXT.

190 International Finance Corporation (IFC), "Century Sunshine," Project #25397 (Environmental and Social Mitigation tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/25397/century-sunshine.

191 Ibid.

192 Hami Zero Distance, "19656人，70137.67万元！这项政策的福利看得见" ("19656 people, 70137.67 yuan!").

193 Xiao-bin Wang, Xiang Yan, and Xiu-ying Li, "Environmental risks for application of magnesium slag to soils in China," *Journal of Integrative Agriculture* 19 (7) (2020): 1671–1679, https://www.sciencedirect.com/science/article/pii/S2095311919628352?via%3Dihub. Wang, Yan, and Li note that "Magnesium mines are weakly regulated and often operated by small and inexperienced firms." They also write: "In the process of ore mining, the operation is often carried out in a disordered manner as a result of the lack of planning, giving rise to safety accidents." Weak oversight is also linked to "serious damage to the ecological environment" (p. 15–16).

194 New Jersey Department of Health, "Hazardous Substance Fact Sheet: Magnesium," September 1999 (updated June 2008), https://nj.gov/health/eoh/rtkweb/documents/fs/1136.pdf; and International Magnesium Association, "Safe Handling of Magnesium," February 2020, https://cdn.ymaws.com/www.intlmag.org/resource/resmgr/safety/Safe-Handlling-of-Mg.pdf.

195 See listings on Xinjiang human resources site xjhr.com for forklift drivers, atmospheric boiler workers, forklift workers, household boiler workers, and maintenance workers, and compare to listing for logistics administration.

196 Fujian CCIC Kangtai Testing Technology Co., Ltd., "新疆腾翔镁制品有限公司煤电冶一体化循环经济项目（一期）职业病危害现状评价" ["Evaluation of the current situation of occupational disease hazards in Xinjiang Tengxiang Magnesium Products Co., Ltd. coal-electricity-smelting integrated circular economy project (Phase I)"], July 27, 2021, https://archive.ph/IQOtp.

197 Beijing Xinguohuan Environmental Technology Development Co., Ltd., "新疆腾翔镁制品有限公司煤电冶一体化循环经济项目环境影响报告书（送审版）" ["Xinjiang Tengxiang Magnesium Products Co., Ltd. Coal-electricity-smelting integrated circular economy project Environmental Impact Report (Submission version)"], Department of Ecological Environment of Xinjiang Uyghur Autonomous Region, September 2019, Section 1 (3), https://archive.ph/93Vds.

198 "About Us – Company Overview," Century Sunshine Group, https://archive.ph/0Hsou.

199 Century Sunshine Group Holdings Limited and Group Sense (International) Limited, "Joint Announcement: Reorganisation Plan Involving Direct and Indirect Shareholdings in China Rare Earth Magnesium Technology Holdings Limited," Baoqiao Partners Capital Limited, September 1, 2017, 23, https://www1.hkexnews.hk/listedco/listconews/sehk/2017/0901/ltn201709012405.pdf.

200 Ibid., 24.

201 OCBC Bank, "Information Memorandum," 112.

202 "About Us," US Magnesium, https://us-magnesium.com/about-us-mag/.

203 United States Environmental Protection Agency (EPA), "Detailed Facility Report: U.S. Magnesium Plant," accessed January 22, 2022, https://echo.epa.gov/detailed-facility-report?fid=110045587352.

61

**AR001742**

204 Lee Davidson, "U.S. Magnesium still 'worst polluter,'" *Deseret News*, January 22, 2003, https://www.deseret.com/2003/1/22/19700212/u-s-magnesium-still-worst-polluter.

205 United States Environmental Protection Agency (EPA), "US Magnesium LLC," 2020, https://ghgdata.epa.gov/ghgp/service/html/latest?et=undefined&id=1000030.

206 United States Environmental Protection Agency (EPA), "Envirofacts Report: US Magnesium LLC," accessed January 3, 2022, based on data extracted on October 13, 2021, https://enviro.epa.gov/enviro/tris_control_v2.tris_print?pPrev=1&tris_id=84074MXMGNROWLE.

207 United States Centers for Disease Control and Prevention (CDC), *NIOSH Health Hazard Evaluation Report: HETA #2004-0169-2982, U.S. Magnesium, Rowley, Utah*, National Institute for Occupational Safety and Health (NIOSH), October 2005, https://www.cdc.gov/niosh/hhe/reports/pdfs/2004-0169-2982.pdf.

208 Robert E. Brown, "Environmental Challenges for the Magnesium Industry," *Magnesium Technology 2011*, 7–11, https://link.springer.com/chapter/10.1007%2F978-3-319-48223-1_3.

209 IFC, "Century Sunshine," Project # 25397 (Environmental and Social Mitigation tab).

210 Beijing Xinguohuan Environmental Technology Development Co., Ltd., *Environmental Impact Report*, 2019, Section 2.5.1(1), (2), (3).

211 Ibid. Section 2.5.2(1).

212 International Finance Corporation (IFC), "IFC's Approach to Greening Equity Investments in Financial Institutions," IFC Financial Institutions Group, September 2020, https://www.ifc.org/wps/wcm/connect/05541643-0001-467d-883c-5d7a127ffd57/IFC+Greening+Report+Sept+2020.pdf?MOD=AJPERES&CVID=nisvaOC&ContentCache=NONE&CACHE=NONE.

213 International Finance Corporation (IFC), "Jointown Pharma," IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/41947/jointown-pharma.

214 Shen Guoping and Yu Guowei, "［高新要闻］新疆九州通现代医药产业园开建 总投资2.5亿元" ["(High-tech News) Xinjiang Jiuzhoutong Modern Pharmaceutical Industrial Park starts construction with a total investment of 250 million yuan"], Weixin, October 16, 2016, https://archive.vn/dkICU#selection-241.128-241.180.

215 IFC, "Jointown Pharma."

216 "Xinjiang Disqualifies Sinopharm & Jointown Pharma From EDL Market," Scrip: Informa Pharma Intelligence, May 21, 2013, https://scrip.pharmaintelligence.informa.com/SC084364/Xinjiang-Disqualifies-Sinopharm-amp-Jointown-Pharma-From-EDL-Market; "基药配送难达标 医药流通企业报怨医院不采购" ("Fundamental medicine distribution standards difficult to meet, pharmaceutical distribution companies complain that hospitals do not purchase"), *China HighTech,* May 28, 2013, https://archive.vn/O3toj; and "基药配送不达标 _国药控股九州通新疆遇 '滑铁卢" ("The delivery of basic medicines does not meet the standards, Sinopharm Holding Jiuzhou Tong Xinjiang encounters 'Waterloo'"), Shanghai Securities News, May 17, 2013, https://archive.ph/Dn6dF.

217 Xu Zili and Ma Xianzhen, "九州通两子公司新疆抽检现不合规 _均为中药饮片产品" ("The two subsidiaries of Jointown in Xinjiang are noncompliant, both are traditional Chinese medicine decoction companies"), *China Economic Net,* May 15, 2020, https://archive.ph/dZSjf.

218 IFC communication with Kendyl Salcito, March 5, 2021.

219 International Finance Corporation (IFC), "Jointown Pharma" (PS2 tab), IFC Project Information & Data Portal, *https://disclosures.ifc.org/project-detail/ESRS/41947/jointown-pharma*.

220 IFC communication with Kendyl Salcito, March 5, 2021.

221 Employment Information Platform for College Graduates, Ma'ashi 4000 yüändin 6000 yüängichä khizmätchi qobul qilindu"

("Employees will be paid between 4,000 and 6,000 yuan"), Weixin, October 5, 2019, https://archive.vn/ISYkS; Aksu Talent Recruitment Platform, "阿克苏人才招聘" ("Aksu Talent Recruitment"), Weixin, May 29, 2019, https://archive.ph/rl7aA; Aksu Convenience Service, "阿克苏今日招聘信息" ("Aksu Today's Job Information"), Weixin, July 10, 2018, https://archive.ph/bJXth; Aksu Talent Recruitment Service Platform, "速看阿克苏九州通医药有限公司招贤纳士啦！" ["Quick look at the recruitment of Aksu Jointown Pharmaceutical Co., Ltd.!"], Weixin, August 25, 2018, https://archive.ph/dn4CG; Golden Triangle Recruitment Exchange, "奎屯10月15日招聘信息汇总，好工作由你来选择！" ("Kuytun recruitment information collection on October 15th, good job is up to you to choose!"), Weixin, October 15, 2019, https://archive.ph/2YSqZ; and Kuitunhui, "月薪3000~8000元！缴纳社保···奎屯9家企业招聘285人！" ("Monthly salary is 3000-8000 yuan! Pay social security... 9 companies in Kuytun recruit 285 people!"), Weixin, September 20, 2020, https://archive.vn/ZQToU.

222 Yili Jointown Pharmaceutical, "古尔邦节 就是这么暖心" ("Gurban is so heart-warming"), Weixin, August 2, 2020, https://archive.ph/SNssd.

223 These videos are not downloadable and may disappear from the Internet. "新疆九州通医药有限公司宣传片" ("Promotional video of Xinjiang Jointown Pharmaceutical"), Youku, September 21, 2020, https://v.youku.com/v_show/id_XNDg2ODYxMDA0MA==.html?spm=a2hbt.13141534.0.13141534; and "新疆九州通2019年春晚心愿f1ag之企管伐木累" ("Xinjiang Jointown pass 2019 Spring Festival with gala"), Youku, January 4, 2019, https://v.youku.com/v_show/id_XMzk5NzEwNjY1Ng==.html.

224 International Finance Corporation (IFC), "RSE COVID Jointown" (Development Impact tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/SII/43968/rse-covid-jointown.

225 IFC communication with Kendyl Salcito, March 5, 2021.

226 International Finance Corporation (IFC), "Jointown Pharma" (Environmental and Social Mitigation Measures tab), IFC Project Information & Data Portal, https://disclosures.ifc.org/project-detail/ESRS/41947/jointown-pharma.

227 Xinjiang Drug Administration, "新疆一大型现代医药产业园即将投产试运行" ("A large modern pharmaceutical industrial park in Xinjiang is about to put into trial operation"), Weixin, December 17, 2020, https://archive.ph/6gDuQ.

228 IFC, email communication with Kendyl Salcito, March 5, 2021.

229 CAO, *Supply Chain Business*.

230 In 2021 alone, this also occurred in the Tigray region of Ethiopia and across Myanmar, under a military coup.

AR001743

63

AR001744

# Atlantic Council | Board of Directors

**CHAIRMAN**
*John F.W. Rogers

**EXECUTIVE CHAIRMAN EMERITUS**
*James L. Jones

**PRESIDENT AND CEO**
*Frederick Kempe

**EXECUTIVE VICE CHAIRS**
*Adrienne Arsht
*Stephen J. Hadley

**VICE CHAIRS**
*Robert J. Abernethy
*C. Boyden Gray
*Alexander V. Mirtchev

**TREASURER**
*George Lund

**DIRECTORS**
Stéphane Abrial
Todd Achilles
*Peter Ackerman
Timothy D. Adams
*Michael Andersson
David D. Aufhauser
Barbara Barrett
Colleen Bell
Stephen Biegun
John Bonsell
*Rafic A. Bizri
Linden P. Blue
Adam Boehler
Philip M. Breedlove
Myron Brilliant
*Esther Brimmer
Richard R. Burt
*Teresa Carlson
*James E. Cartwright
John E. Chapoton
Ahmed Charai
Melanie Chen
Michael Chertoff
*George Chopivsky
Wesley K. Clark
*Helima Croft
*Ankit N. Desai
Dario Deste
*Paula J. Dobriansky
Joseph F. Dunford, Jr.
Richard Edelman
Thomas J. Egan, Jr.
Stuart E. Eizenstat
Mark T. Esper

*Alan H. Fleischmann
*Michael Fisch
Jendayi E. Frazer
Meg Gentle
Thomas H. Glocer
John B. Goodman
*Sherri W. Goodman
Murathan Günal
Frank Haun
Michael V. Hayden
Tim Holt
*Karl V. Hopkins
Ian Ihnatowycz
Mark Isakowitz
Wolfgang F. Ischinger
Deborah Lee James
*Joia M. Johnson
*Maria Pica Karp
Andre Kelleners
Henry A. Kissinger
*C. Jeffrey Knittel
Franklin D. Kramer
Laura Lane
Yann Le Pallec
Jan M. Lodal
Douglas Lute
Jane Holl Lute
William J. Lynn
Mark Machin
Mian M. Mansha
Marco Margheri
Michael Margolis
Chris Marlin
William Marron
Christian Marrone
Gerardo Mato
Timothy McBride
Erin McGrain
John M. McHugh
Eric D.K. Melby
*Judith A. Miller
Dariusz Mioduski
Michael J. Morell
*Richard Morningstar
Georgette Mosbacher
Dambisa F. Moyo
Virginia A. Mulberger
Mary Claire Murphy
Edward J. Newberry
Franco Nuschese
Joseph S. Nye
Ahmet M. Ören
Sally A. Painter
Ana I. Palacio
*Kostas Pantazopoulos
Alan Pellegrini
David H. Petraeus

W. DeVier Pierson
*Lisa Pollina
Daniel B. Poneman
*Dina H. Powell McCormick
Michael Punke
Ashraf Qazi
Thomas J. Ridge
Gary Rieschel
Lawrence Di Rita
Michael J. Rogers
Charles O. Rossotti
Harry Sachinis
C. Michael Scaparrotti
Ivan A. Schlager
Rajiv Shah
Gregg Sherrill
Ali Jehangir Siddiqui
Kris Singh
Walter Slocombe
Christopher Smith
Clifford M. Sobel
James G. Stavridis
Michael S. Steele
Richard J.A. Steele
Mary Streett
Gil Tenzer
*Frances M. Townsend
Clyde C. Tuggle
Melanne Verveer
Charles F. Wald
Michael F. Walsh
Ronald Weiser
Maciej Witucki
Neal S. Wolin
*Jenny Wood
Guang Yang
Mary C. Yates
Dov S. Zakheim

**HONORARY DIRECTORS**
James A. Baker, III
Ashton B. Carter
Robert M. Gates
James N. Mattis
Michael G. Mullen
Leon E. Panetta
William J. Perry
Condoleezza Rice
Horst Teltschik
William H. Webster

*Executive Committee Members

List as of February 2024

AR001745



**THE ATLANTIC COUNCIL**
is a nonpartisan organization
that promotes constructive US
leadership and engagement in
international affairs based on
the central role of the Atlantic
community in meeting today's
global challenges.

1030 15th Street, NW, 12th Floor,
Washington, DC  20005
(202) 778-4952
www.AtlanticCouncil.org

AR001746

Home

# Camel Group

## Disclaimer

This Summary of Investment Information (SII) is prepared by IFC to disclose a factual summary of the main elements of the potential investment. Its purpose is to enhance the transparency of IFC's activities. For any project documentation or data included or attached herein, whether prepared by the project sponsor or otherwise, authorization has been given for public release by the project sponsor. IFC considers that this SII is of adequate quality for release to the public, but has not necessarily independently verified all of the project information therein. The SII may be periodically updated after publication. Board dates are estimates only and this document should not be construed as presuming the outcome of the Board Directors' decision. The following SII is disclosed in accordance with IFC's Access to Information Policy (AIP) that went into effect on January 1, 2012.

The map is for illustrative purposes and does not imply the expression of any opinion on the part of the World Bank, concerning the legal status of any country or territory or concerning the delimitation of frontiers or boundaries. Country borders or names do not necessarily reflect the World Bank Group's official position. In some cases, available project location information is limited to the country of the project's activities. Locations are approximate.

## Summary of Investment Information

| **Project Number** | **Company Name** | **Date SPI Disclosed** |
|---|---|---|
| 41128 | CAMEL GROUP CO., LTD. | Jan 30, 2019 |
| **Country** | **Region** | **Projected Board Date** |
| China | East Asia and the Pacific | Mar 31, 2019 |
| **Environmental Category** | **Status** | **Last Updated Date** |
| A | Completed | |
| **Department** | **Industry** | **Previous Events** |
| Regional Industry - MAS Asia & Pac | Manufacturing | Approved : May 15, 2019 |
| | | Signed: Jul 1, 2019 |
| | | Invested: Jul 30, 2019 |

### Sector

Electrical Machinery, Equipment and Components (Electric Lighting, Motors, Batteries, Insulated Wires and Cables, Fiber Optic Cable, Carbon and Graphite Products, etc.)

## Project Description

Camel Group Co., Ltd. ("Camel Group") is a publicly listed company that engages in the production, distribution and recycling of auto starter batteries. The proposed IFC investment will support Camel Group's capacity expansion for its lead-acid battery recycling operation in frontier regions of China (the "Project").

**AR001747**

## Associated Advisory Engagement

## Sponsor / Cost / Location

### Project Sponsor and Major Shareholders of Project Company

Mr. Liu Guoben is the controlling shareholder and Chairman of the Board of Camel Group (the "Sponsor"). He owns 48% of Camel Group. Mr. Liu Changlai, the CEO, and Miss. Tan Weiping, a relative of the Chairman, own 3.4% and 1.3% of Camel Group respectively. The three of them are shareholders acting in concert. Other senior managers collectively owns 4.3% of Camel Group and the remaining shares are public float.

### Total Project Cost and Amount and Nature of IFC's Investment

The total Project cost is estimated to be approximately US$116 million. IFC's proposed investment is a senior, secured A loan of up to US$36 million and a MCPP loan of up to US$45 million.

### IFC's Investment as Approved by the Board

35.57 million (USD)

| Product Line | IFC Investment (million USD) |
|---|---|
| Risk Management | |
| Guarantee | |
| Loan | 35.57 |
| Equity | |

\* These investment figures are indicative

### Location of Project and Description of Site

The Project is expected to be located in Anhui Province, Jiangxi Province and Xinjiang Uygur Autonomous Region of People's Republic of China.

## Development Impact

AR001748

## Anticipated Impact Measurement & Monitoring (AIMM) Assessment

Environment: The Project will increase the volume of recycled lead and neutralization for discharge in an environmentally safe way i.e. reduce soil and water contamination. This Project will make sure additional lead are processed and neutralized before discharge to the environment. Economy-wide effects: The Project will help to create circular economy by establishing the recycling and reusing waste in the value chain since scrap plastic and secondary lead alloys can be used for new battery production and other lead products. The circular, more integrated design of lead acid battery manufacturing and recycling offers a more cost-effective way to produce batteries and create and help to formalize employment in the recycling value chain. Employees: The upgrading of the two existing facilities will make sure the employees therein benefit from more modern, safer equipment, and strengthened workplace control against excessive lead/acid exposure therefore reduce the occupational safety/health risks. Sustainability: The Project is expected to foster adoption of higher E&S standards driven by better technology and processes across the different players in the value chain in China and thus promote Sustainability principles in the market through its demonstration effects. Integration: The project will demonstrate that it is a natural fit for battery manufacturers like Camel which requires large quantity of lead and has easy access to used batteries to integrate recycling business into their value chain. The project will also contribute to expand China's economic complexity through increased process and supply chain complexities.

## Governance Risk Assessment

Low.

## IFC's Role and Additionality

IFC's expected additionality in the Project stems from its ability to provide long-term loans to support Camel Group's recycling business, which features a long payback period and slim margins. Moreover, IFC's E&S standards will help the Company adopt the best international industry practices and facilitate sustainable development in the lead-acid battery industry, which has significant potential E&S risks that require strong safeguards and controls. Financing Structure: IFC will be providing an USD corporate loan with tenor relatively longer than what is readily available in the market. Lead-acid battery recycling business features a long payback period with slim gross margins. The Company wants to be prudent in its financing mix and seeks long term capital to fund the Project. Resource Mobilization: IFC also mobilizes MCPP capital with the same tenor that can meet the client's needs at reasonable cost. Standard Setting: Lead-acid battery production and recycling is an industry in which there are significant E&S risks and require strong safeguards and controls in the process. One of IFC's significant additionalities is to help the Company to improve its lead dust control and related occupational health and safety management. Knowledge, Innovation and Capacity Building: Camel Group is keen to establish relationships with partners like IFC that can share their knowledge, experience and networks from investing in the emerging markets. The client is also keen to leverage on IFC's networks and values its ability to forge relationships with potential partners and clients.

## E&S Category Rationale / Risks and Mitigation

AR001749

### Environmental & Social Categorization Rationale

Large scale lead-acid battery recycling plants include processes of waste acid neutralization/recycling and lead smelting/molding. Lead and other heavy metals in the wastewater need removal. The waste lead smelting and molding can generate significant lead fumes and dusts, which needs to be controlled for employee and community health. Without proper controls, these processes may cause potentially significant adverse environmental or social risks and/or impacts that are diverse, or irreversible.

The key E&S issues and risks and issues associated with this project include; i) corporate E&S management capacity to control E&S issues consistently at various sites, ii) proper design and operational controls to minimize lead fume/dust at working environment, iii) efficient occupational health/safety (OHS) controls to minimize cases with elevated blood lead levels for employees, and iv) point/fugitive emission and effluent controls to minimize lead spread to the environment and communities. This is therefore a Category A project according to IFC's Policy on Environmental and Social Sustainability.

### Main Environmental & Social Risks and Impacts of the Project

Please refer to the Environmental and Social Review Summary (ESRS) linked to this project SII in the IFC's project disclosure website.

### Mitigation Measures/ESAP

Refer to the E &S Action Plan tab in the ESRS on the SPI (publishing) site.

## Contacts

### For Inquiries About the Project, Contact

Camel Group Co., Ltd
Ye Xiaolong
Manager
+86-0710-3269011
yexiaolong@chinacamel.com
No. 65 Hanjiang North Road, Xiangyang City, Hubei Province, People's Republic of China
www.chinacamel.com

### For Inquiries and Comments About IFC, Contact

General IFC Inquiries
IFC Communications
2121 Pennsylvania Avenue, NW
Washington DC 20433
Telephone: 202-473-3800
Fax: 202-974-4384

### Local Access for Project Documentation

No. 65 Hanjiang North Road, Xiangyang City, Hubei Province, People's Republic of China

## Related Environmental Document

Environmental & Social Review Summary (ESRS)

## Additional Documents

**No related documents.**

**AR001750**

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001751 - AR001761

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001762 - AR001776

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 200 of 388

☰

AREA ⌄    POLITICS ⌄    ECONOMY ⌄    ENVIRONMENT ⌄    CULTURE & SOCIETY ⌄    TECHNOLOGY ⌄    FEATURES ⌄    ABOUT    🔍

**Spatial Results of the 2010 Census in Xinjiang**

Home (https://theasiadialogue.com)   /   China (https://theasiadialogue.com/category/asia/east-asia/china/), Culture and Society (https://theasiadialogue.com/category/culture-and-society/)   /   Spatial Results of the 2010 Census in Xinjiang

AR001777

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 201 of 388



AR001778

⬒ China (https://theasiadialogue.com/category/asia/east-asia/china/),Culture and Society (https://theasiadialogue.com/category/culture-and-society/)  |  ⊙ March 7, 2016

☰

AREA ⌄     POLITICS ⌄     ECONOMY ⌄     ENVIRONMENT ⌄     CULTURE & SOCIETY ⌄     TECHNOLOGY ⌄     FEATURES ⌄     ABOUT     🔍

🐦 (https://twitter.com/intent/tweet?text=Spatial%20Results%20of%20the%202010%20Census%20in%20Xinjiang&url=https%3A%2F%2Ftheasiadialogue.com%2F2016%2F03%2F07%2Fspatial-results-of-the-2010-census-in-xinjiang%2F)

Written by Stanley Toops.

In this entry, I profile the spatial pattern of *minzu* (ethnicity) and population of the 2010 census of Xinjiang. The 2010 census shows Xinjiang as having 21.82 million people; the 2000 census registered 18.46 million. The population is concentrated in two segments, the corridor on the northern foothills of the Tengri Tagh (Tian Shan) and the arcs of oases to the south of the Tengri Tagh. In both cases the roads and now railroads linking the settlements have proved to be the major paths for migration. In terms of ethnicity (*minzu / millet*) the Uyghur are still in the south and the Kazak are in the north. The Han are migrating in a steady stream into the central area and following paths of migration to the other urban centres. The demographic trends also show a population that is becoming less ethnically diverse with more Han migrants. That is the future of Xinjiang's demography.

**Xinjiang's Demographic Landscape**.

Population issues in China are wide ranging. Chan (http://www.tandfonline.com/doi/pdf/10.2747/1539-7216.50.2.197) and Fan (http://journals.cambridge.org/action/displayAbstract?fromPage=online&aid=3311144&fileId=S0305741008001409) examined the issue of *hukou* (household registration) and migration in China. Fan (http://www.sscnet.ucla.edu/geog/downloads/fan/Fan_2002_Population_Change.pdf) discussed the 2000 census, while Hvistendahl (http://science.sciencemag.org/content/330/6003/436), Peng (http://science.sciencemag.org/content/333/6042/581.short), Wines and LaFraniere (http://www.nytimes.com/2011/04/29/world/asia/29census.html?_r=0) analysed the 2010 census. Demographic issues in Xinjiang pose interesting questions for the researcher. Yuan (http://www.tandfonline.com/doi/pdf/10.1080/02634939008400689) examined the population development in Xinjiang between the 1950s and the 1980s. China encouraged migration from other parts in China during the 1950s and 1960s. Pannell and Ma (http://www.tandfonline.com/doi/abs/10.1080/10889388.1997.10641045) discussed urban issues in the 1990s. Toops (2000 (http://www.jstor.org/stable/23615555?seq=1#page_scan_tab_contents), 2004 (http://www.eastwestcenter.org/publications/demographics-and-development-xinjiang-after-1949)) showed that the railroads and the Xinjiang Production Construction Corps are further engines of change bringing migration into areas beyond the cities. Hopper and Webber (http://www.jstor.org/stable/23614960?seq=1#page_scan_tab_contents) and Howell and Fan (http://www.tandfonline.com/doi/abs/10.2747/1539-7216.52.1.119) both surveyed Uyghur and Han migrants into Urumqi. In general their surveys showed that young migrants do better financially than older migrants. This corresponds with level of education. Ma (http://www.amazon.com/Chinas-Minorities-Move-Selected-Studies/dp/0765610248) and Liu (http://www.tandfonline.com/doi/abs/10.1080/13504501003764421) examined Kashgar and other cities, which have experienced migration from other provinces as well as Uyghur migration from the countryside.  This entry brings up to date the population issues discussed in Toops (http://www.eastwestcenter.org/publications/demographics-and-development-xinjiang-after-1949).

**Population patterns.**

The 2010 Census showed Xinjiang with 21.82 million people. Northern Xinjiang has 46.56% (the northern municipalities account for 18.24% of the total), southern Xinjiang has 47.96%, and eastern Xinjiang has 5.48%. So there is a good balance between north and south. The focus of migration has been into northern Xinjiang. Figure 1 shows a general map of the region.

⌄

**AR001779**

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 203 of 388

Major population centres are in Urumqi (over 3 M), Shihezi (over 600,000),  Korla (over 500,000), Ghulja (Ili) (over 450,000), Aksu (over 450,000), Kashgar (over 450,000) and Hami (over 400,000). The north is more urban with Urumqi, Shihezi and Ili compared to the south (Korla, Aksu, Kashgar). Urumqi and Shihezi have the greatest population

AREA ⌄    POLITICS ⌄    ECONOMY ⌄    ENVIRONMENT ⌄    CULTURE & SOCIETY ⌄    TECHNOLOGY ⌄    FEATURES ⌄    ABOUT    Q

mate change means that ter than the aquifers are

naturally replenished (http://www.amazon.co.uk/Xinjiang-Borderland-Studies-Central-Caucasus/dp/0765613182).

Xingjiang_Region_update1 (https://blogs.nottingham.ac.uk/chinapolicyinstitute/files/2016/03/Xingjiang_Region_update1.jpg)

(Figure 1.1 – *Xinjiang 2010 Census (http://chinadatacenter.org/Data/ServiceContent.aspx?id=1620)*, 2012, p2-4).

**Minzu (Ethnicity).**

Ethnicity (China *minzu*, Uyghur *millet*) is another important factor to consider in demography. If one ethnic or national group is much better off than another, then there are inequalities in the society. The population growth rate of the ethnic groups varies also due to regional factors and also government policies. China's population planning policy varies according to urban (one child), rural (second child possible, if first is a girl) and minority nationality (two in the city and three in the countryside).  The impact of this variable population planning policy shows up in the numbers. In the 2010 census, ethnic minorities account (http://science.sciencemag.org/content/333/6042/581) for 8.35%.

In the Xinjiang 2010 census, Uyghur account for 45.84%, Han 40.48%, Kazakh 6.50%, Hui 4.51% and the rest account for 2.67%.  In 2010 all ethnic minority groups amount to 59.52%. The only region in China that has a higher percentage of ethnic minorities is Tibet.

Where are the minzu (ethnic) groups located? See figure 2. Xinjiang has distinctive ethnic concentrations.  The Han population is located in the northern corridor, Hami, Urumqi, Changji, Shihezi, Karamay, and Bortala with southern branches in Bayangol. Han populations match up well with urban and transportation linkages, roads and railroads; migrants tend to follow transportation lines. Han live in the wealthier urban corridor of the north. The Uyghur are located in the south (which is the poorest area), Kashgar, Hotan, Kizilsu, Aksu, Turpan, and north, Ili. The Kazakh are located in the north, Altay, Tacheng, and Ili. The Hui are located in Ili, Changji, and Urumqi. The Kirghiz are located in the south, Kizilsu. The Mongol are located in Bayangol and Bortala. The new municipalities Wujiaqu (outside of Urumqi), Alar (Aral in Uyghur) (formerly part of Aksu), and Tumshuk (formerly part of Kashgar) are mostly Han. Highest levels of Han population are in municipalities such as Shihezi, Kuytun, Wujiaqu, and Alar.

Population by Ethnicity_2_Stacked (1) (https://blogs.nottingham.ac.uk/chinapolicyinstitute/files/2016/03/Population-by-Ethnicity_2_Stacked-1.jpg)

(Figure 2 – *Xinjiang 2010 Census (http://chinadatacenter.org/Data/ServiceContent.aspx?id=1620)*, 2012, p34-73).

What are the prospects for population growth? Population growth continues in Xinjiang, as does the migration to the region from other parts of China. If anything, the migration seems to be increasing in recent years, particularly with the addition of the floating population. This migration will ensure a larger percentage of Han in the region. Han may be a plurality in the future if not a majority. The focus for the Han population will continue to be northern and central Xinjiang around Urumqi. With improved transportation linkages, the Han proportion of the population in southern Xinjiang will increase as well. China's Silk Road Economic Belt policy (http://www.china.org.cn/business/node_7207419.htm) will probably add to the Han migration into Xinjiang.

⌃

AR001780

*Dr Stanley Toops is an Associate Professor at Miami University. His research interests are in the international aspects of development, culture, ethnicity, and tourism with a particular focus on the interplay of culture and development. Image Credit:* CC *(https://creativecommons.org/licenses/by-nc-nd/2.0/) by Peter Morgan*

AREA ⌄        POLITICS ⌄        ECONOMY ⌄        ENVIRONMENT ⌄        CULTURE & SOCIETY ⌄        TECHNOLOGY ⌄        FEATURES        ABOUT        🔍

⟨                                                                            CHINA, SOFT POWER, AND THE POLITICS OF ATTRACTION (HTTPS://THEASIADIALOGUE.COM/2016/03/03/88482/)

THE EDSA REVOLUTION AT 30: WHAT DOES IT MEAN FOR THE POOR IN PHILIPPINES 2016? (HTTPS://THEASIADIALOGUE.COM/2016/03/07/THE-EDSA-REVOLUTION-AT-30-WHAT-DOES-IT-MEAN-FOR-THE-POOR-IN-PHILIPPINES-2016/)        ⟩

**TAGS:**        census (https://theasiadialogue.com/tag/census/)        ethnic groups (https://theasiadialogue.com/tag/ethnic-groups/)        ethnic minorities (https://theasiadialogue.com/tag/ethnic-minorities/)

ethnic policy (https://theasiadialogue.com/tag/ethnic-policy/)        Han Chinese (https://theasiadialogue.com/tag/han-chinese/)        population (https://theasiadialogue.com/tag/population/)

Xinjiang (https://theasiadialogue.com/tag/xinjiang/)

## COMMENTS



### Jay E. Simkin (http://None)

January 30, 2018 at 8:11 pm (https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang/#comment-735)

This is a very useful study! This webpage should be reformatted to allow "full-size" printing. The content can be printed – using Adobe Acrobat – only if shrunk to 45%. That makes the result very hard to read.

**Reply (https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang/?replytocom=735#respond)**



### Don Matson

September 23, 2019 at 3:29 am (https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang/#comment-9682)

A very misleading article.

The 1.4 billion people in China are composed of 56 ethnic groups that occupy a country the same physical size as the United States.

The Han Ethnic group by far makes up majority, 92% or 1.3 billion people. Virtually none of the Han Group are Christians or Muslim.

The Zhuang ethnic group is the second largest ethnic group in China with just over 1 percent or 17 million people making up this ethnic group.

The Zhuang ethnic group lives mostly in Guangxi Autonomous Region and the province of Yunnan. By definition this ethnic group is neither Christian nor Muslims. Their religion is Shigongism (ancestor worship).

The remaining 54 ethnic groups are divided more or less equality across the remaining 7 percent of the 1.4 billion Chinese people (divided more or less equality across 100 million people).

**AR001781**

The article is misleading on several levels. First and foremost the author fails to point out that the total Muslim population in China is estimated at just 0.7 percent of the total population or about 13 million people spread out across the country, a country the size of the USA!

The author also fails (deliberately?) to explain that the Sunni Muslims make up about ten of the other ethnic groups in China and these Sunni ethnic groups have migrated easterly into regions of Ningxia, Gansu and Qinghai Provinces again over many generations and many centuries.

Meanwhile, over a 5,000 year history the Chinese people of Han origins (the vast majority of the Chinese population) had already occupied the region the western world has only known for 500 years and knows today as China. China a western world of perhaps from Portuguese origins in the 16th century.

**Reply (https://theasiadialogue.com/2016/03/07/spatial-results-of-the-2010-census-in-xinjiang/?replytocom=9682#respond)**

## LEAVE A REPLY

**Comment** *

**Name** *

**Email** *

**Website**

☐ **Notify me of follow-up comments by email.**

☐ **Notify me of new posts by email.**

Post Comment



(https://www.nottingham.ac.uk/asiaresearch/)

AR001782

Asia Research Institute

AREA ⌄    POLITICS ⌄    ECONOMY ⌄    ENVIRONMENT ⌄    CULTURE & SOCIETY ⌄    TECHNOLOGY ⌄    FEATURES ⌄    ABOUT    🔍

ble development challenges in
our Chinese and Malaysian
campuses.

Recent posts

Message from The Asia Dialogue **(https://theasiadialogue.com/2020/04/09/message-from-the-asia-dialogue/)**
🕑 April 9, 2020

The long read: What next for the US–Taliban 'peace deal'? **(https://theasiadialogue.com/2020/04/08/the-long-read-what-next-for-the-us-taliban-peace-deal/)**
🕑 April 8, 2020

China and the Strategic Implications of the COVID-19 Pandemic **(https://theasiadialogue.com/2020/04/07/china-and-the-strategic-implications-of-the-covid-19-pandemic/)**
🕑 April 7, 2020

Follow Us

🐦 f
(https://twitter.com/AsiaResInst)(https://www.facebook.com/AsiaResearchInst/)

Subscribe to Blog via Email

Email address

Subscribe

Site Categories

Select...

© 2018 Asia Research Institute Created by Macho Themes **(https://www.machothemes.com)**

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: See our Policy (https://nottingham.ac.uk/utilities/privacy/privacy.aspx)

Close and accept

AR001783

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 207 of 388

≡

AREA ⌄     POLITICS ⌄     ECONOMY ⌄     ENVIRONMENT ⌄     CULTURE & SOCIETY ⌄     TECHNOLOGY ⌄     FEATURES ⌄     ABOUT     🔍

⌃

AR001784

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR001785 - AR002764

archive.today
webpage capture

Saved from | https://mp.weixin.qq.com/s?src=11&timestamp=1626799213&ver=3202&sign | search
no other snapshots from this url

All snapshots from host mp.weixin.qq.com

20 Jul 2021 16:41:31 UTC

| **Webpage** | Screenshot |

share　download .zip　report bug or abuse　Buy me a coffee

# 【新闻】托克逊县举行喀什、和田地区城乡富余劳动力企业上岗交接仪式

托克逊就业服务　2017-07-10

Scan to Follow

　　按照自治区党委组织部、自治区人力资源和社会保障厅《喀什、和田地区城乡富余劳动力有组织转移就业三年规划（2017-2019年）》及吐鲁番市委政府下发的《2017年喀什、和田地区城乡富余劳动力有组织转移就业工作实施方案》文件精神,托克逊县结合第一批喀什、和田地区劳务输出人员特点，提供公益性岗位、固定资产投资项目岗位、纺织服装各类企业岗位共165个；进一步加喀什、和田务工人的政治素养和就业能力，从6月29日至7月8日在县技工学校开展封闭式岗前培训工作，制定丰富多彩的岗前培训计划，包括军训、专题讲座、唱红歌、学员讨论座谈、学双语等内容。

　　7月10日上午，在县技工学校举行喀什、和田地区城乡富余劳动力企业上岗交接仪式，托克逊县政府副县长夏拉帕提·吐尔逊，县人社局、发改委、商经委、住建局林业局、阿乐惠镇主要领导及华天瓷业、骆驼


Curity® Secure APIs With Tokens - Schedule a Demo

[Ad]　curity.io/product


Learn More

AR002765

　　活动伊始，由和田地区于田县务工人员再努热木·麦麦提力代表165名前来托克逊县务工人员发表了热情洋溢的演讲，她表示"很感谢党和县政府、县领导对他们的关心帮助，一定会珍惜这次来之不易的工作机会，努力工作赚钱，改变生活，坚定维护民族团结和祖国统一"；

　　随后，夏拉帕提·吐尔逊带领全体人员，面向国旗，庄严宣誓，维护祖国统一，忠于党、忠于祖国、忠于人民，坚决与"三股势力"作斗争，为国家安全、各民族团结、社会稳定和谐做出自己应有的贡献！同时，号召大家要擦亮眼睛，要像石榴籽那样紧紧抱在一起，珍惜来之不易的幸福生活。果断向宗教极端势力发声亮剑，以强烈的主人翁责任感和事业心，坚定不移地贯彻落实中央、自治区党委和市委关于维护社会稳定的决策部署，每个人要自觉的站在反对民族分裂、维护社会稳定的第一线，站稳立场、亮明态度，带头发声亮剑，主动、深刻揭批暴恐活动罪行，坚决与民族分裂分子作针锋相对的斗争。

　　最后一声令下，各企业代表按照顺序依次带领喀什、和田地区务工人员上车，前往企业上岗就业。


（撰写人：李能）

https://archive.ph/nC4Xt

AR002766



图一：喀什、和田地区城乡富余劳动力企业上岗交接仪式

**AR002767**



图二：和田地区于田县务工人员再努热木·麦麦提力发言

AR002768



图三：夏拉帕提·吐尔逊带领全体人员宣誓

**AR002769**



图四：务工人员庄严宣誓

Case 1:25-cv-00022-LWW   Document 19   Filed 04/07/25   Page 215 of 388



图五：接收企业带领务工员前往企业

AR002771



**AR002772**

https://archive.ph/nC4Xt

AR002773

Case 1:25-cv-00022-LWW Document 19 Filed 04/07/25 Page 218 of 388

# archive.today
webpage capture

Saved from https://mp.weixin.qq.com/s?src=11&timestamp=1626799213&ver=3202&sign [search]

no other snapshots from this url

All snapshots from host mp.weixin.qq.com

20 Jul 2021 16:41:31 UTC

**Webpage** | Screenshot

share · download .zip · report bug or abuse · Buy me a coffee

## [News] Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan

Tucson Career Services · 2017-07-10



Scan to Follow

In accordance with the "Three-Year Plan for the Organized Transfer and Employment of Urban and Rural Surplus Labor in Kashi and Hotan Areas (2017-2019)" issued by the Organization Department of the Party Committee of the Autonomous Region and the Department of Human Resources and Social Security of the Autonomous Region and the "Urban and Rural Development of Kashi and Hotan Areas in 2017" issued by the Turpan Municipal Party Committee and Government According to the spirit of the document "Implementation Plan for the Organized Transfer of Employment of Surplus Labor Force", Toksun County combined the characteristics of the first batch of labor exporters in Kashgar and Hotan areas to provide a total of 165 public welfare positions, fixed asset

 What will your DNA say?

[Ad] Ancestry®

Learn More >

**AR002774**

4/4/23, 10:55 AM

[News] Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 219 of 388

the county technical school from June 29 to July 8, and formulate a variety of pre-job training plans, including military training, special topics Lectures, popular songs, student discussions, bilingual learning, etc.

On the morning of July 10th, a handover ceremony was held at the county technical school for surplus labor enterprises in Kashgar and Hotan areas. The deputy magistrate of Toksun County Government, Shalapati Tursun, the County Human Resources and Social Security Bureau, the Development and Reform Commission, the Business and Economics Commission , The main leaders of the Forestry Bureau of the Housing and Urban- r 300 people attended the handover ceremony.

At the beginning of the event, Zainu Remu Maimaitili, a migrant worker from Yutian County in Hotan Prefecture, delivered a passionate speech on behalf of 165 migrant workers who came to Tuksun County. She expressed her gratitude to the party, the county government and the county leaders for their support With their care and help, they will definitely cherish this hard-won job opportunity, work hard to make money, change lives, and firmly safeguard national unity and the unity of the motherland";

Afterwards, Sharapati Tursun led all the staff, facing the national flag, solemnly swore to safeguard unity of the motherland, be loyal to the party, the motherland, and the people, resolutely fight against the "three evil

**AR002775**

4/4/23, 10:55 AM

[News] Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan

pomegranate seeds, and cherish the hard-won happy life. Resolutely speak out against religious extremist forces, and with a strong sense of responsibility and dedication, unswervingly implement the decisions and arrangements of the Central Committee, the autonomous region party committee, and the municipal party committee on maintaining social stability. Everyone must consciously stand against ethnic division and safeguard social stability. On the front line of stability, stand firm, be clear about your attitude, take the lead in speaking out with your sword, actively and profoundly expose and criticize the crimes of violent and terrorist activities, and resolutely fight against ethnic separatists.

With the last order, the representatives of each enterprise led the migrant workers in Kashgar and Hotan areas to get on the bus in order, and went to the enterprise to work.

(Author: Li Neng )

**AR002776**



Figure 1: Handover Ceremony for Enterprises with Urban and Rural Surplus Labor in Kashi and Hotan

AR002777

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 222 of 388



Picture 2: Zainuremu Maimaitili, a migrant worker from Yutian County,

Hotan Prefecture, giving a speech

AR002778

4/4/23, 10:55 AM

[News] Toksun County held a handover ceremony for enterprises with surplus labor in urban and rural areas in Kashgar and Hotan

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 223 of 388



Picture 3: Sharapati Tursun led all the staff to take the oath

AR002779



Figure 4: Migrant workers solemnly swear an oath

AR002780

Case 1:25-cv-00022-LWW    Document 19    Filed 04/07/25    Page 225 of 388



Figure 5: The receiving company leads migrant workers to the company

AR002781



AR002782

AR002783

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR002784 - AR002791



☰ MENU

Sustainability ›› Policies & Standards ›› E&S Performance Standards

# Performance Standard 7



## Indigenous Peoples (2012)

Indigenous peoples (IPs) may be particularly vulnerable to the adverse impacts associated with project development, including risk of impoverishment and loss of identity, culture, and natural resource-based livelihoods. PS7 seeks to ensure that business activities minimize negative impacts, foster respect for human rights, dignity and culture of indigenous populations, and promote development benefits in culturally appropriate ways. Informed consultation and participation with IPs throughout the project process is a core requirement and may include Free, Prior and Informed Consent under certain circumstances.

**Download:** <u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>Türkçe</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u>

**Download Guidance Note 7:** <u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u>

## Indigenous Peoples (2006)

**Download:** <u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u>

**Download Guidance Note 7:** <u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>简体中文</u> | <u>عربي</u>

## Performance Standard 7 Implementation Resources

- <u>Stakeholder Engagement: A Good Practice Handbook for Companies Doing Business in Emerging Markets</u>
- <u>Case Study Excerpt - Glamis Gold: Stakeholder Analysis in the Marlin Gold Mine Project</u>
- <u>Case Study Excerpt - Sakhalin Energy Investment Company (SEIC): A Participatory Process for the Sakhalin Indigenous Minorities Development Plan</u>
- <u>Good Practice Note: Addressing the Social Dimensions of Private Sector Projects</u>
- <u>Investing in People: Sustaining Communities Through Improved Business Practice</u>
- <u>Doing Better Business Through Effective Public Consultation: A Good Practice Manual</u>

<u>See all Sustainability publications for Performance Standard 7 »</u>

## Full Documents

### 2012 Performance Standards

<u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>Türkçe</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u> | <u>မြန်မာဘာသာ</u> | <u>ລາວ</u> | <u>Tiếng Việt</u>

### 2012 Guidance Notes

<u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u> (last updated June 14, 2021)

### 2006 Performance Standards

<u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>русский</u> | <u>简体中文</u> | <u>عربي</u>

### 2006 Guidance Notes

<u>English</u> | <u>Français</u> | <u>Español</u> | <u>Português</u> | <u>简体中文</u> | <u>عربي</u>

### Interpretation Notes

AR002792

- Interpretation Note on Environmental and Social Categorization
- Interpretation Note on Financial Intermediaries
- Interpretation Note on Small and Medium Enterprises and Environmental and Social Risk Management

---

**World Bank Group Environmental, Health, and Safety (EHS) Guidelines**

---

Pre-2006 Versions

Short URL for this page: **www.ifc.org/ps7**

© 2023 IFC

User Agreement

Privacy

Scam Warning

General Inquiry

**QUICK LINKS**

For Clients

For Investors

For Media

For Stakeholders

For Job Seekers

**ACCOUNTABILITY**

Our Approach

Disclosed Projects

Compliance Advisor Ombudsman

Independent Evaluation Group

**FOLLOW US ON SOCIAL MEDIA!**



**SUBSCRIBE TO IFC INSIGHTS**



IBRD  IDA  IFC  MIGA  ICSID

**AR002793**

# IFC Performance Standards on Environmental and Social Sustainability

### Effective January 1, 2012



AR002794

AR002795

# Table of Contents

**Performance Standards:**

Overview                                                                                 2

Performance Standard 1: Assessment and Management of Environmental
   and Social Risks and Impacts                                                          5

Performance Standard 2: Labor and Working Conditions                                    16

Performance Standard 3: Resource Efficiency and Pollution Prevention                    22

Performance Standard 4: Community Health, Safety, and Security                          27

Performance Standard 5: Land Acquisition and Involuntary Resettlement                   31

Performance Standard 6: Biodiversity Conservation and Sustainable
   Management of Living Natural Resources                                               40

Performance Standard 7: Indigenous Peoples                                              47

Performance Standard 8: Cultural Heritage                                               53

AR002796

# Acronyms

| | |
|---|---|
| **EHS Guidelines** | World Bank Group Environmental, Health and Safety Guidelines |
| **ESMS** | Environmental and Social Management System |
| **FPIC** | Free, Prior, and Informed Consent |
| **GHG** | Greenhouse gases |
| **GIIP** | Good international industry practice |
| **ICP** | Informed Consultation and Participation |
| **ILO** | International Labour Organisation |
| **IPM** | Integrated pest management |
| **IUCN** | International Union for the Conservation of Nature |
| **IVM** | Integrated vector management |
| **UN** | United Nations |

AR002797






AR002798

# Overview

1. IFC's Sustainability Framework articulates the Corporation's strategic commitment to sustainable development, and is an integral part of IFC's approach to risk management. The Sustainability Framework comprises IFC's Policy and Performance Standards on Environmental and Social Sustainability, and IFC's Access to Information Policy. The Policy on Environmental and Social Sustainability describes IFC's commitments, roles, and responsibilities related to environmental and social sustainability. IFC's Access to Information Policy reflects IFC's commitment to transparency and good governance on its operations, and outlines the Corporation's institutional disclosure obligations regarding its investment and advisory services. The Performance Standards are directed towards clients, providing guidance on how to identify risks and impacts, and are designed to help avoid, mitigate, and manage risks and impacts as a way of doing business in a sustainable way, including stakeholder engagement and disclosure obligations of the client in relation to project-level activities. In the case of its direct investments (including project and corporate finance provided through financial intermediaries), IFC requires its clients to apply the Performance Standards to manage environmental and social risks and impacts so that development opportunities are enhanced. IFC uses the Sustainability Framework along with other strategies, policies, and initiatives to direct the business activities of the Corporation in order to achieve its overall development objectives. The Performance Standards may also be applied by other financial institutions.

2. Together, the eight Performance Standards establish standards that the client[1] is to meet throughout the life of an investment by IFC:

**Performance Standard 1:** Assessment and Management of Environmental and Social Risks and Impacts

**Performance Standard 2:** Labor and Working Conditions

**Performance Standard 3:** Resource Efficiency and Pollution Prevention

**Performance Standard 4:** Community Health, Safety, and Security

**Performance Standard 5:** Land Acquisition and Involuntary Resettlement

**Performance Standard 6:** Biodiversity Conservation and Sustainable Management of Living Natural Resources

**Performance Standard 7:** Indigenous Peoples

**Performance Standard 8:** Cultural Heritage

---

[1] The term "client" is used throughout the Performance Standards broadly to refer to the party responsible for implementing and operating the project that is being financed, or the recipient of the financing, depending on the project structure and type of financing. The term "project" is defined in Performance Standard 1.

**AR002799**

3. Performance Standard 1 establishes the importance of (i) integrated assessment to identify the environmental and social impacts, risks, and opportunities of projects; (ii) effective community engagement through disclosure of project-related information and consultation with local communities on matters that directly affect them; and (iii) the client's management of environmental and social performance throughout the life of the project. Performance Standards 2 through 8 establish objectives and requirements to avoid, minimize, and where residual impacts remain, to compensate/offset for risks and impacts to workers, Affected Communities, and the environment. While all relevant environmental and social risks and potential impacts should be considered as part of the assessment, Performance Standards 2 through 8 describe potential environmental and social risks and impacts that require particular attention. Where environmental or social risks and impacts are identified, the client is required to manage them through its Environmental and Social Management System (ESMS) consistent with Performance Standard 1.

4. Performance Standard 1 applies to all projects that have environmental and social risks and impacts. Depending on project circumstances, other Performance Standards may apply as well. The Performance Standards should be read together and cross-referenced as needed. The requirements section of each Performance Standard applies to all activities financed under the project, unless otherwise noted in the specific limitations described in each paragraph. Clients are encouraged to apply the ESMS developed under Performance Standard 1 to all their project activities, regardless of financing source. A number of cross-cutting

topics such as climate change, gender, human rights, and water, are addressed across multiple Performance Standards.

5. In addition to meeting the requirements under the Performance Standards, clients must comply with applicable national law, including those laws implementing host country obligations under international law.

6. The World Bank Group Environmental, Health and Safety Guidelines (EHS Guidelines) are technical reference documents with general and industry-specific examples of good international industry practice. IFC uses the EHS Guidelines as a technical source of information during project appraisal. The EHS Guidelines contain the performance levels and measures that are normally acceptable to IFC, and that are generally considered to be achievable in new facilities at reasonable costs by existing technology. For IFC-financed projects, application of the EHS Guidelines to existing facilities may involve the establishment of site-specific targets with an appropriate timetable for achieving them. The environmental assessment process may recommend alternative (higher or lower) levels or measures, which, if acceptable to IFC, become project- or site-specific requirements. The General EHS Guideline contains information on cross-cutting environmental, health, and safety issues potentially applicable to all industry sectors. It should be used together with the relevant industry sector guideline(s). The EHS Guidelines may be occasionally updated.

7. When host country regulations differ from the levels and measures presented in the EHS Guidelines, projects are expected to achieve whichever is more stringent. If less

**AR002800**  OVERVIEW | **3**

stringent levels or measures are appropriate in view of specific project circumstances, a full and detailed justification for any proposed alternatives is needed as part of the site-specific environmental assessment. This justification should demonstrate that the choice for any alternative performance level is protective of human health and the environment.

8. A set of eight Guidance Notes, corresponding to each Performance Standard, and an additional Interpretation Note on Financial Intermediaries offer guidance on the requirements contained in the Performance Standards, including reference materials, and on good sustainability practices to help clients improve project performance. These Guidance/Interpretation Notes may be occasionally updated.

**AR002801**

## Performance Standard 1

# Assessment and Management of Environmental and Social Risks and Impacts

### Introduction

1.    Performance Standard 1 underscores the importance of managing environmental and social performance throughout the life of a project. An effective Environmental and Social Management System (ESMS) is a dynamic and continuous process initiated and supported by management, and involves engagement between the client, its workers, local communities directly affected by the project (the Affected Communities) and, where appropriate, other stakeholders.[1] Drawing on the elements of the established business management process of "plan, do, check, and act," the ESMS entails a methodological approach to managing environmental and social risks[2] and impacts[3] in a structured way on an ongoing basis. A good ESMS appropriate to the nature and scale of the project promotes sound and sustainable environmental and social performance, and can lead to improved financial, social, and environmental outcomes.

2.    At times, the assessment and management of certain environmental and social risks and impacts may be the responsibility of the government or other third parties over which the client does not have control or influence.[4] Examples of where this may happen include: (i) when early planning decisions are made by the government or third parties which affect the project site selection and/or design; and/or (ii) when specific actions directly related to the project are carried out by the government or third parties such as providing land for a project which may have previously involved the resettlement of communities or individuals and/or leading to loss of biodiversity. While the client cannot control these government or third party actions, an effective ESMS should identify the different entities involved and the roles they play, the corresponding risks they present to the client, and opportunities to collaborate with these third parties in order to help

[1] Other stakeholders are those not directly affected by the project but that have an interest in it. These could include national and local authorities, neighboring projects, and/or nongovernmental organizations.

[2] Environmental and social risk is a combination of the probability of certain hazard occurrences and the severity of impacts resulting from such an occurrence.

[3] Environmental and social impacts refer to any change, potential or actual, to (i) the physical, natural, or cultural environment, and (ii) impacts on surrounding community and workers, resulting from the business activity to be supported.

[4] Contractors retained by, or acting on behalf of the client(s), are considered to be under direct control of the client and not considered third parties for the purposes of this Performance Standard.

AR002802

achieve environmental and social outcomes that are consistent with the Performance Standards. In addition, this Performance Standard supports the use of an effective grievance mechanism that can facilitate early indication of, and prompt remediation for those who believe that they have been harmed by a client's actions.

3.    Business should respect human rights, which means to avoid infringing on the human rights of others and address adverse human rights impacts business may cause or contribute to. Each of the Performance Standards has elements related to human rights dimensions that a project may face in the course of its operations. Due diligence against these Performance Standards will enable the client to address many relevant human rights issues in its project.

### Objectives

- To identify and evaluate environmental and social risks and impacts of the project.
- To adopt a mitigation hierarchy to anticipate and avoid, or where avoidance is not possible, minimize,[5] and, where residual impacts remain, compensate/offset for risks and impacts to workers, Affected Communities, and the environment.
- To promote improved environmental and social performance of clients through the effective use of management systems.
- To ensure that grievances from Affected Communities and external communications from other

stakeholders are responded to and managed appropriately.
- To promote and provide means for adequate engagement with Affected Communities throughout the project cycle on issues that could potentially affect them and to ensure that relevant environmental and social information is disclosed and disseminated.

### Scope of Application

4.    This Performance Standard applies to business activities with environmental and/or social risks and/or impacts. For the purposes of this Performance Standard, the term "project" refers to a defined set of business activities, including those where specific physical elements, aspects, and facilities likely to generate risks and impacts, have yet to be identified.[6] Where applicable, this could include aspects from the early developmental stages through the entire life cycle (design, construction, commissioning, operation, decommissioning, closure or, where applicable, post-closure) of a physical asset.[7] The requirements of this Performance Standard apply to all business activities unless otherwise noted in the specific limitations described in each of the paragraphs below.

---

[5] Acceptable options to minimize will vary and include: abate, rectify, repair, and/or restore impacts, as appropriate. The risk and impact mitigation hierarchy is further discussed and specified in the context of Performance Standards 2 through 8, where relevant.

[6] For example, corporate entities which have portfolios of existing physical assets, and/or intend to develop or acquire new facilities, and investment funds or financial intermediaries with existing portfolios of assets and/or which intend to invest in new facilities.

[7] Recognizing that this Performance Standard is used by a variety of financial institutions, investors, insurers, and owner/operators, each user should separately specify the business activities to which this Performance Standard should apply.

**AR002803**

## Requirements

### Environmental and Social Assessment and Management System

5.    The client, in coordination with other responsible government agencies and third parties as appropriate,[8] will conduct a process of environmental and social assessment, and establish and maintain an ESMS appropriate to the nature and scale of the project and commensurate with the level of its environmental and social risks and impacts. The ESMS will incorporate the following elements: (i) policy; (ii) identification of risks and impacts; (iii) management programs; (iv) organizational capacity and competency; (v) emergency preparedness and response; (vi) stakeholder engagement; and (vii) monitoring and review.

### Policy

6.    The client will establish an overarching policy defining the environmental and social objectives and principles that guide the project to achieve sound environmental and social performance.[9] The policy provides a framework for the environmental and social assessment and management process, and specifies that the project (or business activities, as appropriate) will comply with the applicable laws and regulations of the jurisdictions in which it is being undertaken, including those laws implementing host country obligations under international law. The policy should

be consistent with the principles of the Performance Standards. Under some circumstances, clients may also subscribe to other internationally recognized standards, certification schemes, or codes of practice and these too should be included in the policy. The policy will indicate who, within the client's organization, will ensure conformance with the policy and be responsible for its execution (with reference to an appropriate responsible government agency or third party, as necessary). The client will communicate the policy to all levels of its organization.

### Identification of Risks and Impacts

7.    The client will establish and maintain a process for identifying the environmental and social risks and impacts of the project (see paragraph 18 for competency requirements). The type, scale, and location of the project guide the scope and level of effort devoted to the risks and impacts identification process. The scope of the risks and impacts identification process will be consistent with good international industry practice,[10] and will determine the appropriate and relevant methods and assessment tools. The process may comprise a full-scale environmental and social impact assessment, a limited or focused environmental and social assessment, or straightforward application of environmental siting, pollution standards, design criteria, or

---

[8] That is, those parties legally obligated and responsible for assessing and managing specific risks and impacts (e.g., government-led resettlement).

[9] This requirement is a stand-alone, project-specific policy and is not intended to affect (or require alteration of) existing policies the client may have defined for non-related projects, business activities, or higher-level corporate activities.

[10] Defined as the exercise of professional skill, diligence, prudence, and foresight that would reasonably be expected from skilled and experienced professionals engaged in the same type of undertaking under the same or similar circumstances globally or regionally.

construction standards.[11] When the project involves existing assets, environmental and/or social audits or risk/hazard assessments can be appropriate and sufficient to identify risks and impacts. If assets to be developed, acquired or financed have yet to be defined, the establishment of an environmental and social due diligence process will identify risks and impacts at a point in the future when the physical elements, assets, and facilities are reasonably understood. The risks and impacts identification process will be based on recent environmental and social baseline data at an appropriate level of detail. The process will consider all relevant environmental and social risks and impacts of the project, including the issues identified in Performance Standards 2 through 8, and those who are likely to be affected by such risks and impacts.[12] The risks and impacts identification process will consider the emissions of greenhouse gases, the relevant risks associated with a changing climate and the adaptation opportunities, and potential transboundary effects, such as pollution of air, or use or pollution of international waterways.

8.   Where the project involves specifically identified physical elements, aspects, and facilities that are likely to generate impacts, environmental and social risks and impacts will be identified in the context of the project's area of influence. This area of influence encompasses, as appropriate:

- The area likely to be affected by: (i) the project[13] and the client's activities and facilities that are directly owned, operated or managed (including by contractors) and that are a component of the project;[14] (ii) impacts from unplanned but predictable developments caused by the project that may occur later or at a different location; or (iii) indirect project impacts on biodiversity or on ecosystem services upon which Affected Communities' livelihoods are dependent.

- Associated facilities, which are facilities that are not funded as part of the project and that would not have been constructed or expanded if the project did not exist and without which the project would not be viable.[15]

- Cumulative impacts[16] that result from the incremental impact, on areas or resources used or directly impacted by the project, from other existing, planned or reasonably defined developments at the time the risks and impacts identification process is conducted.

---

[11] For greenfield developments or large expansions with specifically indentified physical elements, aspects, and facilities that are likely to generate potential significant environmental or social impacts, the client will conduct a comprehensive Environmental and Social Impact Assessment, including an examination of alternatives, where appropriate.

[12] In limited high risk circumstances, it may be appropriate for the client to complement its environmental and social risks and impacts identification process with specific human rights due diligence as relevant to the particular business.

[13] Examples include the project's sites, the immediate airshed and watershed, or transport corridors.

[14] Examples include power transmission corridors, pipelines, canals, tunnels, relocation and access roads, borrow and disposal areas, construction camps, and contaminated land (e.g., soil, groundwater, surface water, and sediments).

[15] Associated facilities may include railways, roads, captive power plants or transmission lines, pipelines, utilities, warehouses, and logistics terminals.

[16] Cumulative impacts are limited to those impacts generally recognized as important on the basis of scientific concerns and/or concerns from Affected Communities. Examples of cumulative impacts include: incremental contribution of gaseous emissions to an airshed; reduction of water flows in a watershed due to multiple withdrawals; increases in sediment loads to a watershed; interference with migratory routes or wildlife movement; or more traffic congestion and accidents due to increases in vehicular traffic on community roadways.

**AR002805**

9. In the event of risks and impacts in the project's area of influence resulting from a third party's actions, the client will address those risks and impacts in a manner commensurate with the client's control and influence over the third parties, and with due regard to conflict of interest.

10. Where the client can reasonably exercise control, the risks and impacts identification process will also consider those risks and impacts associated with primary supply chains, as defined in Performance Standard 2 (paragraphs 27–29) and Performance Standard 6 (paragraph 30).

11. Where the project involves specifically identified physical elements, aspects and facilities that are likely to generate environmental and social impacts, the identification of risks and impacts will take into account the findings and conclusions of related and applicable plans, studies, or assessments prepared by relevant government authorities or other parties that are directly related to the project and its area of influence.[17] These include master economic development plans, country or regional plans, feasibility studies, alternatives analyses, and cumulative, regional, sectoral, or strategic environmental assessments where relevant. The risks and impacts identification will take account of the outcome of the engagement process with Affected Communities as appropriate.

12. Where the project involves specifically identified physical elements, aspects and facilities that are likely to generate impacts, and as part of the process of identifying risks and impacts, the client will identify individuals and groups that may be directly and differentially or disproportionately affected by the project because of their disadvantaged or vulnerable status.[18] Where individuals or groups are identified as disadvantaged or vulnerable, the client will propose and implement differentiated measures so that adverse impacts do not fall disproportionately on them and they are not disadvantaged in sharing development benefits and opportunities.

## Management Programs

13. Consistent with the client's policy and the objectives and principles described therein, the client will establish management programs that, in sum, will describe mitigation and performance improvement measures and actions that address the identified environmental and social risks and impacts of the project.

14. Depending on the nature and scale of the project, these programs may consist of some documented combination of operational procedures, practices, plans, and related supporting documents (including legal agreements) that are managed in a systematic

---

[17] The client can take these into account by focusing on the project's incremental contribution to selected impacts generally recognized as important on the basis of scientific concern or concerns from the Affected Communities within the area addressed by these larger scope regional studies or cumulative assessments.

[18] This disadvantaged or vulnerable status may stem from an individual's or group's race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status. The client should also consider factors such as gender, age, ethnicity, culture, literacy, sickness, physical or mental disability, poverty or economic disadvantage, and dependence on unique natural resources.

AR002806

way.[19] The programs may apply broadly across the client's organization, including contractors and primary suppliers over which the organization has control or influence, or to specific sites, facilities, or activities. The mitigation hierarchy to address identified risks and impacts will favor the avoidance of impacts over minimization, and, where residual impacts remain, compensation/offset, wherever technically[20] and financially feasible.[21]

15.   Where the identified risks and impacts cannot be avoided, the client will identify mitigation and performance measures and establish corresponding actions to ensure the project will operate in compliance with applicable laws and regulations, and meet the requirements of Performance Standards 1 through 8. The level of detail and complexity of this collective management program and the priority of the identified measures and actions will be commensurate with the project's risks and impacts, and will take account of the outcome of the engagement process with Affected Communities as appropriate.

16.   The management programs will establish environmental and social Action Plans,[22] which will define desired outcomes and actions to address the issues raised in the risks and impacts identification process, as measurable events to the extent possible, with elements such as performance indicators, targets, or acceptance criteria that can be tracked over defined time periods, and with estimates of the resources and responsibilities for implementation. As appropriate, the management program will recognize and incorporate the role of relevant actions and events controlled by third parties to address identified risks and impacts. Recognizing the dynamic nature of the project, the management program will be responsive to changes in circumstances, unforeseen events, and the results of monitoring and review.

## Organizational Capacity and Competency

17. The client, in collaboration with appropriate and relevant third parties, will establish, maintain, and strengthen as necessary an organizational structure that defines roles, responsibilities, and authority to implement the ESMS. Specific personnel, including management representative(s), with clear lines of responsibility and authority should be designated. Key environmental and social responsibilities should be well defined and communicated to the relevant personnel and to the rest of the

---

[19] Existing legal agreements between the client and third parties that address mitigation actions with regard to specific impacts constitute part of a program. Examples are government-managed resettlement responsibilities specified in an agreement.

[20] Technical feasibility is based on whether the proposed measures and actions can be implemented with commercially available skills, equipment, and materials, taking into consideration prevailing local factors such as climate, geography, demography, infrastructure, security, governance, capacity, and operational reliability.

[21] Financial feasibility is based on commercial considerations, including relative magnitude of the incremental cost of adopting such measures and actions compared to the project's investment, operating, and maintenance costs, and on whether this incremental cost could make the project nonviable to the client.

[22] Action plans may include an overall Environmental and Social Action Plan necessary for carrying out a suite of mitigation measures or thematic action plans, such as Resettlement Action Plans or Biodiversity Action Plans. Action plans may be plans designed to fill in the gaps of existing management programs to ensure consistency with the Performance Standards, or they may be stand alone plans that specify the project's mitigation strategy. The "Action plan" terminology is understood by some communities of practice to mean Management plans, or Development plans. In this case, examples are numerous and include various types of environmental and social management plans.

**AR002807**

client's organization. Sufficient management sponsorship and human and financial resources will be provided on an ongoing basis to achieve effective and continuous environmental and social performance.

18. Personnel within the client's organization with direct responsibility for the project's environmental and social performance will have the knowledge, skills, and experience necessary to perform their work, including current knowledge of the host country's regulatory requirements and the applicable requirements of Performance Standards 1 through 8. Personnel will also possess the knowledge, skills, and experience to implement the specific measures and actions required under the ESMS and the methods required to perform the actions in a competent and efficient manner.

19. The process of identification of risks and impacts will consist of an adequate, accurate, and objective evaluation and presentation, prepared by competent professionals. For projects posing potentially significant adverse impacts or where technically complex issues are involved, clients may be required to involve external experts to assist in the risks and impacts identification process.

## Emergency Preparedness and Response

20. Where the project involves specifically identified physical elements, aspects and facilities that are likely to generate impacts, the ESMS will establish and maintain an emergency preparedness and response system so that the client, in collaboration with appropriate and relevant third parties, will be prepared to respond to accidental and emergency situations associated with the project in a manner appropriate to prevent and mitigate any harm to people and/or the environment. This preparation will include the identification of areas where accidents and emergency situations may occur, communities and individuals that may be impacted, response procedures, provision of equipment and resources, designation of responsibilities, communication, including that with potentially Affected Communities and periodic training to ensure effective response. The emergency preparedness and response activities will be periodically reviewed and revised, as necessary, to reflect changing conditions.

21. Where applicable, the client will also assist and collaborate with the potentially Affected Communities (see Performance Standard 4) and the local government agencies in their preparations to respond effectively to emergency situations, especially when their participation and collaboration are necessary to ensure effective response. If local government agencies have little or no capacity to respond effectively, the client will play an active role in preparing for and responding to emergencies associated with the project. The client will document its emergency preparedness and response activities, resources, and responsibilities, and will provide appropriate information to potentially Affected Community and relevant government agencies.

## Monitoring and Review

22. The client will establish procedures to monitor and measure the effectiveness of the management program, as well as compliance with any related legal and/or contractual obligations and regulatory requirements. Where the government or other third party has responsibility for managing specific risks and

impacts and associated mitigation measures, the client will collaborate in establishing and monitoring such mitigation measures. Where appropriate, clients will consider involving representatives from Affected Communities to participate in monitoring activities.[23] The client's monitoring program should be overseen by the appropriate level in the organization. For projects with significant impacts, the client will retain external experts to verify its monitoring information. The extent of monitoring should be commensurate with the project's environmental and social risks and impacts and with compliance requirements.

23.   In addition to recording information to track performance and establishing relevant operational controls, the client should use dynamic mechanisms, such as internal inspections and audits, where relevant, to verify compliance and progress toward the desired outcomes. Monitoring will normally include recording information to track performance and comparing this against the previously established benchmarks or requirements in the management program. Monitoring should be adjusted according to performance experience and actions requested by relevant regulatory authorities. The client will document monitoring results and identify and reflect the necessary corrective and preventive actions in the amended management program and plans. The client, in collaboration with appropriate and relevant third parties, will implement these corrective and preventive actions, and follow up on these actions in upcoming monitoring cycles to ensure their effectiveness.

24. Senior management in the client organization will receive periodic performance reviews of the effectiveness of the ESMS, based on systematic data collection and analysis. The scope and frequency of such reporting will depend upon the nature and scope of the activities identified and undertaken in accordance with the client's ESMS and other applicable project requirements. Based on results within these performance reviews, senior management will take the necessary and appropriate steps to ensure the intent of the client's policy is met, that procedures, practices, and plans are being implemented, and are seen to be effective.

## Stakeholder Engagement

25. Stakeholder engagement is the basis for building strong, constructive, and responsive relationships that are essential for the successful management of a project's environmental and social impacts.[24] Stakeholder engagement is an ongoing process that may involve, in varying degrees, the following elements: stakeholder analysis and planning, disclosure and dissemination of information, consultation and participation, grievance mechanism, and ongoing reporting to Affected Communities. The nature, frequency, and level of effort of stakeholder engagement may vary considerably and will be commensurate with the project's risks and adverse impacts, and the project's phase of development.

---

[23] For example, participatory water monitoring.

[24] Requirements regarding engagement of workers and related grievance redress procedures are found in Performance Standard 2.

**AR002809**

*Stakeholder Analysis and Engagement Planning*

26. Clients should identify the range of stakeholders that may be interested in their actions and consider how external communications might facilitate a dialog with all stakeholders (paragraph 34 below). Where projects involve specifically identified physical elements, aspects and/or facilities that are likely to generate adverse environmental and social impacts to Affected Communities the client will identify the Affected Communities and will meet the relevant requirements described below.

27. The client will develop and implement a Stakeholder Engagement Plan that is scaled to the project risks and impacts and development stage, and be tailored to the characteristics and interests of the Affected Communities. Where applicable, the Stakeholder Engagement Plan will include differentiated measures to allow the effective participation of those identified as disadvantaged or vulnerable. When the stakeholder engagement process depends substantially on community representatives,[25] the client will make every reasonable effort to verify that such persons do in fact represent the views of Affected Communities and that they can be relied upon to faithfully communicate the results of consultations to their constituents.

28. In cases where the exact location of the project is not known, but it is reasonably expected to have significant impacts on local communities, the client will prepare a Stakeholder Engagement Framework, as part of its management program, outlining general principles and a strategy to identify Affected Communities and other relevant stakeholders and plan for an engagement process compatible with this Performance Standard that will be implemented once the physical location of the project is known.

*Disclosure of Information*

29. Disclosure of relevant project information helps Affected Communities and other stakeholders understand the risks, impacts and opportunities of the project. The client will provide Affected Communities with access to relevant information[26] on: (i) the purpose, nature, and scale of the project; (ii) the duration of proposed project activities; (iii) any risks to and potential impacts on such communities and relevant mitigation measures; (iv) the envisaged stakeholder engagement process; and (v) the grievance mechanism.

*Consultation*

30. When Affected Communities are subject to identified risks and adverse impacts from a project, the client will undertake a process of consultation in a manner that provides the Affected Communities with opportunities to express their views on project risks, impacts and mitigation measures, and allows the client to consider and respond to them. The extent and degree of engagement

---

[25] For example, community and religious leaders, local government representatives, civil society representatives, politicians, school teachers, and/or others representing one or more affected stakeholder groups.

[26] Depending on the scale of the project and significance of the risks and impacts, relevant document(s) could range from full Environmental and Social Assessments and Action Plans (i.e., Stakeholder Engagement Plan, Resettlement Action Plans, Biodiversity Action Plans, Hazardous Materials Management Plans, Emergency Preparedness and Response Plans, Community Health and Safety Plans, Ecosystem Restoration Plans, and Indigenous Peoples Development Plans, etc.) to easy-to-understand summaries of key issues and commitments. These documents could also include the client's environmental and social policy and any supplemental measures and actions defined as a result of independent due diligence conducted by financiers.

required by the consultation process should be commensurate with the project's risks and adverse impacts and with the concerns raised by the Affected Communities. Effective consultation is a two-way process that should: (i) begin early in the process of identification of environmental and social risks and impacts and continue on an ongoing basis as risks and impacts arise; (ii) be based on the prior disclosure and dissemination of relevant, transparent, objective, meaningful and easily accessible information which is in a culturally appropriate local language(s) and format and is understandable to Affected Communities; (iii) focus inclusive[27] engagement on those directly affected as opposed to those not directly affected; (iv) be free of external manipulation, interference, coercion, or intimidation; (v) enable meaningful participation, where applicable; and (vi) be documented. The client will tailor its consultation process to the language preferences of the Affected Communities, their decision-making process, and the needs of disadvantaged or vulnerable groups. If clients have already engaged in such a process, they will provide adequate documented evidence of such engagement.

### Informed Consultation and Participation

31. For projects with potentially significant adverse impacts on Affected Communities, the client will conduct an Informed Consultation and Participation (ICP) process that will build upon the steps outlined above in Consultation and will result in the Affected Communities' informed participation. ICP involves a more in-depth exchange of views and information, and an organized and iterative consultation,

leading to the client's incorporating into their decision-making process the views of the Affected Communities on matters that affect them directly, such as the proposed mitigation measures, the sharing of development benefits and opportunities, and implementation issues. The consultation process should (i) capture both men's and women's views, if necessary through separate forums or engagements, and (ii) reflect men's and women's different concerns and priorities about impacts, mitigation mechanisms, and benefits, where appropriate. The client will document the process, in particular the measures taken to avoid or minimize risks to and adverse impacts on the Affected Communities, and will inform those affected about how their concerns have been considered.

### Indigenous Peoples

32. For projects with adverse impacts to Indigenous Peoples, the client is required to engage them in a process of ICP and in certain circumstances the client is required to obtain their Free, Prior, and Informed Consent (FPIC). The requirements related to Indigenous Peoples and the definition of the special circumstances requiring FPIC are described in Performance Standard 7.

### Private Sector Responsibilities Under Government-Led Stakeholder Engagement

33. Where stakeholder engagement is the responsibility of the host government, the client will collaborate with the responsible government agency, to the extent permitted by the agency, to achieve outcomes that are consistent with the objectives of this Performance Standard. In addition, where government capacity is limited, the client will play an active role during the stakeholder engagement planning, implementation, and

---

[27] Such as men, women, the elderly, youth, displaced persons, and vulnerable and disadvantaged persons or groups.

**AR002811**

monitoring. If the process conducted by the government does not meet the relevant requirements of this Performance Standard, the client will conduct a complementary process and, where appropriate, identify supplemental actions.

## External Communications and Grievance Mechanisms

### *External Communications*

34. Clients will implement and maintain a procedure for external communications that includes methods to (i) receive and register external communications from the public; (ii) screen and assess the issues raised and determine how to address them; (iii) provide, track, and document responses, if any; and (iv) adjust the management program, as appropriate. In addition, clients are encouraged to make publicly available periodic reports on their environmental and social sustainability.

### *Grievance Mechanism for Affected Communities*

35. Where there are Affected Communities, the client will establish a grievance mechanism to receive and facilitate resolution of Affected Communities' concerns and grievances about the client's environmental and social performance. The grievance mechanism should be scaled to the risks and adverse impacts of the project and have Affected Communities as its primary user. It should seek to resolve concerns promptly, using an understandable and transparent consultative process that is culturally appropriate and readily accessible, and at no cost and without retribution to the party that originated the issue or concern. The mechanism should not impede access to judicial or administrative remedies. The client will inform the Affected Communities about the mechanism in the course of the stakeholder engagement process.

## Ongoing Reporting to Affected Communities

36. The client will provide periodic reports to the Affected Communities that describe progress with implementation of the project Action Plans on issues that involve ongoing risk to or impacts on Affected Communities and on issues that the consultation process or grievance mechanism have identified as a concern to those Communities. If the management program results in material changes in or additions to the mitigation measures or actions described in the Action Plans on issues of concern to the Affected Communities, the updated relevant mitigation measures or actions will be communicated to them. The frequency of these reports will be proportionate to the concerns of Affected Communities but not less than annually.

# Performance Standard 2
# Labor and Working Conditions

## Introduction

1.   Performance Standard 2 recognizes that the pursuit of economic growth through employment creation and income generation should be accompanied by protection of the fundamental[1] rights of workers. For any business, the workforce is a valuable asset, and a sound worker-management relationship is a key ingredient in the sustainability of a company. Failure to establish and foster a sound worker-management relationship can undermine worker commitment and retention, and can jeopardize a project. Conversely, through a constructive worker-management relationship, and by treating the workers fairly and providing them with safe and healthy working conditions, clients may create tangible benefits, such as enhancement of the efficiency and productivity of their operations.

2.   The requirements set out in this Performance Standard have been in part guided by a number of international conventions and instruments, including those of the International Labour Organization (ILO) and the United Nations (UN).[2]

## Objectives

- To promote the fair treatment, non-discrimination, and equal opportunity of workers.
- To establish, maintain, and improve the worker-management relationship.
- To promote compliance with national employment and labor laws.
- To protect workers, including vulnerable categories of workers such as children,

---

[2] These conventions are:
ILO Convention 87 on Freedom of Association and Protection of the Right to Organize
ILO Convention 98 on the Right to Organize and Collective Bargaining
ILO Convention 29 on Forced Labor
ILO Convention 105 on the Abolition of Forced Labor
ILO Convention 138 on Minimum Age (of Employment)
ILO Convention 182 on the Worst Forms of Child Labor
ILO Convention 100 on Equal Remuneration
ILO Convention 111 on Discrimination (Employment and Occupation)
UN Convention on the Rights of the Child, Article 32.1
UN Convention on the Protection of the Rights of all Migrant Workers and Members of their Families

---

[1] As guided by the ILO Conventions listed in footnote 2.

AR002813

migrant workers, workers engaged by third parties, and workers in the client's supply chain.

- To promote safe and healthy working conditions, and the health of workers.
- To avoid the use of forced labor.

## Scope of Application

3. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System (ESMS), the elements of which are outlined in Performance Standard 1.

4. The scope of application of this Performance Standard depends on the type of employment relationship between the client and the worker. It applies to workers directly engaged by the client (direct workers), workers engaged through third parties to perform work related to core business processes[3] of the project for a substantial duration (contracted workers), as well as workers engaged by the client's primary suppliers (supply chain workers).[4]

### Direct Workers
5. With respect to direct workers, the client will apply the requirements of paragraphs 8–23 of this Performance Standard.

### Contracted Workers
6. With respect to contracted workers, the client will apply the requirements of paragraphs 23–26 of this Performance Standard.

### Supply Chain Workers
7. With respect to supply chain workers, the client will apply the requirements of paragraphs 27–29 of this Performance Standard.

## Requirements

### Working Conditions and Management of Worker Relationship

#### Human Resources Policies and Procedures
8. The client will adopt and implement human resources policies and procedures appropriate to its size and workforce that set out its approach to managing workers consistent with the requirements of this Performance Standard and national law.

9. The client will provide workers with documented information that is clear and understandable, regarding their rights under national labor and employment law and any applicable collective agreements, including their rights related to hours of work, wages, overtime, compensation, and benefits upon beginning the working relationship and when any material changes occur.

#### Working Conditions and Terms of Employment
10. Where the client is a party to a collective bargaining agreement with a workers' organization, such agreement will be respected. Where such agreements do not exist, or do not address working

---

[3] Core business processes constitute those production and/or service processes essential for a specific business activity without which the business activity could not continue.

[4] Primary suppliers are those suppliers who, on an ongoing basis, provide goods or materials essential for the core business processes of the project.

**AR002814**

conditions and terms of employment,[5] the client will provide reasonable working conditions and terms of employment.[6]

11. The client will identify migrant workers and ensure that they are engaged on substantially equivalent terms and conditions to non-migrant workers carrying out similar work.

12. Where accommodation services[7] are provided to workers covered by the scope of this Performance Standard, the client will put in place and implement policies on the quality and management of the accommodation and provision of basic services.[8] The accommodation services will be provided in a manner consistent with the principles of non-discrimination and equal opportunity. Workers' accommodation arrangements should not restrict workers' freedom of movement or of association.

### *Workers' Organizations*

13. In countries where national law recognizes workers' rights to form and to join workers' organizations of their choosing without interference and to bargain collectively, the client will comply with national law. Where national law substantially restricts workers' organizations, the client will not restrict workers from developing alternative mechanisms to express their grievances and protect their rights regarding working conditions and terms of employment. The client should not seek to influence or control these mechanisms.

14. In either case described in paragraph 13 of this Performance Standard, and where national law is silent, the client will not discourage workers from electing worker representatives, forming or joining workers' organizations of their choosing, or from bargaining collectively, and will not discriminate or retaliate against workers who participate, or seek to participate, in such organizations and collective bargaining. The client will engage with such workers' representatives and workers' organizations, and provide them with information needed for meaningful negotiation in a timely manner. Workers' organizations are expected to fairly represent the workers in the workforce.

### *Non-Discrimination and Equal Opportunity*

15. The client will not make employment decisions on the basis of personal characteristics[9] unrelated to inherent job requirements. The client will base the employment relationship on the principle of equal opportunity and fair treatment, and will not discriminate with respect to any aspects of the employment relationship, such

---

[5] Working conditions and terms of employment examples are wages and benefits; wage deductions; hours of work; overtime arrangements and overtime compensation; breaks; rest days; and leave for illness, maternity, vacation or holiday.

[6] Reasonable working conditions and terms of employment could be assessed by reference to (i) conditions established for work of the same character in the trade or industry concerned in the area/region where the work is carried out; (ii) collective agreement or other recognized negotiation between other organizations of employers and workers' representatives in the trade or industry concerned; (iii) arbitration award; or (iv) conditions established by national law.

[7] Those services might be provided either directly by the client or by third parties.

[8] Basic services requirements refer to minimum space, supply of water, adequate sewage and garbage disposal system, appropriate protection against heat, cold, damp, noise, fire and disease-carrying animals, adequate sanitary and washing facilities, ventilation, cooking and storage facilities and natural and artificial lighting, and in some cases basic medical services.

[9] Such as gender, race, nationality, ethnic, social and indigenous origin, religion or belief, disability, age, or sexual orientation.

**AR002815**

as recruitment and hiring, compensation (including wages and benefits), working conditions and terms of employment, access to training, job assignment, promotion, termination of employment or retirement, and disciplinary practices. The client will take measures to prevent and address harassment, intimidation, and/or exploitation, especially in regard to women. The principles of non-discrimination apply to migrant workers.

16. In countries where national law provides for non-discrimination in employment, the client will comply with national law. When national laws are silent on non-discrimination in employment, the client will meet this Performance Standard. In circumstances where national law is inconsistent with this Performance Standard, the client is encouraged to carry out its operations consistent with the intent of paragraph 15 above without contravening applicable laws.

17. Special measures of protection or assistance to remedy past discrimination or selection for a particular job based on the inherent requirements of the job will not be deemed as discrimination, provided they are consistent with national law.

### Retrenchment

18. Prior to implementing any collective dismissals,[10] the client will carry out an analysis of alternatives to retrenchment.[11] If the analysis does not identify viable alternatives to retrenchment, a retrenchment plan will be developed and implemented to reduce the adverse impacts of retrenchment on workers. The retrenchment plan will be based on the principle of non-discrimination and will reflect the client's consultation with workers, their organizations, and, where appropriate, the government, and comply with collective bargaining agreements if they exist. The client will comply with all legal and contractual requirements related to notification of public authorities, and provision of information to, and consultation with workers and their organizations.

19. The client should ensure that all workers receive notice of dismissal and severance payments mandated by law and collective agreements in a timely manner. All outstanding back pay and social security benefits and pension contributions and benefits will be paid (i) on or before termination of the working relationship to the workers, (ii) where appropriate, for the benefit of the workers, or (iii) payment will be made in accordance with a timeline agreed through a collective agreement. Where payments are made for the benefit of workers, workers will be provided with evidence of such payments.

### Grievance Mechanism

20. The client will provide a grievance mechanism for workers (and their organizations, where they exist) to raise workplace concerns. The client will inform the workers of the grievance mechanism at the time of recruitment and make it easily accessible to them. The mechanism should involve an appropriate level of management and address concerns promptly, using an understandable and transparent process that provides timely feedback to those concerned, without any retribution. The mechanism

---

[10] Collective dismissals cover all multiple dismissals that are a result of an economic, technical, or organizational reason; or other reasons that are not related to performance or other personal reasons.

[11] Examples of alternatives may include negotiated working-time reduction programs, employee capacity-building programs; long-term maintenance works during low production periods, etc.

AR002816

should also allow for anonymous complaints to be raised and addressed. The mechanism should not impede access to other judicial or administrative remedies that might be available under the law or through existing arbitration procedures, or substitute for grievance mechanisms provided through collective agreements.

## Protecting the Work Force

### *Child Labor*

21. The client will not employ children in any manner that is economically exploitative, or is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral, or social development. The client will identify the presence of all persons under the age of 18. Where national laws have provisions for the employment of minors, the client will follow those laws applicable to the client. Children under the age of 18 will not be employed in hazardous work.[12] All work of persons under the age of 18 will be subject to an appropriate risk assessment and regular monitoring of health, working conditions, and hours of work.

### *Forced Labor*

22. The client will not employ forced labor, which consists of any work or service not voluntarily performed that is exacted from an individual under threat of force or penalty. This covers any kind of involuntary or compulsory labor, such as indentured labor, bonded labor, or similar labor-contracting arrangements. The client will not employ trafficked persons.[13]

## Occupational Health and Safety

23. The client will provide a safe and healthy work environment, taking into account inherent risks in its particular sector and specific classes of hazards in the client's work areas, including physical, chemical, biological, and radiological hazards, and specific threats to women. The client will take steps to prevent accidents, injury, and disease arising from, associated with, or occurring in the course of work by minimizing, as far as reasonably practicable, the causes of hazards. In a manner consistent with good international industry practice,[14] as reflected in various internationally recognized sources including the World Bank Group Environmental, Health and Safety Guidelines, the client will address areas that include the (i) identification of potential hazards to workers, particularly those that may be life-threatening; (ii) provision of preventive and protective measures, including modification, substitution, or elimination of hazardous conditions or substances; (iii) training of workers; (iv) documentation and reporting of occupational accidents, diseases, and incidents; and (v) emergency prevention,

---

[12] Examples of hazardous work activities include work (i) with exposure to physical, psychological, or sexual abuse; (ii) underground, underwater, working at heights, or in confined spaces; (iii) with dangerous machinery, equipment, or tools, or involving handling of heavy loads; (iv) in unhealthy environments exposing the worker to hazardous substances, agents, processes, temperatures, noise, or vibration damaging to health; or (v) under difficult conditions such as long hours, late night, or confinement by employer.

[13] Trafficking in persons is defined as the recruitment, transportation, transfer, harboring, or receipt of persons, by means of the threat or use of force or other forms of coercion, abduction, fraud, deception, abuse of power, or of a position of vulnerability, or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Women and children are particularly vulnerable to trafficking practices.

[14] Defined as the exercise of professional skill, diligence, prudence, and foresight that would reasonably be expected from skilled and experienced professionals engaged in the same type of undertaking under the same or similar circumstances, globally or regionally.

**AR002817**

preparedness, and response arrangements. For additional information related to emergency preparedness and response refer to Performance Standard 1.

## Workers Engaged by Third Parties

24. With respect to contracted workers the client will take commercially reasonable efforts to ascertain that the third parties who engage these workers are reputable and legitimate enterprises and have an appropriate ESMS that will allow them to operate in a manner consistent with the requirements of this Performance Standard, except for paragraphs 18–19, and 27–29.

25. The client will establish policies and procedures for managing and monitoring the performance of such third party employers in relation to the requirements of this Performance Standard. In addition, the client will use commercially reasonable efforts to incorporate these requirements in contractual agreements with such third party employers.

26. The client will ensure that contracted workers, covered in paragraphs 24–25 of this Performance Standard, have access to a grievance mechanism. In cases where the third party is not able to provide a grievance mechanism the client will extend its own grievance mechanism to serve workers engaged by the third party.

## Supply Chain

27. Where there is a high risk of child labor or forced labor[15] in the primary supply chain, the client will identify those risks consistent with paragraphs 21 and 22 above. If child labor or forced labor cases are identified, the client will take appropriate steps to remedy them. The client will monitor its primary supply chain on an ongoing basis in order to identify any significant changes in its supply chain and if new risks or incidents of child and/or forced labor are identified, the client will take appropriate steps to remedy them.

28. Additionally, where there is a high risk of significant safety issues related to supply chain workers, the client will introduce procedures and mitigation measures to ensure that primary suppliers within the supply chain are taking steps to prevent or to correct life-threatening situations.

29. The ability of the client to fully address these risks will depend upon the client's level of management control or influence over its primary suppliers. Where remedy is not possible, the client will shift the project's primary supply chain over time to suppliers that can demonstrate that they are complying with this Performance Standard.

---

[15] The potential risk of child labor and forced labor will be determined during the risks and impacts identification process as required in Performance Standard 1.

**AR002818**

# Performance Standard 3

# Resource Efficiency and Pollution Prevention

## Introduction

1.   Performance Standard 3 recognizes that increased economic activity and urbanization often generate increased levels of pollution to air, water, and land, and consume finite resources in a manner that may threaten people and the environment at the local, regional, and global levels.[1] There is also a growing global consensus that the current and projected atmospheric concentration of greenhouse gases (GHG) threatens the public health and welfare of current and future generations. At the same time, more efficient and effective resource use and pollution prevention[2] and GHG emission avoidance and mitigation technologies and practices have become more accessible and achievable in virtually all parts of the world. These are often implemented through continuous improvement methodologies similar to those used to enhance quality or productivity, which are generally well known to most industrial, agricultural, and service sector companies.

2.   This Performance Standard outlines a project-level approach to resource efficiency and pollution prevention and control in line with internationally disseminated technologies and practices. In addition, this Performance Standard promotes the ability of private sector companies to adopt such technologies and practices as far as their use is feasible in the context of a project that relies on commercially available skills and resources.

## Objectives

- To avoid or minimize adverse impacts on human health and the environment by avoiding or minimizing pollution from project activities.
- To promote more sustainable use of resources, including energy and water.
- To reduce project-related GHG emissions.

---

[1] For the purposes of this Performance Standard, the term "pollution" is used to refer to both hazardous and non hazardous chemical pollutants in the solid, liquid, or gaseous phases, and includes other components such as pests, pathogens, thermal discharge to water, GHG emissions, nuisance odors, noise, vibration, radiation, electromagnetic energy, and the creation of potential visual impacts including light.

[2] For the purpose of this Performance Standard, the term "pollution prevention" does not mean absolute elimination of emissions, but the avoidance at source whenever possible, and, if not possible, then subsequent minimization of pollution to the extent that the Performance Standard objectives are satisfied.

**AR002819**

## Scope of Application

3.   The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System, the elements of which are outlined in Performance Standard 1.

## Requirements

4.   During the project life-cycle, the client will consider ambient conditions and apply technically and financially feasible resource efficiency and pollution prevention principles and techniques that are best suited to avoid, or where avoidance is not possible, minimize adverse impacts on human health and the environment.[3] The principles and techniques applied during the project life-cycle will be tailored to the hazards and risks associated with the nature of the project and consistent with good international industry practice (GIIP),[4] as reflected in various internationally recognized sources, including the World Bank Group Environmental, Health and Safety Guidelines (EHS Guidelines).

5.   The client will refer to the EHS Guidelines or other internationally recognized sources, as appropriate, when evaluating and selecting resource efficiency and pollution prevention and control techniques for the project. The EHS Guidelines contain the performance levels and measures that are normally acceptable and applicable to projects. When host country regulations differ from the levels and measures presented in the EHS Guidelines, clients will be required to achieve whichever is more stringent. If less stringent levels or measures than those provided in the EHS Guidelines are appropriate in view of specific project circumstances, the client will provide full and detailed justification for any proposed alternatives through the environmental and social risks and impacts identification and assessment process. This justification must demonstrate that the choice for any alternate performance levels is consistent with the objectives of this Performance Standard.

### Resource Efficiency

6.   The client will implement technically and financially feasible and cost effective[5] measures for improving efficiency in its consumption of energy, water, as well as other resources and material inputs, with a focus on areas that are considered core business activities. Such measures will integrate the principles of cleaner production into product

---

[3] Technical feasibility is based on whether the proposed measures and actions can be implemented with commercially available skills, equipment, and materials, taking into consideration prevailing local factors such as climate, geography, infrastructure, security, governance, capacity and operational reliability. Financial feasibility is based on commercial considerations, including relative magnitude of the incremental cost of adopting such measures and actions compared to the project's investment, operating, and maintenance costs.

[4] GIIP is defined as the exercise of professional skill, diligence, prudence, and foresight that would reasonably be expected from skilled and experienced professionals engaged in the same type of undertaking under the same or similar circumstances globally or regionally. The outcome of such exercise should be that the project employs the most appropriate technologies in the project-specific circumstances.

[5] Cost-effectiveness is determined according to the capital and operational cost and financial benefits of the measure considered over the life of the measure. For the purpose of this Performance Standard, a resource efficiency or GHG emissions reduction measure is considered cost-effective if it is expected to provide a risk-rated return on investment at least comparable to the project itself.

**AR002820**

design and production processes with the objective of conserving raw materials, energy, and water. Where benchmarking data are available, the client will make a comparison to establish the relative level of efficiency.

### Greenhouse Gases

7. In addition to the resource efficiency measures described above, the client will consider alternatives and implement technically and financially feasible and cost-effective options to reduce project-related GHG emissions during the design and operation of the project. These options may include, but are not limited to, alternative project locations, adoption of renewable or low carbon energy sources, sustainable agricultural, forestry and livestock management practices, the reduction of fugitive emissions and the reduction of gas flaring.

8. For projects that are expected to or currently produce more than 25,000 tonnes of $CO_2$-equivalent annually,[6] the client will quantify direct emissions from the facilities owned or controlled within the physical project boundary,[7] as well as indirect emissions associated with the off-site production of energy[8] used by the project. Quantification of GHG emissions will be conducted by the client annually in accordance with internationally recognized methodologies and good practice.[9]

### Water Consumption

9. When the project is a potentially significant consumer of water, in addition to applying the resource efficiency requirements of this Performance Standard, the client shall adopt measures that avoid or reduce water usage so that the project's water consumption does not have significant adverse impacts on others. These measures include, but are not limited to, the use of additional technically feasible water conservation measures within the client's operations, the use of alternative water supplies, water consumption offsets to reduce total demand for water resources to within the available supply, and evaluation of alternative project locations.

## Pollution Prevention

10. The client will avoid the release of pollutants or, when avoidance is not feasible, minimize and/or control the intensity and mass flow of their release. This applies to the release of pollutants to air, water, and land due to routine, non-routine, and accidental circumstances with the potential for local, regional, and transboundary impacts.[10] Where historical pollution such as land or ground water contamination exists, the client will seek to determine whether it is responsible for mitigation measures. If it is determined that the client is legally responsible, then these liabilities will be resolved in accordance with national law, or where this is silent, with GIIP.[11]

---

[6] The quantification of emissions should consider all significant sources of greenhouse gas emissions, including non-energy related sources such as methane and nitrous oxide, among others.

[7] Project-induced changes in soil carbon content or above ground biomass, and project-induced decay of organic matter may contribute to direct emissions sources and shall be included in this emissions quantification where such emissions are expected to be significant.

[8] Refers to the off-site generation by others of electricity, and heating and cooling energy used in the project.

[9] Estimation methodologies are provided by the Intergovernmental Panel on Climate Change, various international organizations, and relevant host country agencies.

[10] Transboundary pollutants include those covered under the Convention on Long-Range Transboundary Air Pollution.

[11] This may require coordination with national and local government, communities, and the contributors to the contamination, and that any assessment follows a risk-based approach consistent with GIIP as reflected in the EHS Guidelines.

**AR002821**

11. To address potential adverse project impacts on existing ambient conditions,[12] the client will consider relevant factors, including, for example (i) existing ambient conditions; (ii) the finite assimilative capacity[13] of the environment; (iii) existing and future land use; (iv) the project's proximity to areas of importance to biodiversity; and (v) the potential for cumulative impacts with uncertain and/or irreversible consequences. In addition to applying resource efficiency and pollution control measures as required in this Performance Standard, when the project has the potential to constitute a significant source of emissions in an already degraded area, the client will consider additional strategies and adopt measures that avoid or reduce negative effects. These strategies include, but are not limited to, evaluation of project location alternatives and emissions offsets.

*Wastes*

12. The client will avoid the generation of hazardous and non-hazardous waste materials. Where waste generation cannot be avoided, the client will reduce the generation of waste, and recover and reuse waste in a manner that is safe for human health and the environment. Where waste cannot be recovered or reused, the client will treat, destroy, or dispose of it in an environmentally sound manner that includes the appropriate control of emissions and residues resulting from the handling and processing of the waste material. If the generated waste is considered hazardous,[14]

the client will adopt GIIP alternatives for its environmentally sound disposal while adhering to the limitations applicable to its transboundary movement.[15] When hazardous waste disposal is conducted by third parties, the client will use contractors that are reputable and legitimate enterprises licensed by the relevant government regulatory agencies and obtain chain of custody documentation to the final destination. The client should ascertain whether licensed disposal sites are being operated to acceptable standards and where they are, the client will use these sites. Where this is not the case, clients should reduce waste sent to such sites and consider alternative disposal options, including the possibility of developing their own recovery or disposal facilities at the project site.

*Hazardous Materials Management*

13. Hazardous materials are sometimes used as raw material or produced as product by the project. The client will avoid or, when avoidance is not possible, minimize and control the release of hazardous materials. In this context, the production, transportation, handling, storage, and use of hazardous materials for project activities should be assessed. The client will consider less hazardous substitutes where hazardous materials are intended to be used in manufacturing processes or other operations. The client will avoid the manufacture, trade, and use of chemicals and hazardous materials subject to international bans or

---

[12] Such as air, surface and groundwater, and soils.

[13] The capacity of the environment for absorbing an incremental load of pollutants while remaining below a threshold of unacceptable risk to human health and the environment.

[14] As defined by international conventions or local legislation.

[15] Transboundary movement of hazardous materials should be consistent with national, regional and international law, including the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal and the London Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter.

AR002822

phase-outs due to their high toxicity to living organisms, environmental persistence, potential for bioaccumulation, or potential for depletion of the ozone layer.[16]

*Pesticide Use and Management*

14. The client will, where appropriate, formulate and implement an integrated pest management (IPM) and/or integrated vector management (IVM) approach targeting economically significant pest infestations and disease vectors of public health significance. The client's IPM and IVM program will integrate coordinated use of pest and environmental information along with available pest control methods, including cultural practices, biological, genetic, and, as a last resort, chemical means to prevent economically significant pest damage and/or disease transmission to humans and animals.

15. When pest management activities include the use of chemical pesticides, the client will select chemical pesticides that are low in human toxicity, that are known to be effective against the target species, and that have minimal effects on non-target species and the environment. When the client selects chemical pesticides, the selection will be based upon requirements that the pesticides be packaged in safe containers, be clearly labeled for safe and proper use, and that the pesticides have been manufactured by an entity currently licensed by relevant regulatory agencies.

16. The client will design its pesticide application regime to (i) avoid damage to natural enemies of the target pest, and where avoidance is not possible, minimize, and (ii) avoid the risks associated with the development of resistance in pests and vectors, and where avoidance is not possible minimize. In addition, pesticides will be handled, stored, applied, and disposed of in accordance with the Food and Agriculture Organization's International Code of Conduct on the Distribution and Use of Pesticides or other GIIP.

17. The client will not purchase, store, use, manufacture, or trade in products that fall in WHO Recommended Classification of Pesticides by Hazard Class Ia (extremely hazardous); or Ib (highly hazardous). The client will not purchase, store, use, manufacture or trade in Class II (moderately hazardous) pesticides, unless the project has appropriate controls on manufacture, procurement, or distribution and/or use of these chemicals. These chemicals should not be accessible to personnel without proper training, equipment, and facilities to handle, store, apply, and dispose of these products properly.

---

[16] Consistent with the objectives of the Stockholm Convention on Persistent Organic Pollutants and the Montreal Protocol on Substances that Deplete the Ozone Layer. Similar considerations will apply to certain World Health Organization (WHO) classes of pesticides.

**AR002823**

# Performance Standard 4
# Community Health, Safety, and Security

## Introduction

1. Performance Standard 4 recognizes that project activities, equipment, and infrastructure can increase community exposure to risks and impacts. In addition, communities that are already subjected to impacts from climate change may also experience an acceleration and/or intensification of impacts due to project activities. While acknowledging the public authorities' role in promoting the health, safety, and security of the public, this Performance Standard addresses the client's responsibility to avoid or minimize the risks and impacts to community health, safety, and security that may arise from project related-activities, with particular attention to vulnerable groups.

2. In conflict and post-conflict areas, the level of risks and impacts described in this Performance Standard may be greater. The risks that a project could exacerbate an already sensitive local situation and stress scarce local resources should not be overlooked as it may lead to further conflict.

## Objectives

- To anticipate and avoid adverse impacts on the health and safety of the Affected Community during the project life from both routine and non-routine circumstances.
- To ensure that the safeguarding of personnel and property is carried out in accordance with relevant human rights principles and in a manner that avoids or minimizes risks to the Affected Communities.

## Scope of Application

3. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System, the elements of which are outlined in Performance Standard 1.

AR002824

4. This Performance Standard addresses potential risks and impacts to the Affected Communities from project activities. Occupational health and safety requirements for workers are included in Performance Standard 2, and environmental standards to avoid or minimize impacts on human health and the environment due to pollution are included in Performance Standard 3.

## Requirements

### Community Health and Safety

5. The client will evaluate the risks and impacts to the health and safety of the Affected Communities during the project life-cycle and will establish preventive and control measures consistent with good international industry practice (GIIP),[1] such as in the World Bank Group Environmental, Health and Safety Guidelines (EHS Guidelines) or other internationally recognized sources. The client will identify risks and impacts and propose mitigation measures that are commensurate with their nature and magnitude. These measures will favor the avoidance of risks and impacts over minimization.

#### *Infrastructure and Equipment Design and Safety*

6. The client will design, construct, operate, and decommission the structural elements or components of the project in accordance with GIIP, taking into consideration safety risks to third parties or Affected Communities. When new buildings and structures will be accessed

by members of the public, the client will consider incremental risks of the public's potential exposure to operational accidents and/or natural hazards and be consistent with the principles of universal access. Structural elements will be designed and constructed by competent professionals, and certified or approved by competent authorities or professionals. When structural elements or components, such as dams, tailings dams, or ash ponds are situated in high-risk locations, and their failure or malfunction may threaten the safety of communities, the client will engage one or more external experts with relevant and recognized experience in similar projects, separate from those responsible for the design and construction, to conduct a review as early as possible in project development and throughout the stages of project design, construction, operation, and decommissioning. For projects that operate moving equipment on public roads and other forms of infrastructure, the client will seek to avoid the occurrence of incidents and injuries to members of the public associated with the operation of such equipment.

#### *Hazardous Materials Management and Safety*

7. The client will avoid or minimize the potential for community exposure to hazardous materials and substances that may be released by the project. Where there is a potential for the public (including workers and their families) to be exposed to hazards, particularly those that may be life threatening, the client will exercise special care to avoid or minimize their exposure by modifying, substituting, or eliminating the condition or material causing the potential hazards. Where hazardous materials are part of existing project infrastructure or components, the client

---

[1] Defined as the exercise of professional skill, diligence, prudence, and foresight that would reasonably be expected from skilled and experienced professionals engaged in the same type of undertaking under the same or similar circumstances globally or regionally.

**AR002825**

will exercise special care when conducting decommissioning activities in order to avoid exposure to the community. The client will exercise commercially reasonable efforts to control the safety of deliveries of hazardous materials, and of transportation and disposal of hazardous wastes, and will implement measures to avoid or control community exposure to pesticides, in accordance with the requirements of Performance Standard 3.

### *Ecosystem Services*

8.    The project's direct impacts on priority ecosystem services may result in adverse health and safety risks and impacts to Affected Communities. With respect to this Performance Standard, ecosystem services are limited to provisioning and regulating services as defined in paragraph 2 of Performance Standard 6. For example, land use changes or the loss of natural buffer areas such as wetlands, mangroves, and upland forests that mitigate the effects of natural hazards such as flooding, landslides, and fire, may result in increased vulnerability and community safety-related risks and impacts. The diminution or degradation of natural resources, such as adverse impacts on the quality, quantity, and availability of freshwater,[2] may result in health-related risks and impacts. Where appropriate and feasible, the client will identify those risks and potential impacts on priority ecosystem services that may be exacerbated by climate change. Adverse impacts should be avoided, and if these impacts are unavoidable, the client will implement mitigation measures in accordance with paragraphs 24 and 25 of Performance Standard 6. With respect to the use of and loss of access to provisioning services, clients will implement mitigation

measures in accordance with paragraphs 25–29 of Performance Standard 5.

### *Community Exposure to Disease*

9.    The client will avoid or minimize the potential for community exposure to water-borne, water based, water-related, and vector-borne diseases, and communicable diseases that could result from project activities, taking into consideration differentiated exposure to and higher sensitivity of vulnerable groups. Where specific diseases are endemic in communities in the project area of influence, the client is encouraged to explore opportunities during the project life-cycle to improve environmental conditions that could help minimize their incidence.

10. The client will avoid or minimize transmission of communicable diseases that may be associated with the influx of temporary or permanent project labor.

### *Emergency Preparedness and Response*

11.    In addition to the emergency preparedness and response requirements described in Performance Standard 1, the client will also assist and collaborate with the Affected Communities, local government agencies, and other relevant parties, in their preparations to respond effectively to emergency situations, especially when their participation and collaboration are necessary to respond to such emergency situations. If local government agencies have little or no capacity to respond effectively, the client will play an active role in preparing for and responding to emergencies associated with the project. The client will document its emergency preparedness and response activities, resources, and responsibilities, and will disclose appropriate information to Affected Communities, relevant government agencies, or other relevant parties.

---

[2] Freshwater is an example of provisioning ecosystem services.

AR002826

### Security Personnel

12. When the client retains direct or contracted workers to provide security to safeguard its personnel and property, it will assess risks posed by its security arrangements to those within and outside the project site. In making such arrangements, the client will be guided by the principles of proportionality and good international practice[3] in relation to hiring, rules of conduct, training, equipping, and monitoring of such workers, and by applicable law. The client will make reasonable inquiries to ensure that those providing security are not implicated in past abuses; will train them adequately in the use of force (and where applicable, firearms), and appropriate conduct toward workers and Affected Communities; and require them to act within the applicable law. The client will not sanction any use of force except when used for preventive and defensive purposes in proportion to the nature and extent of the threat. The client will provide a grievance mechanism for Affected Communities to express concerns about the security arrangements and acts of security personnel.

13. The client will assess and document risks arising from the project's use of government security personnel deployed to provide security services. The client will seek to ensure that security personnel will act in a manner consistent with paragraph 12 above, and encourage the relevant public authorities to disclose the security arrangements for the client's facilities to the public, subject to overriding security concerns.

14. The client will consider and, where appropriate, investigate all allegations of unlawful or abusive acts of security personnel, take action (or urge appropriate parties to take action) to prevent recurrence, and report unlawful and abusive acts to public authorities.

---

[3] Including practice consistent with the United Nation's (UN) Code of Conduct for Law Enforcement Officials, and UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials.

**AR002827**

# Performance Standard 5
# Land Acquisition and Involuntary Resettlement

## Introduction

1. Performance Standard 5 recognizes that project-related land acquisition and restrictions on land use can have adverse impacts on communities and persons that use this land. Involuntary resettlement refers both to physical displacement (relocation or loss of shelter) and to economic displacement (loss of assets or access to assets that leads to loss of income sources or other means of livelihood[1]) as a result of project-related land acquisition[2] and/or restrictions on land use. Resettlement is considered involuntary when affected persons or communities do not have the right to refuse land acquisition or restrictions on land use that result in physical or economic displacement. This occurs in cases of (i) lawful expropriation or temporary or permanent restrictions on land use and (ii) negotiated settlements in which the buyer can resort to expropriation or impose legal restrictions on land use if negotiations with the seller fail.

2. Unless properly managed, involuntary resettlement may result in long-term hardship and impoverishment for the Affected Communities and persons, as well as environmental damage and adverse socio-economic impacts in areas to which they have been displaced. For these reasons, involuntary resettlement should be avoided. However, where involuntary resettlement is unavoidable, it should be minimized and appropriate measures to mitigate adverse impacts on displaced persons and host communities[3] should be carefully planned and implemented. The government often plays a central role in the land acquisition and resettlement process, including the determination of compensation, and is therefore an important third party in many situations. Experience demonstrates that the direct involvement of the client in resettlement activities can result in more cost-effective, efficient, and timely implementation of those activities, as well as in the introduction of innovative approaches to improving the livelihoods of those affected by resettlement.

[1] The term "livelihood" refers to the full range of means that individuals, families, and communities utilize to make a living, such as wage-based income, agriculture, fishing, foraging, other natural resource-based livelihoods, petty trade, and bartering.

[2] Land acquisition includes both outright purchases of property and acquisition of access rights, such as easements or rights of way.

[3] A host community is any community receiving displaced persons.

AR002828

3. To help avoid expropriation and eliminate the need to use governmental authority to enforce relocation, clients are encouraged to use negotiated settlements meeting the requirements of this Performance Standard, even if they have the legal means to acquire land without the seller's consent.

## Objectives

- To avoid, and when avoidance is not possible, minimize displacement by exploring alternative project designs.
- To avoid forced eviction.
- To anticipate and avoid, or where avoidance is not possible, minimize adverse social and economic impacts from land acquisition or restrictions on land use by (i) providing compensation for loss of assets at replacement cost[4] and (ii) ensuring that resettlement activities are implemented with appropriate disclosure of information, consultation, and the informed participation of those affected.
- To improve, or restore, the livelihoods and standards of living of displaced persons.
- To improve living conditions among physically displaced persons through the provision of adequate housing with security of tenure[5] at resettlement sites.

## Scope of Application

4. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System, the elements of which are outlined in Performance Standard 1.

5. This Performance Standard applies to physical and/or economic displacement resulting from the following types of land-related transactions:

- Land rights or land use rights acquired through expropriation or other compulsory procedures in accordance with the legal system of the host country;
- Land rights or land use rights acquired through negotiated settlements with property owners or those with legal rights to the land if failure to reach settlement would have resulted in expropriation or other compulsory procedures;[6]
- Project situations where involuntary restrictions on land use and access to natural resources cause a community or groups within a community to lose access to resource usage where they have traditional or recognizable usage rights;[7]

---

[4] Replacement cost is defined as the market value of the assets plus transaction costs. In applying this method of valuation, depreciation of structures and assets should not be taken into account. Market value is defined as the value required to allow Affected Communities and persons to replace lost assets with assets of similar value. The valuation method for determining replacement cost should be documented and included in applicable Resettlement and/or Livelihood Restoration plans (see paragraphs 18 and 25).

[5] Security of tenure means that resettled individuals or communities are resettled to a site that they can legally occupy and where they are protected from the risk of eviction.

[6] This also applies to customary or traditional rights recognized or recognizable under the laws of the host country. The negotiations may be carried out by the government or by the company (in some circumstances, as an agent of the government).

[7] In such situations, affected persons frequently do not have formal ownership. This may include freshwater and marine environments. This Performance Standard may also apply when project-related biodiversity areas or legally designated buffer zones are established but not acquired by the client.

**AR002829**

- Certain project situations requiring evictions of people occupying land without formal, traditional, or recognizable usage rights;[8] or

- Restriction on access to land or use of other resources including communal property and natural resources such as marine and aquatic resources, timber and non-timber forest products, freshwater, medicinal plants, hunting and gathering grounds and grazing and cropping areas.[9]

6. This Performance Standard does not apply to resettlement resulting from voluntary land transactions (i.e., market transactions in which the seller is not obliged to sell and the buyer cannot resort to expropriation or other compulsory procedures sanctioned by the legal system of the host country if negotiations fail). It also does not apply to impacts on livelihoods where the project is not changing the land use of the affected groups or communities.[10]

7. Where project impacts on land, assets, or access to assets become significantly adverse at any stage of the project, the client should consider applying requirements of this Performance Standard, even where no land acquisition or land use restriction is involved.

## Requirements

### General

#### *Project Design*

8. The client will consider feasible alternative project designs to avoid or minimize physical and/or economic displacement, while balancing environmental, social, and financial costs and benefits, paying particular attention to impacts on the poor and vulnerable.

#### *Compensation and Benefits for Displaced Persons*

9. When displacement cannot be avoided, the client will offer displaced communities and persons compensation for loss of assets at full replacement cost and other assistance[11] to help them improve or restore their standards of living or livelihoods, as provided in this Performance Standard. Compensation standards will be transparent and applied consistently to all communities and persons affected by the displacement. Where livelihoods of displaced persons are land-based,[12] or where land is collectively owned, the client will, where feasible,[13] offer the displaced land-based compensation. The client will take possession of acquired land and related assets only after compensation has been made available[14] and, where applicable, resettlement sites and moving allowances

---

[8] While some people do not have rights over the land they occupy, this Performance Standard requires that non land assets be retained, replaced, or compensated for; relocation take place with security of tenure; and lost livelihoods be restored.

[9] Natural resource assets referred to in this Performance Standard are equivalent to ecosystem provisioning services as described in Performance Standard 6.

[10] More generalized impacts on communities or groups of people are covered in Performance Standard 1. For example, disruption of access to mineral deposits by artisanal miners is covered by Performance Standard 1.

---

[11] As described in paragraphs 19 and 26.

[12] The term "land-based" includes livelihood activities such as subsistence cropping and grazing of livestock as well as the harvesting of natural resources.

[13] Refer to paragraph 26 of this Performance Standard for further requirements.

[14] In certain cases it may not be feasible to pay compensation to all those affected before taking possession of the land, for example when the ownership of the land in question is in dispute. Such circumstances shall be identified and agreed on a case-by-case basis, and compensation funds shall be made available for example through deposit into an escrow account before displacement takes place.

**AR002830**

have been provided to the displaced persons in addition to compensation.[15] The client will also provide opportunities to displaced communities and persons to derive appropriate development benefits from the project.

### Community Engagement

10. The client will engage with Affected Communities, including host communities, through the process of stakeholder engagement described in Performance Standard 1. Decision-making processes related to resettlement and livelihood restoration should include options and alternatives, where applicable. Disclosure of relevant information and participation of Affected Communities and persons will continue during the planning, implementation, monitoring, and evaluation of compensation payments, livelihood restoration activities, and resettlement to achieve outcomes that are consistent with the objectives of this Performance Standard.[16] Additional provisions apply to consultations with Indigenous Peoples, in accordance with Performance Standard 7.

### Grievance Mechanism

11. The client will establish a grievance mechanism consistent with Performance Standard 1 as early as possible in the project

development phase. This will allow the client to receive and address specific concerns about compensation and relocation raised by displaced persons or members of host communities in a timely fashion, including a recourse mechanism designed to resolve disputes in an impartial manner.

### Resettlement and Livelihood Restoration Planning and Implementation

12. Where involuntary resettlement is unavoidable, either as a result of a negotiated settlement or expropriation, a census will be carried out to collect appropriate socio-economic baseline data to identify the persons who will be displaced by the project, determine who will be eligible for compensation and assistance,[17] and discourage ineligible persons, such as opportunistic settlers, from claiming benefits. In the absence of host government procedures, the client will establish a cut off date for eligibility. Information regarding the cut-off date will be well documented and disseminated throughout the project area.

13. In cases where affected persons reject compensation offers that meet the requirements of this Performance Standard and, as a result, expropriation or other legal procedures are initiated, the client will explore opportunities to collaborate with the responsible government agency, and, if permitted by the agency, play an active role in resettlement planning, implementation, and monitoring (see paragraphs 30–32).

---

[15] Unless government-managed resettlement is involved and where the client has no direct influence over the timing of compensation payments. Such cases should be handled in accordance with paragraphs 27–29 of this Performance Standard. Staggered compensation payments may be made where one-off cash payments would demonstrably undermine social and/or resettlement objectives, or where there are ongoing impacts to livelihood activities.

[16] The consultation process should ensure that women's perspectives are obtained and their interests factored into all aspects of resettlement planning and implementation. Addressing livelihood impacts may require intra household analysis in cases where women's and men's livelihoods are affected differently. Women's and men's preferences in terms of compensation mechanisms, such as compensation in kind rather than in cash, should be explored.

[17] Documentation of ownership or occupancy and compensation arrangements should be issued in the names of both spouses or heads of households, and other resettlement assistance, such as skills training, access to credit, and job opportunities, should be equally available to women and adapted to their needs. Where national law and tenure systems do not recognize the rights of women to hold or contract in property, measures should be considered to provide women as much protection as possible with the objective to achieve equity with men.

**AR002831**

14. The client will establish procedures to monitor and evaluate the implementation of a Resettlement Action Plan or Livelihood Restoration Plan (see paragraphs 19 and 25) and take corrective action as necessary. The extent of monitoring activities will be commensurate with the project's risks and impacts. For projects with significant involuntary resettlement risks, the client will retain competent resettlement professionals to provide advice on compliance with this Performance Standard and to verify the client's monitoring information. Affected persons will be consulted during the monitoring process.

15. Implementation of a Resettlement Action Plan or Livelihood Restoration Plan will be considered completed when the adverse impacts of resettlement have been addressed in a manner that is consistent with the relevant plan as well as the objectives of this Performance Standard. It may be necessary for the client to commission an external completion audit of the Resettlement Action Plan or Livelihood Restoration Plan to assess whether the provisions have been met, depending on the scale and/or complexity of physical and economic displacement associated with a project. The completion audit should be undertaken once all mitigation measures have been substantially completed and once displaced persons are deemed to have been provided adequate opportunity and assistance to sustainably restore their livelihoods. The completion audit will be undertaken by competent resettlement professionals once the agreed monitoring period is concluded. The completion audit will include, at a minimum, a review of the totality of mitigation measures implemented by the client, a comparison

of implementation outcomes against agreed objectives, and a conclusion as to whether the monitoring process can be ended.[18]

16. Where the exact nature or magnitude of the land acquisition or restrictions on land use related to a project with potential to cause physical and/or economic displacement is unknown due to the stage of project development, the client will develop a Resettlement and/or Livelihood Restoration Framework outlining general principles compatible with this Performance Standard. Once the individual project components are defined and the necessary information becomes available, such a framework will be expanded into a specific Resettlement Action Plan or Livelihood Restoration Plan and procedures in accordance with paragraphs 19 and 25 below.

### Displacement

17. Displaced persons may be classified as persons (i) who have formal legal rights to the land or assets they occupy or use; (ii) who do not have formal legal rights to land or assets, but have a claim to land that is recognized or recognizable under national law;[19] or (iii) who have no recognizable legal right or claim to the land or assets they

---

[18] The completion audit of the Resettlement Action Plan and/or Livelihood Restoration Plan, will be undertaken by external resettlement experts once the agreed monitoring period is concluded, and will involve a more in-depth assessment than regular resettlement monitoring activities, including at a minimum a review of all mitigation measures with respect to the physical and/or economic displacement implemented by the Client, a comparison of implementation outcomes against agreed objectives, a conclusion as to whether the monitoring process can be ended and, where necessary, a Corrective Action Plan listing outstanding actions necessary to met the objectives.

[19] Such claims could be derived from adverse possession or from customary or traditional tenure arrangements.

AR002832

occupy or use. The census will establish the status of the displaced persons.

18. Project-related land acquisition and/or restrictions on land use may result in the physical displacement of people as well as their economic displacement. Consequently, requirements of this Performance Standard in respect of physical displacement and economic displacement may apply simultaneously.[20]

*Physical Displacement*

19. In the case of physical displacement, the client will develop a Resettlement Action Plan that covers, at a minimum, the applicable requirements of this Performance Standard regardless of the number of people affected. This will include compensation at full replacement cost for land and other assets lost. The Plan will be designed to mitigate the negative impacts of displacement; identify development opportunities; develop a resettlement budget and schedule; and establish the entitlements of all categories of affected persons (including host communities). Particular attention will be paid to the needs of the poor and the vulnerable. The client will document all transactions to acquire land rights, as well as compensation measures and relocation activities.

20. If people living in the project area are required to move to another location, the client will (i) offer displaced persons choices among feasible resettlement options, including adequate replacement housing or cash compensation where appropriate; and (ii) provide relocation assistance suited to the needs of each group of displaced persons. New resettlement sites built for displaced persons must offer improved living conditions. The displaced persons' preferences with respect to relocating in preexisting communities and groups will be taken into consideration. Existing social and cultural institutions of the displaced persons and any host communities will be respected.

21. In the case of physically displaced persons under paragraph 17 (i) or (ii), the client will offer the choice of replacement property of equal or higher value, security of tenure, equivalent or better characteristics, and advantages of location or cash compensation where appropriate. Compensation in kind should be considered in lieu of cash. Cash compensation levels should be sufficient to replace the lost land and other assets at full replacement cost in local markets.[21]

22. In the case of physically displaced persons under paragraph 17 (iii), the client will offer them a choice of options for adequate housing with security of tenure so that they can resettle legally without having to face the risk of forced eviction. Where these displaced persons own and occupy structures, the client will compensate them for the loss of assets other than land, such as dwellings and other improvements to the land, at full replacement cost, provided that these persons have been occupying the project area prior to the cut-off date for eligibility. Based on consultation with such displaced persons,

---

[20] Where a project results in both physical and economic displacement, the requirements of paragraphs 25 and 26 (Economic Displacement) should be incorporated into the Resettlement Action Plan or Framework (i.e., there is no need to have a separate Resettlement Action Plan and Livelihood Restoration Plan).

[21] Payment of cash compensation for lost assets may be appropriate where (i) livelihoods are not land-based; (ii) livelihoods are land-based but the land taken for the project is a small fraction of the affected asset and the residual land is economically viable; or (iii) active markets for land, housing, and labor exist, displaced persons use such markets, and there is sufficient supply of land and housing.

**AR002833**

the client will provide relocation assistance sufficient for them to restore their standard of living at an adequate alternative site.[22]

23. The client is not required to compensate or assist those who encroach on the project area after the cut-off date for eligibility, provided the cut-off date has been clearly established and made public.

24. Forced evictions[23] will not be carried out except in accordance with law and the requirements of this Performance Standard.

### *Economic Displacement*

25. In the case of projects involving economic displacement only, the client will develop a Livelihood Restoration Plan to compensate affected persons and/or communities and offer other assistance that meet the objectives of this Performance Standard. The Livelihood Restoration Plan will establish the entitlements of affected persons and/or communities and will ensure that these are provided in a transparent, consistent, and equitable manner. The mitigation of economic displacement will be considered complete when affected persons or communities have received compensation and other assistance according to the requirements of the Livelihood Restoration Plan and this Performance Standard, and are deemed to have been provided with adequate opportunity to reestablish their livelihoods.

26. If land acquisition or restrictions on land use result in economic displacement defined as loss of assets and/or means of livelihood, regardless of whether or not the affected people are physically displaced, the client will meet the requirements in paragraphs 27–29 below, as applicable.

27. Economically displaced persons who face loss of assets or access to assets will be compensated for such loss at full replacement cost.

- In cases where land acquisition or restrictions on land use affect commercial structures, affected business owners will be compensated for the cost of reestablishing commercial activities elsewhere, for lost net income during the period of transition, and for the costs of the transfer and reinstallation of the plant, machinery, or other equipment.
- In cases affecting persons with legal rights or claims to land which are recognized or recognizable under national law (see paragraph 17 (i) and (ii)), replacement property (e.g., agricultural or commercial sites) of equal or greater value will be provided, or, where appropriate, cash compensation at full replacement cost.
- Economically displaced persons who are without legally recognizable claims to land (see paragraph 17 (iii)) will be compensated for lost assets other than land (such as crops, irrigation infrastructure and other improvements made to the land), at full replacement cost. The client is not required to compensate or assist opportunistic settlers who encroach on the project area after the cut-off date for eligibility.

---

[22] Relocation of informal settlers in urban areas may involve trade-offs. For example, the relocated families may gain security of tenure, but they may lose advantages of location. Changes in location that may affect livelihood opportunities should be addressed in accordance with the principles of this Performance Standard (see in particular paragraph 25).

[23] The permanent or temporary removal against the will of individuals, families, and/or communities from the homes and/or lands which they occupy without the provision of, and access to, appropriate forms of legal and other protection.

AR002834

28. In addition to compensation for lost assets, if any, as required under paragraph 27, economically displaced persons whose livelihoods or income levels are adversely affected will also be provided opportunities to improve, or at least restore, their means of income-earning capacity, production levels, and standards of living:

- For persons whose livelihoods are land-based, replacement land that has a combination of productive potential, locational advantages, and other factors at least equivalent to that being lost should be offered as a matter of priority.

- For persons whose livelihoods are natural resource-based and where project related restrictions on access envisaged in paragraph 5 apply, implementation of measures will be made to either allow continued access to affected resources or provide access to alternative resources with equivalent livelihood-earning potential and accessibility. Where appropriate, benefits and compensation associated with natural resource usage may be collective in nature rather than directly oriented towards individuals or households.

- If circumstances prevent the client from providing land or similar resources as described above, alternative income earning opportunities may be provided, such as credit facilities, training, cash, or employment opportunities. Cash compensation alone, however, is frequently insufficient to restore livelihoods.

29. Transitional support should be provided as necessary to all economically displaced persons, based on a reasonable estimate of the time required to restore their income-earning capacity, production levels, and standards of living.

## Private Sector Responsibilities Under Government-Managed Resettlement

30. Where land acquisition and resettlement are the responsibility of the government, the client will collaborate with the responsible government agency, to the extent permitted by the agency, to achieve outcomes that are consistent with this Performance Standard. In addition, where government capacity is limited, the client will play an active role during resettlement planning, implementation, and monitoring, as described below.

31. In the case of acquisition of land rights or access to land through compulsory means or negotiated settlements involving physical displacement, the client will identify and describe[24] government resettlement measures. If these measures do not meet the relevant requirements of this Performance Standard, the client will prepare a Supplemental Resettlement Plan that, together with the documents prepared by the responsible government agency, will address the relevant requirements of this Performance Standard (the General Requirements and requirements for Physical Displacement and Economic Displacement above). The client will need to include in its Supplemental Resettlement Plan, at a minimum (i) identification of affected people and impacts; (ii) a description of regulated

---

[24] Government documents, where available, may be used to identify such measures.

**AR002835**

activities, including the entitlements of displaced persons provided under applicable national laws and regulations; (iii) the supplemental measures to achieve the requirements of this Performance Standard as described in paragraphs 19–29 in a way that is permitted by the responsible agency and implementation time schedule; and (iv) the financial and implementation responsibilities of the client in the execution of its Supplemental Resettlement Plan.

32. In the case of projects involving economic displacement only, the client will identify and describe the measures that the responsible government agency plans to use to compensate Affected Communities and persons. If these measures do not meet the relevant requirements of this Performance Standard, the client will develop an Environmental and Social Action Plan to complement government action. This may include additional compensation for lost assets, and additional efforts to restore lost livelihoods where applicable.

**AR002836**

Performance Standard 6

# Biodiversity Conservation and Sustainable Management of Living Natural Resources

## Introduction

1. Performance Standard 6 recognizes that protecting and conserving biodiversity, maintaining ecosystem services, and sustainably managing living natural resources are fundamental to sustainable development. The requirements set out in this Performance Standard have been guided by the Convention on Biological Diversity, which defines biodiversity as "the variability among living organisms from all sources including, inter alia, terrestrial, marine and other aquatic ecosystems and the ecological complexes of which they are a part; this includes diversity within species, between species, and of ecosystems."

2. Ecosystem services are the benefits that people, including businesses, derive from ecosystems. Ecosystem services are organized into four types: (i) provisioning services, which are the products people obtain from ecosystems; (ii) regulating services, which are the benefits people obtain from the regulation of ecosystem processes; (iii) cultural services, which are the nonmaterial benefits people obtain from ecosystems; and (iv) supporting services, which are the natural processes that maintain the other services.[1]

3. Ecosystem services valued by humans are often underpinned by biodiversity. Impacts on biodiversity can therefore often adversely affect the delivery of ecosystem services. This Performance Standard addresses how clients can sustainably manage and mitigate impacts on biodiversity and ecosystem services throughout the project's lifecycle.

- To protect and conserve biodiversity.
- To maintain the benefits from ecosystem services.
- To promote the sustainable management of living natural resources through the adoption of practices that integrate conservation needs and development priorities.

---

[1] Examples are as follows: (i) provisioning services may include food, freshwater, timber, fibers, medicinal plants; (ii) regulating services may include surface water purification, carbon storage and sequestration, climate regulation, protection from natural hazards; (iii) cultural services may include natural areas that are sacred sites and areas of importance for recreation and aesthetic enjoyment; and (iv) supporting services may include soil formation, nutrient cycling, primary production.

**AR002837**

## Scope of Application

4. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System (ESMS), the elements of which are outlined in Performance Standard 1.

5. Based on the risks and impacts identification process, the requirements of this Performance Standard are applied to projects (i) located in modified, natural, and critical habitats; (ii) that potentially impact on or are dependent on ecosystem services over which the client has direct management control or significant influence; or (iii) that include the production of living natural resources (e.g., agriculture, animal husbandry, fisheries, forestry).

## Requirements

### General

6. The risks and impacts identification process as set out in Performance Standard 1 should consider direct and indirect project-related impacts on biodiversity and ecosystem services and identify any significant residual impacts. This process will consider relevant threats to biodiversity and ecosystem services, especially focusing on habitat loss, degradation and fragmentation, invasive alien species, overexploitation, hydrological changes, nutrient loading, and pollution. It will also take into account the differing values attached to biodiversity and ecosystem services by Affected Communities and, where appropriate, other stakeholders. Where paragraphs 13–19 are applicable, the client should consider project-related impacts across the potentially affected landscape or seascape.

7. As a matter of priority, the client should seek to avoid impacts on biodiversity and ecosystem services. When avoidance of impacts is not possible, measures to minimize impacts and restore biodiversity and ecosystem services should be implemented. Given the complexity in predicting project impacts on biodiversity and ecosystem services over the long term, the client should adopt a practice of adaptive management in which the implementation of mitigation and management measures are responsive to changing conditions and the results of monitoring throughout the project's lifecycle.

8. Where paragraphs 13–15 are applicable, the client will retain competent professionals to assist in conducting the risks and impacts identification process. Where paragraphs 16–19 are applicable, the client should retain external experts with appropriate regional experience to assist in the development of a mitigation hierarchy that complies with this Performance Standard and to verify the implementation of those measures.

### Protection and Conservation of Biodiversity

9. Habitat is defined as a terrestrial, freshwater, or marine geographical unit or airway that supports assemblages of living organisms and their interactions with the non-living environment. For the purposes of implementation of this Performance Standard, habitats are divided into modified, natural, and critical. Critical habitats are a subset of modified or natural habitats.

AR002838

10. For the protection and conservation of biodiversity, the mitigation hierarchy includes biodiversity offsets, which may be considered only after appropriate avoidance, minimization, and restoration measures have been applied.[2] A biodiversity offset should be designed and implemented to achieve measurable conservation outcomes[3] that can reasonably be expected to result in no net loss and preferably a net gain of biodiversity; however, a net gain is required in critical habitats. The design of a biodiversity offset must adhere to the "like-for-like or better" principle[4] and must be carried out in alignment with best available information and current practices. When a client is considering the development of an offset as part of the mitigation strategy, external experts with knowledge in offset design and implementation must be involved.

*Modified Habitat*

11. Modified habitats are areas that may contain a large proportion of plant and/or animal species of non-native origin, and/or where human activity has substantially modified an area's primary ecological functions and species composition.[5] Modified habitats may include areas managed for agriculture, forest plantations, reclaimed[6] coastal zones, and reclaimed wetlands.

12. This Performance Standard applies to those areas of modified habitat that include significant biodiversity value, as determined by the risks and impacts identification process required in Performance Standard 1. The client should minimize impacts on such biodiversity and implement mitigation measures as appropriate.

*Natural Habitat*

13. Natural habitats are areas composed of viable assemblages of plant and/or animal species of largely native origin, and/or where human activity has not essentially modified an area's primary ecological functions and species composition.

14. The client will not significantly convert or degrade[7] natural habitats, unless all of the following are demonstrated:

• No other viable alternatives within the region exist for development of the project on modified habitat;
• Consultation has established the views of stakeholders, including Affected

---

[2] Biodiversity offsets are measurable conservation outcomes resulting from actions designed to compensate for significant residual adverse biodiversity impacts arising from project development and persisting after appropriate avoidance, minimization and restoration measures have been taken.

[3] Measurable conservation outcomes for biodiversity must be demonstrated in situ (on-the-ground) and on an appropriate geographic scale (e.g., local, landscape-level, national, regional).

[4] The principle of "like-for-like or better" indicates that biodiversity offsets must be designed to conserve the same biodiversity values that are being impacted by the project (an "in-kind" offset). In certain situations, however, areas of biodiversity to be impacted by the project may be neither a national nor a local priority, and there may be other areas of biodiversity with like values that are a higher priority for conservation and sustainable use and under imminent threat or need of protection or effective management. In these situations, it may be appropriate to consider an "out-of-kind" offset that involves "trading up" (i.e., where the offset targets biodiversity of higher priority than that affected by the project) that will, for critical habitats, meet the requirements of paragraph 17 of this Performance Standard.

[5] This excludes habitat that has been converted in anticipation of the project.

[6] Reclamation as used in this context is the process of creating new land from sea or other aquatic areas for productive use.

[7] Significant conversion or degradation is (i) the elimination or severe diminution of the integrity of a habitat caused by a major and/or long-term change in land or water use; or (ii) a modification that substantially minimizes the habitat's ability to maintain viable populations of its native species.

AR002839

Communities, with respect to the extent of conversion and degradation;[8] and

- Any conversion or degradation is mitigated according to the mitigation hierarchy.

15. In areas of natural habitat, mitigation measures will be designed to achieve no net loss[9] of biodiversity where feasible. Appropriate actions include:

- Avoiding impacts on biodiversity through the identification and protection of set asides;[10]
- Implementing measures to minimize habitat fragmentation, such as biological corridors;
- Restoring habitats during operations and/or after operations; and
- Implementing biodiversity offsets.

### *Critical Habitat*

16. Critical habitats are areas with high biodiversity value, including (i) habitat of significant importance to Critically Endangered and/or Endangered[11] species; (ii) habitat of significant importance to endemic and/or restricted-range species; (iii) habitat supporting globally significant concentrations of migratory species and/or congregatory species; (iv) highly threatened and/or unique ecosystems; and/or (v) areas associated with key evolutionary processes.

17. In areas of critical habitat, the client will not implement any project activities unless all of the following are demonstrated:

- No other viable alternatives within the region exist for development of the project on modified or natural habitats that are not critical;
- The project does not lead to measurable adverse impacts on those biodiversity values for which the critical habitat was designated, and on the ecological processes supporting those biodiversity values;[12]
- The project does not lead to a net reduction in the global and/or national/

---

[8] Conducted as part of the stakeholder engagement and consultation process, as described in Performance Standard 1.

[9] No net loss is defined as the point at which project-related impacts on biodiversity are balanced by measures taken to avoid and minimize the project's impacts, to undertake on-site restoration and finally to offset significant residual impacts, if any, on an appropriate geographic scale (e.g., local, landscape-level, national, regional).

[10] Set-asides are land areas within the project site, or areas over which the client has management control, that are excluded from development and are targeted for the implementation of conservation enhancement measures. Set-asides will likely contain significant biodiversity values and/or provide ecosystem services of significance at the local, national and/or regional level. Set-asides should be defined using internationally recognized approaches or methodologies (e.g., High Conservation Value, systematic conservation planning).

[11] As listed on the International Union for the Conservation of Nature (IUCN) Red List of Threatened Species. The determination of critical habitat based on other listings is as follows: (i) If the species is listed nationally / regionally as critically endangered or endangered, in countries that have adhered to IUCN guidance, the critical habitat determination will be made on a project by project basis in consultation with competent professionals; and (ii) in instances where nationally or regionally listed species' categorizations do not correspond well to those of the IUCN (e.g., some countries more generally list species as "protected" or "restricted"), an assessment will be conducted to determine the rationale and purpose of the listing. In this case, the critical habitat determination will be based on such an assessment.

[12] Biodiversity values and their supporting ecological processes will be determined on an ecologically relevant scale.

regional population[13] of any Critically Endangered or Endangered species over a reasonable period of time;[14] and

- A robust, appropriately designed, and long-term biodiversity monitoring and evaluation program is integrated into the client's management program.

18. In such cases where a client is able to meet the requirements defined in paragraph 17, the project's mitigation strategy will be described in a Biodiversity Action Plan and will be designed to achieve net gains[15] of those biodiversity values for which the critical habitat was designated.

19. In instances where biodiversity offsets are proposed as part of the mitigation strategy, the client must demonstrate through an assessment that the project's significant residual impacts on biodiversity will be adequately mitigated to meet the requirements of paragraph 17.

*Legally Protected and Internationally Recognized Areas*

20. In circumstances where a proposed project is located within a legally protected area[16] or an internationally recognized area,[17] the client will meet the requirements of paragraphs 13 through 19 of this Performance Standard, as applicable. In addition, the client will:

- Demonstrate that the proposed development in such areas is legally permitted;
- Act in a manner consistent with any government recognized management plans for such areas;
- Consult protected area sponsors and managers, Affected Communities, Indigenous Peoples and other stakeholders on the proposed project, as appropriate; and
- Implement additional programs, as appropriate, to promote and enhance the conservation aims and effective management of the area.[18]

*Invasive Alien Species*

21. Intentional or accidental introduction of alien, or non-native, species of flora and fauna into areas where they are not normally found can be a significant threat to biodiversity, since some alien species can become invasive, spreading rapidly and out-competing native species.

---

[13] Net reduction is a singular or cumulative loss of individuals that impacts on the species' ability to persist at the global and/or regional/national scales for many generations or over a long period of time. The scale (i.e., global and/or regional/national) of the potential net reduction is determined based on the species' listing on either the (global) IUCN Red List and/or on regional/national lists. For species listed on both the (global) IUCN Red List and the national/regional lists, the net reduction will be based on the national/regional population.

[14] The timeframe in which clients must demonstrate "no net reduction" of Critically Endangered and Endangered species will be determined on a case-by-case basis in consultation with external experts.

[15] Net gains are additional conservation outcomes that can be achieved for the biodiversity values for which the critical habitat was designated. Net gains may be achieved through the development of a biodiversity offset and/or, in instances where the client could meet the requirements of paragraph 17 of this Performance Standard without a biodiversity offset, the client should achieve net gains through the implementation of programs that could be implemented in situ (on-the-ground) to enhance habitat, and protect and conserve biodiversity.

[16] This Performance Standard recognizes legally protected areas that meet the IUCN definition: "A clearly defined geographical space, recognized, dedicated and managed, through legal or other effective means, to achieve the long-term conservation of nature with associated ecosystem services and cultural values." For the purposes of this Performance Standard, this includes areas proposed by governments for such designation.

[17] Exclusively defined as UNESCO Natural World Heritage Sites, UNESCO Man and the Biosphere Reserves, Key Biodiversity Areas, and wetlands designated under the Convention on Wetlands of International Importance (the Ramsar Convention).

[18] Implementing additional programs may not be necessary for projects that do not create a new footprint.

**AR002841**

22. The client will not intentionally introduce any new alien species (not currently established in the country or region of the project) unless this is carried out in accordance with the existing regulatory framework for such introduction. Notwithstanding the above, the client will not deliberately introduce any alien species with a high risk of invasive behavior regardless of whether such introductions are permitted under the existing regulatory framework. All introductions of alien species will be subject to a risk assessment (as part of the client's environmental and social risks and impacts identification process) to determine the potential for invasive behavior. The client will implement measures to avoid the potential for accidental or unintended introductions including the transportation of substrates and vectors (such as soil, ballast, and plant materials) that may harbor alien species.

23. Where alien species are already established in the country or region of the proposed project, the client will exercise diligence in not spreading them into areas in which they have not already been established. As practicable, the client should take measures to eradicate such species from the natural habitats over which they have management control.

## Management of Ecosystem Services

24. Where a project is likely to adversely impact ecosystem services, as determined by the risks and impacts identification process, the client will conduct a systematic review to identify priority ecosystem services. Priority ecosystem services are two-fold: (i) those services on which project operations are most likely to have an impact and, therefore, which result in adverse impacts to Affected Communities; and/or (ii) those services on which the project is directly dependent for

its operations (e.g., water). When Affected Communities are likely to be impacted, they should participate in the determination of priority ecosystem services in accordance with the stakeholder engagement process as defined in Performance Standard 1.

25. With respect to impacts on priority ecosystem services of relevance to Affected Communities and where the client has direct management control or significant influence over such ecosystem services, adverse impacts should be avoided. If these impacts are unavoidable, the client will minimize them and implement mitigation measures that aim to maintain the value and functionality of priority services. With respect to impacts on priority ecosystem services on which the project depends, clients should minimize impacts on ecosystem services and implement measures that increase resource efficiency of their operations, as described in Performance Standard 3. Additional provisions for ecosystem services are included in Performance Standards 4, 5, 7, and 8.[19]

## Sustainable Management of Living Natural Resources

26. Clients who are engaged in the primary production of living natural resources, including natural and plantation forestry, agriculture, animal husbandry, aquaculture, and fisheries, will be subject to the requirements of paragraphs 26 through 30, in addition to the rest of this Performance Standard. Where feasible, the client will locate land-based agribusiness and forestry projects on unforested land or land already converted. Clients who are

---

[19] Ecosystem service references are located in Performance Standard 4, paragraph 8; Performance Standard 5, paragraphs 5 and 25–29; Performance Standard 7, paragraphs 13–17 and 20; and Performance Standard 8, paragraph 11.

AR002842

engaged in such industries will manage living natural resources in a sustainable manner, through the application of industry-specific good management practices and available technologies. Where such primary production practices are codified in globally, regionally, or nationally recognized standards, the client will implement sustainable management practices to one or more relevant and credible standards as demonstrated by independent verification or certification.

27. Credible globally, regionally, or nationally recognized standards for sustainable management of living natural resources are those which (i) are objective and achievable; (ii) are founded on a multi stakeholder consultative process; (iii) encourage step-wise and continual improvements; and (iv) provide for independent verification or certification through appropriate accredited bodies for such standards.[20]

28. Where relevant and credible standard(s) exist, but the client has not yet obtained independent verification or certification to such standard(s), the client will conduct a pre-assessment of its conformity to the applicable standard(s) and take actions to achieve such verification or certification over an appropriate period of time.

29. In the absence of a relevant and credible global, regional, or national standard for the particular living natural resource in the country concerned, the client will:

- Commit to applying good international industry operating principles, management practices, and technologies; and
- Actively engage and support the development of a national standard, where relevant, including studies that contribute to the definition and demonstration of sustainable practices.

## Supply Chain

30. Where a client is purchasing primary production (especially but not exclusively food and fiber commodities) that is known to be produced in regions where there is a risk of significant conversion of natural and/or critical habitats, systems and verification practices will be adopted as part of the client's ESMS to evaluate its primary suppliers.[21] The systems and verification practices will (i) identify where the supply is coming from and the habitat type of this area; (ii) provide for an ongoing review of the client's primary supply chains; (iii) limit procurement to those suppliers that can demonstrate that they are not contributing to significant conversion of natural and/or critical habitats (this may be demonstrated by delivery of certified product, or progress towards verification or certification under a credible scheme in certain commodities and/or locations); and (iv) where possible, require actions to shift the client's primary supply chain over time to suppliers that can demonstrate that they are not significantly adversely impacting these areas. The ability of the client to fully address these risks will depend upon the client's level of management control or influence over its primary suppliers.

---

[20] A credible certification system would be one which is independent, cost-effective, based on objective and measurable performance standards and developed through consultation with relevant stakeholders, such as local people and communities, Indigenous Peoples, and civil society organizations representing consumer, producer and conservation interests. Such a system has fair, transparent and independent decision-making procedures that avoid conflicts of interest.

[21] Primary suppliers are those suppliers who, on an ongoing basis, provide the majority of living natural resources, goods, and materials essential for the core business processes of the project.

**AR002843**

# Performance Standard 7
# Indigenous Peoples

## Introduction

1. Performance Standard 7 recognizes that Indigenous Peoples, as social groups with identities that are distinct from mainstream groups in national societies, are often among the most marginalized and vulnerable segments of the population. In many cases, their economic, social, and legal status limits their capacity to defend their rights to, and interests in, lands and natural and cultural resources, and may restrict their ability to participate in and benefit from development. Indigenous Peoples are particularly vulnerable if their lands and resources are transformed, encroached upon, or significantly degraded. Their languages, cultures, religions, spiritual beliefs, and institutions may also come under threat. As a consequence, Indigenous Peoples may be more vulnerable to the adverse impacts associated with project development than non-indigenous communities. This vulnerability may include loss of identity, culture, and natural resource-based livelihoods, as well as exposure to impoverishment and diseases.

2. Private sector projects can create opportunities for Indigenous Peoples to participate in, and benefit from project-related activities that may help them fulfill their aspiration for economic and social development. Furthermore, Indigenous Peoples may play a role in sustainable development by promoting and managing activities and enterprises as partners in development. Government often plays a central role in the management of Indigenous Peoples' issues, and clients should collaborate with the responsible authorities in managing the risks and impacts of their activities.[1]

## Objectives

- To ensure that the development process fosters full respect for the human rights, dignity, aspirations, culture, and natural resource-based livelihoods of Indigenous Peoples.
- To anticipate and avoid adverse impacts of projects on communities of Indigenous Peoples, or when avoidance is not possible, to minimize and/or compensate for such impacts.
- To promote sustainable development benefits and opportunities for Indigenous Peoples in a culturally appropriate manner.
- To establish and maintain an ongoing relationship based on Informed Consultation and Participation (ICP) with the Indigenous Peoples affected by a project throughout the project's life-cycle.
- To ensure the Free, Prior, and Informed Consent (FPIC) of the Affected Communities of Indigenous Peoples when the circumstances described in this Performance Standard are present.

---

[1] In addition to meeting the requirements under this Performance Standard, clients must comply with applicable national law, including those laws implementing host country obligations under international law.

**AR002844**

- To respect and preserve the culture, knowledge, and practices of Indigenous Peoples.

## Scope of Application

3. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System, the elements of which are outlined in Performance Standard 1.

4. There is no universally accepted definition of "Indigenous Peoples." Indigenous Peoples may be referred to in different countries by such terms as "Indigenous ethnic minorities," "aboriginals," "hill tribes," "minority nationalities," "scheduled tribes," "first nations," or "tribal groups."

5. In this Performance Standard, the term "Indigenous Peoples" is used in a generic sense to refer to a distinct social and cultural group possessing the following characteristics in varying degrees:

- Self-identification as members of a distinct indigenous cultural group and recognition of this identity by others;
- Collective attachment to geographically distinct habitats or ancestral territories in the project area and to the natural resources in these habitats and territories;
- Customary cultural, economic, social, or political institutions that are separate from those of the mainstream society or culture; or

- A distinct language or dialect, often different from the official language or languages of the country or region in which they reside.

6. This Performance Standard applies to communities or groups of Indigenous Peoples who maintain a collective attachment, i.e., whose identity as a group or community is linked, to distinct habitats or ancestral territories and the natural resources therein. It may also apply to communities or groups that have lost collective attachment to distinct habitats or ancestral territories in the project area, occurring within the concerned group members' lifetime, because of forced severance, conflict, government resettlement programs, dispossession of their lands, natural disasters, or incorporation of such territories into an urban area.

7. The client may be required to seek inputs from competent professionals to ascertain whether a particular group is considered as Indigenous Peoples for the purpose of this Performance Standard.

## Requirements

### General

#### *Avoidance of Adverse Impacts*
8. The client will identify, through an environmental and social risks and impacts assessment process, all communities of Indigenous Peoples within the project area of influence who may be affected by the project, as well as the nature and degree of the expected direct and indirect economic, social, cultural (including cultural heritage[2]), and environmental impacts on them.

---

[2] Additional requirements on protection of cultural heritage are set out in Performance Standard 8.

**AR002845**

9. Adverse impacts on Affected Communities of Indigenous Peoples should be avoided where possible. Where alternatives have been explored and adverse impacts are unavoidable, the client will minimize, restore, and/or compensate for these impacts in a culturally appropriate manner commensurate with the nature and scale of such impacts and the vulnerability of the Affected Communities of Indigenous Peoples. The client's proposed actions will be developed with the ICP of the Affected Communities of Indigenous Peoples and contained in a time-bound plan, such as an Indigenous Peoples Plan, or a broader community development plan with separate components for Indigenous Peoples.[3]

*Participation and Consent*

10. The client will undertake an engagement process with the Affected Communities of Indigenous Peoples as required in Performance Standard 1. This engagement process includes stakeholder analysis and engagement planning, disclosure of information, consultation, and participation, in a culturally appropriate manner. In addition, this process will:

- Involve Indigenous Peoples' representative bodies and organizations (e.g., councils of elders or village councils), as well as members of the Affected Communities of Indigenous Peoples; and
- Provide sufficient time for Indigenous Peoples' decision-making processes.[4]

11. Affected Communities of Indigenous Peoples may be particularly vulnerable to the loss of, alienation from or exploitation of their land and access to natural and cultural resources.[5] In recognition of this vulnerability, in addition to the General Requirements of this Performance Standard, the client will obtain the FPIC of the Affected Communities of Indigenous Peoples in the circumstances described in paragraphs 13–17 of this Performance Standard. FPIC applies to project design, implementation, and expected outcomes related to impacts affecting the communities of Indigenous Peoples. When any of these circumstances apply, the client will engage external experts to assist in the identification of the project risks and impacts.

12. There is no universally accepted definition of FPIC. For the purposes of Performance Standards 1, 7, and 8, "FPIC" has the meaning described in this paragraph. FPIC builds on and expands the process of ICP described in Performance Standard 1 and will be established through good faith negotiation between the client and the Affected Communities of Indigenous Peoples. The client will document: (i) the mutually accepted process between the client and Affected Communities of Indigenous Peoples, and (ii) evidence of agreement between the parties as the outcome of the negotiations. FPIC does not necessarily require unanimity and may be achieved even when individuals or groups within the community explicitly disagree.

---

[3] The determination of the appropriate plan may require the input of competent professionals. A community development plan may be appropriate in circumstances where Indigenous Peoples are a part of larger Affected Communities.

[4] Internal decision making processes are generally but not always collective in nature. There may be internal dissent, and decisions may be challenged by some in the community. The consultation process should be sensitive to such dynamics and allow sufficient time for internal decision making processes to reach conclusions that are considered legitimate by the majority of the concerned participants.

[5] Natural resources and natural areas with cultural value referred to in this Performance Standard are equivalent to ecosystem provisioning and cultural services as described in Performance Standard 6.

**AR002846**

### Circumstances Requiring Free, Prior, and Informed Consent

#### *Impacts on Lands and Natural Resources Subject to Traditional Ownership or Under Customary Use*

13.   Indigenous Peoples are often closely tied to their lands and related natural resources.[6] Frequently, these lands are traditionally owned or under customary use.[7] While Indigenous Peoples may not possess legal title to these lands as defined by national law, their use of these lands, including seasonal or cyclical use, for their livelihoods, or cultural, ceremonial, and spiritual purposes that define their identity and community, can often be substantiated and documented.

14.   If the client proposes to locate a project on, or commercially develop natural resources on lands traditionally owned by, or under the customary use of, Indigenous Peoples, and adverse impacts[8] can be expected, the client will take the following steps:

- Document efforts to avoid and otherwise minimize the area of land proposed for the project;
- Document efforts to avoid and otherwise minimize impacts on natural resources and natural areas of importance[9] to Indigenous People;
- Identify and review all property interests and traditional resource uses prior to purchasing or leasing land;
- Assess and document the Affected Communities of Indigenous Peoples' resource use without prejudicing any Indigenous Peoples' land claim.[10] The assessment of land and natural resource use should be gender inclusive and specifically consider women's role in the management and use of these resources;
- Ensure that Affected Communities of Indigenous Peoples are informed of their land rights under national law, including any national law recognizing customary use rights; and
- Offer Affected Communities of Indigenous Peoples compensation and due process in the case of commercial development of their land and natural resources, together with culturally appropriate sustainable development opportunities, including:
  - Providing land-based compensation or compensation-in-kind in lieu of cash compensation where feasible.[11]

---

[6] Examples include marine and aquatic resources timber, and non-timber forest products, medicinal plants, hunting and gathering grounds, and grazing and cropping areas. Natural resource assets, as referred to in this Performance Standard, are equivalent to provisioning ecosystem services as described in Performance Standard 6.

[7] The acquisition and/or leasing of lands with legal title is addressed in Performance Standard 5: Land Acquisition and Involuntary Resettlement.

[8] Such adverse impacts may include impacts from loss of access to assets or resources or restrictions on land use resulting from project activities.

[9] "Natural resources and natural areas of importance" as referred to in this Performance Standard are equivalent to priority ecosystem services as defined in Performance Standard 6. They refer to those services over which the client has direct management control or significant influence, and those services most likely to be sources of risk in terms of impacts on Affected Communities of Indigenous Peoples.

[10] While this Performance Standard requires substantiation and documentation of the use of such land, clients should also be aware that the land may already be under alternative use, as designated by the host government.

[11] If circumstances prevent the client from offering suitable replacement land, the client must provide verification that such is the case. Under such circumstances, the client will provide non land-based income-earning opportunities over and above cash compensation to the Affected Communities of Indigenous Peoples.

**AR002847**

- Ensuring continued access to natural resources, identifying the equivalent replacement resources, or, as a last option, providing compensation and identifying alternative livelihoods if project development results in the loss of access to and the loss of natural resources independent of project land acquisition.
- Ensuring fair and equitable sharing of benefits associated with project usage of the resources where the client intends to utilize natural resources that are central to the identity and livelihood of Affected Communities of Indigenous Peoples and their usage thereof exacerbates livelihood risk.
- Providing Affected Communities of Indigenous Peoples with access, usage, and transit on land it is developing subject to overriding health, safety, and security considerations.

### *Relocation of Indigenous Peoples from Lands and Natural Resources Subject to Traditional Ownership or Under Customary Use*

15. The client will consider feasible alternative project designs to avoid the relocation of Indigenous Peoples from communally held[12] lands and natural resources subject to traditional ownership or under customary use. If such relocation is unavoidable the client will not proceed with the project unless FPIC has been obtained as described above. Any relocation of Indigenous Peoples will be consistent with the requirements of Performance Standard 5. Where feasible, the relocated Indigenous Peoples should be able to return to their traditional or customary lands, should the cause of their relocation cease to exist.

### *Critical Cultural Heritage*

16. Where a project may significantly impact on critical cultural heritage[13] that is essential to the identity and/or cultural, ceremonial, or spiritual aspects of Indigenous Peoples lives, priority will be given to the avoidance of such impacts. Where significant project impacts on critical cultural heritage are unavoidable, the client will obtain the FPIC of the Affected Communities of Indigenous Peoples.

17. Where a project proposes to use the cultural heritage including knowledge, innovations, or practices of Indigenous Peoples for commercial purposes, the client will inform the Affected Communities of Indigenous Peoples of (i) their rights under national law; (ii) the scope and nature of the proposed commercial development; (iii) the potential consequences of such development; and (iv) obtain their FPIC. The client will also ensure fair and equitable sharing of benefits from commercialization of such knowledge, innovation, or practice, consistent with the customs and traditions of the Indigenous Peoples.

---

[12] Typically, Indigenous Peoples claim rights and access to, and use of land and resources through traditional or customary systems, many of which entail communal property rights. These traditional claims to land and resources may not be recognized under national laws. Where members of the Affected Communities of Indigenous Peoples individually hold legal title, or where the relevant national law recognizes customary rights for individuals, the requirements of Performance Standard 5 will apply, rather than the requirements under paragraph 17 of this Performance Standard.

[13] Includes natural areas with cultural and/or spiritual value such as sacred groves, sacred bodies of water and waterways, sacred trees, and sacred rocks. Natural areas with cultural value are equivalent to priority ecosystem cultural services as defined in Performance Standard 6.

**AR002848**

## Mitigation and Development Benefits

18. The client and the Affected Communities of Indigenous Peoples will identify mitigation measures in alignment with the mitigation hierarchy described in Performance Standard 1 as well as opportunities for culturally appropriate and sustainable development benefits. The client will ensure the timely and equitable delivery of agreed measures to the Affected Communities of Indigenous Peoples.

19. The determination, delivery, and distribution of compensation and other benefit sharing measures to the Affected Communities of Indigenous Peoples will take account of the laws, institutions, and customs of these communities as well as their level of interaction with mainstream society. Eligibility for compensation can either be individually or collectively-based, or be a combination of both.[14] Where compensation occurs on a collective basis, mechanisms that promote the effective delivery and distribution of compensation to all eligible members of the group will be defined and implemented.

20. Various factors including, but not limited to, the nature of the project, the project context and the vulnerability of the Affected Communities of Indigenous Peoples will determine how these communities should benefit from the project. Identified opportunities should aim to address the goals and preferences of the Indigenous Peoples including improving their standard of living and livelihoods in a culturally appropriate manner, and to foster the long-term sustainability of the natural resources on which they depend.

## Private Sector Responsibilities Where Government is Responsible for Managing Indigenous Peoples Issues

21. Where the government has a defined role in the management of Indigenous Peoples issues in relation to the project, the client will collaborate with the responsible government agency, to the extent feasible and permitted by the agency, to achieve outcomes that are consistent with the objectives of this Performance Standard. In addition, where government capacity is limited, the client will play an active role during planning, implementation, and monitoring of activities to the extent permitted by the agency.

22. The client will prepare a plan that, together with the documents prepared by the responsible government agency, will address the relevant requirements of this Performance Standard. The client may need to include (i) the plan, implementation, and documentation of the process of ICP and engagement and FPIC where relevant; (ii) a description of the government-provided entitlements of affected Indigenous Peoples; (iii) the measures proposed to bridge any gaps between such entitlements, and the requirements of this Performance Standard; and (iv) the financial and implementation responsibilities of the government agency and/or the client.

---

[14] Where control of resources, assets, and decision making are predominantly collective in nature, efforts will be made to ensure that, where possible, benefits and compensation are collective, and take account of intergenerational differences and needs.

**AR002849**

# Performance Standard 8
# Cultural Heritage

## Introduction

1. Performance Standard 8 recognizes the importance of cultural heritage for current and future generations. Consistent with the Convention Concerning the Protection of the World Cultural and Natural Heritage, this Performance Standard aims to ensure that clients protect cultural heritage in the course of their project activities. In addition, the requirements of this Performance Standard on a project's use of cultural heritage are based in part on standards set by the Convention on Biological Diversity.

## Objectives

- To protect cultural heritage from the adverse impacts of project activities and support its preservation.
- To promote the equitable sharing of benefits from the use of cultural heritage.

## Scope of Application

2. The applicability of this Performance Standard is established during the environmental and social risks and impacts identification process. The implementation of the actions necessary to meet the requirements of this Performance Standard is managed through the client's Environmental and Social Management System (ESMS), the elements of which are outlined in Performance Standard 1. During the project life-cycle, the client will consider potential project impacts to cultural heritage and will apply the provisions of this Performance Standard.

3. For the purposes of this Performance Standard, cultural heritage refers to (i) tangible forms of cultural heritage, such as tangible moveable or immovable objects, property, sites, structures, or groups of structures, having archaeological (prehistoric), paleontological, historical, cultural, artistic, and religious values; (ii) unique natural features or tangible objects that embody cultural values, such as sacred groves, rocks, lakes, and waterfalls; and (iii) certain instances of intangible forms of culture that are proposed to be used for commercial purposes, such as cultural knowledge, innovations, and practices of communities embodying traditional lifestyles.

4. Requirements with respect to tangible forms of cultural heritage are contained in paragraphs 6–16. For requirements with respect to specific instances of intangible forms of cultural heritage described in paragraph 3 (iii) see paragraph 16.

5. The requirements of this Performance Standard apply to cultural heritage regardless of whether or not it has been legally protected or previously disturbed. The requirements of this Performance Standard do not apply

**AR002850**

to cultural heritage of Indigenous Peoples; Performance Standard 7 describes those requirements.

### Requirements

## Protection of Cultural Heritage in Project Design and Execution

6.    In addition to complying with applicable law on the protection of cultural heritage, including national law implementing the host country's obligations under the Convention Concerning the Protection of the World Cultural and Natural Heritage, the client will identify and protect cultural heritage by ensuring that internationally recognized practices for the protection, field-based study, and documentation of cultural heritage are implemented.

7. Where the risk and identification process determines that there is a chance of impacts to cultural heritage, the client will retain competent professionals to assist in the identification and protection of cultural heritage. The removal of nonreplicable cultural heritage is subject to the additional requirements of paragraph 10 below. In the case of critical cultural heritage, the requirements of paragraphs 13–15 will apply.

### *Chance Find Procedures*
8.    The client is responsible for siting and designing a project to avoid significant adverse impacts to cultural heritage. The environmental and social risks and impacts identification process should determine whether the proposed location of a project is in areas where cultural heritage is expected to be found, either during construction or operations. In such cases, as part of the client's

ESMS, the client will develop provisions for managing chance finds[1] through a chance find procedure[2] which will be applied in the event that cultural heritage is subsequently discovered. The client will not disturb any chance find further until an assessment by competent professionals is made and actions consistent with the requirements of this Performance Standard are identified.

### *Consultation*
9.    Where a project may affect cultural heritage, the client will consult with Affected Communities within the host country who use, or have used within living memory, the cultural heritage for long-standing cultural purposes. The client will consult with the Affected Communities to identify cultural heritage of importance, and to incorporate into the client's decision-making process the views of the Affected Communities on such cultural heritage. Consultation will also involve the relevant national or local regulatory agencies that are entrusted with the protection of cultural heritage.

### *Community Access*
10.    Where the client's project site contains cultural heritage or prevents access to previously accessible cultural heritage sites being used by, or that have been used by, Affected Communities within living memory for long-standing cultural purposes, the client will, based on consultations under paragraph 9, allow continued access to the cultural site or will provide an alternative access route, subject to overriding health, safety, and security considerations.

---

[1] Tangible cultural heritage encountered unexpectedly during project construction or operation.

[2] A chance find procedure is a project-specific procedure that outlines the actions to be taken if previously unknown cultural heritage is encountered.

**AR002851**

### Removal of Replicable Cultural Heritage

11. Where the client has encountered tangible cultural heritage that is replicable[3] and not critical, the client will apply mitigation measures that favor avoidance. Where avoidance is not feasible, the client will apply a mitigation hierarchy as follows:

- Minimize adverse impacts and implement restoration measures, in situ, that ensure maintenance of the value and functionality of the cultural heritage, including maintaining or restoring any ecosystem processes[4] needed to support it;
- Where restoration in situ is not possible, restore the functionality of the cultural heritage, in a different location, including the ecosystem processes needed to support it;
- The permanent removal of historical and archeological artifacts and structures is carried out according to the principles of paragraphs 6 and 7 above; and
- Only where minimization of adverse impacts and restoration to ensure maintenance of the value and functionality of the cultural heritage are demonstrably not feasible, and where the Affected Communities are using the tangible cultural heritage for long-standing cultural purposes, compensate for loss of that tangible cultural heritage.

### Removal of Non-Replicable Cultural Heritage

12. Most cultural heritage is best protected by preservation in its place, since removal is likely to result in irreparable damage or destruction of the cultural heritage. The client will not remove any nonreplicable cultural heritage,[5] unless all of the following conditions are met:

- There are no technically or financially feasible alternatives to removal;
- The overall benefits of the project conclusively outweigh the anticipated cultural heritage loss from removal; and
- Any removal of cultural heritage is conducted using the best available technique.

### Critical Cultural Heritage

13. Critical cultural heritage consists of one or both of the following types of cultural heritage: (i) the internationally recognized heritage of communities who use, or have used within living memory the cultural heritage for long-standing cultural purposes; or (ii) legally protected cultural heritage areas, including those proposed by host governments for such designation.

14. The client should not remove, significantly alter, or damage critical cultural heritage. In exceptional circumstances when impacts on critical cultural heritage are unavoidable, the client will use a process of Informed Consultation and Participation (ICP) of the Affected Communities as

---

[3] Replicable cultural heritage is defined as tangible forms of cultural heritage that can themselves be moved to another location or that can be replaced by a similar structure or natural features to which the cultural values can be transferred by appropriate measures. Archeological or historical sites may be considered replicable where the particular eras and cultural values they represent are well represented by other sites and/or structures.

[4] Consistent with requirements in Performance Standard 6 related to ecosystem services and conservation of biodiversity.

[5] Nonreplicable cultural heritage may relate to the social, economic, cultural, environmental, and climatic conditions of past peoples, their evolving ecologies, adaptive strategies, and early forms of environmental management, where the (i) cultural heritage is unique or relatively unique for the period it represents, or (ii) cultural heritage is unique or relatively unique in linking several periods in the same site.

**AR002852**

described in Performance Standard 1 and which uses a good faith negotiation process that results in a documented outcome. The client will retain external experts to assist in the assessment and protection of critical cultural heritage.

15. Legally protected cultural heritage areas[6] are important for the protection and conservation of cultural heritage, and additional measures are needed for any projects that would be permitted under the applicable national law in these areas. In circumstances where a proposed project is located within a legally protected area or a legally defined buffer zone, the client, in addition to the requirements for critical cultural heritage cited in paragraph 14 above, will meet the following requirements:

- Comply with defined national or local cultural heritage regulations or the protected area management plans;
- Consult the protected area sponsors and managers, local communities and other key stakeholders on the proposed project; and
- Implement additional programs, as appropriate, to promote and enhance the conservation aims of the protected area.

## Project's Use of Cultural Heritage

16. Where a project proposes to use the cultural heritage, including knowledge, innovations, or practices of local communities for commercial purposes,[7] the client will inform these communities of (i) their rights under national law; (ii) the scope and nature of the proposed commercial development; and (iii) the potential consequences of such development. The client will not proceed with such commercialization unless it (i) enters into a process of ICP as described in Performance Standard 1 and which uses a good faith negotiation process that results in a documented outcome and (ii) provides for fair and equitable sharing of benefits from commercialization of such knowledge, innovation, or practice, consistent with their customs and traditions.

---

[6] Examples include world heritage sites and nationally protected areas.

[7] Examples include, but are not limited to, commercialization of traditional medicinal knowledge or other sacred or traditional technique for processing plants, fibers, or metals.

**AR002853**

# Index

Note: The ¶ sign indicates that paragraph numbers follow. Unnumbered sections are identified as "objectives" and ".n" refers to footnotes.

## A

accommodation services, 18¶12

Action Plans, 10.n22, 10¶16. *See also* Environmental and Social Action Plan
Affected Communities, reporting to, 15¶36
disclosure of, 13¶29

adequate housing, 32¶3
security of tenure, 32.n5, 33.n8, 36¶21–22

Affected Communities, 5¶1. *See also* Affected Communities of Indigenous Peoples; Indigenous Peoples
addressing grievances from, 6¶objectives, 15¶35, 30¶12, 34¶11. *See also* grievance mechanisms
avoidance of risk and/or impacts on, 14¶31, 28¶5, 28¶6, 45¶25, 48¶8, 49¶9
consultation, 13¶30, 14¶31, 34.n16, 35¶14, 36¶22, 42¶14, 43¶14, 44¶20, 49¶10, 54¶9, 56¶15
defined, 5¶1
disclosure of information to, 10¶21, 13¶29, 13¶30, 29¶11, 34¶10
engagement of, 6¶objectives, 10¶15, 10¶20–21, 12¶25, 13¶30, 14¶31, 34¶10
good faith negotiation, 49¶12, 56¶14
identification of, 13¶26, 13¶28
Informed Consultation and Participation (ICP), 14¶31, 55¶14
participation in determining priority ecosystem services, 45¶24
participation in monitoring activities, 10¶22

reporting to, 12¶25, 15¶36
representatives of, 11¶22, 13.n25, 13¶27
risks and impacts identification, 9¶11, 9¶12, 10¶15, 28¶4–5, 29¶8
sharing of development benefits and opportunities, 14¶31, 33¶9, 34¶9
Stakeholder Engagement Plan, 13.n26, 13¶27

Affected Communities of Indigenous Peoples. *See also* Indigenous Peoples
avoidance of adverse impacts on, 48¶8, 49¶9
culturally appropriate sustainable development opportunities, 50¶14, 51¶14, 52¶18, 52¶20
defined, 48¶5
engagement process, 14¶32, 49.n4, 49¶10
Free, Prior, and Informed Consent (FPIC), 49¶11, 49¶12, 50¶13–14, 51¶15–17
Informed Consultation and Participation (ICP), 14¶32, 47¶objectives, 49¶9, 49¶12, 52¶22
representative bodies, 49¶10
sharing of benefits, 47¶2, 47¶objectives, 51¶14, 51¶17, 52¶19

alien species, 41¶6, 44¶21, 45¶22–23
introduction of, 44¶21
invasive, 44¶21, 45¶22–23

ambient conditions
addressing project adverse impacts on, 25¶11
assimilative capacity, 25.n13, 25¶11
described, 25.n12

animal husbandry, 41¶5, 45¶26

associated facilities, 8¶8

audits
completion, 35.n18, 35¶15
internal, 12¶23

AR002854

## B

baseline data
    environmental and social, 7¶7
    socio-economic, 34¶12
basic services requirements, 18¶12
    defined, 18.n8
biodiversity
    adaptive management, 41¶7
    avoidance of impacts, 41¶7, 43¶15
    defined, 40¶1
    delivery of ecosystem services, 40¶3
    identification of risks and impacts, 41¶6,
      41¶8, 45¶24
    project impacts on, 8¶8, 25¶11, 40¶3,
      41¶6, 43¶15
    threats to, 41¶6, 44¶21
Biodiversity Action Plan, 10.n22, 13.n26,
    44¶18
biodiversity offsets, 42.n2, 42.n4, 42¶10,
    43¶15
    assessment of residual impacts, 44¶19
    defined, 42.n2
    "in-kind offset," 42.n4
    "like-for-like or better principle," 42¶10
      defined, 42.n4
biodiversity protection and conservation,
    40¶1, 40¶objectives, 42¶10, 44.n15
    biodiversity offsets, 42.n2, 42.n4, 42¶10,
      43¶15
    internationally recognized areas, 44¶20
      defined, 44.n17
    legally protected areas, 44.n16, 44¶20
    measurable conservation outcomes,
      42¶10
      defined, 42.n3
    "net gains," 44¶18
      defined, 44.n15
    no net loss, 42¶10, 43¶15
      defined, 43.n9
biodiversity value, 42.n4, 42¶12, 43.n10,
    43¶16–17, 44¶18
bonded labor, 20¶22

## C

census, 34¶12, 36¶17
chemical pesticides, 26¶15
child labor, 20¶21
    in primary supply chains, 21¶27
cleaner production, 23¶6
clients
    defined, 2.n1
    third parties, 5¶2
climate change
    impacts on communities, 27¶1
    impacts on priority ecosystem services,
      29¶8
    risks and impacts identification process,
      8¶7
collective bargaining
    agreements, 17¶10, 19¶18
    alternative mechanisms, 18¶13
    no discrimination or retaliation against,
      18¶14
    workers' organizations, 18¶13
collective dismissals, 19¶18, 19¶19
    defined, 19.n10
communicable diseases, 29¶9–10
community development plan, 49.n3, 49¶9
community engagement, 34¶10. *See also*
    stakeholder engagement
    as part of the Environmental and Social
      Management System (ESMS), 5¶1
community health and safety
    Community Health and Safety Plan,
      13.n26
    preventive and control measures, 28¶5
    project impacts on priority ecosystem
      services, 29¶8
    World Bank Group Environmental,
      Health and Safety Guidelines (EHS
      Guidelines), 28¶5
compensation for employment (workers),
    17¶9, 18¶15
compensation, land acquisition and
    involuntary resettlement, 32¶objectives,
      33¶9, 34¶9
    in case of government-managed
      resettlement, 31¶2, 39¶32

**AR002855**

cash, 36.n21, 36¶20, 36¶21, 37¶27, 38¶28
   on collective basis, 38¶28, 52¶19
   cut-off date, 34¶12, 36¶22, 37¶23, 37¶27
   for economic displacement, 37¶27
   eligibility for, 34.n17, 34¶12
   improvements made to land, 37¶27
   in-kind, 34.n16, 36¶21, 50¶14
   land-based, 33¶9, 36.n21, 50¶14
   opportunistic settlers, 34¶12
   rejection by, of affected persons, 34¶13
   replacement cost, 32¶objectives, 33¶9, 36¶19, 36¶21–22, 37¶27
     defined, 32.n4
   staggered payments, 34.n15
   timing of, 33.n14, 33¶9, 34.n15
completion audit, 35.n18, 35¶15
consultation
   with Affected Communities, 13¶30, 14¶31, 49¶10
   biodiversity protection and conservation, 42¶14, 43¶14, 44¶20
   cultural heritage, 54¶9, 56¶15
   effective, process of, 14¶30
   inclusive engagement in, 14¶30
   Informed Consultation and Participation (ICP), 14¶31, 55¶14
   land acquisition and resettlement, 34.n16, 36¶22, 38¶15
contracted workers, 17¶6
   defined, 17¶4
   grievance mechanisms, access to, 21¶26
contractors
   defined, 5.n4
   environmental and social management programs, applicability to, 9¶14
   hazardous waste disposal by, 25¶12
Convention on Biological Diversity, 40¶1, 53¶1
Convention Concerning the Protection of the World Cultural and Natural Heritage, 53¶1, 54¶6
core business processes, defined, 17.n3
corrective action, 12¶23, 35.n18, 35¶15

credible standards, 7¶6, 45¶26, 46¶27–29
   client actions in the absence of, 46¶29
   defined, 46.n20
   independent verification or certification, 45¶26, 46¶27
     credible certification systems defined, 46.n20
   sustainable management of living natural resources, role in, 45¶26, 46¶27
critical habitat, 43¶16–17, 44¶18–19
   Critically Endangered species, 43.n11, 43¶16–17
   defined, 41¶9, 43¶16
   Endangered species, 43.n11, 43¶16–17
   limitations on activities in, 43¶17
   net reduction
     Critically Endangered or Endangered species, 43¶17
     defined, 44.n13
cultural heritage
   chance find, 54¶8
     defined, 54.n1
     procedure, 54.n2, 54¶8
   community access to, 54¶10
   consultation with Affected Communities, 54¶9, 55¶14, 56¶16
   critical, 51.n13, 51¶16–17, 55¶13–14, 56¶15
     Affected Communities of Indigenous Peoples, 51¶16–17
     defined, 55¶13
     legally protected heritage areas, 56.n6, 56¶15
   defined, 53¶3
   fair equitable sharing of benefits from, 56¶16
   non-replicable, 55.n5
     removal of, 55¶12
   project use of, 51¶17, 56¶16
   replicable, 55.n3
     removal of, 55¶11
   tangible and intangible forms of, 53¶3–4
   tangible, removal of, 55¶11
cumulative impacts, 8¶8, 25¶11
   defined, 8.n16

AR002856

## D

direct workers, 17¶5
  defined, 17¶4
  as security personnel, 30¶12
disadvantaged or vulnerable groups, 9¶12,
    27¶1, 33¶8, 36¶19. *See also* vulnerable
    populations
  defined, 9.n18
  effective participation in stakeholder
    engagement, 13¶27, 14.n27, 14¶30
disease
  arising from or occurring in the course of
    work, 20¶23
  communicable, 29¶10
  community exposure to, 29¶9, 47¶1
displaced persons
  classifying, 35¶17
  compensation and benefits for, 33¶9,
    34¶9
  consultation with, 34¶10, 36¶22
  host community, 31¶2
displacement, 35¶17, 36¶18
  economic, 37¶25–27, 38¶28–29
  land-related transactions resulting, in
    types of, 32¶5, 33¶5
  physical, 31¶1, 36¶19–20, 36¶21–22,
    37¶23–24
due diligence, human rights, 6¶3, 8.n12

## E

economic development, economic growth,
    16¶1
economic displacement
  alternative income-earning opportunities,
    38¶28
  compensation for loss of assets or access
    to assets, 37¶27
  defined, 31¶1, 37¶26
  Livelihood Restoration Plan, 37¶25
  transitional support in case of, 38¶29
  types of land-related transactions that
    can result in, 32¶5, 33¶5
ecosystems, 40¶1, 43¶16
  ecosystem processes, 55¶11
  Ecosystem Restoration Plan, 13.n26

ecosystem services. *See also* priority
    ecosystem services
  biodiversity and, 40¶1
  defined, 40¶2
  ecosystem cultural services, project
    impacts on, 51.n13, 55¶11
  four types of, 40¶2
  management, 45¶24–25
  natural resource-based livelihoods,
    31.n1, 38¶28
  project impacts on, 8¶8, 29¶8, 45¶25
  use of and loss of access to provisioning
    ecosystem services, 29¶8, 33.n9, 33¶5,
    38¶28, 50.n6, 50.n9
EHS Guidelines. *See* Environmental, Health
    and Safety Guidelines (EHS Guidelines)
emergency preparedness and response,
    10¶20–21
  collaboration with third parties, 10¶21,
    29¶11
  local government, capacity of, 10¶21,
    29¶11
  as part of Environmental and Social
    Assessment and Management System
    (ESMS), 7¶5, 10¶20, 13.n26
  system, components of, 10¶20
Endangered species, 43¶16, 43¶17
  Critically, 43¶16, 43¶17
  International Union for the
    Conservation of Nature (IUCN), Red
    List of Threatened Species, 43.n11
  net reduction, 44.n13
Environmental, Health and Safety
    Guidelines (EHS Guidelines)
  national laws differing from, 3¶4–7
  as source of good international industry
    practice
    community health and safety, 28¶5
    occupational health and safety, 20¶23
    resource efficiency and pollution
      prevention, 23¶5
Environmental and Social Action Plan
    (ESAP), 10¶16. *See also* Livelihood
    Restoration Plan; Resettlement Action
    Plan
  specific plans, examples of, 10.n22,
    13.n26

**AR002857**

Environmental and Social Impact
Assessment (ESIA), 7¶7
environmental and social impacts
defined, 5.n3
process for identification of, 7¶7, 8¶7–
11
Environmental and Social Management
System (ESMS)
defined, 5¶1
elements of, 7¶5
periodic performance reviews of
effectiveness of, 12¶24
environmental and social risk
defined, 5.n2
identification of, overall approach, 7¶7,
8¶7–11, 9¶12
inherent, 20¶23
equal opportunity, 18¶12. *See also* non-
discrimination in employment
equipment, design and safety, 28¶6
ESAP. *See* Environmental and Social Action
Plan
ESIA. *See* Environmental and Social Impact
Assessment
ESMS. *See* Environmental and Social
Management System (ESMS)
expropriation, 31¶1, 33¶5, 34¶12
external communications, 13¶26, 15¶34

## F

financial feasibility, defined, 10.n21
forced evictions
adequate housing with security of tenure,
36¶22
avoiding, 37¶24
defined, 37.n23
displacement resulting from, 33¶5
forced labor, 20¶22
in primary supply chains, 21¶27
Free, Prior, and Informed Consent (FPIC)
Affected Communities of Indigenous
Peoples, 49¶11–12
circumstances requiring, 50¶13–14,
51¶15–17
defined, 49¶12
Informed Consultation and Participation

(ICP), connection to, 14¶32, 49¶12,
52¶22

## G

GHG emissions. *See* greenhouse gas (GHG)
emissions
good faith negotiation
Free, Prior, and Informed Consent,
Indigenous Peoples, 49¶12
project impacts on and use of cultural
heritage, 56¶14, 56¶16
good international industry practice (GIIP),
7¶7
defined, 20.n14, 23.n4
World Bank Group Environmental,
Health and Safety Guidelines, 20¶23,
23¶4, 28¶5
governments
assessment and management of
environmental and social risks and
impacts, responsibility for, 5¶2, 7¶5,
10¶22
government-managed resettlement, 7.n8,
34.n15, 38¶30–31, 39¶32
Indigenous Peoples' issues management,
47¶2, 52¶21
land acquisition and resettlement
process, role in, 31¶2, 32¶5
greenfield developments, environmental and
social impact assessment for, 8.n11
greenhouse gas (GHG) emissions
options to reduce, project-related, 24¶7
quantification of, 24.n6, 24¶8
risks and impacts identification process
and, 8¶7
grievance mechanisms, 6¶2
for Affected Communities, 13¶29,
15¶35
compensation and relocation concerns,
34¶11
security personnel actions, 30¶12
stakeholder engagement, element of,
12¶25, 15¶35
for workers, 19¶20

AR002858

## H

habitat
  critical, 43¶16–17, 44¶18–19
  defined, 41¶9
  modified, 42¶11–12
  natural, 44¶13–14, 45¶15
hazardous materials
  management, 25¶13
  minimizing community exposure to, 28¶7
hazardous wastes
  disposal of by third parties, 29¶7
  transboundary movement of, 25.n15
hazardous work activities
  child labor, 20¶21
  defined, 20.n12
High Conservation Value, 43.n10
historical pollution, 24¶10
host communities
  defined, 31.n3
  for displaced persons, 31¶2
human rights
  conventions of the International Labour Organization, 16.n2
  defined, 6¶3
  due diligence, 6¶3, 8.n12
  Indigenous peoples, 47¶objectives
  responsibility of business to respect, 6¶3
  safeguarding of personnel and property, in accordance with, 33¶objectives

## I

ICP. *See* Informed Consultation and Participation (ICP)
identification of risks and impacts
  in primary supply chains, 9¶10, 21¶27, 46¶30
  process and scope, 7¶7
  from third party actions, 9¶9
IFC Sustainability Framework, 2¶1
ILO. *See* International Labour Organization (ILO)
indentured labor, 20¶22
Indigenous Peoples. *See also* Affected Communities of Indigenous Peoples

collective attachment, 48¶6
critical cultural heritage of, 51¶16
decision-making processes, 49.n4, 49¶10
defined, 48¶4, 48¶5
Free, Prior, and Informed Consent (FPIC), 14¶32, 49¶11, 50¶13–14, 51¶15–17
Informed Consultation and Participation (ICP), 7¶30, 14¶32, 47¶objectives, 49¶9
lands and natural resources, traditionally owned or under customary use, 50¶13, 51¶15
relocation of, 51¶15
vulnerability of, 47¶1, 49¶9, 49¶11
Indigenous Peoples Plan, 13.n26, 49¶9
Informed Consultation and Participation (ICP), 14¶31
  critical cultural heritage, 55¶14, 56¶16
  Indigenous Peoples, 7¶30, 14¶32, 47¶objectives, 49¶9
intangible cultural heritage, 53¶3, 56¶16
Integrated pest management (IPM), 26¶14
Integrated vector management (IVM), 26¶14
International Labour Organization (ILO), 16.n2, 16¶2
internationally recognized areas, 44¶20
  defined, 44.n17
International Union for the Conservation of Nature (IUCN), 44.n13, 44.n16
  Red List of Threatened Species, 43.n11
international waterways, transboundary effects on, 8¶7
invasive alien species, 44¶21, 45¶22–23
involuntary resettlement
  defined, 31¶1
  government-managed, 34.n15, 38¶30–31, 39¶32
  socio-economic impacts of, 31¶2
  Supplemental Resettlement Plan, 38¶30–31, 39¶32
IPM. *See* Integrated pest management (IPM)
IUCN. *See* International Union for the Conservation of Nature
IVM. *See* Integrated vector management (IVM)

## L

**AR002859**

labor
    child, 20¶21
    forced, 20¶22
    influx, 29¶10
land
    access, restrictions on, 32¶5
    Indigenous Peoples' relationship to and use of, 50¶13
    legal rights to, 32¶5, 35¶17, 37¶27
      absence of, 33.n7, 33.n8, 35¶17, 37¶27, 50¶13
    traditionally owned or under customary use, 50¶13–14
      recognition under national laws, 51.n12
      relocation from, Indigenous Peoples, 51¶15
land acquisition
    defined, 31.n2
    minimizing impacts from, 36¶objectives
    physical and economic displacement as a result of, 32¶5, 33¶5, 36¶18
    scope of, 31.n2
land use, restrictions on, 31¶1, 33¶5, 36¶18, 50.n8
legally protected areas, 44¶20
    cultural heritage areas, 56¶15
    IUCN definition, 44.n16
"like-for-like or better principle," 42¶10
    defined, 42.n4
livelihood
    defined, 31.n1
    land-based, 33¶9, 36.n21, 38¶28
      defined, 33.n12
    natural resource-based, 31.n1, 38¶28
    restoration, planning and implementation, 34¶12–13, 35¶14
Livelihood Restoration Framework, 35¶16
Livelihood Restoration Plan, 35¶15
    completion audit, 35.n18, 35¶15
    guidelines, 37¶25
living natural resources
    credible standards for sustainable management of, 45¶26, 46¶27–29
    defined, 40¶1
    production of, 41¶5, 45¶26
    sustainable management of, 45¶26, 46¶27–29

**M**

management programs, 9¶13–14, 10¶15–16
    components of, 9¶14
    Environmental and Social Action Plan, 10¶16
    monitoring the effectiveness of, 10¶22
migrant workers
    non-discrimination principles, applicability of, 19¶15
    working conditions and terms of employment, 18¶11
minors, employment of, 07¶21
mitigation hierarchy, 3¶6, 6¶objectives, 10¶14, 52¶18
    protection and conservation of biodiversity, 41¶8, 43¶14
      biodiversity offsets, 42¶10
    removal of replicable cultural heritage, 55¶11
modified habitats, 42¶11–12
    defined, 42¶11
monitoring
    as a component of Environmental and Social Management System, 7¶5
    participation in, by Affected Communities, 34¶10
    what it includes, 12¶23

**N**

national laws
    claim to land, recognized or recognizable under, 35¶17, 37¶27
    EHS Guidelines differing from, 3¶4–7
    host country obligations under international law, 7¶6, 47.n1
    Indigenous Peoples' rights under, 50¶14, 51¶17
    requirement to comply with, 7¶6, 17¶8, 19¶16, 20¶21, 24¶10, 54¶6
natural areas of importance, defined, 50.n9
natural habitats, 44¶13–14, 45¶15
    limits on activities in, 42¶14, 43¶14
    no net loss, 43¶15
      defined, 43.n9
    "set asides," 43¶15

**AR002860**

defined, 43.n10

significant conversion or degradation, 43¶14

   defined, 42.n7

natural resources

   defined, 50.n9

   ecosystem services and, 29¶8, 49.n5, 50.n6, 50.n9

   Indigenous Peoples' collective attachment to, 48¶6

   living, 41¶5, 45¶26, 46¶27–29

   restrictions on access to, 33¶5, 38¶28, 50¶14

negotiated settlements, 31¶1, 32¶3, 32¶5, 34¶12, 38¶31

non-discrimination in employment, 19¶15

   migrant workers, 19¶15

   national laws, requirement to comply with, 19¶16

   retrenchment plan, 19¶18

nonreplicable cultural heritage

   defined, 55.n5

   removal of, 55¶12

## O

occupational health and safety, 20¶23

opportunistic settlers, 34¶12, 37¶27

organizational capacity and competency, 10¶17, 11¶18–19

   personnel qualifications, 10¶18

## P

persistent organic pollutants, 26.n16

pesticides

   chemical, use of, 26¶15

   community exposure to, 29¶7

   use and management, 26¶14–17

      application regime, 26¶16

   WHO Recommended Classification, by Hazard Class, 26¶17

physical displacement, 36¶19–20, 36¶21–22, 37¶23–24

defined, 31¶1

relocation, 36¶20, 36¶22

replacement property, characteristics of, 36¶21

Resettlement Action Plan, 36¶19

policy, as part of Environmental and Social Management System, 7¶6

pollution, defined, 22.n1

pollution prevention, 24¶10, 25¶11–13, 26¶14, 26¶15–17

   defined, 22.n2

primary production

   ecosystem services, 40.n1

   of living natural resources, 45¶26

   supply chain, 46¶30

primary suppliers

   applicability of management programs to, 10¶14

   client control or influence on, 10¶14, 21¶29, 46¶30

   defined, 17.n4, 46.n21

   supply chain workers, 17¶4

primary supply chains

   child or forced labor in, 21¶27

   conversion of natural and/or critical habitats, 46¶30

   risks and impacts identification, 9¶10

priority ecosystem services

   defined, 45¶24

   health and safety risks and impacts to Affected Communities from project impacts on, 29¶8, 45¶24–25

   managing project impacts on, 45¶25

project

   defined, 6¶4

   design to avoid physical/economic displacement, 33¶8

   design to reduce impact on cultural heritage, 54¶8

      chance find procedures, 54¶8

   life cycle, 6¶4

project area of influence

   associated facilities, 8.n15, 8¶8

   cumulative impacts, 8.n16, 8¶8

   risks and impacts identification, 8¶8

**AR002861**

## R

relocation, 31¶1, 36¶20
    assistance, 36¶20, 36¶22
    Indigenous Peoples, 51¶15
    informal settlers, 37.n22
    resettlement sites, 36¶20
replacement cost, 32¶objectives, 36¶21–22,
    37¶27
    compensation and benefits for displaced
    persons, 33¶9, 36¶19
    defined, 32.n4
replacement property, 36¶21, 37¶27
    security of tenure, 32.n5, 36¶21–22
replicable cultural heritage
    defined, 55.n3
    removal of, 55¶11
resettlement
    involuntary. *See* involuntary resettlement
    voluntary land transactions, resulting in,
    33¶6
Resettlement Action Plan, 35¶15
    completion audit, 35.n18, 35¶15
    implementation, 35¶15
    physical displacement, 36¶19
Resettlement Framework, 35¶16
resettlement sites, 33¶9, 36¶20
residual impacts
    biodiversity and ecosystem services,
    41¶6, 44¶19
    mitigation hierarchy, 10¶14
resource efficiency, 23¶6, 24¶7–9
    cost effectiveness of, 23.n5, 23¶6
retrenchment, 19¶18–19
retrenchment plan, 19¶18
risks and impacts identification. *See*
    identification of risks and impacts

## S

security personnel, 30¶12–14
    community health and safety, risks to,
    30¶12–14
    grievance mechanisms, 30¶12
    project's use of government security
    personnel, 30¶13
security of tenure, 32¶3

    defined, 32.n5
    physically displaced persons, 36¶22
set-asides, 43¶15
    defined, 43.n10
severance payments, 19¶19
significant conversion or degradation of
    natural habitats, defined, 44.n7
stakeholder engagement, 12¶25
    community engagement, 34¶10
    community representatives, 13¶27
    consultation, 12¶25, 13¶27
    disclosure of, 13¶29
    government-led, 14¶33
    grievance mechanisms, 6¶2, 12¶25,
    13¶29, 15¶35, 30¶12, 34¶11
Stakeholder Engagement Framework, 13¶28
Stakeholder Engagement Plan, 13¶27
Stakeholders. *See also* stakeholder
    engagement
    analysis and engagement planning,
    13¶26–27
    description of, 5.n1, 5¶1
    external communications, 15¶34
Supplemental Resettlement Plan, 38¶31,
    39¶32
supply chain, 21¶27–29. *See also* primary
    supply chain
    risks and impacts identification in, 9¶10
supply chain workers, 17¶7
    defined, 17¶4
    safety issues, client responsibilities for
    mitigation measures, 21¶28

## T

technical feasibility, defined, 10.n20
terms of employment, 17¶10, 18.n5
third parties
    hazardous waste disposal by, 25¶12
    identification of risks presented by, 9¶9
    workers engaged by, 17¶4, 21¶24–26
trafficked persons, employment of, 20¶22
trafficking in persons defined, 20.n13
transboundary effects of business activities,
    8¶7, 24¶10
    movement of hazardous material, 25.n15
transboundary pollutants, 24.n10

AR002862

## V

voluntary land transactions, 33¶6
vulnerable populations. *See also*
    disadvantaged or vulnerable groups
    adverse impacts on, 9¶12
    community health and safety, 27¶1,
    29¶9
    displacement considerations, 33¶8,
    36¶19
    Indigenous Peoples, 47¶1, 49¶11
    stakeholder analysis and engagement,
    13¶27

## W

waste, 25¶12
    hazardous, defined, 25¶12
water consumption
    priority ecosystem services, 45¶24
    reducing, in project activities, 24¶9
women
    assessment of land and resource use by
    Indigenous Peoples, 50¶14
    Informed Consultation and Participation
    (ICP), 14¶31, 34.n16
    non-discrimination and equal
    opportunity, 19¶15
    occupational health and safety, 20¶23
workers. *See* compensation for employment
    (workers); contracted workers; direct
    workers; grievance mechanisms; migrant
    workers; occupational health and safety;
    supply chain workers
workers' organizations, 18¶13–14
working conditions and terms of
    employment, 17¶10, 18¶11–12
    reasonable, determination of, 18.n6
    defined, 18.n5
    for migrant workers, 18¶11
    non-discrimination and equal
    opportunity, 18¶15

**AR002863**

AR002864



International Finance Corporation
2121 Pennsylvania Ave. NW
Washington, DC 20433
Tel. 1-202-473-1000
www.ifc.org/sustainability

The material in this publication is copyrighted. IFC encourages the dissemination of the content for educational purposes. Content from this publication may be used freely without prior permission, provided that clear attribution is given to IFC and that content is not used for commercial purposes.



AR002865

# Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China

**Report to Congress**
June 17, 2022



**Office of Strategy, Policy, and Plans**

AR002866

# Message from the Under Secretary for Strategy, Policy, and Plans

June 17, 2022

The United States is committed to promoting respect for human rights and dignity and supporting a system of global trading free from forced labor. As the Chair of the Forced Labor Enforcement Task Force (FLETF), and on behalf of the U.S. Department of Homeland Security (DHS), I am pleased to present to Congress this "Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China." Additional members of the FLETF include the Office of the U.S. Trade Representative and the U.S. Departments of Commerce, Justice, Labor, State, and the Treasury. The U.S. Departments of Agriculture and Energy, the U.S. Agency for International Development, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and the National Security Council participate as FLETF observers.



This strategy has been prepared by the FLETF, in consultation with the U.S. Department of Commerce and the Office of the Director of National Intelligence, pursuant to Section 2(c) of Public Law No. 117-78, *an Act to ensure that goods made with forced labor in the Xinjiang Uyghur Autonomous Region of the People's Republic of China do not enter the United States market, and for other purposes,* otherwise known as the Uyghur Forced Labor Prevention Act. This report reflects public input received in response to a Federal Register notice published on January 24, 2022 and during a public hearing held on April 8, 2022.

Ending forced labor is a moral, economic, and national security imperative. DHS and its FLETF partners remain steadfast in their duty to address the global challenge of prohibiting the importation of goods mined, produced, or manufactured wholly or in part with forced labor. Combating trade in illicit goods produced with forced labor, including government-sponsored forced labor or convict labor, protects against unfair competition for compliant U.S. and international manufacturers and promotes American values of free and fair trade, the rule of law, and respect for human dignity.

Pursuant to Pub. L. No. 117-78, this report will be made publicly available and is being submitted to relevant congressional committee leaders listed below:

The Honorable Gregory Meeks, Chairman
U.S. House of Representatives Foreign Affairs Committee

The Honorable Michael McCaul, Ranking Member
U.S. House of Representatives Foreign Affairs Committee

The Honorable Maxine Waters, Chairwoman
U.S. House of Representatives Committee on Financial Services

i

AR002867

The Honorable Patrick McHenry, Ranking Member
U.S. House Committee on Financial Services

The Honorable Richard Neal, Chair
U.S. House of Representatives Committee on Ways and Means

The Honorable Kevin Brady, Ranking Member
U.S. House of Representatives Committee on Ways and Means

The Honorable Bennie G. Thompson, Chairman
U.S. House of Representatives Committee on Homeland Security

The Honorable John Katko, Ranking Member
U.S. House of Representatives Committee on Homeland Security

The Honorable Bob Menendez, Chairman
U.S. Senate Committee on Foreign Relations

The Honorable James E. Risch, Ranking Member
U.S. Senate Committee on Foreign Relations

The Honorable Sherrod Brown, Chairman
U.S. Senate Committee on Banking, Housing, and Urban Affairs

The Honorable Patrick J. Toomey, Ranking Member
U.S. Senate Committee on Banking, Housing, and Urban Affairs

The Honorable Ron Wyden, Chairman
U.S. Senate Committee on Finance

The Honorable Mike Crapo, Ranking Member
U.S. Senate Committee on Finance

The Honorable Gary C. Peters, Chairman
U.S. Senate Committee on Homeland Security and Governmental Affairs

The Honorable Rob Portman, Ranking Member
U.S. Senate Committee on Homeland Security and Governmental Affairs

Sincerely,

Robert Silvers
Under Secretary for Strategy, Policy, and Plans
U.S. Department of Homeland Security

ii

AR002868

# Executive Summary

The Uyghur Forced Labor Prevention Act[1] (UFLPA) was enacted on December 23, 2021, to strengthen the existing prohibition against the importation of goods made wholly or in part with forced labor into the United States and to end the systematic use of forced labor in the Xinjiang Uyghur Autonomous Region (Xinjiang). Among its mandates, the UFLPA charged the Forced Labor Enforcement Task Force (FLETF), chaired by the U.S. Department of Homeland Security (DHS), to develop a strategy for supporting the enforcement of Section 307 of the Tariff Act of 1930, as amended (19 U.S.C. § 1307) to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China (PRC).

This strategy incorporates input from various public and private-sector stakeholders. It incorporates significant contributions from FLETF members and observers and takes into account public comments received through the FLETF's Federal Register request for information and the UFLPA public hearing.[2]

Pursuant to the UFLPA, this strategy includes:

- A comprehensive assessment of the risk of importing goods mined, produced, or manufactured, wholly or in part, with forced labor in the PRC;
- An evaluation and description of forced-labor schemes, UFLPA-required lists (including the UFLPA Entity List), UFLPA-required plans, and high priority sectors for enforcement;
- Recommendations for efforts, initiatives, tools, and technologies to accurately identify and trace affected goods;
- A description of how U.S. Customs and Border Protection (CBP) plans to enhance its use of legal authorities and tools to prevent entry of goods at U.S. ports in violation of 19 U.S.C. § 1307;
- A description of additional resources necessary to ensure no goods made with forced labor enter U.S. ports;
- Guidance to importers; and
- A plan to coordinate and collaborate with appropriate nongovernmental organizations (NGOs) and private-sector entities.

---

[1] Pub. L. No. 117-78, 135 Stat. 1525 (2021).

[2] *See* Notice Seeking Public Comments on Methods to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China, Especially in the Xinjiang Uyghur Autonomous Region, Into the United States, 87 Fed. Reg. 3567 (Jan. 24, 2022); Notice of Public Hearing on the Use of Forced Labor in the People's Republic of China and Measures to Prevent the Importation of Goods Produced, Mined, or Manufactured, Wholly or in Part, With Forced Labor in the People's Republic of China Into the United States, 87 Fed. Reg. 15448 (Mar. 18, 2022); *Nonrulemaking Docket: Notice of Public Hearing on the Use of Forced Labor in the People's Republic of China and Measures to Prevent the Importation of Goods Produced, Mined, or Manufactured, Wholly or in Part, With Forced Labor in the People's Republic of China Into the United States*, Regulations.gov, https://www.regulations.gov/docket/DHS-2022-0001 (last visited May 19, 2022) (containing public comments submitted in response to 87 Fed. Reg. 3567 and a transcript of verbal testimony from the hearing on April 8, 2022).

AR002869

**Assessment of the Risk of Importing Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China**

The assessment addresses the risk of importing goods made with forced labor in the PRC, threats that may lead to the importation of forced labor-made goods from the PRC, and procedures to reduce such threats. Complex supply chains that touch Xinjiang are highly susceptible to contamination by goods made using forced labor. Threats that amplify the risk of such goods in U.S. supply chains include lack of supply chain visibility, commingling inputs made with forced labor into otherwise legitimate production processes, import prohibition evasion, and forced labor practices that target vulnerable populations within the PRC.

Securing U.S. supply chains against forced labor will require cooperation across stakeholders, including industry, civil society, and federal agencies. All entities whose supply chains touch Xinjiang should undertake due diligence measures to ensure compliance with U.S. laws and trace their supply chains for potential exposure to forced labor.

**Evaluation and Description of Forced-Labor Schemes and UFLPA Entity List**

The evaluation of labor schemes and the UFLPA Entity List provides an overview of PRC-sponsored labor programs that include forced labor by Uyghurs and other persecuted groups; lists of entities, products, and high-priority sectors affiliated with forced labor in the PRC; and U.S. department and agency enforcement plans related to the lists. Forced labor in internment camps and other labor schemes remain a central PRC tactic for the repression of Uyghurs, Kazakhs, Kyrgyz, Tibetans, and members of other persecuted groups. The possibility of internment in these labor programs functions as an explicit or implicit threat to compel members of persecuted minorities to work. In some cases, workers are transferred directly from detention to factories in and outside of Xinjiang. Even when workers in these programs are not transferred directly from internment camps, their work is the product of forced labor. They do not undertake the labor with free and informed consent and are not free to leave; they are subject to discriminatory social control, including pervasive surveillance, and the threat of detention.[3]

UFLPA Section 2(d)(2)(B) requires the strategy to include: (i) entities in Xinjiang that produce goods using forced labor; (ii) entities that work with the Xinjiang government to recruit, transport, transfer, harbor, or receive forced labor or Uyghurs, Kazakhs, Kyrgyz or members of other persecuted groups out of Xinjiang; (iii) products made by entities in lists (i) and (ii); (iv) entities that export products identified in (iii) from the PRC to the United States; and (v) entities and facilities that source material from Xinjiang or from persons working with the Xinjiang government or the Xinjiang Production and Construction Corps (XPCC) for purposes of any government-labor scheme that uses forced labor. Goods from these entities will be subject to the UFLPA rebuttable presumption under 19 U.S.C. § 1307. Furthermore, this strategy includes high-priority sectors for enforcement, and FLETF enforcement plans and plans to identify additional entities associated with these labor schemes in the future.

---

[3] *See e.g.*, Amy K. Lehr, *Addressing Forced Labor in the Xinjiang Uyghur Autonomous Region: Towards a Shared Agenda*, Ctr. for Strategic & Int'l Studies, 1-2 (July 30, 2020), https://www.csis.org/analysis/addressing-forced-labor-xinjiang-uyghur-autonomous-region-toward-shared-agenda.

iv

AR002870

**Recommended Efforts, Initiatives, Tools, and Technologies to Accurately Identify and Trace Goods**

The strategy outlines several recommendations for efforts, initiatives, tools, and technologies that CBP will adopt to identify and trace goods made with forced labor. CBP will procure cutting-edge technologies that provide improved visibility into trade networks, and that improve supply-chain tracing to identify goods made wholly or in part with forced labor. CBP will improve its existing enterprise automated systems to increase data quality and communication to enhance both forced labor enforcement actions and processes that facilitate lawful trade. Finally, CBP will expand collaboration with interagency partners and leverage existing U.S. government tools.

**CBP Enhancement of Use of Legal Authorities and Tools to Prevent Entry of Goods at U.S. Ports in Violation of 19 U.S.C. § 1307**

This strategy also provides a description of how CBP plans to enhance its use of legal authorities to prevent the importation of goods prohibited by 19 U.S.C. § 1307. CBP will consider enhancing its use of its detention and exclusion authorities under 19 U.S.C. § 1499, and seizure authorities under 19 U.S.C. § 1595a(c). CBP will consider other regulatory changes that will allow CBP to respond more quickly to forced labor allegations, provide importers with clear guidance on admissibility determination timeframes, and provide a more uniform process for the determination of merchandise admissibility. Overall, the plan to enhance use of authorities and tools will provide for a more effective and efficient enforcement of 19 U.S.C. § 1307.

**Additional Resources Necessary to Ensure No Goods Made with Forced Labor Enter U.S. Ports**

This section highlights additional resources required to administer and implement the UFLPA. FLETF agencies must manage existing resources effectively, identify resource shortfalls, and adequately resource implementation of this enforcement strategy, not only through direct operational requirements but also through policy, management, and oversight. This section outlines what will be required by the FLETF Chair, the DHS Office of Strategy, Policy, and Plans (PLCY); CBP; and U.S. Immigrations and Customs Enforcement (ICE) Homeland Security Investigations (HSI).

**Guidance to Importers**

The UFLPA establishes a rebuttable presumption that goods mined, produced, or manufactured wholly or in part in Xinjiang or by an entity on the UFLPA Entity List are prohibited from U.S. importation under 19 U.S.C. § 1307. If an importer of record can demonstrate by clear and convincing evidence that the goods in question were not produced wholly or in part by forced labor, fully respond to all CBP requests for information about goods under CBP review, and demonstrate that it has fully complied with the guidance outlined in this strategy, the Commissioner of CBP may grant an exception to the presumption. Within 30 days of any determination to grant an exception, the Commissioner of CBP must submit to Congress and make available to the public a report outlining the evidence supporting the exception.

AR002871

As mandated by the UFLPA, this report's guidance includes information on three topics: (1) due diligence, effective supply-chain tracing, and supply-chain management measures to ensure that such importers do not import any goods produced wholly or in part with forced labor from the PRC, especially from Xinjiang; (2) the type, nature, and extent of evidence that demonstrates that goods originating in the PRC were not produced wholly or in part in Xinjiang; and (3) the type, nature, and extent of evidence that demonstrates that goods originating in the PRC, including goods detained, excluded or seized for violations of the UFLPA, were not produced wholly or in part with forced labor.

**Coordination and Collaboration with Appropriate Nongovernmental Organizations and Private-Sector Entities**

Finally, the strategy features the FLETF's plan to coordinate with appropriate NGOs and private-sector entities to implement and update this strategy. The FLETF will continue to engage with NGOs and the private sector on UFLPA implementation and to host joint-interagency meetings with NGOs and the private sector to discuss enforcement and trade facilitation opportunities. The FLETF will institute biannual working-level meetings with both private-sector and NGO partners on the UFLPA strategy. Finally, the FLETF will establish a dhs.gov webpage that will include information on the FLETF, public reports issued by the FLETF, and a compiled list of FLETF agency resources to address forced labor concerns, as well as resources related to the presence of forced labor in U.S. supply chains and mitigating the risk of forced labor in global supply chains.

**Path Forward**

This strategy outlines the FLETF's recommendations for fully implementing the UFLPA's mandates in accordance with congressional intent to ensure U.S. supply chains are free of forced labor based in the PRC, especially forced labor by Uyghurs, Kazakhs, Kyrgyz, Tibetans, and members of other persecuted groups in the PRC. The strategy should be implemented in a way that strengthens U.S. supply chains and prioritizes long-term U.S. economic security.

AR002872



# Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China

# Table of Contents

**Statutory Language** ................................................................................................................. 1

Background ................................................................................................................................ 6

**UFLPA Strategy** ....................................................................................................................11

I. Assessment of the Risk of Importing Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China ....................................................................... 10

II. Evaluation and Description of Forced-Labor Schemes and UFLPA Entity List .................... 18

III. Efforts, Initiatives, Tools, and Technologies to Accurately Identify and Trace Goods ......... 31

IV. CBP Enhancement of the Use of Legal Authorities and Tools to Prevent Entry of Goods in Violation of 19 United States Code 1307 at U.S. Ports ........................................................ 34

V. Additional Resources Necessary to Ensure No Goods Made with Forced Labor Enter at U.S. Ports ....................................................................................................................................... 35

VI. Guidance to Importers .......................................................................................................... 40

VII. Coordination and Collaboration with Appropriate Nongovernmental Organizations and Private-Sector Entities ............................................................................................................ 52

**Conclusion** ............................................................................................................................... 58

Appendix A - Acronyms ............................................................................................................ 59

Appendix B – Public Perspective on FLETF Collaboration Opportunities ................................. 60

**Organization of Report**

This report begins with an introduction, including the UFLPA's statutory language and background on the FLETF. Sections I through VII correspond directly to each of the UFLPA's requirements described in 1 through 7 of Section 2(c) of Pub. L. No. 117-78. A conclusion and appendices complete the strategy.

AR002873

# Statutory Language

Section 2(c) of Public Law 117-78, *An Act [t]o ensure that goods made with forced labor in the Xinjiang Uyghur Autonomous Region of the People's Republic of China do not enter the United States market, and for other purposes*, also known as the Uyghur Forced Labor Prevention Act (UFLPA), requires that "the Forced Labor Enforcement Task Force, in consultation with the Secretary of Commerce and the Director of National Intelligence, shall develop a strategy for supporting enforcement of Section 307 of the Tariff Act of 1930 (19 U.S.C. 1307) to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China."

The UFLPA requires that the FLETF solicit public comments and host a public hearing, as described in Sections 2(a) and 2(b):

(a) *PUBLIC COMMENT.* —

(1) *IN GENERAL.*— Not later than 30 days after the date of the enactment of this Act, the Forced Labor Enforcement Task Force, established under section 741 of the United States-Mexico-Canada Agreement Implementation Act (19 U.S.C. 4681), shall publish in the Federal Register a notice soliciting public comments on how best to ensure that goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China, including by Uyghurs, Kazakhs, Kyrgyz, Tibetans, and members of other persecuted groups in the People's Republic of China, and especially in the Xinjiang Uyghur Autonomous Region, are not imported into the United States.

(2) *PERIOD FOR COMMENT.*— The Forced Labor Enforcement Task Force shall provide the public with not less than 45 days to submit comments in response to the notice required by paragraph (1).

(b) *PUBLIC HEARING.*—

(1) *IN GENERAL.*— Not later than 45 days after the close of the period to submit comments under subsection (a)(2), the Forced Labor Enforcement Task Force shall conduct a public hearing inviting witnesses to testify with respect to the use of forced labor in the People's Republic of China and potential measures, including the measures described in paragraph (2), to prevent the importation of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China into the United States.

(2) *MEASURES DESCRIBED.* — The measures described in this paragraph are—

(A) measures that can be taken to trace the origin of goods, offer greater supply chain transparency, and identify third country supply chain routes for goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China; and

1

AR002874

(B) other measures for ensuring that goods mined, produced, or manufactured wholly or in part with forced labor do not enter the United States.

UFLPA Section 2(c) requires the FLETF to develop a strategy to support enforcement of Section 307 of the Tariff Act of 1930 to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the PRC; Section 2(d) outlines the required content of the strategy:

(c) *DEVELOPMENT OF STRATEGY.*— After receiving public comments under subsection (a) and holding the hearing required by subsection (b), the Forced Labor Enforcement Task Force, in consultation with the Secretary of Commerce and the Director of National Intelligence, shall develop a strategy for supporting enforcement of Section 307 of the Tariff Act of 1930 (19 U.S.C. § 1307) to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China.

(d) *ELEMENTS.* — The strategy developed under subsection (c) shall include the following:

(1) A comprehensive assessment of the risk of importing goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China, including from the Xinjiang Uyghur Autonomous Region or made by Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups in any other part of the People's Republic of China, that identifies, to the extent feasible—

(A) threats, including through the potential involvement in supply chains of entities that may use forced labor, that could lead to the importation into the United States from the People's Republic of China, including through third countries, of goods mined, produced, or manufactured wholly or in part with forced labor; and

(B) what procedures can be implemented or improved to reduce such threats.

(2) A comprehensive description and evaluation—

(A) of ''pairing assistance'' and ''poverty alleviation'' or any other government labor scheme that includes the forced labor of Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups outside of the Xinjiang Uyghur Autonomous Region or similar programs of the People's Republic of China in which work or services are extracted from Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups through the threat of penalty or for which the Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups have not offered themselves voluntarily; and

AR002875

(B) that includes—

(i) a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

(ii) a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

(iii) a list of products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii);

(iv) a list of entities that exported products described in clause (iii) from the People's Republic of China into the United States;

(v) a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the ''poverty alleviation'' program or the ''pairing-assistance'' program or any other government labor scheme that uses forced labor;

(vi) a plan for identifying additional facilities and entities described in clause (v);

(vii) an enforcement plan for each such entity whose goods, wares [sic] articles, or merchandise are exported into the United States, which may include issuing withhold release orders to support enforcement of section 4 with respect to the entity;

(viii) a list of high-priority sectors for enforcement, which shall include cotton, tomatoes, and polysilicon; and

(ix) an enforcement plan for each such high-priority sector.

(3) Recommendations for efforts, initiatives, and tools and technologies to be adopted to ensure that U.S. Customs and Border Protection can accurately identify and trace goods made in the Xinjiang Uyghur Autonomous Region entering at any of the ports of the United States.

(4) A description of how U.S. Customs and Border Protection plans to enhance its use of legal authorities and other tools to ensure that no goods are entered at any of the ports of the United States in violation of section 307 of the Tariff Act of 1930 (19 U.S.C. 1307),

3

AR002876

including through the initiation of pilot programs to test the viability of technologies to assist in the examination of such goods.

(5) A description of the additional resources necessary for U.S. Customs and Border Protection to ensure that no goods are entered at any of the ports of the United States in violation of section 307 of the Tariff Act of 1930 (19 U.S.C. 1307).

(6) Guidance to importers with respect to—

(A) due diligence, effective supply chain tracing, and supply chain management measures to ensure that such importers do not import any goods mined, produced, or manufactured wholly or in part with forced labor from the People's Republic of China, especially from the Xinjiang Uyghur Autonomous Region;

(B) the type, nature, and extent of evidence that demonstrates that goods originating in the People's Republic of China were not mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region; and

(C) the type, nature, and extent of evidence that demonstrates that goods originating in the People's Republic of China, including goods detained or seized pursuant to section 307 of the Tariff Act of 1930 (19 U.S.C. 1307), were not mined, produced, or manufactured wholly or in part with forced labor.

(7) A plan to coordinate and collaborate with appropriate nongovernmental organizations and private sector entities to implement and update the strategy developed under subsection (c).

UFLPA Section 2(e) outlines the timeline for the initial report and frequency of subsequent updates to the strategy:

(e) *SUBMISSION OF STRATEGY.*—

(1) *IN GENERAL.*— Not later than 180 days after the date of the enactment of this Act, and annually thereafter, the Forced Labor Enforcement Task Force, in consultation with the Department of Commerce and the Director of National Intelligence, shall submit to the appropriate congressional committees a report that —

(A) in the case of the first such report, sets forth the strategy developed under subsection (c); and

(B) in the case of any subsequent such report, sets forth any updates to the strategy.

(2) *UPDATES OF CERTAIN MATTERS.*— Not less frequently than annually after the submission under paragraph (1)(A) of the strategy developed under subsection (c), the Forced Labor Enforcement Task Force shall submit to the appropriate congressional

4

AR002877

committees updates to the strategy with respect to the matters described in clauses (i) through (ix) of subsection (d)(2)(B).

(3) *FORM OF REPORT.* — Each report required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex, if necessary.

(4) *PUBLIC AVAILABILITY.*— The unclassified portion of each report required by paragraph (1) shall be made available to the public.

UFLPA Section 2(f) outlines that nothing in the UFLPA legislation or in this report will be construed to limit the application of regulations or actions taken before UFLPA enactment, that is, before December 23, 2021:

(f) *RULE OF CONSTRUCTION.*— Nothing in this section may be construed to limit the application of regulations in effect on or measures taken before the date of the enactment of this Act to prevent the importation of goods mined, produced, or manufactured wholly or in part with forced labor into the United States, including withhold release orders issued before such date of enactment.

**AR002878**

# Background

Section 1307 of Title 19, United States Code, prohibits goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by forced labor from being imported into the United States, including convict labor, indentured labor under penal sanctions, and forced or indentured child labor. CBP enforces this prohibition while facilitating legitimate trade at 328 ports of entry throughout the United States. CBP has authority to detain, seize, or exclude goods produced with forced labor, as well as to issue civil penalties against those who facilitate such imports.[4]

**Establishment of the FLETF**

The FLETF was authorized on January 29, 2020 by the United States-Mexico-Canada Agreement (USMCA) Implementation Act (19 U.S.C. § 4681). Executive Order 13923, signed May 15, 2020, established the FLETF and identified the Secretary of Homeland Security as its Chair. The Secretary delegated the role of FLETF Chair to the Under Secretary for Strategy, Policy, and Plans. The FLETF's additional members are the Office of the U.S. Trade Representative (USTR) and the U.S. Departments of Commerce (DOC), Justice (DOJ), Labor (DOL), State (DOS), and the Treasury (Treasury). The U.S. Departments of Agriculture and Energy, the U.S. Agency for International Development (USAID), CBP, ICE, and the National Security Council participate as observers.[5]

**Role of the FLETF**

The FLETF is responsible for monitoring the enforcement of 19 U.S.C. § 1307. The FLETF convenes quarterly leadership meetings and coordinates amongst its members to fulfill its mission. The FLETF provides biannual reports to Congress that include information and statistics related to CBP's enforcement of 19 U.S.C. § 1307 and plans regarding goods included in DOL's *Findings on the Worst Forms of Child Labor* report[6] and *List of Goods Produced by Child Labor or Forced Labor* report.[7]

**Forced Labor in Xinjiang and the UFLPA**

The United States condemns the PRC's violations and abuses of human rights in Xinjiang. The PRC government engages in genocide and crimes against humanity against predominantly

---

[4] 19 U.S.C. §§ 1592, 1595a.

[5] The FLETF Chair has the authority to invite agencies and departments to participate as members or observers, as appropriate.

[6] DOL's *Findings on the Worst Forms of Child Labor* report is submitted in accordance with the requirements for an annual report per section 504 of the Trade Act of 1974, as amended (19 U.S.C. § 2464).

[7] DOL's *List of Goods Produced by Child Labor or Forced Labor* report is submitted to Congress and made publicly available at least every two years in accordance with section 105(b)(2)(C) of the Trafficking Victims Protection Reauthorization Act of 2005 (22 U.S.C. § 7112(b)(2)(C)).

AR002879

Muslim Uyghurs and members of other ethnic and religious minority groups in Xinjiang.[8] Crimes against humanity include imprisonment, torture, forced sterilization, and persecution, including through forced labor and the imposition of draconian restrictions on the freedom of religion or belief, expression, and movement.[9] Congress enacted the UFLPA to highlight these abhorrent practices, combat the PRC's systematic use of forced labor in Xinjiang, and prevent goods produced in whole or in part by this repressive system from entering the United States.

**Enforcement Actions Prior to the Implementation of the UFLPA**

The U.S. government has undertaken significant efforts to mitigate the use of forced labor in Xinjiang, including by identifying and targeting specific entities and products affiliated with forced labor and publishing reports highlighting the risks of forced labor in supply chains. Since 2019, CBP has issued Withhold Release Orders[10] (WROs) on specific goods from nine PRC companies using government-sponsored forced labor,[11] on cotton from the XPCC, and on all Xinjiang cotton and tomatoes and all downstream products using Xinjiang cotton and tomatoes as inputs.[12] The DOC Bureau of Industry and Security (BIS) has added entities that use forced labor in Xinjiang to the *BIS Entity List*, which imposes a license requirement on exports, reexports, or transfers (in-country) of commodities, software, and technology subject to the Export Administration Regulations (EAR)[13] to such entities. DOL has identified goods produced in Xinjiang or through the labor transfer program on its *List of Goods Produced by Child Labor or Forced Labor*, and Treasury has identified individuals and entities for the *Specially*

---

[8] *Risks and Considerations for Businesses and Individuals with Exposure to Entities Engaged in Forced Labor and other Human Rights Abuses linked to Xinjiang, China*, U.S. Department of State, 1-2 (July 13, 2021), https://www.state.gov/wp-content/uploads/2021/07/Xinjiang-Business-Advisory-13July2021-1.pdf [hereinafter *Xinjiang Business Advisory*].

[9] *See id.* at 2*.*

[10] Pursuant to 19 C.F.R. § 12.42, CBP issues WROs against a good or goods from an entity when information reasonably, but not conclusively, indicates that a good produced by forced labor, as defined under 19 U.S.C. § 1307, is being, or is likely to be, imported into the United States. A WRO allows CBP to detain the goods in question at all U.S. ports of entry unless importers can prove the absence of forced labor in their good's supply chain.

[11] The nine WROs issued against companies using government-labor schemes include: (1) silica-based products from Hoshine Silicon Industry Co. Ltd. and subsidiaries; (2) all products from Lop County No. 4 Vocational Skills Education and Training Center; (3) hair products made in the Lop County Hair Product Industrial Park; (4) apparel produced by Yili Zhuowan Garment Manufacturing Co., Ltd. and Baoding LYSZD Trade and Business Co., Ltd; (5) cotton produced and processed by Xinjiang Junggar Cotton and Linen Co., Ltd; (6) computer parts made by Hefei Bitland Information Technology Co., Ltd.; (7) hair products from Lop County Meixin Hair Product Co. Ltd; (8) hair products from Hetian Haolin Hair Accessories Co. Ltd.; and (9) garments produced by Hetian Taida Apparel Co., Ltd.

[12] *Withhold Release Orders and Findings List*, U.S. Customs and Border Protection, https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings (last visited May 19, 2022).

[13] The Export Administration Regulations (15 C.F.R. §§ 730-774) impose additional license requirements on, and limit the availability of most license exceptions for, exports, reexports, and transfers (in country) to certain listed entities. The *BIS Entity List* (supplement no. 4 to part 744 of the EAR) identifies entities reasonably believed to be involved in, or to pose a significant risk of being or becoming involved in, activities contrary to the national security or foreign policy interests of the United States. The End-User Review Committee, composed of representatives of the Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the Treasury, makes all decisions regarding additions to, removals from, or other modifications to the *BIS Entity List*.

7

AR002880

*Designated Nationals and Blocked Persons List*, including the XPCC.[14] DOS led an interagency effort to issue an updated *Xinjiang Supply Chain Business Advisory* in July 2021, which provided information highlighting the heightened risks for businesses with supply chain and investment links to Xinjiang.[15] Additionally, DOS submitted the *Diplomatic Strategy to Address Forced Labor in Xinjiang* to Congress on April 12, 2022. Current members of the FLETF contributed to these efforts through interagency coordination and communication with U.S. stakeholders, including the private sector and NGOs. Although past efforts have prevented specific goods made with forced labor from entering the U.S. economy, the UFLPA bolsters the U.S. government's enforcement authority for prohibiting the importation of forced labor-made goods from Xinjiang and across the PRC. The UFLPA will supersede current WROs related to Xinjiang for goods imported on or after June 21, 2022.[16]

**Implementation of the UFLPA**

*Rebuttable Presumption*

The UFLPA establishes a rebuttable presumption effective June 21, 2022 that any goods mined, produced, or manufactured wholly or in part in Xinjiang are in violation of 19 U.S.C. § 1307. Pursuant to the UFLPA, the same presumption applies to goods produced by any entity included in this strategy's UFLPA Entity List. The Commissioner of CBP may grant an exception to the presumption if an importer meets specific criteria outlined in Section 3(b) of the UFLPA.[17]

*Public Comments*

The UFLPA also mandated that the FLETF solicit input from the public regarding the use of forced labor in the PRC and how best to ensure that goods mined, produced, or manufactured wholly or in part with forced labor in the PRC are not imported into the United States.

On January 24, 2022, DHS, on behalf of the FLETF, published a Federal Register notice (FRN) soliciting comments from the public.[18] DHS received 180 comments from U.S. and foreign businesses, industry associations, civil society organizations, labor unions, academia, NGOs, and

---

[14] *2020 List of Goods Produced by Child Labor or Forced Labor*, U.S. Department of Labor, (Sept. 2020), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2019/2020_TVPRA_List_Online_Final.pdf; *Specially Designated Nationals and Blocked Persons List (SDN) Human Readable Lists*, U.S. Department of the Treasury, https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists (last updated May 9, 2022).

[15] *Xinjiang Supply Chain Business Advisory*, *supra* note 8.

[16] Shipments that were imported prior to June 21, 2022 will be adjudicated through the CBP WRO/Findings process. Shipments imported on or after June 21, 2022 that are subject to the UFLPA, which previously would have been subject to a Xinjiang WRO, will be processed under UFLPA procedures, and detained, excluded, or seized.

[17] *See* Pub. L. No. 117-78, § 3, 135 Stat. 1525 (2021).

[18] Notice Seeking Public Comments on Methods To Prevent the Importation of Goods Mined, Produced, or Manufactured With Forced Labor in the People's Republic of China, Especially in the Xinjiang Uyghur Autonomous Region, Into the United States, 87 Fed. Reg. 3567 (Jan. 24, 2022).

8

**AR002881**

private individuals.[19] The comments addressed a wide array of issues such as transshipment of materials produced by forced labor, labor conditions in Xinjiang and the PRC, innovative supply-chain tracing technologies, reports of labor transfers and other programs connected to forced labor in the region, and PRC-government retaliation against businesses. Commenters made recommendations for implementing the UFLPA, raised concerns regarding the necessary information to rebut the presumption, and provided suggestions on how importers can meet the "clear and convincing" evidentiary standard, which governs exceptions to the presumption.

The FLETF held a hearing on April 8, 2022, on the use of forced labor in the PRC and measures to prevent the importation into the United States of goods produced, mined, or manufactured, wholly or in part, with forced labor.[20] The hearing was organized to encompass the following topics: (i) forced-labor schemes in Xinjiang and the PRC; (ii) risks of importing goods made wholly or in part with forced labor; (iii) measures that can be taken to trace the origin of goods and to offer greater supply chain transparency; (iv) measures that can be taken to identify third country supply chain routes; (v) factors to consider in developing and maintaining the required UFLPA Entity List; (vi) high-priority enforcement sectors, including cotton, tomato, and polysilicon; (vii) importer guidance; (viii) opportunities for coordination and collaboration; and (ix) other general comments related to the UFLPA and covering multiple topics.

Sixty members of the public provided verbal testimony, and nine submitted supplemental written testimony. Witnesses included private individuals, industry associations, consultancy and risk-management companies, civil society organizations, NGOs, research and educational institutions, advocacy groups, labor unions, and importers or their representatives. Testimony addressed topics such as forced labor conditions in Xinjiang; concerns related to UFLPA implementation; and technologies, roadblocks, and potential solutions related to UFLPA implementation.[21]

The FLETF has considered all public comments received in response to the January 24, 2022 FRN and April 8, 2022 public hearing in the development of this strategy.

---

[19] *Id.*

[20] Notice of Public Hearing on the Use of Forced Labor in the People's Republic of China and Measures To Prevent the Importation of Goods Produced, Mined, or Manufactured, Wholly or in Part, With Forced Labor in the People's Republic of China Into the United States, 87 Fed. Reg. 15448 (Mar. 18, 2022).

[21] Notice of Public Hearing on the Use of Forced Labor in the People's Republic of China and Measures to Prevent the Importation of Goods Produced, Mined, or Manufactured, Wholly or in Part, With Forced Labor in the People's Republic of China Into the United States, Regulations.gov, https://www.regulations.gov/docket/DHS-2022-0001 (last visited May 19, 2022) (containing public comments submitted in response to 87 Fed. Reg. 3567 and a transcript of verbal testimony from the hearing on April 8, 2022).

AR002882

# I. Assessment of the Risk of Importing Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China

This section provides a comprehensive assessment of the risk of importing goods mined, produced, or manufactured wholly or in part with forced labor in the PRC due to threats, including the use of forced labor in supply chains.[22] This assessment of risk supports the overall strategy to enforce the prohibition on the importation of goods made with forced labor in Xinjiang and will address the following:

- Threats that may lead to the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the PRC; and
- Procedures that can be implemented or improved to reduce such threats.[23]

**Overview of Forced Labor in Xinjiang**

The PRC government has committed genocide and crimes against humanity against Uyghurs and members of other ethnic and religious minority groups in Xinjiang. Other human rights abuses in Xinjiang involve discriminatory surveillance, ethno-racial profiling measures designed to subjugate and exploit minority populations in internment camps and, since at least 2017, the use of widespread state-sponsored forced labor.[24] DOS's 2021 *Trafficking in Persons Report* stated that the PRC arbitrarily detained more than one million Uyghurs and members of other mostly Muslim minority groups in Xinjiang.[25] Many detained individuals approved to "graduate" from internment were sent to external manufacturing sites in proximity to the camps or in other provinces and subjected to forced labor.[26] The government continued to transfer some non-interned members of minority communities designated arbitrarily as "rural surplus labor" to other areas within Xinjiang as part of a "poverty alleviation" program to exploit them for forced labor.[27] Authorities also used the threat of internment to coerce members of Muslim communities into forced labor in manufacturing.[28]

---

[22] As used in this assessment, a "supply chain" is the sequence of steps taken to produce a final good from primary factors, starting with processing of raw materials, continuing with production of (often a series of) intermediate inputs, and ending with final assembly and distribution.

[23] Pub. L. No. 117-78, § 2(d)(1), 135 Stat. 1525 (2021).

[24] *Xinjiang Business Advisory*, *supra* note 8, at 1-2; *2021 Trafficking in Persons Report*, U.S. Department of State (June 2020), https://www.state.gov/wp-content/uploads/2021/09/TIPR-GPA-upload-07222021.pdf.

[25] *2021 Trafficking in Persons Report*, *supra* note 24, at 46.

[26] *Id. at* 177.

[27] *Id.*

[28] *Id.*

10

AR002883

PRC-government documents shared by the New York Times in November 2019 confirm that forced labor is part of the government's targeted campaign of repression, mass internment, and indoctrination of ethnic minorities in Xinjiang.[29] Personal testimonies of former internment camp detainees indicate PRC authorities are systemically forcing predominantly Muslim ethnic minorities to engage in forced labor in Xinjiang.[30] Additionally, the PRC has expanded its mass detention and political indoctrination campaign through the transfer of more than 80,000 detainees into forced labor in as many as 19 other provinces between April 1, 2019 and March 31, 2020, according to a DOS report.[31] Satellite imagery also shows rapid construction of camps in Xinjiang between 2015 and 2020.[32]



PRC authorities also placed more than 500,000 rural Tibetans in "military-style" vocational training and manufacturing jobs around the country under the auspices of a quota-based "surplus labor"

---

[29] Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019), https://www.nytimes.com/interactive/2019/11/16/world/asia/china-xinjiang-documents.html.

[30] *Global Supply Chains, Forced Labor, and the Xinjiang Uyghur Autonomous Region*, Congressional-Executive Commission on China, 5 (Mar. 2020), https://www.cecc.gov/sites/chinacommission.house.gov/files/documents/CECC%20Staff%20Report%20March%20 2020%20- %20Global%20Supply%20Chains%2C%20Forced%20Labor%2C%20and%20the%20Xinjiang%20Uyghur%20Aut onomous%20Region.pdf; Vicky Xiuzhong Xu et al., *Uyghurs for Sale: 'Re-education,' forced labour and surveillance beyond Xinjiang*, Australian Strategic Policy Institute, 5 (Mar. 1, 2020), https://ad-aspi.s3.ap-southeast-2.amazonaws.com/2021- 10/Uyghurs%20for%20sale%202020OCT21.pdf?VersionId=zlRFV8AtLg1ITtRpzBm7ZcfnHKm6Z0Ys.

[31] *2021 Trafficking in Persons Report*, *supra* note 24, at 177.

[32] *Who are the Uyghurs and why is China being accused of genocide?*, BBC News (June 21, 2021), https://www.bbc.com/news/world-asia-china-22278037; Eric Robinson & Sean Mann, *Part 2: Have Any of Xinjiang's Detention Facilities Closed?*, Tearline.mil (Feb. 26,2021), https://www.tearline.mil/public_page/xinjiang-nighttime-2/.

11

AR002884

transfer program ostensibly intended as a "poverty alleviation" measure.[33] Observers noted that victims were subjected to forced labor and had little to no ability to refuse participation due to the PRC's social control over Tibet.[34]

**Threats that May Lead to the Importation of Goods Made with Forced Labor from the PRC**

Supply chains that touch Xinjiang are highly susceptible to the use of forced labor. Complex supply chains obscure the use of PRC-based forced labor in goods that enter the United States. Threats that amplify the likelihood of the presence of such goods in U.S. supply chains include lack of supply chain visibility, obscured Xinjiang inputs into multi-tiered manufacturing, supply chains that commingle inputs made with forced labor with legitimate production processes, intentional import prohibition evasion through transshipment, and forced labor practices that target vulnerable populations within the PRC.

*Lack of Supply Chain Visibility*

Global supply chain distribution and complexity in the production, processing, and manufacturing of goods is a key challenge in preventing goods produced with state-sponsored forced labor in the PRC from entering the United States.[35] This complexity obscures the origins of goods sourced from Xinjiang—a challenge compounded by the limited means of reliably tracing product sourcing.

Importers face challenges in tracing their supply chains due to a lack of tracing technologies, restrictions on independent auditors in the region, and other challenges.[36] As a result, importers often have visibility only into primary stages of their supply chains but not into the raw, or near-raw, material supplier level.[37] Forced labor often occurs at this supplier level, for example in agriculture and extraction of raw materials; and, in some cases, forced labor will be in mid-tier production chains, for example in manufacturing and assembly.[38] U.S. businesses may struggle

---

[33] Adrian Zenz, *Xinjiang's System of Militarized Vocational Training Comes to Tibet*, The Jamestown Foundation: China Brief (Sept. 22, 2020), https://jamestown.org/program/jamestown-early-warning-brief-xinjiangs-system-of-militarized-vocational-training-comes-to-tibet/.

[34] *Id.*

[35] *Not for Sale-Advertising Forced Labor Products for Illegal Export*, Laogai Research Foundation, 6-7 (Feb. 2010), https://d18mm95b2k9j1z.cloudfront.net/wp-content/uploads/2019/01/21-Not-for-sale.pdf; *Global Supply Chains*, *supra* note 30, at 7.

[36] *See* Eva Xiao, *Auditors to Stop Inspecting Factories in China's Xinjiang Despite Forced-Labor Concerns*, Wall St. J. (Sept. 21, 2020), https://www.wsj.com/articles/auditors-say-they-no-longer-will-inspect-labor-conditions-at-xinjiang-factories-11600697706.

[37] Consumer Technology Association Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 2, 6 (Mar. 11, 2022), https://downloads.regulations.gov/DHS-2022-0001-0139/attachment_1.pdf.

[38] Lehr, *supra* note 3, at 2-3; *Ending child labour, forced labour and human trafficking in global supply chains*, International Labour Organization, 62 (Nov. 12, 2019), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---ipec/documents/publication/wcms_716930.pdf. Suppliers in a supply chain are often ranked by "tier," depending on their distance from the business producing the good at issue. First-tier suppliers are those who supply direct to the business, second-tier are suppliers to the first-tier, and so on until the raw or near-raw supplier level.

AR002885

to gain visibility into the suppliers involved in the early stages of manufacturing, and therefore are not always aware of supplier level or mid-tier manufacturer sourcing, and will continue to be unaware without wider availability of adequate tracing technologies.[39] If not aware of material supplier level or mid-tier sourcing, final tier manufacturers and U.S. importers would not be able to confirm if those materials were sourced directly or indirectly from Xinjiang.

*Third Country or Province Manufacturing Processes*

In 2019, total exports from Xinjiang totaled $17.6 billion, including only $300 million in direct U.S. imports.[40] The China Chamber of International Commerce reports that in 2020, Xinjiang had direct exports to 177 countries and regions, exporting 4,761 different kinds of products, therefore introducing risk that imports from these 177 countries may be impacted by labor conditions in Xinjiang.[41] For example, Xinjiang produces about one-fifth of the world's cotton[42] and about half of the world's polysilicon.[43] Raw or processed materials (e.g., cotton, thread or yarn) manufactured in Xinjiang may be shipped to another region or province in the PRC or to a third country for processing. Those materials could be commingled with inputs from other regions and obscure the origin of the materials imported into the United States.[44] Companies that purchase raw or processed materials from third countries may in fact be procuring goods from Xinjiang indirectly.

*Intentional Transshipment and Evasion*

In efforts to circumvent 19 U.S.C. § 1307, companies attempt to use illegal transshipment to conceal the origin of goods or inputs from Xinjiang. For example, even though CBP issued a WRO on the XPCC in 2020 for using forced labor, the XPCC has sustained trade relationships

---

[39] National Association of Manufacturers Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 2 (Mar. 11, 2022), https://downloads.regulations.gov/DHS-2022-0001-0176/attachment_1.pdf.

[40] *Working on the chain gang: Congress is moving to block goods made with the forced labor of Uyghurs*, The Economist (Jan. 9 2021), https://www.economist.com/united-states/2021/01/09/congress-is-moving-to-block-goods-made-with-the-forced-labour-of-uyghurs.

[41] China Chamber of International Commerce Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 21-22 (Mar. 11, 2022), https://www.regulations.gov/comment/DHS-2022-0001-0157.

[42] BBC News, *supra* note 32; Laura T. Murphy Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 3 (Mar. 11, 2022), https://downloads.regulations.gov/DHS-2022-0001-0148/attachment_1.pdf.

[43] Solar Energy Industries Association Response to Senator Rubio and Senator Merkley, SEIA, 1 (Mar. 26, 2021), https://www.seia.org/sites/default/files/2021-03/SEIA%20Response%20to%20Senators%20Rubio%20and%20Merkley%20%283.26.2021%29.pdf; Dan Murtaugh et al., *Secrecy and Abuse Claims Haunt China's Solar Factories in Xinjiang*, Bloomberg (Apr. 13, 2021), https://www.bloomberg.com/graphics/2021-xinjiang-solar/?sref=Tj5BOuJ2.

[44] International Union, United Automobile, Aerospace & Agricultural Implement Workers of America Comment to the Forced Labor Enforcement Task Force, Regulations,gov, 2 (Mar. 8, 2022), https://downloads.regulations.gov/DHS-2022-0001-0047/attachment_1.pdf.

13

AR002886

with commercial actors in third countries.[45] These relationships allow the XPCC to evade U.S. import restrictions by transshipping goods through these third countries. One study that traced goods produced by XPCC-majority owned companies found that, since 2019, these companies have exported 4,559 shipments to their top trade partners, who then reexported these goods to the United States and other countries.[46] For example, XPCC subsidiaries have exported tomato products to a third country food company, which, since 2019, has likely used these inputs in over 300 shipments exported to the United States.[47] Goods originating from Xinjiang, but that arrive in the United States under a declared country of origin other than the PRC, may evade detection as forced labor-made products.

Manufacturing processes and multi-tiered supply chains can further obscure the use of forced labor inputs by incorporating them into legitimate manufacturing processes. A 2021 USAID-funded Sheffield Hallam University study detailed the practice of PRC textile companies that, although not using forced labor in their own mid-tier third country facilities, rely on prohibited Xinjiang raw materials or semi-finished goods. Such goods could then be exported from a third country to the United States as a means of obscuring or "laundering" the importation of tainted raw materials from Xinjiang.[48]

*PRC Policies and Practices Pose Challenges to U.S. Forced Labor Enforcement*

Suppliers and manufacturers located in the PRC face pressures, including via the PRC's Anti-Foreign Sanctions Law, to defy U.S. import laws and regulations.[49] In March 2022, U.S. industry stakeholders reported that the PRC government has acted against PRC companies for complying with U.S. requirements to eliminate Xinjiang supply chain inputs.[50] The PRC also encourages the use of forced labor through its "mutual pairing assistance" programs, which provide companies with government incentives to establish factories near Xinjiang internment camps and to train detainees in labor-intensive industries like textile and garment manufacturing.[51]

---

[45] Irina Bukharin, *Long Shadows: How the Global Economy Supports Oppression in Xinjiang*, C4ADS, 16-17 (2021), https://c4ads.org/s/Xinjiang-Report.pdf; *Treasury Sanctions Chinese Entity and Officials Pursuant to Global Magnitsky Human Rights Executive Order*, U.S. Department of the Treasury (July 31, 2020), https://home.treasury.gov/news/press-releases/sm1073; *CBP Issues Detention Order on Cotton Products Made by Xinjiang Production and Construction Corps Using Prison Labor*, U.S. Customs and Border Protection (Dec. 2, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-detention-order-cotton-products-made-xinjiang-production.

[46] Bukharin, *supra* note 45, at 18.

[47] *Id.* at 20.

[48] Laura T. Murphy et al., *Laundering Cotton: How Xinjiang Cotton is Obscured in International Supply Chains*, Sheffield Hallam University Helena Kennedy Centre for International Justice, 51 (2021), https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/laundered-cotton.

[49] Seyfarth Shaw LLP, *Anti-Foreign Sanctions Law: Update for Companies Doing Business in China*, JDSupra (Oct. 15, 2021), https://www.jdsupra.com/legalnews/anti-foreign-sanctions-law-update-for-3549235/.

[50] United States Council for International Business Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 29 (Mar. 10, 2022), https://downloads.regulations.gov/DHS-2022-0001-0137/attachment_1.pdf.

[51] *See infra* Section II. Evaluation and Description of Forced Labor Schemes and UFLPA Entity List.; *Xinjiang Business Advisory*, *supra* note 8, at 7.

AR002887

U.S. and other Western companies have also been targeted by the PRC government, potentially due to public statements against forced labor in Xinjiang.[52] In March 2021, a clothing retailer was removed from all major e-commerce platforms in the PRC after the Communist Youth League of China accused the retailer of "spreading rumors" about the cotton industry in Xinjiang.[53] In June 2021, the PRC's General Administration of Customs confiscated, destroyed, or returned several shipments from U.S. companies that had spoken out against forced labor.[54]

**Procedures to Reduce Such Threats**

*Existing Efforts to Address the Threat of Forced Labor Goods Entering U.S. Supply Chains*

State-sponsored forced labor in the PRC continues to pose a significant threat to U.S. and global supply chains. As of April 2022, CBP has 35 active WROs[55] against goods from the PRC, accounting for nearly 65 percent of all WROs. Many recent WROs issued against entities based in the PRC have been tied to the government's use of forced labor targeting Uyghurs and members of other ethnic and religious minorities in Xinjiang. In addition, CBP maintains five active Findings[56] against goods produced with forced labor in the PRC, accounting for 55 percent of CBP's total forced labor Findings worldwide.[57]

---

[52] *China accuses Western firms over 'harmful' kids' goods*, BBC News (June 3, 2021), https://www.bbc.com/news/business-57339758.

[53] Allard K. Lowenstein International Human Rights Clinic Comment to the Forced Labor Enforcement Task Force, Regulations.gov, 5-6 (Mar. 11, 2022), https://downloads.regulations.gov/DHS-2022-0001-0141/attachment_1.pdf.

[54] Karen M. Sutter, *China's Recent Trade Measures and Countermeasures: Issues for Congress*, Congressional Research Service, 55 (Dec. 10, 2021), https://crsreports.congress.gov/product/pdf/R/R46915.

[55] CBP implements 19 U.S.C. 1307 through the issuance of WROs and Findings to prevent merchandise produced in whole or in part in a foreign country using forced labor from being imported into the United States. There are 35 active WROs and one partially active WRO as of April 2022. CBP is now partially implementing one WRO involving goods from the PRC as a result of a modification that removed some goods covered by the original WRO.

[56] CBP issues a Finding when the agency makes a determination based on probable cause that forced labor is used in the manufacturing or production of a good or goods. *See* 19 CFR 12.42(f). A Finding allows CBP to seize the product(s) in question at all U.S. ports of entry.

[57] *Withhold Release Orders and Findings List*, *supra* note 12.

15

AR002888



*Image as of April 27, 2022 from https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings*

DOL's *List of Goods Produced by Child or Forced Labor* includes 18 goods made with forced labor in China: artificial flowers, Christmas decorations, coal, fish, footwear, garments, gloves, hair products, nails, thread or yarn, tomato products, bricks, cotton, electronics, fireworks, textiles, toys,[58] and polysilicon (added in 2021).[59] Of these, ten have links to forced labor in Xinjiang or by Uyghur workers transferred to other parts of China: cotton, garments, footwear, electronics, gloves, hair products, polysilicon, textiles, thread/yarn, and tomato products. In addition, citing widespread state-sponsored forced labor, DOS has for years identified the PRC as a Tier 3 country, the lowest rank, in its *Trafficking in Persons Report* due to the PRC's failure to meet minimum standards on eliminating human trafficking set forth in the Trafficking Victims' Protection Act.[60]

**Future Efforts to Reduce Such Threats**

Businesses and individuals should undertake heightened due diligence to ensure compliance with U.S. law and to identify potential supply chain exposure to companies operating in Xinjiang,

---

[58] *2020 List of Goods Produced by Child Labor or Forced Labor*, *supra* note 14, at 31.

[59] Notice of Update to the Department Labor's List of Goods Produced by Child Labor or Forced Labor, 86 FR 32977 (Jun. 23, 2021).

[60] *2021 Trafficking in Persons Report*, *supra* note 24, at 47.

16

AR002889

linked to Xinjiang (e.g., through the pairing assistance program or Xinjiang supply chain inputs), or using Uyghur or other minority laborers in the PRC.

Businesses and individuals must review the risks and both civil and criminal liabilities in doing business with suppliers in the PRC and in third countries that may touch PRC forced labor. The United Nations' *Guiding Principles on Business and Human Rights*, the Organisation for Economic Cooperation and Development's *Guidelines for Multinational Enterprises*, the International Labor Organization's (ILO) *Combating Forced Labour: A Handbook for Employers and Business*, and the Office of the High Commissioner for Human Rights guide on *The Corporate Responsibility to Respect Human Rights* provide guidance for heightened due diligence in high-risk and conflict-affected regions. These documents highlight factors that may be considered in determining appropriate action, including whether and how to responsibly end relationships when a business is unable to prevent or mitigate the use of forced labor. Additional recommendations to secure supply chains against the risk of forced labor can be found in Section VI of this strategy.

AR002890

# II. Evaluation and Description of Forced-Labor Schemes and UFLPA Entity List

This section provides a description and evaluation of PRC government-labor schemes, as mandated by Section 2(d)(2)(A) of the UFLPA.

**''Pairing Assistance,'' ''Poverty Alleviation,'' and Other Government-Labor Schemes Overview**

The PRC government engages in genocide and crimes against humanity against Uyghurs and other ethnic and religious minority groups in Xinjiang.[61] Forced labor is a central tactic used for repression in state-run internment camps.[62] The PRC has implemented labor programs across the country with a stated objective of eradicating poverty. However, use of such programs in Xinjiang and the use of labor sourced from persecuted groups carries a particularly high-risk of forced labor for members of ethnic and religious minority groups. In some cases, workers are transferred directly from detention to factories in and outside of Xinjiang.[63] Even when workers in these programs are not directly transferred from internment, they are not voluntarily offering themselves as labor.[64]

The PRC government administers labor programs that target Uyghurs, Kazakhs, Kyrgyz, Tibetans, and members of other persecuted groups. Purported "poverty alleviation," "pairing assistance," and "labor transfer" programs can include discriminatory social control, pervasive surveillance, and large-scale internment.[65] An official PRC government report published in September 2020 indicated that the government reports to have placed over two and a half million workers at farms and factories in Xinjiang and across the PRC.[66] Research has since shown that workers in these schemes are largely members of ethnic minorities who are subjected to systemic oppression through forced labor and do not offer themselves voluntarily.[67] Notably, reports and testimony from former workers from Xinjiang who are members of ethnic and religious minority groups have consistently identified indicators of forced labor in four specific sectors: apparel, cotton and cotton products, silica-based products (including polysilicon), and tomatoes and downstream products.[68]

---

[61] *Xinjiang Business Advisory*, *supra* note 8 at 1-2.

[62] *Forced Labor in China's Xinjiang Region*, U.S. Department of State (July 1, 2021), https://www.state.gov/wp-content/uploads/2021/06/Forced-Labor-in-Chinas-Xinjiang-Region_LOW.pdf.

[63] Lehr, *supra* note 3 at 1-2.

[64] *See, e.g.*, *id.*

[65] Murphy et al., *supra* note 48, at 26-29.

[66] *Employment and Labor Rights in Xinjiang* [English version], The State Council Information Office of the People's Republic of China (Sept. 2020).

[67] Murphy et al., *supra* note 48, at 9.

[68] The FLETF has identified these four sectors as high priority for enforcement in Strategy Section II.

18

AR002891

**State-Sponsored Forced Labor in the PRC's Labor Programs**

The PRC refers to internment camps as "Vocational Training Centers."[69] Uyghurs and members of other ethnic and religious minority groups are subjected to forced labor in the internment camps, but so too are individuals who "graduate" from the camps.[70] Such individuals are often required to work at nearby facilities or are sent to satellite factories in their home region or other provinces.[71]

*The PRC "Mutual Pairing Assistance" Program*

Xinjiang government documents indicate that the PRC administers the "mutual pairing assistance" program, which facilitates PRC companies establishing satellite factories in Xinjiang and in conjunction with the internment camps.[72] Through the PRC government's mutual pairing assistance program, at least 19 cities and developed provinces have spent billions of Chinese yuan to establish factories in Xinjiang.[73] Factories are directly involved in the use of internment camp labor, including as part of labor programs that require parents to leave behind children as young as 18 months old while forced to work full-time under constant surveillance. Those children are then sent to state-controlled orphanages and other facilities.[74]

The PRC's pairing strategy relies generally on low-skilled labor industries that require only limited job training.[75] Private companies receive subsidies and other incentives for operating in Xinjiang or "absorbing" ethnic minority workers through government-labor assignment programs.[76] Xinjiang attracts textile and garment companies by building production sites near internment camps and providing companies subsidies for each detainee they train and employ.[77] These subsidies create a windfall for these PRC-linked companies, artificially lowering labor costs and supporting unfair competition. Reports and testimony from minority-group former workers have indicated the use of forced labor at private-sector labor assignments in the cotton textile sector, including through restriction of movement, deception about the terms of work, retention of identification documents, withholding of wages, and physical abuse.[78]

---

[69] *2021 Trafficking in Persons Report*, *supra* note 24, at 178.

[70] *Id.*

[71] Adrian Zenz, *Beyond the Camps: Beijing's Grand Scheme of Coercive Labor, Poverty Alleviation and Social Control in Xinjiang*, Congressional Executive Commission on China, 6-14 (Oct. 17, 2019), https://www.cecc.gov/sites/chinacommission.house.gov/files/documents/Beyond%20the%20Camps%20CECC%20testimony%20version%20%28Zenz%20Oct%202019%29.pdf.

[72] *Id.* at 8-13.

[73] *Id.* at 23-24.

[74] *Id.* at 21-23.

[75] *Xinjiang Business Advisory*, *supra* note 8, at 7.

[76] Murphy et al., *supra* note 48, at 10.

[77] *Id.* at 17.

[78] *Id.*; *see also* Xinjiang Victims Database, https://www.shahit.biz/eng (last visited May 19, 2022).

19

AR002892

*PRC's Poverty Alleviation Programs*

The PRC's "poverty alleviation" programs place Uyghurs and members of other persecuted minority groups in farms and factories across the PRC and compel them to work involuntarily under threat of penalty. PRC government policy documents indicate that these programs are intended to exercise control over the employment of every working-age person in Xinjiang.[79]

Factories that accept minority workers through these labor programs receive government subsidies, as do the recruitment intermediaries who organize transfers of workers from Xinjiang to other provinces.[80] According to an NGO report, between 2017 and 2019 an estimated 80,000 ethnic minority workers were assigned out of Xinjiang to work in factories in eastern Chinese provinces through labor transfer programs under a PRC government policy known as "Xinjiang Aid."[81] The factories produce inputs for a variety of industries, including apparel and textiles, electronics, solar energy, and the automotive sector.[82]

*Land Transfer and Reemployment*

In rural areas, coercive expropriation of farmland from small-scale farmers also facilitates involuntary labor transfers.[83] The Xinjiang government administers crop production programs under which predominantly minority owners of (usually small) agricultural plots are required to transfer their land to "cooperatives" run by a small group of prominent farmers or a Han Chinese person.[84] The cooperatives in turn grow crops for use in private companies' manufacturing, at purchase prices set by the company. Dispossessed farmers are left unemployed and vulnerable to forced labor transfers or, if they refuse, internment. In some cases, farmers are required to work as hired labor for the cooperatives and companies that assume control over expropriated land, including their own, in a program described as "land transfer and reemployment."[85]

**Indicators of Forced Labor in PRC Labor Programs**

The ILO Forced Labour Convention defines forced labor as "all work or service…exacted from any person under the menace of any penalty and for which the said person has not offered…[them]self voluntarily."[86] This is the same definition set forth in 19 U.S.C. § 1307. The ILO has identified 11 indicators of forced labor: abuse of vulnerability, deception, restriction of movement, isolation, physical and sexual violence, intimidation and threats, retention of identity

---

[79] Zenz, *supra* note 71, at 4.

[80] *Id.* at 10-11.

[81] Xu et al., *supra* note 30, at 3, 13.

[82] *Id.* at 5.

[83] Laura T. Murphy, Kendyl Salcito & Nyrola Elimä, *Financing & Genocide: Development Finance and the Crisis in the Uyghur Region*, The Atlantic Council, 8 (Feb. 2022), https://www.atlanticcouncil.org/wp-content/uploads/2022/02/Financing__Genocide.pdf.

[84] *Id.*

[85] *Id.* at 26; Murphy et al., *supra* note 48, at 11-12.

[86] International Labour Organization, Forced Labour Convention, 1930, No. 29, https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C029.

AR002893

documents, withholding of wages, debt bondage, abusive working and living conditions, and excessive overtime.[87]

The following forced labor indicators[88] are present in government-labor schemes that use the forced labor of members of persecuted minorities from Xinjiang:

- **Intimidation and threats:** Labor transfer and work is undertaken involuntarily as a result of pervasive government intimidation and threats, as well as penalty of detention and indoctrination. Individuals who attempt to resist government work assignments are subjected to mandatory ideological education, sometimes in a prison or detention facility. Workers do not have the option to decline employment under the poverty alleviation or pairing assistance labor transfer programs without explicit or implicit threats of penalty. Ethnic and religious minority residents of Xinjiang are subject to the threat of arbitrary detention. Workers are also subjected to threats to family members in Xinjiang, including threats of detention of family members.[89] Workers are subjected to constant surveillance, and are monitored by security personnel and digital surveillance tools.[90] Surveillance is done through electronic means, watchtowers, government minders, or by employers reporting to the government.[91] Workers' movements are tightly restricted even outside the workplace.[92]

- **Abuse of vulnerability:** The persecution of members of ethnic minority groups in Xinjiang makes them vulnerable to forced labor and abuse. Members of minority groups are often transferred from internment camps to factories or are subject to threats of imprisonment at detention camps or traditional prisons.[93] Such threats make these persecuted minorities dependent on their employers for safety. The PRC also exploits the vulnerability of minority workers in Xinjiang by expropriating their private land, thereby dispossessing them of homes and income sources and forcing them into transfer programs.[94] Any entity who knowingly or has reason to believe it is employing workers impacted by "pairing assistance" or "poverty alleviation" who were subject to forced recruitment is abusing the worker's vulnerability and is itself implicated in forced labor.

- **Restriction of Movement:** Workers perform duties in internment camps and fenced-in factories with surveillance, guards, and requirements to report their movements.[95] Uyghur,

---

[87] *ILO Indicators of Forced Labour*, International Labour Organization, 3 (Oct. 1, 2012), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.
[88] *Id.*
[89] *See, e.g.*, Xu et al., *supra* note 30, at 6.
[90] *Id.*
[91] *Id.* at 10.
[92] *Id.* at 6.
[93] *2021 Trafficking in Persons Report*, *supra* note 24, at 177-78; Murphy et al., *supra* note 48, at 9.
[94] Murphy et al., *supra* note 48, at 11-12.
[95] Murphy et al., *supra* note 48, at 7; Xu et al., *supra* note 30, at 6; *see also* Xinjiang Victims Database, *supra* note 78; Lehr, *supra* note 3; Zenz, *supra* note 71, at 2.

21

AR002894

Kazakh, and other ethnic minority group workers are often not allowed to leave the factories, or are heavily monitored when they do.[96]

- **Isolation:** Authorities segregate Turkic and Muslim forced laborers from other workers at factories in and outside Xinjiang. Workers live in segregated dormitories and are transported in dedicated trains.[97]

- **Abusive working conditions:** Workers are subject to political, cultural, and ideological indoctrination, police guard posts in factories, military-style management, and a ban on religious practices, such as praying or reading the Quran.[98]

- **Excessive overtime:** Workers are required to attend "patriotic education" and "vocational training," which includes Mandarin Chinese language classes, sometimes after working factory shifts that include full days of work activities.[99]

The below addresses the remaining requirements of Section 2(d)(2)(B), which includes the UFLPA Entity List, lists of products made by listed entities, FLETF member and observer agencies' plan to identify additional entities and facilities, a list of high-priority enforcement sectors, and enforcement plans for entities and high-priority sectors. The entities listed are subject to the presumption that their products are prohibited from entry into the United States under 19 U.S.C. § 1307, effective June 21, 2022.[100] The FLETF has identified the entities, facilities, and products based on the criteria outlined by the UFLPA. The initial sources for the entities listed pursuant to Sections 2(d)(2)(B)(i), (ii), (iv), and (v) are existing CBP WROs and the *BIS Entity List*. The listed entities, as well as any future updates, will be published in the Federal Register.

Section 2(d)(2)(B) of the UFLPA requires the FLETF to provide the following lists and plans outlined in subsections (i) through (ix).

**Section 2(d)(2)(B)(i) A list of entities in Xinjiang that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor**

| |
|---|
| Baoding LYSZD Trade and Business Co., Ltd. |
| Changji Esquel Textile Co. Ltd. (and one alias[101]: Changji Yida Textile) |
| Hetian Haolin Hair Accessories Co. Ltd. (and two aliases: Hotan Haolin Hair Accessories; and Hollin Hair Accessories) |
| Hetian Taida Apparel Co., Ltd (and one alias: Hetian TEDA Garment) |

---

[96] *Id.*

[97] Xu et al., *supra* note 30, at 4-6.

[98] *See, e.g.*, Lehr, *supra* note 3, at 2; Zenz, *supra* note 71, at 11; Xu et al., *supra* note 30, at 4.

[99] Murphy et al., *supra* note 48, at 20; Zenz, *supra* note 71, at 6; Xu et al., *supra* note 30, at 6.

[100] Pub. L. No. 117-78, § 3(a), 135 Stat. 1525 (2021).

[101] Aliases for listed entities were collected through public or commercially available information.

AR002895

| |
|---|
| Hoshine Silicon Industry (Shanshan) Co., Ltd (including one alias: Hesheng Silicon Industry (Shanshan) Co.) and subsidiaries |
| Xinjiang Daqo New Energy, Co. Ltd (including three aliases: Xinjiang Great New Energy Co., Ltd.; Xinjiang Daxin Energy Co., Ltd.; and Xinjiang Daqin Energy Co., Ltd.) |
| Xinjiang East Hope Nonferrous Metals Co. Ltd. (including one alias: Xinjiang Nonferrous) |
| Xinjiang GCL New Energy Material Technology, Co. Ltd (including one alias: Xinjiang GCL New Energy Materials Technology Co.) |
| Xinjiang Junggar Cotton and Linen Co., Ltd. |
| Xinjiang Production and Construction Corps (including three aliases: XPCC; Xinjiang Corps; and Bingtuan) and its subordinate and affiliated entities |

**Section 2(d)(2)(B)(ii) A list of entities working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang**

| |
|---|
| Aksu Huafu Textiles Co. (including two aliases: Akesu Huafu and Aksu Huafu Dyed Melange Yarn) |
| Hefei Bitland Information Technology Co., Ltd. (including three aliases: Anhui Hefei Baolongda Information Technology; Hefei Baolongda Information Technology Co., Ltd.; and Hefei Bitland Optoelectronic Technology Co., Ltd.) |
| Hefei Meiling Co. Ltd. (including one alias: Hefei Meiling Group Holdings Limited) |
| KTK Group (including three aliases: Jiangsu Jinchuang Group; Jiangsu Jinchuang Holding Group; and KTK Holding) |
| Lop County Hair Product Industrial Park |
| Lop County Meixin Hair Products Co., Ltd. |
| Nanjing Synergy Textiles Co., Ltd. (including two aliases: Nanjing Xinyi Cotton Textile Printing and Dyeing; and Nanjing Xinyi Cotton Textile) |
| No. 4 Vocation Skills Education Training Center (VSETC) |
| Tanyuan Technology Co. Ltd. (including five aliases: Carbon Yuan Technology; Changzhou Carbon Yuan Technology Development; Carbon Element Technology; Jiangsu Carbon Element Technology; and Tanyuan Technology Development) |
| Xinjiang Production and Construction Corps (XPCC) and its subordinate and affiliated entities |

**Section 2(d)(2)(B)(iii) A list of products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii)**

| Name of entity listed in clause (i) or (ii) | Products mined, produced, or manufactured wholly or in part by each entity |
|---|---|
| Aksu Huafu Textiles Co. (including two aliases: Akesu Huafu and Aksu Huafu Dyed Melange Yarn) | Textiles; Clothing |
| Baoding LYSZD Trade and Business Co., Ltd. | Apparel |

23

AR002896

| Name of entity listed in clause (i) or (ii) | Products mined, produced, or manufactured wholly or in part by each entity |
|---|---|
| Changji Esquel Textile Co. Ltd. (and one alias: Changji Yida Textile) | Textiles; Clothing |
| Hefei Bitland Information Technology Co., Ltd. (including three aliases: Anhui Hefei Baolongda Information Technology; Hefei Baolongda Information Technology Co., Ltd.; and Hefei Bitland Optoelectronic Technology Co., Ltd.) | Computer parts; Electronics |
| Hefei Meiling Co. Ltd. (including one alias: Hefei Meiling Group Holdings Limited) | Electronics |
| Hetian Haolin Hair Accessories Co. Ltd. (and two aliases: Hotan Haolin Hair Accessories; and Hollin Hair Accessories) | Hair Products |
| Hetian Taida Apparel Co., Ltd (and one alias: Hetian TEDA Garment) | Garments |
| Hoshine Silicon Industry (Shanshan) Co., Ltd (including one alias: Hesheng Silicon Industry (Shanshan) Co.) and subsidiaries | Silica-Based Products |
| KTK Group (including three aliases: Jiangsu Jinchuang Group; Jiangsu Jinchuang Holding Group; and KTK Holding) | Rail Transportation Equipment |
| Lop County Hair Product Industrial Park | Hair Products |
| Lop County Meixin Hair Products Co., Ltd. | Hair Products |
| Nanjing Synergy Textiles Co., Ltd. (including two aliases: Nanjing Xinyi Cotton Textile Printing and Dyeing; and Nanjing Xinyi Cotton Textile) | Textiles; Clothing |
| Tanyuan Technology Co. Ltd. (including five aliases: Carbon Yuan Technology; Changzhou Carbon Yuan Technology Development; Carbon Element Technology; Jiangsu Carbon Element Technology; and Tanyuan Technology Development) | Touch Screens for Handheld Devices and Cars; Other Similar Products. Electronics |
| Xinjiang Daqo New Energy, Co. Ltd (including three aliases: Xinjiang Great New Energy Co., Ltd.; Xinjiang Daxin Energy Co., Ltd.; and Xinjiang Daqin Energy Co., Ltd.) | Polysilicon, including Solar-Grade Polysilicon |
| Xinjiang East Hope Nonferrous Metals Co. Ltd. (including one alias: Xinjiang Nonferrous) | Polysilicon, including Solar-Grade Polysilicon |
| Xinjiang GCL New Energy Material Technology, Co. Ltd (including one alias: Xinjiang GCL New Energy Materials Technology Co.) | Polysilicon, including Solar-Grade Polysilicon |
| Xinjiang Junggar Cotton and Linen Co., Ltd. | Cotton; Processed Cotton |

24

AR002897

| Name of entity listed in clause (i) or (ii) | Products mined, produced, or manufactured wholly or in part by each entity |
|---|---|
| Xinjiang Production and Construction Corps (including three aliases: XPCC; Xinjiang Corps; and Bingtuan) and its subordinate and affiliated entities | Cotton and Cotton Products |
| Yili Zhuowan Garment Manufacturing Co., Ltd. | Apparel |

**Section 2(d)(2)(B)(iv) A list of entities that exported products described in clause (iii) from the PRC into the United States**

Entities identified in sections (i) and (ii) above may serve as both manufactures and exporters. We have not identified additional exporters at this time but will continue to investigate and gather information about additional relevant entities.

**Section 2(d)(2)(B)(v) A list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from Xinjiang or from persons working with the government of Xinjiang or the Xinjiang Production and Construction Corps for purposes of the ''poverty alleviation'' program or the ''pairing-assistance'' program or any other government-labor scheme that uses forced labor**

| |
|---|
| Baoding LYSZD Trade and Business Co., Ltd. |
| Hefei Bitland Information Technology Co. Ltd. |
| Hetian Haolin Hair Accessories Co. Ltd. |
| Hetian Taida Apparel Co., Ltd. |
| Hoshine Silicon Industry (Shanshan) Co., Ltd., and Subsidiaries |
| Xinjiang Junggar Cotton and Linen Co., Ltd. |
| Lop County Hair Product Industrial Park |
| Lop County Meixin Hair Products Co., Ltd. |
| No. 4 Vocation Skills Education Training Center (VSETC) |
| Xinjiang Production and Construction Corps (XPCC) and its subordinate and affiliated entities |
| Yili Zhuowan Garment Manufacturing Co., Ltd. |

**Section 2(d)(2)(B)(vi) A plan for identifying additional facilities and entities described in clause (v)**

FLETF agencies will be able to recommend the addition, removal, or modification of entities for the UFLPA Entity List. The UFLPA Entity List will be published on a DHS FLETF website and the Federal Register. Pursuant to Section 2(e) of the UFLPA, the UFLPA Entity List will also be incorporated into the public-facing annual congressional report. Depending on the level of information or evidence available, the FLETF may make referrals to relevant U.S. government, agencies for additional follow-up or action(s) (e.g., if appropriate, the FLETF may make a referral to HSI and DOJ for further investigation). While any FLETF member agency can make

25

AR002898

recommendations for the addition of entities or facilities to this list, the following members provided specific plans as follow.

DOS, in coordination with the FLETF, will provide guidance to U.S. embassies abroad on the identification of prospective new entities and facilities in Xinjiang and elsewhere in the PRC that produce goods with forced labor; entities that participate in recruitment, transfer, receipt, or other facilitation of forced labor and labor transfer of members of persecuted groups; and entities that export products produced with forced labor or by entities using the labor transfer program. When appropriate, DOS will submit recommendations for the addition and/or removal of an entry on the UFLPA Entity List. DOS will continue to engage with NGOs to obtain relevant information to identify additional facilities and entities.

CBP will use a range of sources and research tools, both public and non-public, to identify entities in Xinjiang, and XPCC subsidiaries and affiliates, as well as entities that utilize forced labor via the PRC "poverty alleviation" program, the "pairing assistance" program, or any other government-labor scheme using forced labor with potential nexus to U.S. imports. This will include entities within Xinjiang and entities, whether or not located in Xinjiang, using products in their supply chain that were produced in Xinjiang.

DOC BIS will identify additional facilities or entities by utilizing the End-User Review Committee (ERC) process and the criteria set forth under the EAR. DOC's BIS will continue to review activities of the Chinese government and commercial entities to determine whether placement of additional entities on the *BIS Entity List* or removal of compliant entities is warranted.

**Section 2(d)(2)(B)(vii) An enforcement plan for each such entity whose goods, wares articles, or merchandise are exported into the United States, which may include issuing withhold release orders to support enforcement of section 4 with respect to the entity**

In bilateral engagements with foreign governments, DOS, U.S. embassies and consulates, and other federal departments and agencies will continue to emphasize the United States' commitment to ending forced labor, including the commitment to preventing the importation of any goods made with forced labor into the United States pursuant to 19 U.S.C. § 1307. DOS will also use these engagements to encourage foreign governments to prevent rerouting to third countries of shipments of goods produced with forced labor; encourage likeminded allies and partners, including trade partners, to publicly denounce PRC atrocities, and other human rights violations and abuses in Xinjiang; and encourage foreign governments to pursue complementary actions to hold entities accountable to prevent the importation of goods that utilize forced labor.

CBP will identify and interdict shipments exported to the United States by those entities located in Xinjiang, subsidiaries and affiliates of the XPCC, and any other entities, whether or not located in Xinjiang, found to utilize products in their supply chain produced in Xinjiang. The goods targeted will include all products produced and exported by these entities, as well as finished goods exported by other manufacturers that were produced with inputs (e.g., raw materials) from the aforementioned entities.

**AR002899**

CBP will employ a risk-based approach, dynamic in nature, that prioritizes the highest-risk goods based on current data and intelligence. Currently the highest-risk goods include those imported directly from Xinjiang into the United States and from entities on the UFLPA Entity List. CBP will also prioritize illegally transshipped goods with inputs from Xinjiang, as well as goods imported into the United States by entities that, although not located in Xinjiang, are related to an entity in Xinjiang (whether as a parent, subsidiary, or affiliate) and likely to contain inputs from that region.

In addition to CBP identifying and interdicting goods subject to the rebuttable presumption, other DHS Components will also undertake separate enforcement efforts. The DHS Center for Countering Human Trafficking (CCHT) will send viable referrals of allegations of forced labor by entities in the PRC or affiliates of such entities that use or benefit from forced labor in Xinjiang to HSI field offices for pursuit of criminal investigations and federal prosecution, as appropriate.

**Section 2(d)(2)(B)(viii) A list of high-priority sectors for enforcement, which shall include cotton, tomatoes, and polysilicon[102]**

**Apparel:** There are reports that forced labor is used in the production of apparel in the PRC. Researchers note that Xinjiang is undergoing an expansion of the garment and textile industry, and it is possible that hundreds of thousands of workers are being subjected to forced labor as part of this effort. There are indicators of forced labor, including the restriction of movement, isolation, intimidation and threats, withholding of wages, and abusive working and living conditions. Workers are also subjected to constant surveillance, retribution for religious beliefs, exclusion from community and social life, and threats to family members. Further, some workers have been subject to military-style management, government indoctrination, and are paid below the minimum wage. Through the "mutual pairing assistance" and "poverty alleviation" programs, workers can be placed at factories within Xinjiang, where the camps are located, or be transferred to factories in eastern PRC.

**Cotton and cotton products:** There are reports that forced labor is used in the production of cotton in the PRC. Reports indicate that even as rates of mechanization in the cotton harvest in Xinjiang have increased, up to half a million ethnic minority workers each year are mobilized to pick cotton as part of coercive labor transfer programs. "Labor transfer of rural surplus laborers" and "poverty alleviation" programs place farmers into seasonal wage labor harvesting cotton on plantations in southern Xinjiang. Workers are recruited through intrusive government door-to-door pressure and indoctrination campaigns, and are subjected to constant surveillance and control while working. Workers also report receiving wages below the national minimum. In addition, many workers are subjected to forced labor at yarn factories within Xinjiang, particularly for cotton yarns. Reports indicate that more than 2,000 adult Uyghur and ethnic

---

[102] The paragraphs in this section are based on the U.S. Department of Labor Trafficking Victims Protection Reauthorization Act List, *supra* note 14 and the U.S. Customs and Border Protection Withhold Release Orders, *supra* note 12.

**AR002900**

Kazakh workers have been involuntarily transferred out of Xinjiang to yarn factories in the east and forced to produce thread or yarn products.

**Silica-Based Products (including polysilicon):** There are reports of forced labor in the production of silica-based products in the PRC. Silica is a raw material that is used to make aluminum alloys, silicones, and polysilicon, which is then used in buildings, automobiles, petroleum, concrete, glass, ceramics, sealants, electronics, solar panels, and other goods. Companies operating in Xinjiang are offered government subsidies to use the labor of ethnic minority groups. There are credible reports that factories have engaged in coercive recruitment; intimidation and threats; limited workers' freedom of movement and communication; subjected workers to constant surveillance, retribution for religious beliefs, and exclusion from community and social life; and threatened workers' family members.

**Tomatoes and Downstream Products:** There are reports of forced labor in the production of tomato products in the PRC. The factories that produce tomato products, especially tomato paste, have frequently engaged in coercive recruitment; limited workers' freedom of movement and communication; and subjected workers to constant surveillance, retribution for religious beliefs, and isolation. Through the "mutual pairing assistance" and "poverty alleviation" programs, workers can be placed at factories within Xinjiang or be transferred to factories in eastern PRC.

**Section 2(d)(2)(B)(ix) An enforcement plan for each such high-priority sector**

*Existing Enforcement Actions by U.S. Agencies*

The rebuttable presumption, effective June 21, 2022, will apply to all products (whether or not already subject to WROs) within these high-priority sectors produced in Xinjiang or by entities on the UFLPA Entity List.[103] Shipments that were imported prior to June 21, 2022 will be adjudicated through the CBP WRO/Findings process. Shipments imported on or after June 21, 2022 that are subject to the UFLPA, which previously would have been subject to a Xinjiang WRO, will be processed under UFLPA procedures, and detained, excluded, or seized. Upon detention or exclusion of the merchandise, importers should consult Section VI of this strategy and CBP's *Uyghur Forced Labor Prevention Act U.S. Customs and Border Protection Operational Guidance for Importers*[104] to understand the options to export the goods, to request a review of whether the importation is within the UFLPA's purview, or to request an exception from the rebuttable presumption in accordance with Section 3(b) of the UFLPA.[105]

CCHT supports HSI investigations of alleged criminal violations of 18 U.S.C. § 1589 forced labor, including those related to the importation of garments and silica-based products from Xinjiang.

---

[103] *See* Pub. L. No. 117-78, § 3(a), 135 Stat. 1525 (2021).
[104] *Uyghur Forced Labor Prevention Act U.S. Customs and Border Protection Operational Guidance for Importers*, U.S. Customs and Border Protection (June 2022), https://www.cbp.gov/document/guidance/uflpa-operational-guidance-importers
[105] *Id.* § 3(b).

28

AR002901

Since October 2019, BIS has added a total of 67 entities to the *BIS Entity List* for their involvement in the PRC's repression, mass arbitrary detention, forced labor programs, and high-technology surveillance targeted at Uyghurs and members of other Muslim minority groups in Xinjiang, including 15 entities that were identified by BIS as implicated in the practice of accepting or utilizing forced labor. A U.S. company wishing to export, reexport, or transfer (in-country) any item subject to the EAR to any of the 67 entities is required to apply for a license.

*Future Enforcement Actions*

The U.S. government agencies listed above will continue to follow developments in and gather information about these sectors and others, as relevant, using their existing processes and authorities. Each of these agencies will also continue to use this information to carry out its own legally mandated enforcement actions or sanctions.

CBP will implement an enforcement plan that identifies and interdicts goods from high-priority sectors that are found to have a nexus to producers in Xinjiang, subsidiaries and affiliates of the XPCC, and any other producing entity found to utilize forced labor via a government-labor scheme, including those identified in the UFLPA Entity List. This enforcement plan will cover primary commodities and finished goods produced and exported from Xinjiang or an XPCC-linked entity, as well as finished and semi-finished goods manufactured by other entities that were produced with inputs from Xinjiang or the XPCC (e.g., textiles and apparel manufactured with cotton from Xinjiang). This enforcement plan will apply to any producer of finished products found to utilize inputs from Xinjiang or entities on the UFLPA Entity List, irrespective of the country of final manufacture.

In regards to the listed high priority sectors, CBP will employ a risk-based approach, dynamic in nature, that prioritizes the highest-risk goods based on current data and intelligence. Currently the highest-risk goods include those imported directly from Xinjiang into the United States and from entities on the UFLPA Entity List. CBP will also prioritize illegally transshipped goods with inputs from Xinjiang, as well as goods imported into the United States by entities that, although not located in Xinjiang, are related to an entity in Xinjiang (whether as a parent, subsidiary, or affiliate) and likely to contain inputs from that region.

CCHT will send viable referrals of allegations against those identified as high-priority sectors under Section 2 (d)(2)(B)(viii) of the UFLPA to HSI to pursue criminal investigation and federal prosecution, as appropriate.

BIS will continue to use the ERC process to identify and review activities of the PRC government and commercial entities to determine whether placement of additional entities on the *BIS Entity List* is warranted. Under Section 744.11(b) of the EAR,[106] persons for whom there is reasonable cause to believe, based on specific and articulable facts, that they have been involved,

---

[106] 15 C.F.R. §§ 730-774

29

**AR002902**

are involved, or pose a significant risk of being or becoming involved in, activities that are contrary to the national security or foreign policy interests of the United States, along with those acting on behalf of such persons, may be added to the *BIS Entity List*. Included in activities that are deemed contrary to U.S. foreign policy interests are human rights violations including the use of forced labor.

As part of its commitment to putting human rights at the center of U.S. foreign policy, which includes holding accountable entities that engage in forced labor, DOS will continue to use appropriate tools and authorities to draw attention to and promote accountability for human rights violations and abuses in Xinjiang. Utilizing mechanisms to promote accountability, including the Elie Wiesel Genocide and Atrocities Prevention Act of 2018[107] and visa restriction authorities under Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021,[108] DOS will contribute to the whole-of-government effort to hold accountable those who seek to benefit from forced labor in Xinjiang. Further details on DOS's *Diplomatic Strategy to Address Forced Labor in Xinjiang* are contained in the report submitted to Congress in April 2022, required by Section 4 of the UFLPA.

---

[107] Pub. L. No. 115-441, 132 Stat. 5586 (2019).
[108] Pub. L. No. 116–260, § 7031(c), 134 Stat. 1743 (2020).

30

AR002903

# III. Efforts, Initiatives, Tools, and Technologies to Accurately Identify and Trace Goods

The following section provides recommendations for efforts, initiatives, and tools and technologies to ensure CBP can accurately identify and trace goods made in Xinjiang upon arrival at any port of entry in the United States. In developing these recommendations, the FLETF explored approaches for CBP to improve supply-chain tracing and identify goods made in Xinjiang entering at U.S. ports of entry. The FLETF identified innovative technology-based solutions that would enhance CBP's automated systems.

**Assessment of New Supply-Chain Tracing Technology**

CBP is assessing cutting-edge technologies to identify and trace goods made with forced labor, specifically those technologies that support enhanced visibility into trade networks and supply chains that source goods or materials made with forced labor. CBP will prioritize technological capabilities that include:

- Integration of commercial-data sources with artificial intelligence and machine learning;
- Scanning, translation, and data extraction of non-text-searchable documents and sources;
- Remote sensing to support the digital traceability of raw materials sourced from Xinjiang;
- Foreign corporate registry data to map the structure of multinational companies and their global corporate networks; and
- Mapping major global supply chains that source from Xinjiang.

CBP plans to adopt enhanced supply-chain tracing technology that can connect imported goods to Xinjiang and other parts of the world at high-risk for forced labor. CBP also plans to invest in advanced search engines that may allow CBP to link known or suspected forced labor violators with their related business structures and transactions. These links may expose shell companies and layered ownership structures for entities involved in forced labor.

CBP is exploring other leading-edge technologies that can expedite the translation of documents in multiple languages (to include Chinese script) and improve the targeting of goods at high-risk of being made with forced labor by using enhanced modeling. These unique and scalable technological solutions have the potential to significantly enhance forced labor enforcement efforts by allowing CBP to quickly and accurately identify those entities that attempt to bypass the law through fraudulent documentation or shipping practices.

Additionally, CBP will work with interagency partners, including Federally Funded Research and Development Centers, to identify potential advanced-analytic models capable of identifying previously unknown entities engaged in forced labor practices and enhancing the speed of entity identification.

31

AR002904

*Investments to Enhance Existing Systems*

In addition to exploring new technologies, CBP will continue to invest in its existing automated systems. CBP plans to enhance its current case management system to include an official record of a forced labor investigation's life cycle, which will be visible CBP-wide. The enhanced system will include all evidence, correspondence, and other documents related to the investigation, including detention orders, materials obtained and considered by CBP during an investigation, information submitted by importers with an admissibility petition, and materials from other agencies provided to CBP pursuant to the investigation. The planned enhancements also include a portal to track admissibility petitions.

CBP is considering other enhancements, which include:

- Improving current diagnostic analysis and analytical targeting to effectively enforce the UFLPA and prevent the importation of goods at high-risk of forced labor from other parts of the world.
- Advancing the integration of agency-wide systems to streamline user interface and data alignment between systems to support legitimate trade and provide uniform and reliable data capture and reporting.

Investments in CBP automated processes related to forced labor detentions, reviews, validations, and subsequent actions to facilitate lawful trade will improve CBP's ability to efficiently implement the UFLPA and include the following:

- Automating detention and seizure notices to provide immediate shipment status notifications to relevant parties (importer and broker);
- Developing a portal where importers submit evidence to contest the UFLPA rebuttable presumption, which will expedite admissibility determinations; and,
- Creating a common interface where field operators can access laboratory validation results for imported goods suspected of originating in regions at high-risk for forced labor and directly connect to existing systems that document release or enforcement efforts based on laboratory validation results.

Modernized and integrated enterprise systems will increase data quality and communication, enabling CBP to make better informed decisions more rapidly about admissibility of goods. The trade community will benefit from the enhancements as CBP decreases examination time, submits focused examination requests, and automates notifications.

32

**AR002905**

**Enhanced Interagency Collaboration on the Identification and Tracing of Goods**

CBP will continue to leverage DOL's *List of Goods Produced by Child Labor or Forced Labor*,[109] *List of Products Produced by Forced or Indentured Child Labor*,[110] and *Better Trade Tool*,[111] as well as DOS's *Trafficking in Person Report*[112] and *Responsible Sourcing Tool*,[113] to help identify and target imported goods at risk of being made with forced labor. CBP will also continue to utilize DOL's tools such as *Comply Chain*[114] to educate importers on effective supply-chain tracing and transparency. CBP encourages importers to manage their global supply chains by developing comprehensive and transparent due diligence systems.[115]

CBP will collaborate with industry analysts from other FLETF member and observer agencies to gain commodity expertise and supply-chain insights for specific goods or production inputs. This enhanced collaboration will support CBP audits to determine the veracity of the documentation that an importer may provide to petition for the admissibility of goods.

The existing collaboration between HSI and CBP has resulted in a significant increase in WROs and Findings issued in Fiscal Years (FY) 2021 and 2022. CBP and HSI will continue to investigate forced labor with a high-level of coordination and explore innovative solutions and combined investments to support investigations.

---

[109] *List of Goods Produced by Child Labor or Forced Labor*, U.S. Department of Labor, https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods (last visited May 19, 2022).

[110] *List of Products Produced by Forced or Indentured Child Labor*, U.S. Department of Labor, https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-products (last visited May 19, 2022).

[111] *Better Trade Tool*, U.S. Department of Labor, https://www.dol.gov/agencies/ilab/better-trade-tool (last visited May 19, 2022).

[112] *2021 Trafficking in Persons Report*, *supra* note 24.

[113] Responsible Sourcing Tool, https://www.responsiblesourcingtool.org (last visited May 19, 2022).

[114] *Comply Chain: Business Tools for Labor Compliance in Global Supply Chains*, U.S. Department of Labor, https://www.dol.gov/general/apps/ilab-comply-chain (last visited May 19, 2022).

[115] *See* The Basics of a Social Compliance System, *Comply Chain*, U.S. Department of Labor, https://www.dol.gov/ilab/complychain/steps/2 (last visited May 19, 2022).

33

AR002906

# IV. CBP Enhancement of the Use of Legal Authorities and Tools to Prevent Entry of Goods in Violation of 19 United States Code 1307 at U.S. Ports

The UFLPA requires a description of how CBP plans to enhance its use of legal authorities and other tools to ensure that no goods in violation of 19 U.S.C. § 1307 are entered at any U.S. port, including through the initiation of pilot programs to test the viability of technologies to assist in the examination of such goods. Such existing authorities include, but are not limited to, detention and exclusion authorities under 19 U.S.C. § 1499 and seizure authorities under 19 U.S.C. § 1595a(c).

CBP is considering revisions to its regulations that will allow the agency to respond more quickly and nimbly to allegations of forced labor; provide importers with clear guidance as to processes, requirements, and timeframes for admissibility and exception determinations; and more uniformly implement admissibility determination processes for those determinations. The projected revisions are intended to provide well-defined requirements for importers for more effective and efficient enforcement of the prohibition of goods made with forced labor, with the goal of deterring and discouraging the use of forced labor.

AR002907

# V. Additional Resources Necessary to Ensure No Goods Made with Forced Labor Enter at U.S. Ports

Effectively combating the importation of goods made wholly or in part by forced labor requires relevant federal agencies to manage existing resources effectively; identify resource shortfalls; and, subject to Administration priorities, the President's budget process, and appropriations, adequately resource implementation of this strategy. Such investments include not only direct operational costs, but also management and oversight requirements.

**DHS Office of Strategy, Policy, and Plans**

DHS PLCY supports the Undersecretary in his role as the Chair of the FLETF, which is currently comprised of thirteen department and agency members and observers.[116] The FLETF was authorized pursuant to Section 741 of the USMCA Implementation Act,[117] formally established by Executive Order 13923 on May 15, 2020 and tasked with monitoring enforcement of 19 U.S.C. § 1307. The UFLPA tasked the FLETF with hosting a public comment period and public hearing, both of which informed the development of this strategy. As a result, PLCY has undertaken a significant reallocation of resources to meet those demands and anticipates both near- and long-term resource needs to effectively execute ongoing requirements.

*Staffing and Overtime*

The FLETF, and the administration of the new congressionally mandated lines of effort for the FLETF, were not allocated separate staff or resourcing. Each FLETF member and observer agency has relied on its existing resources for participation. DHS PLCY has oversight and administration responsibilities for the FLETF. PLCY has routinely organized meetings, established FLETF priorities, coordinated bi-annual reports to Congress, and, most recently, led FLETF efforts to implement provisions of the UFLPA.

As PLCY prioritized the UFLPA implementation in FY 2022, it realigned existing staff members to support the coordination of an expedited whole-of-government strategy. Overtime was critical to address the required surge in work. This prioritization, however, resulted in the temporary diversion of resources away from other DHS trade policy priorities. Additional resources will be needed for the oversight and coordination role intended by Congress for the FLETF and sustainable implementation of the UFPLA. To this end, PLCY is recruiting additional full-time staff policy analysts in FY 2022 and 2023 to execute FLETF responsibilities.

---

[116] The Secretary of Homeland Security is designated as Chair of the FLETF, per Executive Order 13923, and has since delegated this position to the Under Secretary for the Office of Strategy, Policy, and Plans. As Chair, the Undersecretary for the Office of Strategy, Policy, and Plans has the authority to invite departments and agencies to participate as members or observers, as appropriate.

[117] 19 U.S.C. § 4681.

AR002908

*Strategy and Coordination*

PLCY led coordination efforts among interagency and DHS Component partners, through a series of *ad hoc* working groups, to meet congressional requirements and produce this strategy. Moving forward, the FLETF will need to maintain oversight of future implementation efforts of elements of this strategy. PLCY will continue to facilitate coordination on various policy and operational matters set before the FLETF, including in the following areas:

- Assessment, evaluation, and designation of entities to be included or removed from the UFLPA Entity List.
- Enhanced outreach and coordination with civil society, private-sector organizations, and congressional stakeholders on the continued implementation of the UFLPA.
- Alignment with any other U.S. government initiative affecting the prohibition of imports of goods made with forced labor or policies related to the PRC.
- Proactive engagement with international partners to support the Diplomatic Strategy and to prohibit trade in products made with forced labor in Xinjiang.
- Annual updates to the strategy.

*Communication and Outreach*

To implement the UFLPA, the statute requires the FLETF to take on a new public engagement role. Whereas interagency staff assigned to the FLETF previously consisted of analysts focused on U.S. supply chains, forced labor, and interagency coordination, PLCY staff must now execute external-engagement and public-affairs coordination. As outlined in Section VII of this strategy, the FLETF, led by PLCY, will increase its regular meetings with different stakeholder groups on a range of issues related to the UFLPA. To facilitate these meetings, PLCY will be heavily involved in communicating and coordinating with stakeholders and monitoring public concerns submitted to the FLETF public email inbox. PLCY will also lead the establishment and maintenance of a FLETF website hosted on dhs.gov. Since no resources have been authorized or appropriated to the FLETF, PLCY must prioritize among mission areas within DHS and the other FLETF member agencies to support this new function.

**U.S. Customs and Border Protection**

CBP is the primary federal agency responsible for enforcing customs laws to combat the importation of goods produced with forced labor, as required by 19 U.S.C. § 1307. CBP investigates suspected forced labor in U.S. supply chains, targets and inspects imports that may contain goods that were produced with forced labor; detains, excludes, or seizes particular goods at U.S. ports of entry; investigates suspicious trade activity; conducts audits related to forced labor allegations; pursues civil penalties against individuals and companies involved in the importation of those prohibited goods; and works with HSI in support of criminal investigations related to forced labor.

CBP anticipates a significant increase in workload because of the rebuttable presumption in the UFLPA. Implementation of the rebuttable presumption increases the scope and volume of goods

36

**AR002909**

subject to examination and enforcement under the UFLPA at ports of entry as well as a proportionate increase in administrative requirements across the agency. The increase in staff actions at ports of entry and headquarters to enforce UFLPA provisions has the potential to overcome other trade-enforcement priorities and requirements that are risk-based, such as intellectual property rights, detection and interdiction of opioids and other contraband, duty collections, and antidumping and countervailing duty evasion cases. The end-to-end forced labor enforcement process requires the support of nearly every CBP program office and an increase in resources commensurate to the impact to these offices. The pay funding request in the FY 2023 President's Budget includes positions critical for the vast actions within the forced labor enforcement process. The significant increase in scope and volume of reviews and the anticipated scale of requests for exceptions will require increased resources at ports of entry and in every CBP program office involved in forced labor enforcement to manage, audit, review, and generate reports to Congress for each exception.

CBP has assessed current resources against anticipated needs and identified needs for significant investments in the areas of staffing, training, strategy and outreach, and tools and technology. Thanks to the support of Congress, CBP secured $27.5 million in the FY 2022 Enacted Budget to implement initial UFPLA requirements. An additional $70.3 million is included in the FY 2023 President's Budget request, with FY 2024 and outyear support to be considered as part of future annual budget processes. This initial resourcing (FY 2022 and FY 2023) includes funding for continued enforcement, but CBP recognizes that acquiring, training, and equipping adequate staff and technologies will be an ongoing process.

*Staffing and Overtime*

Of the $27.5 million secured in the FY 2022 Enacted Budget, funding of $5.6 million was secured for staffing to allow for 65 positions, and $10 million was secured for overtime to supplement staffing shortages at the ports of entry. Overtime was deemed critical to address the anticipated surge in cases that would require time and training to fully ingest. For FY 2023, CBP estimates another 300 positions will be required to effectively implement the new legislation. Staffing needs will include CBP Officers, Import Specialists, Seized Property Specialists, Technicians, Paralegals, Trade Analysts, Auditors, Attorneys, Scientists, Instructors, Technical Experts, and support staff. These positions are critical to ensuring proper staffing levels are provided to carry out CBP's trade mission and address the increased workload associated with the UFLPA.

*Internal Communications and Training*

Funding of $526,000 was secured in the FY 2022 Enacted Budget to allow CBP to continue to ensure its personnel have the necessary knowledge of forced labor legislation and the policies and procedures to effectively implement and enforce the UFLPA. CBP will educate personnel at all levels about the requirements and operational impact of the UFLPA using various communication channels available to CBP. A robust training program for CBP personnel involved in forced labor enforcement will be initiated, to include webinars and a new forced labor curriculum at the Trade and Cargo Academy. The training will enable personnel involved

37

**AR002910**

in trade enforcement to adapt to the changing trade environment and build expertise in the complexities of supply chains, risk management, and forced labor.

*Strategy & Outreach*

Funding of $3 million was appropriated in the FY 2022 Enacted Budget for enhanced strategy development and outreach. CBP will evaluate and establish an organizational mechanism to leverage, and as appropriate, centralize and coordinate its capabilities and resources to effectively combat the importation of goods produced with forced labor.

Industry compliance is essential to combatting forced labor. If industry views violating laws and regulations prohibiting forced labor as a cost of doing business, then those laws and regulations have not achieved their goal of preventing this illegal activity from occurring. Additionally, if industry lacks information or necessary investments and tools to identify forced labor risks in supply chains, industry will not achieve the goal of preventing this illegal activity.

Therefore, industry education and collaboration are essential to ensuring the facilitation of legitimate trade. CBP will educate the public on forced labor and its impact on commerce and society through a *Public Awareness Campaign: U.S. Consumers and American Producers.* The goal of this campaign is to highlight CBP's global leadership of forced labor enforcement efforts and to enhance public awareness of forced labor and its impact on commerce and society. As part of this campaign, CBP will use various communication platforms to educate the public, the trade community, NGOs, and international organizations on forced labor, including: webinars, digital print materials, articles, media messages, and CBP social media.

Additionally, CBP will continue to provide timely and accurate information to the trade community to ensure that importers, customs brokers, and other relevant entities maintain compliance with forced labor legislation, including the newly enacted UFLPA. Trade outreach will focus on:

- Increasing awareness of the passage of the UFLPA;
- Communicating the timeline of its implementation; and
- Educating importers on how the rebuttable presumption will be applied and how the trade community can request a review of whether the importation is within UFLPA's purview or an exception to the rebuttable presumption.

CBP will implement the most efficient, cost-effective measures possible to engage and support partner efforts to prevent importation of goods made wholly or in part with forced labor. This will include posting updated forced labor resource links, Informed Compliance Publications, fact sheets, and frequently asked questions on the cbp.gov informational web page.[118] In addition, CBP will continue to work in collaboration with partner government agencies to develop

---

[118] *Forced Labor,* U.S. Customs and Border Protection, https://www.cbp.gov/trade/forced-labor (last visited May 20, 2022)

AR002911

education and training materials and host extensive trade outreach events such as educational webinars, panels, trade fairs, and international and domestic training with public, private, and international stakeholders. Furthermore, DHS will continue to meet with partner government agencies, NGOs, the trade community, and foreign governments seeking information on forced labor within supply chains.

*Tools and Technology*

Funding of $8.3 million was secured in the FY 2022 Enacted Budget to provide enforcement and trade personnel with the appropriate tools and technology to enforce trade laws to combat the importation of goods produced with forced labor. An additional $19.4 million is included in the FY 2023 President's Budget request, with FY 2024 and beyond support to be considered as part of outyear budget processes. This funding will support workforce modernization efforts and technology enhancements as described in Sections III and IV of this strategy. The goals of CBP's technology enhancements are to:

- Streamline the appeal process for admissibility reviews and exceptions to the rebuttable presumption;
- Improve the integration of CBP systems to modernize and streamline workflows that will result in better enforcement of 19 U.S.C. § 1307, facilitation of legitimate cargo, and support targeting of high-risk country-commodity-producer combinations for forced labor;
- Advance supply-chain tracing capabilities;[119] and
- Expand on CBP's Forced Labor Case Management system.

**U.S. Immigration and Customs Enforcement**

The DHS CCHT, led by ICE HSI, is working with CBP to determine the possible increased workload for ICE HSI, and to request commensurate resources to address the anticipated increase in investigative referrals after various provisions of UFLPA become effective in June 2022. This resourcing, subject to the President's Budget process and appropriations, will include personnel, overtime, technology, and training but cannot be accurately assessed at this time due to uncertainty as to the rate of referrals.

---

[119] *See supra* Section III. Efforts, Initiatives, Tools, and Technologies to Accurately Identify and Trace Goods.

39

AR002912

# VI. Guidance to Importers

The UFLPA requires the Commissioner of CBP to apply a rebuttable presumption that all goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in Xinjiang, or by entities on the UFLPA Entity List, are prohibited from entry into the United States under 19 U.S.C. § 1307. The rebuttable presumption applies to downstream products that incorporate these goods as inputs, regardless of where the products are produced, *i.e.,* to goods produced in the PRC outside Xinjiang, as well as goods produced in third countries or shipped through third countries, if they contain inputs mined, produced, or manufactured in Xinjiang or by an entity on the UFLPA Entity List.

It should be noted that an importer may provide information to CBP indicating that the goods are not in any way subject to the UFLPA, *i.e.,* its importations, and inputs, are sourced completely from outside Xinjiang and have no connection to the UFLPA Entity List. CBP will release such shipments, provided they are otherwise in compliance with U.S. law. If CBP has taken an enforcement action under the UFLPA on an importation, but an importer believes that its importation is outside the scope of the UFLPA, an importer may provide information to CBP to that effect, *i.e.*, information that the imported goods and their inputs are sourced completely from outside Xinjiang and have no connection to the UFLPA Entity List. Providing such documentation in English will facilitate CBP's efficient review of these exception requests. For the types of information required to establish that the importation is outside the scope of the UFLPA, refer to Section IV (B) of this strategy.

For an importation that is within the scope of the UFLPA, an importer may request an exception, which requires the importer to demonstrate that it has complied with the guidance set forth in this section, responded completely and substantively to all CBP requests for information, as well as demonstrate, by clear and convincing evidence that its imports were not mined, produced, or manufactured wholly or in part with forced labor. For guidance on the evidence relevant to the latter, refer to Section IV (C) of this strategy.

Section 2(d)(6) of the UFLPA requires the FLETF to provide guidance to importers on the following topics:

- due diligence, effective supply-chain tracing, and supply-chain management measures to ensure that importers do not import any goods mined, produced, or manufactured wholly or in part with forced labor from the PRC, especially from Xinjiang;
- the type, nature, and extent of evidence that demonstrates that goods originating in the PRC were not mined, produced, or manufactured wholly or in part in Xinjiang; and
- the type, nature, and extent of evidence that demonstrates that goods originating in the PRC, including goods detained or seized pursuant to 19 U.S.C. § 1307, were not mined, produced, or manufactured wholly or in part with forced labor.

An importer seeking an exception to the rebuttable presumption must demonstrate that it has fully complied with the requirements set forth in this section, and with any regulations that may

40

**AR002913**

be issued in the future by CBP to implement this section. Barriers to performing due diligence, to supply-chain tracing, and supply-chain management, and to obtaining evidence to demonstrate that goods were not made wholly or in part in Xinjiang or by an entity on the UFLPA Entity List, may make it difficult for importers to fully comply with this guidance. Such barriers may prevent an importer from qualifying for an exception to the rebuttable presumption. Goods that do not qualify for an exception are subject to exclusion, or seizure and forfeiture.

In addition, the UFLPA requires that an importer seeking an exception to the rebuttable presumption must completely and substantively respond to all CBP requests for information to ascertain whether the goods were made wholly or in part with forced labor. CBP must also determine that there is clear and convincing evidence that the goods, wares, articles, or merchandise at issue were not mined, produced, or manufactured wholly or in part by forced labor. Importers may identify additional shipments that have identical supply chains to those that have been reviewed previously and determined to be admissible by CBP, to facilitate the faster release of identical shipments.

To facilitate implementation of the rebuttable presumption, CBP has also provided complementary guidance that is operational in nature, and which is available on CBP's UFLPA website.[120]

Shipments imported prior to June 21 will be adjudicated through the WRO/Findings process. Shipments imported on or after June 21 that are subject to the UFLPA, which previously would have been subject to a Xinjiang WRO, will be processed under UFLPA procedures, and detained, excluded, or seized.

**A. Due diligence, effective supply chain tracing, and supply chain management measures to ensure that importers do not import any goods mined, produced, or manufactured wholly or in part with forced labor from the People's Republic of China, especially from Xinjiang**

*Due Diligence*

To overcome the rebuttable presumption, importers must conduct due diligence to ensure they do not import any goods mined, produced, or manufactured wholly or in part with forced labor. For the purposes of this guidance, due diligence includes assessing, preventing, and mitigating forced labor risk in the production of goods imported into the United States.

DOL's *Comply Chain*[121] lays out in detail the ways in which an importer may demonstrate due diligence by developing a due diligence system. While systems may vary from industry to industry, an effective due diligence system in any industry may include the following elements:

- Engage stakeholders and partners

---

[120] *Uyghur Forced Labor Prevention Act*, U.S. Customs and Border Protection, https://www.cbp.gov/trade/forced-labor/UFLPA (last visited May 19, 2022).
[121] *Comply Chain*, U.S. Department of Labor, https://www.dol.gov/ilab/complychain/ (last visited May 19, 2022).

41

AR002914

- Assess risks and impacts
- Develop a code of conduct
- Communicate and train across supply chain
- Monitor compliance
- Remediate violations
- Independent review
- Report performance and engagement

Importers may refer to DOL's *Comply Chain* for more information on the elements of an effective due diligence system. The following information summarizes these elements.

1) Engage stakeholders and partners

Due diligence includes identifying and engaging with stakeholders. Stakeholders may include individuals and communities affected by the operations and practices of a business, including those who work for suppliers throughout the supply chain.

Importers must engage with suppliers involved directly in the production of goods that will be imported into the United States and either work through those suppliers to engage, or engage directly, with producers of raw materials and components used in the imported goods to assess and address forced labor risk.

Sufficient due diligence may not be possible with regard to goods made in Xinjiang or made using the labor of workers from PRC-labor schemes if barriers prevent safe and secure engagement with the workers.

2) Assess risks and impacts

Forced labor risk assessments identify those places in supply chains where goods or materials are at risk of being made wholly or in part with forced labor.[122] To conduct a forced labor risk assessment, importers must map supply chains for their imported goods and then identify steps at risk of using forced labor.

In making a forced labor risk assessment, factors to consider include, but are not limited to:

- Origin of imported goods and any raw materials or components in the imported good;
- Transactions among entities along the supply chain tied to the specific imported goods;
- Locations and identities of entities in the supply chain;

---

[122] *ILO Indicators of Forced Labour*, *supra* note 87. The ILO has developed 11 forced labor indicators to identify the most common signs that point to the possible existence of forced labor. With respect to PRC's forced-labor schemes (including transfer of workers from Xinjiang), the most common ILO indicators of forced labor are: intimidation and threats; exploitation of a position of dependency and vulnerability; restriction on freedom of movement; isolation; abusive working and living conditions; and excessive hours, as described in Section II.

AR002915

- Business relationships among entities in the supply chain;
- Use of publicly available datasets to estimate probability that raw materials or components originated in Xinjiang (when there are indications that raw materials or components do not originate from the stated location, such as inputs from countries that are known to lack production capacity that matches its output volume, additional due diligence is needed); and
- Indications that a supplier at any tier of the supply chain is using detainee or ex-detainee labor or is receiving workers from Xinjiang through PRC government-labor programs. For examples, see Strategy Section II.

3) Develop a code of conduct

A written code of conduct or equivalent statement of supply-chain standards that provides a framework for addressing the risk of forced labor in supply chains is an important element of due diligence. For supply chains that touch Xinjiang or involve entities that use labor transferred from Xinjiang under PRC-labor programs, the code of conduct must specifically forbid the use of forced labor and address the risk of use of PRC government-labor schemes, such as pairing assistance, poverty alleviation, or other labor transfer programs.

The importer should incorporate its code of conduct into its supplier contracts, including specification of all activities that a supplier is required to undertake as part of the importer's due diligence system, such as allowing auditors and verification organizations necessary access to facilities. In addition, if the importer plans to rely on direct suppliers to ensure its upstream suppliers implement standards consistent with the importer's code of conduct, the contract with the direct supplier should require the direct supplier to ensure that upstream suppliers train employees on detecting forced labor; conduct self-audits or obtain independent audits, including on recruitment of workers and use of PRC government-labor programs; implement corrective action plans; track and report on its performance of the contract's requirements; and require and monitor subcontractor adherence to the code of conduct.

4) Communicate and train across supply chain

Importers must provide training to their employees or agents responsible for selecting suppliers, including on risks of forced labor identified by the risk assessments, the prohibition on importation of goods produced by forced labor into the United States, the presumption that goods made in Xinjiang or by companies on the UFLPA Entity List are made using forced labor, risks of suppliers being included on future additions to the UFLPA Entity List, and the importer's code of conduct. Importers' employee and agent training should integrate efforts to eliminate forced labor risk into the supplier selection and contracting process.

Communicating the standards included in the code of conduct to agents (if applicable); suppliers at all tiers of the supply chain; labor brokers, recruiters, and employment agencies (if applicable); workers and trade unions; and communities and civil society groups is also an important element of a due diligence system. Importers should provide a thorough and comprehensive overview of coercive recruitment through PRC poverty alleviation, pairing assistance, and other labor transfer

43

**AR002916**

programs; what to expect from an audit or verification process; and opportunities for worker input including grievance mechanisms.

5)  Monitor compliance

Importers should monitor supplier compliance with their code of conduct, particularly for those suppliers and subcontractors in Xinjiang or on the UFLPA Entity List. This may be accomplished by conducting credible audits or through processes that go beyond traditional auditing and may involve the use of technology or partnerships with civil society.

A credible audit includes the following core elements: (1) unannounced arrival at the worksite and at a time when the workforce, especially workers at risk of forced labor, are likely to be present; (2) examination of ILO indicators of forced labor, in particular those described in Section II; (3) worker, management, and labor broker or recruiter interviews completed in the interviewee's native language and free of employer or government intimidation; (4) unrestricted access to the worksite and any associated locations, such as cafeterias and dormitories, to observe conditions; and (5) review of documents and other information to provide additional proof of compliance and to identify or corroborate discrepancies in the information and observations of the worksite and associated facilities. Because coercion often occurs at the recruitment stage, a credible audit should include documentation of the supplier's involvement with PRC-labor transfer programs, receipt of workers from Xinjiang, and measures to ensure voluntary participation by all workers in the supply chain.[123]

As discussed in the updated *Xinjiang Supply Chain Business Advisory*[124] (issued in July 2021), audits, including third-party audits, are not alone sufficient to demonstrate due diligence and may not be a credible source of information for indicators of forced labor in Xinjiang. It is difficult to conduct a credible audit in Xinjiang (or of the use of ethnic and religious minority workers transferred from Xinjiang) due to the extent in which forced labor has been integrated into the regional economy, the restrictions on access to Xinjiang, the commingling of involuntary labor with voluntary labor, the inability of witnesses to speak freely about working conditions given government surveillance and coercion, and the incentives of government officials and entities doing business in the PRC to conceal government-sponsored forced labor. These due diligence barriers do not relieve importers seeking an exception to the rebuttable presumption of the statutory requirement to comply with this guidance. See Strategy Section VI (C) for information on credible audits and other evidence that demonstrates that goods originating in the PRC were not mined, produced, or manufactured wholly or in part with forced labor.

---

[123] Even where companies are not directly involved in the coercion, the PRC government may be providing workers who were recruited through coercion by threat of detention. Entities receiving ethnic and religious minority workers from Xinjiang through the labor transfer program may also be involved in creating coercive conditions at the entity itself, including limiting freedom of movement, pervasive surveillance, or failure to pay workers directly. Where there are multiple indicators of forced labor, all indicators must be addressed.

[124] *Xinjiang Supply Chain Business Advisory*, *supra* note 8.

44

AR002917

6) Remediate violations

If forced labor indicators (see Strategy Section II) are identified, thus signifying the presence of forced labor in the supply chain, all importations of goods made prior to remediation are prohibited from entry into the United States. In order to import goods made by that supplier, the importer must demonstrate that it has fully remediated all such indicators of forced labor. Any imported goods that were produced prior to full remediation are prohibited. The importer must therefore develop a corrective action plan if it intends to continue sourcing inputs from the supplier. The corrective action plan must specifically address all indicators of forced labor.

Some abuses, including PRC-sponsored forced labor, may be impossible to fully remediate. Similarly, it may not be possible to require additional monitoring or transparency due to the PRC laws or policies. Corrective action in such cases may be limited to terminating the relationship with the supplier. When ending a business relationship, it is also recommended that the importer mitigate impacts on the workers, where possible, such as by communicating and engaging with the supplier and workers on the decision and timeline for disengagement.[125]

7) Independent review

Independent third-party verification can demonstrate the implementation and effectiveness of an importer's due diligence system and is part of due diligence. Importers should periodically assess performance of their due diligence and evaluate the effectiveness of system components for ensuring that the supply chain is free of forced labor.

8) Report performance and engagement

An importer is encouraged to provide regular and timely public reporting on its due diligence system, including the auditing and verification processes. Such reporting may take many forms, such as a formal annual report or periodic web-based updates. Such reporting does not entail the disclosure of business proprietary information or other confidential data.

*Effective Supply-Chain Tracing*

Effective supply-chain tracing is a critical first step of due diligence. Importers must know their suppliers and labor sources at all levels of the supply chain.

The first step in conducting supply-chain tracing is "mapping" the entire supply chain, up to and including suppliers of raw materials used in the production of the imported good or material. Mapping is an exercise by which a company or a third-party collects information on the suppliers

---

[125] Failure to terminate the relationship with the supplier or take other appropriate remedial action could expose an importer to potential criminal liability if the importer continues to benefit, financially or by receiving anything of value, from participating in a venture engaged in forced labor, while knowing of or recklessly disregarding the forced labor. *See* 18 U.S.C. § 1589(b).

45

AR002918

throughout the supply chain. It should also allow the importer to identify who is doing the work at each step in the process and the conditions under which the work is being done. The more comprehensively an importer can map its supply chains, the more accurately it can identify those places along the chain with the greatest risks of forced labor.

Beyond mapping, supply-chain tracing is the ability to demonstrate chain of custody of goods and materials from the beginning of the supply chain to the buyer of the finished product. Some established methods for supply-chain tracing include identity preservation and segregation. Identity preservation requires each product input to be packaged, processed, and traced separately from other product inputs or modifications throughout the supply chain. Most importantly, it does not allow any commingling of product inputs at any point in the supply chain. Alternative approaches such as segregation permit commingling of inputs, provided that each batch to be commingled is fully traced and documented to be free of forced labor prior to mixing. Segregated products must be kept separate from other products that cannot be identified as free of forced labor both physically and in documentation.

Importers should be aware that if their importations involve inputs from factories that source materials both from within Xinjiang and outside of Xinjiang, they risk having their importations subject to detention, as it may be harder to verify that the supply chain for imports to the U.S. is using only non-Xinjiang materials that have not been replaced by or commingled with Xinjiang materials at any point in the manufacturing process.

*Supply-Chain Management Measures*

Supply-chain management measures are also part of due diligence; they are measures taken to prevent and mitigate identified risks of forced labor.[126] Effective supply-chain management measures include having a process to vet potential suppliers for forced labor prior to entering a contract with them; requiring that supplier contracts necessitate corrective action by the supplier if forced labor is identified in the supply chain; and outlining the consequences if corrective action is not taken, such as termination of the contractual relationship. Effective supply-chain management also includes having access to documentation, personnel, and workers for verification of the absence of forced labor indicators, including at the recruitment stage.

Importers should have an information system to manage supply-chain management data, including all mapping and risk and impact assessment information, which should be entered into this system and updated on a regular basis. Importers should be able to demonstrate how risk and impact assessment information is used to inform forced labor risk prevention and mitigation.

---

[126] Failure to take appropriate remedial action could expose an importer to potential criminal liability if the importer continues to benefit, financially or by receiving anything of value, from participating in a venture engaged in forced labor, while knowing of or recklessly disregarding the forced labor. *See* 18 U.S.C. § 1589(b).

46

AR002919

Importers may leverage U.S. government and NGO publications and other information to assist in implementing due diligence, effective supply-chain tracing, and supply-chain management measures to limit risks of forced labor in their supply chains. The following list provides resources to help importers and others address forced labor abuses in global supply chains (this list is illustrative, and the practices described in these documents do not supersede this guidance):

International Standards:

- The United Nations Guiding Principles on Business and Human Rights;[127]
- The Organisation for Economic Co-operation and Development (OECD) Guidelines for Multinational Enterprises (including sector-specific guidance);[128]
- The ILO Tripartite Declaration of Principles concerning Multinational Enterprises and Social Policy;[129]
- The ILO publication, *Combating Forced Labour: A Handbook for Employers and Business*;[130]
- ILO Guidelines Concerning the Measurement of Forced Labor;[131]
- ILO General Principles and Operational Guidelines for Fair Recruitment;[132]
- International Organization for Migration's ethical recruitment standards;[133] and
- The Office of the High Commissioner for Human Rights guide on *The Corporate Responsibility to Respect Human Rights* (OHCHR guide).[134]

U.S. Government:
- The U.S. Department of State's *Responsible Sourcing Tool*;[135]

---

[127] *UN Guiding Principles on Business and Human Rights*, Business & Human Rights Resource Centre, https://www.business-humanrights.org/en/big-issues/un-guiding-principles-on-business-human-rights/ (last visited May 19, 2022).

[128] *Guidelines for Multinational Enterprises*, Organisation for Economic Co-operation and Development, https://www.oecd.org/corporate/mne/ (last visited May 19, 2022).

[129] *Tripartite Declaration of Principles concerning Multinational Enterprises and Social Policy*, International Labour Organization, https://www.ilo.org/empent/areas/mne-declaration/lang--en/index.htm (last visited May 19, 2022).

[130] *Combating Forced Labour: A Handbook for Employers and Business*, International Labour Organization, (June 25, 2015) https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_101171.pdf.

[131] *Guidelines Concerning the Measurement of Forced Labor*, International Labour Organization (2018), https://www.ilo.org/wcmsp5/groups/public/---dgreports/---stat/documents/meetingdocument/wcms_648619.pdf.

[132] *General Principles and Operational Guidelines for Fair Recruitment*, International Labour Organization (2019), https://www.ilo.org/wcmsp5/groups/public/---ed_protect/---protrav/---migrant/documents/publication/wcms_536755.pdf.

[133] *The IRIS Standard Report Version 1.2*, International Organization for Migration: IRIS Ethical Recruitment, (2019) https://iris.iom.int/sites/g/files/tmzbdl201/files/documents/IRIS%20Standard%20Report%20.pdf.

[134] *The Corporate Responsibility to Respect Human Rights*, UN Human Rights Office of the High Commissioner (June 1, 2012), https://www.ohchr.org/sites/default/files/Documents/Publications/HR.PUB.12.2_En.pdf.

[135] Responsible Sourcing Tool, *supra* note 104.

47

**AR002920**

- The U.S. Department of Labor's *Comply Chain*;[136]
- The U.S. Department of Labor's *Findings on the Worst Forms of Child Labor*;[137]
- The U.S. Department of Labor's *List of Goods Produced by Child Labor or Forced Labor*;[138]
- The U.S. Department of Labor's *List of Products Produced by Forced or Indentured Child Labor*;[139]
- The U.S. Department of Labor's *Better Trade Tool*;[140]
- Federal Acquisition Regulations;[141]
- National Action Plan on Responsible Business Conduct;[142]
- The updated *Xinjiang Supply Chains Business Advisory* (July 2021);[143]
- The U.S. Customs and Border Protection's *Reasonable Care: An Informed Compliance Publication* and other relevant publications;[144]
- The U.S. Customs and Border Protection's Forced Labor website resources;[145] and
- The U.S. Customs and Border Protection's Withhold Release Orders and Findings, including those involving China and Xinjiang, and related FAQs that may aid importers in identifying additional merchandise, regions, and producers whose imports into the United States may be subject to exclusion and/or seizure.[146]

Other:

- Group of Seven (G7) Trade Ministers' Statement on Forced Labor;[147] and
- The Human Trafficking Legal Center's guide, *Importing Freedom: Using the U.S. Tariff Act to Combat Forced Labor in Supply Chains*.[148]

---

[136] *Comply Chain: Business Tools for Labor Compliance in Global Supply Chains*, *supra* note 114.

[137] *Findings on the Worst Forms of Child Labor,* U.S. Department of Labor, https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings (last visited June 15, 2022).

[138] *2020 List of Goods Produced by Child Labor or Forced Labor*, supra note 14.

[139] *List of Products Produced by Forced or Indentured Child Labor,* supra note 110.

[140] *Better Trade Tool*, *supra* note 111.

[141] *FAR*, Acquisition.gov, https://www.acquisition.gov/browse/index/far (last visited May 19, 2022). Contractors or other suppliers of the U.S. Government that violate U.S. law or the FAR prohibition on human trafficking in U.S. Government acquisitions, per FAR clauses 52.222-18, -19, and -50, are subject to administrative enforcement action.

[142] *National Action Plan on Responsible Business Conduct*, U.S. Department of State (June 22, 2021), https://www.state.gov/responsible-business-conduct-national-action-plan/.

[143] *Xinjiang Supply Chain Business Advisory*, supra note 8.

[144] *Reasonable Care: An Informed Compliance Publication*, U.S. Customs and Border Protection (Oct. 25, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/icprescare2017revision.pdf (last updated Feb. 26, 2020).

[145] *See Forced Labor*, U.S. Customs and Border Protection, https://www.cbp.gov/trade/forced-labor/ (last visited May 19, 2022).

[146] *Withhold Release Orders and Findings List*, *supra* note 12.

[147] *G7 Trade Ministers' Statement on Forced Labor*, GOV.UK (Oct. 22, 2021), https://www.gov.uk/government/news/g7-trade-ministers-statement-on-forced-labour-annex-a.

[148] *Importing Freedom: Using the U.S. Tariff Act to Combat Forced Labor in Supply Chains*, The Human Trafficking Legal Center (June 2020), https://htlegalcenter.org/?smd_process_download=1&download_id=4935.

48

AR002921

**B. Evidence to demonstrate that a good was not mined, produced, or manufactured, wholly or in part, in Xinjiang**

CBP is responsible for determining whether goods have been mined, produced, or manufactured wholly or in part with forced labor and imported into the United States in violation of the UFLPA. This section outlines the forms of evidence that typically facilitate this determination.

This section also reflects the forms of evidence that would facilitate a determination that an importation is not subject to the UFLPA—*i.e.*, information that the imported goods and their inputs are sourced completely from outside Xinjiang and have no connection to the UFLPA Entity List.

The type, nature, and extent of evidence required from the importer, however, will vary based on the facts and circumstances of the import in question. The following information is not intended to be an exhaustive list of the documentation CBP may request, and the goal is to provide importers flexibility to provide documentation consistent with their business operations.

Translation of documents into English will allow CBP to properly and more efficiently evaluate the information.

Supply-chain tracing is the general method to demonstrate that imported goods were not mined, produced, or manufactured in Xinjiang. In some instances, transshipment of goods made in Xinjiang, as described in Section I of this report, may be used to obscure the good's origin. Based on the facts and circumstances of a particular entry, CBP may request evidence to demonstrate supply-chain tracing of the entire supply chain of an imported good or a specific component of the good. When requested, importers should be able to trace the complete supply chain of the good under CBP review. Documentation should include:

- Detailed description of the supply chain for the imported good and components thereof, including all stages of mining, production, or manufacture, including any step of the sourcing, manufacturing, or processing of goods in third countries. This includes documenting how the imported good was made from raw materials to finished good, by what entities, and where, including all in-house manufacturing, sub-assembly operations, and outsourced production related to the imported good. This also includes documenting the roles of the entities involved at each stage of the supply chain, as well as the relationship between the entities (e.g., whether a supplier is also a manufacturer).
- Evidence that indicates the provenance of each component of the imported good. When possible, unique identifiers should be used to track raw materials and other inputs through the supply chain. When raw materials/inputs from different suppliers are commingled, there should be an auditable process for demonstrating the origin and control of each raw material or input.

DNA traceability or isotopic testing may make it possible to identify the origin of particular goods or materials without tracing the supply chain. For such evidence to be considered, its reliability must be demonstrated; it must relate to the part of the supply chain for which the

49

**AR002922**

alternative evidence is being substituted, and the test results must be traceable to the specific import under CBP review.

**C. Evidence to demonstrate that a good originating in the PRC, including goods detained or seized pursuant to 19 U.S.C. § 1307, was not mined, produced, or manufactured wholly or in part by forced labor**

To obtain an exception to the UFLPA presumption, the importer must provide "clear and convincing evidence, that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor" to CBP. CBP is responsible for determining whether goods have been mined, produced, or manufactured wholly or in part with forced labor and imported into the United States in violation of the UFLPA. This section outlines the forms of evidence that will typically facilitate this determination. The type, nature, and extent of evidence required from the importer, however, will vary based on the facts and circumstances of the import in question. The following information is not intended to be an exhaustive list of the documentation CBP may request, and the goal is to provide importers flexibility to provide documentation consistent with their business operations.

Translation of documents into English will allow CBP to properly and more efficiently evaluate the information.

Evidence must demonstrate that indicators of forced labor, including intimidation and threats, abuse of vulnerability, restriction of movement, isolation, abusive living and/or working conditions, and excessive hours, do not exist or are fully remediated.

Evidence to demonstrate that goods originating in the PRC were not made wholly or in part with forced labor may include:

- Evidence mapping the entire supply chain, and transport along the supply chain, including which entities were involved at each stage;
- Complete list of all workers at an entity subject to the rebuttable presumption in the production of the imported goods, including:
  - ➢ Evidence to demonstrate how and to whom wages are paid at each workplace;
  - ➢ Evidence to identify whether each worker comes from Xinjiang, as well as the worker's residency status;
  - ➢ Evidence to demonstrate that output is consistent with the documented workers, including:
    - ▪ number of workers in each job category, total volume of material or goods input, and total volume of outputs of materials or goods; and,
    - ▪ documents relating to hours worked and daily production output of goods.
- Evidence that none of the workers who were involved in the production of the product were a) recruited, b) transported, c) transferred, d) harbored, or e) received with the involvement of the government of the PRC, XPCC, or entities on the UFLPA Entity List. Evidence should specifically address the controls each entity has in place to ensure that all workers are recruited voluntarily;

50

AR002923

- Evidence that reliably demonstrates that every worker from Xinjiang is working voluntarily, and without menace or threat of penalty, including credible evidence that demonstrates for each such worker that:
  - ➢ recruitment to work, including recruitment to any job fair, was fully voluntary;
  - ➢ recruitment and continuation at the job were and are not subject to government or entity coercion;
  - ➢ recruitment was free of any forced labor indicator (see Strategy Section II), including detention, prior detention or threats of detention, detention or threats of detention of family members, or forced transfer of land to the government;
  - ➢ transport from Xinjiang was voluntary and free of any forced labor indicator, including government surveillance or control of worker movements during transport from Xinjiang;
  - ➢ transfer to the entity was voluntary and free of any forced labor indicator, including government surveillance;
  - ➢ living and working conditions at the entity are free of any forced labor indicator, including government surveillance or reporting by the entity to the government, restriction of movement, or required activities such as political, language, or cultural classes; and,
  - ➢ receipt of the worker by the entity was undertaken voluntarily and without any indicators of forced labor, including government surveillance or reporting.

Any audit performed to demonstrate that goods originating in the PRC were not made wholly or in part with forced labor including such evidence must explain its methodology, how it determined the presence or absence of forced labor indicators, a description of all evidence upon which the determination was based, and a description of how the auditor determined the reliability of the evidence used to reach the audit's conclusions. See Strategy Section VI (A) for additional information on due diligence and credible audits.

51

AR002924

# VII. Coordination and Collaboration with Appropriate Nongovernmental Organizations and Private-Sector Entities

This section addresses the FLETF's plan to coordinate and collaborate with appropriate NGOs and private-sector entities to implement and update this strategy. This section also outlines the FLETF's considerations for such a plan, lays out new FLETF engagement efforts related to the UFLPA implementation, and highlights ongoing FLETF engagements in which UFLPA strategy efforts can be incorporated.

**Considerations**

*Forced Labor Enforcement Task Force UFLPA Mandate*

The UFLPA requires the FLETF to develop a plan to engage with the U.S. public to implement and update this strategy.[149] This requirement is new to the FLETF, which has previously primarily focused on forced labor enforcement monitoring, interagency collaboration, and information sharing. This new role requires an increased commitment of public engagement resources for FLETF efforts.

The FLETF developed this strategy in a way that considers the breadth of public input and comments on the UFLPA. The FLETF aims to leverage member and observer agencies' existing partnerships with NGOs, the private-sector, and other stakeholders for continued engagement. In addition, the FLETF will be instituting UFLPA-specific mechanisms to engage the public in advance of future updates to the UFLPA strategy.

*Receiving Public Input and Concerns Surrounding Retaliation*

During the public comment period and prior to the hearing the FLETF heard concerns that certain individuals, NGOs, and businesses abstained from the public comment and public hearing process due to fear of potential PRC retaliation against parties that make statements related to the use of forced labor in the PRC, specifically in Xinjiang. These stakeholders may include the following groups:

- Survivors, Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups who reside in the PRC or countries with bilateral extradition treaties with the PRC, or who have friends and family in the PRC or countries with bilateral extradition treaties with the PRC;
- Survivors, Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups who do not have legal status in their countries of current residence, who fear removal to the PRC;
- NGOs that operate in the PRC or have the potential to operate in the PRC;

---

[149] *Id.* § 2(d)(7).

52

AR002925

- U.S. importers with supply chains dependent on inputs from the PRC; and
- U.S. companies that have a physical presence in the PRC or have a PRC customer base.

Recognizing this challenge, the FLETF will promote collaboration with the groups identified above and seek ways to mitigate the fear of retaliation. The FLETF will also increase its coordination on external outreach related to the UFLPA strategy to ensure a whole-of-government approach. The increased FLETF coordination and synchronization will also ensure any potential gaps are identified and addressed in updates to the strategy.

**Expanding Engagement Efforts of the FLETF**

*Engaging with NGOs and the Private Sector*

As part of the FLETF's effort to engage NGOs and the private sector on the UFLPA, the FLETF will host more joint-interagency meetings with NGOs and the private sector to discuss the enforcement initiatives and trade facilitation measures. Additionally, the FLETF will institute recurring working-level meetings with the private sector and NGOs on this strategy and will meet with these NGOs and private-sector groups no less than biannually. The FLETF will also use platforms for survivors and entities fearing retaliation to share feedback anonymously.

Interested parties can inquire about participation in these meetings by reaching out to the FLETF via FLETF.PUBLIC.COMMENTS@hq.dhs.gov. The FLETF will structure appropriate representation for NGO and private-sector participation in meetings and adjust the parameters and implementation of these meetings as needed to reflect participant input, congressional guidance, and available resources.

*DHS.gov Landing Page for the FLETF*

The FLETF will be launching a FLETF webpage housed on the dhs.gov domain. The webpage will include:

- Information about the FLETF;
- Publicly available reports issued by the FLETF;
- A compiled list of .gov links to FLETF agency resources on 19 U.S.C. § 1307;
- Resources related to forced labor in supply chains of goods imported into the United States and mitigation of forced labor in global supply chains;
- Information about ongoing UFLPA implementation; and
- The UFLPA Entity List.

In addition to the FLETF webpage, DHS will continue to monitor the FLETF.PUBLIC.COMMENTS@hq.dhs.gov email inbox and include this email address as a contact point on the dhs.gov landing page to provide parties interested in participating in the FLETF public collaboration efforts an avenue to engage directly with the FLETF.

53

**AR002926**

**FLETF Recommendations for Stakeholder Engagements**

The FLETF recommends stakeholders, including importers subject to the rebuttable presumption, consider the following types of supply chain-related stakeholder roles and engagements. The FLETF encourages NGOs and the private sector to share information with the FLETF related to engagements and efforts to implement programs to support these engagements, so the FLETF can continue to develop and define best practices. The FLETF will share updates on best practices on the FLETF webpage.

| Stakeholder | Roles |
|---|---|
| Company employees | • Suggest ways that risk assessment and auditing data and analysis could assist in making decisions on sourcing, product development, strategy, and other issues<br>• Act as extra "eyes and ears" on social compliance issues to supplement worksite monitoring programs |
| Workers in production facilities and worker representative unions | • Help identify risks of forced labor and other code of conduct violations at their worksites<br>• Be involved in remediation planning where appropriate<br>• Suggest opportunities for the company to address root causes of labor violations |
| Suppliers throughout the supply chain | • Be involved in code of conduct development<br>• Help ensure that suppliers' employees, agents, and suppliers are educated on the code; for example, ensure that recruiters understand any prohibition on using the labor transfer programs<br>• Cooperate fully with auditors and independent verifiers |
| Communities and community-based organizations throughout the supply chain | • Provide valuable input into risk assessment; for example, provide advice on indicators of forced labor in recruitment of minority workers<br>• Provide information to auditors and independent verifiers, as appropriate and safe<br>• Provide comment on public reporting to enhance accuracy and credibility |
| National or international civil society organizations | • Supply information, via research, reports, or personnel in-country, to inform risk assessment<br>• Carry out audits or independent verification, as appropriate and safe<br>• Contribute to or provide comment on public reporting to enhance accuracy and credibility |

AR002927

| Stakeholder | Roles |
|---|---|
| Shareholders and investor groups | <ul><li>Communicate with companies on specific risks, including the risk of forced labor, in their supply chains (vocal shareholders can also advocate for change if they believe the social compliance system is not effective); this heightened attention from shareholders can also increase reputational risk</li><li>Encourage the company to dedicate resources to public reporting</li><li>Engage with the company to help identify root causes of labor abuse that may be linked to its operations</li></ul> |
| Other companies in the importer's industry | <ul><li>Share risk assessment information about particular sourcing locations or suppliers</li><li>Join together to train or communicate with shared suppliers and other stakeholders on codes of conduct</li><li>Arrange joint audits or independent verification processes</li></ul> |

**Opportunities for Public Engagement through Existing U.S. Government Mechanisms**

To build robust NGO and private-sector engagement on UFLPA implementation, FLETF member agencies must take advantage of existing U.S. government mechanisms, as appropriate for each stakeholder group. FLETF members and observers have commenced planning to integrate UFLPA-related discussions into current working bodies such as CBP's Commercial Customs Operations Advisory Committee (COAC)[150] and Civil Society Roundtable, USTR's Labor Advisory Committee, DOL's ongoing reporting requirements and tools to identify labor exploitation around the world, USAID's ongoing work with advocacy NGOs focused on Xinjiang forced labor, and DOS's ongoing work with NGOs and engagement with the foreign private sector and governments. The DHS Office of Partnership and Engagement (OPE) and PLCY will build on ongoing engagements with private-sector and NGO stakeholders to work collaboratively on initiatives to ensure goods made with forced labor are not imported into the United States. The recently established CCHT will also be engaging with its NGO and private sector stakeholders to increase awareness of UFLPA implementation and CBP enforcement of 19 U.S.C. § 1307.

*Engagement with NGOs*

CBP's Office of Trade plans to use its existing Civil Society Roundtable to continue discussing forced labor enforcement opportunities, as well as UFLPA implementation. The Civil Society Roundtable convenes quarterly and consists of many members who spend a significant amount

---

[150] *Commercial Customs Operations Advisory Committee (COAC)*, U.S. Customs and Border Protection, https://www.cbp.gov/trade/stakeholder-engagement/coac (last updated Mar. 21, 2022).

AR002928

of time on the issue of forced labor in Xinjiang.[151] Many of these NGOs continue to advocate for the victims of forced labor across the globe, especially in Xinjiang.

USAID will continue its support for research and advocacy through a coalition of dozens of NGOs globally. Through this work, USAID partners advocate for like-minded governments to adopt legislation and improve enforcement to address Xinjiang forced labor and companies to extricate themselves from tainted supply chains.

DOS will continue its diplomatic efforts, in Washington and via U.S. embassies and consulates abroad, to exchange ideas and information with appropriate domestic and international NGOs, including diaspora groups and survivors, about goods mined, produced, or manufactured wholly or in part with forced labor in Xinjiang and U.S. government efforts to address atrocities and human rights violations and abuses in the PRC. Since its original release in July 2020 and its update in July 2021, the *Xinjiang Supply Chain Business Advisory*[152] has provided a platform to engage and raise awareness with NGOs about the risks associated with sourcing goods mined, produced, or manufactured wholly or in part with forced labor in Xinjiang. DOS continues to consult civil society organizations, inform messaging strategies related to the *Xinjiang Supply Chain Business Advisory* and provide updates as appropriate to NGOs on new guidance developed pursuant to Sections 2 and 3 of the UFLPA.

*Private-Sector Engagements*

CBP announced the sixteenth term of the COAC in early 2022. The COAC is a statutorily-mandated advisory committee comprised of a representative sample of U.S. industry and makes recommendations on regulations, policies or practices relating to CBP, including CBP's forced labor enforcement authority. CBP and private-sector representatives of the COAC will continue to discuss UFLPA implementation, including the rebuttable presumption requirement, in the COAC's Intelligent Enforcement Sub-Committee. As part of this subcommittee's efforts, CBP subject-matter experts and the private sector will discuss many of the concerns the industry raised in their public comments. This continuing dialogue is vital to informing CBP's enforcement of the UFLPA rebuttable presumption.

---

[151] Members of the quarterly Civil Society Roundtable are: The Australian Strategic Policy Institute, Business and Human Rights Resource Centre, Center for Advanced Defense Studies, Center for Strategic & International Studies, Child Labor Coalition, China Labor Watch, Citizen Power Initiatives for China, Corporate Accountability Lab, Environmental Justice Foundation, Fair Labor Association, Freedom Fund, Global Labor Justice-International Labor Rights Forum (GLJ-ILRF), GoodWeave International, Greenpeace, Human Rights Training Center, Human Rights Watch, Human Trafficking Legal Center, Humanity United, Impact, International Corporate Accountability Roundtable, International Initiative on Exploitative Child Labor, International Labor Rights Forum, Kailash Satyarthi Children's Foundation, Laogai Research Foundation, Laudes Foundation, Minderoo Foundation, Liberty Shared, Rainforest Alliance/UTZ, Solidarity Center, The Hong Kong Polytechnic University, Transparentem, Uyghur Human Rights Project, Verité, Walk Free Foundation, Workers Rights Consortium, and Xinjiang Victims' Database. There were two meetings held between October 1, 2020 and March 31, 2021.

[152] *Xinjiang Supply Chain Business Advisory*, *supra* note 8.

AR002929

DOL will continue to leverage its connections with organized labor, civil society, and industry to engage on forced labor issues in a range of fora. DOL's Bureau of International Labor Affairs (ILAB) uses its research and reporting to regularly collaborate with other U.S. government agencies to improve the response to forced labor with respect to public procurement, diplomatic engagement, and trade considerations. ILAB frequently provides briefings on these topics to external groups, such as unions, civil society organizations, business associations, and companies, often in conjunction with other U.S. government partners. ILAB shares reporting insights and other tools like *Comply Chain*,[153] which is a mobile app that provides guidance to companies and industry groups that do not have a social compliance system in place, or those needing to strengthen their existing systems or achieve operational efficiencies. Further, DOL supports the Global Business Network on Forced Labor, which is an ILO forum for companies to collaborate and share best practices to address forced labor and other abusive labor practices within supply chains.

DOS will continue strengthening diplomatic outreach to relevant overseas private-sector entities, including international industry leaders, foreign trade and business associations in key sectors, particularly those using inputs sourced from the PRC, U.S. business associations in the PRC, and other foreign businesses where appropriate. DOS's outreach aims to target foreign companies that may be less aware of the risks they face in not complying with the UFLPA's requirements. DOS's outreach also seeks to increase private-sector awareness in foreign markets that the law not only covers products and components sourced directly from Xinjiang, but also those shipped to other parts of the PRC or to third countries for further manufacture, and those manufactured in other parts of the PRC by entities that use the labor transfer program to receive members of persecuted groups from Xinjiang.

Finally, DOC is leading an interagency effort that implements part of the *National Action Plan to Combat Human Trafficking* to develop industry outreach on forced labor in global supply chains (not limited to Xinjiang). As part of the President's Interagency Task Force to Monitor and Combat Trafficking in Persons, DOC, in collaboration with other U.S. government agencies, including DHS, DOL, DOS, and USTR, will create an interactive tool that provides information and guidance to U.S. firms on identifying and addressing the use of forced labor in global supply chains. The program will provide extensive information on relevant U.S. laws and regulations (including the UFLPA); suggest best practices in establishing an internal due diligence program to identify and address possible incidents of forced labor; and highlight the extensive U.S. government resources available to the private sector to better understand and mitigate the risks of forced labor in a company's supply chain. The program is scheduled to be released by the end of FY 2022 and will be supported with introductory webinars hosted by DOC and subject-matter experts from a number of FLETF member agencies to promote the program with key industry stakeholders.

---

[153] *Comply Chain: Business Tools for Labor Compliance in Global Supply Chains*, *supra* note 114.

AR002930

# Conclusion

The United States is deeply committed to combating forced labor, ensuring the global supply chain remains free and clear of these illicit goods. Importation of goods made using forced labor is an affront to our shared national values, exploiting vulnerable populations around the world. Thus, DHS and the FLETF remain dedicated to ensuring that the United States is doing its part in promoting human rights, fair labor standards, and allowing American workers and manufacturers a fair and equal playing field in the global marketplace. PRC forced-labor schemes and practices have drastic effects beyond the United States, impacting regions across the globe, and undermining development and worker rights in developing nations. Allowing such weaknesses in the global trading system undermines national security and the long-term stability of international labor standards. Combating forced labor is a moral imperative, and the United States will remain diligent in standing up against these human rights abuses.

Prohibitions on the entry of items tainted by forced labor have been a cornerstone of U.S. trade law for almost a century. The UFLPA strengthens the existing 19 U.S.C. § 1307 prohibition against the importation of goods made wholly or in part with forced labor and will better ensure that the U.S. economy is free from goods made with forced labor. The FLETF is supporting CBP's enforcement of the rebuttable presumption through the issuance of this strategy and will continue to monitor the enforcement of 19 U.S.C. § 1307 broadly. Moreover, as industry is adjusting to the UFLPA, FLETF agencies are continuing engagement with NGOs and the private sector to ensure all interested parties have the necessary resources and methods for engagement. DHS will update the FLETF webpage regularly to provide information and resources on the UFLPA.

The UFLPA has significant resource implications for CBP, as well as DHS PLCY and ICE. The effective use of legal authorities and resources are critical to effectively implement each provision of the UFLPA. As CBP is enforcing the rebuttable presumption, increased staffing is necessary to keep up with the significant increase in scope and volume of reviews and the anticipated scale of requests for exceptions. Further, funding is needed to enhance technologies to ensure accurate targeting of forced labor goods. DHS PLCY has led all FLETF coordination efforts among the interagency.

Pursuant to the UFLPA, this strategy will be updated annually. The FLETF also intends to update the UFLPA Entity List multiple times per year. The FLETF encourages concerned individuals, members of Congress, civil society groups, and other stakeholders to continue efforts to ensure the use of forced labor is eradicated from U.S. and international supply chains and better understand the labor conditions affecting those supply chains.

58

**AR002931**

# Appendix A - Acronyms

List of Abbreviations and Acronyms

| BIS | Bureau of Industry and Security |
|---|---|
| CCHT | Center for Countering Human Trafficking |
| CBP | U.S. Customs and Border Protection |
| COAC | Commercial Operations Advisory Committee |
| DHS | U.S. Department of Homeland Security |
| DOC | U.S. Department of Commerce |
| DOJ | U.S. Department of Justice |
| DOL | U.S. Department of Labor |
| DOS | U.S. Department of State |
| EAR | Export Administration Regulations |
| ERC | End-User Review Committee |
| FLETF | Forced Labor Enforcement Task Force |
| FRN | Federal Register notice |
| FY | Fiscal Year |
| HSI | Homeland Security Investigations |
| ICE | U.S. Immigration and Customs Enforcement |
| ILAB | Bureau of International Labor Affairs (DOL) |
| ILO | International Labor Organization |
| NGO | Nongovernmental Organization |
| PLCY | Office of Strategy, Policy, and Plans (DHS) |
| PRC | People's Republic of China |
| TIP Report | Trafficking in Persons Report |
| Treasury | U.S. Department of the Treasury |
| TVPA | Trafficking Victims Protection Act |
| TVPRA | Trafficking Victims Protection Reauthorization Act |
| UFLPA | Uyghur Forced Labor Prevention Act |
| USAID | U.S. Agency for International Development |
| USMCA | U.S.-Mexico-Canada Agreement |
| USTR | Office of the U.S. Trade Representative |
| WRO | Withhold Release Orders |
| Xinjiang | Xinjiang Uyghur Autonomous Region |
| XPCC | Xinjiang Production and Construction Corps |

AR002932

# Appendix B – Public Perspective on FLETF Collaboration Opportunities

As part of the public comment and hearing process, various stakeholders welcomed having an increased level of engagement with the FLETF on the implementation of the UFLPA. Both NGOs and private-sector entities emphasized the importance of a robust continued partnership and information sharing and provided recommendations for the FLETF as follows:

- Establish advisory groups of experts and advocates to inform the FLETF implementation of the UFLPA and to work closely with existing CBP groups;
- Lead importer education engagements on the FLETF implementation of the UFLPA;
- Establish a primary point of contact for stakeholders to contact the FLETF about UFLPA implementation;
- Establish an information-sharing database for better evidence-based coordination on UFLPA enforcement;
- Better engage U.S. allies and partners on the issue of forced labor;
- Determine a FLETF mechanism to evaluate effective remediation;
- Create a formal and confidential process by which all U.S. importers, manufacturers, distributors, and other entities can report the names, addresses, and operations of all known business entities in Xinjiang; and
- Establish multi-stakeholder engagements related to UFLPA implementation.

Public comments also emphasized the importance of public-private cooperation on specific issues covered by the strategy, including:

- The implementation and maintenance of the UFLPA Entity List;
- Limitations on supply-chain traceability and visibility due to current supply-chain systems and standards;
- Importer guidance and the evidence needed to rebut the presumption under the UFLPA and the presence of forced labor in a good's supply chain; and
- Ideas for potential plans and programs that could support the mitigation of the risk of forced labor in U.S. supply chains.

AR002933

109 Shiloh Dr. Suite 300
Laredo, TX 78045



**U.S. Customs and
Border Protection**

## THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

May 3, 2024

MEMORANDUM FOR:    Note to file

FROM:    ███████████████ PII ███████████████

SUBJECT:    Note to file on ██████████

This memorandum serves to clarify that that the Machinery Center of Excellence and Expertise (CEE) performed a Uyghur Forced Labor Prevention Act (UFLPA applicability review on Camel Energy ███████████████████████████. The CEE recommended to the Port Director ███████████ that the merchandise imported ████████████ is not within the purview of the UFLPA—that is, the merchandise was not produced in whole or in part in the XUAR or by an entity on the UFLPA entity list. During this review, we did not consider or opine on whether forced labor was present in the supply chain. This determination was based on the review of the UFLPA Response Package for ████████████ provided on August 19, 2023, by Dickinson Wright PLLC, counsel for Camel Energy Inc.

**AR002934**

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR002935 - AR002941

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR002942 - AR002949

**CHINESE TRANSLITERATION OF UYGHUR (AND OTHER ETHNIC MINORITY) NAMES**

The naming traditions of the Han Chinese community dictate that the family name precedes the given name. Typically, the family name is only one character and the given name is two. The "three-character name," composed of the monosyllabic surname and bi-syllabic given name, accounts for more than 84% of names in China. There are only approximately twenty bi-syllabic surnames used in the Han Chinese community.[1] Some exceedingly few Han people have mono- or tri-syllabic given names. These traditions have been in place since the second half of the 20th century, when the Chinese government simplified the naming system and standardized it.[2] The International Federation of Library Associations and Institutions produced a helpful primer on Chinese names, which includes examples of Chinese names. As is clear from that list, all of the Chinese names are three characters.[3]

Surnames and given names that are more than two syllables do exist in China, but they are not the names of ethnically Han people. They are exceptions to the Chinese system of naming reserved for the transliteration of ethnic "minorities'" names. The Xinjiang Uyghur Autonomous Region government has created very stringent rules on the transliteration of ethnic minority names, governed under the 2005 "Rules for transliteration of Chinese characters of Uyghur names."[4] Uyghur people are required to spell their names on all official documents using the pinyin system, which reduces Uyghur language words to the 400 standard sounds available within the system. This not only changes the sound of the names, but often extends it into more syllables than the original Uyghur name would have. For instance, a famous Uyghur Tiananmen Square protestor named Örkesh (traditionally, Uyghurs only used given names and no surnames is officially transliterated with four syllables – Wu'er Kaixi – in the Chinese system.[5] It might be useful to note that the one row in the International Federation of Library Associations and Institutes primer that includes ethnic minority names is the only one that includes longer names. It is also useful to note that while Han names situate the surname first, followed by the given name, Uyghur names typically use the reverse order.

Furthermore, because Uyghur (and other ethnic "minorities") names are so different and have an unconventional number of syllables (from the perspective of traditional Han names), their surname and given names are often challenging to parse for Chinese readers. To address this confusion, some writers will put an interpunct (a centered dot) in between the first and last names of Uyghur people in writing.[6]

While Uyghurs do not abide by Chinese naming traditions when naming their own children, they do have some traditional names that are very recognizably Uyghur. Many Uyghur, Kazakh, and other predominantly Muslim communities in the XUAR will often use names related to the Koran or Islam. Similarly, Tibetan families have some names that are traditional and used by many families. Familiarity with those commonly used names can aid in identifying the names of ethnic "minority" people in Chinese media.

Useful Resources

- International Federation of Library Associations and Institutions, "IFLA Cataloguing Section: Names of Persons – Chinese Names" provides useful information on the standardization of Han Chinese names.

- Uyghur Human Rights Project, "Decolonizing the Discussion of Uyghurs: Recommendations for Journalists and Researchers" explains the reasons why Uyghur naming traditions are different and encourages culturally competent respect for Uyghur's wishes on naming.

- For lists of Uyghur names and place names, see Mutallip Sidik 木太里夫。司地克. 1996. 维吾尔人名手册, Handbook of Uyghur Names. kashgar:  Kashgar Daily Printing Factory, 喀什日报社印刷厂; Yu Taishan, 余太山, Gao Huachen, 陈高华, and Xie Fang, 谢方. 1996. 新疆各族历史文化词典，Dictionary of History and Culture of Various Ethnic Groups in Xinjiang. Beijing, 北京: Zhonghua Book Company,中华书局;

**AR002950**

---

[1] International Federation of Library Associations and Institutions, "IFLA Cataloguing Section: Names of Persons – Chinese Names," https://cdn.ifla.org/files/assets/cataloguing/pubs/ifla_names_of_persons_chinese_names_2020.pdf

[2] Endymion Wilkinson, Chinese History: A New Manual" (5th ed.), 2018, pg 121. See also pg 119, where the author explains that Han Chinese names are typically monosyllabic surnames and bi-syllabic given names.

[3] International Federation of Library Associations and Institutions

[4] Xinjiang Uyghur Autonomous Region Quality and Technical Supervision Bureau, 维吾尔族人名汉字音译转写规则 ["Rules for transliteration of Chinese characters for Uyghur names"], https://www.docin.com/p-2399524624.html

[5] Aksu, Anderson, and Szadziewski, "Decolonizing the Discussion of Uyghurs: Recommendations for Journalists and Researchers," Uyghur Human Rights Project, https://uhrp.org/report/decolonizing-the-discussion-of-uyghurs-recommendations-for-journalists-and-researchers/

[6] Lang Yinxia and Zhang Ling, "中文期刊维吾尔族作者人名英译问题和规范研究" [Problems in English Translation of Uyghur Authors' Names in Chinese Journals and Normative Research], *Ethnic Translation*, Issue 3 (2020), http://www.mzywfyj.org.cn/downloadRepository/8a349385-926d-4bc3-a18b-7753bc64d14a.pdf

**AR002951**

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR002952 - AR002967

This document comprises protected information and is not being included in the public version of the administrative record.

This document comprises AR002968 - AR002976

UNCLASSIFIED

*Office of Strategy, Policy, and Plans*

**U.S. Department of Homeland Security**
**Washington, DC 20528**



July 9, 2024

Mark V. Heusel
350 S. Main Street, Suite 300
Ann Arbor, MI 48104-2131

**Subject:**   **The Forced Labor Enforcement Task Force's Decision Regarding Camel Group Co., Ltd.'s Request for Removal from the Uyghur Forced Labor Prevention Act Entity List**

Dear Mr. Heusel:

Following consideration of Camel Group Co., Ltd.'s (Camel Group) request for removal from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List, the Forced Labor Enforcement Task Force (FLETF) has determined that the information provided by Camel Group as part of its removal request did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA.  Camel Group will remain on the UFLPA Entity List.

As you are aware, on August 2, 2023, the U.S. Department of Homeland Security published a Federal Register Notice announcing the addition of Camel Group to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA (Public Law 117-78).  The list described in Section 2(d)(2)(B)(ii) of the UFLPA is "entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

The Federal Register Notice describes the process for entities to request removal from the UFLPA Entity List.  The Federal Register Notice states "[a]ny listed entity may submit a request for removal (removal request) from the UFLPA Entity List along with supporting information to the FLETF Chair at *FLETF.UFLPA.EntityList@hq.dhs.gov*.  In the removal request, the entity (or its designated representative) should provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the applicable clause ((i), (ii), (iv), or (v)) of section 2(d)[(2)](B) of the UFLPA."

On November 7, 2023, Camel Group submitted a removal request to the FLETF.  The FLETF reviewed Camel Group's removal request and prepared questions for Camel Group.  On December 14, 2023, the FLETF sent a set of questions to Camel Group.  On December 21, 2023, Camel Group acknowledged receipt of the FLETF's questions, raised concerns about responding to certain questions posed by the FLETF, and requested information explaining the reasons for

UNCLASSIFIED

AR002977

UNCLASSIFIED

Camel Group's addition to the UFLPA Entity List. On January 31, 2024, the FLETF responded to Camel Group's letter and advised Camel Group that the FLETF welcomes Camel Group's responses to the questions it chooses to answer and that the FLETF will consider any and all information Camel Group provides to assess the removal request. On March 1, 2024, Camel Group provided responses to the FLETF's questions.

In its removal request and responses to the FLETF's questions, Camel Group asserts that it did not participate in the Toksun County Labor Transfer Program (Labor Transfer Program) in 2017 and that if the FLETF relied on this information to add Camel Group to the Section 2(d)(2)(B)(ii) list of the UFLPA, it is inaccurate. Camel Group provides a number of certifications/affidavits, signed subject to penalty of perjury, that contend that the information relied upon by the FLETF was subject to a factual correction following initial publication that undermines the FLETF's reasoning for placing Camel Group on the UFLPA Entity List. Camel Group also submitted several documents, including employee lists, its corporate record and business license, and its supplier regulations, to support its assertion that Camel Group did not participate in or benefit from any labor transfer programs. Camel Group further suggests that, although it never participated in any labor transfer programs, the Labor Transfer Program ended in 2019, and so it is not possible for Camel Group to be on the UFLPA Entity List under Section 2(d)(2)(B)(ii) on the basis of reporting related to this Labor Transfer Program.

Camel Group's removal request also included a request to meet with the FLETF. On March 15, 2024, the FLETF informed Camel Group that the FLETF agreed to accept Camel Group's meeting request prior to the FLETF's vote on the removal request, and, on March 22, 2024, the FLETF provided meeting protocols to Camel Group. In the protocols, the FLETF advised Camel Group that the meeting would be structured as a listening session to allow Camel Group to present or highlight information that it would like the FLETF to consider. The protocols also provided that any new information presented by Camel Group during the meeting must be submitted to the FLETF in writing. On April 2, 2024, the FLETF held a virtual meeting with Camel Group. Following the meeting, on April 5, 2024, Camel Group submitted a letter to the FLETF. In the letter, Camel Group indicated that it had no further documents or materials to provide the FLETF and that it considered the record for its removal request closed. Camel Group did not submit new information in writing to the FLETF.

On May 16, 2024, Camel Group submitted a letter to the FLETF Chair, requesting that the FLETF provide an update on the status of its removal request. On May 24, 2024, the FLETF sent a communication to update Camel Group on the status of its removal request. The FLETF informed Camel Group that the FLETF intended to issue its decision on their removal request within 30 business days and that the FLETF Chair would advise Camel Group in writing of the FLETF's decision.

The FLETF also provided Camel Group with a summary of the information the FLETF relied upon when considering whether to add Camel Group to the UFLPA Entity List. The FLETF added Camel Group to the UFLPA Entity List because it determined, based on publicly available information, that there was reasonable cause to believe Camel Group participated in the Labor Transfer Program and that Camel Group received workers from Uyghur-majority areas in southern Xinjiang through a handover ceremony coordinated by the Toksun County government

UNCLASSIFIED

AR002978

UNCLASSIFIED

in Turpan Prefecture in Xinjiang. Given the information indicating Camel Group's work with the Xinjiang government to receive Uyghurs and/or members of other persecuted groups from the Xinjiang Uyghur Autonomous Region, the FLETF determined that Camel Group satisfied the criteria for addition to the Section 2(d)(2)(B)(ii) list of the UFLPA. After receiving the FLETF's May 24, 2024 letter, Camel Group did not submit any new information in writing to the FLETF.

After reviewing all of the information provided by Camel Group to the FLETF, the FLETF has determined that Camel Group's removal from Section 2(d)(2)(B)(ii) list of the UFLPA is not warranted. The FLETF determined the information provided by Camel Group as part of its removal request did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA.

In reaching its conclusion, the FLETF has carefully considered all of the arguments made on behalf of your clients. The FLETF determined that Camel Group did not provide sufficient, credible information to demonstrate it did not and does not participate in Toksun County government's labor transfer programs to recruit, transfer, or receive workers from Uyghur-majority areas in southern Xinjiang.

Based on publicly available information from 2017, 2023, and 2024 illustrating continued Toksun County implementation of labor transfer schemes and Camel Group participation in Toksun County-sponsored labor recruitment events, the FLETF has reasonable cause to believe that Camel Group is working with the Toksun County government to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz. These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Labor Transfer Program.

The FLETF's decision to deny Camel Group's request for removal is not appealable; however, Camel Group may submit a new request for removal if it can provide new information to support such a request.

If you have further questions, please email the FLETF at FLETF.UFLPA.ENTITYLIST@hq.dhs.gov.

Thank you for your engagement on this request.

UNCLASSIFIED

AR002979

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

July 26, 2024

**N**                                    **N**          **N**
            **N**

**r  o**  : (U//FOUO) Forced Labor Enforcement Task Force (FLETF) Member Agencies are requested to vote on the request for removal of Camel Group Co., Ltd. (Camel Group) from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List.

**ro    d**: (U//FOUO) On August 2, 2023, the FLETF published a Federal Register Notice[1] announcing the addition of Camel Group to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA (Public Law 117-78).  Section 2(d)(2)(B)(ii) of the UFLPA is "a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

(U//FOUO) The Federal Register Notice describes the process for entities to request removal from the UFLPA Entity List.  The Federal Register Notice states "[a]ny listed entity may submit a request for removal (removal request) from the UFLPA Entity List along with supporting information to the FLETF Chair at *FLETF.UFLPA.EntityList@hq.dhs.gov*.  In the removal request, the entity (or its designated representative) should provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the applicable clause ((i), (ii), (iv), or (v)) of section 2(d)[(2)](B) of the UFLPA."

(U//FOUO) On November 7, 2023, Camel Group submitted Removal Request RR23-003 (RR23-003) to the FLETF Chair.  (Attachment A).  On November 8, 2023, the FLETF Chair referred RR23-003 to the FLETF.  The FLETF reviewed RR23-003 and prepared questions for Camel Group.  The FLETF Chair sent the FLETF's questions to Camel Group on December 14, 2023.  (Attachment B).  The FLETF Chair received a letter from Camel Group on December 21, 2023.  (Attachment C).  In the letter, Camel Group acknowledged receipt of the FLETF's questions, raised concerns about responding to certain questions posed by the FLETF, and requested information explaining the reasons for Camel Group's addition to the UFLPA Entity List.  On January 31, 2024, the FLETF responded to Camel Group's letter and advised Camel Group that the FLETF welcomes Camel Group's responses to the questions it chooses to answer and that the FLETF will consider any and all information Camel Group provides to assess the removal request.  (Attachment D).  On March 1, 2024, Camel Group provided responses to the FLETF's questions.  (Attachment E).

(U//FOUO) The Federal Register Notice also provides that "[l]isted entities may request a meeting with the FLETF after submitting a removal request in writing to the FLETF Chair at *FLETF.UFLPA.EntityList@hq.dhs.gov*.  Following its review of a removal request, the FLETF may accept the meeting request at the conclusion of the review period and, if accepted, will hold the meeting prior to voting on the entity's removal request."  RR23-003 included Camel Group's request to meet with the FLETF.  On March 15, 2024, the FLETF Chair informed Camel Group that the FLETF agreed to accept Camel Group's meeting request prior to the FLETF's vote on the removal request.  On March 22, 2024, the FLETF Chair provided meeting protocols to Camel

---

[1] 88 Fed. Reg. 50902.

**AR002980**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

Group. (Attachment F). In the protocols, the FLETF advised Camel Group that the meeting would be structured as a listening session to allow Camel Group to present or highlight information that it would like the FLETF to consider. The protocols also provided that any new information presented by Camel Group during the meeting must be submitted to the FLETF in writing. On April 2, 2024, the FLETF held a virtual meeting with Camel Group. Following the meeting, Camel Group submitted a letter to the FLETF Chair on April 5, 2024. (Attachment G). In the letter, Camel Group indicated that it had no further documents or materials to provide the FLETF and that it considered the record for RR23-003 closed. Camel Group did not submit new information in writing to the FLETF.

(U//FOUO) On May 16, 2024, Camel Group submitted a letter to the FLETF Chair. (Attachment H). In the letter, Camel Group requested that the FLETF provide an update on the status of RR23-003. On May 24, 2024, the FLETF sent a communication to update Camel Group on the status of RR23-003. (Attachment I). The FLETF informed Camel Group that the FLETF intends to issue a decision on their removal request within 30 business days and that the FLETF Chair will advise Camel Group in writing of the FLETF's decision. The FLETF also provided Camel Group with a summary of the information the FLETF relied upon when considering whether to add Camel Group to the UFLPA Entity List. After receiving the FLETF's May 24, 2024 letter, Camel Group did not submit new information in writing to the FLETF.

(U//FOUO) The FLETF Chair will initiate the FLETF's vote on RR23-003 on June 26, 2024. The voting period will end on June 28, 2024.

(U//FOUO) The FLETF should consider information from the following documents when evaluating RR23-003 (included as Attachments).

A. Camel Group Request for Removal from the UFLPA Entity List - RR23-003 (with attachments)
B. FLETF Questions to Camel Group (December 14, 2023)
C. Camel Group Letter to the FLETF (December 21, 2023)
D. FLETF Response to Camel Group (January 31, 2024)
E. Camel Group Response to FLETF Questions (March 1, 2024)
F. Removal Request Meeting Protocols
G. Camel Group Letter to the FLETF (April 5, 2024)
H. Camel Group Letter to the FLETF (May 16, 2024)
I. FLETF Response to Camel Group (May 24, 2024)
J. UFLPA Entity List Package 23-004
K. CBP Note to File addressing applicability review (May 3, 2024)
L. █████████████████████████████████████████
   ████████████████████████████
M. ███████████████████████████████████████████
   ██████████████████████████████
N. Murphy, L. (2023). Chinese Transliteration of Uyghur (And Other Ethnic Minority) Names [Unpublished resource guide]. Professor of Human Rights and Contemporary Slavery, Helena Kennedy Centre for International Justice, Sheffield Hallam University.
O. ████████████████████████████████████

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR002981

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

P. ███████████████████████████

**Discussion**:

1.    Addition of Camel Group to the UFLPA Entity List

(U//FOUO) UFLPA Entity List Package 23-004 (Attachment J) identifies a February 2022 Sheffield Hallam University report, *Financing & Genocide: Development Finance and the Crisis in the Uyghur Region* and a July 10, 2017, announcement from Toksun County's official WeChat page (which is also cited in the *Financing & Genocide* report). The Toksun County WeChat announcement identifies Camel Group as one of several companies that participated in a "handover ceremony" coordinated by the Toksun County government in Turpan Prefecture in Xinjiang that received workers in 2017 from Kashgar and Hotan, which are Uyghur-majority areas in southern Xinjiang. The handover ceremony was conducted under the Toksun County labor transfer program known as the "Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (herein after referred to as the "Labor Transfer Program").

(U//FOUO) Given the information indicating that Camel Group received workers through the Toksun County Labor Transfer Program, the FLETF determined that Camel Group satisfied the criteria for addition to the Section 2(d)(2)(B)(ii) list of the UFLPA, specifically that Camel Group works with the government of the XUAR to receive Uyghurs and/or members of other persecuted groups from the XUAR.

2.    Camel Group Removal Request

(U//FOUO) In RR23-003, Camel Group asserts that it did not participate in the Toksun County Labor Program in 2017 and that the information that the FLETF relied on to add Camel Group to the Section 2(d)(2)(B)(ii) list of the UFLPA is inaccurate. Camel Group provides a number of certifications/affidavits, signed subject to penalty of perjury, that contend that the information relied upon by the FLETF was subject to a factual correction following initial publication that undermines the FLETF's reasoning for placing Camel Group on the UFLPA Entity List. Camel Group also submitted several documents, including employee lists, its corporate record and business license, and its supplier regulations, to support its assertion that Camel Group did not participate in or benefit from any labor transfer programs.[2] Camel Group

---

[2] Although not the focus of its removal request, Camel Group also highlights in its removal request that a subsidiary, Camel Energy, has had shipments detained by U.S. Customs and Border Protection and ultimately released. In particular, it highlights an email received from CBP on September 13, 2023, stating that it had reviewed Camel Energy Inc.'s "applicability documentation" related to entry ███████ and that Camel Energy Inc. "has provided sufficient documentation to support their claim that shipment was not manufactured with forced labor." (RR23-003, Exh.14). CBP prepared a note to file that clarifies that during the review of entry ███████, it did not consider whether forced labor was present in the supply chain, despite that statement being included in the e-mail. (Attachment K). Camel includes this discussion in its removal request to show that despite a "stellar record of successfully seeking (and obtaining) CBP UFLPA-detention releases" it was still added to the UFLPA Entity List and that this successful record should be taken into account by the FLETF when reviewing RR23-003. (RR23-003, pg. 5-6, 19). However, the CBP assessments of individual entries by a Camel Group subsidiary do not preclude or restrict the FLETF from making an assessment that Camel Group meets the statutory criteria for placement on the UFLPA Entity List.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

further suggests that, although it never participated in any labor transfer programs, the Labor Transfer Program identified on the Toksun County WeChat page ended in 2019, and so it is not possible for them to be on the UFLPA Entity List under Section 2(d)(2)(B)(ii) on the basis of this reporting.  The FLETF must weigh the persuasiveness and credibility of these arguments and information, as outlined in Camel's removal request and answers to the FLETF's follow-up questions, against the record originally presented in UFLPA Entity List Package 23-004 supporting Camel Group's designation and recent information indicating Camel Group is working with the government of Xinjiang Uyghur Autonomous Region to recruit members of persecuted groups out of Xinjiang.

A.    Toksun County 2017 WeChat Announcement

(U//FOUO) In Removal Request 23-003 (RR23-003), Camel Group claims that Toksun County's July 10, 2017 announcement on its official WeChat page identifying Camel Group as one of several companies that participated in a "handover ceremony" receiving workers through a Toksun County Labor Transfer Program, was inaccurate.  Camel Group claims that a "corrected" article from Sina News, dated July 12, 2017, that replicates the content of the Toksun County WeChat article but omits Camel Group from the list of participating companies, demonstrates that Camel Group was not one of the participating entities.

(U//FOUO) Camel Group claims that Toksun County mistakenly identified Camel Group as a participant in the labor transfer program and handover ceremony described in the announcement.  Camel Group notes that "[u]pon seeing the erroneous WeChat Article, Camel Group immediately contacted the Toksun County SSHR on July 11, 2017 (the very next day), and informed it of the error in the report."  (RR23-003, pg. 9).  Camel Group also claims that "the photos included in the WeChat Article do not show any Camel Group representatives or other evidence of its participation." (RR23-003, pg. 9).

(U//FOUO) Camel Group submits a certification letter signed and dated October 25, 2023, from the Toksun County Human Resources and Social Security Bureau (Toksun County SSHR) confirming Camel Group's claims.  (RR23-003, Exhibit 23).  It states that Camel Group immediately informed the Toksun County SSHR that the report published on the Toksun County WeChat account was incorrect.  The 2023 Toksun County SSHR certification letter attests that Camel Group did not participate in the ceremony.  (RR-23-003, Exhibit 23).

(U//FOUO) In response to follow-up questions from the FLETF, Camel Group states that all communications with the Toksun County SSHR about the alleged misidentification, via the Toksun County WeChat account, of Camel Group as participating in a Toksun County Labor Transfer Program handover ceremony occurred via telephone.  (Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 7-8).

(U//FOUO) Camel Group states that the Toksun County SSHR "immediately corrected the article by removing all mention of Camel Group's name."  (RR23-003, pg. 9).  Camel Group explains that "[t]he corrected article was published that same day through Yaxin Network News, a subsidiary of national Chinese State media outlet Sina (新浪), entitled 'Toksun County, Xinjiang holds a handover ceremony for surplus labor entities.'"  (RR23-003, pg. 9).  Camel Group claims

AR002983

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

that this "corrected" article from Sina News, dated July 12, 2017, demonstrates that Camel Group did not participate in the handover ceremony and Labor Transfer Program.

(U//FOUO) The July 10, 2017, WeChat article is posted on Toksun County's official WeChat page. Sina News is a global media company that was reproducing the announcement issued by the Toksun County government. The official WeChat page does not include a correction to the text or a notice indicating a correction. The July 12, 2017 Sina News article with the purported "correction" was not an official retraction by Toksun County, as it did not come from the Toksun County government.

(U//FOUO) The FLETF confirmed Camel Group's claims that photos included in the WeChat Article do not appear to show any Camel Group representatives or other evidence of its participation in the handover ceremony. However, the FLETF considers that their absence from the photos is not dispositive of whether they participated in the handover ceremony and labor transfer program.

(U//FOUO) The FLETF also questions the credibility of the Toksun County SSHR certification document. Labor transfers in the XUAR, a key component of XUAR government policies (i.e. 14th Five – Year Plan), are the "coercive work policy that underpins most forced labor linked to Xinjiang."[3] Toksun County SSHR helped to facilitate labors transfers in the XUAR, and, it would behoove Camel Group and Toksun County SSHR to draft a document intended for the U.S. Government that says Camel Group did not participate in a handover ceremony implemented under a government labor transfer program.

        B.      Camel Group Correspondence with Toksun County Government Regarding Labor

(U//FOUO) In RR23-003, Camel Group claims it corresponded with the Toksun County government regarding labor and/or labor transfers once in early 2017 when Camel Group's labor recruitment officer, ███████████ received a phone call from an official from the Toksun County SSHR asking if Camel Renewable and Camel Xinjiang Battery had any need for labor, which Camel Group declined, noting that it had not obtained all proper approvals for its XUAR facilities and therefore had no need to begin hiring. (RR23-003, pg. 8, ███ Declaration - Ex. 22; Toksun County SSHR Letter - Ex. 23.; ███████████ Declaration - Ex. 25).

(U//FOUO) The FLETF requested that Camel Group provide documentation memorializing that phone call between ███ and the Toksun County SSHR and all correspondence/documentation (such as e-mails, letters, notes) between Camel Group and Toksun County SSHR. (FLETF Questions for Camel Group Co. Ltd, pg. 1). According to Camel Group, all communication between the Toksun County SSHR and Camel Group in 2017 was conducted by telephone. (Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 5-7). Camel Group states that this 2017 phone call is the only known communication or record related to Camel Group's participation in or involvement with the Toksun County Labor Transfer Program. (See RR23-003, pgs. 14-15; Camel Group Co. Ltd. Responses to FLETF Questions, pgs. 5-7).

---

[3] Forced Labor in the Xinjiang Uyghur Autonomous Region: Assessing the Continuation of Coercive Labor Transfers in 2023 and Early 2024 - Jamestown

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR002984

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

(U//FOUO) Notably, all correspondence, including documentation memorializing the phone conversation between ▮▮▮, Camel Group's labor recruitment officer, and Toksun County, as well as information attesting to the phone conversations, occurred in 2023, after Camel Group was named to the UFLPA Entity List. (See RR23-003, Exhibits 22- 25). There is no contemporaneous documentation, including internal notes or a memorandum memorializing Camel Group's 2017 call with the Toksun County official in 2017 when the call purportedly occurred.

(U/FOUO) Moreover, while Camel Group asserts that it could not have participated in the Toksun County Labor Transfer Program because its XUAR facilities were not operational until mid-2018, (Removal Request RR23-003, Exhibit 22), Camel Group's XUAR employee lists demonstrate that they did in fact recruit employees for its Xinjiang facilities in 2017 and early 2018. (Removal Request RR23-003, Exhibit 30).

### C.    Camel Group Labor Recruitment

(U//FOUO) Camel Group asserts that it does not employ and has not employed anyone who was recruited through the Labor Transfer Program. (RR23-003, pgs. 16-17). Camel Group states that its current employees were hired through Camel Group's typical "social recruitment/social hiring." (RR23-003, Exhibit 27 (▮▮ Declaration), Exhibit 28 (▮▮▮ Declaration), Exhibit 29 (Camel Group Employee List), Exhibit 30 (Camel Xinjiang Employee List)). Camel Group also states that

(U//FOUO) Additional FLETF research identified two additional instances in which Camel Group is working with Toksun County to recruit members of persecuted minority groups.

(U//FOUO) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Camel Group participated in a state-sponsored labor recruitment event for surplus laborers hosted by Toksun County. A member of the Toksun County government ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[4] (Attachment L).

(U//FOUO) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Camel Group had recruited and received ▮▮▮▮▮ through a state-sponsored job fair for surplus laborers operated by the Toksun County government. (Attachment M). Uyghur, Kazakh, or Kyrgyz villagers appear to have attended the fair, as evidenced by ▮▮▮▮▮▮▮▮▮▮▮▮▮ who is likely a member of the Uyghur, Kazakh, or Kyrgyz communities, based on naming conventions.[5]

---

[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[5] Full names for Han individuals (the majority ethnic group in China) regularly consist of two or three Chinese characters. Names for ethnic minorities in China, especially Uyghurs, Kazakhs, Kyrgyz, Tajiks, and Uzbeks, regularly consist of more than two syllables and often include an interpunct (·) or other separator (i.e. -), to separate the first and last name in writing. *See* Attachment N.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR002985

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

(U//FOUO) Information from these two additional sources indicates that Camel Group is working with Toksun County to recruit individuals from persecuted groups.[6] These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Toksun County Labor Transfer Program.

D.    Continued Use of Labor Transfer Programs in Toksun County

(U//FOUO) In RR23-003, Camel Group further submits that the Toksun County SSHR confirmed that the Toksun County Labor Transfer Program began in 2017 and ended in 2019. (RR23-003, pg. 18). Camel Group asserts that "even if the Task Force is not convinced that Camel Group did not participate in the Labor Transfer Program (which it did not), the Labor Transfer Program concluded more than 4 years ago, and Camel's Xinjiang entities were not in need of any labor at that time." (RR23-003, pg 18).

(U//FOUO) Although the "Three-year Plan" to promote labor transfers identified in Recommendation 24-004 has conceivably ended, additional FLETF research indicates that the Toksun County labor transfer programs remain active and ongoing. ███████████████ ██████████████████████ indicates that Toksun County continued to participate in labor transfers, having transferred ██████████████████████████████████████. (Attachment O).

(U//FOUO) Additionally, although the Three-year Plan may have ended, there is evidence that Camel Group works with Toksun County to recruit members of persecuted groups, by participating in a state-sponsored job fair for surplus laborers operated by the Toksun County government. (Attachments L, M).

**Action Requested**: (U//FOUO) Signature of official with authority or delegated authority to make FLETF decisions on behalf of your department/agency documenting your department/agency's vote on the removal of the entity identified in RR23-003 to the UFLPA Entity List.

**Attachments**: (U//FOUO)
A. Camel Group Request for Removal from the UFLPA Entity List - RR23-003 (with attachments)
B. FLETF Questions to Camel Group (December 14, 2023)
C. Camel Group Letter to the FLETF (December 21, 2023)
D. FLETF Response to Camel Group (January 31, 2024)
E. Camel Group Response to FLETF Questions (March 1, 2024)
F. Removal Request Meeting Protocols
G. Camel Group Letter to the FLETF (April 5, 2024)
H. Camel Group Letter to the FLETF (May 16, 2024)
I. FLETF Response to Camel Group (May 24, 2024)
J. UFLPA Entity List Package 23-004
K. CBP Note to File addressing applicability review (May 3, 2024)
L. ████████████████████████████████████████████

███████████████████████████████████████████████████
████████████████████████████████

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

M. ████████████████████████████████████████████

N. Murphy, L. (2023). Chinese Transliteration of Uyghur (And Other Ethnic Minority) Names [Unpublished resource guide]. Professor of Human Rights and Contemporary Slavery, Helena Kennedy Centre for International Justice, Sheffield Hallam University.

O. ████████████████████████████████████████████

P. ████████████████████████████████████████████
████

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR002987