UNITED STATES COURT OF INTERNATIONAL TRADE
HONORABLE LISA W. WANG, JUDGE

| | | |
|---|---|---|
| CAMEL GROUP CO., LTD., | : | |
| | : | |
| Plaintiff, | : | Court No. 25-00022 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES ET AL., | : | **PUBLIC VERSION** |
| | : | |
| Defendants. | : | |
| | : | |

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

MONICA P. TRIANA
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9240 or 9230
*Attorneys for Defendants*

Date: January 29, 2026

## TABLE OF CONTENTS

BACKGROUND.................................................................................................1

   A.  Statutory And Regulatory Framework ...........................................................1

       i.   Uyghur Labor ............................................................................... 3

      ii.   The Uyghur Forced Labor Prevention Act ................................... 6

     iii.   Enforcement Of The Prohibitions Set Forth In The UFLPA ............. 10

   B.  Camel Group's UFLPA Listing ..................................................... 11

RULE 56.1 STATEMENT ......................................................................... 15

   A.  Administrative Determination To Be Reviewed .................................. 15

   B.  Issues Presented ...................................................................... 16

SUMMARY OF ARGUMENT .................................................................. 16

ARGUMENT ............................................................................................. 17

  I.     THE FLETF'S DECISION COMPLIES WITH THE APA ......................... 17

   A.  The FLETF's Decision Denying Camel Group's Request For Removal From
       The UFLPA Entity List Was Not Arbitrary And Capricious And Was
       Supported By Substantial Evidence ............................................... 17

       i.   Standard Of Review .................................................................. 18

      ii.   Camel Group Was Working With The Government Of Xinjiang To "[R]ecruit[],
        [T]ransport[], [H]arbor[] [O]r [R]eceive[] Uyghurs Or Other Persecuted Groups20

        a)  There Is Reasonable Cause to Believe That Camel Group Satisfied The
           Statutory Requirements Of Section 2(d)(2)(B) Of The UFLPA.................. 21

        b)  There Is No Reason To Discount Any Evidence Relied On By The FLETF 23

        c)  The FLETF Considered *All* Evidence Submitted By Camel Group And
           Identified During Its Investigation................................................ 28

        d)  Camel Group's Interpretation Of The Statute Is Incorrect ........................ 32

   B.  The FLETF Provided Adequate Explanation............................................ 33

      i.     The FLETF Adequately Explained Its Decision Denying Camel's Request For Removal From The UFLPA Entity List.............................................................. 34

      ii.    Camel Group Has Not Established A Lack Of Adequate Explanation........... 36

C.  Reasonable Cause To Believe Is The Correct Burden Of Proof For The FLETF's Listing And Removal Decisions ..................................................................... 39

      i.     Camel Group Waived This Argument Because It Was Not Raised In Its Complaint............................................................................................... 40

      ii.    The Rationale For Applying The Reasonable Cause To Believe Standard Applies Equally To A UFLPA Decision And A Decision Following A Request For Removal ............................................................................................ 40

      iii.   Reasonable Cause To Believe Standard Is Often Used In Matters Of Foreign Policy ............................................................................................ 45

      iv.   Camel Group's Remaining Arguments As To Why A Preponderance Standard Should Be Applied To Removal Decisions Have No Merit .......................... 46

D.  Camel's Group's Rights Were Not Harmed And It Was Afforded All The Process To Which It Was Entitled ...................................................................... 49

II.     SHOULD THE COURT FIND IT NECESSARY, REMAND WITHOUT VACATUR IS THE PROPER REMEDY ..................................................... 52

CONCLUSION................................................................................................ 53

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ................................................................... 52

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ................................................................................. 49

*Ass'n of Nat'l Advertiser's, Inc. v. F.T.C.,*
627 F.2d 1151 (D.C. Cir. 1979) ............................................................... 41

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ............................................................................... 19

*Camp v. Pitts,*
411 U.S 138 (1973) ................................................................................ 18

*Rodriguez v. Department of Veterans Affairs,*
8 F. 4th 1290 (Fed. Cir. 2012) ................................................................ 43

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) ................................................................. 46

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ............................................................................... 18

*Consolo v. Fed. Maritime Comm'n,*
383 U.S. 607 (1966) ........................................................................ 19, 28

*Consolidated Bearings Co. v. United States,*
412 F.3d 1266 (Fed. Cir. 2005) ............................................................... 18

*Consolidated Edison Co. of New York v. NLRB,*
305 U.S. 197 (1938) ............................................................................... 19

*CS Wind Viet. Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) ............................................................... 34

*District of Columbia v. Wesby,*
583 U.S. 48 (2018) ................................................................................. 44

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ............................................................................... 43

*Frontier-Kemper Constructors, Inc. v. U.S. Dep't of Lab.*,
876 F.3d 683 (4th Cir. 2017) .................................................................... 26

*Gazelle v. Shulkin*,
868 F.3d 1006 (Fed. Cir. 2017).................................................................. 43

*Hisgen v. Fanning*,
208 F. Supp. 3d 186 (D.D.C. 2016) ........................................................... 23

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000).................................................... 19, 21, 28

*Int'l Custom Prods., Inc. v. United States*,
791 F.3d 1329 (Fed. Cir. 2015).................................................................. 49

*Int'l Union, UMW v. Federal Mine Safety and Health Admin.*,
920 F.2d 960 (D.C. Cir. 1990).................................................................... 52

*Islamic Am. Relief Agency (IARA-USA) v. Gonzales*,
477 F.3d 728 (2007).................................................................................. 18

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012) ........................................................... 45, 46

*Kurshumi v. Ashcroft*,
102 Fed.Appx. 172 (1st Cir. 2024) ...................................................... 29, 37

*Mazzari v. Rogan*,
323 F.3d 1000 (Fed. Cir. 2003).................................................................. 18

*McAndrews v. Fleet Bank of Mass., N.A.*,
989 F.2d 13 (1st Cir. 1993)........................................................................ 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................... 19

*N.Y. Cent. & Hudson River R.R. Co. v. United States*,
212 U.S. 500 (1909)................................................................................... 26

*Nat'l Org. of Veterans Advocs., Inc. v. Sec'y of Veterans*,
*Affs.*, 260 F.3d 1365 (Fed. Cir. 2001) ....................................................... 52

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013).................................................................... 18

*NEC Corp. v. United States,*
151 F.3d 1361 (Fed. Cir. 1998)...................................................................49, 50

*Ninestar Corp. v. United States,*
687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ......................................*passim*

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) ...................................................................25, 26

*Ogbolumani v. Napolitano,*
557 F.3d 729 (7th Cir. 2009) ....................................................................29, 38

*OKKO Bus. PE v. Lew,*
133 F. Supp. 3d 17 (D.D.C. 2015) ................................................................ 45

*PBGC v. LTV Corp.,*
496 U.S. 633 (1990)....................................................................................42, 52

*Philips Med. Sys. (Cleveland), Inc. v. Buan,*
2022 WL 602485 (N.D. Ill. Mar. 1, 2022) ..................................................... 6

*Regan v. Wald,*
468 U.S. 222 (1984)......................................................................................... 45

*Sakievich v. United States,*
369 F. Supp. 3d 278 (D.D.C. 2019) .............................................................. 19

*SAS Inst., Inc. v. Iancu,*
584 U.S. 357 (2018)......................................................................................... 18

*Software Sys. Assocs., Inc. v. Saiki,*
1993 WL 294782 (D.D.C. June 25, 1993) .................................................... 42

*Steadman v. S.E.C.,*
450 U.S. 91 (1981).....................................................................................41, 43

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
435 U.S. 519 (1978)......................................................................................... 42

*Western Oil & Gas Ass'n v. EPA,*
633 F.2d 803 (9th Cir. 1980) ........................................................................ 52

**Statutes**

5 U.S.C. § 554..................................................................................................41

5 U.S.C. § 706..................................................................................................18

19 U.S.C. § 1307 ...................................................................................................*passim*

19 U.S.C. § 1499 .............................................................................................................. 2, 10

19 U.S.C. § 4681 ...................................................................................................................... 2

28 U.S.C. § 1581 .................................................................................................................... 18

28 U.S.C. § 2640 .................................................................................................................... 18

50 U.S.C. § 1702 .................................................................................................................... 45

Uyghur Forced Labor Prevention Act, P.L 117-21 (Dec. 23, 2021) ...................................*passim*

**Rules**

USCIT R. 56.1 .................................................................................................................... 1, 15

**Regulations**

15 C.F.R. § 744.11(b) ............................................................................................................ 46

19 C.F.R. § 12.42 ............................................................................................................... 44, 47

19 C.F.R. Part 151.............................................................................................................. 2, 10

**Other Authorities**

*Notice Regarding the Uyghur Forced Labor Prevention Act Entity List,*
88 Fed. Reg. 38,080 (June 12, 2023) .................................................................................... 2

*Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List,*
87 Fed. Reg. 47,777 (Aug. 4, 2022)................................................................................... 8, 9

*Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*
88 Fed. Reg. 50,902 (Aug. 2, 2023)..................................................................................*passim*

UNITED STATES COURT OF INTERNATIONAL TRADE
HONORABLE LISA W. WANG, JUDGE

_____

CAMEL GROUP CO., LTD.,                              :
                                                                       :
                                       Plaintiff,            :          Court No.  25-00022
                                                                       :
                        v.                                         :
                                                                       :          **PUBLIC VERSION**
UNITED STATES ET AL.,                                :
                                                                       :
                                       Defendants.       :
_____  :

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendants, the United States *et al.* (the Government), pursuant to Rule 56.1 of the United States Court of International Trade (USCIT), respectfully submit this response in opposition to plaintiff's, Camel Group Co., Ltd. (Camel Group or plaintiff), motion for judgment on the agency record.  The record demonstrates that the Forced Labor Enforcement Task Force's (FLETF) decision denying plaintiff's request to be removed from the list of entities described in Uyghur Forced Labor Prevention Act (UFLPA), P.L. 117-21 (Dec. 23, 2021), Section 2(d)(2)(B), was not arbitrary or capricious, and was supported by substantial evidence.

### BACKGROUND

#### A.  Statutory And Regulatory Framework

The United States prohibits the importation of all "goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by … forced labor …."  19 U.S.C. § 1307.  Section 307 of the Tariff Act of 1930 defines forced labor as "all work or service … exacted from any person under the menace of any penalty … and for which the worker does not offer … [themselves] voluntarily."  *Id.*  U.S. Customs and Border Protection (CBP) is charged with enforcing section 307 for merchandise presented for entry into

UNITED STATES COURT OF INTERNATIONAL TRADE
HONORABLE LISA W. WANG, JUDGE

_____

CAMEL GROUP CO., LTD.,                    :
                                          :
                          Plaintiff,      :        Court No.  25-00022
                                          :
              v.                          :
                                          :        **CAMEL CONFIDENTIAL**
UNITED STATES ET AL.,                     :
                                          :
                          Defendants.     :
_____       :

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>JUDGMENT ON THE AGENCY RECORD</u>**

Defendants, the United States *et al.* (the Government), pursuant to Rule 56.1 of the

United States Court of International Trade (USCIT), respectfully submit this response in

opposition to plaintiff's, Camel Group Co., Ltd. (Camel Group or plaintiff), motion for judgment

on the agency record.  The record demonstrates that the Forced Labor Enforcement Task Force's

(FLETF) decision denying plaintiff's request to be removed from the list of entities described in

Uyghur Forced Labor Prevention Act (UFLPA), P.L. 117-21 (Dec. 23, 2021), Section

2(d)(2)(B), was not arbitrary or capricious, and was supported by substantial evidence.

## <u>BACKGROUND</u>

### A.  Statutory And Regulatory Framework

The United States prohibits the importation of all "goods, wares, articles, and

merchandise mined, produced, or manufactured wholly or in part in any foreign country by …

forced labor …."  19 U.S.C. § 1307.  Section 307 of the Tariff Act of 1930 defines forced labor

as "all work or service … exacted from any person under the menace of any penalty … and for

which the worker does not offer … [themselves] voluntarily."  *Id.*  U.S. Customs and Border

Protection (CBP) is charged with enforcing section 307 for merchandise presented for entry into

the United States.  All entries are subject to examination by CBP, on an entry-by-entry basis, pursuant to its authority under 19 U.S.C. § 1499 and 19 C.F.R. Part 151.

