**PUBLIC VERSION**

# IN THE UNITED STATES
# COURT OF INTERNATIONAL TRADE

CAMEL GROUP CO., LTD.,

        *Plaintiff*,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CUSTOMS AND BORDER
PROTECTION; FORCED LABOR
ENFORCEMENT TASK FORCE;
ALEJANDRO MAYORKAS, *in his
official capacity as the Secretary of the
Department of Homeland Security*;
TROY A. MILLER, *in his official
capacity as the Senior Official Performing
the Duties of the Commissioner for
U.S. Customs and Border Protection*;
ROBERT SILVERS, *in his official capacity
as Under Secretary for Office of Strategy,
Policy, and Plans and Chair of the Forced
Labor Enforcement Task Force*,

        *Defendants*.

Case No.: 25-00022

Hon. Lisa W. Wang

---

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1
MOTION AND BRIEF IN SUPPORT OF RULE 56.1 MOTION FOR JUDGMENT ON
THE AGENCY RECORD**

**PUBLIC VERSION**

**PUBLIC VERSION**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ....................................................................................................... i

**TABLE OF AUTHORITIES** .............................................................................................. ii

**TABLE OF ABBREVIATIONS** ......................................................................................... iv

**I.  The Court Should Not Defer to the FLETF's Conclusions** ..................................... 1

**II.  The Appropriate Standard of Proof for UFLPA Removal Decisions Should be a "Preponderance of Evidence"** ....................................................................................... 1

    *A.  The Court should decide what the correct standard of proof for UFLPA removal decisions* ......................................................................................................... 2

    *B.  The correct comparison for standard of proof in UFLPA removal decisions is the WRO process and formal §307 findings* ................................................ 4

    *C.  The Government's position for the same lower standard of proof throughout the UFLPA process would cause "statutory asymmetry" with §307 and lead to absurd results* ........................................................................................................ 6

    *D.  The Government's concerns regarding difficulty in obtaining information are misplaced* ......................................................................................................... 9

    *E.  UFLPA removal decisions are a formal administrative procedure subject to the safeguards of due process* ........................................................................... 11

**III.  The Public Articles Cannot be Considered "Substantial Evidence" to Support the FLETF's Conclusion that Camel Group's Participation in [██████] is Connected to Forced Labor or that Camel Group's Participation is Ongoing** .................................... 12

**IV.  FLETF Did Not Consider the AR as a Whole and Therefore Did Not Provide a "Reasoned Explanation" of its Removal Decision in Violation of the APA** ................. 15

**V.  The Government's Interpretation of the UFLPA Regarding "Out of [XUAR]" and Labor Programs is Incorrect and Would Lead to Absurd Results** .............................. 16

**VI.  The Government Does Not Address the Conflict of Interest with Dr. Laura Murphy** ............................................................................................................................ 19

**CONCLUSION** ................................................................................................................... 20

**PUBLIC VERSION**

## <u>TABLE OF AUTHORITIES</u>

**LAWS, STATUTES AND REGULATIONS**

19 C.F.R. § 12.42 ................................................................................................4, 5

28 U.S.C. § 455 ...................................................................................................19

*Administrative Procedures Act*, 5 U.S.C. §§ 551–559, Pub. L. 79-404, 60 Stat. 237 (1967)...............................................................................1, 3, 12, 15, 16, 20

*Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug. 2, 2023) .................................................5, 7, 9, 10, 12, 18

*PRC Data Security Law* (中华人民共和国数据安全法) (*Zhonghua Renmin Gongheguo Shuju Anquan Fa*), Standing Committee of the National People's Congress, adopted on June 10, 2021 and promulgated on September 1, 2021, (last access on June 15, 2025), available at https://www.gov.cn/xinwen/2021-06/11/content_5616919.htm (CN) and http://www.npc.gov.cn/englishnpc/c2759/c23934/202112/t20211209_385109.html (EN)..........15

*Section 307 of the Tariff Act of 1930*, 19 U.S.C. § 1307, Pub. L. 106-200, 46 Stat. 689 (1930)..............................................................2, 3, 4, 5, 6, 7, 9, 11

*The Uyghur Forced Labor Prevention Act*, Pub. L. 117-78, 135 Stat. 1525 (2021).....................................................................6, 7, 8, 9, 10, 16, 17, 18

**RULES**

Fed. R. Civ. Pro. Rule 8 ...........................................................................................2

USCIT R. 8 .........................................................................................................2, 3

**CASES**

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ....................................................3

*Camel Energy, Inc. v. United States, et. al.*, Case No. 25-230 (Ct. Int'l Trade) ..............................8

*Camel Energy, Inc. v. United States, et. al.*, Case No. 25-420 (Ct. Int'l Trade) ..............................8

*Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) ..................................................3

*Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th Cir. 2017)...............................3

*In re Google*, 56 F.4th 1363 (Fed. Cir. 2023) ...............................................................12, 13, 15

*Kaptan Demir Celik Endustrisi v. Ticaret A.S.,* 803 F. Supp. 3d 1291 (Ct. Int'l Trade 2025) ........1

*Lamie v. U.S. Tr.,* 540 U.S. 526, 534 (2004) ................................................................17

PUBLIC VERSION

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...............................................................1

*Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ..........................................................2, 4, 5, 6, 7, 8, 9, 13

*Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106 (D.C. Cir. 2002)..................................................13, 15

*U.S. Steel Corp. v. United States*, 35 C.I.T. 651 (2011) .................................................12, 13, 15

*Vivitar Corp. v. United States*, 585 F. Supp. 1419 (Ct. Int'l Trade 1984), *aff'd*, 761 F.2d 1552 ........................................................................................................................3

*Zall v. Standard Ins. Co.*, 58 F.4th 284 (7th Cir. 2023)...................................................................3

OTHER MATERIALS

[ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] (October 23, 2017) (Attachment 13; AR002935-AR002941)..........12, 13

"Filing a Petition for Removal from an OFAC List," No. 9, Dept. of Treasury, available at https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list ................................................................................................................6

[ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] (June 9, 2024) (Attachment 16; AR002952-AR002967)....................................................................................................................13, 14

[ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] (March 4, 2023) (Attachment 14; AR002942-AR002949)....................................................................................................................13, 14

"WRO and Finding Modifications Guide," U.S. Customs and Border Patrol, CBP Publication No. 5040-0525, available at https://www.cbp.gov/sites/default/files/2025-08/FLD_Withhold%20Release%20Order%20%28WRO%29%20and%20Finding%20Modificati ons%20Guide_08.21.2025.pdf...................................................................................................6