In January 2020, pursuant to section 741 of the United States–Mexico–Canada Agreement Implementation Act, Congress directed the President to establish the FLETF to "monitor United States enforcement of the prohibition under section 1307 …."  *See* 19 U.S.C. § 4681.  The FLETF, established by Executive Order, is chaired by the Department of Homeland Security (DHS) and comprises seven member agencies: DHS, the U.S. Trade Representative (USTR), and the Departments of Justice, Labor, State, Treasury, and Commerce.  19 U.S.C. § 4681; Exec. Order 13923, *Establishment of the Forced Labor Enforcement Task Force Under Section 741 of the United States-Mexico-Canada Agreement Implementation Act,* 85 Fed. Reg. 30,587 (May 15, 2020); *see Notice Regarding the Uyghur Forced Labor Prevention Act Entity List,* 88 Fed. Reg. 38,080, 38,081 n.1 (June 12, 2023) (Commerce is a member of the FLETF, as invited by DHS).  In addition to the seven member agencies, the FLETF comprises several observer agencies: the Departments of Energy and Agriculture, the National Security Council, CBP, and U.S. Immigration and Customs Enforcement Homeland Security Investigations.  *See* 88 Fed. Reg. 38,081.[1]

In 2021, Congress strengthened the Government's ability to root out imported products made with forced labor by enacting the UFLPA.  As discussed below, Congress tasked the FLETF to develop a strategy to enforce section 307 for forced labor occurring in the People's Republic of China (China or PRC).

---

[1] The U.S. Agency for International Development was previously one of the observer agencies, but is no longer identified.  *See https://ww.dhs.gov/forced-labor-enforcement-task-force.*

###### i.    Uyghur Labor

The Chinese government's oppression of the predominantly Muslim Uyghur people and other ethnic and religious minority groups from the Xinjiang Uyghur Autonomous Region (Xinjiang or XUAR) is well-documented.  *See Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China*, Department of Homeland Security (June 17, 2022) (*FLETF Strategy*), at 6-7, 10-12, https://www.dhs.gov/uflpa-strategy.[2]  According to the State Department's 2021 *Trafficking in Persons Report*, cited in the *FLETF Strategy*:

> Over the last four years, the [PRC] ... has carried out a mass detention and political indoctrination campaign against Uyghurs, who are predominantly Muslim, and members of other ethnic and religious minority groups in … Xinjiang …, a large region in western China.  The courageous voices of survivors, their family members abroad, researchers, and international advocacy groups have thoroughly documented the PRC's discriminatory use of surveillance technologies and trumped-up administrative and criminal charges to abduct and detain more than one million Muslims, including Uyghurs, ethnic Hui, ethnic Kazakhs, ethnic Kyrgyz, ethnic Tajiks, and ethnic Uzbeks, in as many as 1,200 state-run internment camps throughout Xinjiang.  Detention in these camps is intended to erase ethnic and religious identities under the pretext of "vocational training."  Forced labor is a central tactic used for this repression.
>
> In Xinjiang, the government is the trafficker.  Authorities use threats of physical violence, forcible drug intake, physical and sexual abuse, and torture to force detainees to work in adjacent or off-site factories or worksites producing [many different products] ….

2021 *Trafficking in Persons Report* at 47, available at, https://www.state.gov/reports/2021-trafficking-in-persons-report/.  Application of these practices began with the introduction of a

---

[2] The FLETF prepared the *UFLPA Strategy* in response to the directive set forth in Section 2(c) of the UFLPA.

"XUAR [(Xinjiang Uyghur Autonomous Region)] De-Extremification Regulation" and a 2018 revision to that regulation, legalizing the re-education internment campaign by the Xinjiang government, in which experts believe the PRC government was involved. *See* Adrian Zenz, *Evidence of Chinese Central Government's Knowledge of and Involvement in Xinjiang's Re-Education Internment Campaign*, 21 China Brief 18 (Sept. 14, 2021), https://jamestown.org/program/evidence-of-the-chinese-central-governments-knowledge-of-and-involvement-in-xinjiangs-re-education-internment-campaign/. The goal of government programs was to exert control over all people of working age in Xinjiang. *FLETF Strategy*, at 20.

By 2020, "[t]he Chinese government ha[d] detained and 'reeducated' more than 1 million Uyghurs and other Muslim ethnic and religious minorities in Xinjiang in an effort to fully secure and control—or stabilize—the population there." Amy Lehr, Ctr. for Strategic & Int'l Studies, *Addressing Forced Labor in the Xinjiang Uyghur Autonomous Region: Towards a Shared Agenda*, at 1 (July 30, 2020) (Lehr), https://www.csis.org/analysis/addressing-forced-labor-xinjiang-uyghur-autonomous-region-toward-shared-agenda (cited in *FLETF Strategy*, at iv). The PRC government sought stability through incarceration, detention, and political indoctrination. *Id.* It believed that factory work would cause these minorities to assimilate to mainstream Han Chinese culture. *Id.* at 1-2. China's gross human rights violations include both forced labor within Xinjiang and trafficking Uyghurs or other persecuted groups from Xinjiang to other provinces within the PRC. 2021 *Trafficking in Persons Report*, at 47; *FLETF Strategy*, at 10-11, 18-20; *see also* Global Supply Chains, Forced Labor, and the Xinjiang Uyghur Autonomous

Region, Congressional-Executive Commission on China (March 2020) at 5 (*CECC Report*),[3]

(cited in *FLETF Strategy*, at 11).

As part of that campaign, the PRC government not only places Uyghurs in internment camps but also implements several different euphemistically named labor programs, like "pairing assistance," "poverty alleviation," and "labor transfer" programs.  As the FLETF has explained, although some labor programs are ostensibly for "eradicating poverty … *use of such programs in Xinjiang* and the use of labor sourced from persecuted groups *carries a particularly high-risk of forced labor* …."  *FLETF Strategy*, at 18 (emphasis added).  Moreover, these programs:

> can include discriminatory social control, pervasive surveillance, and large-scale internment. An official PRC government report published in September 2020 indicated that the government reports to have placed over two and a half million workers at farms and factories in Xinjiang and across the PRC.  Research has since shown that workers in these schemes are largely members of ethnic minorities who are subjected to systemic oppression through forced labor and do not offer themselves voluntarily.

*Id*.  In some rural areas, the government expropriates farmland from some small-scale farms, which facilitates involuntary labor transfers.  *Id.* at 20.  Farmers who lose their land are vulnerable to labor transfer programs.  *Id.*  When conducting a "poverty alleviation" program, "local officials are under pressure to deliver certain quotas of people out of poverty, which can be accomplished on paper by transferring them from their traditional work to other jobs."  Lehr, at 2.

As part of these forced labor programs, companies and local governments—as well as recruitment intermediaries—receive financial incentives like tax breaks and subsidies.  2021 *Trafficking in Persons Report*, at 47, 177; *FLETF Strategy*, at 19-20.  As an example of just how

---

[3] *Available at* https://www.cecc.gov/sites/chinacommission.house.gov/files/documents/CECC%20Staff%20Report%20March%202020%20%20Global%20Supply%20Chains%2C%20Forced%20Labor%2C%20and%20the%20Xinjiang%20Uyghur%20Autonomous%20Region.pdf.

widespread these human rights abuses are, according to one Non-Governmental Organization report, between 2017 and 2019, approximately 80,000 ethnic minority workers were transferred out of Xinjiang to work in factories in other provinces in the PRC, specifically eastern Chinese provinces, under a government policy called "Xinjiang Aid." *See FLETF Strategy*, at 10-11, 20; 2021 *Trafficking in Persons Report*, at 177. Worker participation is involuntary – it results from the government's pervasive intimidation and threats, including detention, and workers are subject to constant surveillance. *FLETF Strategy*, at 21.

Although the forced labor of Uyghurs is well-documented, it is difficult to obtain specific information about conditions in manufacturing facilities, both inside and outside of Xinjiang, with respect to Uyghur workers. *CECC Report*, at 7. Specifically, Uyghur workers transferred outside of Xinjiang are under constant threat of detention, both for themselves and family members, making it almost impossible for them to speak up. *Id.* And any data voluntarily produced from China to U.S. authorities must receive the PRC government's imprimatur. Article 36 of China's "Data Security Law" "requires review by the Supreme People's Court before a Chinese individual or organization may provide data in response to requests 'made by foreign judicial or law enforcement authorities.'" *Philips Med. Sys. (Cleveland), Inc. v. Buan*, 2022 WL 602485, at *6 (N.D. Ill. Mar. 1, 2022).

### ii.    The Uyghur Forced Labor Prevention Act

In December 2021, Congress passed the UFLPA to address the state-sanctioned forced labor of Uyghurs and other minorities inside and outside of Xinjiang. UFLPA, Section 1(6). Congress intended the law "to strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307 …." *See* UFLPA, Section 1(1)

(Statement of Policy).  The statute directs the United States to deny entry of prohibited goods by using "all the authorities available to the United States Government, including visa and financial sanctions, export restrictions, and import controls."  UFLPA, Section 1(6)(B).

The UFLPA required the FLETF to develop a "strategy for supporting enforcement of Section 307 of the Tariff Act" with respect to goods made in whole or in part with forced labor in China.  UFLPA, Section 2(c); *FLETF Strategy*.  As part of this strategy, the law instructed the FLETF to assess the risk of importing goods made in China, including in the Xinjiang region or by persecuted groups, and a description and evaluation of programs such as "poverty alleviation" and "pairing assistance," "or similar programs of the [PRC] in which work or services are extracted from Uyghurs, Kazakhs, Kyrgyz, Tibetans, or members of other persecuted groups through the threat of penalty or for which [these groups] or members of other persecuted groups have not offered themselves voluntarily …." UFLPA, Section 2(d)(2)(A); *FLETF Strategy*, at 18-20.  Labor transfer programs are also discussed in the *FLETF Strategy*.  *FLETF Strategy*, at 18; *see supra* at 5.

The UFLPA also required the FLETF to create and update a list of entities that meet any of the following four statutory criteria:

> (i) a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

> (ii) a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

(iii) …[4]

(iv) a list of entities that exported products described in clause (iii) from the People's Republic of China into the United States;

(v) a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor;

UFLPA, Section 2(d)(2)(B). The entities identified by the FLETF as satisfying these statutory criteria are placed on the UFLPA Entity List. *See FLETF Strategy,* at 22-25; *Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List*, 87 Fed. Reg. 47,777, 47,778-79 (Aug. 4, 2022). As explained below, the UFLPA requires that CBP apply a rebuttable presumption that any goods "mined, produced, or manufactured," in whole or in part, in Xinjiang or produced by an entity named on the UFLPA Entity List, are prohibited under 19 U.S.C. § 1307 and are not allowed into the United States. UFLPA, Section 3(a).

The UFLPA requires the FLETF to update the UFLPA Entity List at least annually. UFLPA, Section 2(e)(2). To that end, the FLETF established Standard Operating Procedures to carry out this responsibility. Administrative Record (AR)1-9. Entities are added when "there is reasonable cause to believe, based on specific and articulable information, that … [they] meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA." AR2. At any time, a FLETF member agency can recommend that an entity be added to the UFLPA Entity List. 87 Fed. Reg. 47,778; *Notice Regarding the Uyghur Forced Labor Prevention Act Entity*

---

[4] Subsection (iii) of Section 2(d)(2)(B) addresses "a list of *products* mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii)" and therefore it does not identify entities to be placed on the UFLPA Entity List. *Id.* (emphasis added).

*List*, 88 Fed. Reg. 50,902, 50,903-04 (Aug. 2, 2023); *see* AR3.  Such a recommendation will

include, to the extent available, publicly available or other information that serves as the basis of

the recommendation.  AR3.  Agencies may also submit "classified or otherwise non-releasable

information that serves as the basis for the recommendation." *Id.*  The recommendation and

supporting information are circulated to other FLETF members for review, *id.*, and an entity is

added to the UFLPA Entity List by a majority vote of the FLETF member agencies.  87 Fed.