**PUBLIC VERSION**

**TABLE OF ABBREVIATIONS**

Below is a list of abbreviations used in Plaintiff's Reply Brief in Support of the Rule 56.1 Motion for Judgment on the Agency Record provided for the convenience of the reader. Plaintiff also refers the reader to ECF 47 and 48, pp. viii-xi for further abbreviations.

| Abbreviation Used | Full Meaning |
|---|---|
| *UFLPA* | *The Uyghur Forced Labor Prevention Act*, Pub. L. No. 117-78, 135 Stat. 1525 (2021) |
| *PRC or China* | People's Republic of China |
| *XUAR* | Xinjiang Uygur Autonomous Region, PRC |
| *§307* | *Section 307 of the Tariff Act of 1930*, 19 U.S.C. § 1307, Pub. L. 106-200, 46 Stat. 689 |
| *APA* | *Administrative Procedures Act*, 5 U.S.C. §§ 551–559, Pub. L. No. 79-404, 60 Stat. 237 |
| *Camel Group* | Camel Group Co., Ltd. |
| *Government or Defendants* | United States of America; Department of Homeland Security; United States Customs and Border Protection; Forced Labor Enforcement Task Force; Alejandro Mayorkas, *in his official capacity as the Secretary of the Department of Homeland Security*; Troy A. Miller, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; Robert Silvers, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force.* |
| *FLETF* | U.S. Forced Labor Enforcement Task Force |
| *CBP* | U.S. Customs and Border Protection |
| *CEE* | U.S. Centers of Excellence and Expertise |
| *DHS* | U.S. Department of Homeland Security |
| *DHS PLCY* | U.S. Department of Homeland Security, Office for Strategy, Policy and Plans |
| *SHU* | Sheffield Hallam University Helena Kennedy Centre for International Justice |
| *DOL* | U.S. Department of Labor |
| *Listing Decision* | References FLETF' decision to add Camel to the UFLPA List and the *Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug. 2, 2023), which contained the public announcement of the FLETF's decision to add Camel to the UFLPA List. |
| *8/2 Fed. Reg.* | *Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 50902, 50904 (Aug. 2, 2023), |
| *Removal Decision* | FLETF's vote to deny Camel's Removal Petition and July 9th Decision Letter from U.S. Dep't of Homeland Sec., Off. of Strategy, Policy, & Plans to Mark V. Heusel, Dickinson Wright PLLC (July 9, 2024): *The Forced Labor Enforcement Task Force's Decision Regarding Camel Co., Ltd's Request for Removal from the Uyghur Forced Labor Prevention Act,* which |

**PUBLIC VERSION**

| | |
|---|---|
| | was the formal communication and "explanation" of FLETF's decision to deny Camel's Removal Petition (AR002977-AR002979) |
| *Removal Petition* | Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (November 7, 2023): *Camel Group Co. Ltd. UFLPA List Removal Request Petition (and Exhibits 1-31)* (AR000024-AR001283) |
| *FLETF Questions* | Forced Labor Enforcement Task Force, Questions to Camel Group Co. Ltd. (December 14, 2023) (AR001284-AR001287) |
| *Camel's Responses* | Letter from Mark V. Heusel, Dickinson Wright PLLC, to Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans (March 1, 2024): Camel Co. Ltd. Responses to FLETF Questions (with Attachments 1-10) (AR001293-AR001637) |
| *SHU Feb. 2022 Report* | Laura T. Murphy et. al., *Financing & Genocide, Development Finance and the Crisis in the Uyghur Region*, The Atlantic Council (February 2022), https://www.atlanticcouncil.org/wpcontent/uploads/2022/02/Financing__Genocide.pdf  (AR001007-AR001076; AR001678-AR001746) |
| *SHU Dec. 2022 Report* | Laura Murphy, et al., *Driving Force: Automotive Supply Chains and Forced Labor in the Uyghur Region,* Sheffield Hallam University Helena Kennedy Centre for International Justice, NomoGia, December 2022, available at https://www.shu.ac.uk/helena-kennedy-centre-internationaljustice/research-and-projects/all-projects/driving-force (AR001091-AR001169) |
| *SHU May 2023 Report* | Sheffield Hallam University Helena Kennedy Centre for International Justice, "Products Made with Forced Labor in the Uyghur Region," Evidence Briefs, Issue Brief No. 3, (May 2023), https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-andprojects/all-projects/evidence-briefs (AR001170-AR001179) |
| *SHU Reports* | Collectively, the SHU Feb. 2022 Report, SHU Dec. 2022 Report, and SHU May 2023 Report |
| *Labor Transfer Program* | Notice of the Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" (《自治州推进喀什和田地区城乡富余劳动力有组织转移就业三年规划 (2017-2019年)》的通知) and the activities associated with this program. |
| *WeChat Article* | Toksun Public Employment Service Center, (《托克逊就业服务》), "Toksun County holds the handover ceremony for the urban and rural surplus labor enterprises in Kashgar and Hotan areas" (《托克逊县举行喀什、和田地区城乡富余劳动力企业上岗交接仪式》), Toksun County, XUAR Bureau of Social Security and Human Resources, WeChat (Tencent) (July 10, 2017), https://archive.ph/nC4Xt (AR001085-AR001090; AR002765-AR002783) |
| *Sina Article* | Yaxin Net (《亚心网》), "Toksun County, Xinjiang holds a handover ceremony for surplus labor entities" (《新疆托克逊县举行富余劳动力企业上岗交接仪式》), Sina News Network (《新浪新闻》), July 12, 2017, available at https://news.sina.com.cn/o/2017-07-12/doc- |

|  | ifyhwehx572486.shtml  (AR001194-AR0011990) [[███████ ██████ ]] |
|---|---|
| *AR* | Camel Group's Administrative Record comprising of the Public version of the Administrative Record (ECF 19); Confidential version of the Administrative Record (ECF 26-28); and the Camel Confidential Administrative Record (ECF 29). |
| *Toksun SSHR* | Toksun County Bureau of Social Security and Human Resources, a local government agency affiliated Toksun County, XUAR, PRC |
| *Rule 56.1 Motion* | Plaintiff Camel Group Co., Ltd.'s Rule 56.1 Motion for Judgment on the Agency Record and Brief in Support (ECF 47 and 48) |
| *Gov. Response or Gov. Resp.* | Defendants' Response to Plaintiff Camel Group Co., Ltd.'s Rule 56.1 Motion for Judgment on the Agency Record and Brief in Support (ECF 61, 62, 63) |
| *WRO* | Withhold Release Order and the related process for CBP issuing a WRO and making a final determination on the modification or recission of a WRO |
| *Public Articles* | Attachment 13 [[██████████████████████████████████ ████████████████████████████████ ]] (October 23, 2017) (AR002935-AR002941);<br><br>Attachment 14 [[████████████████████████████████ ███████████████████████ ]] (March 4, 2023) (AR002942-AR002949); and<br><br>Attachment 16 [[██████████████████████████████████ ██████████████████████████ ]] (June 9, 2024) AR002952-AR002967. |