Reg. 47,778; 88 Fed. Reg. 50,904; AR3-5.  The UFLPA Entity List is posted on the DHS-

UFLPA website, *see* https://www.dhs.gov/uflpa-entity-list, and a notice is then published in the

Federal Register.  *See* 88 Fed. Reg. 50,904-05.

Although the statute is silent regarding removing an entity from the list, the FLETF has

promulgated and published in the Federal Register guidelines governing removal requests,

which are directed to the FLETF Chair.  87 Fed. Reg. 47,778; 88 Fed. Reg. 50,904.  The

Federal Register notice provides:

> In the removal request, the entity (or its designated representative)
> should provide information that demonstrates that the entity *no
> longer meets* or *does not meet* the criteria described in the
> applicable clause ((i), (ii), (iv), or (v) of section 2(d)(B) of the
> UFLPA.  The FLETF Chair will refer all such removal requests
> and supporting information to FLETF member agencies.  Upon
> receipt of the removal request, the FLETF Chair or the Chair's
> designated representative may contact the entity on behalf of the
> FLETF regarding questions on the removal request and may
> request additional information.  Following review of the removal
> request by the FLETF member agencies, the decision to remove an
> entity from the UFLPA Entity List will be made by majority vote
> of the FLETF member agencies.

*Id.* (emphasis added).  After an entity submits a request for removal from the UFLPA Entity List,

it can ask for a meeting with the FLETF.  *Id.*  After reviewing the removal request, the FLETF

may accept a meeting request and, if so, the meeting will take place before the FLETF votes on

the removal request.  *Id.*  While the FLETF's decision as to the removal request is not appealable

to the FLETF, an entity is free to submit a new removal request if it is accompanied by new

information.  *Id.*; *see also* AR5-6.

    **iii.**    **Enforcement Of The Prohibitions Set Forth In The UFLPA**

Once placed on the UFLPA Entity List, the statute requires that UFLPA's Section 3

rebuttable presumption apply to importation of merchandise produced by that entity.

Specifically, Section 3(a) requires CBP to presume that any goods (1) "mined, produced, or

manufactured," in whole or in part, from Xinjiang or (2) produced by an entity named on the

UFLPA Entity List are prohibited under 19 U.S.C. § 1307 and "are not entitled to entry."

UFLPA, Section 3(a)(1), (2).  In other words, Congress has determined that goods from Xinjiang

and from listed entities are presumed to be made with forced labor.

Because this presumption is rebuttable, mere inclusion on the UFPLA Entity List does

not mean that an entity's goods will be prohibited from entry.  Pursuant to its authority under 19

U.S.C. § 1499 and 19 C.F.R. Part 151, CBP implements the presumption using various

enforcement actions, including detention, exclusion, or seizure of merchandise.  *See Uyghur*

*Forced Labor Prevention Act, U.S. Customs and Border Protection Operational Guidance For*

*Importers,* Dept. of Homeland Security (June 13, 2022), at 7–9 (*CBP Operational Guidance*),

https://www.cbp.gov/document/guidance/uflpa-operational-guidance-importers.  The importer

will be notified of such action and will, thereafter, be afforded the opportunity to rebut the

presumption administratively and demonstrate the shipment's admissibility.  *Id.*

The UFLPA places the burden on the importer to demonstrate that goods from Xinjiang

or listed entities are not made with forced labor.  To find that the presumption is rebutted under

the statute, the Commissioner of CBP must determine that the importer has (1) "fully complied

with" CBP's guidance and any implementing regulations; (2) "completely and substantively

responded" to the Commissioner's inquiries as to whether the imported merchandise was produced with forced labor; and (3) shown "by clear and convincing evidence," that the imported merchandise was not produced using forced labor.  UFLPA, Section 3(b).  If the importer is successful in this showing, the goods will be permitted to enter the United States, assuming the shipment does not violate other relevant trade or customs laws.

Pursuant to Section 2(d)(6) of the UFLPA, the *FLETF Strategy* details the administrative mechanism and the types of evidence necessary for an importer to obtain an exception from the CBP Commissioner to the UFLPA's presumption with respect to a specific entry.  *FLETF Strategy*, at 40–51.  This process of rebutting the presumption regarding a specific entry is separate and distinct from a request to the FLETF for removal from the UFLPA Entity List.

### B.  Camel Group's UFLPA Listing

On August 2, 2023, DHS published a Federal Register notice placing Camel Group on the UFLPA Entity List.  88 Fed. Reg. 50,904; *see* AR1643, AR1651-52.  The administrative record satisfies the criteria of Section 2(d)(2)(B)(ii).  Camel Group worked with the government of Xinjiang to recruit, harbor, or receive Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups from Xinjiang.  AR1646; AR1643.

Camel Group, headquartered in Xianyang City, Hubei, China, AR1651, expanded its operations in Xinjiang several times in Toksun County.  Specifically, Camel Group Xinjiang Renewable Resources Co., Ltd. (Camel Renewable) was established in September 2015, and Camel Group Xinjiang Storage Battery Co., Ltd. (Camel Xinjiang Battery) was established in February 2017.  Compl., ¶¶ 46, 48.  Camel Group holds ███████████████ in each of the Xinjiang entities.  AR26-27.

Entities located in Toksun County were subject to the "Three Year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural

THIS PAGE CONTAINS CAMEL CONFIDENTIAL INFORMATION

Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (Labor Transfer Program). AR10; AR1647; ████████████ Labor transfer programs are highly incentivized by the Turpan government (of which Toksun County is a part), and entities, like Camel Group, are expected to engage in the programs. AR1712; AR1648-1649, ████████████ Indeed, with facilities in Toksun County, Xinjiang, Camel Group benefited from those labor programs. AR1711-1712.

In 2017, the Toksun County official WeChat page announced that Camel Group was a participant in the handover ceremony coordinated by the Toksun County government in Turpan prefecture in Xinjiang that received workers from southern Xinjiang. AR10; AR1647-1648; AR2765-2783; AR1085-1090. The Toksun County government-sponsored labor transfer program transported 165 workers from southern Xinjiang to Turpan (1300 kilometers away) for a 10-day state-run pre-job training where they were not allowed to leave. AR1647; AR1711. Those who attended the pre-job training received military and ideological teaching, were required to sing patriotic songs and learn the Chinese language, and take an oath celebrating the labor program as promoting national unity, among other things, AR1647, which are typical of the treatment endured by Uyghurs and other groups who are persecuted in the Xinjiang region. AR1647-1648; ████████████ That the laborers originated from southern Xinjiang further supports this conclusion as the population of southern Xinjiang is majority Uyghur. AR1647-1648; AR1777-1784. After completion of the pre-job training, a handover ceremony took place where government officials had the workers dispatched to companies, including Camel Group. AR1647-1648; AR2765-2783; AR1085-1090. The handover ceremony was conducted under the Toksun County "Three Year Plan" Labor Transfer Program. AR2765-2783.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

Camel Group's presence in Xinjiang grew.  Specifically, in 2019, Camel Group received a $35 million International Finance Corporation (IFC) loan to expand recycling operations into Toksun County, Xinjiang, at its recently built manufacturing facility.  AR1647; AR1747-1750. In February 2022, *the Financing & Genocide Report* was issued, which summarized the information identified by the FLETF in its listing determination.  AR1678-1746.  This Report was the result of a joint investigation by the Helena Kennedy Centre for International Justice at Sheffield Hallam University and NomoGaia, AR1646; AR1679, which is a non-profit research organization that focuses on human rights.  AR1679.  The Department of Labor (DOL) verified the sources cited in the *Financing & Genocide Report* against the criteria used to develop and maintain reports required by Congress.  AR1646.  DOL also determined the credibility, level of expertise, and reputation of the author.  *Id*.  As noted in the *Financing & Genocide Report*, Camel Group participates in labor transfer programs "that benefit indigenous people of the region." AR1711.  The term "indigenous people," which is defined in the IFC literature, should be understood to mean Uyghurs, Kazakhs, Kyrgys, as well as members of other persecuted groups.  AR1648; AR2792-2865.

The information provided in the Report, considered against the well-documented backdrop of forced labor in the Xinjiang region and use of labor transfer programs involving persecuted groups, constitutes a reasonable cause to believe that Camel Group worked with the government to receive workers, including Uyghurs and/or members of other persecuted groups, from Xinjiang.  AR1648.

On November 7, 2023, Camel Group submitted a removal request to the FLETF.  AR10; AR24-44.  The request asserts that the information the FLETF relied on for the listing decision is incorrect.  AR11; AR24-44.

13

However, separate from the WeChat page, the FLETF identified further evidence supporting its decision.  Specifically, an ███████████████████████ Camel Group participated in another state sponsored labor recruitment event for surplus laborers hosted by Toksun County," specifically the ████████████████████████ AR14; AR2935-2941.  ███████████████████████████████ AR2938. Separately, in ████████████████████████

████████████████████████████████████

████████████████ "Camel Group had recruited and received ████████ through a state-sponsored job fair for surplus laborers operated by the Toksun County government."  AR14; AR2942-2949.  It appears that Uyghur, Kazakh, or Kyrgyz workers attended the event.  AR14.  The FLETF noted that information from these sources indicates Camel Group participated in labor transfer programs sponsored by the Toksun government, which is part of the government of Xinjiang, that recruit individuals from groups that are persecuted in the region.  *Id.*  Indeed, Uyghurs ████████████████████ ████████  AR14; AR2968-2976.  This casts doubt on Camel Group's assertion in its removal request that it did not participate in the Labor Transfer Program, or other labor transfer programs in Toksun County.

Moreover, the FLETF found a ██████████████████████ ████████ that indicates that Toksun County continued to participate in labor transfers, and "transferred ████████████████████████ AR14; ████████ ████.  That one particular program ended is, therefore, not evidence that labor transfers by the

<p style="text-align:center; color:red;"><strong>THIS PAGE CONTAINS CONFIDENTIAL INFORMATION</strong></p>

Toksun County government are not ongoing, or that Camel Group did not participate in other similar programs.  AR14-15; ███████████; ███████████

On April 2, 2024 the FLETF held a virtual meeting with Camel Group.  AR2978.  The FLETF considered Camel Group's removal request and determined that the information provided "did not demonstrate that Camel Group either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA."  AR15; AR2979.  On May 24, 2024, the FLETF sent an update on the status of the removal request and included a summary of the information on which it relied when considering whether to add Camel Group to the entity list.  AR1643.  On June 28, 2024, the FLETF voted to deny the removal request.  *Id.*  On July 9, 2024, the FLETF provided its reasons for denial of the removal request to Camel Group and reiterated its reasons for adding Camel Group to the UFLPA Entity List.  AR2977-2979.

## RULE 56.1 STATEMENT

### A.  Administrative Determination To Be Reviewed

The Court is reviewing the FLETF's denial of Camel Group's request to be removed from the UFLPA Entity List.  To be removed, Camel Group must show that it "*no longer meets or does not meet"* the requirements to be included on the UFLPA Entity List.  88 Fed. Reg. 50,904 (emphasis added).  The FLETF found reasonable cause to believe that Camel Group was "working with the government of Xinjiang . . . to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of . . . Xinjiang," in violation of Section 2(d)(2)(B)(ii) of the UFLPA.  *See id.*

In its complaint, Camel Group claims the FLETF's decision was arbitrary and capricious because it failed to provide an adequate explanation (Count I) and was not supported by substantial evidence (Count II).  In addition, Camel Group alleges that the FLETF's actions were

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

in excess of its statutory authority because the listing and removal decision relied on evidence from before the UFLPA's enactment (Count III).

**B. Issues Presented**

1.    Whether the FLETF's decision to deny Camel Group's request to be removed from the UFLPA Entity List was arbitrary or capricious, or not supported by substantial evidence in the record.