**PUBLIC VERSION**

## I.    The Court Should Not Defer to the FLETF's Conclusions

The Government argues that the Court should be "highly deferential" to the FLETF's conclusions and not question in the slightest how it arrived at its decision.  *See, e.g.,* Gov. Resp., at 18-19, 29. This supposition is incorrect.  "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  "…[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." Id. The Court should exercise its discretion and "independent judgment" to determine whether the FLETF's actions were in violation of the APA, and should not simply defer to the FLETF's conclusions.  Moreover, this does not amount to asking the Court to re-weigh evidence.  It is simply asking the Court to follow the most recent U.S. Supreme Court precedent and "exercise its independent judgment" in determining whether the FLETF's decision was supported by substantial evidence, a reasoned opinion, not taken in excess of the FLETF's statutory authority, or were contrary to due process or the applicable law. Id. When done so and viewed in the context of the entire record "including contradictory evidence," no reasonable person can conclude that the FLETF's decision to deny Plaintiff's Removal Petition was proper.  *See Kaptan Demir Celik Endustrisi v. Ticaret A.S.*, 803 F.Supp. 3d 1291, 1302 (CIT 2025) ("To be supported by substantial evidence, a determination must account for whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn.") (internal citations and quotations omitted).

## II.    The Appropriate Standard of Proof for UFLPA Removal Decisions Should be a "Preponderance of Evidence"

The correct standard of proof that the FLETF must meet at the delisting stage to sustain a listing decision, has become a core issue in this case.  If the Court finds that the standard of proof

**PUBLIC VERSION**

is the same low "reasonable cause to believe" standard applicable to making UFLPA listing decisions then the FLETF would be able to deny any entity's removal petition based solely on evidence it relied on to add the entity in the first instance, unless that entity can provide a response that annihilates every inkling of doubt in the minds of the FLETF. Put another way, to accept the Government's argument would be to require the listed entity to prove beyond a reasonable doubt that the FLETP's reasons for its decision are insufficient to sustain the lowest of bars. It would also create significant "statutory asymmetry" between the UFLPA and §307 and Withhold Release Orders ("WRO"),[1] as it would be easier for a party to modify or obtain rescission of a WRO than to seek removal from the UFLPA Entity List. *See Ninestar Corp. v. United States,* 687 F.Supp. 3d 1308, 1333 (Ct. Int'l Trade 2024) (holding a "reasonable cause" standard for a UFLPA listing decision avoids illogical asymmetry where §307 embargoes are easier to obtain than a UFLPA embargo). If the Court finds that the standard of proof should be a "preponderance of evidence standard" at the delisting stage, like what is reflected in a formal §307 finding, then that would not only avoid "statutory asymmetry" with §307, but also encourage listed entities to engage, submit evidence, and address forced labor concerns directly with the FLETF. Id., at 1333-1335.

*A. The Court should decide the standard of proof for UFLPA removal decisions*

The Government's claim that Plaintiff has waived this argument is without merit. The Government does not cite to any case law, court rule, or other authority to support its argument, nor is Plaintiff aware of any case law or court rule that requires a party to specifically allege arguments and facts concerning the applicable legal standard. USCIT R. 8(a) mirrors Fed. R. Civ. Pro. R. 8(a), which only requires a party provide "a short and plain statement of the claim showing

---

[1] The Court in *Ninestar* found that the operative law for the UFLPA is §307, and that they do not "operate independently of each other." *Ninestar Corp.*, 687 F.Supp. 3d at 1333. The primary enforcement tool of §307 is WROs. *See Id.*

2

**PUBLIC VERSION**

that the pleader is entitled to relief." USCIT R. 8(a)(2). The Supreme Court has held that complaints only require "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007). And other federal courts have found that, "[t]he Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories." *Chessie Logistics Co. v. Krinos Holdings, Inc*., 867 F.3d 852, 859 (7th Cir. 2017) (citations omitted). "It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Coop*., 875 F.3d 846, 848 (7th Cir. 2017) (internal citation omitted).

Plaintiff raised factual allegations and concerns in its complaint regarding the FLETF's excessive use of authority in violation of the APA, including violating Plaintiff's due process rights, and putting the Government on notice regarding APA violations. *See, e.g.,* ECF 5, at 45-46. Further, the issue was raised and fully briefed by both parties, concerns a key matter of law, and would not prejudice any party if it were heard. *See Zall v. Standard Ins. Co.*, 58 F.4th 284, 296 (7th Cir. 2023) (finding that a district court should exercise discretion to hear an argument concerning a new legal theory that was fully briefed in summary judgment).

Additionally, the Court should decide this issue because it affects parties beyond this litigation. *See Vivitar Corp. v. United States*, 585 F.Supp. 1419, 1423 (CIT 1984), *aff'd,* 761 F.2d 1552 (Fed. Cir. 1985) (finding that the CIT's purpose is to ensure uniform judicial decision making and provide a degree of certainty in complex international trade transactions). The UFLPA is silent on the standard of proof the FLETF must meet to sustain a listing decision or remove an entity from the UFLPA List at the delisting stage. *Ninestar* clarified the standard to *add* an entity to the UFLPA List was based on a "reasonable cause to believe" because the UFLPA derives its powers from §307 and should not have any "statutory asymmetry" with its enforcement. *See*

3

**PUBLIC VERSION**

*Ninestar Corp.,* 687 F.Supp. 3d at 1333-1335.  It further used the framework of the WRO process as a comparison point for UFLPA embargos. Id. However, *Ninestar* did not opine on the standard of proof applicable to a UFLPA *removal* request.  Therefore, the standard of proof to remove an entity remains a substantial issue of law, not just for Plaintiff but for dozens of other future plaintiffs that seek removal from the UFLPA List.  For these reasons, the Court should consider the issue to resolve this precedential case and cases to follow.