2.    Whether the FLETF's decision improperly relied on evidence predating the passage of the UFLPA.

## SUMMARY OF ARGUMENT

Camel Group's motion for judgment on the agency record should be denied.  The FLETF's decision to deny Camel Group's request for removal from the UFLPA Entity List was neither arbitrary nor capricious and it was supported by substantial evidence in the administrative record.  First, substantial evidence supports the FLETF's finding of "reasonable cause to believe, based on specific and articulable information," that it was working with the government of Xinjiang to recruit, transport, transfer, harbor or receive Uyghurs from Xinjiang.  This highly deferential standard – which reflects both the FLETF's applicable burden of proof and this Court's limited basis for reviewing agency action under the Administrative Procedure Act (APA) – is met here.

In particular, the administrative record includes public media sources from 2017, 2023, and 2024 that identify Camel Group as a participant in a number of labor transfer programs run by the Toksun County government in the Xinjiang region, as well as documentation that labor transfer programs in Toksun County continued through 2023.  The public media sources also

acknowledge the presence of Uyghurs as part of those programs.[5]  In addition, Camel Group has

subsidiaries in the Xinjiang region, the number of which has increased since 2019.  Together,

substantial evidence supports the FLETF's decision.  Camel Group has failed to show that it

"does not meet or no longer meets" the statutory standard.

Moreover, the FLETF adequately, and publicly, explained its decision to Camel Group

both by letter, and further when the administrative record was publicly filed in this matter.  And,

the same burden of proof that this Court has already applied to a FLETF listing decision –

reasonable cause to believe that the statutory requirements have been met – applies equally to a

decision by the FLETF to deny an entity's request for removal from the UFLPA Entity List.

Finally, there are no retroactivity concerns with respect to the FLETF's decision.

Although some of the evidence was from 2017, reliance on that evidence was not unreasonable

where, as here, there is similar evidence of conduct after passage of the UFLPA.  Additional

public records show the continuation of labor transfer programs sponsored by the Toksun County

government in 2023, and Camel Group's continued participation in those programs.

## **ARGUMENT**

### I.  **THE FLETF'S DECISION COMPLIES WITH THE APA**

#### A. **The FLETF's Decision Denying Camel Group's Request For Removal From The UFLPA Entity List Was Not Arbitrary and Capricious And Was Supported By Substantial Evidence**

Camel Group contends (in Count II) that the decision to deny Camel Group's request for

removal from the UFLPA Entity List was not supported by substantial evidence.  But substantial

record evidence supports the FLETF's finding of reasonable cause to believe, based on its

participation in several labor transfer programs organized by the Xinjiang government (*i.e.*, the

---

[5] The FLETF's determination is further supported by the documented human rights violations taking place with respect to Uyghurs and other minorities from Xinjiang.

Toksun County government), that Camel Group was "working with the government of …
Xinjiang … to recruit, transport, transfer, harbor or receive forced labor or Uyghurs" out of
Xinjiang. UFLPA, Section 2(d)(2)(B)(ii).  In its request for removal, Camel Group failed to show
that it either "does not meet or no longer meets" the criteria described in Section 2(d)(2)(B)(ii) of
the UFLPA.  88 Fed. Reg. 50,904.  Camel Group simply disagrees with the FLETF's decision
and asks the Court to re-weigh the evidence and give its own evidence greater weight.  That is
not the standard of review.

### i.    Standard Of Review

The scope of judicial review for actions commenced under 28 U.S.C. § 1581(i) is found
in 28 U.S.C. § 2640(e), which directs the Court to 5 U.S.C. § 706.  It is "highly deferential" to
the agency, here the FLETF.  *See Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d
728, 732 (D.C. Cir. 2007).  The Court will "hold unlawful and set aside agency action, findings,
and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law … (C) in excess of statutory … authority … [or] (E) unsupported by
substantial evidence in a case subject to sections 556 and 557 of this title…."  5 U.S.C. § 706(2);
*SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 371 (2018); *see also Consolidated Bearings Co. v. United
States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005); *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir.
2003).  The Court's review in section 1581(i) actions is limited to the administrative record
developed before the agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve
Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (judicial review is based on the "full
administrative record that was before [the agency] at the time [it] made [its] decision").

An agency's decision may be arbitrary and capricious where it "has relied on factors
which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court's review is, thus, "narrow." *Sakievich v. United States*, 369 F. Supp. 3d 278, 287 (D.D.C. 2019) (quoting *State Farm*, 463 U.S. 29 at 43). That is, the decision of the agency is presumed valid. *See Volpe*, 401 U.S. at 415. The Court may not "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and it must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). The agency's decision should be affirmed as long as there is a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 246 (1962)).

The substantial evidence standard means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). While the Court examines "the record *as a whole*, taking into account evidence that both justifies and detracts from an agency's decision," *In re Gartside*, 203 F.3d at 1313 (emphasis added), "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)).

Camel Group's challenge suffers from a number of fatal errors: it ignores the burden of proof properly applied by the FLETF (reasonable cause to believe that the statutory requirements were met), *see infra* at 39, discounts the "highly deferential" standard applicable to this Court's

review of agency action under the APA, considers evidence piecemeal (and out of context), and misconstrues the language and purpose of the statute. The FLETF rationally concluded based on all of the evidence in the administrative record that there is reasonable cause to believe that Camel Group satisfied the requirements to remain on the UFLPA Entity List. Camel Group did not show that it "does not meet or no longer meets" the statutory criteria, and the FLETF's decision should be sustained.

ii.    **Camel Group Was Working With The Government Of Xinjiang To "[R]ecruit[], [T]ransport[], [H]arbor[] [O]r [R]eceive[]" Uyghurs Or Other Persecuted Groups.**

Camel Group argues that its participation in the Labor Transfer Program is not supported by substantial evidence and that the FLETF "ignores contradictory evidence, relies on its own assumptions, and rests on a misinterpretation of the evidence." Plaintiff's Brief (Pl. Br.) at 21. Specifically, Camel Group claims that the record lacks substantial evidence either that (i) Camel Group "'recruited, transported, harbored, or received' Uyghurs or any other persecuted group", that (ii) Camel Group "transferred individuals 'out of XUAR,'" or (iii) that the Labor Transfer Program is ongoing. Pl. Br. at 19-31. Camel Group then goes piecemeal through the evidence in an attempt to show how no single document meets the standard. Plaintiff's analysis and conclusions are incorrect.

The administrative record provides reasonable cause to believe that the statutory requirements have been satisfied – that Camel Group is working with the government of Xinjiang to recruit, transport, harbor, or receive Uyghur labor from Xinjiang based on all of the evidence provided. The analysis is not limited to a single labor transfer program. The evidence, as a whole, must be considered against the backdrop of the language and purpose of the statute itself, and the record need only include "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d at 1312. The FLETF has met that standard.

> **a) There Is Reasonable Cause To Believe That Camel Group Satisfied The Statutory Requirements Of Section 2(d)(2)(B) Of The UFLPA**

As a threshold matter, the language and purpose of the statute are paramount. The statute was passed "to strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307 …." *See* UFLPA, Section 1(1) (Statement of Policy). The statute was directed at addressing the well-documented and "gross violations of human rights in the" XUAR, particularly with respect to the persecution of Uyghur workers. UFLPA, Section 1(6).

As explained above, the UFLPA required that the FLETF "develop a strategy for supporting enforcement of Section 307 of the Tariff Act" with respect to goods made in whole or in part with forced labor in China. UFLPA, Section 2(c); *FLETF Strategy*. As the statute required, the Strategy included a description and evaluation of "pairing assistance" and "poverty alleviation" programs, as well as other labor schemes (including labor transfer programs) that involved the forced labor of Uyghurs and members of other persecuted groups. UFLPA, Section 2(d)(2); *FLETF Strategy*, at 18-20. As explained, poverty alleviation, labor transfer and pairing assistance programs present a "particularly high-risk of forced labor" when they are used in Xinjiang and involve the use of labor sourced from persecuted groups. *Supra* at 5 (*FLETF Strategy*, at 18).

Listing under Section 2(d)(2)(b)(ii) of the UFLPA requires evidence that Camel Group worked with the government of Xinjiang to "recruit, transport, transfer, harbor *or* receive

Uyghurs." (emphasis added).  Toksun County is located in the Xinjiang province, and evidence

of participation in *any* Toksun County labor program, including labor transfer or poverty

alleviation programs in the Xinjiang region that involve the receipt of Uyghurs or members of

other persecuted groups, satisfies that standard.  Camel Group participated in several such

programs.  First, Camel Group participated in the Labor Transfer Program described on the

Toksun County WeChat page.  AR10; AR1645-1647; ██████████████    That specific labor

transfer program extended through 2019, ████████████ when Camel Group operations in

Xinjiang expanded.  Although its two Xinjiang subsidiaries opened in 2015 and 2017,

respectively, *see supra* at 11, in 2019, Camel Group received an IFC loan to expand its

operations in Xinjiang.  AR1647; AR1747-1750.  The 2022 *Financing & Genocide Report*,

prepared by experts in the field and vetted by experts at the DOL, further describe and analyze

this specific evidence, concluding that Camel Group had received Uyghur workers.  AR1711-

1712.



   In addition, in ██████████████ Camel Group also participated in a state sponsored labor

recruitment event for surplus laborers hosted by the ████████████████████████

████████████    AR14; AR2935-2941 ████████████████████████████████████

████████████████████████████████████████████    This ████████████████████

████████████████████████████████████████████████████

████████████████████████    AR2935-2941.  And, in ████████████████████████

████████████    Camel Group had recruited and received ████████████    through a state-

sponsored job fair for surplus laborers operated by the Toksun County Government."  AR14;

AR2942-2949, ████████████████████████████████████████████████████

████████████████████████████████████████████    Uyghur, Kazakh,

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

or Kyrgyz workers attended the event.  *Id.*  Finally, public records support a conclusion that labor transfer programs continued in Toksun County in ████████████████████ ████████████████████ AR14; ████████████ .  Together, this evidence provided further support for the original UFLPA Listing decision and the FLETF's decision to deny Camel Group's request for removal.

The Court considers the record *as a whole* to determine whether the decision at issue is supported by substantial evidence.  *See, e.g.*, *Hisgen v. Fanning*, 208 F. Supp. 3d 186, 199 (D.D.C. 2016) ("Quoting poorly articulated passages from an agency decision is insufficient to demonstrate that the agency's action violated the APA, particularly when the passage is cited in isolation without consideration of the full record.")  Camel Group's attempt to view each piece of evidence in isolation evades the powerful corroborating impact the evidence has here when viewed in combination.  The evidence collectively supports the FLETF's interpretation of, and conclusions reached based on, that evidence that there is reasonable cause to believe that Camel group worked with the government of Xinjiang to "recruit, transport, transfer, harbor *or* receive" Uyghurs from Xinjiang.  UFLPA, Section 2(d)(2)(B)(ii) (emphasis added).

### b)  There Is No Reason To Discount Any Evidence Relied On By The FLETF

Camel Group challenges the FLETF's reliance on certain public sources identified in the record.  Pl. Br. at 24-28.  Camel Group suggests that only evidence related to a single labor transfer program, the one identified in the WeChat page, can be considered.  *Id*. at 24-28, 29. There is simply no basis for these arguments.  The standard is whether there is reasonable cause to believe that Camel Group was working with the government of Xinjiang to "recruit, transport, transfer, harbor or receive," UFLPA, Section 2(d)(2)(B)(ii), Uyghurs or members of other

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

persecuted groups, not whether participation in a single program is supported by substantial evidence.

Specifically, Camel Group challenges the consideration of Attachment 13  ████████████, and Attachment 14 ███████████████████ ██████████, *see* Pl. Br. at 24-28, which were identified in the removal record, *see* ECF Nos. 26-28, and plainly provide further support for the decision to add Camel Group to the UFLPA Entity List and for the denial of Camel Group's request for removal. Camel Group's arguments to the contrary have no merit. First, Camel Group notes that these documents were not previously referenced. Pl. Br. at 24-25. But, they were referenced in the decision memo and included in the record. AR14. When these documents were discovered during the administrative process does not in any way factor into their validity or whether they are properly part of the record. They were identified and considered in the denial of Camel Group's request for removal from the UFLPA Entity List, the only determination being challenged here.