> **B.  The correct comparison for standard of proof in UFLPA removal decisions are formal §307 findings**

The Government's Response concedes that §307 is the bedrock on which the UFLPA is based and that WROs are the key enforcement mechanism for §307.  *See* Gov. Resp. at 43-44. While *Ninestar's* ultimate decision regarding the "reasonable cause to believe" standard *is limited only to UFLPA listing decisions*, the court in *Ninestar* made several applicable conclusions about the UFLPA and its interplay with §307 and WROs.  *Ninestar* lays out the different stages of the WRO process and rising standards of proof:

> "First, a Customs officer initiates an investigation of merchandise based on a reason to believe. *See* 19 C.F.R. §12.42(a). Next, Customs issues a WRO against particular merchandise based on its 'reasonabl[e] but not conclusive[ ]' belief, *see* id. §12.42(e), which is comparable to a burden of proof of reasonable cause. At that point, an embargo against that suspect merchandise goes into effect. *See* id. Finally, Customs publishes a formal finding based on its preponderance-of-the-evidence 'determin[ation].' *See* id. §12.42(f)." *Ninestar Corp.*, 687 F.Supp. 3d 1333.

The parallels are clear.  The FLETF first initiated an investigation against Camel Group based on the SHU Reports.  This mirrors the same investigation of merchandise CBP will initiate with respect to a WRO.  *See* 19 C.F.R. §12.42(a).  Next, the FLETF voted to add Camel Group to the UFLPA List and issued its Listing Decision based on a "reasonable cause to believe" standard that was published in the Federal Register, at which point the UFLPA embargo was in effect.  *See* Listing Decision.  This is identical to the second phase of issuing a WRO, where CBP issues a

**PUBLIC VERSION**

WRO based on the same "reasonable cause to believe" standard at which point the §307 embargo is in effect. *See* 19 C.F.R. §12.42(e); *see also Ninestar Corp.*, 687 F.Supp. 3d at 1333. It follows that a formal UFLPA removal decision should mirror the standards for a formal §307 finding with the same standard of proof: "Preponderance of evidence."

Even the Government concedes that, like a UFLPA removal decision, a formal §307 finding is based on a "heightened level of evidence." *See* Gov. Resp., at 48. Similarly, a UFLPA removal decision is made after evidence is provided, arguments are made, and the sanctioned entity's side has been heard, and a formal vote is taken by FLETF members involving multiple federal agencies. Then, a formal written decision is issued to the entity. *See* Removal Decision. Formal §307 findings require review by the CBP Commissioner and approval of the Secretary of Treasury, and their decisions are to be published in the Federal Register. There is a similar interagency process, issuance of a formal decision, and opportunity for an entity to be heard in a hearing. Lastly, a UFLPA removal decision is final and non-appealable, and an entity must submit new evidence with a new removal petition or seek recourse in the court. AR002979; *see also* 8/2 Fed. Reg. Similarly, a formal §307 finding can only be challenged through a new application to CBP or through the courts. And, while formal §307 findings may result in seizure of the goods, an embargo of the goods causes similar serious damage to the importer. These similarities militate towards applying the same standard of proof in UFLPA removal decisions as is applied in formal §307 decisions.

*Ninestar* found that the UFLPA listing process mirrors the second phase of the WRO process, namely CBP's investigation and issuance of a WRO. It follows that a formal UFLPA finding on whether that embargo should remain (*i.e.*, a removal decision) is likened to a formal §307 finding under 19 C.F.R. § 12.42(f). Thus, the FLETF should be required to find by a

**PUBLIC VERSION**

"preponderance of evidence" whether to sustain a listing decision after a removal request to avoid

"statutory asymmetry" with the §307.  *See Ninestar Corp.*, at 687 F.Supp 3d at 1334.

> *C.  The Government's position for the same lower standard of proof throughout the UFLPA process would cause "statutory asymmetry" with §307 and lead to absurd results*

If a UFLPA removal decision is subject to the same low standard of proof as a UFLPA

listing decision, then it would lead to "statutory asymmetry" with §307, whereby it will be easier

to modify or rescind a WRO than it would be a UFLPA embargo.[2]  The court in *Ninestar* was

particularly concerned with this issue, finding that it should not require more evidence to obtain a

UFLPA listing embargo than a §307 WRO.  *See Ninestar Corp.,* 687 F.Supp. 3d at 1334.  It follows

that it should not be more difficult to obtain relief from the UFLPA embargo through a removal

petition or rebutting the presumption (*see* UFLPA §3(a)) than to obtain relief through rescission

or modification of a WRO.  That is exactly what the Government's position would do.  If the

"reasonable cause" standard were applied at the removal stage, as was done here, then it makes it

nearly impossible for an entity to successfully obtain relief from a UFLPA embargo or be removed

from the UFLPA List.  The "reasonable cause" standard would have already been met at the time

of the removal decision because the FLETF had already accumulated sufficient evidence to meet

that standard at the time of listing.  This lower standard would require the entity to completely

---

[2] An entity may submit a petition and evidence during the second phase of the WRO process to rescind or modify the WRO.  But, there are stark differences between this and the UFLPA removal process.  For one, CBP has published guidance to help an entity subject to a WRO to identify the exact issues underlying it and engage with CBP to resolve it.  *See, e.g.,* "WRO and Finding Modifications Guide," U.S. Customs and Border Patrol, CBP Publication No. 5040-0525, available at FLD_Withhold Release Order (WRO) and Finding Modifications Guide.  The OFAC listing process has a similar mechanism where an entity can request OFAC to provide it with the evidence for why it was listed.  *See* "Filing a Petition for Removal from an OFAC List," No. 9, Dept. of Treasury, available at https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list.  None of that is present in the UFLPA process.  Because the FLETF refuses to engage an entity, it should not be rewarded with a lower standard of proof to keep entities sanctioned indefinitely.

PUBLIC VERSION

disprove and dispel any and all suspicion the FLETF has, almost to say that an entity has to prove beyond a reasonable doubt that the FLETF's "suspicion" is wrong. That is an impossible standard that does not further the purpose of the UFLPA and is not supported by any case law or statutory construction. Entities will perpetually remain on the list, as the FLETF currently offers no real opportunities for interaction or exchange during the administrative process,[3] in contrast to the WRO and OFAC listing processes.[4] It then begs the question, why would an entity not simply wish CBP issue a WRO with respect to any forced labor issues, because that process is more transparent, with clear and escalating standards of proof, and has an actual chance of success? This "statutory asymmetry" with §307 would manifest in new ways and lead to absurd results should the Court find that the standard for listing and removal of an entity under the UFLPA were the same. Therefore, for a UFLPA removal decision, the FLETF should be required to find by a "preponderance of the evidence" that a listed entity has engaged and continues to engage in actions prohibited under UFLPA §2(b) in order to maintain a listing after the delisting process.