Second, consideration of these documents is not based on "mistaken notion[s]," "assumptions," or "unsupported assertions." Pl. Br. at 25. Indeed, there is no reason to challenge their validity or consideration. Camel Group claims that, based on the photographs in the ███████████████ (Attachment 13), which ███████████████████  ██████████ that it is "unlikely associated with the Labor Transfer Program or forced labor." *Id.* Camel Group's self-serving assertion is unsupported. This article discusses ██ ████████████████████████ AR2938, ████████████████ identified in Section 2(d)(2)(A) of the UFLPA and discussed further in the *FLETF Strategy*. Despite plaintiff's disbelief, Pl. Br. at 30, use of these types of labor transfer programs is strongly indicative of forced labor of Uyghurs or other persecuted groups, particularly those programs,

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

like this one, implemented in the Xinjiang region. *FLETF Strategy*, at 18-20. Again, such programs in the Xinjiang region carry a high risk of being involved with forced labor, and receipt of workers through those programs evidence that Camel Group satisfies the criteria of Section 2(d)(2)(B)(ii) of the UFLPA. These are well-documented red flags.

This does not, as plaintiff states, "ignore[] the complexity of the region." Pl. Br. at 30. Instead, it acknowledges that complexity. *See FLETF Strategy*, at 18-20. That the ████████ ████████ indicates that ██████████████████████ or the fact that ██████████████████ Pl. Br. at 25-26, simply does *not* support Camel Group's conclusion or challenge the FLETF's. And, Camel Group's argument that the FLETF translated portions of the document incorrectly is, likewise, irrelevant. Pl. Br. at 26. Indeed, whether the term in the article is properly translated as █████████ or ██████████████ *id.*, does nothing to change this analysis. That language, itself, was not the basis for the FLETF's conclusion. It was Camel Group's participation in another labor transfer program sponsored by the Xinjiang government that is significant. *See* AR14.

Third, Camel Group claims that, even if the █████████████ was evidence that Camel Group was working with the government of Xinjiang to receive Uyghur workers, it is from ████ and cannot be the basis for the FLETF's conclusion. Pl. Br. at 26. Again, plaintiff is wrong, and there are no concerns that the FLETF impermissibly relied on evidence from prior to the passage of the UFLPA. As set forth by this Court in *Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1336 (Ct. Int'l Trade 2024):

> **where there is record evidence of post-enactment conduct, an agency's reliance on evidence dated before the statute is not per se unreasonable**, see, *e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011)

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

(agency's reliance on ten-year-old data, without "any scientific studies or testimony in the record" that the data was substantially the same ten years later, was arbitrary and capricious), nor does it run afoul of the presumption against retroactivity, *see, e.g.*, *Frontier-Kemper Constructors, Inc. v. U.S. Dep't of Lab.*, 876 F.3d 683, 689 (4th Cir. 2017), *as amended* (Dec. 12, 2017) ("[A] statute has no retroactive effect where the conduct being regulated begins before a statutory change occurs and continues after that change has taken effect."); *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 16 (1st Cir. 1993) ("Even when the later-occurring circumstance depends upon the existence of a prior fact, that interdependence, without more, will not transform an otherwise prospective application into a retroactive one." (citing *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 500, 505–06, 29 S.Ct. 309, 53 L.Ed. 624 (1909))).

*Id.* (emphasis added). Here, there is evidence of post-enactment conduct by Camel Group that satisfies the UFLPA's statutory requirements. Therefore, consideration of pre-enactment conduct is permissible.

Not only was the *Financing & Genocide Report* issued in 2022 and verified at that time by the DOL, AR1678-1746, but, as stated above, in ███████████████████████ ████████████ that Camel Group had recruited and received ███████████ through a state-sponsored job fair for surplus laborers operated by the Toksun County Government." AR14; AR2942-2949 ████████████████████████ Again, Toksun County is a government in the Xinjiang region ████████████████████████████████ AR14; ████████████. Therefore, although individual programs may end (the 2017-2019 Labor Transfer Program), plainly others that are likewise indicative of forced labor of Uyghurs continued.

Camel Group next asserts that ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████ Pl. Br. at 27. Regardless of whether a program is used elsewhere in China, as many

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

poverty alleviation programs are, Congress determined that entities working with the government

of Xinjiang to recruit members of persecuted groups from Xinjiang is presumptively forced

labor.  UFLPA, Section 2(d)(2)(B).  And, even if the Court could consider extra-record evidence,

that it was a China-wide program would not detract from the conclusion that this program

utilized in the Xinjiang region is precisely the kind of program targeted by the UFLPA.  UFLPA,

Section 2(d)(2)(A).  Camel Group's participation in that program is evidence that the

requirements of the UFLPA are satisfied.  *See* Pl. Br. at 27; AR2942-2949; *FLETF Strategy*, at

18-20.

Moreover, public records support a conclusion that the transfer of laborers throughout

China, and in the XUAR, continued.  Specifically, a ███████████████████████████████

███████████████ indicates that Toksun County continued to participate in labor transfers,

and transferred █████████████████████████████████ AR14; AR2952-2967.

Contrary to Camel Group's contention, this evidence need not support the continuation of the

specific Labor Transfer Program identified in the WeChat page, to be relevant here.[6]  Pl. Br. 29.

Instead, as the FLETF stated in its decision memo, ████████████████ provides further

evidence that the Toksun County labor transfer programs remain active and ongoing."  AR14;

AR2952-2967.



**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

---

[6] Camel contends that the FLETF has designated documents "Confidential" and that this has "the effect of concealing from public knowledge that [the] FLETF knew the Labor Transfer Program Regulations ended in 2019."  Pl. Br. at 30.  The designation of the documents in the administrative record as "Confidential" was supported by the declaration of Cynthia Echeverria, and upheld by this Court.  *See* ECF No.44.  That appropriate designation does not "show that . . . [the] FLETF knowingly based its conclusion on UFLPA Pre-enactment behavior . . . ."  Pl. Br. at 30.

There are, thus, no retroactivity concerns (Count III) with the evidence in this case, and the documents identified, (Attachments 13 (AR2935-AR2941), 14 (AR2942-2949), and 16 (AR2952-2967)), were properly included and provide support for the FLETF's determination.

### c) The FLETF Considered *All* Evidence Submitted By Camel Group And Identified During Its Investigation

Camel Group challenges the FLETF's conclusion, claiming that the FLETF "ignores contradictory evidence." Pl. Br. at 21-24. This assertion is wrong. Indeed, the FLETF considered and discussed all relevant information in denying Camel Group's request for removal from the UFLPA Entity List. Camel Group simply disagrees with the FLETF's conclusion. And, even if "two inconsistent conclusions [could be drawn] from the evidence," which as explained below was not the case, that "does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Gartside*, 203 F.3d at 1312 (quoting *Consolo*, 383 U.S. at 620).

Camel Group relies heavily on a July 12, 2017 article published by Sina News, a national Chinese State media outlet, that includes information about the Labor Transfer Program and the handover ceremony but does not identify Camel Group as being a participant. Camel Group claims the article "corrects" the information on the Toksun County official WeChat page (which does identify Camel Group). Pl. Br. at 21. The FLETF did not "ignore" this evidence. *Id.* To the contrary, the FLETF's decision memorandum, which explained its denial of Camel Group's removal request, discusses both the WeChat page and the Sina article at length. For the reasons outlined in the memorandum, and herein, the FLETF simply did not find the Sina article to be credible or compelling. AR11-12. An article published by a separate media outlet cannot convincingly be considered a "retraction" of the information on the official Toksun County WeChat page, AR12, nor, for that matter, does the Sina article even state that it is a correction.

AR1195-1199; ████████████. Tellingly, there was also no notification on the official Toksun County WeChat page that a correction to the WeChat page was made. AR12. Plaintiff is improperly asking the Court to re-weigh the evidence because it does not agree with the FLETF's conclusion.

Notably, it is well-settled that an agency "is not required to discuss each and every piece of evidence or write an exegesis on every contention." *Kurshumi v. Ashcroft,* 102 F. App'x 172, 175 (1st Cir. 2004); *Ogbolumani v. Napolitano*, 557 F.3d 729, 735 (7th Cir. 2009). "It need only announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ogbolumani*, 557 F.3d at 735 (internal quotation marks omitted). The FLETF did that. AR11-16.

Camel Group next points to additional pieces of evidence it submitted with its request for removal that it claims the FLETF "ignored or summarily dismissed . . . without any consideration," Pl. Br. at 22: (1) declaration from a Camel Group employee (and the former GM of Camel's Xinjiang entities), outlining alleged communications with the Toksun Government both about Camel Group's need for labor at its facilities, and to correct the post on Toksun County's WeChat page; (2) a letter from the Toksun County SSHR stating that Camel did not participate in the Labor Transfer Program, and (3) statements from other Camel Group employees indicating that Camel did not receive any workers from the Labor Transfer Program identified in the WeChat page. Pl. Br. at 22. Plaintiff is wrong. Indeed, each piece of evidence was considered by the FLETF, and discussed in the decision memorandum. Again, the FLETF did not find them to be credible. AR10-16.

As to the letter from the Toksun County SSHR ████████████████████████ ████████████████████████████████ (AR1203) – the FLETF plainly considered the

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

THIS PAGE CONTAINS  CAMEL CONFIDENTIAL INFORMATION

information.  AR12-13.  It stated that Camel did not participate in the Labor Transfer Program or the handover ceremony, that Camel Group notified the Toksun Government of the mistake in 2017, and that the Sina article corrected the WeChat page.  AR12; AR1192-1193.  The FLETF noted that "[l]abor transfers in the XUAR [are] a key component of XUAR government policies . . .[and] are the 'coercive work policy that underpins most forced labor linked to Xinjiang.'" AR12-13.  This letter, therefore, is a self-serving document, prepared after the UFLPA listing decision by a representative of the Toksun County (Xinjiang) government.  As the FLETF noted, there is no contemporaneous communication, document or writing of any kind referencing this alleged exchange.  AR13. While Camel Group dismisses this consideration because it did not know it would need documentation as the exchange was before the UFLPA was passed, Pl. Br. at 23, it is unlikely that Camel Group believed it necessary to correct this "mistake" but at the same time did not document the correction at the time Camel requested it.

With respect to the declaration by the Camel Group employee purportedly recounting a communication with the Toksun Government about the need for labor in 2017, the FLETF likewise did not find that statement in the declaration compelling for several reasons.  AR13.  As with the communication regarding any correction to the WeChat page, this alleged communication was by telephone and there is no contemporaneous written note, discussion, or communication about it.  AR13.  And, as the FLETF noted, the declarations recounting those conversations were drafted *after* Camel Group was placed on the UFLPA Entity List.  AR13. Moreover, the FLETF noted, Camel Group's rationale for declining the Toksun government's assistance with labor recruitment – that it did not yet have a reason for labor recruitment in its Xinjiang facilities – raised some additional questions about credibility.  AR13.  Indeed, employee records provided by Camel Group indicate that Camel Group did, in fact, recruit

employees for its Xinjiang facilities in 2017 and 2018.  AR13; AR1246-1262.  That Camel

Group hired *any* employees (Han, Uyghur or members of another ethnic group) for its Xinjiang

facilities in 2017-2018, *see* Pl. Br. at 23, contradicts the declaration made in the 2023 that it was

not yet in need of labor.  AR13.

The FLETF, therefore, *did* "grapple[] with these contradictions," Pl. Br. at 22, and Camel

Group's contention that the FLETF "summarily dismissed this evidence without asking Camel to

further substantiate its evidence" is wrong.  *Id.*  Indeed, on December 24, 2023, less than two

months after Camel Group submitted information to the FLETF, the FLETF issued ████

questions to Camel Group.  AR1284-1287.  Specifically, the FLETF inquired further into ████

████████████████████████████████████████████████████████

████    *Id.*  As noted above, Camel Group could not provide any contemporaneous written

documentation memorializing the conversations identified.