Moreover, keeping the same standard for UFLPA listing and removal decisions will create "statutory asymmetry" within the UFLPA itself. There are two ways a listed entity may obtain relief from a UFLPA embargo: 1) Permanent relief through the removal process,[5] and 2) overcoming the UFLPA's "rebuttable presumption." *See* UFLPA §3(b); *see also* 8/2 Fed. Reg. To

---

[3] This was certainly the case for Camel Group, as it made multiple attempts to contact the FLETF to obtain more information to allow for a more effective removal process, only for the FLETF to completely ignore its requests. As such, Camel Group was forced to submit its petition based solely on its own research. AR000024, fn. 1; *see also Ninestar Corp.,* 687 F.Supp. 3d at fn. 15. ("Exhaustion of the FLETF's delisting procedure, rather than litigation, is the preferable route through which a litigant should receive adequate notice; it better conserves judicial resources and it makes use of the FLETF's expertise").

[4] *See* fn. 2.

[5] To Plaintiff's knowledge, no entity added to the UFLPA List has ever been removed, and Camel Group is one of the very first, if not the only one, to go through the UFLPA delisting process.

PUBLIC VERSION

overcome the "rebuttable presumption," an entity must show by "clear and convincing evidence" that the "good[s], ware[s], article[s], or merchandise was not mined, produced, or manufactured wholly or in part by forced labor." UFLPA, §3(b)(2). This demonstrates Congress' intent to increase the standard of proof throughout the UFLPA process once evidence is available and submitted by an entity. Additionally, if a listed entity is able to show by such a high bar multiple times that its goods are not made with forced labor and within the scope of the UFLPA, as Plaintiff and its affiliates have in other cases,[6] then why would it not follow that the entity meets the standard to be removed permanently? This "statutory asymmetry" within the UFLPA itself, whereby it requires importers to prove to CBP by "clear and convincing evidence" to overcome the rebuttable presumption but is silent as to the standard of proof for removal, has led to confusion amongst importers seeking any relief from application of the UFLPA, let alone delisting. Requiring the FLETF to find by a "preponderance of the evidence" at the delisting stage that a listed entity has engaged and continues to engage in actions prohibited under UFLPA §2(b) to deny removal and sustain a listing would reduce such asymmetry.

Lastly, the Government contends that the lower standard should apply because, "[i]f all a listed entity had to do to increase the burden on the United States was to seek a delisting, that would be equally as incongruous with respect to the purpose of the statute." Gov. Resp., at 44. But this ignores why the burden should increase. The reason the Government is provided a lower standard to add an entity to the UFLPA List is to not overly burden the Government due to the lack of evidence. *See Ninestar Corp.,* 687 F.Supp. 3d at 1333-1334. However, once an entity is

---

[6] *See* AR000155-AR000156; AR000157-AR000160; AR001005-AR001006; and AR002934. *See also Camel Energy, Inc. v. United States, et. al.*, Case No. 25-230 (CIT) and *Camel Energy, Inc. v. United States, et. al.*, Case No. 25-420 (CIT), where CBP and the Government found that Camel Energy's entries were not subject to the UFLPA and had no link to forced labor in its supply chain. *See, e.g., Camel Energy, Inc. v. United States, et. al.*, Case No. 25-230 (CIT) ECF 37 and 38.

**PUBLIC VERSION**

listed, the entity then has the burden to submit arguments and evidence to the FLETF to show that "it does not or no longer meets" the criteria under the UFLPA. *See* 8/2 Fed. Reg. At this point, the Government's concern regarding the availability of evidence is substantially reduced, if not eliminated. *See infra.*, Sec. II(D). As such, a "preponderance of evidence" standard applied to UFLPA removal decisions would not be "incongruous" with the purpose of the UFLPA, and the FLETF should be required to find by a "preponderance of the evidence" that a listed entity has engaged and continues to engage in actions prohibited under UFLPA §2(b).

>    D. *The Government's concerns regarding difficulty in obtaining information are misplaced*

The Government believes that a "preponderance of evidence" standard for UFLPA removal decisions would impede the FLETF's ability to obtain evidence. *See* Gov. Resp., at 44-45. The Government cites *Ninestar* on this point, which once again discusses the difficulty for the FLETF to obtain information in the context of the *initial FLETF investigation and listing decision.* Id., at 44; *see Ninestar Corp.*, 687 F.Supp. 3d at 1334-1335 (emphasis added). It makes sense at that very early point in the UFLPA process because the FLETF is still conducting its initial investigation and preparing its initial listing decision. This is similar to the initial investigation and initial WRO issued by CBP to enforce §307. At the time of those decisions, all the agency may have are unverified NGO reports, like the SHU Reports relied on here. Now the Government claims that a "higher burden" would conflict with the goals and purpose of the UFLPA, and that more evidence would not be available because an entity applies for removal. However, this statement conflicts with the reality of the UFLPA rebuttable presumption and delisting process. First, the UFLPA contemplates raising the standard of proof for an importer to overcome a UFLPA rebuttable presumption, as once CBP applies the rebuttable presumption, an importer can submit evidence to show by "clear and convincing evidence" that it is not subject to the UFLPA. *See*

PUBLIC VERSION

UFLPA §3(b).  This UFLPA process is set up to increase the burden on the importer and CBP because more evidence is now available.

Second, in order to apply for removal, an entity must submit a removal petition and evidence demonstrating that they do not or no longer meet the criteria under the UFLPA.  *See* 8/2 Fed. Reg.  The mere act of submitting a removal petition means the FLETF will have more evidence available to it directly from the entity.  Further, once an entity has entered into the removal process the FLETF is able to issue questions to the entity that seeks responses and further evidence.  Id.  Arguably, the FLETF has unlimited opportunities to ask questions and request and obtain more information until it is satisfied that all of its questions have been addressed, as the language of the Federal Register does not restrict this deliberative process.  The FLETF has another opportunity to obtain information during a hearing. The FLETF can even issue more questions after the hearing until it is fully satisfied with the evidence.

In Camel Group's case, Camel Group provided hundreds of pages of evidence to the FLETF in its Removal Petition and Camel's Responses. Despite Plaintiff's full cooperation during the administrative process, the FLETF refused to identify what information it relied on in making its decision and even refused to share the reasons why Camel Group was listed outside of vague statements about "publicly available information."  This one-way sharing exercise made it extremely difficult for Camel Group to address any of the reasons that the FLETF may have relied on. Camel Group was placed in the impossible situation of responding to a verdict without knowing the basis for the charges. Moreover, the FLETF only issued one round of questions to Camel Group and neglected its opportunity to ask any questions during the one hearing that was held. This lack of meaningful engagement by the FLETF is especially troubling since the AR demonstrates that some of the Public Articles relied on by FLETF in its final decision were obtained after the hearing, not used in the initial Listing Decision, and Camel Group was never

**PUBLIC VERSION**

given the opportunity to respond to them. It begs the question, why have the FLETF and entity go through all of this if the standard of proof does not change?