In sum, the FLETF's actions were neither arbitrary nor capricious, and the decision is

supported by substantial evidence.  Indeed, the FLETF has not "relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency," nor

is its decision "so implausible that it could not be ascribed to a difference in view or the product

of agency expertise."  *State Farm*, 463 U.S. at 43.  Further, the FLETF did not rely on

"assumptive stereotypes and convenient politically accepted themes."  Pl. Br. at 22.  The

persecution of Uyghur workers in the Xinjiang region and throughout China is well-documented,

as is the use of labor transfer and similar programs facilitated by the Xinjiang government to do

so.  *See FLETF Strategy*, at 18.  There is evidence of Camel Group's participation in those

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

precise programs.  Ultimately, Camel Group simply disagrees with the FLETF's conclusion and analysis of the documentary support for its conclusion, which is not sufficient to warrant relief.

### d)   Camel Group's Interpretation Of The Statute Is Incorrect

Camel next argues that the language in Section 2(d)(2)(B)(ii) requires a showing that laborers from the persecuted groups were taken out of the Xinjiang region and into another region of China for the statute to be satisfied.  Pl. Br. at 28. Camel Group's strained reading of the statute runs far astray from Congress' intention in passing the UFLPA.

In response to the persecution and forced labor of Uyghurs and other minority groups from the Xinjiang region, the UFLPA was passed "to strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307 …." *See* UFLPA, Section 1(1).  To do so, the statute includes several categories of entities to be included on the UFLPA Entity List, the result of which would be for the U.S. Government to invoke a presumption that merchandise made, in whole or in part, would be excluded from entry. The UFLPA Entity List includes, but is not limited to, the following:

> (i) a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;
>
> (ii) a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups **out of the Xinjiang Uyghur Autonomous Region;**

UFLPA, Section 2(d)(2)(B) (emphasis added).  Subpart (i) includes entities in Xinjiang for which there is evidence that the entity produces goods with forced labor.  Subpart (ii) covers other entities where there may not be direct evidence of forced labor, but instead includes entities

who work with the Xinjiang government to "recruit, transport, transfer, harbor or receive" members of persecuted groups *out of* the XUAR. This language "out of the" XUAR in subsection (ii) very clearly means *from* the XUAR. *See* AR14; AR1646, n.3. As stated, working with the government of Xinjiang as part of labor transfer or similar programs is indicative of forced labor. It would be illogical for the statute to cover entities that worked with the government of Xinjiang to receive Uyghur workers who are being transported to another region of China, but not cover entities that worked with the government of Xinjiang to receive Uyghur workers who are transported within Xinjiang. Plainly, this is contrary to the language and purpose of the statute.

Moreover, even under plaintiff's strained interpretation, the FLETF's decision passes review under the statute. Camel Group is an entity that is headquartered in Xiangyang, Hubei, China. Camel Group is identified as having worked with the government of Xinjiang as part of labor transfer programs. That there are facilities in Xinjiang, which may or may not have been the recipient of all these workers, does not negate that the statutory requirement has been met. Therefore, the requirement that the workers be "out of Xinjiang" is plainly satisfied, and the decision is supported by the record.

<div align="center">*    *    *</div>

Because substantial evidence in the record supports the FLETF's determination that there is reasonable cause to believe that Camel Group was working with the government of Xinjiang "to recruit, transport, transfer, harbor or receive forced labor or Uyghurs" from Xinjiang – and Camel Group fails to show that it does not meet or no longer meets the statutory criteria – the FLETF's denial of Camel Group's request for removal should be sustained.

### B.  The FLETF Provided Adequate Explanation

#### i.    The FLETF Adequately Explained Its Decision Denying Camel's Request For Removal From The UFLPA Entity List

Camel Group further contends that the decision lacked an adequate explanation and, therefore, must be set aside.  Pl. Br. at 31-37.  However, the FLETF provided its explanation in a letter to Camel Group's counsel as well as in the decision memorandum, most of which was filed publicly in the administrative record.  AR2977-2979; AR1643; AR10-16.  That explanation satisfies the APA.

In support of its contention, Camel Group simply reiterates the same arguments raised above – that the FLETF should have afforded greater weight to Camel Group's documents.  As was the case in *Ninestar*, "[t]hose arguments [citing explanatory deficiencies and inconsistencies] are more accurately characterized as challenges to agency action for lack of substantial evidence."  *Ninestar*, 687 F. Supp. 3d at 1330.  Each of these arguments is addressed again briefly herein.

We agree that "an agency's 'explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding.'"  *Ninestar*, 687 F. Supp. at 1328 (quoting *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016)).  The FLETF did just that.  The Court's decision in *Ninestar* is instructive.  In *Ninestar*, the Court determined that the listing decision in the Federal Register provided the statutory reason for the decision – that Ninestar was allegedly working with the XUAR government to recruit, transport, transfer, harbor or receive forced labor or persecuted minorities out of the XUAR (the same statutory reason applicable here) – but the explanation was supplied by the

Public Administrative Record, including a memorandum from DHS.  *Id*. at 1329.  This, the *Ninestar* court found, satisfied the APA.  *Id*. at 1330.

Specifically, the *Ninestar* Court noted that the public record included a memorandum from DHS identifying information received from an informant and additional information including:

> PRC government documents, Ninestar's company documents, and media reports that corroborate that Ninestar is participating in the PRC government's 'poverty alleviation' programs transferring laborers from 'remote and underdeveloped areas' to its facilities. This information reasonably indicates that these workers from the [XUAR] were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their hometowns in the [XUAR].

*Id.* at 1329.  In addition, the Court noted that documentary evidence further explained that Ninestar worked with the government of Xinjiang through a "third-party agency," that sources corroborate that Uyghurs at Ninestar were "recruited, transferred and are presently still monitored by" Xinjiang officials, *id.*, and that Ninestar was participating in "poverty alleviation" programs supported by the Guangdong province.  *Id*.  The connection between the facts found and each element was either expressly discussed in, or reasonably discerned from, the Public Administrative Record.  *Id*.

The explanation provided in this case – in the May 24, 2024 and July 9, 2024 letters and the Public Administrative Record – is even more specific, plainly satisfying the necessary standard.  Here, the FLETF sent correspondence dated May 24, 2024 and July 9, 2024, to Camel Group's counsel advising that the information provided by Camel Group failed to show that Camel Group did not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA.  AR2977.  The FLETF explained that Camel Group participated in the Toksun County Labor Transfer Program in 2017, and that the laborers were recruited and received by

Camel Group from Uyghur-majority areas in southern Xinjiang through a handover ceremony coordinated by the Toksun County government in Turpan Prefecture in Xinjiang.  AR2978-2979; AR1643.  The FLETF also explained that publicly available information from 2017, 2023, and 2024 showed continued Toksun County implementation of labor transfer schemes and Camel Group's participation in Toksun County-sponsored labor recruitment events to recruit individuals from Uyghur-majority area who are likely Uyghurs, Kazakhs, and/or Kyrgyz.  AR2979.

Additional detailed explanation of the Labor Transfer Program and some of the other transfer programs was provided in the decision memorandum included in the record filed with the Court, most of which is publicly available.  AR10-16.  The FLETF also identified several other sources that indicate that participation in Toksun County labor transfer programs continued.  AR12-14.  The FLETF thus provided a reasonable explanation of the decision to deny Camel Group's removal from the UFLPA Entity List.  As was the case in *Ninestar,* the connection between the facts found and each element of the statute – that Camel Group worked with the government of Xinjiang to recruit, harbor, or receive Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups from the Xinjiang Uyghur Autonomous Region – was either expressly discussed in, or reasonably discerned from, the Public Administrative Record.  *Id.*

### ii.  Camel Group Has Not Established A Lack Of Adequate Explanation

Camel Group simply reiterates its previous arguments, none of which establish a lack of adequate explanation.  First, Camel Group, again, claimed that Toksun County's official WeChat page, announcing Camel Group as a participant in the Toksun County Labor Transfer Program on July 10, 2017, was inaccurate.  In support, Camel Group references the submitted declarations, the Toksun County SSHR letter, the Sina article, and employee lists.  Pl. Br. at 32-34; AR10-16; AR1180-1188; AR1189-1193; AR1194-1199.

As stated above, the FLETF considered this information as explained in its decision. Camel Group asserted that the Sina article and the SSHR letter were "corrections" to the Toksun County's official WeChat page announcement. AR12. In its decision, the FLETF explained that the Toksun County's official WeChat page did not, itself, include a correction to the text or indicate that a correction was made. *Id.* The Sina article was not an official retraction by Toksun County as it was not from the Toksun County government. *Id.* And, as the FLETF explained, the FLETF did not consider the absence of Camel Group representatives in photos to be dispositive of participation in the handover ceremony and Labor Transfer Program. *Id.* The FLETF also questioned the credibility of the Toksun County SSHR letter, given that it was in its interest to make those statements; indeed, the Toksun County SSHR helped facilitate labor transfers in the XUAR. AR13. As to the alleged contact with the Toksun County government regarding labor and/or labor transfers in early 2017, as reflected in a Camel Group declaration, the FLETF questioned Camel Group's explanation that it could not have participated because its XUAR facilities were not operational until mid-2018. *Id.* Again, the only documentation related to any communication was from 2023, and Camel Group's XUAR employee lists demonstrate that Camel Group did, in fact, recruit employees for the Xinjiang facilities in 2017 and early 2018. *Id.* The FLETF's explanation for its conclusions were reasonable and supported by the record.

Camel Group asserts a specific lack of explanation with respect to employee lists, internal policies, and customer letters. Pl. Br. at 33. However, all the information was considered, and most of it was directly addressed in the decision memo. AR10-16. The agency "is not to discuss each and every piece of evidence or write an exegesis on every contention." *Kurshumi,* 102

Fed.Appx. at 175; *Ogbolumani*, 557 F.3d at 735.  The FLETF explained the evidence it relied on, and discredited others.

      Camel Group next complains that the FLETF failed to consider CBP's previous decisions that its subsidiary's (Camel Energy) imports were not subject to the UFLPA.  Pl. Br. at 34.  This assertion highlights Camel Group's misunderstanding of the law and the basis for its challenge to the listing decision.  The FLETF's decision to place Camel Group on the UFLPA Entity List is based on the information in the record, and the issue here is whether Camel Group has established that there is no longer a reasonable cause to believe that it was working with the government of Xinjiang to transport, harbor or receive laborers from one of the persecuted groups from Xinjiang.  Being placed on the UFLPA Entity List means that goods made by that entity are subject to the UFLPA and imports are presumptively prohibited.  But the presumption only applies to goods that are either made in Xinjiang or by an entity on the UFLPA Entity List.  So, the first step at entry is for CBP to determine if the UFLPA's rebuttable presumption applies.  If it applies, it may be overcome on an entry-by-entry basis with a showing, by clear and convincing evidence, of a clean supply chain that does not violate the UFLPA.  That is known as an exception.  That Camel Group's subsidiary entered goods that CBP determined were not subject to the UFLPA – which is why those goods were entered (*i.e.,* not pursuant to an exception) – is not determinative of, or relevant to, whether Camel Group itself has met the criteria for inclusion on the UFLPA Entity List.

      Camel Group next accuses the FLETF of not explaining why it believes Camel Group worked with the government of Xinjiang and engaged in forced labor of individuals "out of the XUAR."  Pl. Br. at 36.  As stated above, the statute was intended to target forced labor of individuals *from* XUAR, not that the laborers had to be physically moved out of the XUAR.

AR1646 ("The FLETF interprets this provision as applying to recruitment, transport, transfer, harboring, or receipt of members of persecuted groups from the XUAR within the XUAR."). But, even if Camel Group's interpretation were correct, Camel Group is not, itself, located in Xinjiang, and it was the entity that public sources identified as having participated in the identified labor transfer programs. AR2979.

Camel Group additionally claims that the FLETF failed to explain that Camel Group is still participating in the Labor Transfer Program. Pl. Br. at 35-36. As a threshold matter, the FLETF need not find or explain that a single labor transfer program has continued, just that there is evidence of conduct, after the passage of the UFLPA, that violates the statute. The FLETF did that. In its letter to Camel Group, it explained that publicly available information from 2017, 2023, and 2024 showed continued Toksun County implementation of labor transfer schemes and Camel Group's participation in Toksun County-sponsored labor recruitment events to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz. AR2979. Moreover, the FLETF further explained that its research indicated that the Toksun County labor transfer programs remain active and ongoing. AR14.