The Government also cites to *Ninestar* for the proposition that a preponderance standard would require the FLETF to "rule out" a listed entity's "explanation for suspicious facts" or make it easier to enforce §307 and WROs compared to the UFLPA. Gov. Resp. at 44. However, this is misleading. The FLETF is still able to enforce the UFLPA by listing entities based on a "reasonable cause" standard, which would not require them to "rule out a listed entity's explanation for suspicious facts" at that stage. However, once an entity has submitted a petition and evidence, and the FLETF has had an opportunity to obtain and examine the entity on its evidence, then the FLETF should be held to a higher standard to sustain a listing decision at the removal stage. As such, requiring a "preponderance" standard for UFLPA removal decisions would not impact the FLETF's ability to enforce the UFLPA.

Lastly, the Government concedes that the default standard of proof for administrative procedures is a "preponderance of evidence," but wrongly claims an exception applies to UFLPA removal decisions because of concerns on availability of evidence. Gov. Resp., at 43. Once again, the Government cites *Ninestar* to support its claim but fails to mention that the exception in *Ninestar* only concerns UFLPA listing decisions. UFLPA removal decisions would not warrant the same exception for the reasons above.

> E.  *UFLPA removal decisions are a formal administrative procedure subject to the safeguards of due process*

The Government's position that a UFLPA removal process is an "informal" process and not subject to the safeguards of due process is plainly wrong. *See* Gov. Resp., at 40-42. In support of this contention, the Government claims that many of the traits of "formal adjudication" are not present. Id., at 42. The Government's supposition on this point is incorrect. Like a formal

**PUBLIC VERSION**

proceeding, an entity in the removal process must submit a brief (removal petition) with proposed findings and conclusions that the FLETF considers, and the FLETF presides over the taking of evidence, and is entitled to cross-examine it through questions. *See* APA §§ 556(b)(1) and 557(c) *and compare* 8/2, 2023 Fed. Reg.  The FLETF also performs many functions of the fact-finder by presiding over the process and hearings as well as weighing and ruling on evidence in its decision. *See* APA §556(c).   A hearing may be requested and held, as was true in this case.  *See* 8/2 Fed. Reg.; AR001638. A decision is also final and non-appealable.  AR002979.  FLETF cannot simply point to language that suggests its compliance may be voluntary and that it will not create records of hearings as a way to permit it to operate in violation of the APA and without due process.  The parallels to a formal APA process are clear and the Government's assertion that a UFLPA removal process is an "informal" administrative process is without merit.

**III.    The Public Articles Cannot be Considered "Substantial Evidence" to Support the FLETF's Conclusion that Camel Group's Participation in [[⬛⬛⬛⬛]] is Connected to Forced Labor or that Camel Group's Participation is Ongoing**

The Public Articles relied on by the FLETF are not "substantial evidence" of the presence of forced labor or that Camel Group's participation in any alleged "labor transfer" is ongoing. First, with respect to Attachment 13 [[⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛]] (October 23, 2017) (AR002935-AR002941), the Government's attempts to assert that the mere label of [[⬛⬛⬛⬛⬛⬛]] is tantamount to forced labor.  Gov. Resp., at 14.  However, that label on its own cannot be considered "substantial evidence" sufficient to deny relief to Plaintiff without any other connection to forced labor.  This means that the FLETF has irresponsibly painted all such programs in XUAR as indicative of forced labor, showing that the FLETF is relying on its own "assumptions," "unsupported assertions," and "mistaken notions" about [[⬛⬛⬛⬛⬛]] programs in China.  *See In re Google*, 56 F.4th 1363, 1369 (Fed. Cir. 2023); *U.S. Steel Corp. v. United States*,

**PUBLIC VERSION**

35 C.I.T. 651, 656 (Ct. Int'l Trade 2011); *Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1112-13 (D.C. Cir. 2002). Moreover, as the Government concedes, FLETF cannot rely on UFLPA pre-enactment conduct without evidence of post-enactment conduct. Gov. Resp., at 25-26*; see Ninestar Corp.*, 687 F.Supp. 3d at 1336. Attachment 13 is dated October 2017, well before the enactment of the UFLPA. As such, Attachment 13 does not prove any UFLPA post-enactment conduct.

Second, the Government once again relies on its own "assumptions" and "mistaken notions" with respect to Attachment 14 [[



]] (March 4, 2023) (AR002942-AR002949) and Attachment 16, [[

]] (June 9, 2024) (AR002952-AR002967) to argue that Camel Group engaged in UFLPA post-enactment misconduct. Evidence of UFLPA post-enactment conduct is required to sustain a UFLPA sanction and to permit the FLETF to rely on pre-enactment conduct as it has done here. *See Ninestar Corp.,* 687 F.Supp. 3d at 1336. But Attachment 14 and Attachment 16 do not evidence such misconduct by Camel Group. The Government's only response here is that because the event described in Attachment 14 took place in Toksun County and Attachment 16 [[

]], this is somehow evidence of forced labor activities. Gov. Resp., at 26-27. However, this is unsubstantiated speculation at best and again showing the FLETF's reliance on its own "mistaken notion[s]," "assumptions," and "unsupported assertions" to deny Camel Group's Removal Petition. *See In re Google*, 56 F.4th 1363, 1369; *U.S. Steel Corp.*, 35 C.I.T. 651, 656; *Sasol N. Am. Inc.*, 275 F.3d 1106, 1112-13.

With respect to Attachment 14, the location of the [[ ]] is not itself "substantial evidence" of forced labor. Even when placed in the broader context of all the evidence, the

**PUBLIC VERSION**

location of a program even within XUAR does not itself confirm the presence of forced labor. Then, when Plaintiff pointed out that Attachment 14 identifies the actual program it is affiliated with in its text and it is not related to forced labor (ECF 47/48, at 27), the Government's only response is to ask the Court to simply ignore it.  *See* Gov. Resp., at 26-27.  But Attachment 14 and its content identifying the specific labor program *are part of the AR* (*see* AR002942-AR002949) and should be considered by the Court.  The article itself clearly indicates that [[█████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████ ]].  *See* AR002942; AR002946; ECF 47/48, at 42.  The Court should consider that context when evaluating the FLETF's reliance on Attachment 14. Moreover, Attachment 16 is [[█████████████████████████████████████████ ████████████████████████████ ]].  It does not reference Camel Group, the specific Labor Transfer Program, or make any factual connection or mention to forced labor and Plaintiff. This cannot be considered "substantial evidence" of anything related to Camel Group.