The FLETF adequately explained its decision, in accordance with the requirements of the APA.

### C. Reasonable Cause To Believe Is The Correct Burden Of Proof For The FLETF's Listing And Removal Decisions

Camel Group argues that the FLETF "exceeded its statutory authority by applying the wrong standard of proof to its removal decision." Pl. Br. at 37-43. Specifically, plaintiff argues that, instead, preponderance of the evidence standard should have been applied in considering its request for removal from the UFLPA Entity List. *Id.* For several reasons, most of which are identified in this Court's decision in *Ninestar*, 687 F. Supp. 3d 1308, plaintiff is wrong.

### i.  Camel Group Waived This Argument Because It Was Not Raised In Its Complaint

As a threshold matter, Camel failed to raise this claim in its Complaint and the Court need not consider it here.  Camel's Complaint included three counts – that the FLETF's decision was arbitrary and capricious because it failed to provide an adequate explanation (Count I) and was not supported by substantial evidence (Count II), and that the FLETF's actions were in excess of its statutory authority because the listing and removal decision relied on evidence from prior to the passage of the UFLPA (Count III).   Camel *did not* claim, in its Complaint, that the FLETF's application of the reasonable cause to believe standard exceeded its statutory authority.  Therefore, that argument is waived.

### ii.  The Rationale For Applying The Reasonable Cause To Believe Standard Applies Equally To A UFLPA Listing Decision And A Decision Following A Request For Removal

Even if the Court considers this argument, it has no merit.  The parties agree that the UFLPA does not, itself, identify a particular burden of proof applicable to either a listing decision or a request for removal from the UFLPA Entity List.  The *Ninestar* court, which considered the same statute and regulatory framework, addressed this precise issue in the context of a listing decision and held that the burden of proof applied by the FLETF, reasonable cause to believe that the statutory requirements of the UFLPA have been met, was appropriate.  *Ninestar*, 687 F. Supp. 3d at 1335.  That standard should also apply when considering a request for removal from the UFLPA Entity List, as the rationale for its application is equally appropriate in both circumstances.  The criteria for the FLETF's decision – either at listing or on a request for removal – is always the same: does the entity meet the criteria for inclusion on the UFLPA Entity List, as identified in clause (i), (ii), (iv), or (v)) of Section 2(d)(2)(B) of the UFLPA.  *See* 88 Fed. Reg. 50,904.

Here, at listing, the FLETF found that there was "reasonable cause to believe" that Camel Group was working with the government of Xinjiang in violation of the UFLPA – *i.e.,* that it met the statutory requirements of Section 2(d)(2)(B)(ii) of the UFLPA.  As set forth in the Federal Register, when a request for removal is made, the FLETF is simply determining whether the entity "*no longer meets* or *does not meet*" those same criteria.  *Id.* (emphasis added).  That is, the FLETF is still looking at whether, based on everything before it, there remains reasonable cause to believe that the statutory requirements are met.  There is no basis in law or logic to conclude that the FLETF's burden becomes greater when an entity seeks removal.

To challenge the correct burden, Camel Group first asserts that a preponderance of the evidence standard applies because a decision on a removal request results from a formal agency adjudication.  Pl. Br. at 38-39.  This is plainly wrong.  The parties agree that preponderance of the evidence is the standard applicable for formal agency adjudications, *see Steadman v. S.E.C.*, 450 U.S. 91, 101-02 (1981), but that standard is not relevant here.  A "[f]ormal adjudication is governed by section 554 of the APA, [5 U.S.C. § 554,] and arises in 'every case of adjudication *required by statute to be determined on the record after opportunity for an agency hearing*.' Section 554 incorporates the procedural requirements of sections 556 and 557 and affords parties to a formal adjudication the right to present evidence and to conduct cross-examination," among other things.  *Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1160 (D.C. Cir. 1979) (quoting 5 U.S.C. § 554) (emphasis added).  By contrast, "informal adjudication occurs when an agency determines the rights or liabilities of a party in a proceeding to which [section] 554 does not apply." *Id.* at 1161 n.17.  There is no statute requiring or even suggesting that the FLETF's listing decisions, or decisions on a request for removal, must be made "on the record after

opportunity for an agency hearing," and Camel Group conspicuously cannot point to any such requirement.

Therefore, contrary to Camel Group's assertion, "the Removal Decision [does not] fit[] the traits of a 'formal adjudication.'" Pl. Br. at 39. Indeed, there are no "trial-type procedures" at issue. *Id.* As the Federal Register states, a listed entity can make a submission to the FLETF to establish that the entity "no longer meets or does not meet" the criteria for each specific clause of the UFLPA ((i), (ii), (iv), or (v) of Section 2(d)(2)(B)). In doing so, the entity can submit any relevant documents, the FLETF can ask questions of the entity at any time, and the FLETF can, but is not required to, accept a meeting request, if sought. 88 Fed. Reg. 50,904. This is not, as plaintiff contends, "a closed hearing." Pl. Br. at 41. No one will take testimony, administer oaths, or cross-examine witnesses. It is structured as a "listening session," which is not recorded. As set forth in the meeting guidelines, during the "listening session," an entity may be permitted to provide additional information. AR1638. Certainly, this is not "a complete administrative adjudicative process where evidence and arguments are submitted and a hearing is held." Pl. Br. at 39. Decisions on a request for removal, therefore, are (at most) informal adjudications under the APA.

A 'preponderance of the evidence' standard does not automatically apply to "informal agency adjudications, which are not subject to the procedural safeguards of § 556 of the APA." *Software Sys. Assocs., Inc. v. Saiki*, 1993 WL 294782, at *5 (D.D.C. June 25, 1993). And "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA" or governing statutes. *PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990) (discussing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978)). As noted by the Court in *Ninestar*, preponderance of the evidence is the traditional burden of proof in civil

administrative proceedings, *Ninestar*, 687, F. Supp. 3d at 1332; *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1299 (Fed. Cir. 2012), but that general proposition did not end the inquiry in *Ninestar* when considering the UFLPA, nor should it here.  A "reasonable cause to believe" standard is appropriate when making a determination based on the application of the UFLPA given the UFLPA's text and purpose.

Indeed, as the Court in *Ninestar* acknowledged, the Federal Circuit in *Rodriguez* carves out certain agency determinations from the preponderance standard.  *Ninestar*, 687 F. Supp. 3d at 1332; *Rodriguez*, 8 F.4th at 1301.  As noted therein, there "may be exceptional circumstances in which a lower burden of proof than preponderance of the evidence could legitimately be applied."  *Rodriguez*, 8 F.4th at 1301; *see also Ninestar*, 687 F. Supp. 3d at 1332 (noting the exception identified in *Rodriguez)*.  Although exceptions to the preponderance standard "would typically require an explicit directive to use a [lesser] burden of proof," the *Ninestar* Court held that the exception applies with respect to the UFLPA.  *See Ninestar*, 687 F. Supp. 3d at 1332, 1335.  Indeed, "[i]f not express, the burden of proof may be implied from congressional intent, as inferred from text, context, and even legislative history.  *Id*. at 1332 (citing *Steadman*, 450 U.S. at 98-102).  And, it is "presumed that Congress legislates against the backdrop of existing law," *id*. at 1333 (quoting *Gazelle v. Shulkin*, 868 F.3d 1006, 1011 (Fed. Cir. 2017), and not "in isolation." *id*. (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132 (2000)).  In *Ninestar,* the Court held that the lesser burden applies with respect to the application of the UFLPA.

The law existing at the time the UFLPA was passed was 19 U.S.C. § 1307.  And, the goal of the UFLPA was "to strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does

not undermine the effective enforcement of section 307 ….” *See* UFLPA, Section 1(1)

(Statement of Policy); *Ninestar*, 687 F. Supp. 3d at 1333-34.  The *Ninestar* Court noted that a

reasonable cause to believe standard furthers that goal for two reasons, both of which are equally

applicable with respect to a removal request.  First, it would be incongruous that the United

States could issue a withhold release order under section 307 based on reasonable but not

conclusive evidence, 19 C.F.R. § 12.42(e), but could not act with respect to the UFLPA without

a preponderance of evidence, specifically because the UFLPA was passed to make enforcement

stronger.  *Ninestar.* 687 F. Supp. 3d 1333-34.  If all a listed entity had to do to increase the

burden on the United States was to seek a delisting, that would be equally as incongruous with

respect to the purpose of the statute.

Second, as the *Ninestar* Court found, “a preponderance standard in the UFLPA would not

cohere with Congress’s concern with the difficulty of obtaining information regarding forced

labor in China.”  *Id.* at 1334.  Congress wanted to make sure the government of China could not

“undermine” the effectiveness of the statute.  *Id.* (citing UFLPA, Section 1(1)).  As this Court

noted in *Ninestar* “[p]ut simply, the UFPLA is in part intended to overcome the transparency

issues prohibiting section 307’s effective enforcement in Xinjiang.”  *Id.* at 1334.  For example,

Article 36 of China’s “Data Security Law” requires the Chinese Government to approve the

release of information, limiting the availability of reliable information.  *See id.*  Given the

scarcity of information, the FLETF, under a preponderance standard, “would be required to ‘rule

out’ a listed entity’s ‘explanation for suspicious facts,’ even if it did not have the realistic ability

to do so.”  *Id.* at 1334-35 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018)).  This

rationale is equally true when an entity seeks removal from the UFLPA Entity List.  The FLETF

does not suddenly have the ability to obtain more information with respect to entities in China simply because Camel Group sought removal.

Because the same rationale for applying a "reasonable cause to believe" standard with respect to a listing decision is equally as applicable here, that same standard – a reasonable cause to believe that the statutory requirements have been met – correctly applies.

### iii. Reasonable Cause To Believe Standard Is Often Used In Matters Of Foreign Policy

Moreover, as the *Ninestar* Court noted, "reasonable cause-like standards in more analogous agency determinations concerning U.S. foreign and economic policy, such as listing decisions by Commerce's Bureau of Industry Security (BIS) and the Department of the Treasury's Office of Foreign Assets Control (OFAC), form a better basis for a presumptive standard of proof here." *Ninestar*, 687 F. Supp. 3d at 1335, n. 21. Indeed, "[m]atters of strategy and tactics relating to the conduct of foreign policy 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015) (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984)).

For example, OFAC maintains lists of "specially designated" entities that are listed ("designated") as funding drug trafficking or terrorism, among other things. Such designations can result in the freezing or seizure of assets. Like the UFLPA, the statutes governing OFAC's designations do not recite a particular burden of proof. *See, e.g.*, 50 U.S.C. § 1702. Numerous federal courts have upheld OFAC designations based on a "reason to believe" standard. *See, e.g.*, *Kadi v. Geithner*, 42 F. Supp. 3d 1, 11 (D.D.C. 2012) (upholding a listing determination that was based on OFAC's "reason to believe" certain facts); *OKKO Bus. PE*, 133 F. Supp. 3d at 20 (same). Additionally, though not subject to APA review, the BIS Entity List includes entities

that are made subject to export restrictions for foreign policy reasons (including forced labor violations) under a "reasonable cause to believe … based on specific and articulable facts" standard, 15 C.F.R. § 744.11(b).  *See Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022).  Thus, the FLETF's chosen standard is consistent not only with the UFLPA and section 307, but also with longstanding agency practice in closely analogous foreign-relations contexts.

Plaintiff contends that *Kadi* and similar cases only support a conclusion that a reasonable cause to believe standard is appropriate with respect to listing.  Pl. Br. at 41.  Not so.  The Court in *Ninestar* cited to those cases because they involve a foreign policy context, as is the case here. Camel Group's distinction, therefore, has no merit.

### iv.    Camel Group's Remaining Arguments As To Why A Preponderance Standard Should Be Applied To Removal Decisions Have No Merit

Camel Group makes a number of arguments as to why a preponderance of the evidence standard should apply with respect to a removal decision, specifically that the UFLPA and section 307 dictate such a result.  Those arguments have no merit.