FLETF's reliance on the Public Articles violates due process because they were not found until after the hearing. The Government argues that "[w]hen these documents were discovered…does not in any way factor into their validity or whether they are properly part of the record."  Gov. Resp., at 24.  But this ignores the real issue: Camel Group was denied due process when the FLETF did not allow Camel Group to address the articles. The FLETF was only in possession of these documents after Camel Group submitted its Removal Petition and the FLETF never inquired about these documents and never gave Camel Group an opportunity to react to them.  In fact, Attachment 16, which the Government relies on as "evidence" of Plaintiff's UFLPA post-enactment misconduct, was not even published until June 9, 2024, *more than two months after the hearing on Camel Group's Removal Petition*.  ECF 19 at 10.  These actions imply that the FLETF intended to hide its evidence from Camel Group, ensuring that Plaintiff would not have

**PUBLIC VERSION**

a fair removal process and would always be operating at a disadvantage.  The Government cannot simply hide the evidence then rely on it to sanction an entity without giving that entity any real opportunity to respond.  This goes against the very foundation of American due process and rule of law. Because Camel Group was denied any opportunity to respond to the allegations contained in the Public Articles during the removal process, any reliance is in violation of Plaintiff's due process rights.  Thus, the Public Articles cannot be considered "substantial evidence."

IV.     **FLETF Did Not Consider the AR as a Whole and Therefore Did Not Provide a "Reasoned Explanation" of its Removal Decision in Violation of the APA**

The Government claims that Plaintiff attempts to "view each piece of evidence in isolation" but that is the opposite of the truth.  Camel Group simply asserts that the FLETF failed to consider the record as a whole, and instead dismissed and discounted Camel Group's submitted evidence without any "reasoned explanation."

Camel Group went to extraordinary lengths to obtain credible evidence to support its position that it did not participate in the Labor Transfer Program.  It was even one of the rare Chinese entities that took the risk to request not only a formal letter from Toksun County attesting to Camel Group's innocence, but also to go through a rigorous legal process in China to provide it to foreign government authorities.  *See* AR001200-AR0012909; *see also* PRC Data Security Law, Art. 36.  The Government brushes this aside as if it is something commonly done in China; it is not and demonstrates the Government's limited understanding of Chinese law despite their attempt to use it to support their position.  *See* Gov. Resp., at 29.  The Government then questions the letter's credibility and dismisses it as "self-serving" because it was obtained after Camel Group was listed and there were no contemporaneous records.  AR000012-AR000013; Gov. Resp., at 30.  This once again demonstrates the FLETF making conclusions based on "assumptions" and "mistaken notions" regarding the letter and how it was obtained.  *See In re Google*, 56 F.4th at

**PUBLIC VERSION**

1369; *U.S. Steel Corp.*, 35 C.I.T. at 656; *Sasol N. Am. Inc.*, 275 F.3d at 1112–13. Just because contemporaneous records do not exist or that a letter was requested at a time when Camel Group needed it takes nothing away from the validity of the letter or the accompanying employee declarations, sworn under oath, that corroborate these facts. *See, e.g.,* AR001180-AR001188; AR001200-AR001209.

Next, the Government attempts to discount the Sina Article because it is not labeled as a "correction" or retraction. AR000012; Gov. Resp., at 30. Once again, the Government is making "assumptions" and "mistaken notions" as to the distribution of articles from national Chinese State-run news syndicates like Sina. The FLETF "assumes" that a corrected article in China would certainly bear the words "correction," when there is no basis in the record, law, fact or reality to support that assumption. As such, FLETF is relying on its own stereotypes and "assumptions" to dismiss Plaintiff's evidence out of hand without giving it due consideration. This cannot be considered a "reasoned explanation" and is in violation of the APA.

## V.    The Government's Interpretation of the UFLPA Regarding "Out of [XUAR]" and Labor Programs is Incorrect and Would Lead to Absurd Results

The Government puts forth several interpretations of the UFLPA that are not supported by the law or facts. First, the Government suggests that the language in UFLPA §2(d)(2)(B)(ii) that plainly reads, "out of XUAR" means "from the XUAR." Gov. Resp., at 33. In support of that assertion, the FLETF only (and, in the words of the FLETF, "self-servingly") cites to a footnote in its UFLPA Entity Package 23-004 where the FLETF fabricates, without explanation, the interpretation of "from XUAR" into being. *See*, <u>Id</u>.; AR1646 at fn. 3. Changing the words "out of" to "from" are dramatically different propositions. When the word "from" is used, it describes a starting point or place of origins, but the words "out of" clearly refer to movement or emergence from one place to another, as in "transferred out of XUAR." The Government's interpretation is

16

**PUBLIC VERSION**

not rooted in any statute, regulation, case law, or legislative history, and goes against the very plain and clear language of the statute.

"It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.,* 540 U.S. 526, 534 (2004) (internal quotations and citations omitted). Here, UFLPA §2(d)(2)(B)(ii) clearly, plainly, and unambiguously states that entities must have i) worked with part of the XUAR government; ii) to recruit, transport, transfer, harbor, or receive forced labor, Uyghurs or other persecuted groups; iii) *out of XUAR. See* UFLPA §2(d)(2)(B)(ii) (emphasis added). There are no other notes or other interpretations that individuals transferred within XUAR are subject to this section of the statute. Moreover, if the Court adopts the Government's suggestion that the statute encompasses anyone "from XUAR," then that would lead to an absurd result. Namely, it would effectively prohibit any recruitment of any minority for any reason (even if forced labor is not present) by any company in the region for fear of being sanctioned by the FLETF for legitimately recruiting an ethnic minority from XUAR. At worst, this could result in companies adopting discriminatory practices to avoid hiring Uyghurs, ethnic minorities, or anyone in XUAR, regardless of whether they will be working in XUAR or at a location outside of XUAR. It cannot be the intent and purpose of the UFLPA to fight forced labor by prohibiting all labor recruitment in XUAR. The Court should reject the Government's interpretation of the UFLPA in favor of the plain, clear and unambiguous meaning of the statute.

Second, the Government contends that UFLPA §2(d)(2)(B)(ii) encompasses whether an entity was working with the XUAR government to "recruit, transport, transfer, harbor or receive" Uyghurs or other persecuted groups regardless of whether it refers to participation in a specific labor program. *See* Gov. Resp., at 23. Further, the Government states that simply working with the XUAR government is enough to imply forced labor without any direct link. Id., at 33. Lastly,

**PUBLIC VERSION**

the Government claims that it "need not find or explain that a single transfer program has continued, just that there is evidence of conduct after the passage of the UFLPA." Id., at 39. This is equally illogical and results in the FLETF targeting entities who are recruiting for legitimate purposes in XUAR. More importantly, it allows the FLETF to sanction entities regardless of whether there is any evidence of or link to forced labor, which will have the effect of discouraging entities from any presence in the region. Moreover, the UFLPA requires that conduct be "ongoing" to sustain a listing,[7] so evidence of past misconduct alone cannot be enough to satisfy the statute. The purpose of the UFLPA is to combat forced labor, not suppress legitimate employment and economic opportunities for minorities in XUAR.