First, the UFLPA *does not*, as Camel Group contends, "provide[] a higher standard for removal decisions."  Pl. Br. at 39.  Specifically, Camel Group claims that "UFLPA's [] heightened standard [for obtaining an exception to the exclusion resulting from a listing decision] suggests that Congress intended to raise the standard of proof for all post-listing actions, including removal decisions."  *Id.* at 40.  Not so, and this argument appears to result from a misunderstanding as to how the UFLPA listing decisions are applied.  Indeed, a UFLPA listing decision does not change, or suddenly strengthen, when an entity seeks removal and that request is denied.  At the time of listing, UFLPA Section 3(a) immediately applies to exclude entered merchandise that was produced by the listed entity, just as it applies to all goods from

Xinjiang, unless the importer can establish, by clear and convincing evidence, that the merchandise was not made with forced labor.  UFLPA, Section 3(b).  The same is true after an entity seeks removal and that request is denied.  That is, Section 3(a)'s application of the rebuttable presumption, and the required "clear and convincing evidence" necessary to establish that merchandise is not made with forced labor, applies equally in each instance.  *See* UFLPA, Section 3(b).  A decision to deny removal from the UFLPA Entity List simply keeps the listing decision in place, it does not impose a greater burden on an importer.[7]

Similarly, and contrary to Camel Group's contention, section 307 likewise does not "point to a higher standard for [UFLPA] removal decisions."  Pl. Br. at 18.  Plaintiff argues that a UFLPA listing decision (an embargo under the UFLPA) is analogous to a WRO (an "embargo" under section 307 pursuant to 19 C.F.R. § 12.42(e)), and that the denial of the request for removal from the UFLPA entity list is analogous to a "finding" under 19 C.F.R. § 12.42(f), requiring the same burden applicable to a "finding."  Pl. Br. at 40-41.  The first analogy may be accurate, but the latter is not.  CBP issues a "finding" under section 307 when it determines that

---

[7] Camel Group's reference to entries of merchandise made by its subsidiary, Camel Energy, is both incorrect, and in any event, irrelevant to this Court's analysis in this case.  Camel Group, in this action, is challenging the FLETF's decision to deny Camel Group's request for removal from the UFLPA Entity List.  That determination is separate from the necessary determinations to be made by CBP related to a particular entry – (i) whether the UFLPA applies to a particular entry; and (ii) if it does, whether an importer establish that an exception applies to that particular shipment of goods.  Here, the Court must only consider whether there is substantial evidence to support the FLETF's finding that there remains, after considering Camel Group's submission, a "reasonable cause to believe" that Camel Group satisfied the statutory requirement of the UFLPA.

To clarify, though, none of Camel Energy's entries were admitted because they "successfully rebutted CBP's presumption by 'clear and convincing evidence.'"  Pl. Br. at 40.  Instead, certain entries were admitted because it was determined that the UFLPA did not apply.  That is, it was determined that the merchandise was not made in the Xinjiang region, or by an entity on the UFLPA Entity list.

forced labor was used in the manufacturing or production, in whole or in part, of goods, and that such goods are being, or are likely to be, imported into the United States. It should also be noted that, contrary to Camel Group's suggestion, Pl. Br. at 40, CBP need not engage with an entity prior to issuing a "finding," and CBP need not issue a "finding" just because an entity seeks to modify a WRO or submits information to CBP. They are simply different paths.

Moreover, because a "finding," is based on a heightened level of evidence, the effect of a "finding" may be different from either a listing decision or a decision to deny a request for removal from the UFLPA Entity List. Specifically, when a "finding" is issued, the result, at entry, is not just detention or exclusion – as with a WRO or a listing decision under the UFLPA – but seizure of the merchandise for a violation of 19 U.S.C. § 1307. It certainly, therefore, is not analogous to the denial of a removal request which simply results in a listing decision remaining in place.

As the Court in *Ninestar* acknowledged, establishing the use of forced labor by a preponderance of the evidence is difficult with respect to foreign entities, particularly where those entities are located in China. The vast majority of section 307 enforcement is done through issuance of a WRO. *Ninestar*, 687 F. Supp at 1333-34 (noting that 51 WROs have been issued as compared to only 8 findings). More evidence is not available to United States agencies simply because a listed entity seeks removal from the UFLPA Entity List, and it would be illogical to impose a greater burden on the United States in that instance.

Contrary to Camel Group's contention, imposition of a preponderance of the evidence standard related to a request to be removed from the UFLPA Entity List *does* "conflict with Ninestar [], § 307, [and] the purpose and congressional intent in adopting the UFLPA." Pl. Br. at 41. The FLETF would likely have no greater ability to "rule out" the facts identified by a

Chinese entity at the removal stage than it did at the time of the listing. *Ninestar,* 687 F. Supp at 1334-35. Indeed, the information remains extremely difficult to obtain. Therefore, a heightened burden would greatly conflict with the goals and purpose of the UFLPA.

<p style="text-align:center">*    *    *</p>

Here, a UFLPA listing decision is based on a "reasonable cause to believe" that the statutory requirements of the UFLPA are met. When an entity seeks removal from the UFLPA Entity List, they must show sufficient evidence to establish that there is no longer "reasonable cause to believe" that the statutory requirements are met. Because, as the Court in *Ninestar* acknowledged, reasonable cause is most consistent with the text and purpose of the UFLPA, which Congress passed against the backdrop of difficult-to-obtain Chinese data and CBP's longstanding section 307 enforcement through withhold release orders based on a similar evidentiary standard, it must similarly apply here. *Id.* at 1333–34. Camel Group's motion offers no plausible reason for the Court to alter that analysis.

### D. Camel Group's Rights Were Not Harmed And It Was Afforded All The Process To Which It Was Entitled

Despite Camel Group's assertions and failure to raise this claim in the Complaint, there was no Fifth Amendment violation. Pl. Br. at 43-44. Camel Group alleges deprivation of due process rights including liberty and property, *Id*. at 18, "throughout the delisting process." *Id*. at 44. To begin, plaintiff has not identified any liberty or legally protected property interest. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"). The "Constitution does not provide a right to import merchandise" or afford a "protectable interest to engage in international trade." *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citations omitted). *See also NEC Corp. v. United States*,

<p style="text-align:center">49</p>

151 F.3d 1361, 1369 (Fed. Cir. 1998) ("[E]ngaging in foreign commerce is not a fundamental right protected by notions of substantive due process."). That Camel Group has a subsidiary,[8] which is not the listed entity nor a party to this action, located in the United States does not create a protected interest, and neither does the assertion that its subsidiary has minimum contacts in the state of Michigan. Pl. Br. at 43-44.

Through this action, Camel Group challenges the removal decision of the FLETF. In this decision, it was afforded all the process it was due. The FLETF complied with the procedures, considered the evidence on the record, and arrived at a reasoned decision to list Camel Group on the UFLPA Entity List. Likewise, the FLETF also followed the procedures for entities to request removal from the UFLPA Entity List and considered all information on the record. 88 Fed. Reg. at 50,904. That Camel Group engaged and submitted a request for removal demonstrates that it availed itself of the process provided and was not deprived of any rights.

Nevertheless, Camel Group asserts that it was harmed by the FLETF's lack of explanation for the listing decision such that it could not meaningfully participate in the delisting proceedings. Pl. Br. at 45. This is inaccurate. Camel Group participated meaningfully in the delisting proceedings, as demonstrated by its submissions, which included affidavits, certifications, employee lists, and responses to the FLETF's questions. AR11-13; ███████

███████ Moreover, to the extent Camel Group complains that it was not aware of the basis for the listing decision, which impacted its removal request, the FLETF did provide an explanation of the listing decision prior to the conclusion of the delisting proceeding. AR1643. In its message to Camel Group's counsel, the FLETF provided information on Camel Group's listing

---

[8] Camel Energy is Camel Group's U.S. subsidiary and has two separate cases pending in this Court.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

and invited Camel Group to "submit additional information in response to the factual summary provided above." *Id*. Camel Group did not submit any new information to the FLETF to support its removal request. AR2979. Thus, Camel Group availed itself of the process, had the opportunity to meaningfully participate, and was not deprived of any process it was due.

Instead, it appears that Camel Group is unhappy with the FLETF's unfavorable decision, but that does not mean that it was not afforded due process. Camel complains that there appears to be a conflict of interest because Dr. Murphy, one of the authors of the report used by the DOL when it submitted Camel Group for consideration to the FLETF, subsequently joined DHS as a Policy Advisor. Pl. Br. at 44. Camel Group goes so far as to allege that Dr. Murphy "manufactured" evidence against Camel Group and was advising on the removal request. *Id*. These assertions are unfounded.

First, the DOL verified the sources relied upon in the report against criteria used in developing and maintaining DOL Congressionally mandated reports. AR1646. There is no indication of "manufactured" evidence. Second, the DOL also determined the credibility, level of expertise and reputation of Dr. Murphy. *Id*. And Camel Group itself does not "question Dr. Murphy's expertise of forced labor issues in Xinjiang." AR1290-1291. Instead, Camel Group's concern is her past work and that she started with DHS after it made its removal request, *id*., but that does not demonstrate any impropriety. Third, the evidence in this case is considered according to the information on the record and whether there is evidence that supports the FLETF's decision. The FLETF is comprised of multiple agencies that each evaluate the information provided. For Camel Group to insinuate that there was a "conflict of interest" or "improper[] influence" when there is nothing to support that accusation must be rejected. Pl. Br. at 44.

## II.    SHOULD THE COURT FIND IT NECESSARY, REMAND WITHOUT VACATUR IS THE PROPER REMEDY

If the Court were to find that the FLETF's decision violated the APA (which it did not), the appropriate relief would not be to vacate the FLETF's decision.  Rather, the appropriate relief would be to remand the matter back to the FLETF for further explanation.  *See, e.g.*, *PBGC,* 496 U.S. at 654; *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993); *Int'l Union, UMW v. Federal Mine Safety and Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990); *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980).

A court may remand an agency decision without vacatur "where the failure lay in lack of reasoned decision-making [or] where the order was otherwise arbitrary and capricious." *Int'l Union*, 920 F.2d at 966.  As this Court noted, in "deciding whether to issue a remand without vacatur," to the extent any relief is required, the Court must consider the following two factors: (1) "the seriousness of the order's deficiencies" and (2) "the disruptive consequences of an interim change that may itself be changed."  *Ninestar*, 687 F. Supp. 3d at 1337 n.25 (quoting *Nat'l Org. of Veterans Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001)).

As to the first factor, the Court will look to the "extent of doubt whether the agency chose correctly," *Allied-Signal,* 988 F.3d at 151, and as set forth herein, Camel Group has not identified any serious deficiencies that would place the FLETF's determination in doubt.  As to the second factor, there are significant disruptive consequences associated with vacatur.  "Remand without vacatur may indeed be well suited to preserve, rather than disrupt, Congress's weighty humanitarian, economic and foreign policy concerns."  *Ninestar*, 687 F. Supp. 3d at 1337 n.25. This Court rightly concluded that "[t]he American public interest … extends beyond consumer and corporate complicity in Chinese atrocities in Xinjiang … [and] encompasses a directive,

52

global in scope, that the high watermark of human rights be satisfied in international trade." *Id.*

at 1344. Because "even a single entry of goods made with forced labor from Xinjiang is one too

many," *id.* at 1343, vacatur is not appropriate. Accordingly, even if the Court were to find merit

in Camel Group's claims, it should, at most, remand the case to the FLETF without vacatur.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Camel Group's motion for

judgment on the agency record, and dismiss this action with prejudice.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Monica P. Triana
MONICA P. TRIANA
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9240 or 9230

Date: January 29, 2026    *Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I, Monica P. Triana, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Government's memorandum in support of its motion for judgment on the agency record, and in opposition to plaintiffs' motion for judgment on the agency record, dated January 29, 2026, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, as amended by this Court's order, dated January 26, 2026, and contains 16,104 words.

/s/ Monica P. Triana
MONICA P. TRIANA