Finally, the Government contends that even if the Court finds that the proper interpretation of UFLPA §2(d)(2)(B)(ii) is the plain meaning of "out of [XUAR]," Plaintiff is "headquartered in Xiangyang, Hubei" which is enough to meet the "out of [XUAR]" requirement. *See* Gov. Resp., at 33. It is conclusory and a dangerous overreach by the FLETF to claim that an entity having a presence outside of XUAR is alone enough to satisfy criteria that an entity has transferred or received forced labor there. To do so, without citing any case law, facts or evidence, is particularly unconvincing. Additionally, the facts disproving the Government's assertion are already available to the Government in the AR. Camel Group provided the FLETF its employee list for its Xiangyang, Hubei entity, showing that it only employs two individuals from XUAR, [[████████ ████████]] *both of whom are Han ethnicity and are not Uyghur or another persecuted minority from XUAR*. AR001229, AR001238. The Government's interpretation of the UFLPA is incorrect based on the facts in the AR and plain language of the statute, and is not founded in law.

---

[7] *See* 8/2 Fed. Reg. (saying that an entity may obtain removal if it shows that it does not or no longer meets the criteria in the UFLPA).

PUBLIC VERSION

## VI.    **The Government Does Not Address the Conflict of Interest with Dr. Laura Murphy**

The Government claims that the DOL verified the SHU Reports as well as the credibility level of Dr. Murphy.  Gov. Resp., at 51.  Regardless of DOL's verification of the reports and credibility of Dr. Murphy, that has no bearing on whether Dr. Murphy inappropriately participated or advised on Camel Group's Removal Decision, particularly if she opined on the credibility of her own evidence that the Government concedes was the basis for its decision. *See, e.g.,* AR000010; AR000016; AR001646-AR001649.  Even the appearance of impropriety taints due process, which is why judges are required to recuse themselves in such situations.  *See* 28 U.S.C. §455.  If the FLETF wishes to be the factfinder for UFLPA removal decisions, then it should also dispel any appearance of impropriety, which the FLETF has refused to do.  Also, contrary to the Government's claim that there is "no indication of 'manufactured evidence,'" Gov. Resp., at 51, the FLETF even admitted that the SHU Reports made up the captions of the photos it claimed depicted actual Camel Group representatives at the Handover Ceremony.  AR000012.  Further, the SHU Reports rely only on the WeChat Article and completely omit the Sina Article. AR001740.  It is even more troubling that the FLETF still relied on this document despite the significant doubt cast on its allegations since [[███████████████████████████████ ███████████████████████████████]].

The Government's assertion that the AR does not "insinuate" a potential conflict of interest is wrong.  Gov. Resp., at 51.  The FLETF relied on Dr. Murphy's work for the Listing Decision. AR000010; AR001646-49.  Shortly after Dr. Murphy joined DHS, Plaintiff asked FLETF directly whether she would be involved, and FLETF failed to respond, simply repeating her title with DHS, which fueled speculation on whether she would participate in Plaintiff's Removal Decision. AR001292.  Now, in addition to relying on her research for the Listing Decision, Dr. Murphy appears to have prepared a special document during the eleventh-hour regarding naming

**PUBLIC VERSION**

conventions that the FLETF relied on to deny Camel Group's Removal Petition. AR000015-16. Camel Group's record is rife with evidence developed by Dr. Murphy. Yet, the FLETF refuses to explain whether Dr. Murphy participated in or had any influence on the Removal Decision. Its failure to do so has tainted the FLETF's decision and violated Plaintiff's due process rights.

<u>**CONCLUSION**</u>

For the reasons described herein, Plaintiff respectfully requests this Court grant Plaintiff's Rule 56.1 Motion, declare that Defendants acted in violation of the APA and its Removal Decision is unlawful, declare that the appropriate standard of proof to be applied to UFLPA removal decisions is a "preponderance of evidence" standard, declare that Plaintiff has met the criteria to be removed from the UFLPA List, order that FLETF's Removal Decision be vacated and remanded to FLETF to re-consider Camel's Removal Petition in light of this Court's opinion, and immediately remove Camel Group from the UFLPA Entity List.

Respectfully submitted,

*/s/ Mark V. Heusel*
Mark V. Heusel
Jacob L. Clark
DICKINSON WRIGHT PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 623-1908
*Attorneys for Plaintiff*

**DATE:** February 26, 2026

20

**PUBLIC VERSION**

<u>**CERTIFICATION OF COMPLIANCE**</u>

I, Mark V. Heusel, a member at the law firm Dickinson Wright PLLC, who is the lead counsel and counsel of record on behalf of Plaintiff Camel Group Co. Ltd and is responsible for Plaintiff's Reply to Defendants' Response to Plaintiff's Brief in Support of Rule 56.1 Motion for Judgment on the Agency Record, dated February 26, 2026, relying upon the word count feature of the word processing program used to prepare the brief, certify that this document complies with the word count limitation contained in Standard Chambers Procedures 2(B)(1), and contains 6,992 words including footnotes, headings, and quotations, and excluding those parts exempted by Standard Chambers Procedure 2(B)(1)(c).

*/s/ Mark V. Heusel*
Mark V. Heusel
Jacob L. Clark
DICKINSON WRIGHT PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 623-1908
*Attorneys for Plaintiff*

**DATE:** February 26, 2026

PUBLIC VERSION

### CERTIFICATE OF SERVICE FOR PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1 MOTION AND BRIEF IN SUPPORT OF <u>RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to the United States Court of International Trade Administrative Order 25-01, I hereby certify that on February 26, 2026, a true copy of Plaintiff Camel Group Co.'s Plaintiff's Reply to Defendants' Response to Plaintiff's Brief in Support of Rule 56.1 Motion for Judgment on the Agency Record in Case No. 25-00022, *Camel Group Co., Ltd. v. United States, et al.,* was served via CM/ECF and by email on the attorneys of record to the below emails:

Monica Triana:  monica.p.triana@usdoj.gov

Mathias Rabinovitch:  mathias.rabinovitch@usdoj.gov

Respectfully submitted,

<u>/s/ Mark V. Heusel</u>
Mark V. Heusel
Jacob L. Clark
DICKINSON WRIGHT PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 623-1908
*Attorneys for Plaintiff*

**DATE:**  February 26, 2026